**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRE-TRIAL MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

In accordance with the Court's July 6, 2006 order and pursuant to Appendix A, paragraphs 14 through 16 of the Rules of the United States Court of Federal Claims, the United States respectfully submits its memorandum of contentions of fact and law for the trial on accord and satisfaction.

**INTRODUCTION**

The Court has held that the United States will bear the burden of establishing that the affirmative defense of accord and satisfaction at trial. The evidence will demonstrate that the Puget Sound Naval Shipyard and the Bremerton Metal Trades Counsel ("BMTC" or the "union") settled the plaintiffs' high pay grievance, and that the plaintiffs' claim is thereby barred by the doctrine of accord and satisfaction.

**CONCISE STATEMENT OF FACTS**

The plaintiffs are employees of the Puget Sound Naval Shipyard ("the shipyard") located in Bremerton, Washington. The plaintiffs allege that they are classified or have worked as "shipwrights" in the shipyard's Shop 64. The underlying controversy involves a principal shipwright job task, erecting and dismantling staging, commonly known as scaffolding, in and

around Naval ships assigned to the shipyard for overhaul, repair or decommissioning. Staging is erected by connecting specially made staging pipe to form a rigid platform.

The plaintiffs, and all shipwrights, are represented by BMTC, a union that is comprised of affiliated local unions. One of the affiliated unions is the United Brotherhood of Carpenters and Joiners, local 2317. Pursuant to the collective bargaining agreement between the shipyard and BMTC, BMTC, with a few exceptions not applicable to this matter, is recognized as the exclusive representative for plaintiffs and all non-supervisory shipwrights.

Pursuant to the collective bargaining agreement and the Civil Service Reform Act ("CSRA"), the union is authorized to negotiate upon behalf of its members, to represent them in grievances, and, along with management, to request arbitration upon behalf of its member(s) if a grievance is not resolved to the satisfaction of the union or the member. The union is required to fairly represent all of its members, even those who are not dues paying members. The collective bargaining agreement took effect in 1987. A new agreement was negotiated and took effect in 2003. Pursuant to this agreement, the parties negotiated the right of employees to receive environmental differential pay, including high pay.

Article 10, section 1002 of the collective bargaining agreement states the general conditions under which environmental differential will be paid. In part, "Pay for environmental differential is authorized: (1) for exposure to an unusually severe hazard which could result in significant injury, illness, or death, such as on a high structure when the hazard is not adequately alleviated by mechanical equipment or protective devices being used or on an open structure when adverse conditions such as darkness, lightning, steady rain, snow, sleet, ice or high wind velocity exist . . . ." Section 1003 provides that "Employees will be paid environmental

differentials, when warranted, in accordance with FPM Supplement 532-1 and Appendix J attached thereto." Pursuant to Appendix J of the Federal Personnel Manual Supplement ("FPM") (contained in Appendix II of the CBA), high work is defined as "working on any structure at least 100 feet above the ground, deck, floor or roof or from the bottom of a tank or pit." It also includes "working at a lesser height if the footing is unsure or the structure is unstable . . . ." The CBA provides that "immediate supervisors will notify employees promptly when environmental pay is authorized . . ." and mandates that "[i]f at any time during a job assignment an employee believes that additional pay is warranted, the employee will call the matter to the attention of the immediate supervisor who will advise the employee if additional pay may be allowed."

On April 13, 1999, 99 shipwrights filed a grievance in which they demanded high pay for all of the years that each shipwright had worked in Shop 64. The grievants also stated that they wanted to be represented by the union. Messrs. Joe Hamel and Joe Aiken were named as the union representatives. The grievance number assigned was 05153-K. Ms. Mary Jane Tallman was the Superintendent for several trade shops, to include Shop 64, and she was the management official responsible for resolving the grievances. Ms. Tallman created a management team to investigate the grievance. Included on this team were Mr. Mark Winkler and Ms. Lynnette Niemi. Prior to settling the grievance, Ms. Tallman also consulted with Mr. Rodney Witcher.

In investigating the grievance, the management team examined how environmental differentials had been handled elsewhere at the shipyard, and other shipyards. The team also wanted to work with the union to amicably resolve the matter if possible. The management team met with the union and eventually an agreement was reached to settle the grievance. The

agreement provided that high pay would be provided prospectively to shipwrights who build or dismantle staging beginning from the first level above the ground or deck unless flooring and safety rails are installed or fall protection devices can be properly used. High pay would also be paid prospectively to shipwrights who build or dismantle hanging staging under similarly unguarded situations when fall protection devices cannot properly be used. The agreement also provided that shipwrights who had performed such high work would receive high pay from 15 days prior to the filing of the grievance, to the date of resolution on January 18, 2000.

In deciding the amount of back pay, management, and in particular Mr. Winkler, worked very closely with the union to arrive at final figures. Mr. Winkler initially met with Mr. Aiken and identified those employees who performed high pay. They then assigned a numerical assessment in hours for the amount of high work that each employee would have worked. After making this assessment, Mr. Winkler met with his foremen and went over the list, name by name, to verify the numerical assessment. Many changes were made and these changes were presented to the union. The union reviewed the assessments and either concurred or disagreed. For those shipwrights who the union felt deserved a higher assessment, the parties negotiated further. Finally, they arrived at a numerical assessment for each shipwright. There was a wide range of hours, from zero to 1,264 hours paid.

Prior to signing the agreement, Mr. Aiken met with Ms. Tallman to discuss the agreement. After discussing the agreement with Ms. Tallman, Mr. Aiken left to discuss the agreement with Mr. Hamel and the grievants. After such consultation, on January 18, 2000, Mr. Aiken returned and signed the agreement. Although the agreement was termed a "decision," it was fully negotiated and mutually agreed to by both parties. Mr. Aiken's signature on the

"decision" constituted the union's agreement that the grievance was resolved and the union would not proceed to arbitration. The union did not seek arbitration.

The agreement called for the payment of interest upon the back pay. Payment was to be made by the Defense Finance and Accounting Service ("DFAS") which processes all civilian pay for Navy civilians. As of August 2000, the interest payments had not been made. Consequently, on August 30, 2000, the union filed an unfair labor charge against the shipyard. In this charge, the union alleged that the shipyard commander had violated the terms of grievance 05153-K by not paying the agreed upon interest without giving the union notice or the opportunity to bargain further. It also charged that DFAS had refused "to comply with [the] negotiated settlement agreement, Grievance #05153-K, sub paragraph IV (2) by refusing to pay the appropriate interest for the back pay . . . ."

On November 8, 2001, Mark Mascioli filed an employee grievance, alleging that he should have received high pay under the terms of grievance 05153-K. Mr. Mascioli was represented by the union. On July 9, 2002, the shipyard and the union signed a settlement agreement which provided that Mr. Mascioli would receive back pay. The agreement further stated that the union "agrees to make no additional claims for back pay in connection with the high pay grievance settlement of 18 January 2000, Council Control #05153-K." Thus, in both an unfair labor charge and grievance, the union characterized the resolution of the high pay grievance as a negotiated settlement agreement.

The result of the settlement agreement was a change in pay practices that favored all the shipwrights, and the payment of back pay, with interest, in an amount of $374,407.06.

## STATEMENT OF THE ISSUES

### Plaintiffs' Claim Is Barred By The Doctrine Of Accord And Satisfaction

On July 6, 2006, the Court ordered a trial on the affirmative defense of accord and satisfaction. Accordingly, accord and satisfaction is to be the sole issue at this trial. The Government will prove at trial that the Puget Sound Naval Shipyard and the Bremerton Metal Trades Counsel settled the plaintiffs' high pay grievance, and that the plaintiffs' claim is thereby barred by the doctrine of accord and satisfaction.

### I. Contentions Of Law Regarding Accord and Satisfaction

In its order and opinion on the parties' cross-motions for summary judgment, the Court held that a "settlement agreement between a union and an agency, pertaining to employment grievances of federal workers, can operate as a valid accord and satisfaction of the employees' claims, thereby barring further litigation of those claims." Jaynes v. United States, 68 Fed. Cl. 747, 757 (2005) (citing O'Connor v. United States, 308 F.3d 1233, 1244 (Fed. Cir. 2002)). The Court did not rule on the issue of accord and satisfaction, because it determined that issues of material fact remained with regard to whether or not there was a meeting of the minds and consideration. Id.

Accord and satisfaction has occurred when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." O'Connor, 308 F.3d at 1233, (quoting Case, Inc. v. United States, 88 F.3d 1004, 1011 n.7 (Fed. Cir. 1996)). "In its most common form, an accord and satisfaction exists as 'a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide

dispute.'" O'Connor, 308 F.3d at 1240 (quoting Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73, 76 (10th Cir. 1949)). Stated another way, "an accord and satisfaction occurs when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" O'Connor v. United States, 50 Fed. Cl. 285, 293-94 (2001), rev. in part and aff'd in part, 308 F.3d 1233 (Fed. Cir. 2002), (quoting Case, Inc., 88 F.3d at 1011 n.7). A valid accord and satisfaction requires four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. O'Connor, 308 F.3d at 1240; see also Ahrens v. United States, 62 Fed. Cl. 664, 668 (2004).

Because all of the elements have been met, there was an accord and satisfaction with all of the grievants.

**A. Contentions Of Law Regarding Proper Subject Matter**

For there to be proper subject matter under the accord and satisfaction doctrine, the subject matter of the dispute before the Court must be the same as the subject matter of the purported accord and satisfaction. See King Fisher Marine Serv., Inc. v. United States, 16 Cl. Ct. 231, 237 (1989). Because the subject matter of the complaint is the same subject matter as the grievance settlement, there is proper subject matter.

**B. Contentions Of Law Regarding Competent Parties**

A "competent party" is one who has the authority to bind a party to the accord portion of an accord and satisfaction. See Thomas Creek Lumber & Log Co. v. United States, 36 Fed. Cl. 220, 242 (1996).

The CSRA authorizes the Federal Government and its employees to engage in collective bargaining and for a properly elected labor organization to be the exclusive representative of employees within its unit. Such labor organizations are authorized to negotiate collective bargaining agreements covering all employees in the unit. See 5 U.S.C. §7114(a)(1). The CSRA also authorizes collective bargaining agreements to provide procedures for the settlement of grievances. Id. §7121. As noted in O'Connor, the CRSA authorizes a union to act upon behalf of all of its members, to serve as their exclusive representative, and to bind its members by resolving grievances. 308 F.3d at 1241. Accordingly, because the federal government and the union were competent to enter into a settlement agreement, there were competent parties.

**C. Contentions Of Law Regarding Meeting of the Minds**

As noted by the Court in its order and opinion on the parties' cross-motions for summary judgment, "[m]eeting of the minds 'is a question of law, and a court's finding should be primarily based on the intent of the parties.'" Jaynes, 68 Fed. Cl. at 758 (quoting Ahrens v. United States, 62 Fed. Cl. at 671 (citations omitted)). "Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the circumstances." Texas Instruments Inc., v. United States, 922 F.2d 810, 815 (Fed. Cir. 1990). As the Government will demonstrate at trial, the totality of the circumstances demonstrate that both the Government and the union clearly intended to settle the entire grievance, and thus there was a meeting of the minds regarding the settlement of the grievance.

**D. Contentions Of Law Regarding Consideration**

"Consideration is present if there is a 'detriment incurred by the promissee, or a benefit received by the promissor at the request of the promissor.'" Ahrens, 62 Fed. Cl. at 671 (quoting Estate of Bogley v. United States, 514 F.2d 1027, 1033, 206 Ct. Cl. 695 (1975)). Because the Government and the union both received a benefit in settling the grievance, there was adequate consideration for settlement.

**II. Contentions Of Fact Regarding Accord and Satisfaction**

The Government will prove at trial that the parties settled the high pay grievance, and that the plaintiffs' claims are therefore barred by the doctrine of accord and satisfaction.

**A. Contentions Of Fact Regarding Proper Subject Matter**

Plaintiffs did not contest proper subject matter on the parties' cross motions for summary judgment. The evidence at trial will demonstrate that proper subject matter exists. The collective bargaining agreement between the parties allows for grievances concerning high pay. A grievance over high pay was actually filed and settled. The present action seeks the same recovery that was sought in the grievance. Therefore, the subject matter of both the grievance and this lawsuit are the same.

Specifically, the evidence at trial will demonstrate that there is a collective bargaining agreement between the parties. The applicable agreement was entered into between the parties on October 1, 1987 and continued until June 13, 2003, when the parties entered into a new agreement. Article 10 of both agreements provides that the employer will provide environmental differential pay when the exposure to the hazard is unusually severe and the employer cannot correct for that hazard. Further in the agreement, it states that payment of environmental

differential pay, when warranted, will be in accordance with Appendix J of Federal Personnel Manual Supplement 532-1. Article 30 of the agreement provides that grievances may be filed, in effect, by the employer, the union, or an employee concerning, among other things, a claim that the collective bargaining agreement has been breached. The collective bargaining agreement also excludes certain matters from its coverage. However, pay issues regarding environmental differential pay are not excluded.

The evidence at trial will demonstrate that on April 13, 1999, the 99 employees, being represented by the union, filed employee grievances requesting that the employer pay them environmental differential pay for high work, as outlined in the collective bargaining agreement. The grievance language, prepared by the union, sought back pay for all the years each grievant had worked in Shop 64. The grievance number assigned was 05153-K. One hundred and thirty-four employees eventually signed the grievance. Eventually, after approximately nine months of review and negotiations, the parties settled the grievance.

In their amended complaint, plaintiffs asserted that "this is an action to recover money damages ... for fail[ure] to pay, in part or in whole, Environmental Differential Pay for 'high work' as mandated by Article 10 and Appendix II of the Bremerton Metal Trades Council ("BMTC") Agreement ...." Plaintiffs specifically cited to the grievance that the union filed upon behalf of 99 members of the bargaining unit, and stated that they "seek to recover back pay retroactive to six years prior to the date of the grievance, less the 15 days of back pay awarded by management."

Accordingly, the evidence at trial will demonstrate that proper subject matter exists

**B. Contentions Of Fact Regarding Competent Parties**

Plaintiffs did not contest that the parties were competent to enter into a settlement agreement on the parties' cross motions for summary judgment. The evidence at trial will demonstrate that the parties were competent to enter into a settlement agreement.

Specifically, the evidence at trial will demonstrate that Mary Jane Tallman was authorized to settle the plaintiffs' grievance on behalf of the shipyard. The evidence will further demonstrate that Article One provides that the BMTC is recognized as the exclusive representative of all employees in the unit. The plaintiffs are covered in the unit. Indeed, the evidence will show that the grievants gave their permission to be represented by the union by checking Box 11 of the "Employee Grievance Form" which requests whether they request union representation.

The Civil Service Reform Act authorizes union representation. BMTC is the recognized bargaining unit. And, the union acted upon behalf of the plaintiffs in settling the high pay grievance. Accordingly, the evidence at trial will demonstrate that the parties were competent to enter into a settlement of the high pay grievance.

**C. Contentions of Fact Regarding Meeting of the Minds**

There is no dispute that the union represented, as the exclusive representative, the employees who submitted the high pay grievance. The Government will prove at trial that the grievance sought back environmental pay for all high work performed since their employment in Shop 64, interest on that back pay, and proper payment of high pay in the future. Thereafter, the parties then began a series of back and forth negotiations to resolve the grievance.

Ms. Tallman created a management team to investigate the grievance. Included on this team were Mr. Mark Winkler and Ms. Lynnette Niemi. Prior to settling the grievance, Ms. Tallman also consulted with Mr. Rodney Witcher.

In investigating the grievance, the management team examined how environmental differentials had been handled elsewhere at the shipyard, and other shipyards. The team also wanted to work with the union to amicably resolve the matter if possible. The management team met with the union and eventually an agreement was reached to settle the grievance. The agreement provided that high pay would be provided prospectively to shipwrights who build or dismantle staging beginning from the first level above the ground or deck unless flooring and safety rails are installed or fall protection devices can be properly used. High pay would also be paid prospectively to shipwrights who build or dismantle hanging staging under similarly unguarded situations when fall protection devices cannot properly be used. The agreement also provided that shipwrights who had performed such high work would receive high pay from 15 days prior to the filing of the grievance to the date of resolution on January 18, 2000, a period of more than nine months.

In deciding the amount of back pay, management, and in particular Mr. Winkler, worked very closely with the union to arrive at final figures. Mr. Winkler initially met with Mr. Aiken and identified those employees who performed high pay. They then assigned a numerical assessment in hours for the amount of high work that each employee would have worked. After making this assessment, Mr. Winkler met with his foremen and went over the list, name by name, to verify the numerical assessment. Many changes were made and these changes were presented to the union. The union reviewed the assessments and either concurred or disagreed.

For those shipwrights who the union felt deserved a higher assessment, the parties negotiated further. Finally, they arrived at a numerical assessment for each shipwright. There was a wide range of hours, from zero to 1,264 hours paid.

Prior to signing the agreement, Mr. Aiken met with Ms. Tallman to discuss the agreement. After discussing the agreement with Ms. Tallman, Mr. Aiken left to discuss the agreement with Mr. Hamel and the grievants. After such consultation, on January 18, 2000, Mr. Aiken returned and signed the agreement.

Although this document is titled a "decision," it is disingenuous to say that it was not a negotiated settlement agreement. The evidence will show that the union clearly agreed to this method of resolution, and actively participated in formulating the final number of hours of high work that each employee would receive.

Further evidence that this was a negotiated settlement agreement is found in a letter sent on July 7, 2000 to Congressman Norman D. Dicks from Joseph Hamel, Chief Stewart of union, complaining about the timeliness of payment from the shipyard. This letter describes the high pay issue as one that was "resolved with an agreement reached on 1/18/00." Further evidence is also found in the Unfair Labor Practice Charge filed by the union with the Federal Labor Relations Authority on August 30, 2000. In this charge, the union charged that management committed an unfair labor practice "by interfering with [the union's] bargaining relationship with P.S.N.S. by refusing to comply with a negotiated grievance settlement, Grievance #05153K, sub paragraph IV(2) by refusing to pay the appropriate interest for the back pay. . . ."

Finally, additional evidence that this was a negotiated agreement is found in the resolution of a grievance that was filed in 2002. That grievance was filed upon behalf of Mark

Mascioli and sought high pay for the period of March 23, 1999, through June 6, 1999. In July 2002, the union and the shipyard resolved the grievance; management agreed to pay the high pay, and the union agreed that the "settlement" constituted full and final resolution of the grievance. In paragraph 3 of this settlement, the Union agreed to the following language: "The Union agrees to make no additional claims for back pay in connection with the high pay grievance settlement of 18 January 2000, Council Control #05153-K." (emphasis added).

It is clear that the parties sought to amicably resolve this matter, and that indeed the union did negotiate a settlement agreement. The parties mutually agreed to a formula for the future payment of high pay, a method for calculating back pay during the time that the matter was being resolved, and an agreement to limit back pay in return for a more generous monetary settlement. The fact that several months later the union itself also claimed that this was a negotiated settlement makes all the more undisputable that a meeting of the minds occurred to resolve the grievance. Indeed, even two years after the agreement had been entered into, and after the lawsuit had been filed, the union still referred to the 2000 agreement as a "settlement." Thus, with respect to the two parties involved, the resolution of the high pay grievance was made via a negotiated settlement agreement. There was a meeting of the minds when it came to settling this claim.

**D. <u>Contentions Of Fact Regarding Consideration</u>**

The Government will demonstrate at trial that there was consideration for this agreement. The Navy as promissor agreed to a generous formulation of future high pay and agreed to a generously formulated 15 day back payment calculation. The union, in return, waived its rights

for back pay from the time that the member started to work at the shipyard. Indeed, the plaintiffs received sizable monetary compensation as part of the settlement agreement.

The Government will demonstrate at trial that it agreed to a new, generous formula for the payment of future high pay. The Government also agreed to pay back pay, in varying degrees, to all of the grievants, plus an additional 35 union members. In return for a generous assignment of hours, the union agreed that back pay would only go back to 15 days prior to the filing of the grievance. The total amount of back pay paid was $374,407.06.

At trial, Mr. Winkler will testify that the Government was generous when it determined high pay in order to expedite the settlement process. For instance, when Navy officials were working with the union to determine the number of hours to pay an employee, they did not cross check to see if the employee may have been in training, on travel, or other limiting reasons for periods of time when they may have worked high pay. For the union's part, Mr. Aiken will testify that the union was giving up its claim to back pay for employees from when they started to work at the shipyard.

## CONCLUSION

For all of the above reasons, the Government respectfully requests that the Court find at trial that plaintiffs' claim is barred by the doctrine of accord and satisfaction and dismiss plaintiffs' complaint.

As required by RCFC App. A, 15 & 16, the Government is filing contemporaneously herewith its: (1) list of exhibits to be offered at trial for case-in chief or rebuttal purposes, and (2) list of witnesses to be presented at trial.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tele: (202) 616-2377
Steven.Mager@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

JOHN D. NOEL
Senior Trial Attorney
Department of the Navy
720 Kennon Street, S.E., Room 233
Washington, D.C. 20374-5013

STEVEN L. SEATON
Puget Sound Naval Shipyard
1400 Farragut Avenue
Bremerton, Washington 98314-5001

August 21, 2006

CERTIFICATE OF FILING

I hereby certify that on this 21st day of August, 2006, a copy of the foregoing "DEFENDANT'S PRE-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice