**APPENDIX A TO MOTION TO FILE 30(b)(6) DEPOSITION TESTIMONY**

**PLAINTIFFS' 30(b)(6) TRIAL DESIGNATIONS**

# I. Niemi, Lynnette 03/09/05 testimony:

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 16:11 - 17:1

Q How long have you been employed with the Puget Sound Naval Shipyard?
A Since 1978.
Q And what departments are you currently working with?
A I work for the production resources department.
Q What's your title?
A Administrative officer.
Q And before that, what were you? What was your job?
A My job previous to that was human resources specialist with Navy Region Northwest.
Q Okay. And how long have you been the production resources department administrative officer?
A Since November of 2000.
Q All right. And how long were you a human resources specialist with Navy Region Northwest?
00017
A For about three and a half years prior to that.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 20:7-15

Q Who is responsible for entering the time charge records for a given employee?
A The supervisor.
Q And that is the first line supervisor?
A Correct.
Q And when is the supervisor supposed to enter this information?
A The same day is when they're supposed to do that, sometime during the day.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 21:10 - 22:6

Q You started going into this and I wanted to finish up or clarify, what is the information that the supervisor enters on a daily basis?
A The job order that depicts the work being done, the numbers of hours because they may do more than one type of job. If there's any additional pay, there's pay codes for that. If the employee is on leave, there's leave codes for that. If there's overtime, there's charging for that. You know, it all goes onto this charge sheet.
Q So they'll enter the job number. You mentioned something about they may do more than one type of job?
A Correct.
Q And I lost you on that. Do you mean working on more than one job number?
A Yes.
Q In a given day?
00022

A Exactly.
Q In which case they'll record time under each specific job number at the end of the day?
A Exactly.
Q So then they'll enter the base time and hours?
A Yes.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 34:14-21
Q Does the shipyard currently keep any records of how much time the shipwrights spend on the leading edge of staging work?
A No.
Q Does the shipyard currently maintain any records of how much a shipwright spends passing materials up and down the staging while that shipwright is actually on it?
A No.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 35:18-22
Q Okay. Let me ask you just one more specific one. Does the shipyard currently keep any records of dates and times and when shipwrights are doing staging work during steady rain?
A No, not that I know of.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 35:23 - 36:8
Q How would you go about determining for sure whether the shipyard maintains those records?
A Ask the shipwrights. I mean, if they keep some records
00036
I'm unaware of, I don't know about. The records I'm aware of, the official records, no, they do not address that.
Q So apart from the possibility that an individual shipwright might somehow report time he's spending on staging in steady rain, there are no other records of that activity that the shipyard keeps?
A That would be correct.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 39:25 - 41:16
Q Let's start a different way. If the Court ultimately
00040
rules that the shipwrights are entitled to additional high pay for work that is not being compensated under the current system, what records will the shipyard have to document the amount of work that has been performed?
MR. FATOUROS: Objection; calls for speculation.
THE WITNESS: I really -- I don't know. I don't think there is anything there that would tell when they performed the high work.
Q Given that the shipwrights are claiming that they're entitled to high pay -- let me start over.
Given that the shipwrights are claiming or certain of the shipwrights are claiming that they perform high

work that is not currently receiving environmental differential, why isn't the shipyard trying to maintain records of that activity the shipwrights claim is high work?
A I don't know. And I don't know about the claim that we're currently not paying high work that should be paid.
Q I understand. You don't have to agree with me that the shipwrights perform high work that doesn't receive an environmental differential. My question is simply: Given that there is a claim that they are doing high work and that they're not receiving high pay for, why isn't the shipyard trying to document the amount of time that
00041
is being spent on this alleged additional high work?
MR. FATOUROS: Objection; calls for legal conclusion. Are you asking her to interpret your complaint to then understand why we're not documenting what you've alleged in your complaint we should be paying the people for?
MR. SCARAMASTRA: We have -- that's worthy of a little discussion. Our complaint alleges that certain activities of the shipwrights, basically any activity on staging, is high work. And so my question is, given that the shipyard is well aware of those allegations, why are they making no efforts to record the amount of work that's being spent on staging? That's the question.
MR. FATOUROS: Objection; calls for legal conclusion. She can answer to the best of her ability.
THE WITNESS: I don't know.

## II. Niemi, Lynette 03/10/05 testimony:

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 21:16-24

down right out of the git-go if you need to. I gather that there have been two different policies, which I'm going to call the old policy and the new policy, and that the old policy was one that was in effect basically until the grievance decision, and that there is now a different policy, which I'll call the new policy, with respect to how high pay is paid and high work is treated. Is that assumption a fair one?
A Yes.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 26:4-6

Q Did anyone actually obtain any sort of legal advice as part of the process of formulating the old policy?
A I don't know.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 31:5 - 32:8

Q All right. Exhibit 11 has a number of references. It mentions the grievance meeting of May 20th. And I think yesterday we reviewed some notes by Mary Walls of that meeting, right?
A Correct.

Q Then it mentions a discussion with management SME. I'm sorry; what does SME stand for?
A Subject matter expert.
Q And that is Mr. Winkler?
A That's correct.
Q Was he your principle point of contact during the resolution of the shipwright grievance?
A He was.
Q And then there's a tour of the staging that you mention. Do you recall who attended that tour?
A Mr. Winkler; Mr. Aiken, the union representative; and, I believe, Joe Hamel, the other union rep involved.
Q About how long did that tour take?
A Couple hours maybe or so.
Q I don't want to get into all of the details of it today, but just generally did it consist of going out to the
00032
yard and observing the construction of or dismantling of staging?
A Yes, in various location and with various types of features.
Q And did you actually go up on any of this staging?
A Only the stuff that was fit for -- other than shipwrights -- to be on. Only shipwrights can be on incomplete staging.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 33:5-7
Q And since the planks are being moved, are they fastened in any way prior to moving to the working level?
A No. They were just laid on the staging.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 36:1-13
Q Once you prepared Exhibit 11, did you have any follow-up discussions with anyone in management or at the union about the grievance and how it should be resolved?
A It's hard to remember the timing. I would have met and spoke with Ms. Tallman and Mark Winkler either in conjunction with it or shortly thereafter.
Q Okay. And the one thing, I guess I can infer is given than you're referring to the tour of staging on November 10, 1999, and given that the grievance decision was dated, I believe, January 18, 2000, is it fair to say that you prepared Exhibit 11 sometime after November 10th but before January 18th?
A Yes.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 37:2-9
Q Does reference H, in Exhibit 11, refer to what I've just handed you that's been marked as Exhibits 13 and 14?
A It does.
Q Do you have any general familiarity with the OPM Operating Manual as part of your role as an -- either your previous job in human resources or your current job in the production resources department?

A Yes.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 41:20-25
Q No? Okay. With respect to the old policy, I had asked you whether the shipyard had developed it with input from legal counsel, and you didn't know. I have the same question now with respect to the new policy. Was that policy implemented with input from legal counsel?
A No.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 42:1-6
Q Was there a reason why nobody went to counsel for help in understanding either the operating manual or the regulations or the terms of the collective bargaining agreement?
A I don't know there was a particular reason. We just worked it out in the HR office.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 48:6-10
I gather under the old policy there might have been some high pay for work in the rain, but you don't know whether any such high pay was ever paid. Is that a fair summary of the truth?
A I don't know for a fact what was paid for that rain.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 52:1-10
Q I recognize somebody else is going to talk to us about fall protection, so I don't need you to go into all of the details, but do you have an understanding of, generally speaking, what are the circumstances when fall protection devices are deemed to be capable of being properly used?
A In a general way? I mean, primarily, the anchor point has to be accessible and above you. And in the case of the shipwrights that are erecting scaffolding, that's rarely able to happen.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 52:11-14
Q Okay. All right. Even as of today's date, shipwrights, as I understand it, are rarely able to hook into a proper anchor point for fall protection?
A Correct, that's my understanding.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 54:10-17
Has the shipyard provided any guidelines or instruction to management or to its employees regarding what constitutes steady rain for purposes of receiving high pay?
A Not that I know of.
Q How is the determination made that the rain is such that high pay is called for?
A I don't know.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 56:7-25.

Q If you turn to Exhibit 13 -- you can keep 14 in front of you. I have 13 here. This is excerpts from the OPM manual, right?
A It is.
Q And if you turn to page 2, and that's Section S8-7(c); you with me so far?
A I am.
Q This part of Section S8-7 is one you are pretty familiar with?
A It is.
Q If you look five lines down, there is a sentence and it reads: "Exposure to a hazard, physical hardship, or working condition of an unusually severe nature listed in appendix J is not taken into consideration in the job-grading process, and additional pay for exposure to these conditions is provided only through the environmental differentials authorized by this section." Did I read that right?
A You did.
00057

Niemi, Lynnette 30(b)(6) v.2 03/10/05 – 57:18-59:19.
Q All right. And did you, in fact, read the provision I just read from?
A Yes.
Q Exhibit 13? Okay. Did that play a role in the recommendations that you made in Exhibit 11?
A It did.
Q Did you have any discussions with anybody else in management about the provision in Exhibit 13 we just
00058
read?
A I talked about the case in general, and my conclusions with my supervisor in the human resources office.
Q Who was that?
A Her name was Joene Lott.
Q How do you spell Ms. Lott's name?
A J-o-e-n-e, L-o-t-t. And then, also, with Ms. Tallman and Mr. Winkler.
Q Okay. And can you describe what you recall of your conversation with Ms. Lott about Exhibit 13's provisions that we just quoted?
A With regard to that particular point?
Q Yes.
A That -- you know, that I hadn't found anything, and this wasn't the only thing I looked at to support a conclusion that we could blanketly say shipwrights aren't entitled to high pay because they're shipwrights.
Q You mentioned not finding anything that supported that. Did you find other sources of information that tended to agree with what we just read in Exhibit 13?
A I did.
Q What else did you find?
A Well, I did some case law research, and, you know, some

grievance decisions, arbitrations, FLRA and comp general,
just to get a feel for what was going on out there in
00059
this kind of a case. So I relied on that too. I
couldn't tell you what the cases were or anything.
Q I was going to ask you, did you document what you found
in the cases in any way?
A I may have at the time, but I don't -- those records were
left behind in HRO and have since, as far as I've been
told, been cleaned up. I don't know if they exist.
Q When you say "cleaned up," meaning?
A Periodically purge their files after two to three years.
Q Okay. Would it have been your practice to have printed
copies of the comptroller or arbitration or other
decisions, court decisions that you had found and thought
were relevant?
A Some of them. My practice would be to look at a lot, and
print one or two that were on the most point.
Q And how did you find those decisions? Did you use a
legal research computer database or something else.
A Yeah, I used a computer database cyberFEDS, I believe,
was what we had at the time.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 63:11-16
Q Can you think of circumstances where there aren't those
differences, where members of other shops receive high
pay for work on staging or incomplete staging where
shipwrights in Shop 64 do not?
A No. In fact, I believe other workers cannot be on
incomplete staging.

## III. Winkler, Mark 03/10/05 testimony:

Winkler, Mark 30(b)(6) 03/10/05 - Page 12:5 - 13:9
What is your current job position?
A I'm a superintendent overseeing the blasters and painters
in Shop 71 in Puget Sound Naval Shipyard.
Q How long have you been doing that?
A About a year and a month in that capacity.
Q What were you doing before that?
A Numerous positions. If you want to go through the
history, I started in the shipyard in 1980, came in as a
work study. Went in the shipwright apprenticeship,
started in 1981. 1985, I made shipwright mechanic. From
1985 to 1990, I think I was the shipwright foreman on the
waterfront. I was a foreman till, I think it was 1996,
when I became shipwright general foreman overseeing all
shipwrights for Shop 64. 1999, I think I became senior
process manager over Shops 57, 64 and 71. It was
numerous trades. I don't know if you want to hear all
the various trades. And subsequently, after that, I
became painter superintendent in Shop 71 a year ago.
Q Is the move to this current position a promotion?
A Yes.

Q So I don't want to go through all of those positions. I
00013
want to just capture the ones really from right before the grievance was filed during the period for which we're seeking high pay, forward. So it sounds like your job changed in 1996 from a foreman--
A I think --
Q --to the general foreman?
A Yes.
Q Supervising the other foremen?
A Absolutely.

Winkler, Mark 30(b)(6) 03/10/05 - Page 13:10 – 14-6
Q Can you tell me what that general foreman position entailed? And then we'll work forward to the present.
A I was responsible for all processes, all costs and schedules, all hiring, firing, removing. I basically was the person directly in charge of roughly a hundred plus people, i.e., the people that, one, held the shipwright trade designator or were loaned in to help or assist the shipwrights during that time period.
Q So did you oversee all of the first level foreman and supervisors in Shop 64?
A Just shipwrights.
Q Just the shipwright foreman?
A Yes.
Q Okay. Gotcha. And then that changes?
A About 1999, I think, is when I oversaw all general foremen and all foremen throughout all three of the
00014
shops.
Q Okay. That was 71, 64 and--
A And 57.
Q --57. All right. And you were in that position until about a year and a half ago?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 14:16-15:5
Q Who do you currently report to?
A Captain Mazzone.
Q Okay. And in your prior position before that, who did you report to?
A Mary Jane Tallman.
Q So that's from '99 till about a year and a half ago?
A Yes.
Q Okay. And from '96 to '99, who did you report to?
A Mary Jane Tallman.
Q Okay. Did they add a level?
00015
A Yes.
Q A layer in '99?
A Yes.
Q I see. And promoted you into that?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 27:2 - 31:2
Q Let's walk through Exhibit 17, then we'll come back to the process a little more.
A Okay.
Q I asked Ms. Niemi about paragraph 2, which indicates that, "shop 64 pays shipwrights environmental high pay for operating or working from the basket of a JLG or manlift." Do you see that?
A Yes.
Q I understand that that is the result of an arbitration decision; is that correct?
A I don't know.
Q You don't know? Okay. It indicates that it's been in effect since 1985. What happened in 1985 to bring this into effect?
A I remember that, I don't know why, but roughly around that particular time, some employees -- one received some back pay for operation of JLGs and then, at that particular stage of the junction, anybody that was, one, operating or, one, in the basket got high pay anytime they were working out of the JLGs.
Q Let's go to paragraph 4. It says, "When erecting staging inside a slope tank for the first ring of the staging or until level footing is established." Do you see that?
A Mm-hm (answers affirmatively).
00028
Q It says that's been in effect for about two years. Do you see that?
A Yes.
Q What brought about that change?
A I'm sure it had to do with a lot of work at that particular stage of the junction and clarification of the union agreement. As we went through processes in here, we continually were asked by the employees on the definitions of what was in the union contract. And this went on for years on trying to get some clarifications on what the intent of those particular paragraphs in the union contract were. So I would imagine that came out of the agreement; that we felt that that was another justification for the unsure footing situation that it talks about in the union contract. Speculation, but that's what I would say.
Q Okay. Paragraph 5 says that Shop 64 pays shipwrights environmental high pay when working on staging in extreme weather conditions at the supervisor's discretion. Did I read that correctly?
A Yes, sir.
Q Is that statement true?
A Yes, sir.
Q And what's meant by, "extreme weather conditions"?
A That was, like it says before, the supervisor's
00029
discretion on what we felt primarily that had to do with

wind, rain -- excessive rain and wind. Of course, in this area, sometimes you get rain all the time, so more had to do with the combination of rain and wind. And then possibly, if there was any snow on those particular situations. So those were kind of some examples that we went through at that particular stage.
Q Who went through at that particular stage?
A Like I stated before, the clarification of which was actually identified in the union contract. When I took over as shipwright general foreman, there was questions about the intent of or some of examples of when high pay would have been paid.
Q That's back in 1996?
A I think that's when I made general foreman.
Q Did you make or anyone else under your command or that you were reporting to document these decisions that were being made about where high pay should be paid and where not?
A Not that I'm aware of. This appears to be an example of trying to put some of that stuff together so that we could get some additional clarification for the supervisors out there on the waterfront.
Q You sort of gave me a description of what you thought extreme weather conditions would mean.

00030

A Mm-hm (answers affirmatively).
Q I gather that by the end it was possibly a combination of wind and rain?
A Mm-hm (answers affirmatively).
Q Right?
A Yes.
Q Rain alone without more would not qualify as an extreme weather condition?
A Depend on how much rain.
Q And that's what I was getting at. So just the fact that it's raining isn't enough to warrant high pay under this policy, right?
A No.
Q It had to be some amount of rain. Did you come up with some objective measurement of how much rain would qualify as an extreme weather condition?
A No.
Q How did you expect supervisors to know how much was enough?
A Get with the employee, come to a mutual agreement on what they felt was excessive. I didn't appear to get to the -- if it's raining three inches an hour is a time period where we felt we wanted to go. I didn't want to get to that level of detail. It was more of a, Hey, let's sit down. If we need some additional

00031

clarification, then you get myself involved to come out and take a look at the situation.

Winkler, Mark 30(b)(6) 03/10/05 - Page 33:15 - 34:3
Q How would you go about determining if the wind was severe enough that you had to go shut down?
A Just by going out and looking at the specific job and where they were working.
Q What were you looking for?
A Looking to see the effect on the wind, as far as, was it pushing me around; kind of where it was coming from; how high the people were off the ground. A lot of different factors that I would take a look at; visibility. That was probably a lot of the issues that I dealt with is because when the wind and rain combined, it really
00034
affected the visibility of the employees as far as -- of course, hand-eye coordination is crucial to that particular thing.

Winkler, Mark 30(b)(6) 03/10/05 - Page 37:22 - 38:16
Q Is it true that each level of staging is planked and that the planks are fastened to the frame with wire before proceeding to the next level?
A Not a hundred percent.
00038
Q Okay. About what percentage of the time do shipwrights actually create a stable floor by wiring planks to a level of incomplete staging before going to the next level?
A Depending on the staging, if you're looking for an overall average, it would be small. Most of the time they move the planks as they go up. But if the staging to be built requires a planking and lifeline of that particular level as they go up, they might lifeline wire that level as they go up. It really depends on the staging and the use of that particular staging.
So I would say if you're asking a percentage of how many times that's happens, it's probably less than ten percent on a high staging. But there is multiple different types of staging that are built throughout the ship.

Winkler, Mark 30(b)(6) 03/10/05 - Page 40:20 - 42:5
Q For the planks that are being used by the shipwrights for temporary platforms, what's the width of the planks that are typically used for that purpose?
A One foot wide.
Q And how many are typically used side-by-side to establish a temporary work surface?
00041
A Two.
Q So you've got a 24-foot wide surface?
A Yes.
Q Are those two planks fastened together in any way, as a general rule?
A Required, yes. Are they, no.

Q Does the shipyard take any action to discipline employees
who don't fasten them together?
A Not that I'm aware of.
Q And then my understanding is that when a level is
complete, those planks are moved up to the next level to
continue construction more often than not. Is my
understanding correct?
A I'd say half and half. Sometimes additional planks are
brought up from below or those are moved up because
people subsequently either stand on those particular
areas to pass material up. Or if you're in this
particular situation as you've identified here that the
JLGs use, then those planks would be moved up because the
means of getting the material up is mechanical.
Q These planks, are they metal planks or wooden or some
other substance?
A Could be wood, could be metal -- steel or aluminum.
Q And what are the lengths that are typically used? We
talked width. What's the length?
00042
A In our aluminum plankings, we've got anywhere up, I think
to 16 feet is kind of the general, usually 8s, 12s, 16s.
In our -- we've got eight-footers primarily with our
system staging, and wood planking could be at any level,
or, excuse me, any length.

Winkler, Mark 30(b)(6) 03/10/05 - Page 53:3-20
general understanding of this. Okay? But at the time
you were involved in the grievance, were the shipwrights
typically tied into the structure of the staging?
A No.
Q Is that something that's the case now?
A No.
Q Typically, shipwrights still don't tie into the framing
of the staging?
A No.
Q How about other anchorage points?
A Yes.
Q And were they tying into anchorage points, typically,
back then, aside from the staging itself?
A We had started experimenting with it. It was a process
that we were trying to evaluate when I first took over.
And we were trying to see in how many areas we could.
We're making an asserted effort to try to reduce the
hazard to employees.

Winkler, Mark 30(b)(6) 03/10/05 - Page 59:1-5
Q Okay. Did you play any role in the actual investigation
of the grievance? You've talked about negotiations, but
did you play any role in investigating the facts of the
grievance?
A No, I don't think so.

Winkler, Mark 30(b)(6) 03/10/05 - Page 60:11-13

Q Did you and Ms. Niemi meet together with Mr. Aiken at any point during the course of the grievance?
A I don't remember meeting with the two of them.

Winkler, Mark 30(b)(6) 03/10/05 - Page 76:4-23

reached in just a minute. But first, how did you come up with these numerical ratings or assessments initially?
A Took the cover page of the grievance. I think I sat down with the union, went through everybody on that list, started putting a numerical assessment based on who we felt were the people that were doing the leading edge work -- that we felt were doing the leading edge work more than the other ones. So if --
Q Okay. Before we go further, why don't I show you what we'll have marked as the next exhibit.
(Exhibit Number 22 marked for identification.)
Q This will be Exhibit 22. Is Exhibit 22 what you were referring to just a minute ago? The pages you pulled from the grievance?
A Yes.
Q Are these then the numbers or initial numerical assessments that appear there next to the names?
A Yes.
Q Okay.
A That was the first crack.

Winkler, Mark 30(b)(6) 03/10/05 - Page 76:24 - 77:16

Q First crack at it? You can tell from this? Okay. Now, before we go too far, let's take the first name up here,
00077
David J. Hurn.
A Yes.
Q There are actually three different numbers. There's a "1" in a circle, then there is a "2" in a circle, and then there's a "4" without a circle. Can you tell me what each of those figures represent?
A Okay. The first one was two different opinions on Mr. Hurn and what we felt his rating as far as being in a high pay situation.
Q So one person opined that he should get a one and another person opined he should get a two?
A Yes.
Q Who were the people who provided these opinions regarding the various shipwrights?
A I'm thinking this was between Mr. Aiken and myself. It was the first initial crack.

Winkler, Mark 30(b)(6) 03/10/05 - Page 78:7 - 81:1

Q Okay. Which of these two figures represents your number? The one or the two?
A I don't -- I don't know.
Q And whose handwriting appears here? Whose handwriting is the one with the circle around it next to Mr. Hurn's name?

A I think it's mine.
Q Okay. And same with the two with the circle around it?
A Yes.
Q How about the four that's not circled?
A I think that's mine, also.
Q Did you make all of these three numbers at about the same time?
A No.
Q Tell me when you made the first two sets of numbers. I assume those two were made about the same time?
A Yes.
Q The one and the two?
A Yes.

00079

Q About when did you make those?
A It would be one of the very first get-togethers we had once we came to the idea of the concept of the formula. As far as the actual date, I couldn't provide that.
Q Okay. And then how much later in time did you write down the four that appears next to Mr. Hurn's name?
A I think that was significantly later, because the first initial thing didn't quite work the way we were anticipating, so we regrouped.
Q Tell me what the four represents.
A The four represents, in an eight-hour period, how many hours that we felt that Mr. Hurn would have been in a high pay situation.
Q And so do the one and two also represent estimates of the number of hours in an eight hour day that were spent in high work?
A No. Our first initial thing was we were trying to rate them. One being a person that's spent a lot of time -- we kind of went in reverse. We were trying to say, okay, a number one is a person that probably does a lot of high work. A two is almost a lot, three...
So we tried that first. Figured that wasn't going to be the way we needed to do this. We needed to regroup. So that's when we regrouped and came up with this other one.

00080

Q I see.
A You understand?
Q So a one would have been the highest level of high work under this initial system?
A Yes.
Q What was the lowest rate?
A Zero, I think -- or five. Excuse me.
Q One to five?
A Yeah.
Q Would five basically represent little to no high work?
A Yes.
Q Under the new ranking system, what did the rankings run from? I assume from zero, for zero hours per day, theoretically?

A Yes.
Q Did you actually rate anyone at zero?
A Yes.
Q What was the highest ranking you gave anyone. I'll tell you the highest I've seen is a five. Does that correspond to your recollection?
A Yes, it corresponds to my recollection.
Q So the most hours that you credited a shipwright with doing was five hours of high pay per day?
A In a--
Q Per eight-hour day?
00081
A In a high pay situation, yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 81:2 - 82:11
Q When you came up with this initial assessment, how did you go about doing that?
A Like I said, we met with the union first, then we meant with every one of the supervisors that worked for me at that particular time to go over name-by-name, to -- I guess what I consider, help validate the information that would -- we had had.
Q When you went into that initial meeting, though, had you received any input from your foreman as to what each individual's ratings ought to be?
A I don't think so.
Q Okay. How did you come up with the numbers to give? And there were quite a number of people, right?
A Yes.
Q I think there were. I think, 99 signatories that you concluded, right?
A Yes.
Q And then you went through and found everyone else in Shop 64 as well, correct?
A And other shops.
Q Okay. So well over a hundred people?
A Mm-hm (answers affirmatively).
Q How is it that you, on your own, came up with ratings for each one of these over 100 people?
00082
A I didn't. Myself and Mr. Aiken did.
Q And presumably you went into that meeting with Mr. Aiken with some notion of where people ought to fall in the--
A Oh, yeah.
Q --one to five on either way?
A Absolutely.
Q Okay. What inputs of data did you have to come up with those initial ratings that you had in mind?
A Personal observation.
Q Just personal observation? Okay.
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 86:20-24
Q After you met with Mr. Aiken and came up with Exhibit 22,

did you present this to anyone in shipyard management
before going further down the road towards coming up with
a high pay calculation?
A Probably not this exhibit, no.

Winkler, Mark 30(b)(6) 03/10/05 - Page 89:20 - 90:7
I had a little surprise. At some point I gather somebody
did a calculation to figure out the number of workdays
for which each shipwright was going to receive high pay.
A Yes.
Q Wasn't the starting point of that to come up with the
total number of working days in the claim period itself?
00090
A Yes. Whenever we -- I would imagine, we would have had
to know when the signing was going to be and how far we
were going to go back on it.
Q Right. Did you, at some point, calculate the number of
workdays between the date 15 days prior to the grievance
and the January 18, 2000, grievance decision?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 94:12 - 96:17
Q Okay. Now you can put Mr. Whitcher's declaration aside.
And I want to go back to yours. In fact, I'll take it.
Let's go to paragraph 8. I think that's where we were.
The last sentence begins, on page number 62, goes to
next page, says: "After the union and I completed this,"
this referring to initial numerical assessment, "I met
with my foremen and went over the list, name by name, to
verify our numerical assessment." Do you see that?
A Mm-hm (answers affirmatively).
Q That's a yes?
A Yes, sorry.
Q And I'll try to keep those questions to a minimum.
At this initial meeting to go over the list and
verify the numerical assessment, did you or the other
00095
foremen rely on any documents?
A No.
Q Did you meet with the foremen as a whole in one big group
session, or did you have individual meetings with various
foremen, or did you do it some other way?
A It was a group of the foremen. All of them pretty much
together except for I had to meet independently with the
back shift guy because he wasn't in on that particular
time. But it was day shift supervisors that I was
responsible for.
Q Was there a single meeting to do this or several
meetings?
A I only remember one long meeting.
Q Okay. The record won't reflect this, but you stretched
out the word long quite a bit. How long was this
meeting? And I don't need it down to the minute.
A It took, I'd say, in excess of two hours to go through

name-by-name, and there was quite a dialogue between the supervisors.
Q Would you describe there as being a fair amount of disagreement over the proper assessments for individuals?
A Some individuals. I mean, it wasn't a huge disparity. It was, no, he's a three. No, he's a four. No, she's two. No, she's a three. Conversations like that based on the supervisors' observations.
00096
Q About when did this meeting take place?
A I would say later in '99, I would imagine.
Q Do you remember about when, or where this meeting took place?
A In the Ocun Loft. That's where most of -- I know that.
Q Where all the work gets done?
A It was a place to go where you wouldn't be distracted.
Q Okay. Were there any union personnel or representatives at that meeting?
A I don't honestly remember if Joe was there or not.
Q Was Lynnette Niemi at this meeting?
A No.
Q Was Ms. Tallman at the meeting?
A No.
Q Aside from the foremen and you, were there any other management representatives at the meeting?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 97:4-7
Q The final set of uncircled numbers that appear on Exhibit 22, did you write those numbers down before or after this meeting with your foremen?
A It looks like after.

Winkler, Mark 30(b)(6) 03/10/05 - Page 97:8-13
Q When you went into the meeting with the foremen, were you still going with the initial system of rating, one being the highest--
A No.
Q --amount of high work?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 100:10-23
Q We've handed you Exhibits 27 and 28.
A Okay.
Q Can you tell me what these two exhibits contain?
A Looked like they've got a numerical assessment and I would imagine the number of days in that particular period. I should say for 27 and 28 they look pretty close to the same to me, but I'd have to go validate that. But they're just in different forms based on, it looks like 28 is based upon badge number, so we sorted it by badge number. 27 -- I don't know why it's sorted that particular way, but --
Q That was going to be my next question. So 27 is sorted

by badge number?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 101:7-19
Q Now we have Exhibit 29 in front of you. That appears to be yet another compilation of the data concerning hours of high work, right?
A Yes.
Q Now, a question was asked off the record and might as well get it on the record.
The last question I asked you about the preparation was who prepared or who input them. Now let me ask you, these are records that were manually input by someone, correct?
A Yes.
Q And into a computer?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 102:1-10
Q I gather the document created first was Exhibit 22?
A Yep.
Q Okay. What was the next document to be created?
A I would venture to say 23.
Q And then what was the next document that was created?
A Either one of these two.
Q 27 or 28?
A Yeah.
Q And then what came after 27, slash, 28?
A Looks like 24. And then 29, I would venture to say.

Winkler, Mark 30(b)(6) 03/10/05 - Page 106:6 - 107:13
Let's take Walt Jaynes. He's in each of these.
A Okay. Walt Jaynes, Walk Jaynes --
MR. FATOUROS: Walt Jaynes?
MR. SCARAMASTRA: Yes.
THE WITNESS: Can you find him?
Q On Exhibit 23?
A 22.
Q I'm sorry, yes, I can find him. He's on page 2 about six names down. And he's a four, right?
A Yep.
Q So now we're going to Exhibit 23. And I will tell you there that Mr. Jaynes is on page J2512, almost halfway down.
A Four.
Q He's four, again. Want to take a look at 24?
A Four.
Q Four, again. Exhibit 27.
A I don't have it.
Q Oh, excuse me, sorry. He should be on --
MR. HOLCOMB: Page 1, he's about ten down.
00107
MR. SCARAMASTRA: Yep.
THE WITNESS: Four.

Q He's a four, again. And so let's take 28 and 29, if you would. On 28 Mr. Jaynes is on page 3, 2516, three down from the top.
A Four.
Q Okay. And go ahead and take 29, if you would.
A Four.
Q Four, again. Okay. I'm going to stop this exercise. So far each of these three individuals, their ratings have held constant through the process. Would you agree with me?
A Mm-hm (answers affirmatively).

Winkler, Mark 30(b)(6) 03/10/05 - Page 113:19 - 115:4
If you concluded that someone had spent two hours, out of an eight-hour day, on average, doing high work, you'd rank them a two?
A Yes.
Q Okay. Now, you're going to multiply that two by something else to come up with hours of high pay?
A Yes.
00114
Q I want to talk about that something else. And that's your next sentence. You add up his hours based on workdays--
A Yes.
Q --subtract days of leave, and added his overtime.
A Yes.
Q Is that what you say in paragraph 9?
A Yes.
Q Okay. How did you come up with the hours based on workdays?
A I would imagine we went from the agreed upon date of 14 or 15 days prior to the grievance and to the date it was signed.
Q And this is where we started -- we left off before. You then calculated that -- somewhere, someone must have done a calculation of the number of workdays in the claim period, right?
A Yes.
Q Okay. And then you're going to subtract leave days from that number?
A Yes.
Q Right. And then add overtime hours back in; is that right?
A Yes.
Q Okay. But first, you could convert overtime hours to
00115
days; is that right?
A Yes.
Q And did you convert hours to days by dividing by eight?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 115:16 - 116:3
Q Looks like Exhibit 31 is another one of the charts that

you prepared?
MR. HOLCOMB: Is this 31, now?
MR. SCARAMASTRA: Yes.
THE WITNESS: Yes.
Q That's a yes?
A Yes.
Q Do you want to do the same exercise with these and sort of put them in what you think is roughly chronological order?
00116
A Way out here.
Q Okay. So you've got 31 is the last one.
A Mm-hm (answers affirmatively).

Winkler, Mark 30(b)(6) 03/10/05 - Page 116:25 - 117:2
Q So you have them in order. It's 27, 28, 24, 29, 30, and
00117
31; is that right?
A Yep.

Winkler, Mark 30(b)(6) 03/10/05 - Page 126:16 - 127:12
Q That's the claim period. And Exhibit 40 is collecting the amount of overtime hours and leave hours for a series of employees, right?
A Yes, that appears so.
Q Okay. For Jay Neitzel, it's got 12.7 overtime hours and 222 leave hours. Do you see that?
A Yes.
Q And then there is handwritten, next to it, minus 26. Do you know what that represents?
MR. SCARAMASTRA: You're not writing on it, are
00127
you?
THE WITNESS: Yes.
MR. SCARAMASTRA: Oh, boy. Go ahead and write on it. We'll make another one. You're using a blue pen?
THE WITNESS: Yeah.
MR. SCARAMASTRA: Go ahead and mark in blue.
THE WITNESS: Sorry.
MR. SCARAMASTRA: No, it's okay. We'll know we need a clean exhibit later.
Q Is it a conversion from hours to days, as best as you can tell?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 127:13 - 128:15
Q Okay. Let's turn to Exhibit 38. Whose handwriting is this?
A Speculation?
Q Go ahead?
A Jim Jazuk.
Q And that's the name that appears in the upper right-hand corner?
A I don't know that for sure.

Q Is he one of your foremen?
A Could have been at this time.
Q All right. Now, let's take an example here, Greg Corey, two down.
A Okay.

00128

Q Someone has written 245 combined hours of leave and written next to it 30.6 days. Do you see that?
A Yep.
Q And then it's put 383 hours of overtime and has written 47.8 days.
A Okay.
Q Then appears to have taken 47.8 and subtracted 30.6 to get 17, which is circled and put next to Mr. Corey's name.
A Okay.
Q Would you agree with me that that's what happened?
A Yes.
Q Is this the system that was being used to adjust the work hours for each shipwright?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 129:8 - 132:5

handle on it. I'm going to show you what I'll have marked as Exhibits 41 and 42.
(Exhibit Numbers 41 and 42 marked for identification.)
Q Okay. You have those two exhibits in front of you?
A Yes.
Q Can you tell me what Exhibit 41 is?
A It appears to be a report that was taken out of a program to look at how much leave Mr. Scott used from -- let's say, 2/1/99 to 1/7/2000.
Q Now, looks like someone crossed out the entries for February 1999 down there, right?
A Yeah.
Q Okay. And then there is a number of eights that follow, and one three. And then next to it in handwriting it says "163 leave." Is that the sum total of the number of hours of leave that appears on Exhibit 41?
A Can I take your word for it?

00130

Q I've done the math. I think it is. Would that be consistent with the process you were using?
A Okay. Yes.
Q If you look at Exhibit 42, what does that show you? Let me rephrase it. What does the printed portion of this show?
A Are you talking about this portion?
Q Correct. The left few columns, as opposed to the handwriting.
A It appears to be a job order that the individual was working on specific days.
Q And I'll note that the dates all appear to take place in

that claim period, beginning 15 days before the grievance to the date of the grievance decision. Does that appear to be the case? Actually, with the exception of sometime towards the end?
A Okay. Yes.
Q Now, somebody, looks like, tallied in handwriting his overtime hours, Mr. Scott's overtime hours, and came up with 577.9. Is that what happened?
A Appears that.
Q Then it says, handwriting below, "232 prior OT." What does that refer to?
A I don't know.
Q Somebody subtracted that from 577.9 and got 345. Does

00131

that appear to be what happened?
A Yes.
Q Then there is 163 with the word, "leave" written next to it?
A Mm-hm (answers affirmatively).
Q Do you see that? Is that a yes?
A Yes.
Q And does that come from Exhibit 41?
A Speculation. But yeah, I would imagine.
Q The same figure --
A It's the same number.
Q Okay. And then it looks like somebody subtracted 163 from 345 and got 183. Do you see that?
A Yes.
Q And then somebody divided 183 by eight and got 23 days. Is that right?
A Appears to be -- it's not quite there, but...
Q Just about.
A Okay.
Q Now, back in the series of documents we were looking at before, I'm going to show you Exhibit 33. Would you look at Mr. Scott's name. Can you find it on there?
A Yes, I do.
Q There is a handwritten number next to his name?
A Yes.

00132

Q What is it?
A Plus 23.
Q Plus 23. That's the same number that is calculated on Exhibit 42, correct?
A Okay. Yes, sorry.

Winkler, Mark 30(b)(6) 03/10/05 - Page 137:2-14

Q How did you convert overtime hours into days?
A Divided by eight, I would imagine.
Q Divide by eight, right?
A Yes.
Q In fact, that's exactly what you did or someone did in Exhibit 42, right? They came up with a net hours of 183 for Mr. Scott?

A Which number?
Q Exhibit 42?
A Okay.
Q They divided by eight hours per day and came up with a 23-day adjustment, right?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 140:12-15
Q Okay. So you are not saying that the employment grievance decision that's Exhibit 18 was negotiated with the union?
A I wasn't -- I didn't negotiate it.

Winkler, Mark 30(b)(6) 03/10/05 - Page 141:17-19
Q You didn't participate in the drafting of Exhibit 18, did you?
A I didn't draft it, no.

Winkler, Mark 30(b)(6) 03/10/05 - Page 143:15 - 144:13
Q Okay. Let me show you what I'll have marked as 43.
(Exhibit Number 43 marked for identification.)
Q Have you seen Exhibit 43 before?
A No, but it's what I think it was when I stated earlier, a decision that was agreed upon by -- things for high pay.
Q This is the settlement agreement, is it not?
A That's what it says at the top.
Q And it's signed by a member of the union, correct?
A Yep.
Q And by an A. Burton, for the employees. Do you see that?
A Yep.
00144
Q And it refers to employees who are assigned to work inside main ballast tanks. This is a settlement agreement associated with a 1998 grievance by insulators in Shop 64, right?
A I don't know.
Q Obviously the shipyard knows how to prepare a settlement agreement when it wants because this is one, correct?
A That's what it says at the top.
Q Why didn't the shipyard draft a settlement agreement like Exhibit 43 to resolve the high pay grievance?
A I wasn't the deciding official on this one.
Q You don't know why?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 145:20-25
Q First of all, did you or anyone you know actually consult with legal counsel to find out if high work was required by law or regulation?
A I didn't.
Q Did anybody else alert you that they had done that?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 146:3-12

Q Given that there was, as you described it, uncertainty on your part and on the management's part as to whether law or regulation required the payment of high pay, is there a reason why nobody went to legal counsel to find an answer?
A We don't usually go to law and counsel when answering -- or settling grievances.
Q Even when there is uncertainty as to what the law requires?
A It wasn't mine to go do. I had my own portion.

Winkler, Mark 30(b)(6) 03/10/05 - Page 146:18 - 147:1
Q Does the fact that an employee or union representative signs the resolution of a grievance always indicate to you satisfaction with management's actions?
A No, but he said personally.
Q What's that?
A No. But Mr. Aiken said it personally that he thought it was a good thing for the employees, and subsequently he told me that his union officials, i.e., the president,
00147
thought it was a good decision on the employees' behalf.

Winkler, Mark 30(b)(6) 03/10/05 - Page 152:4-7
Q Did you condition the settlement high pay award on the union giving up any rights on behalf of its members to further high pay?
A I wouldn't know that.

Winkler, Mark 30(b)(6) 03/10/05 - Page 152:20 - 153:3
Q But, in other words, leaving aside the legal stuff--
A Okay.
Q --or how it might have put in legalese, did Ms. Tallman or you or anyone else in your presence tell anybody from the union that a condition of the high pay award was that the union and the Shop 64 employees not pursue additional
00153
high pay?
A No. We were just trying to resolve the issue with what we considered a fair settlement.