# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., | No. 04-856C |
| Plaintiffs, | Judge Miller |
| vs. | |
| THE UNITED STATES, | Electronically Filed on 09/11/06 |
| Defendant. | |

## NOTICE OF FILING

Plaintiffs hereby give notice that pursuant to the Court's Case Management Procedure, and Plaintiffs' Motion to File 30(b)(6) Deposition Testimony, the following excerpts from the 30(b)(6) deposition testimony of the Puget Sound Naval Shipyard are hereby filed with the Court.

DATED this 11th day of September, 2006.

Respectfully Submitted,

s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON HANBERG, et al. )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

LYNNETTE NIEMI

VOLUME I

Wednesday, March 9, 2005

---

past answer, that's the August 15, 2001, memo from the commander of the Puget Sound Naval Shipyard regarding implementation of changes and SUPDESK S-U-P-D-E-S-K for time and attendance?
A Yes.
Q Since we're not making it an exhibit it's a bit of a formality. Let me ask a couple of questions about who you are, what you've been doing. Can you tell me what post-secondary degrees you hold, if any?
A None.
Q How long have you been employed with the Puget Sound Naval Shipyard?
A Since 1978.
Q And what departments are you currently working with?
A I work for the production resources department.
Q What's your title?
A Administrative officer.
Q And before that, what were you? What was your job?
A My job previous to that was human resources specialist with Navy Region Northwest.
Q Okay. And how long have you been the production resources department administrative officer?
A Since November of 2000.
Q All right. And how long were you a human resources specialist with Navy Region Northwest?

Q That was going to be my next question. So is there a paper input? Does someone enter information on paper that's input into SUPDESK?
A No, not that I know of.
Q SUPDESK is sort for supervisor's desk; is that right?
A That's correct.
Q Who is responsible for entering the time charge records for a given employee?
A The supervisor.
Q And that is the first line supervisor?
A Correct.
Q And when is the supervisor supposed to enter this information?
A The same day as when they're supposed to do that, sometime during the day.
Q Is it they're supposed to do that, do they in fact do it?
A Usually there are occasions when they don't.
Q Does the first line supervisor -- is that a desk job?
A No.
Q Okay.
A There's some desk time, but they're expected to be out and about on the waterfront as well.
Q And so there are, I take it, computer terminals available for them somewhere where they can enter this data?
A Yes.

Q How are they supposed to go about collecting this data regarding their employees?
A They have the data because they assign out the jobs to the employees and those job assignments that they make are connected to the job order that they charge.
Q How many employees does a given first line supervisor have responsibility for?
A It varies. It would commonly be between six and 12 to 15 depending on the type of work being done.
Q You started going into this and I wanted to finish up or clarify, what is the information that the supervisor enters on a daily basis?
A The job order that depicts the work being done, the numbers of hours because they may do more than one type of job. If there's any additional pay, there's pay codes for that. If the employee is on leave, there's leave codes for that. If there's overtime, there's charging for that. You know, it all goes onto this charge sheet.
Q So they'll enter the job number. You mentioned something about they may do more than one type of job?
A Correct.
Q And I lost you on that. Do you mean working on more than one job number?
A Yes.
Q In a given day?

Work already paid." Is the shipyard aware of any means to document or approximate which shipwrights did high work before the grievance?
A Not to my knowledge, no.
Q Does the shipyard currently keep any records of how much time each shipwright spends on staging either assemblage or disassemblage?
A No, I don't believe the records would say when they were on the staging.
Q Does the shipyard currently keep any records of -- by the way when I refer to "the shipyard," do you understand I'm referring to the Puget Sound Naval Shipyard?
A Sure.
Q Does the shipyard currently keep any records of how much time the shipwrights spend on the leading edge of staging work?
A No.
Q Does the shipyard currently maintain any records of how much a shipwright spends passing materials up and down the staging while that shipwright is actually on it?
A No.
MR. SEATON: Could I go off the record here a second?
MR. SCARAMASTRA: Yes.
(Discussion held off the record.)

Q We had a discussion to clarify some questions, and do you want to -- based on the discussion off the record -- do you want to clarify or supplement what you just said?

A Well, in addition to your -- or in response to your specific questions, do we know if it's leading edge? Do we know if they were handling materials? What we know is what the timekeeping records show, which is they either did or didn't get high pay. If they got high pay it could have been for differing reasons. So to explain why I say no to those specific questions, is because the records don't show what version of shipwright work they were doing.

Q Okay. So in other words, while the shipyard doesn't keep any of the records I just described in my question, there is a general record of how much high pay was paid to a shipwright on a given date, is that fair?

A Correct.

Q Okay. Let me ask you just one more specific one. Does the shipyard currently keep any records of dates and times and when shipwrights are doing staging work during steady rain?

A No, not that I know of.

Q How would you go about determining for sure whether the shipyard maintains those records?

A Ask the shipwrights. I mean, if they keep some records

I'm unaware of, I don't know about. The records I'm aware of, the official records, no, they do not address that.

Q So apart from the possibility that an individual shipwright might somehow report time he's spending on staging in steady rain, there are no other records of that activity that the shipyard keeps?

A That would be correct.

MR. FATOUROS: Again, for clarification purposes, we talked specifically about steady rain or adverse weather conditions, I believe there is a code for environmental differential pay because of that. I don't know.

THE WITNESS: It's the same code no matter what high work it is. The very same code.

Q And that's EB, is that the code that's entered?

A It could be. I'd have to look.

Q That's okay. We'll probably take a break at some point and we can confirm. But there is a single code and all that code designates is high pay that's been paid by the shipyard, right?

A Exactly.

Q While that high paid should correlate to the high work performed that's really an indirect -- first of all, that's an indirect measurement of high work?

A No.

MR. FATOUROS: Objection; misstates former testimony.

Q How did I go wrong?

A Okay. There is one code for high work.

Q Okay.

A The definition for that code, that high work, is, work above 100 feet, at or above I believe it is, or work at lesser heights if these things exist. That's one definition of high work, 25 percent. There's another high work definition, work at extreme heights which is a separate high work definition which wasn't at play in this grievance.

Q All right. So it's one code or the other depending on whether it falls into?

A The extremeness of the work.

Q Sorry, we were ships passing in the night there. Sorry for the pun.

Does the shipyard understand or believe that it has an obligation to maintain records of all high work shipwrights perform?

A I'm not sure. We have an obligation to maintain the attendance records which includes the high work that's paid.

Q Let's start a different way. If the Court ultimately

rules that the shipwrights are entitled to additional high pay for work that is not being compensated under the current system, what records will the shipyard have to document the amount of work that has been performed?

MR. FATOUROS: Objection; calls for speculation.

THE WITNESS: I really -- I don't know. I don't think there is anything there that would tell when they performed the high work.

Q Given that the shipwrights are claiming that they're entitled to high pay -- let me start over.

Given that the shipwrights are claiming or certain of the shipwrights are claiming that they perform high work that is not currently receiving environmental differential, why isn't the shipyard trying to maintain records of that activity the shipwrights claim is high work?

A I don't know. And I don't know about the claim that we're currently not paying high work that should be paid.

Q I understand. You don't have to agree with me that the shipwrights perform high work that doesn't receive an environmental differential. My question is simply: Given that there is a claim that they are doing high work and that they're not receiving high pay for, why isn't the shipyard trying to document the amount of time that

is being spent on this alleged additional high work?
MR. FATOUROS: Objection; calls for legal conclusion. Are you asking her to interpret your complaint to then understand why we're not documenting what you've alleged in your complaint we should be paying the people for?
MR. SCARAMASTRA: We have -- that's worthy of a little discussion. Our complaint alleges that certain activities of the shipwrights, basically any activity on staging, is high work. And so my question is, given that the shipyard is well aware of those allegations, why are they making no efforts to record the amount of work that's being spent on staging? That's the question.
MR. FATOUROS: Objection; calls for legal conclusion. She can answer to the best of her ability.
THE WITNESS: I don't know.
Q You're familiar with Leave and Earnings statements?
A Yes.
Q What are those?
A Those are the statements we get every two weeks, every pay period that tells us what we've earned and how much leave we've used and how much we have and everything about our pay for that pay period including added-pay overtime.
Q How are those generated?

# Melissa J. Watkins & Associates, Inc.

## Certified Court Reporters

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181


---

June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Lynnette Neimi, Vol I
Date Taken: March 09, 2005

This letter is to advise you of the following:

________ Signature was waived. The original transcript is being served upon you at this time for filing.

__X____ Deponent has completed reading and signing. The original transcript and correction sheet is being served upon you at this time for filing.

__X____ A copy of the deponent's corrections are enclosed for your reference.

________ No corrections were returned by the deponent.

________ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

________ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey

Dawn Lindsey

cc: Mr. Thomas B. Fatouros

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON HANBERG, et al. )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF

LYNNETTE NIEMI

Volume II

Thursday, March 10, 2005

Tallman, and Rodney J. Whitcher, submitted to the Court in the above-captioned action." Do you see that?
A I do.
Q First of all, I think we misspelled your first name. You need a second "N"?
A You did.
Q My apologies there. I understand that you're here today to talk about the shipyard's current and past high pay policies with respect to high work and high pay?
A Yes.
Q But Mr. Winkler will come in to testify regarding the specific issue of how high pay awards were calculated in connection with the resolution of the grievance?
A That's correct.
Q Okay. Here's my working assumption so you can shoot it down right out of the git-go if you need to. I gather that there have been two different policies, which I'm going to call the old policy and the new policy, and that the old policy was one that was in effect basically until the grievance decision, and that there is now a different policy, which I'll call the new policy, with respect to how high pay is paid and high work is treated. Is that assumption a fair one?
A Yes.
ATTY3: Can we go off the record.

A For the old policy?
Q Correct.
A I'm not aware of any other.
Q Did anyone actually obtain any sort of legal advice as part of the process of formulating the old policy?
A I don't know.
Q Is there someone who would know the answer to that question?
A I'm not sure anyone that was around back then is even with us, or maybe even still alive. That policy may have gone back many, many years.
Q Well, that was going to be another question. Do you know when this policy first came to be in the shipyard?
A I don't.
Q Do you know what role, if any, the union representing Shop 64 shipwrights played in the formulation of the old policy?
A I don't.
Q Okay. Well, let's talk about the formulation of the new policy for a couple minutes since I think that probably is a topic a little nearer and dearer to your heart and something you know more about. Can you tell me, in very general terms, how the shipyard developed the new policy? And I don't mean blow by blow, just a general when it happened and who did it.

you get a warning that you've now overloaded your reserve space on the J drive and you have to unload some of the items in it?
A You have to clean house or stop, yes.
Q All right. Exhibit 11 has a number of references. It mentions the grievance meeting of May 20th. And I think yesterday we reviewed some notes by Mary Walls of that meeting, right?
A Correct.
Q Then it mentions a discussion with management SME. I'm sorry; what does SME stand for?
A Subject matter expert.
Q And that is Mr. Winkler?
A That's correct.
Q Was he your principle point of contact during the resolution of the shipwright grievance?
A He was.
Q And then there's a tour of the staging that you mention. Do you recall who attended that tour?
A Mr. Winkler; Mr. Aiken, the union representative; and, I believe, Joe Hamel, the other union rep involved.
Q About how long did that tour take?
A Couple hours maybe or so.
Q I don't want to get into all of the details of it today, but just generally did it consist of going out to the

yard and observing the construction of or dismantling of staging?
A Yes, in various location and with various types of features.
Q And did you actually go up on any of this staging?
A Only the stuff that was fit for -- other than shipwrights -- to be on. Only shipwrights can be on incomplete staging.
Q I haven't gone through the materials you mentioned reviewing for today's deposition. Is Exhibit 11 one of the documents that you reviewed--
A No.
Q --to prepare? Okay. Just one question. That last couple of sentences on page 1, it says that: "Shipwrights typically use two planks in building a staging (one on each side of the level), and move them from level to level as they work. When the staging reaches a working level (where other workers will be using it), the level is fully planked and lifelines (safety rails) are installed." Is that still, in your view, an accurate summary of this portion of the process of building staging?
A In my view, yes.
Q And these planks -- about how wide are they?
A It's been a while, but I would think, 18, 20 inches or

somewhere in there.
Q Your hands looked to me more like 12 inches, but I'm not going to hold you to the exact.
A Yeah, I don't know. 18 inches maybe.
Q And since the planks are being moved, are they fastened in any way prior to moving to the working level?
A No. They were just laid on the staging.
Q The next page is your recommendation. And, I guess, my first question is: Was this your personal recommendation, by you, or was this recommendation being joined in by anybody else, like Mr. Winkler?
A No. This was my recommendation to the shop which includes Mr. Winkler and Ms. Tallman.
Q The very last sentence of that page says: "Adverse environmental conditions under b(3) are also reoccurring factors in the work." Do you see that?
A Let me catch up.
Q I'm sorry.
A Okay.
Q So you see that last sentence?
A Mm-hm (answers affirmatively).
Q And b(3) is the provision immediately above that you're quoting?
A Right.
Q That mentions a number of adverse environmental

Q Once you prepared Exhibit 11, did you have any follow-up discussions with anyone in management or at the union about the grievance and how it should be resolved?
A It's hard to remember the timing. I would have met and spoke with Ms. Tallman and Mark Winkler either in conjunction with it or shortly thereafter.
Q Okay. And the one thing, I guess I can infer is given than you're referring to the tour of staging on November 10, 1999, and given that the grievance decision was dated, I believe, January 18, 2000, is it fair to say that you prepared Exhibit 11 sometime after November 10th but before January 18th?
A Yes.
Q Among the references you have there is reference H. And that refers to OPM Operating Manual 532-1, Subchapter 8-7, and Appendix J. And what I'll do -- and it looks like you have a copy there in your binder -- I'm going to have a copy marked as an exhibit. Exhibit 13 will be some subchapters from the OPM manual, and Exhibit 14 will be Appendix J.

(Exhibit Numbers 13 and 14 marked for identification.)

ATTY2: J is 14.

MR. SCARAMASTRA: J is 14. The wage system is 13.

(Discussion held off the record.)

MR. SCARAMASTRA: Let's go back on.
Q Does reference H, in Exhibit 11, refer to what I've just handed you that's been marked as Exhibits 13 and 14?
A It does.
Q Do you have any general familiarity with the OPM Operating Manual as part of your role as an -- either your previous job in human resources or your current job in the production resources department?
A Yes.
Q Okay. And have you had any training in the use of the OPM manual?
A No.
Q Okay. Is that a document that you have cause to refer to in the course of your own day-to-day duties either in your current position with the production resource department or in your past role in human resources?
A In both.
Q Okay. Would you -- and I think you either said this off the record or on the record. Would you consider yourself fairly familiar with the provisions, that is to say, Subchapter 7-6, and 7-7, and 8-8, of Exhibit 13, and then Appendix J, which is 14?
A A --
Q Let me restart. That was a terrible question.
Would you consider yourself fairly familiar with the

authorized, to inform the employee of that.
Q Now, if you would, take Exhibit 16 and just put my nose in the part of that instruction that creates a requirement for an employee to request environmental differential pay in advance?
A It's on page 3. And it's under the, employees will, Paragraph D. And it's notifying their supervisor when they feel they are working in hazardous or unsafe conditions.
Q Okay. So that's -- for the record, that's Section 5(d)(2) that appears on page 3 of Exhibit 16?
A Yes.
Q All right. Is there anything in the OPM Operating Manual that also, to your knowledge, imposes a requirement like this on an employee?
A I'm not sure without reading it.
Q And I'm not going to put you to that task right now unless you know exactly where you'd read.
A No.
Q No? Okay. With respect to the old policy, I had asked you whether the shipyard had developed it with input from legal counsel, and you didn't know. I have the same question now with respect to the new policy. Was that policy implemented with input from legal counsel?
A No.

Q Was there a reason why nobody went to counsel for help in understanding either the operating manual or the regulations or the terms of the collective bargaining agreement?
A I don't know there was a particular reason. We just worked it out in the HR office.
Q Is it a situation where it -- just nobody thought to do it, or was it a situation where the possibility was raised and then people decided not to do it?
A It wasn't the latter. It was an issue of we would just typically work these things out in the HR office, and the management.
Q I'm going to show you what I'll have marked as Exhibit 17. This, I think, I saw in your binder.
(Exhibit Number 17 marked for identification.)
Q Have you seen Exhibit 17 before?
A Only in connection with preparing for this.
Q All right.
A Recently, a day or two ago.
Q Okay. That's fair. And am I correct that Exhibit 17 -- a copy of that is in the binder of materials you brought today?
A That's correct.
Q So you have only reviewed Exhibit 17 for purposes of preparing to testify today?

BY MR. SCARAMASTRA:
Q Having walked through a couple of documents, I want to now go to the subject that I indicated we were headed towards, which is old policy versus new policy. What's kind of different between the two?
I gather under the old policy there might have been some high pay for work in the rain, but you don't know whether any such high pay was ever paid. Is that a fair summary of the truth?
A I don't know for a fact what was paid for that rain.
Q Okay. Is this policy, regarding high pay for work in the rain any different under the new policy than it was under the old?
A Well, under the new policy, it doesn't require rain, so meaning if they're working on the unprotected scaffolding they're receiving high pay if it's not raining.
Q Right. And you're talking about the leading edge workers there?
A Correct.
Q What about the workers who are not on the leading edge that are working on the scaffolding in the rain, under the new policy, do they get high pay?
A If the scaffolding was complete, they wouldn't get high pay in the rain.
Q When you say "complete" --

Q I recognize somebody else is going to talk to us about fall protection, so I don't need you to go into all of the details, but do you have an understanding of, generally speaking, what are the circumstances when fall protection devices are deemed to be capable of being properly used?

A In a general way? I mean, primarily, the anchor point has to be accessible and above you. And in the case of the shipwrights that are erecting scaffolding, that's rarely able to happen.

Q Okay. All right. Even as of today's date, shipwrights, as I understand it, are rarely able to hook into a proper anchor point for fall protection?

A Correct, that's my understanding.

Q Is the majority of the time shipwrights spend on staging, but not on the leading edge, work for which high pay is being paid under the new policy?

A I don't know because I don't know when they finish each layer. Mr. Winkler can better answer that.

Q Okay. And when you say, "finish each layer," each ring up of the staging?

A Correct, each level of staging.

Q And you referred to in Exhibit 18 that high pay wouldn't be paid where flooring and safety rails are installed?

A Correct.

A Correct.
Q And Mr. Winkler would know?
A I would think so, yes.
Q Very well. A few minutes ago I asked you in the context of the old policy whether the shipyard had any policies or documents or instructions that define what constitutes steady rain that would justify high pay, remember that?
A I do.
Q I have the same question with respect to the new policy. Has the shipyard provided any guidelines or instruction to management or to its employees regarding what constitutes steady rain for purposes of receiving high pay?
A Not that I know of.
Q How is the determination made that the rain is such that high pay is called for?
A I don't know.
Q Who would make that decision under the new policy?
A The second level in the shop. In this case, in the shipwrights.
Q And currently, who would the second level supervisor be?
A I don't know.
Q Is that Mr. Whitcher by any chance?
A It could be Mr. Whitcher.
Q At the time of the grievance was the second level

particular trade would qualify for high pay or --
A Yes, it was.
Q And how did the shipyard arrive at this determination that only a condition unusually severe for the particular trade involved warranted high pay?
A I don't know.
Q If you turn to Exhibit 13 -- you can keep 14 in front of you. I have 13 here. This is excerpts from the OPM manual, right?
A It is.
Q And if you turn to page 2, and that's Section S8-7(c); you with me so far?
A I am.
Q This part of Section S8-7 is one you are pretty familiar with?
A It is.
Q If you look five lines down, there is a sentence and it reads: "Exposure to a hazard, physical hardship, or working condition of an unusually severe nature listed in appendix J is not taken into consideration in the job-grading process, and additional pay for exposure to these conditions is provided only through the environmental differentials authorized by this section." Did I read that right?
A You did.

Q Were you familiar with the language I just read, and was the shipyard generally familiar with the language I just read at the time Exhibit 4 was prepared?
A I wasn't involved at the time Exhibit 4 was prepared, so I don't know what was considered then.
Q Did the shipyard, at some point, conclude that the statement I read earlier from Exhibit 4 was, in fact, not accurate?
MR. FATOUROS: Objection; there's no basis in the record for that question. It assumes facts not in evidence or testimony not in evidence. Go ahead.
THE WITNESS: Okay. I can only answer on my knowledge. So when I was involved in looking into the shipwright grievance, I didn't find anything that supported the conclusion that because they were shipwrights, they shouldn't be entitled to that hazard pay.
Q All right. And did you, in fact, read the provision I just read from?
A Yes.
Q Exhibit 13? Okay. Did that play a role in the recommendations that you made in Exhibit 11?
A It did.
Q Did you have any discussions with anybody else in management about the provision in Exhibit 13 we just

read?
A I talked about the case in general, and my conclusions with my supervisor in the human resources office.
Q Who was that?
A Her name was Joene Lott.
Q How do you spell Ms. Lott's name?
A J-o-e-n-e, L-o-t-t. And then, also, with Ms. Tallman and Mr. Winkler.
Q Okay. And can you describe what you recall of your conversation with Ms. Lott about Exhibit 13's provisions that we just quoted?
A With regard to that particular point?
Q Yes.
A That -- you know, that I hadn't found anything, and this wasn't the only thing I looked at to support a conclusion that we could blanketly say shipwrights aren't entitled to high pay because they're shipwrights.
Q You mentioned not finding anything that supported that. Did you find other sources of information that tended to agree with what we just read in Exhibit 13?
A I did.
Q What else did you find?
A Well, I did some case law research, and, you know, some grievance decisions, arbitrations, FLRA and comp general, just to get a feel for what was going on out there in

this kind of a case. So I relied on that too. I couldn't tell you what the cases were or anything.
Q I was going to ask you, did you document what you found in the cases in any way?
A I may have at the time, but I don't -- those records were left behind in HRO and have since, as far as I've been told, been cleaned up. I don't know if they exist.
Q When you say "cleaned up," meaning?
A Periodically purge their files after two to three years.
Q Okay. Would it have been your practice to have printed copies of the comptroller or arbitration or other decisions, court decisions that you had found and thought were relevant?
A Some of them. My practice would be to look at a lot, and print one or two that were on the most point.
Q And how did you find those decisions? Did you use a legal research computer database or something else.
A Yeah, I used a computer database cyberFEDS, I believe, was what we had at the time.
Q Ms. Barnes' memo that's Exhibit -- 4 goes through considerable amount of discussion of what's involved in the assemble or disassembly of staging. I am taking, from some of your earlier testimony, that it would be better to ask Mr. Winkler about the accuracy of the -- for example, noting that each level of the staging is

they're in their helmets and respirators and gear, to where they can't even see what their footing is.

So certain trades have particular types of tasks that enhance the danger.

Q Okay. So those are, I guess in my view at least -- I appreciate you walking me through that. That would be an instance where the work conditions are materially different, at least in the shipyard's view, from typical work assembling or disassembling staging?

A Correct, very different.

Q Can you think of circumstances where there aren't those differences, where members of other shops receive high pay for work on staging or incomplete staging where shipwrights in Shop 64 do not?

A No. In fact, I believe other workers cannot be on incomplete staging.

Q At this stage in the shipyard's history, are there any instructions, policies, guidance documents, other records that try to identify circumstances under which high pay should be paid for workers other than Shop 64 shipwrights?

MR. FATOUROS: Objection to the form of the question.

THE WITNESS: I don't really understand the question.

**Melissa J. Watkins & Associates, Inc.**
**Certified Court Reporters**

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181

---

June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Lynnette Neimi, Vol II
Date Taken: March 10, 2005

This letter is to advise you of the following:

______ Signature was waived. The original transcript is being served upon you at this time for filing.

__X__ Deponent has completed reading and signing. The original transcript and correction sheet is being served upon you at this time for filing.

__X__ A copy of the deponent's corrections are enclosed for your reference.

______ No corrections were returned by the deponent.

______ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

______ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey

cc: Mr. Thomas B. Fatouros

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON HANBERG, et al. )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

MARK WINKLER

Thursday, March 10, 2005

---

why he's asserting an objection and nothing seems to happen, sometimes that's what's going on. Okay?

A Okay.

Q Let's start with a little getting to know you phase. What is your current job position?

A I'm a superintendent overseeing the blasters and painters in Shop 71 in Puget Sound Naval Shipyard.

Q How long have you been doing that?

A About a year and a month in that capacity.

Q What were you doing before that?

A Numerous positions. If you want to go through the history, I started in the shipyard in 1980, came in as a work study. Went in the shipwright apprenticeship, started in 1981. 1985, I made shipwright mechanic. From 1985 to 1990, I think I was the shipwright foreman on the waterfront. I was a foreman till, I think it was 1996, when I became shipwright general foreman overseeing all shipwrights for Shop 64. 1999, I think I became senior process manager over Shops 57, 64 and 71. It was numerous trades. I don't know if you want to hear all the various trades. And subsequently, after that, I became painter superintendent in Shop 71 a year ago.

Q Is the move to this current position a promotion?

A Yes.

Q So I don't want to go through all of those positions. I

want to just capture the ones really from right before the grievance was filed during the period for which we're seeking high pay, forward. So it sounds like your job changed in 1996 from a foreman--
A I think --
Q --to the general foreman?
A Yes.
Q Supervising the other foremen?
A Absolutely.
Q Can you tell me what that general foreman position entailed? And then we'll work forward to the present.
A I was responsible for all processes, all costs and schedules, all hiring, firing, removing. I basically was the person directly in charge of roughly a hundred plus people, i.e., the people that, one, held the shipwright trade designator or were loaned in to help or assist the shipwrights during that time period.
Q So did you oversee all of the first level foreman and supervisors in Shop 64?
A Just shipwrights.
Q Just the shipwright foreman?
A Yes.
Q Okay. Gotcha. And then that changes?
A About 1999, I think, is when I oversaw all general foremen and all foremen throughout all three of the

shops.
Q Okay. That was 71, 64 and--
A And 57.
Q --57. All right. And you were in that position until about a year and a half ago?
A Yes.
Q And now what additional responsibilities have you taken on in your current position?
A My current position?
Q Yes.
A I oversee a lot of safety organizations, groups within the shipyard. I'm part of the superintendent association. I primarily don't have a whole lot of affiliation with the shipwrights in this particular stage and junction anymore.
Q Who do you currently report to?
A Captain Mazzone.
Q Okay. And in your prior position before that, who did you report to?
A Mary Jane Tallman.
Q So that's from '99 till about a year and a half ago?
A Yes.
Q Okay. And from '96 to '99, who did you report to?
A Mary Jane Tallman.
Q Okay. Did they add a level?

A Yes.
Q A layer in '99?
A Yes.
Q I see. And promoted you into that?
A Yes.
Q I'm going to show you what's been marked as Exhibit 1. Have you seen Exhibit 1 before?
A I think I've seen a lot of the same situation. I thought it was a little bit longer, the one I'd seen, but, yes.
Q All right. And if you turn to page 4, and it's captioned up at the top, "Matters for Examination." Are you with me?
A Yep.
Q Matter number 3 reads: "All aspects of the Shipyard's high pay policy for high work including the development, implementation of the policy and the method of calculating the amount of back pay awarded pursuant to the Shipyard's January 18, 2000 employee grievance decision. This specifically includes the substance, veracity, and accuracy of the statements related to the policy made in the declaration of Mark Winkler, Lynette Niemi, Mary Jane Tallman, and Rodney J. Whitcher, submitted to the Court in the above-captioned action."
My understanding is that you are going to be providing testimony concerning matters reasonably

months of my time.
Q Let's walk through Exhibit 17, then we'll come back to the process a little more.
A Okay.
Q I asked Ms. Niemi about paragraph 2, which indicates that, "shop 64 pays shipwrights environmental high pay for operating or working from the basket of a JLG or manlift." Do you see that?
A Yes.
Q I understand that that is the result of an arbitration decision; is that correct?
A I don't know.
Q You don't know? Okay. It indicates that it's been in effect since 1985. What happened in 1985 to bring this into effect?
A I remember that, I don't know why, but roughly around that particular time, some employees -- one received some back pay for operation of JLGs and then, at that particular stage of the junction, anybody that was, one, operating or, one, in the basket got high pay anytime they were working out of the JLGs.
Q Let's go to paragraph 4. It says, "When erecting staging inside a slope tank for the first ring of the staging or until level footing is established." Do you see that?
A Mm-hm (answers affirmatively).

Q It says that's been in effect for about two years. Do you see that?
A Yes.
Q What brought about that change?
A I'm sure it had to do with a lot of work at that particular stage of the junction and clarification of the union agreement. As we went through processes in here, we continually were asked by the employees on the definitions of what was in the union contract. And this went on for years on trying to get some clarifications on what the intent of those particular paragraphs in the union contract were. So I would imagine that came out of the agreement; that we felt that that was another justification for the unsure footing situation that it talks about in the union contract. Speculation, but that's what I would say.
Q Okay. Paragraph 5 says that Shop 64 pays shipwrights environmental high pay when working on staging in extreme weather conditions at the supervisor's discretion. Did I read that correctly?
A Yes, sir.
Q Is that statement true?
A Yes, sir.
Q And what's meant by, "extreme weather conditions"?
A That was, like it says before, the supervisor's

discretion on what we felt primarily that had to do with wind, rain -- excessive rain and wind. Of course, in this area, sometimes you get rain all the time, so more had to do with the combination of rain and wind. And then possibly, if there was any snow on those particular situations. So those were kind of some examples that we went through at that particular stage.

Q Who went through at that particular stage?

A Like I stated before, the clarification of which was actually identified in the union contract. When I took over as shipwright general foreman, there was questions about the intent of or some of examples of when high pay would have been paid.

Q That's back in 1996?

A I think that's when I made general foreman.

Q Did you make or anyone else under your command or that you were reporting to document these decisions that were being made about where high pay should be paid and where not?

A Not that I'm aware of. This appears to be an example of trying to put some of that stuff together so that we could get some additional clarification for the supervisors out there on the waterfront.

Q You sort of gave me a description of what you thought extreme weather conditions would mean.

A Mm-hm (answers affirmatively).

Q I gather that by the end it was possibly a combination of wind and rain?

A Mm-hm (answers affirmatively).

Q Right?

A Yes.

Q Rain alone without more would not qualify as an extreme weather condition?

A Depend on how much rain.

Q And that's what I was getting at. So just the fact that it's raining isn't enough to warrant high pay under this policy, right?

A No.

Q It had to be some amount of rain. Did you come up with some objective measurement of how much rain would qualify as an extreme weather condition?

A No.

Q How did you expect supervisors to know how much was enough?

A Get with the employee, come to a mutual agreement on what they felt was excessive. I didn't appear to get to the -- if it's raining three inches an hour is a time period where we felt we wanted to go. I didn't want to get to that level of detail. It was more of a, Hey, let's sit down. If we need some additional

clarification, then you get myself involved to come out and take a look at the situation.
Q Is the supervisor being referred to when you mention supervisor discretion, the general foreman or the foreman at the first level?
A Foreman.
Q So in '96 that would have been you?
A Depends.
Q I goofed. Is it the first level supervisors--
A Yes.
Q --who had that discretion?
A Yes.
Q And were there any cases where first line supervisors came to you to consult with you about whether the weather conditions justified high pay?
A Yes.
Q Can you describe the circumstances where that happened?
A I remember some situations of disagreements between the employees and the supervisors on what they felt it was. So I would go out, take a -- do an evaluation on that particular thing. I can honestly say most of the time I erred on the employee side with regards to why didn't we pay him high pay because of conditions that were out there.
Q About how many times during the time you were the general

A No.

Q So you didn't have some objective way of measuring the velocity of the wind?

A Other than at the shipyard at 20 miles an hour, most aerial work platforms and cranes are shut down, so that's kind of our indicator that if it's a severe enough wind to shut those particular operations down. But by building staging, you could be in a situation where the wind wasn't affecting you whatsoever.

So it's not a catchall for those because you could be building inside a building; you could be building on the other side of a building. So it wasn't a general, at 20 miles an hour we're going to shut down all these particular operations, as far as wind staging.

Q How would you go about determining if the wind was severe enough that you had to go shut down?

A Just by going out and looking at the specific job and where they were working.

Q What were you looking for?

A Looking to see the effect on the wind, as far as, was it pushing me around; kind of where it was coming from; how high the people were off the ground. A lot of different factors that I would take a look at; visibility. That was probably a lot of the issues that I dealt with is because when the wind and rain combined, it really

affected the visibility of the employees as far as -- of course, hand-eye coordination is crucial to that particular thing.

Q I would think. And then, at the end of this memo that's written under your name, it says: "These are the situations where shipwrights are currently being given high pay. All of these situations require second level approval of high pay conditions." At the time this memo was created, would that second level approval have come from you for Shop 64?

A Yeah. At that particular time we were -- there was no what we would call codification that -- how do I put this? There was issues in the shipyard at that time. It had to do with overall environmental pay. I think my light bulb just went off on why this was initiated.

There was some practices in the shipyard that the supervisors were paying environmental pay; could be any type of environmental pay. And they found some fraudulent issues in the shipyard of supervisors paying employees environmental pay for things that they didn't actually do. And, if I'm not mistaken, I'd have to go validate, but my light bulb is going off. I have a feeling this has to do with you had to have some type of validation that that particular person did work because they found issues of fraud where supervisors were paying

remember the talk of it, extensively.

Q All right. I just want to walk you through a few paragraphs, and what I'm going to -- the general thing I'm trying to get at is whether you agree with that description of the assembly and disassembly of staging. In other words, staging that's not complete is accurately depicted in Exhibit 4.

So let's start with paragraph 5. And it starts by saying: "The nature of the Shipwright trade is such that high work is a given, but the policies, procedures and safety practices that have been established are considered to have adequately alleviated the hazards of the work. By following the established guidelines, Shipwrights build safe staging as they go. Each level is to be stabilized before they proceed on to construct the next level. To stabilize, each level is to be "planked" and secured with wire, thereby providing stable footing." Have I read paragraph 5 correctly?

A Mm-hm (answers affirmatively).

Q That's yes?

A Yes.

Q Is it true that each level of staging is planked and that the planks are fastened to the frame with wire before proceeding to the next level?

A Not a hundred percent.

Q Okay. About what percentage of the time do shipwrights actually create a stable floor by wiring planks to a level of incomplete staging before going to the next level?

A Depending on the staging, if you're looking for an overall average, it would be small. Most of the time they move the planks as they go up. But if the staging to be built requires a planking and lifeline of that particular level as they go up, they might lifeline wire that level as they go up. It really depends on the staging and the use of that particular staging.

So I would say if you're asking a percentage of how many times that's happens, it's probably less than ten percent on a high staging. But there is multiple different types of staging that are built throughout the ship.

Q But less than 10 percent of the time, would each level be planked and secured with wire before moving to the next level, as a general rule across the shipyard?

A Yes, in that situation.

Q So paragraph 7, then, goes on to say that devices and mechanisms that are used, that are considered to adequately alleviate the hazards are, planking the staging, wiring enforcement, and using a JLG to lift materials. A harness and a lifeline can be used, but are

floor that's planked to create a work area?
A Probably anywhere from two feet wide to 13 feet wide.
Q Is it common to have a two-foot wide work surface on the final?
A No.
Q That would be in a situation, I take it, where there was something about how the vessel was protruding and you couldn't --
A General rule is four foot for a working platform, but in some situations you don't have four feet, so you give them the most that you can for that particular situation.
Q Are there any rules about where the safety rail or lifeline has to be placed? At what heights it has to be placed around the work platform?
A Yes.
Q What are the rules?
A General rules are from, usually, 21 for the lower rail, 42 for the upper rail or for the work platform, is the general rule of thumb.
Q For the planks that are being used by the shipwrights for temporary platforms, what's the width of the planks that are typically used for that purpose?
A One foot wide.
Q And how many are typically used side-by-side to establish a temporary work surface?

A Two.
Q So you've got a 24-foot wide surface?
A Yes.
Q Are those two planks fastened together in any way, as a general rule?
A Required, yes. Are they, no.
Q Does the shipyard take any action to discipline employees who don't fasten them together?
A Not that I'm aware of.
Q And then my understanding is that when a level is complete, those planks are moved up to the next level to continue construction more often than not. Is my understanding correct?
A I'd say half and half. Sometimes additional planks are brought up from below or those are moved up because people subsequently either stand on those particular areas to pass material up. Or if you're in this particular situation as you've identified here that the JLGs use, then those planks would be moved up because the means of getting the material up is mechanical.
Q These planks, are they metal planks or wooden or some other substance?
A Could be wood, could be metal -- steel or aluminum.
Q And what are the lengths that are typically used? We talked width. What's the length?

A In our aluminum plankings, we've got anywhere up, I think to 16 feet is kind of the general, usually 8s, 12s, 16s. In our -- we've got eight-footers primarily with our system staging, and wood planking could be at any level, or, excuse me, any length.

Q Okay. Let's go to paragraph 8 of Exhibit 4. And in it, Ms. Barnes writes, "In order to assess the staging first hand, I went to Dry Dock 5 and observed how staging is constructed." She goes on to write, "The staging was very solid, the frame was held in place with large clamps, preventing sway or shaking." Let's stop there.

Is that typical of the temporary planking that's used that it's held in place with large clamps to prevent sway or shaking?

A Not planks, but it doesn't say planks.

Q I'm sorry -- with. I misread, I'm sorry.

The next sentence, "The planking is constructed of metal with 3 planks side by side creating a footing 3 to 4 feet wide, and it was wired to the frame to prevent slipping." That's where I wanted to stop.

Is that the typical way that temporary work surfaces are constructed for shipwrights to use during building or disassembly of staging?

A For shipwrights to use?

Q Right.

of the grievance, and I know someone else is going to come and talk in some more detail, I just want your general understanding of this. Okay? But at the time you were involved in the grievance, were the shipwrights typically tied into the structure of the staging?
A No.
Q Is that something that's the case now?
A No.
Q Typically, shipwrights still don't tie into the framing of the staging?
A No.
Q How about other anchorage points?
A Yes.
Q And were they tying into anchorage points, typically, back then, aside from the staging itself?
A We had started experimenting with it. It was a process that we were trying to evaluate when I first took over. And we were trying to see in how many areas we could. We're making an asserted effort to try to reduce the hazard to employees.
Q When you were coming up with the back pay award amount, what assumptions, if any, did you make concerning the availability or use of fall protection by shipwrights who are not on the leading edge?
A We were going to subsequently -- in the future we were

Q Okay. Did you play any role in the actual investigation of the grievance? You've talked about negotiations, but did you play any role in investigating the facts of the grievance?
A No, I don't think so.
Q Who did that?
A I would imagine Lynnette. She was primarily the, I guess, what I consider the resident expert on where we were heading with that.
Q Let me hand you what's been marked as Exhibit 11, and ask you if you've seen that before.
A Doesn't ring a bell, but there's a lot of information in here.
Q Right. Ms. Niemi testified earlier that she was the person who drafted this. Was the union given a copy of Exhibit 11 at any point during the grievance process?
A I don't know.
Q Did they have any input into the preparation of Exhibit 11?
A Don't know.
Q And among the references is reference C, which mentions discussions with what Ms. Niemi said were you, the subject matter expert, Mr. Winkler. About how many meetings did you have with Ms. Niemi about the grievance?
A I don't remember too many meetings with her. My -- like

I said before, was primarily going out and showing her the actual work in execution, so she would -- she would contact me. I would go out and show her some of the multi-various things that go on in the shipwright trade when she was doing, I guess what I consider the investigation or the analysis of what the shipwrights do. So I don't remember having a whole lot of meetings, other than she would call me and say, I need to go take a look at this. So I showed her what was going on out at the waterfront.

Q Did you and Ms. Niemi meet together with Mr. Aiken at any point during the course of the grievance?

A I don't remember meeting with the two of them.

Q Did you attend the grievance meeting that took place on May 20, 1999?

A Grievance meeting?

Q Yes.

A I don't remember that, but --

Q I'll show you Exhibit 3, which has been -- earlier witnesses testified are notes of the meeting. And you look at the top and it indicates the attendees. I think you'll agree with me that your name does not come up.

A True.

Q Why is it that you didn't attend the May 20, 1999, meeting?

other words, notes of meetings?
A No.
Q We're going to turn to the numerical assessments that you reached in just a minute. But first, how did you come up with these numerical ratings or assessments initially?
A Took the cover page of the grievance. I think I sat down with the union, went through everybody on that list, started putting a numerical assessment based on who we felt were the people that were doing the leading edge work -- that we felt were doing the leading edge work more than the other ones. So if --
Q Okay. Before we go further, why don't I show you what we'll have marked as the next exhibit.
(Exhibit Number 22 marked for identification.)
Q This will be Exhibit 22. Is Exhibit 22 what you were referring to just a minute ago? The pages you pulled from the grievance?
A Yes.
Q Are these then the numbers or initial numerical assessments that appear there next to the names?
A Yes.
Q Okay.
A That was the first crack.
Q First crack at it? You can tell from this? Okay. Now, before we go too far, let's take the first name up here,

David J. Hurn.
A Yes.
Q There are actually three different numbers. There's a "1" in a circle, then there is a "2" in a circle, and then there's a "4" without a circle. Can you tell me what each of those figures represent?
A Okay. The first one was two different opinions on Mr. Hurn and what we felt his rating as far as being in a high pay situation.
Q So one person opined that he should get a one and another person opined he should get a two?
A Yes.
Q Who were the people who provided these opinions regarding the various shipwrights?
A I'm thinking this was between Mr. Aiken and myself. It was the first initial crack.
Q And why do you think that?
A Because I'm almost positive -- well, let me read my declaration just a second. I'm sure I met with Mr. Aiken first before I sat down with the supervisors. But I better refresh my memory.
MR. SCARAMASTRA: Exhibit 2 is right in that pile. Let's go off the record.
(Discussion held off the record.)
MR. SCARAMASTRA: Okay. Let's go back on the

record.
Q You checked your declaration?
A Yes.
Q Okay.
A And it says that I met with Mr. Aiken first when I started this numerical assessment.
Q Okay. Which of these two figures represents your number? The one or the two?
A I don't -- I don't know.
Q And whose handwriting appears here? Whose handwriting is the one with the circle around it next to Mr. Hurn's name?
A I think it's mine.
Q Okay. And same with the two with the circle around it?
A Yes.
Q How about the four that's not circled?
A I think that's mine, also.
Q Did you make all of these three numbers at about the same time?
A No.
Q Tell me when you made the first two sets of numbers. I assume those two were made about the same time?
A Yes.
Q The one and the two?
A Yes.

Q About when did you make those?
A It would be one of the very first get-togethers we had once we came to the idea of the concept of the formula. As far as the actual date, I couldn't provide that.
Q Okay. And then how much later in time did you write down the four that appears next to Mr. Hurn's name?
A I think that was significantly later, because the first initial thing didn't quite work the way we were anticipating, so we regrouped.
Q Tell me what the four represents.
A The four represents, in an eight-hour period, how many hours that we felt that Mr. Hurn would have been in a high pay situation.
Q And so do the one and two also represent estimates of the number of hours in an eight hour day that were spent in high work?
A No. Our first initial thing was we were trying to rate them. One being a person that's spent a lot of time -- we kind of went in reverse. We were trying to say, okay, a number one is a person that probably does a lot of high work. A two is almost a lot, three...
So we tried that first. Figured that wasn't going to be the way we needed to do this. We needed to regroup. So that's when we regrouped and came up with this other one.

Q I see.
A You understand?
Q So a one would have been the highest level of high work under this initial system?
A Yes.
Q What was the lowest rate?
A Zero, I think -- or five. Excuse me.
Q One to five?
A Yeah.
Q Would five basically represent little to no high work?
A Yes.
Q Under the new ranking system, what did the rankings run from? I assume from zero, for zero hours per day, theoretically?
A Yes.
Q Did you actually rate anyone at zero?
A Yes.
Q What was the highest ranking you gave anyone. I'll tell you the highest I've seen is a five. Does that correspond to your recollection?
A Yes, it corresponds to my recollection.
Q So the most hours that you credited a shipwright with doing was five hours of high pay per day?
A In a--
Q Per eight-hour day?

A In a high pay situation, yes.
Q When you came up with this initial assessment, how did you go about doing that?
A Like I said, we met with the union first, then we meant with every one of the supervisors that worked for me at that particular time to go over name-by-name, to -- I guess what I consider, help validate the information that would -- we had had.
Q When you went into that initial meeting, though, had you received any input from your foreman as to what each individual's ratings ought to be?
A I don't think so.
Q Okay. How did you come up with the numbers to give? And there were quite a number of people, right?
A Yes.
Q I think there were. I think, 99 signatories that you concluded, right?
A Yes.
Q And then you went through and found everyone else in Shop 64 as well, correct?
A And other shops.
Q Okay. So well over a hundred people?
A Mm-hm (answers affirmatively).
Q How is it that you, on your own, came up with ratings for each one of these over 100 people?

A I didn't. Myself and Mr. Aiken did.
Q And presumably you went into that meeting with Mr. Aiken with some notion of where people ought to fall in the--
A Oh, yeah.
Q --one to five on either way?
A Absolutely.
Q Okay. What inputs of data did you have to come up with those initial ratings that you had in mind?
A Personal observation.
Q Just personal observation? Okay.
A Yes.
Q When you were -- sorry. This was when you were the processing foreman?
A Process general foreman.
Q Process general foreman?
A Mm-hm (answers affirmatively).
Q Is that an office job?
A Nope.
Q So you're out on the deck?
A (Witness shakes head affirmatively.)
MR. FATOUROS: You have to answer audibly.
THE WITNESS: Yes.
Q Do have you a workstation that you mobilize out of every day?
A Yes.

mind for the time spent going to lunch and coming back to lunch?
A No. We don't condone the fact that they come back at 11:00 and hang out in the shack, but we try and afford them a reasonable amount of time to clean up.
Q Did you come up with calculations of any of the other time where they were punched in but not directly performing work?
A No.
Q Who came up with or proposed the five hour upper limit on number of hours per day average high pay?
A I would probably say it was me.
Q Okay. And you obviously presented it to Mr. Aiken, or did you present that to Mr. Aiken?
A I don't ever remember presenting it to him as we were going to have an upper limit. It just -- when we went through this thing, this is what we came up with. I don't remember actually saying, We're not going to pay anybody more than five, but --
Q After you met with Mr. Aiken and came up with Exhibit 22, did you present this to anyone in shipyard management before going further down the road towards coming up with a high pay calculation?
A Probably not this exhibit, no.
Q That would have taken place later in the process?

the date it was agreed.
Q Number of workdays for the individual during the claim period, right? Okay. The claim period meaning 15 days prior to the grievance up until issuance of the grievance decision.
A Yes, the signing of it. Yes.
Q So for example, for Randolf Abbott, he would have been on record with 105 workdays for which a high pay award was going to be made? Do I have that right?
A He probably was in a pay situation 105 days between -- what was it? April and January.
Q So then what you would do, that third column typewritten under "Total Hours," that's what you get for Randolf Abbott, it's 315. That's what you get when you multiply three, the hours per day, times 105, the number of days?
A Yes.
Q So you get 315 hours of high pay?
A Yes.
Q Now, I want to turn back to the question, and that's why I had a little surprise. At some point I gather somebody did a calculation to figure out the number of workdays for which each shipwright was going to receive high pay.
A Yes.
Q Wasn't the starting point of that to come up with the total number of working days in the claim period itself?

A Yes. Whenever we -- I would imagine, we would have had to know when the signing was going to be and how far we were going to go back on it.

Q Right. Did you, at some point, calculate the number of workdays between the date 15 days prior to the grievance and the January 18, 2000, grievance decision?

A Yes.

Q Okay. Now, let me show you what we'll have marked as the next exhibit.

(Exhibit Number 25 marked for identification.)

Q What was Exhibit 25 used for? I know that there is handwriting in that upper left-hand corner.

A I don't have a clue.

Q Okay. Here was my surmise, and maybe this is something you want to quickly confirm off the record.

A Off the record?

Q We can do that in a second.

It looks to me, like somebody at some point determined that there were 202 workdays between the date 15 days prior to the grievance filing and the grievance decision. Does that ring a bell with you?

A It doesn't ring a bell with me. I mean, I could go count them out, but it could have been.

Q All right. Well, let's hold that 202 in mind. If you want to check with counsel and see if they've got an

subject to that.

Q So three or four crews?

A No, one crew. Three or four individuals on that crew are primarily assigned to the docking crew.

Q Okay.

A Are you talking about my period? I hope.

Q Yes.

A Yes.

Q And then everybody else, their primary duties would be the staging? Assembling and disassembly of staging?

A Yes.

Q Okay. Now you can put Mr. Whitcher's declaration aside. And I want to go back to yours. In fact, I'll take it. Let's go to paragraph 8. I think that's where we were.

The last sentence begins, on page number 62, goes to next page, says: "After the union and I completed this," this referring to initial numerical assessment, "I met with my foremen and went over the list, name by name, to verify our numerical assessment." Do you see that?

A Mm-hm (answers affirmatively).

Q That's a yes?

A Yes, sorry.

Q And I'll try to keep those questions to a minimum.

At this initial meeting to go over the list and verify the numerical assessment, did you or the other

foremen rely on any documents?
A No.
Q Did you meet with the foremen as a whole in one big group session, or did you have individual meetings with various foremen, or did you do it some other way?
A It was a group of the foremen. All of them pretty much together except for I had to meet independently with the back shift guy because he wasn't in on that particular time. But it was day shift supervisors that I was responsible for.
Q Was there a single meeting to do this or several meetings?
A I only remember one long meeting.
Q Okay. The record won't reflect this, but you stretched out the word long quite a bit. How long was this meeting? And I don't need it down to the minute.
A It took, I'd say, in excess of two hours to go through name-by-name, and there was quite a dialogue between the supervisors.
Q Would you describe there as being a fair amount of disagreement over the proper assessments for individuals?
A Some individuals. I mean, it wasn't a huge disparity. It was, no, he's a three. No, he's a four. No, she's two. No, she's a three. Conversations like that based on the supervisors' observations.

Q About when did this meeting take place?
A I would say later in '99, I would imagine.
Q Do you remember about when, or where this meeting took place?
A In the Ocun Loft. That's where most of -- I know that.
Q Where all the work gets done?
A It was a place to go where you wouldn't be distracted.
Q Okay. Were there any union personnel or representatives at that meeting?
A I don't honestly remember if Joe was there or not.
Q Was Lynnette Niemi at this meeting?
A No.
Q Was Ms. Tallman at the meeting?
A No.
Q Aside from the foremen and you, were there any other management representatives at the meeting?
A No.
Q You go on to say, "a lot of changes were made," in paragraph 8 of your declaration. And is that accurate?
A Yeah.
Q When you say a lot of changes, do you have in mind what percentage of the ratings changed as a result of this meeting?
A I wouldn't say any more than 20 percent. There were just a lot of numbers that changed. I mean, I could go figure

it out because there is objective evidence right there on what Joe and I thought it was versus what the supervisors thought it was. So I'm guessing at 20 percent.

Q The final set of uncircled numbers that appear on Exhibit 22, did you write those numbers down before or after this meeting with your foremen?

A It looks like after.

Q When you went into the meeting with the foremen, were you still going with the initial system of rating, one being the highest--

A No.

Q --amount of high work?

A No.

Q Okay. So you'd come up with the other system?

A Yeah, because the other one wasn't going where we wanted it to.

Q Right. Did you present the foremen with initial ratings in the format that you ended up adopting? That is to say the number of hours per day of high work?

A Yeah. I'm pretty sure we said how many hours do you think this particular individual spent in the high pay situation.

Q By that point, did you have each shipwright or most of the shipwrights ranked under the new system? The five being the most high work per day on average and zero

Q Rod. Did he do this in Excel or in spreadsheet format?
Do you know?
A Yes.
Q Let me show you the next exhibit, which will be Exhibit
27.
(Exhibit Number 27 marked for identification.)
MR. SCARAMASTRA: Off the record.
(Exhibit Number 28 marked for identification.)
MR. SCARAMASTRA: Okay. Let's go on.
Q We've handed you Exhibits 27 and 28.
A Okay.
Q Can you tell me what these two exhibits contain?
A Looked like they've got a numerical assessment and I
would imagine the number of days in that particular
period. I should say for 27 and 28 they look pretty
close to the same to me, but I'd have to go validate
that. But they're just in different forms based on, it
looks like 28 is based upon badge number, so we sorted it
by badge number. 27 -- I don't know why it's sorted that
particular way, but --
Q That was going to be my next question. So 27 is sorted
by badge number?
A Yes.
Q And Exhibit 28 is a mystery to you?
A It's a mystery to me.

Q All right. Well, you can only do so much. And as long as I'm here, just so we've got a complete set -- is this a computer print out here?
A No.
(Discussion held off the record)
(Exhibit Number 29 marked for identification.)
Q Now we have Exhibit 29 in front of you. That appears to be yet another compilation of the data concerning hours of high work, right?
A Yes.
Q Now, a question was asked off the record and might as well get it on the record.
The last question I asked you about the preparation was who prepared or who input them. Now let me ask you, these are records that were manually input by someone, correct?
A Yes.
Q And into a computer?
A Yes.
Q Can you tell from looking at them essentially which Exhibit -- let's take 22, 23, 24, 27, 28, and 29.
MR. FATOUROS: Maybe we can go through those numbers again.
MR. SCARAMASTRA: 22, 23, 24, 27, 28, 29. So 25 and 26 are not in the running right now.

Q I gather the document created first was Exhibit 22?
A Yep.
Q Okay. What was the next document to be created?
A I would venture to say 23.
Q And then what was the next document that was created?
A Either one of these two.
Q 27 or 28?
A Yeah.
Q And then what came after 27, slash, 28?
A Looks like 24. And then 29, I would venture to say.
MR. SCARAMASTRA: Let's give you Exhibit 30.
(Exhibit Number 30 marked for identification.)
Q And let's have you put that in the order where you think it should go.
A I think at the end.
Q I'm feeling very good about this exercise because that was my guess, so we're -- either I'm very clever or you're very wrong.
A Ouch.
Q What I want to do is quickly walk through a couple of representatives and see how, if at all, the numerical ratings change. I thought the best representatives would be my own clients.
A Okay.
Q So why don't we start with Don Baker. If you can tell me

Q He's a four, again?
A Yep.
Q And then go to Exhibit 29.
A Appears to be a four.
Q So, again, constant throughout.
Let's take Walt Jaynes. He's in each of these.
A Okay. Walt Jaynes, Walk Jaynes --
MR. FATOUROS: Walt Jaynes?
MR. SCARAMASTRA: Yes.
THE WITNESS: Can you find him?
Q On Exhibit 23?
A 22.
Q I'm sorry, yes, I can find him. He's on page 2 about six names down. And he's a four, right?
A Yep.
Q So now we're going to Exhibit 23. And I will tell you there that Mr. Jaynes is on page J2512, almost halfway down.
A Four.
Q He's four, again. Want to take a look at 24?
A Four.
Q Four, again. Exhibit 27.
A I don't have it.
Q Oh, excuse me, sorry. He should be on --
MR. HOLCOMB: Page 1, he's about ten down.

MR. SCARAMASTRA: Yep.
THE WITNESS: Four.
Q He's a four, again. And so let's take 28 and 29, if you would. On 28 Mr. Jaynes is on page 3, 2516, three down from the top.
A Four.
Q Okay. And go ahead and take 29, if you would.
A Four.
Q Four, again. Okay. I'm going to stop this exercise. So far each of these three individuals, their ratings have held constant through the process. Would you agree with me?
A Mm-hm (answers affirmatively).
Q I will just represent to you, and you need not take my word for it, but I have found the same for Mr. Peterson, who is ranked five on Exhibits 23, 24, 27 and 29, and Mr. Scott, who is consistently ranked a four throughout the course of this.
Does this consistency with the five named plaintiffs surprise you, given the statement in the declaration that a lot of changes were made to the numerical assessments?
A No, because they were some of the better employees and recognized as that. We didn't seem to have an issue with the people that we felt were doing some of that work. It was the lower end of the rating system.

A Yes.

Q So you would give that person a numerical assessment of one, correct? Or, no, you wouldn't -- out of eight hours, it's one-fifth of eight. I'm sorry.

A Yes.

Q So let's -- it's not going to be a nice fraction, so never mind. Let's change it a little and make it a nice fraction. Let's say you concluded that it was a quarter of the time rather than a fifth of the time.

A Okay.

Q Then you would give that person a numerical rate of two, correct? Two hours out of an eight-hour day?

A No, because they're not in -- they're not in a high pay situation for eight hours.

Q Okay. If you concluded that a particular employee spent a quarter of an average eight-hour day.

A We didn't go quarters, but --

Q Okay. Then let's forget about it.

If you concluded that someone had spent two hours, out of an eight-hour day, on average, doing high work, you'd rank them a two?

A Yes.

Q Okay. Now, you're going to multiply that two by something else to come up with hours of high pay?

A Yes.

Q I want to talk about that something else. And that's your next sentence. You add up his hours based on workdays--
A Yes.
Q --subtract days of leave, and added his overtime.
A Yes.
Q Is that what you say in paragraph 9?
A Yes.
Q Okay. How did you come up with the hours based on workdays?
A I would imagine we went from the agreed upon date of 14 or 15 days prior to the grievance and to the date it was signed.
Q And this is where we started -- we left off before. You then calculated that -- somewhere, someone must have done a calculation of the number of workdays in the claim period, right?
A Yes.
Q Okay. And then you're going to subtract leave days from that number?
A Yes.
Q Right. And then add overtime hours back in; is that right?
A Yes.
Q Okay. But first, you could convert overtime hours to

days; is that right?
A Yes.
Q And did you convert hours to days by dividing by eight?
A Yes.
Q Okay. What I'd like you to do is keep handy Exhibits 27, or pull Exhibits 27, 28, 29, and 24.
A Okay.
Q And I'm going to give you two more that I think -
A Can I take a break?
Q Yes, absolutely.

(Recess taken from 3:19 to 3:26 p.m.)

(Exhibit Number 31 marked for identification.)

E X A M I N A T I O N - (Continuing)

BY MR. SCARAMASTRA:
Q Looks like Exhibit 31 is another one of the charts that you prepared?

MR. HOLCOMB: Is this 31, now?

MR. SCARAMASTRA: Yes.

THE WITNESS: Yes.

Q That's a yes?
A Yes.
Q Do you want to do the same exercise with these and sort of put them in what you think is roughly chronological order?

A Way out here.
Q Okay. So you've got 31 is the last one.
A Mm-hm (answers affirmatively).
Q What's the next in time?
A I don't think I have a next in time.
Q Is there an Exhibit 30?
MR. NOEL: Well, would it still be the same order as before?
MR. SCARAMASTRA: There is actually some different ones at the beginning, so they sort of overlap a bit.
Q Okay. So we're going --
A 31 is after 30, I think.
Q All right. So starting with 27 --
A Okay.
Q And we're going to work our way through to 31.
Is there anything you need to fill in the gaps? Looked to me like Exhibit 24 might be dated around the same time as Exhibit 28, and 29. Can you tell?
MR. HOLCOMB: Isn't the time sequence the same as the numerical sequence?
MR. SCARAMASTRA: No, it's not. Oh, if it were that easy, Byron.
THE WITNESS: Okay.
Q So you have them in order. It's 27, 28, 24, 29, 30, and

31; is that right?
A Yep.
Q Good. That's the order I got. And let's just walk through and take one example. And let's take Walt Jaynes.
A Again?
Q Yes. And what I want to now do is have you walk through the process of Mr. Jaynes' hours changing as you perform this calculation you were describing before the break. So if you turn to Exhibit 27, and Mr. Jaynes is on the first page.
A Yep.
Q You have a total hours calculation for him of 796; is that right?
A Yep.
Q Then you go to Exhibit 28 and he has the same calculation. You've got to go to page 2516. See him up there at the top?
MR. HOLCOMB: I read 796 on 27.
MR. SCARAMASTRA: 796?
MR. HOLCOMB: My number 27 says 796 for Walter Jaynes.
MR. SCARAMASTRA: Did I not say that?
THE WITNESS: No, that's what you said.
MR. SCARAMASTRA: Okay.

Q And there's Jay Neitzel and there's a handwritten figure of minus 26. Do you know what that represents?
A This one?
Q On Exhibit 38. Are you on Exhibit 38?
A Yes.
Q Then I goofed. I'm sorry. Can I see that for a second? I transposed my numbers. I apologize. All right. Never mind.
(Discussion held off the record.)
MR. SCARAMASTRA: What I thought was Exhibit 38 -- I'll have this marked as Exhibit 40.
(Exhibit Number 40 marked for identification.)
Q Okay. Now, you've got another chart there with 3/23/99 to 1/18/00.
A Yes.
Q That's the claim period. And Exhibit 40 is collecting the amount of overtime hours and leave hours for a series of employees, right?
A Yes, that appears so.
Q Okay. For Jay Neitzel, it's got 12.7 overtime hours and 222 leave hours. Do you see that?
A Yes.
Q And then there is handwritten, next to it, minus 26. Do you know what that represents?
MR. SCARAMASTRA: You're not writing on it, are

you?

THE WITNESS: Yes.

MR. SCARAMASTRA: Oh, boy. Go ahead and write on it. We'll make another one. You're using a blue pen?

THE WITNESS: Yeah.

MR. SCARAMASTRA: Go ahead and mark in blue.

THE WITNESS: Sorry.

MR. SCARAMASTRA: No, it's okay. We'll know we need a clean exhibit later.

Q Is it a conversion from hours to days, as best as you can tell?

A Yes.

Q Okay. Let's turn to Exhibit 38. Whose handwriting is this?

A Speculation?

Q Go ahead?

A Jim Jazuk.

Q And that's the name that appears in the upper right-hand corner?

A I don't know that for sure.

Q Is he one of your foremen?

A Could have been at this time.

Q All right. Now, let's take an example here, Greg Corey, two down.

A Okay.

Q Someone has written 245 combined hours of leave and written next to it 30.6 days. Do you see that?
A Yep.
Q And then it's put 383 hours of overtime and has written 47.8 days.
A Okay.
Q Then appears to have taken 47.8 and subtracted 30.6 to get 17, which is circled and put next to Mr. Corey's name.
A Okay.
Q Would you agree with me that that's what happened?
A Yes.
Q Is this the system that was being used to adjust the work hours for each shipwright?
A Yes.
Q Can you show me Exhibit 39? Can you tell me what Exhibit 39 is?
A No clue.
Q All right. Okay. So that process didn't help us much. Let's come at it a different way. I'm going to give you some records for Mr. Scott.
MR. FATOUROS: Can we put some of these exhibits away?
MR. SCARAMASTRA: You may.
THE WITNESS: All of them?

MR. SCARAMASTRA: No, you're probably going to need some of them back in a minute. Take the ones, that first set, and throw them aside. Keep the charts.

MR. FATOUROS: When you say, the first set --

MR. SCARAMASTRA: You're fine. That's right. You did good.

Q Let's do this process for Paul and see if we can get a handle on it. I'm going to show you what I'll have marked as Exhibits 41 and 42.

(Exhibit Numbers 41 and 42 marked for identification.)

Q Okay. You have those two exhibits in front of you?

A Yes.

Q Can you tell me what Exhibit 41 is?

A It appears to be a report that was taken out of a program to look at how much leave Mr. Scott used from -- let's say, 2/1/99 to 1/7/2000.

Q Now, looks like someone crossed out the entries for February 1999 down there, right?

A Yeah.

Q Okay. And then there is a number of eights that follow, and one three. And then next to it in handwriting it says "163 leave." Is that the sum total of the number of hours of leave that appears on Exhibit 41?

A Can I take your word for it?

Q I've done the math. I think it is. Would that be consistent with the process you were using?
A Okay. Yes.
Q If you look at Exhibit 42, what does that show you? Let me rephrase it. What does the printed portion of this show?
A Are you talking about this portion?
Q Correct. The left few columns, as opposed to the handwriting.
A It appears to be a job order that the individual was working on specific days.
Q And I'll note that the dates all appear to take place in that claim period, beginning 15 days before the grievance to the date of the grievance decision. Does that appear to be the case? Actually, with the exception of sometime towards the end?
A Okay. Yes.
Q Now, somebody, looks like, tallied in handwriting his overtime hours, Mr. Scott's overtime hours, and came up with 577.9. Is that what happened?
A Appears that.
Q Then it says, handwriting below, "232 prior OT." What does that refer to?
A I don't know.
Q Somebody subtracted that from 577.9 and got 345. Does

that appear to be what happened?
A Yes.
Q Then there is 163 with the word, "leave" written next to it?
A Mm-hm (answers affirmatively).
Q Do you see that? Is that a yes?
A Yes.
Q And does that come from Exhibit 41?
A Speculation. But yeah, I would imagine.
Q The same figure --
A It's the same number.
Q Okay. And then it looks like somebody subtracted 163 from 345 and got 183. Do you see that?
A Yes.
Q And then somebody divided 183 by eight and got 23 days. Is that right?
A Appears to be -- it's not quite there, but...
Q Just about.
A Okay.
Q Now, back in the series of documents we were looking at before, I'm going to show you Exhibit 33. Would you look at Mr. Scott's name. Can you find it on there?
A Yes, I do.
Q There is a handwritten number next to his name?
A Yes.

Q What is it?
A Plus 23.
Q Plus 23. That's the same number that is calculated on Exhibit 42, correct?
A Okay. Yes, sorry.
Q Okay. What was done with that plus 23 figure once it was computed?
A If I'm not mistaken, we went and assessed the same numerical number to the 23 days to come up with another number.
Q Okay. Why don't you take Exhibit 24. Mr. Scott's figures appear on the last page, about mid-way down the page.
A Okay.
Q What is the number of days in the claim period that's recorded for Mr. Scott?
A Appears to be 225.
Q Right. Does that include the 23 additional hours or days that were computed on Exhibits 41 and 42?
A I don't know.
Q If it did, then that would mean that the original number of days in the claim period was 202, right? 225 less the 23 days, correct?
A I don't know if there was 202 days. I don't know where you're going. But I guess if you subtracted 225 plus 23,

(Discussion held off the record.)
Q How did you convert overtime hours into days?
A Divided by eight, I would imagine.
Q Divide by eight, right?
A Yes.
Q In fact, that's exactly what you did or someone did in Exhibit 42, right? They came up with a net hours of 183 for Mr. Scott?
A Which number?
Q Exhibit 42?
A Okay.
Q They divided by eight hours per day and came up with a 23-day adjustment, right?
A Yes.
Q Okay. Now, let's just work backwards and take that 183 out. Okay? If you were going to add -- convert it to -- keep it in hours at 183 hours, and you wanted to make an adjustment to the total hours for Mr. Scott, you'd add that to 743 in Exhibit 29, right?
A I'm -- can I tell you what I did?
Q Sure.
A Everything was based on days.
Q I understand.
A So I tried to compute it back to days, an eight-hour day. Okay? So once I got it back to an eight-hour day, i.e.,

Q Who did?
A Mr. Aiken said it was generous to the employees, not the management. He felt it was a good win-win for the employees and was also communicating that with his union affiliates.
Q In paragraph 8, skip one sentence from what I just read. It says: "In essence we negotiated the decision with the union." Do you see that? Are you referring to the employment grievance decision?
A No. I'm referring to the concept of how we were going to go back and pay.
Q Okay. So you are not saying that the employment grievance decision that's Exhibit 18 was negotiated with the union?
A I wasn't -- I didn't negotiate it.
Q Okay.
A I don't have that...
Q All right. So you did not participate in any negotiations concerning the substance of the employee grievance decision or the terms that were written in it. Is that fair?
MR. FATOUROS: Objection; foundation.
MR. SCARAMASTRA: I'm actually laying foundation, so...
THE WITNESS: I worked on, I guess what you

consider, some of the -- how would you say that -- the essence of why it was settled. I worked on all the precursor things to the signature. So I guess I had part in it, but I wasn't the ultimate citing official.

Q So you worked on the formula and coming up with the inputs to the formula, correct?

A Yes.

Q You didn't actually participate in drafting the employment grievance decision, did you?

A What's the employment grievance decision?

Q Exhibit 18, that's signed by Ms. Tallman.

MR. FATOUROS: We don't have the record copy, but we have a copy of it.

MR. SCARAMASTRA: That's great. I'm just making sure I am, in fact, referring to the correct exhibit number.

Q You didn't participate in the drafting of Exhibit 18, did you?

A I didn't draft it, no.

Q You didn't participate in any discussions with union representatives about what the terms of Exhibit 18 would be, did you?

A None other than probably Number 2 in the award. There was some preliminary discussions.

Q About the decision to allow high pay for building and

A In her office.
Q Were there any discussions before it was signed or after it was signed?
A We met -- I remember Mr. Aiken leaving for a period of time to consult with the employees that had signed the grievance to get, I guess, nothing more than their perception on signing off this grievance. He went and spent what seemed like an hour, hour and a half, to go talk to employees that signed the back of this, asking if they felt it was a fair and equitable resolution settlement to the grievance, came back about, I'm thinking an hour afterwards, and stated that the employees wanted to settle the grievance and that he was signing. And so subsequently the signing took place.
Q Okay. Let me show you what I'll have marked as 43.
(Exhibit Number 43 marked for identification.)
Q Have you seen Exhibit 43 before?
A No, but it's what I think it was when I stated earlier, a decision that was agreed upon by -- things for high pay.
Q This is the settlement agreement, is it not?
A That's what it says at the top.
Q And it's signed by a member of the union, correct?
A Yep.
Q And by an A. Burton, for the employees. Do you see that?
A Yep.

Q And it refers to employees who are assigned to work inside main ballast tanks. This is a settlement agreement associated with a 1998 grievance by insulators in Shop 64, right?
A I don't know.
Q Obviously the shipyard knows how to prepare a settlement agreement when it wants because this is one, correct?
A That's what it says at the top.
Q Why didn't the shipyard draft a settlement agreement like Exhibit 43 to resolve the high pay grievance?
A I wasn't the deciding official on this one.
Q You don't know why?
A No.
MR. SEATON: Can we go off the record a second?
MR. SCARAMASTRA: Sure.
(Discussion held off the record.)
MR. SCARAMASTRA: Let's go back on the record.
Q Okay. I've been corrected. This settlement agreement does not concern Shop 64 insulators, but otherwise is what it purports to be, which is a settlement agreement.
Anything that you'd like to add given the discussion off the record?
A It appears to be a settlement agreement with the work that was going on in Code 350 -- I don't know if that's true -- which was a portion of the work. I don't know if

it goes on to talk about all the rest of the work that was going on in the shipyard, but it may. I haven't read this whole thing. But Mr. Burton was the Code 350 superintendent, so...

Q Okay. In paragraph 1 of your affidavit or declaration --

A Which one?

Q Your declaration, Exhibit 2.

A Okay.

Q Sorry.

Paragraph 11, I'm sorry. You write: "The union signed the management decision and decided not to seek binding arbitration." Do you see that?

A Yes.

Q Then you go on to say: "I believe this indicated the union was satisfied with management actions, and I also believe all of us were uncertain as to whether pay for high work by shipwrights is really required by law or regulation." Do you see that?

A Yes.

Q First of all, did you or anyone you know actually consult with legal counsel to find out if high work was required by law or regulation?

A I didn't.

Q Did anybody else alert you that they had done that?

A No.

Q Are you aware of anybody having done that?
A I think I know the shipwrights did.
Q Given that there was, as you described it, uncertainty on your part and on the management's part as to whether law or regulation required the payment of high pay, is there a reason why nobody went to legal counsel to find an answer?
A We don't usually go to law and counsel when answering -- or settling grievances.
Q Even when there is uncertainty as to what the law requires?
A It wasn't mine to go do. I had my own portion.
Q You go on to say that the fact that the union signed the management decision and elected not to seek binding arbitration indicated to you that the union was satisfied with management's actions. Do you see that?
A Yes.
Q Does the fact that an employee or union representative signs the resolution of a grievance always indicate to you satisfaction with management's actions?
A No, but he said personally.
Q What's that?
A No. But Mr. Aiken said it personally that he thought it was a good thing for the employees, and subsequently he told me that his union officials, i.e., the president,

thought it was a good decision on the employees' behalf.
Q Is there a reason why you didn't refer to that in your declaration here?
A No. But there is probably a bunch of details I didn't put in.
Q Okay. So you have seen instances, I take it, where an employee and union official sign a grievance decision even though they're not satisfied with the outcome; have you not?
MR. FATOUROS: Objection; foundation.
MR. SCARAMASTRA: That was a, "have you seen," so that was to get to the foundation.
MR. FATOUROS: I believe you preference it with, "you have seen."
MR. SCARAMASTRA: Fair point.
Q Have you seen -- that's more leading, but -- have you seen instances where employees or union officials sign grievance decisions where it didn't reflect satisfaction with the outcome?
A Well, usually the union, at least in my thing, doesn't sign on those particular things. It's a decision made by management as to the outcome, usually on a grievance. So this was -- this was -- I guess in my opinion, different, because the union signed. And I guess I got the impression, and also the union said they agreed with the

A I don't remember him saying he was going to go any further with it. He just said that between him and the employees and the union, they agreed to the settlement.
Q Did you condition the settlement high pay award on the union giving up any rights on behalf of its members to further high pay?
A I wouldn't know that.
Q Who would?
A I guess somebody that would understand by signing that. I -- you know, I didn't sign it. I was just part of the --
Q That would be a question for Ms. Tallman or someone else?
MR. FATOUROS: I'm objecting to this line of questioning. It calls for a legal conclusion. I believe that's where the confusion is coming for Mr. Winkler.
THE WITNESS: True. I don't know about all the legal --
Q I'm not asking for anything legal. I'm --
A You said legal -- you can't go any further.
Q But, in other words, leaving aside the legal stuff--
A Okay.
Q --or how it might have put in legalese, did Ms. Tallman or you or anyone else in your presence tell anybody from the union that a condition of the high pay award was that the union and the Shop 64 employees not pursue additional

high pay?

A No. We were just trying to resolve the issue with what we considered a fair settlement.

Q Okay. Thank you very much.

(Signature reserved.)

(Deposition concluded at 4:31 p.m.)

# Melissa J. Watkins & Associates, Inc.

## Certified Court Reporters

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181


June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Mark Winkler
Date Taken: March 10, 2005

This letter is to advise you of the following:

________ Signature was waived. The original transcript is being served upon you at this time for filing.

________ Deponent has completed reading and signing. The original correction sheet is being served upon you at this time for filing.

________ A copy of the deponent's corrections are enclosed for your reference.

________ No corrections were returned by the deponent.

__X____ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

________ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey

cc: Mr. Thomas B. Fatouros