**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., | No. 04-856C |
| Plaintiffs, | Judge Miller |
| vs. | |
| THE UNITED STATES, | Electronically Filed on 09/11/06 |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW AND FACT**

## I. INTRODUCTION

On January 18, 2000, Mary Jane Tallman signed an "employee grievance decision" that resolved the largest grievance, in terms of dollars or number of affected employees, that she had ever experienced. Union steward Joe Aiken placed his signature on the decision.

Although the grievance decision is not worded as a settlement agreement, the Shipyard now claims it was, in fact, one. But the decision itself fails to express a settlement. And the parties who signed the decision or who were present for its signature recall no conversations regarding any "agreements" that were reached. No one said that the grievance decision, or performance of its terms, would operate as a full and final satisfaction of the shipwrights' claims. No one indicated that it would bar further claims by shipwrights. No one discussed what would happen if

individual shipwrights sought additional pay, through a lawsuit or otherwise.

Ms. Tallman's decision did not award the shipwrights anything to which they were not already entitled. Two months before signing her decision, Ms. Tallman received a memorandum from the Shipyard's human resources officer that advised that the Shipyard owed high pay under certain circumstances. Ms. Tallman copied the memorandum's language word for word. She decided to pay exactly what she believed she was legally obligated to pay, and not a penny more. She did, however, refuse to pay for high work performed more than 15 days before the grievance was filed, relying on the collective bargaining agreement's 15-day deadline for filing grievances. But the Shipyard had already lost an arbitration that held the 15-day deadline did not apply to continuing pay violations.

Ms. Tallman's decision came at the end of highly unusual grievance procedure that failed to follow the collective bargaining agreement. Perhaps most importantly, after processing the grievance as a series of individual employee grievances, the parties excluded individual grievants from the most important hearing on the grievance even though each grievant was entitled under the collective bargaining agreement to attend.

Under these circumstances, most or all of the elements of accord and satisfaction are absent. There was no bona fide dispute when Ms. Tallman signed her decision and the Shipyard gave no consideration for the alleged accord. There was no objectively expressed meeting of the minds, either in a written agreement or elsewhere. And given the violations of the collective bargaining agreement,

competent parties and a proper subject matter were also absent. The Court should dismiss the Shipyard's accord and satisfaction defense with prejudice.

## II. FACTS

On a stormy Saturday in early 1999, Joe Aiken found himself building scaffolding high above the grounds of the Puget Sound Naval Shipyard. He knew he would receive no high pay for this work.

Mr. Aiken was a union steward and shipwright employed in Shop 64. As a shipwright, he had a direct financial interest in the recovery of high pay. As a union steward, he did not believe he could initiate a grievance on his own behalf. So he prepared a grievance for high pay and persuaded David Hurm to sign it. Mr. Aiken also signed as a grievant (his signature appears two below Mr. Hurm's on the first page of the signature sheets behind the grievance form) and he convinced another 97 employees to sign it, too. Mr. Aiken filed the grievance on April 13, 1999. Mr. Aiken was thus purporting to act as both the union representative on the grievance and as one of the individual grievants.

### A. Procedures for the Resolution of Individual Employee Grievances As Well as "Council Grievances"

Article 30 of the collective bargaining agreement contained several different avenues for the resolution of employee grievances. Section 3002 set forth provisions for the resolution of a grievance on behalf of an individual employee. Section 3012, meanwhile, set forth procedures for the resolution of a grievance that "is not identifiable to a specific individual employee but is the result of an action … that

significantly affects the provisions of this written Agreement." Section 3012(a)(1) denominated the latter a "Council Grievance."

Section 3002(b) of the agreement required all grievances to be "reduced to writing on the appropriate form." The Shipyard maintained different forms for "employee grievances" and "council grievances." Mr. Aiken prepared his high-pay grievance on the "employee grievance" form.

**B. Procedures for Resolving Individual "Employee Grievances"**

Individual (as opposed to council) grievances first went to "Step 1" and then to "Step 2." Section 3003(a) and (b) required management to meet with the grievant in addition to the union representative at each step. At Step 1, section 3003(a) stated that the grievant's "immediate supervisor shall meet with the grievant and Council Representative." At Step 2, section 3003(b) required the "Shop/Branch head or designee shall meet with the grievant and Council Representative." The grievant thus had the absolute right to attend all meetings regarding the grievance.

The collective bargaining agreement allowed multiple grievances to be consolidated for certain purposes. Specifically, section 3001(b) provided that the shipyard and the union "mutually retain[ed] the right to join similar issues from the same or separate parties for the purpose of conducting a single grievance hearing."

The agreement likewise required grievance decisions to be in writing. Section 3003(a) of the agreement required a resolution of a Step 1 grievance within three working days of the meeting with the grievant and stated that the supervisor "shall issue a written decision." Section 3003(b) of the agreement required resolution of a

Step 2 grievance within fifteen working days of the Step 2 meeting and stated that the shop head "shall issue a written decision."

The shipyard's grievance form also required both the employee's and the union representative's signature after the shipyard made a decision at Step 1 of an employee grievance. The form required the grievant to check a box indicating whether or not the grievance had been resolved at Step 1.

### C. Procedures for Handling "Council Grievances"

Council grievances were to be handled differently from individual grievances. Section 3012(b) required council grievances, unlike individual grievances, to set forth "the desired corrective action which is specific to the Council or the unit, **but in no event to individual employees.**" Council grievances were to be submitted to "Code 160." Unlike individual grievances, council grievances did not proceed through a two-step process. And unlike the case with individual grievances, employees had no right to attend meetings regarding a council grievance; section 3012(c) limited that right to union representatives.

But as with individual grievances, shipyard decisions regarding council decisions were required to be reduced to writing. Section 3012(c) provided: "The Employer's decision regarding the Council's grievance … shall be in writing on the appropriate form."

### D. Limits on the Right to Arbitrate Grievances

After a Step 2 decision or a decision on a council grievance, the next step was arbitration under Article 31 of the agreement. Section 3101 required arbitration to

be invoked in writing not later than 30 calendar days of the 2nd step grievance decision. Under section 3102, only the union and the Shipyard could demand arbitration.

### E. Limits on the Union and Shipyard's Power to Resolve Grievances

There were limits on the Shipyard's and union's authority to resolve disputes using Article 30's grievance resolution procedures. For one thing, section 3001(d)(1) excluded from the grievance procedure, "[m]atters that are not 'conditions of employment' as defined in the Act." (Page 1 of the agreement defined the "Act" as the Civil Service Reform Act, 5 U.S.C. sec. 7101, *et seq*.)

Section 3905 of the agreement, meanwhile, provided that "No agreement, understanding, variation, waiver, or modification of any of the terms or conditions herein shall be made by any employee or group of employees with the Employer, and in no case shall it be binding upon the parties hereto unless such an agreement is made and executed between the parties hereto and approved by the Secretary of the Navy."

### F. Processing of the Grievance Through the Issuance of the Decision

The shipyard initially took no action in response to the grievance Mr. Aiken had orchestrated. So on May 13, 1999, the union's Chief Steward, Joe Hamel, filed a council grievance regarding the shipyard's handling of the grievance.

This got the attention of Shop 64 Superintendent Mary Jane Tallman. On Friday, May 14, she emailed William Ellis, Department Administration Officer, to express her concern: "It's a BIG issue about high pay for shipwrights .... It's going to

involved hundreds of employees. There is no way I can meet with them one on one, and doing a group thing seems like inhumane punishment." Indeed, this was the largest grievance, in terms of both dollars and number of employees, that Ms. Tallman had ever processed.

In a string of emails, Ms. Tallman and Mr. Ellis struggled with how to respond to the grievance. As Ms. Tallman's email quoted above recognized, each individual employee had the right to attend all meetings regarding the grievance, even if it was "inhumane punishment" for the management employee involved. On Monday morning, May 17, Mr. Ellis emailed Ms. Tallman to inform her that he had contacted the union to find out "how did they plan on getting everyone to a meeting or was the union going to rep all employees at a meeting." Later that afternoon, Ms. Tallman emailed the Chief Steward, Joe Hamel, to schedule the Step 2 meeting for May 20; "[y]ou are welcome," she wrote, "to bring three or four of the grievants, or another steward, with you to help with presenting the grievance…."

The following day, Mr. Hamel emailed Ms. Tallman to indicate that the union wished to proceed under section 3003, which spelled out the procedures for resolving individual employee grievances. Yet he did not insist on bringing each individual grievant to the meeting. Instead, he proposed limiting the number of shipwrights whom the union intended to present. Ms. Tallman balked at the presentation of even this limited number of witnesses. On May 19, Mr. Hamel emailed that the union "will meet you halfway" and call only six employees as

witnesses. No one obtained the consent of each grievant to this departure from the procedures mandated by the collective bargaining agreement.

The Step 2 meeting was held on May 20, 1999. At the hearing, Mr. Aiken and several shipwrights, including Mr. Hurm and Walter Jaynes, presented the shipwrights' case for high pay. Mary Jane Tallman attended, as did the human resources officer assigned to investigate the grievance, Lynnette Niemi.

The hearing ended without a decision. On June 4, 1999, the parties agreed to a six-month extension of the deadline for management to issue a decision regarding the grievance.

In late July 1999, Lynnette Niemi emailed Ms. Tallman to confirm that she was about to "get started on the high pay review." Ms. Tallman identified Mark Winkler, the shipwright's general foreman, as Ms. Niemi's point of contact regarding the shipwright grievance.

Ms. Niemi then began researching whether and under what circumstances the shipyard owed high pay to shipwrights. She reviewed case law and consulted the Office of Personnel Management's Operating Manual. Based on her review of these sources, Ms. Niemi concluded that high work was not factored into the shipwrights' base pay grade and that the Shipyard owed high pay for all high work performed by shipwrights.

On Wednesday, November 10, 1999, Ms. Niemi toured staging with Mr. Winkler to assess the nature of the shipwrights' work. Over the next week or so, she prepared a memorandum that identified the circumstances under which the

shipyard owed high pay. After describing the shipwrights' work and she recited the definition of the 25% high work applicable to this grievance:

> b. Working at lesser height:
>
> (1) If the footing is unsure or the structure is unstable;
>
> (2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swing stage, boatswain chair, or similar support);
>
> Or
>
> (3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.

After reciting this definition, Ms. Niemi concluded:

> The work of the staging builders and dismantlers does frequently meet the definition of unsure footing under b.(1) (pipe, single plank, staging couplings), and frequently lacks the protective enclosures or facilities contemplated under b.(2). Adverse environmental conditions under b.(3) are also recurring factors in the work.

Based on these conclusions, Ms. Niemi concluded:

> Payment of the 25% high pay differential is recommend[ed] for the following work situations:
>
> 1) Building and dismantling staging beginning from the first level above ground/deck unless:
>
> a) flooring and safety rails are installed, or
>
> b) fall protection devices can be properly used.
>
> 2) Building and dismantling hanging staging under similarly unguarded situations when fall protection devices cannot be properly used.

The Tuesday after Ms. Niemi conducted her site visit was November 16, 1999. That day, Mr. Hamel wrote an email reminding the Shipyard of the

impending deadline for issuing a decision. He requested a decision regarding the grievance along with supporting documentation.

On Monday, November 22, Ms. Tallman exchanged emails with a shipyard administrative officer regarding Mr. Hamel's request. Ms. Tallman also indicated that she "got [Ms. Niemi's] read-out on the shipwright side on Friday." She asked the administrative officer to request an additional one-month extension to issue a decision. Mr. Hamel agreed to the extension the following day.

On Monday, December 13, Ms. Niemi and Ms. Tallman set up a management meeting to discuss the shipwrights' high pay grievance. No union officials were to be invited. Mr. Winkler was to be one of the attendees. The meeting was set for Thursday, December 16. No one recalls what took place at that meeting or whether it even took place.

On Friday, January 7, 2000, an administrative officer emailed management and union representatives to schedule a meeting for January 14, 2000, the Friday before the Martin Luther King, Jr. holiday weekend. No one recalls whether that meeting took place or what was said at it.

**G. The Signing of the Grievance Decision**

On the following Tuesday, January 18, 2000, Ms. Tallman prepared and signed a grievance decision. Actually, she signed two decisions. First, she signed a grievance decision that contained no place for Mr. Aiken to sign. Later, she revised the decision to include a signature line for Mr. Aiken. She reprinted the decision and both individuals signed it later that day.

The grievance decision adopted the recommendations from Ms. Niemi's November 1999 memorandum verbatim (except that Ms. Tallman decided not to pay high pay for high work performed more than 15 days before the grievance was filed). Specifically, the decision read:

> 25% high pay will be paid for work under the following circumstances:
>
> 1) Building and dismantling staging beginning from the first level above the ground/deck unless:
>
> a) flooring and safety rails are installed, or
>
> b) fall protection devices can be properly used.
>
> 2) Building and dismantling hanging staging under similarly unguarded situations when fall protection devices cannot be properly used.

The decision was worded unilaterally. It contained no recitation of an agreement. It contained no language that its terms were in full and final payment of disputed claims. It contained no release. It contained no expression of any agreements, promises, or commitments by the union.

This stood in stark contrast to the Shipyard's May 1998 settlement of a high pay grievance by employees working inside main ballast tanks. The document resolving that grievance was entitled "Settlement Agreement: On-Behalf-Of (OBO) Grievance No. 03875E." The first line of this agreement read: "The parties herein agree to the following as full and final resolution of the above cited OBO grievance …." Four of the five numbered paragraphs of this "Settlement Agreement" contained the words "the parties agree."

The language of the grievance also contrasted with the language of an agreement resolving a high-pay grievance by an employee named Mark Mascioli two years after the grievance decision was issued. This agreement, too, was captioned a "settlement agreement." The first lines of the agreement state that the union and the Shipyard "have agreed to the following to resolve the above named grievance." The agreement then contains four numbered paragraphs, three of which contain the phrase "the union agrees" or "the parties agree."

Mr. Aiken says that after seeing the grievance decision, he spoke to Mr. Hurm, who recalls Mr. Aiken calling him about the decision. Mr. Aiken told Mr. Hurm that each shipwright would receive $5,000 (which was more than all but four of the shipwrights actually received) and he assured Mr. Hurm that this was a "good deal." Mr. Aiken told Mr. Hurm that the union did not intend to demand arbitration. When Mr. Hurm asked what would happen to those shipwrights who were dissatisfied, Mr. Aiken said they were on their own and could either pursue their claims individually or file their own grievances. Even though he purported to represent individual employees with individual grievances, Mr. Aiken never discussed the decision with any of the other individual grievants before putting his signature on Ms. Tallman's decision.

Mr. Winkler, Ms. Tallman, and Mr. Aiken recall nothing of their discussions surrounding the signing of the January 18, 2000 grievance decision. No one recalls any negotiations over the terms of the decision. No one recalls the parties agreeing that the decision represented a full and final payment of all claims for high pay. No

one recalls the parties agreeing that no further high-pay claims would be brought. No one recalls the parties discussing whether the decision would bar litigation regarding the shipwrights' right to high pay.

### H. Dissemination of Information About the Grievance

Apart from Mr. Aiken's conversation with Mr. Hurm, no one from Shipyard management or the union made any effort to inform the shipwrights of the alleged "agreement." The grievance decision was not posted in a public place. No formal announcement was made. Several shipwrights called the union to find out what was happening and to get a copy of the grievance decision. Their efforts were initially rebuffed. Mr. Aiken says he did not want shipwrights to find out about the grievance decision right away. He stopped picking up his phone to answer inquiries and he did not return phone calls seeking information regarding the decision. Meanwhile, Mr. Hamel received a phone inquiry from a shipwright named Paul Scott on February 28, 2000. Mr. Hamel documented the discussion on a notepad and he promptly informed Steve Seaton, legal counsel for the Shipyard:

> I received a call from shipright [sic] paul scott this am at 0813. He proposed to ask me two questions for his lawyer. The questions and my answers were:
>
> 1. Has the shipyard con[t]acted the union in respect to this grievance? "No."
>
> 2. Do we still maintain our position on the grievance? "I believe we do."
>
> That was the entire conversation. Sorry for not referring them to you or the legal department.

Mr. Seaton had already entered the fray. On February 18, 2000, he emailed Ms. Tallman, "In your absence, Mark Winkler brought me a letter addressed to you w/ enclosures from attorney Byron Holcomb. … I have just been briefed by Lynette Niemi on the resolution of the grievances …." Based on his consultation with Ms. Niemi, Mr. Seaton wrote a letter to Mr. Holcomb that concluded: "I have provided no advice on the subject of the grievance or your request for reconsideration of that grievance, but I have been asked to inform you on her behalf that she is not going to reconsider that decision."

Mr. Seaton's letter made no mention of the grievance being settled or of an accord and satisfaction that barred the shipwrights' claims. No doubt that is because when Ms. Niemi briefed him on the grievance, she did not advise him that there was a settlement. That was consistent with Ms. Niemi's later correspondence. On October 2, 2000, Ms. Niemi sent a fax in connection with efforts to ensure that interest on back high pay was paid in accordance with the decision. In it, Ms. Niemi wrote: "I understand you requested a copy of the grievance decision and something that identifies Ms. Tallman as having authority to make the decision. Enclosed is a copy of Ms. Tallman's decision …."

On February 2, 2000, just over two weeks after the grievance decision was issued, Mr. Aiken was promoted from shipwright to shipwright trainer. He was given a raise. The promotion was no real surprise to Mr. Aiken; Mr. Winkler had approached him about it while the grievance was pending and Mr. Aiken had discussed the possible promotion with both Ms. Tallman and Mr. Winkler.

## I. Management's Calculation of Individual High Pay Awards

The grievance decision instructed, "Management will work with the union to develop a means of determining the appropriate amount of back pay for each grievant. The grievants' typical work assignments over the back pay period will be considered in making the determination." The day after the grievance decision was issued, someone in management began printing information regarding each shipwright's overtime and leave hours from 15 days before the filing of the grievance until the issuance of the decision.

Mr. Winkler and Mr. Aiken initially met to rate each employee's level of high work. Initially, they decided to rank each employee from 1 to 5. The rankings had no absolute meaning. A ranking of 1 simply meant the individual was someone who tended to do the most high work, while a ranking of 5 meant the individual did the least amount. Mr. Winkler and Mr. Aiken compared rankings and arrived at a consensus ranking for each employee.

Mr. Winkler then realized that these relative rankings were useless for calculating high pay awards. At this point, he came up with a different system: he decided to estimate how many hours out of a standard eight-hour day each shipwright spent doing work that qualified as high work under the grievance decision. He capped these new rankings at five, i.e., five hours of high work per eight-hour day. Over a period of time, Mr. Winkler, after consultation with first-line supervisors, tinkered with some of the figures he originally came up with. Most remained the same, a few went down by as much as an hour, and only two went up.

The attached Table 1 summarizes Mr. Winkler's computations over a period of time. As that table shows, Mr. Winkler initially calculated a mean hourly calculation of 3.6 hours of high pay per day, which was reduced over time to 3.3 hours per day. Yet Mr. Winkler believes that shipwrights spend an average of 4-6 hours per day working aloft on staging.

After arriving at these average hourly rankings, Mr. Winkler then calculated the number of days each employee worked between March 23, 1999 (fifteen working days before the grievance was filed) and January 18, 2000. He concluded that there were 202 working days in the claim period. This estimate is, in fact, low by five days, as a shipyard calendar shows. Thus, Mr. Winkler undercounted the number of days in the claim period. The attached Table 2 shows these calculations, which were either conducted by Mr. Winkler or by first-line supervisors at his direction.

Once he had calculated the number of days each shipwright worked, Mr. Winkler multiplied the rating by the number of days to estimate the number of hours of high work performed. Thus, an employee who worked "all" 202 days in the claim period and who was rated as performing 4 hours per day of high work was credited with having worked 808 hours of high work.

Mr. Winkler then adjusted this figure to reflect overtime and leave hours. For each employee, he arranged to add the number of overtime hours and subtracted them by the number of leave hours. He divided the resulting net figure by 8 to convert to days. For example, in Joe Aiken's case, Mr. Winkler subtracted 25 days from the original 202 to yield 177 eight-hour "days" during the claim period.

Mr. Winkler then multiplied the adjusted number of eight-hour days in the claim period by his estimate of the number of hours per eight-hour day spent doing high work. In Joe Aiken's case, that estimate was 4, so Mr. Winkler multiplied that by the 177 days in the claim period to estimate the number of hours of high work Mr. Aiken had performed. In Mr. Aiken's case, as Table 2 shows, this yielded a figure of 708 hours of high work.

Mr. Winkler then calculated the number of hours of high pay already received during the claim period. Mr. Aiken, for example, had already been paid for 34 hours of high work. As Table 2 again reflects, Mr. Winkler subtracted that from his estimate of hours performed to yield the number of hours of high work for which no high pay had been paid. Thus, in Mr. Aiken's case, he subtracted 34 from 708 to yield 674.

Some of these hours, however, were for overtime work. Thus far, Mr. Winkler's calculation failed to reflect that shipwrights were owed "time and a half" for overtime high work. So, as the attached Table 3 reflects, Mr. Winkler adjusted for this by adding a number of hours equal to half of the overtime performed, dividing this figure by 8, and multiplying by the hourly rate. Mr. Aiken received no such adjustment. But in Paul Scott's case, Mr. Winkler's calculations reflected that Mr. Scott had performed 373 hours of overtime. So Mr. Winkler divided this figure in half, to yield 172.5, divided by 8 to yield 22 additional days of work, and multiplied by 4 to yield an additional 88 hours of high work. Then, as the attached

Table 4 shows, Mr. Scott's initial 743 hours of high work were adjusted upward by 88, to 831, and he was awarded high pay for these hours.

## III. STATEMENT OF ISSUES TO BE RESOLVED BY THE COURT

The following issues are presented to this Court for resolution at the upcoming November 6, 2006 trial on the issue of accord and satisfaction:

- Does the grievance decision embody an settlement agreement?
- Are any portions of the grievance decision ambiguous? If so, how?
- Is there any extrinsic evidence of communications surrounding the negotiation or execution of the grievance decision that indicates that the grievance decision is, in fact, a settlement agreement?
- Is evidence of the parties' unexpressed intentions admissible to explain the meaning of an alleged agreement?
- Is evidence of communications that took place after the execution of an alleged agreement admissible to prove the meaning of the agreement?
- If the parties reached an agreement on January 18, 2000, what were its terms? Did the parties express to each other an understanding that the January 18, 2000 grievance decision represented a full and final resolution of all claims by shipwrights for high pay?
- Did the union have the authority to pursue the claims it did through consolidated employee grievances rather than a council grievance?
- If the union had the authority to pursue individual employee grievances, did the union and the Shipyard comply with the procedures

for such grievances when they excluded grievants from the Step 2 hearing and other grievance procedures?

- If the union's authority was limited to prosecuting a council grievance, did it have the authority to pursue a grievance that sought to define the terms under which the Shipyard would pay high work?
- If the union's authority was limited to prosecuting a council grievance, did it have the authority to negotiate individual high pay awards for each affected employee?
- Since the Shipyard's grievance decision failed to offer the shipwrights anything to which they were not already entitled, was there any consideration for the "benefits" the shipwrights received under it?

These legal and factual issues are discussed in the pages that follow.

## IV. <u>DISCUSSION OF LEGAL PRINCIPLES AND THEIR APPLICATION</u>

### A. General Principles of Contract Interpretation Apply to the Question of Accord and Satisfaction

An accord and satisfaction is "a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute."[1] As a "mutual agreement," analysis of an accord and satisfaction is governed by ordinary contract law principles.[2] One of those principles is that any writing alleged to embody the

[1] *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002); *quoting Nev. Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir. 1949).
[2] *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct. Cl. 101, 109 (1981).

agreement must be construed against the drafter.[3]

As with any contract, the Court's role in interpreting a claim of accord and satisfaction is to determine the parties' intent.[4] But unexpressed intent is not enough. There must be an objective manifestation of assent from each side to the other.[5] Each party's subjective intent is irrelevant if it is not communicated to the other party. Thus, the court in *Addison-Taylor* rejected affidavits from a union negotiator stating the union's intent in reaching an agreement, because the negotiator did "not attest that the union negotiators' understanding was expressed to agency negotiators."[6]

Hence, the document embodying the "agreement" is ultimately the best indicator of the parties' intent.[7]

## V. THERE WAS NO BONA FIDE DISPUTE

A prerequisite to finding an accord and satisfaction is the existence of a bona fide dispute.[8] Otherwise, a party could "manufacture a dispute that did not exist at the time, and then claim that they offered to settle the 'dispute' as consideration for an alleged accord and satisfaction."[9] Hence, a debtor may not proffer a smaller

---

[3] *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992).
[4] *Ahrens v. United States*, 62 Fed. Cl. 664, 669 (2004).
[5] *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419-20 (1999) ("Plaintiff here must show something more than 'subjective intent' in order to preclude summary judgment for defendant on its defense of accord and satisfaction."); *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct. Cl. 101, 109-10 (1981).
[6] *Addison-Taylor v. United States*, 63 Fed. Cl. 345, 351 (2004).
[7] *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419-20 (1999).
[8] *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002); *Edwards v. United States*, 22 Cl. Ct. 411, 422 (1991).
[9] *Edwards v. United States*, 22 Cl. Ct. 411, 422 (1991).

sum than what is clearly owed, and then claim that it constitutes accord and satisfaction for the entire undisputed amount; both parties must agree that there is an amount in dispute first.[10]

An accord and satisfaction can only resolve a controversy that exists at the time of resolution.[11] Here, the relevant time is January 18, 2000, the date the grievance decision was issued.

As of that date, however, the Shipyard had no bona fide basis for disputing the shipwrights' entitlement to high pay under the circumstances set forth in the grievance decision. Two months earlier, the Shipyard's human resource officer had researched the matter and concluded, in writing, that the Shipyard owed high pay under precisely the circumstances set forth in the decision. The Shipyard had no basis for believing Ms. Niemi's memorandum was incorrect.

"[A]n agreement must settle a bona fide dispute over hours or compensation to be enforceable"[12] For if "there is no bona fide dispute over hours worked or compensation due, then the employer **must** pay the employee."[13] Here, having learned that it was required to pay high work under the terms set forth in Ms. Niemi's memorandum, the Shipyard had only one recourse: pay what was undeniably owed. What the Shipyard could **not** do was withhold what was admitted owed in an effort to extract concessions from its employees. Yet that is precisely what the Shipyard did.

---

[10] *See, e.g., McDonald v. United States*, 13 Cl. Ct. 255, 261 (1987).
[11] *Edwards v. United States*, 22 Cl. Ct. 411, 422 (1991).
[12] *Hohnke v. United States*, 69 Fed. Cl. 170, 175 (2005).
[13] *Hohnke v. United States*, 69 Fed. Cl. 170, 175 (2005).

Moreover, there could be no bona fide dispute over the shipwrights' entitlement to high pay or the definition of "high work" because those matters were defined by statute and regulation.

In this sense, the environmental differential statute[14] that mandates high pay is the same as statutes requiring premium pay under the Fair Labor Standards Act (FLSA).

In the context of claims under the FLSA, courts have uniformly held that there can be no bona fide dispute, and therefore no accord and satisfaction, regarding coverage of the FLSA. The environmental differential pay statute, like the FLSA, is mandatory.[15] To allow parties to settle disputes concerning the coverage of a mandatory pay statute would allow employers to contract with their employees for pay under conditions that violated these statutes.[16]

For these two reasons, no bona fide dispute existed when Ms. Tallman issued her grievance decision. The Shipyard knew that it owed high pay under, at a minimum, the circumstances spelled out in Ms. Tallman's decision. At that point, the Shipyard had no right to withhold pay under those circumstances as a means to extract concessions from its employees. And the Shipyard had no right to redefine what constituted high pay within the meaning of the environmental differential pay statute. Because there was no bona fide dispute, there can be no accord and satisfaction.

---

[14] 5 U.S.C. § 5343(a)(5), *implemented by* 5 C.F.R. § 532.511.
[15] *Hohnke v. United States*, 69 Fed. Cl. 170, 175 (2005), *quoting Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 710 (1945).
[16] *Hohnke v. United States*, 69 Fed. Cl. 170, 175 (2005).

### A. None of the Four Elements of Accord and Satisfaction Is Present

Because accord and satisfaction is an affirmative defense, the Shipyard has the burden of proving all four elements.[17] To meet its burden of proving an accord and satisfaction that fully settled the shipwrights' claims for high pay, the Shipyard must establish four elements: proper subject matter; competent parties; a meeting of the minds; and consideration for the new agreement.

#### 1. There Was No Objectively Expressed Meeting of the Minds

A meeting of the minds is the "critical element" of an accord and satisfaction.[18] The court will determine if there is a meeting of the minds by examining "the totality of the circumstances."[19] The most important factor is the parties' objectively expressed intent,[20] and the most important indicator of intent is the writing embodying the alleged agreement.[21]

The Shipyard alleges that the union and the Shipyard had a meeting of the minds that employees would give up their right to sue for back pay for work performed prior to March 23, 1999. But the language of the grievance decision – the only document evidencing the alleged accord and satisfaction – does not demonstrate a meeting of the minds. In fact, the language of the decision indicates

---

[17] Court of Federal Claims Rule 8(c); *Ahrens v. United States*, 62 Fed. Cl. 664, 668 (2004); *O'Conner v. United States*, 60 Fed. Cl. 164, 168 (2004).
[18] *McDonald*, 13 Cl. Ct. at 260.
[19] *Ahrens*, 62 Fed. Cl. at 670; *see also Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990).
[20] *Id.*
[21] *Id.* at 671; *see also Greco v. Dept. of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988).

that it was a unilateral decision made by Mary Jane Tallman on behalf of the Shipyard. The grievance decision contains the following language:

> After careful consideration of the information presented in the grievance, during the grievance meeting, and through further investigation of this matter, **I have reached the following conclusions. ... I conclude that this grievance, as it relates to the back pay requested, is untimely.**

This language does not suggest that the document is the result of the union and the Shipyard reaching a negotiated agreement.

Nor does the decision contain any language that suggests or even implies that the shipwrights were giving up any of their rights. More telling, nothing in the grievance decision identifies exactly what the employees would be giving up.

There can be no meeting of the minds without "sufficient expression [in the agreement] to make it unreasonable for [the grievants] not to realize that the performance offered by the government was made in full satisfaction of their claims."[22] This is because of the "representative relationship between the union and the **specific, individual** members who filed the grievance."[23] The grievance decision contains no language that would indicate to a shipwright that the decision represented a full and final settlement of his or her claim such that he or she would be precluded from seeking judicial relief. Hence, nothing in the decision put any shipwright on notice that his or her claim had been settled.

The language of Ms. Tallman's grievance decision stands in stark contrast to the agreements found to constitute accord and satisfaction in *Ahrens* and *Addison-*

---

[22] *Ahrens*, 62 Fed. Cl. at 672.
[23] *Id.*

*Taylor*. It also contrast with language the Shipyard and union used when they settled other high-pay grievances.

Excerpts quoted by the *Ahrens* court make clear that the Memorandum of Understanding between union and employer there showed a settlement. First, it was designated a "Memorandum of Understanding" as opposed to a "decision" by the contracting parties. Also, a "prefatory memorandum" to the MOU, signed by representatives of the Navy and the union, stated that "the MOU was reached to resolve the [FLSA] grievances…."[24] The first sentence stated that the MOU was made "by and between" the Navy and the union "in consideration of the mutual promises and representations contained herein…."[25] The MOU also stated that the FLSA grievances "are hereby resolved."[26] No language of this type appears in the grievance decision.

Likewise, the agreement in *Addison-Taylor* contained the following language: "The Employer agrees to pay the Union a total of $5,285,000…"[27] and "[t]he $5,285,000 payment represents all backpay, interest, liquidated damages and attorneys' fees and costs…."[28] Further, the union agreed it would not "arbitrate the matters asserted in the FLSA grievances…nor [would] they pursue to arbitration

---

[24] *Id.* at 666.
[25] *Id.*
[26] *Id.* at 670.
[27] *Addison-Taylor v. United States*, 63 Fed. Cl. 345, 348 (2004).
[28] *Id.*

individual employee FLSA claims other than as provided in [the] Agreement…."[29] Again, this is in contrast to the grievance decision.

Here, meanwhile, the Shipyard and the union twice settled grievances over high pay, once on behalf of main ballast tank workers before the decision was issued and once on behalf of Mark Mascioli after. In each case, the parties captioned the pertinent document as a "settlement agreement" and repeatedly used language that expressly indicated that the parties "agreed" to the terms set forth.

In its order on the parties' cross-motions for summary judgment, this Court held out the possibility that extrinsic evidence might establish that what was a unilateral order on its face was, in fact, an agreement that constituted an accord and satisfaction. As set forth above, any such extrinsic evidence must take the form of communications between the parties, because unexpressed intentions are irrelevant. But none of the individuals involved in the grievance remembers any conversations pertinent to the issue of accord and satisfaction. No one recalls agreeing that the grievance decision was a full and final settlement of the shipwrights' claims, no one recalls discussing the impact of the union's decision not to pursue arbitration, and no one recalls discussing the impact of the decision on the shipwrights' right to pursue a judicial remedy.

The Shipyard's Memorandum of Contentions of Law and Fact argues that post-decision correspondence, including some that took place two years after Ms. Tallman signed her decision and this lawsuit started, shows that the union thought

---

[29] *Id.*

the grievance decision was a settlement. This correspondence, however, is irrelevant and inadmissible. Extrinsic evidence concerning the meaning of a contract is only admissible if it existed prior to or contemporaneous with the agreement.[30] Otherwise, parties could attempt to modify a previously executed contract through a post-contract paper chase. The dangers of allowing extrinsic evidence increase exponentially when post-lawsuit evidence is concerned, as the parties have the motive and opportunity to doctor up extrinsic "evidence" of the parties' intent. In any event, the post-contracting extrinsic evidence does not favor the Shipyard. The Shipyard's human resources officer and in-house counsel Steve Seaton referred to Ms. Tallman's decision as her unilateral decision (as did Ms. Tallman's previous declarations in this case).

In short, Ms. Tallman's grievance decision lacks "accompanying expressions sufficient to make the [party] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise."[31] The decision gave the individual shipwrights no notice that it was intended to be a full and final settlement of their claims. Because the grievance decision lacks this crucial element, it cannot effect an accord and satisfaction.

### 2. The Grievance Decision Signed by the Union and the Shipyard Was Unsupported by Consideration

"As with any contract modification, a valid accord and satisfaction must be

---

[30] RESTATEMENT (SECOND) OF CONTRACTS § 214 (1979); *California Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 25 (1990) ("This Court, however, has never held that legitimate subsequent modification indicate a written license was not final and completely integrated. Only actions and negotiation prior to, or contemporaneous with, the execution of the license would have any relevance.").

[31] *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct. Cl. 101, 109 (1981).

supported by consideration."[32] Consideration will be found where "there is a detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor."[33]

But performance of a pre-existing duty can never serve as consideration.[34] Here, the grievance decision offered nothing to the shipwrights that the Shipyard did not already owe them.

First, the Shipyard's human resources officer Lynnette Niemi concluded that the Shipyard was required to pay shipwrights high pay under the circumstances described in her memorandum. That is all the grievance decision offered.

Second, neither the grievance decision nor Ms. Niemi's memorandum expanded the availability of high pay beyond those circumstances already set forth in applicable regulations and in the OPM Operating Manual. Indeed, it might be more restrictive. A comparison of the grievance decision and the regulatory and contractual definitions of "high work" reveals no concession on the Shipyard's part. The grievance decision committed to pay high pay when shipwrights were:

> 1) Building and dismantling staging beginning from the first level above ground/deck unless: a) flooring and safety rails are installed, or b) fall protection devices can be properly used. 2) Building and dismantling hanging staging under similarly unguarded situations when fall protection devices cannot be properly used.

The environmental differential pay regulation requires high pay to be paid when workers are:

---

[32] *Thomas Creek Lumber & Log Co. v. United States*, 36 Fed. Cl. 220, 242 (1996).
[33] *Ahrens*, 62 Fed. Cl. at 672.
[34] *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004).

(a) Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor, or roof, or from the bottom of a tank or pit;

(b) Working at a lesser height;

(1) If the footing is unsure or the structure is unstable; or

(2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or

(3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.[35]

The grievance decision's language does not offer anything that the regulation does not already require.

Third, the grievance decision refused to pay high pay for high work performed more than 15 days before the grievance was in hand. Ms. Tallman based this refusal on the 15-day deadline for bringing grievances. Yet the Shipyard had already lost before the Federal Labor Relations Authority when it appealed an earlier arbitration award. The FLRA, applying labor law, ruled that the failure to pay wages amounted to a continuing violation.[36] Accordingly, it ruled that the 15-day time limit for filing a grievance did not bar the recovery of wages earned more than 15 days before the filing. This rule was issued under the same collective bargaining agreement to the one at issue here.

On January 18, 2000, the Shipyard had, and knew that it had, a pre-existing

---

[35] 5 C.F.R. § 532, Subpart E, App. A.
[36] *Am. Fed'n of Gov't Employees*, 46 F.L.R.A. No. 128 (1993).

and uncontested duty to pay high pay under the circumstances set forth in Ms. Niemi's memorandum and in the grievance decision, and it knew that the 15-day notice provision in the collective bargaining agreement did not bar relief going back more than 15 days before the filing of the grievance. The shipwrights received nothing from the grievance decision other than that to which they were already legally entitled. There was no consideration.

By contrast, in each of the Court of Federal Claims cases involving accord and satisfaction of an employee grievance, the government paid more than legally required. In *O'Connor*, which involves the same underlying settlement agreement as *Addison-Taylor*, the government paid the union $5,285,000, which not only represented back pay and interest, but liquidated damages, attorney's fees, and costs. The government paid the latter items even though the case had not yet been litigated. In *Ahrens*, the MOU required the government to provide an incentive program for any employees whose position classification was changed from non-exempt to exempt for overtime purposes, something the government was not legally required to provide.

To get around this problem, the Shipyard argues that the alleged accord and satisfaction was supported by consideration because each shipwright's individual high-pay award was somehow "generous." But there is no evidence of this generosity.

First, the shipwrights received no high pay for high work performed more then fifteen days before the grievance was filed even though they were entitled to it.

Next, those employees who were employed as shipwrights as of March 23, 1999, fifteen days before the grievance was filed, did not receive high pay for every day during the claim period. Shipwrights received average high pay awards that were substantially less than the average number of hours spent working on staging each day.

Next, it appears that when making the calculations, the Shipyard did not follow the federal regulations regarding the calculation of environmental differential pay. As Sec. S8-7(f) of the OPM Operating Manual shows, an employee is paid a minimum of one hour's differential pay. For exposure beyond this first hour, the employee is paid for at least 15 minutes. If an employee is exposed to the hazard intermittently, each exposure is considered a separate occurrence, warranting an hour of high pay. The Shipyard did not follow these regulations in making its high pay calculations. To the contrary, the Shipyard simply estimated the number of hours each shipwright normally spent doing high work and multiplied that number by the number of days in the claim period. Because the Shipyard has failed to keep records of high work, it is impossible to tell the number of exposures any shipwright might have faced. But Mr. Winkler justified his five-hour cap on high work ratings on the fact that shipwrights frequently climbed and dismantled the staging. This suggests that credit for multiple exposures should have been given.

Finally, the Shipyard's method for calculating individual high-pay awards contained no mechanism for dolloping extra high pay on the shipwrights. Certain,

there was nothing in the high-pay award calculation that compensated for the deprivation of years of high pay for high work performed more than 15 days before the grievance was filed. Rather, Mr. Winkler simply ordered a formulaic effort to calculate, as close a possible and subject to a cap of 5 hours, the average number of high work that each shipwright worked in an 8-hour day. Administrative efficiency, not generosity, was built into Mr. Winkler's system.

Generosity in the high-pay awards would have irrelevant in any event, because those high-pay awards were not, and could not have been, spelled out in the grievance decision. Because, as the following section explains, the union could only have pursued a high-pay grievance on behalf of all shipwrights as a council grievance, and a council grievance could not seek specific relief on behalf of individual shipwrights.

3. The Definition of High Work Was Not a Proper Subject Matter for the Collective Bargaining Agreement's Grievance Procedures and the Union Was Not Competent To Resolve a Generalized Dispute Regarding What Constitutes High Work

Thus far, this discussion has assumed that the union had the authority to enter into an "agreement" along the lines of Ms. Tallman's grievance decision. In fact, it did not.

As mentioned in the Statement of Facts above, the union had two relevant means to adjust grievances: it could pursue a grievance on behalf of an individual employee or it could pursue a "council grievance" on its own behalf. In the case of the shipwrights, the union chose to pursue 99 consolidated individual grievances. The collective bargaining agreement, however, did not allow the union to do this.

The agreement required the union to treat any grievance that was "not identifiable to a specific individual employee" but instead "was the result of an action … that significantly affects the provisions of this written Agreement" as a council grievance. And the collective bargaining agreement required a council grievance to set forth a "desired corrective action which is specific to the Council or the unit, **but in no event to individual employees.**"

Here, the union sought relief that was not specific to an individual employee but was the result of action that significantly affected the collective bargaining agreement. The collective bargaining agreement required the union to pursue any grievance as to the general terms under which high pay was required as a council grievance. This makes sense, because all shipwrights would be affected by the outcome of such a grievance.

Yet having opted for the impermissible option of pursuing individual grievances, the parties then failed to abide by the rules applicable to such grievances. Most importantly, the parties excluded almost all of the individual grievants from the meetings which they were entitled to attend, most notably the May 20 Step 2 meeting. Unlike other cases in which an accord and satisfaction has been found, the union and the Shipyard here failed – in the most important and elementary of ways – to comply with the grievance procedures set forth in the collective bargaining agreement.

As a council grievance, however, the process was even more fatally flawed. This is so because other provisions of the collective bargaining agreement did not

permit global questions about what constituted high work to be resolved through the agreement's negotiated grievance procedures. Section 3001(d) of the agreement excludes certain matters from the agreement's negotiated grievance procedures, including "matters that are not 'conditions of employment' as defined in the [Civil Service Reform] Act." The Civil Service Reform Act defines "conditions of employment" to exclude "policies, practices, and matters-- …(C) to the extent such matters are specifically provided for by Federal statute…."[37]

Environmental differential pay is specifically provided for by federal statute so it is exempt from the collective bargaining process. 5 U.S.C. § 5343(c) provides:

> The Office of Personnel Management, by regulation, shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide … (4) for proper differentials, "as determined by the Office," for duty involving unusually severe working conditions or unusually severe hazards…

The Office of Personal Management's environmental pay regulations are found at 5 C.F.R. § 532.511, Appendix J, and in Subchapter S8-7(c) of its Operations Manual.

Because the shipwrights' entitlement to high pay was specifically established by statute, it was not a "condition of employment" under the CSRA.

This interpretation is supported by case law, the legislative history of 5 U.S.C. § 7103(a)(14)(C), and decisions of the Federal Labor Relations Authority. Few cases have interpreted the meaning of "conditions of employment." Those that have had generally held that, because wages and pay for federal employees are typically prescribed by federal statute, those issues are exempt from bargaining as

[37] 5 U.S.C. § 7103(a)(14).

"conditions of employment" except for the "miniscule minority of federal employees"[38] whose pay conditions are not prescribed by statute. The Third Circuit, for example, held that the Navy could not be forced to bargain over the pay of civilian mariners, because "Congress did not intend to subject the pay of federal employees to collective bargaining under [5 U.S.C. § 7103(a)(14)(C)]."[39] Decisions by the Federal Labor Relations Authority have reached this same result.[40]

Other than a small group of federal employees, such as teachers on military bases, Congress intended for pay rates to be exempt from the collective bargaining process. The House Report on the Committee's bill provides: "Federal pay will continue to be set in accordance with the pay provisions of title 5, and fringe benefits, including retirement, insurance, and leave, will continue to be set by Congress."[41] The sponsor of the version that Congress enacted into law stated, "there is not really any argument in this bill or in this title about federal collective bargaining for wages and fringe benefits and retirement.... All these major regulations about wages and hours and retirement and benefits will continue to be established by law through congressional action."[42]

The case law speaks generally to the union's power to bargain away matters

---

[38] *Ft. Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641, 649, 110 S. Ct. 2043, 109 L. Ed. 2d 659 (1990).
[39] *Dept. of the Navy v. Federal Labor Relations Authority*, 836 F.2d 1409, 1419 (3d Cir. 1988).
[40] *See, e.g., Fort Bragg Unit of North Carolina Ass'n of Educators & Fort Bragg Dependents Schools*, 12 FLRA No. 100 (1983); *International Brotherhood of Electrical Workers & Dept. of the Army*, 10 FLRA No. 43 (1982); *National Treasury Employees Union & Pension Benefit Guaranty Corp.*, 9 FLRA No. 82 (1982).
[41] H.R.Rep. No. 95-1403, 95th Cong., 2d Sess. 12 (1978).
[42] 124 Cong. Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall).

that are specifically provided by statute. Here, of course, the situation is different: the union relinquished its right to pursue grievances arising from matters that were not "conditions of employment." While the collective bargaining agreement did not deprive the union of the right to adjust individual grievances over the number of hours spent performing high work, it did preclude the union from addressing more globally the circumstances under which shipwrights were entitled to high pay by statute.

## VI. PLAINTIFFS' OBJECTIONS TO DEFENDANT'S EXHIBITS AND WITNESSES

Plaintiffs object to the following exhibits offered by defendants:

Ex. 2. Collective Bargaining Agreement June 2003.

This Agreement is irrelevant, because it was entered into three-and-a-half years after the grievance decision was issued by the Shipyard on January 18, 2000, and over three years after this lawsuit was filed.

Ex. 54-58. Documents related to "Unfair Labor Practice Charge."

The Shipyard offers these post-decision exhibits because they refer to the grievance decision as a settlement. They are irrelevant extrinsic evidence regarding the meaning or intent of the January 18, 2000 decision. Only statements or other evidence that occurred prior to or contemporaneous with a purported contract are relevant to interpret a document's meaning.[43] These documents were created after issuance of the grievance decision and initiation of this lawsuit.

Ex. 61-62. Mascioli grievance documents.

[43] Restatement (Second) of Contracts § 214 (1979); *California Sand & Gravel, Inc.*, 22 Cl. Ct. at 25.

To the extent that these exhibits are offered to show evidence of the parties' intent regarding the alleged January 18, 2000 "settlement" of the shipwrights' high pay grievance, they are inadmissible. The Mascioli grievance was filed after issuance of the grievance decision and initiation of this lawsuit. As discussed in reference to Ex. 54-58, only evidence of negotiations or statements that took place prior to or contemporaneous with an agreement are admissible as evidence regarding the parties' intent.

Ex. 69. Declaration of Barry Joe Aiken.

Mr. Aiken's declaration is an out-of-court statement. As such, it is hearsay under Fed. R. Evid. 801(c), and inadmissible under Fed. R. Evid. 802. Mr. Aiken indicated in his deposition that he will be available for trial, so none of the exceptions available under Fed. R. Evid. 804 are applicable. Nor do the exceptions of Fed. R. Evid. 803 apply. It is possible that some or all of the declaration may be admissible to impeach Mr. Aiken under Fed. R. Evid. 801(d)(1), but a decision whether such a use is proper must await Mr. Aiken's testimony at trial.

## VII. CONCLUSION

Faced with the undisputed fact that it owed high pay for the work described in Lynnette Niemi's memorandum and that it owed this money for years before the shipwrights filed their grievance, Ms. Tallman and Mr. Winkler struggled to wriggle free from these obligations. Rather than concede and pay the money it owed, as required, the Shipyard instead hatched a plan to try and limit its exposure to a period beginning 15 days before the grievance was filed. The grievance decision

took much away from the shipwrights, but gave them nothing in return. All the shipwrights received was what the Shipyard owed them in the first place. No settlement agreement did, or could, permissibly do this.

In short, the Shipyard's case for accord and satisfaction lacks evidence of

- a bona fide dispute over its obligation to pay high pay,
- consideration,
- a document that looks even remotely like a settlement agreement,
- extrinsic evidence of such an agreement, and
- the parties' compliance with the dispute resolution provision of the collective bargaining agreement.

Without this evidence, the Shipyard lacks a case, and it cannot prove its accord and satisfaction case. Accordingly, the Court must dismiss it with prejudice.

DATED this 11th day of September, 2006.

Respectfully Submitted,

s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs