**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM OF LAW AND FACT ON THE ISSUE OF ACCORD AND SATISFACTION**

Pursuant to this Court's order, dated September 15, 2006, the United States respectfully submits its reply to plaintiffs' memorandum of law and fact on the issue of accord and satisfaction.[1]

## INTRODUCTION

In their memorandum of law and fact, plaintiffs put forth several arguments as to why there could not have been a valid accord and satisfaction. The first argument is that there was no bona fide dispute. There are two components to this argument. The first is that several months earlier, during the investigation phase of the grievance, the Puget Sound Naval Shipyard (the "Shipyard") reached the conclusion that plaintiffs were entitled to high pay.[2] Thus, they argue, because the settlement was identical to the findings made in the investigative phase, there was no

[1] Defendant does not respond herein to plaintiffs' contentions regarding the admissibility of certain evidence, as such matters are more properly addressed in motions in limine, to be filed on October 20, 2006, after the final pre-trial exhibit list is settled.

[2] The investigation was conducted by Ms. Lynnette Niemi.

bona fide dispute.[3] The second component of their first argument is that there also could be no bona fide dispute because the shipyard was statutorily bound to pay high pay and therefore, as in the case of the Fair Labor Standards Act, a mandatory pay statute cannot be compromised.

Plaintiffs' second main argument is that proper subject matter is lacking. Specifically they argue that "high pay" is specifically provided for by federal law, and under the Collective Bargaining Agreement is excluded from the negotiated grievance procedure. That being the case, they argue, the union could not settle this claim. Plaintiffs also raise several other issues of lesser importance; that the union failed to "publicize" the decision and this somehow affects the validity of the settlement; and, that the main union negotiator was somehow compromised (apparently by receiving a promotion shortly after the final settlement). Although not stated explicitly, this seems to fit into the failure to publicize portion of their statement of law and fact.

Plaintiffs' arguments demonstrate a misunderstanding of federal law as it applies to federal employees and collective bargaining within the federal system. Their arguments also attempt to disparage the lead union negotiator, who obtained a settlement in which plaintiffs and other shipwrights now potentially receive high pay as soon as they are off the ground, but limited the award of back pay to 15 days prior to the filing of the grievance. While one may argue with that aspect of the settlement, to attempt to taint him with unethical conduct is simply beyond the pale.

---

[3] Plaintiffs also state that this reason also means that there was no real consideration because the shipyard was already bound to pay high pay.

## ARGUMENT

### I. Environmental Differential Pay Is A Local Determination

Plaintiffs in this case are wage-grade employees. Pay for wage-grade employees is set by the Prevailing Rate Systems Act, 5 U.S.C. §§5341-5349. Under this Act, the Office of Personnel Management ("OPM") is tasked with conducting wage surveys in the local commuting area and determining what the prevailing wages are for similar, private sector wage-type jobs. These surveys are then used to set the base wages for the federal wage-grade employees in that wage area. In addition, OPM is also statutorily tasked with establishing another component of this pay, namely the payment of Environmental Differential Pay ("EDP") – which is paid for duty involving unusually severe working conditions or hazards. There are numerous categories for EDP, such as working with poisons, working in pressure chambers, exposure to asbestos, or in this case, high work.[4]

At the time the grievance and subsequent lawsuit was initially filed, 5 U.S.C. §5343(c)(4) provided, in part, that:

> The Office of Personnel Management, by regulation shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide–
>
> ***
>
> (4) for proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually

---

[4] All EDP is a percentage of the salary of a WG-10/Step 2. The percentage varies depending upon the type of severe working condition or hazard. In the case of high work, it is 25%.

severe hazards; . . . .[5]

OPM initially published these "proper differentials" (that is, Environmental Differential Pay) as Appendix J to the Federal Personnel Supplement Part 532-1, Subchapter S8-7. With respect to this matter, the Collective Bargaining Agreement ("CBA") between the shipyard and the union that covers the plaintiffs discusses EDP in Article 10 and references the FPM Supplement. In the 1990s, the Federal Personnel Manual and Supplements were retired, and these differentials are now published in 5 C.F.R. §532.511.

Pursuant to the statutory mandate cited above, when OPM issued its regulations providing for EDP for categories of working conditions, rather than providing specific levels or triggers for EDP entitlement, it specifically left these determinations up to the local installation or activity. Thus, at the time this grievance and lawsuit were initiated, 5 C.F.R. §532.511 provided:

> (a) Entitlements to environmental differential pay.
>
> (1) In accordance with Section 5343(c)(4) of Title 5, United States Code, an employee shall be paid an environmental differential when exposed to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management.
>
> (2) Each installation or activity must evaluate its situations against guidelines issued by the Office of Personnel Management to determine whether the local situation is covered by one or more of the defined categories.

---

[5] On November 24, 2003 Congress amended the statute and specifically stated that EDP for asbestos exposure must be based upon the OSHA Permissible Exposure Limit. The importance of this will be discussed below with respect to whether EDP is a "condition of employment" and therefore excluded from coverage of the Collective Bargaining Agreement.

5 C.F.R. §532.511 (emphasis added).

This "local determination" is key to understanding the error in plaintiffs' argument. Under OPM regulations, and included in the collective bargaining agreement between the parties, high pay is authorized when:

> a. Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor or roof, of from the bottom of a tank or pit;
>
> b. Working at a lesser height:
>
> (1) if the footing is unsure or the structure is unstable;
>
> (2) if safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or
>
> (3) if adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.[6]

5 C.F.R. Part 532 Appendix A to Subpart E. Aside from the 100 foot trigger in paragraph (a), there is no trigger for when high pay is authorized. Plaintiffs' argument, however, is that because the plaintiffs are entitled to high pay their can be no bona fide dispute. The flaw in this logic is that under the statutory scheme, as implemented by OPM, *when* to pay is a matter of local determination. Stated another way, although entitled to EDP, there must be a trigger and this trigger can be determined locally, to include via arbitration.

---

[6] As this Court held in Jaynes v. United States, 68 Fed. Cl. 747 (2005), work above 100 feet is not at issue in this case.

The regulations for the payment of EDP are published in the Code of Federal Regulations by OPM. OPM also publishes a manual to guide federal agencies in the application of OPM's regulations. One subchapter of the OPM Manual, S8-7, is devoted to explaining how a Federal agency is to determine the proper EDP entitlement. The OPM Manual makes clear that the determination of when EDP is to be paid is to be made by the local Federal activity. It goes on to explain that the collective bargaining process is a completely acceptable means to make the local determination. Therefore, not only is the determination of when to pay EDP not "provided for by statute," but Federal pay guidelines expressly permit that the when determination can be made with the participation of the union as it was in the settlement agreement in the instant case. The OPM Manual, chapter S8-7 reads in pertinent part:

> g. Determining local situations when environmental differentials are payable.
>
> 1. Appendix J defines the categories of exposure for which the hazard, physical hardships, or working conditions are of such an unusual nature as to warrant environmental differentials, and gives examples of situations which are illustrative of the nature and degree of the particular hazard, physical hardship, or working condition involved in performing the category. The examples of the situations are not all inclusive but are intended to be illustrative only.
>
> 2. Each installation or activity must evaluate its situations against the guidelines in appendix J to determine whether the local situation is covered by one or more of the defined categories.
>
>     a. When the local situation is determined to be covered by one or more of the defined categories (even though not covered by a specific illustrative example), the authorized environmental differential is paid for the appropriate category.
>
>     b. When the local situation is not covered by one of the defined categories but is considered to be unusual in nature so as to warrant payment of an environmental differential, a

differential may not be paid, but action is to be initiated to request OPM to consider authorizing the payment of an environmental differential.

3. Nothing in this section shall preclude negotiations through the collective bargaining process for:

   a. Determining the coverage of additional local situations under appropriate categories in appendix J and application of appendix J categories to local work situations. For example, local negotiations may be used to determine whether a local work situation is covered under an approved category, even though the work situation may not be described under a specific illustrative example.

OPM Manual, chapter S8-7 (emphasis added).

This is also the clear position of the Federal Labor Relations Authority. In Department of Navy, Charleston Naval Shipyard, SC and Federal Employees Metal Trade Council, 39 FLRA No 84, 39 FLRA 987 (March 5, 1991), the FLRA stated its oft repeated holding that:

> FPM Supplement 532-1, appendix J, is a Government-wide regulation which lists categories of situations, such as "high work" requiring the payment of environmental differentials. However, the specific work situations for which EDP is payable under the categories of appendix J are left to local determination, including arbitration.

Id. See also International Ass'n of Machinists & Aerospace Workers, District Lodge 725, Local Lodge 726 & United States Navy, Naval Air Depot, North Island, 60 FLRA No. 44, 60 FLRAS 196 (August 26, 2004). Similarly in Allen Howarth, Jr. v. The United States, 41 Fed. Cl. 160 (1998), the plaintiffs sought EDP for asbestos exposure, arguing that any exposure entitled them to payment. The Court disagreed, noting that the statute and OPM regulations were silent regarding a specific level of exposure warranting EDP thereby leaving the determination of a triggering point to the local agency. Id. at 163. Thus, just

because the plaintiffs are authorized to receive EDP does not mean they get it. Rather, the relevant question before the Shipyard was determining the circumstances for when they would be entitled to it.

The fact that there must be a local determination makes sense in the context of the regulation, because the entitlement is for unusually severe working conditions or unusually severe hazards. Rather than rigidly define the terms "unusually severe," OPM left it to local installations. In the present matter, the parties had not, prior to the grievance that preceded this litigation, negotiated a specific height or standard for payment of high pay. Indeed, as indicated by Mr. Winkler, the shipyard paid EDP for high work only in limited circumstances, such as working on staging in difficult weather.[7] Once the grievance was filed, the parties began exploring resolution. To that end, the shipyard tasked Ms. Lynnette Niemi, at the time a Personnel Management Specialist, to help investigate and see what the practice for paying EDP for high work at the shipyard was and whether a change may be warranted. After her investigation was completed, she noted that Appendix J states the general rule, but she recommended that the plaintiffs receive EDP for high pay beginning from the first level above ground/deck unless flooring and safety rails are installed or fall protection can be properly used.

Contrary to plaintiff's assertions, Lynnette Niemi's memorandum was nothing more than a recommendation. After researching the issue, Ms. Niemi had concluded that EDP for high work could be paid to Shipwrights without violating pay regulations, and

[7] First Declaration of Mark Winkler ¶ 3 (submitted as part of the Corrected Copy of Defendant's Opposition to Plaintiffs' Motion for Class Certification).

she suggested a policy for Mary Jane Tallman to consider. Under the collective bargaining agreement, only Mary Jane Tallman as the Shop Superintendent had the authority to decide or settle the grievance. Ms. Niemi from the Human Resources office was assisting her. Therefore, it would reverse the "chain of command" to say that Ms. Niemi's memorandum was anything more than a pre-decisional recommendation. It would be fair to say is that Mary Jane Tallman had received a recommendation from Lynnette Niemi that described a pay standard that Ms. Niemi believed would not be inconsistent with the federal pay regulations.

Further, the fact that the shipyard eventually adopted that standard as its position when settling the grievance does not mean that there was not a bona fide dispute. Rather, it clearly shows that whereas before there was no real standard for when to pay (e.g., a specific height), high pay now is granted beginning at the first level off the ground unless safety rails are installed or fall protection devices can properly be used. Plaintiffs' argument completely ignores the well-established principle that EDP is a local determination. For example, high pay is generally paid with reference to a certain height. At what height is the employee exposed to "an unusually severe hazard?" Should high pay for an "unusually severe hazard" begin at 10 feet, 20 feet, 30 feet, or some other option? There is no statutory or regulatory answer to that question, and that was the question that needed to be determined locally. The settlement agreement set the height for the payment of high pay at the height a safety harness would be required, which we know to be five feet off the ground. Starting high pay at five feet off the ground was the extraordinarily generous pay policy set by the settlement agreement. Mary Jane Tallman

was not required by statute to start high pay at five feet, that was a determination that can only be explained by the process of negotiation with the union. It is this generous settlement about which plaintiffs now complain.

With the settlement of the grievance the parties created a new local determination. The entitlement to high pay was a given, however, when they were entitled was not. It was a local determination. With the settlement of the grievance a new local determination was established. Thus, there was clearly a bona fide dispute that was resolved with the settlement of the grievance.

## II. Environmental Differential Pay Is Not The Same As Payments Made Under The Fair Labor Standards Act

The plaintiffs' second component to their first argument is that EDP is a mandatory pay statute and therefore because they were entitled to EDP, there could be no bona fide dispute as to their entitlement. They equate EDP with the Fair Labor Standards Act and state that because EDP is mandatory, there could be no dispute as to their entitlement to it. That is, "to allow parties to settle disputes concerning the coverage of a mandatory pay statute would allow employers to contract with their employees for pay under conditions that violated these statutes." Pl. Mem. of Law & Fact at 22. For reasons similar to those discussed above, plaintiffs' argument misses the mark.

The Plaintiffs cite to Janelle Hohnke v. The United States, 69 Fed. Cl. 170 (2005), in support of their position. The facts in Hohnke are somewhat involved, but in short, Ms. Hohnke sought overtime wages allegedly owed to her under the FLSA despite previously having signed a settlement agreement in an unrelated EEO case that waived,

among other things, overtime compensation claims including FLSA claims. Id. at 172. Ms. Hohnke was represented by an attorney when she signed the settlement agreement. Later, she did file a claim for overtime with the Court of Federal Claims, after realizing that as a dog handler she might be entitled to wages for caring for the dog during her off-hours. The Court held that there could be no valid accord and satisfaction. However, the Court made it clear that the reason was that a party could not waive entitlement to overtime under the FLSA. That is, if the person was covered by the Act and worked overtime, they had to be paid. Id. at 174-75. Thus there could be no bona fide dispute over the Act's coverage. That said, the Court went on to state that there could be a bona fide dispute over hours worked or compensation due. Under such circumstances there could be a valid settlement. Id. at 175-76.

The Court, however, also held that had Ms. Hohnke been a member of a federal union and had that union settled the FLSA claim, then a valid settlement would have occurred. The Court cited to O'Connor v. The United States, 308 F.3d 1233 (Fed. Cir. 2002), rehearing denied and rehearing en banc denied, 2003 U.S. App. LEXIS 3402 (Fed. Cir., Feb. 7, 2003), for this proposition. O'Connor was also a dispute brought under the FLSA. Prior to that, though, the unions representing Mr. O'Connor and his co-workers had filed a grievance seeking overtime payment under the FLSA. The unions and the United States entered a global settlement and resolved the matter. Thereafter, O'Connor and others filed suit. The Court of Federal Claims initially held, in part, that there had been a valid accord and satisfaction and the Court of Appeals for the Federal Circuit upheld that finding.

Importantly for the purposes of this case is what the Federal Circuit had to say regarding a bona fide dispute. The Court noted that there was some ambiguity as to whether the suit was over the coverage of the Act or the amount of hours owed. However, that issue did not have to be resolved in order to determine that a valid accord and satisfaction had occurred. 308 F.3d at 1243 n.3. The Court observed that the Civil Service Reform Act ("CSRA") authorized unions and authorized them to represent federal employees. It authorized unions to pursue grievances pursuant to a negotiated grievance. Because of this, federal employees were not in the same situation as non-federal employees, and pursuant to the CSRA could legitimately relinquish their FLSA rights as part of an accord and satisfaction. Id. at 1242-43.

### A. This Was Not A Dispute Over Whether Environmental Differential Pay Is Payable But Over When Shipwrights Were Entitled To It

Plaintiffs' premise is misplaced. The Shipyard has not disputed that EDP is a component of their base pay (and, in that sense, is mandatory). Rather, the Shipyard disputed, in the grievance procedure, the circumstances when that pay was due. The dispute centered upon the "local determination" component of when EDP and high pay will be paid. As discussed above, the statutory scheme, as interpreted by the Courts and the FLRA make clear that the application of the proper EDP differentials is a matter for local determination – whether that is done via an agency regulation, a collective bargaining agreement, or arbitration. The better analogy in this case is that the dispute over when to pay high pay was similar to a dispute over the number of hours of overtime worked. In Hohnke, the Court clearly stated that such a dispute would be bona fide.

### B. Even If The Dispute Had Been Over Whether Environmental Differential Pay Was Payable, A Settlement Made By A Union On Behalf Of Its Members Is Enforceable

Even if plaintiffs' argument above were correct, it still ignores the conclusion reached in both Hohnke and O'Connor that settlements negotiated by federal unions on behalf of their members are binding. Plaintiffs' may properly dispute whether there was a settlement, what was settled, or who was covered. See Ahrens v. United States, 62 Fed. Cl. 664 (2004). However, the plaintiffs here are attempting to assert that there can never be a bona fide dispute because of the mandatory nature of the Prevailing Rate Systems Act. This is simply not true. The O'Connor court made clear that it did not matter whether the dispute was over hours or the coverage of the FLSA because under the Civil Service Reform Act, federal unions, pursuant to collective bargaining agreements, can settle issues arising under the FLSA, regardless of how they arise.[8] Thus, even if this case involved whether the Shipyard had to pay (which it does not) as opposed to when or under what circumstances it had to pay, the union could still, consistent with the Civil Service Reform Act, have settled the dispute because, as will be discussed below, payment of EDP is a proper subject for grievances under the CBA.

## III. High Pay Is Not Specifically Provided For By Statute

Plaintiffs also assert as a second argument that the definition of high work was not a proper subject matter for the CBA's grievance procedures and the Bremerton Metal

---

[8] The Government is also mindful that there is no dispute as to whether there is proper subject matter jurisdiction in this case. The issue is whether, in the administrative phase, did the plaintiffs' union settle all of its members' claims so as to act as a valid accord and satisfaction.

Trades Council was not competent to resolve such a dispute. As an initial matter, this argument is directly contrary to this Court's earlier ruling on the Defendant's Motion for Partial Summary Judgment that there was proper subject matter and competent parties. Specifically, the Court previously held that it "agrees that the subject matter of plaintiffs' claims would be appropriate for accord and satisfaction and that BMTC and PSNS were competent parties to reach such a settlement." Jaynes v. United States, 68 Fed. Cl. 747, 757-58 (2005). Plaintiffs have not specifically requested reconsideration of this ruling, and could not meet the standard for reconsideration, in any event. Reconsideration will be granted only where (a) an intervening change in the controlling law has occurred; (b) evidence not previously available has become available; or (c) that the motion is necessary to prevent manifest injustice. See Bishop v. United States, 26 Cl. Ct. 281, 286 (1991). However, plaintiffs cite to no change in the law, and plaintiffs' argument revolves around the text of the union agreement, a document cited and appended to the parties' motions, and thus clearly available to them at the time of the motion. Reconsideration is "not intended to give an unhappy litigant an additional chance to sway the court." Circle K Corp. v. United States, 23 Cl. Ct. 659, 664-65 (1991).

Moreover, the plaintiffs' argument is incorrect. In essence, plaintiffs argue that Section 3001 of the CBA between the parties excludes EDP from its coverage because it is not a "condition of employment." Plaintiffs are correct that under the CBA matters that are not conditions of employment are excluded from coverage. They are also correct that the statutory definition of condition of employment excludes policies, practices and matters to the extent they are specifically provided for by federal statute. See 5 U.S.C.

§7103(a)(14). However, in this case EDP for high work is not specifically provided for by federal statute. Therefore, it is a proper subject matter for negotiation.

The plaintiffs' argument might be plausible if, for example, the Shipyard and the BMTC had said that the differential for high work would only be 15% as opposed to the 25% that was established by OPM. In that scenario it would be a plausible argument because under the statutory scheme, OPM has established the differential at 25%. Plaintiffs' argument, herein, however, lacks merit because the issue turns on what triggers the high pay – or, as stated above when or under what circumstances is high pay warranted (e.g., what height triggers the entitlement)? It does not turn on the right to EDP (under the circumstance determined locally) or the percentage amount. In other words, the right to and percentage are provided for by statute, but the when is not provided for by statute.

In November 2003, Congress amended 5 U.S.C. § 5343(c)(4) and, with respect to asbestos, set the trigger for entitlement as the Permissible Exposure Limit set by OSHA. It also made that provision retroactive and made it applicable to "any administrative or judicial determination after the date of the enactment of [the] Act . . . ." 5 U.S.C. §5343(c)(4) note on applicability of the 2003 amendment. See also National Defense Authorization Act for Fiscal Year 2004, Section 1122 (c), P.L. 108-136 (November 24, 2003). In that situation, Congress clearly amended the statute to set the triggering point (or the when or under what circumstances) for entitlement to EDP for asbestos exposure. Thus, unlike this case, with respect to asbestos, a union cannot now grieve the triggering

point for asbestos exposure because that has been provided for by statute and is no longer a condition of employment.

That, however, is contrasted with the present situation. Herein, as discussed above, when an employee receives EDP for high pay (and all other situations save asbestos) is a local determination, which may also be determined via arbitration. Indeed, if this were not so, Congress would have had no need to state that its amendment with respect to asbestos exposure was retroactive and applied to "administrative" determinations. A grievance and/or arbitration is an administrative procedure. Thus, there is no question that not only is the determination of when to pay EDP for high work a subject for local determination, but it is also a proper subject for a grievance under the CBA. Therefore, it was a proper subject matter for the parties to resolve.

## IV. An Alleged Failure To Publicize The Settlement And Alleged Misconduct On The Part Of The Union Negotiator Do Not Negate The Validity Of The Settlement

Plaintiffs raise several potential other legal issues, but do not clearly say how they may affect the settlement. They state that a failure to publicize and/or to follow the grievance procedures invalidates any settlement. They also intimate that the union negotiator was compromised because after the settlement was reached, he received a promotion. There is no merit to these allegations.

### A. The Alleged Failure To Publicize Or Follow Procedures Does Not Invalidate The Settlement

Plaintiffs allege that the union failed to publicize the settlement (or indeed to discuss it with the members for signing the agreement) and that means that there could not have been a meeting of the minds. Also, they allege that a failure to follow the

grievance procedures spelled out in the CBA means that there could not have been a valid settlement. Both of these allegations really go to a union's right, under the CSRA, to file grievances and to pursue them.

As the O'Connor court has made clear, under the CSRA, Congress authorized unions to represent federal employees and to act on their behalf. Specifically:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. . . .

5 U.S.C. §7114(a)(1). See also 308 F.3d at 1241. And, as the O'Connor court also noted, 5 U.S.C. §7121(b)(1)(C)(1) states that the union is to act on behalf of an employee in processing a grievance. 308 F.3d at 1241. There is nothing in the statute which states that as part of processing a grievance, which would include settling it, it must be publicized to all members, either before or after it is signed, in order for it to be valid. Because the union is the exclusive representative it acts on behalf of the employees. Its actions bind the employees. Indeed, in O'Connor, there were some 3,225 employees who received money under the settlement agreement. O'Connor v. United States, 50 Fed. Cl. 285, 295 (Fed. Cl. 2001). There is no indication in O'Connor that the union polled each and every employee or sought their approval before it entered into the global settlement. The reason for this is because the union did not have to do so. Statutorily, the union was authorized to act on behalf of the employees. In this case, it simply does not matter what the union did to communicate the agreement to its members. There is no statutory requirement that they do so. While it may have been a good idea if they had conferred

with their members before or after signing the settlement, there was no requirement that they do so.

Plaintiffs also assert that the parties failed to follow the CBA because not every union member was present at the meeting with Mary Jane Tallman, the management official who heard the grievance. This argument, too, demonstrates a fundamental lack of knowledge concerning collective bargaining in the Federal sector. As discussed above, the CSRA authorizes a union to process a grievance on behalf of the members of the union. With respect to failure to follow the grievance procedure, the FLRA has held that the harmful error rule can be used to determine whether the failure to follow the CBA should result in a reversal of the grievance decision. The harmful error rule must be used when resolving grievances over performance-based actions or serious adverse actions, and can be use in all other circumstances. For example, in American Federation of Government Employees Local 331 and Department of Veterans Affairs, Maryland Health Care System, 61 FLRA 103 (May 2, 2006), the agency failed to timely respond to the grievance. The CBA in that case said that failure to timely respond mean that the grievance should be resolved in favor of the union if the requested remedy was "legal and reasonable under the circumstances of the grievance." Id. The arbitrator concluded that the union had suffered no harm and then decided the grievance on the merits (and in favor of the Government). The FLRA held that the arbitrator had properly analyzed the arguments raised by the union and did not disturb his results. Similarly in Department of Health and Human Services, Social Security Administration, Region X, Office of Hearings and Appeals and AFGE Local 3937, 49 FLRA 691 (April 7, 1994), the FLRA

agreed with the arbitrator that the grievant had suffered no harmful error when he and the union objected to a note-taker being present during his oral reply and therefore did not give an oral reply as called for in the CBA.

In light of the above, the failure to follow the CBA in this case should be analyzed in light of whether there was any harmful error. There could not have been any harmful error because the union itself agreed with management that only a certain number of employees would be allowed to present evidence at the grievance hearing. Moreover, there could be no harmful error because the result obtained in the settlement was that shipwrights now receive high pay as soon as the scaffolding is one level off the ground (unless the flooring is secure or safety devices can be used). Unless plaintiffs were going to receive high pay for standing on the ground, the settlement could not have been more favorable to the plaintiffs.

Plaintiffs also ignore that article 30 (the grievance article) of the CBA authorizes either the union or management to join similar issues from the same or separate parties for the purpose of conducting a single grievance hearing. It appears that this is what happened in this case. According to the plaintiffs this some how defeats the settlement agreement. But they cite to no authority for this proposition. Rather, the CBA seemingly allows for many claims to be consolidated into one hearing. The CBA is silent as to the process when that occurs. However, because the statute authorizes the union to process grievances on behalf of union members, the decision to not have every union member speak at the first step hearing should not be fatal to a finding that a valid settlement was reached. Indeed, there was certainly no harmful error in not allowing them all to speak.

At most, the union members might be able to file an Unfair Labor Charge against the union. But that would be a matter between the union and the member.

**B. The Union Negotiator Acted In Good Faith On Behalf Of The Grievants**

The plaintiffs also intimate that the union negotiator somehow engaged in bad faith when he negotiated the settlement. It is difficult to say exactly what the plaintiffs are alleging because they simply state that just over two weeks after settlement, the union negotiator, Mr. Aiken was promoted from shipwright to shipwright trainer. They say that Mr. Winkler, a management official, discussed the possible promotion while the grievance was pending. Pl. Mem. of Law & Fact at 14. However, to the extent that they are trying to intimate that a fraud was somehow committed, that allegation must fail because plaintiffs have never plead it. As noted in Carr v. United States, 61 Fed. Cl. 326 (2004),[9] fraudulent concealment must be pled with particularity and there must be a showing that the fraudulent party actively had concealed its wrongdoing. Id. at 331. Plaintiffs seemingly argue that fraud occurred because both sides knew that they were going to promote Mr. Aiken but allowed him to continue as the union negotiator. While this is simply no truth to this allegation, since it was not plead, it must be ignored.

## CONCLUSION

For all of the above reasons, the Government respectfully requests that the Court find at trial that plaintiffs' claim is barred by the doctrine of accord and satisfaction.

---

[9] The allegation of fraud in Carr was that the United States failed to tell the plaintiffs that there was asbestos in certain building where they work. As a result, the statute of limitations should be tolled.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th floor
Washington, D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7643
steven.mager@usdoj.gov

Attorneys for Defendant

OF COUNSEL .
JOHN D. NOEL
Senior Trial Attorney
Department of the Navy
720 Kennon Street, S.E., Room 233
Washington, D.C. 20374-5013

STEVEN L. SEATON
Puget Sound Naval Shipyard
1440 Farragut Avenue
Bremerton, Washington 98314-5001

October 6, 2006

**CERTIFICATE OF FILING**

I hereby certify that on this 6th day of October, 2006, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM OF LAW AND FACT ON THE ISSUE OF ACCORD AND SATISFACTION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice