**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-856C<br><br>Judge Miller<br><br>Electronically Filed on ________ |

**PLAINTIFFS' MOTION IN LIMINE AND POSITION REGARDING ADMISSIBILITY OF DEFENSE EXHIBITS**

## I. INTRODUCTION

The sole issue in the upcoming trial is whether there was an accord and satisfaction between the union and the Shipyard regarding plaintiffs' claims for environmental differential pay for high work. The Shipyard contends that a January 18, 2000 grievance decision (Plaintiffs' Exhibit 3) constitutes a settlement agreement that, once complied with, effected an accord and satisfaction.

As the Court recalls, Exhibit 3 contains no language that expresses either an intent to settle or, more importantly, language consistent with an accord and satisfaction. Consequently, the Shipyard will be forced to offer evidence extrinsic to the four corners of Exhibit 3 to show, first, that is a settlement and, second, the precise terms that effected an accord and satisfaction.

Because, as set forth in Plaintiffs' Memorandum of Contentions of Fact and Law, the doctrine of accord and satisfaction sounds in contract, substantive contract law applies. That law restricts what extrinsic evidence may be offered in an effort to

prove a contract and its terms.

Specifically, under contract law, intentions that were not expressed by one contracting party to the other are irrelevant. Accordingly, the Court should exclude all testimony of the (allegedly) contracting parties – Joe Aiken, Mary Jane Tallman, and Mark Winkler (or anyone else) – regarding intentions they may have had but did not express to the other party during contract negotiations.

Related to this, the Court should exclude all testimony regarding the parties' alleged, but unexpressed, interpretation of ambiguous non-verbal conduct unless the witness first lays a foundation – for example, by showing a previous course of dealing – that supports that interpretation.

Second, under substantive contract law, post-contract (and post-lawsuit) statements by contracting parties that purport to interpret a contract are also inadmissible. For this reason, the Court should forbid the offering of exhibits – such as defense exhibits 1 and 19 through 23 – that post-date the execution of the grievance decision for the purpose of explaining what the grievance decision was or meant.

Third, the Court should exclude the testimony of witnesses who lack personal knowledge regarding the negotiation or drafting of the grievance decision regarding its meaning or effect. Thus, the Court should exclude the testimony of Rodger Brown regarding what Ms. Tallman and Mr. Aiken intended when they put their signatures on the grievance decision.

Finally, plaintiffs confirm that they have no objection to the authenticity of

any of defense exhibits 1 through 27. Thus, it is unnecessary for the Shipyard to call witnesses to authenticate any defense exhibits. As set forth more fully below, plaintiffs do object to the admissibility of certain defense exhibits. As to the rest, plaintiffs are unable to determine – without hearing testimony elicited by defense counsel – whether the exhibits will be relevant or, if relevant, whether their relevance will be outweighed by other factors, such as their cumulative nature or the potential waste of time involved.[1]

## II. THE COURT SHOULD EXCLUDE EVIDENCE OF INTENTIONS THAT WERE NOT EXPRESSED TO THE OTHER SIDE

Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action" more or less probable than without the evidence.[2] Only relevant evidence is admissible.[3] Lay testimony, to be admissible, must be based on personal knowledge.[4]

At trial, the central issue is whether the parties had a meeting of the minds concerning **both** the **existence and** the **specific terms** of the purported settlement agreement, and whether those specific terms amounted to an accord and satisfaction. Put another way, the Court must determine not just whether there was an agreement but, if there was one, what its precise terms were.

The court determines if there is a meeting of the minds by examining "the totality of the circumstances."[5] However, the court only considers the parties'

---

[1] Fed. R. Evid. 403.
[2] Fed. R. Evid. 401.
[3] Fed. R. Evid. 402.
[4] Fed. R. Evid. 602.
[5] *Ahrens v. United States*, 62 Fed. Cl. 664, 670 (2004); *see also Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990).

expressed intent.[6] The most important expression of intent is the writing embodying the alleged agreement.[7] Here, that writing is plaintiffs' exhibit 3, the grievance decision signed by Mary Jane Tallman and Joe Aiken. But that document contains no language evidencing an agreement of any sort, much less one that amounts to an accord and satisfaction. To prove its case, therefore, the Shipyard must rely on a far less important factor – evidence extrinsic to the grievance decision itself – to prove that a meeting of the minds regarding an accord and satisfaction existed.

In its Memorandum of Contentions of Law and Fact, the Shipyard insists that "the totality of the circumstances demonstrate that both the Government and the union clearly intended to settle the entire grievance."[8] Contract law places limits on what evidence is admissible to show these circumstances.

### A. An Accord and Satisfaction Requires that the Terms be Expressed

For contracting parties to have a meeting of the minds regarding certain contract terms, those terms must have been expressed by each party to the other. In other words, there must be an objective manifestation of assent to these terms from each side to the other.[9] For this reason, "[t]he unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party."[10]

---

[6] *Ahrens*, 62 Fed. Cl. at 670.
[7] *Id.* at 671; *see also Greco v. Dept. of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988).
[8] Def's Memo at p.8.
[9] *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419-20 (1999); *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct. Cl. 101, 109-10 (1981). *See also* RESTATEMENT (2nd) CONTRACTS § 3 ("An agreement is a manifestation of mutual assent on the part of two or more persons."), § 17(1) ("…the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").
[10] *Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 30 (1971), *collecting*

In *Chesapeake & Potomac Telephone Co. v. United States*, the Court of Claims endorsed and applied this objective manifestation theory in the context of an alleged accord and satisfaction. There, the Court held that the party must have "clearly express[ed] his intention that [the check was] sent as a settlement in full."[11] Likewise, in *Safeco Credit v. United States*,[12] the Court of Federal Claims applied the doctrine to an accord and satisfaction claim, although in that case it worked in favor of the party asserting the defense: "Plaintiff here must show something more than 'subjective intent' in order to preclude summary judgment for defendant on its defense of accord and satisfaction."

The doctrine also applies to agreements allegedly reached by a union. When the union in *Addison-Taylor* attempted to offer statements by a union negotiator regarding the union's intent in settling claims, the court found it could disregard the statement because the witness did "not attest that the union negotiators' understanding was expressed to agency negotiators."[13]

### B. <u>None of the Signatories Expressed that the Grievance Decision was a Full and Final Settlement of the Shipwrights' Claims</u>

During their deposition testimony, neither Mr. Aiken nor Ms. Tallman, the two individuals who placed signatures on the grievance decision, recalled any conversations in which they spelled out that the decision operated not just as an agreement, but as an agreement that achieved an accord and satisfaction.

Mr. Aiken repeatedly disclaimed any recollection of conversations

---

*cases*.
[11] *Chesapeake*, 228 Ct. Cl. at 110.
[12] 44 Fed. Cl. 406, 419-20 (1999).
[13] *Addison-Taylor v. United States*, 63 Fed. Cl. 345, 351 (2004).

surrounding the effect of the grievance decision. He first testified as follows regarding a January 14, 2000 meeting with Ms. Tallman,[14] when Ms. Tallman first laid the grievance decision before him:

> Q. What did Ms. Tallman tell you during the course of this meeting aside from that she'd run it by the powers that be and they were in general agreement to it?
>
> A. That was basically it.[15]
>
> ***
>
> Q. Did she make it a condition to her signing the decision that you sign it with her?
>
> A. I don't believe she did.
>
> ***
>
> Q: …Did she tell you that she expected the union not to demand arbitration if she signed the grievance decision that she handed you on January 14?
>
> A: No.
>
> Q: Did that topic ever come up during your conversation, the topic of whether the union would demand arbitration if she signed the grievance decision?
>
> A: No. [16]
>
> ***
>
> Q. …During that meeting, did you have any discussion, first of all, during that meeting did you promise that the union would not seek arbitration if Ms. Tallman signed the grievance decision she put in front of you?

[14] Deposition of Barry Joe Aiken at 158:1-8.
[15] *Id.* at 158.
[16] *Id.* at 159.

A. No.[17]

***

Q. Did you discuss the possibility that individuals might sue for back pay, back high pay in federal court?

A. I was never aware of that.

Q. So that was not a subject of discussion?

A. That was not a subject.[18]

Mr. Aiken then acknowledged that he did not meet with Ms. Tallman again between Friday, January 14, 2000 and the following Tuesday, January 18, when he placed his signature on the grievance decision.[19] Once again, he disclaimed knowledge of any discussion regarding the impact of the grievance decision as either a settlement or, more specifically, as an accord and satisfaction:

Q. …Did you have any discussion with Ms. Tallman on January 18th regarding anything?

A. Other than Mr. Winkler and I would work out all the rest of the information on how much – who is going to get what and …[20]

Mr. Aiken likewise denied playing any role in the drafting of the grievance decision.[21]

Finally, when asked to confirm whether any conversations suggesting an accord and satisfaction took place at either the January 14th or January 18th

---

[17] *Id.* at 161.
[18] *Id.* at 162.
[19] *Id.* at 160-61.
[20] *Id.* at 178-79.
[21] *Id.* at 187.

meetings took place, Mr. Aiken first evaded the question for several minutes[22] before finally admitting that none had:

> Q. …My question to you is you're not in a position to testify under oath under penalty of perjury in court that you ever used the words "full and final resolution" or "full and final settlement" during your January 14th and January 18, 2000, conversations with Ms. Tallman, are you?[23]
>
> THE WITNESS: Did I verbally speak those words?
>
> Q. Correct.
>
> A. Yes or no? You need a yes or no answer?
>
> Q. I do.
>
> A. No.
>
> Q. Okay. And to address counsel's objection, we might as well follow up. As you sit here today you're not able to testify under oath that you definitely used the words "full and final resolution" or "full and final settlement" during your conversations with Ms. Tallman on January 14th and January 18th, 2000 are you?
>
> A. Not that I can recall.
>
> Q. Same question on the other side. You're not able, as you sit here today, to testify definitively that Ms. Tallman ever used the words "full and final resolution" or "full and final settlement" during your conversations with her on January 14th and January 18, 2000, can you?
>
> A. Without a written record of what transpired in that office, no.[24]

Similarly, Ms. Tallman had no recollection of meeting with Mr. Aiken to

[22] *Id.* at 188-89.
[23] *Id.* at 189 (objection omitted).
[24] *Id.* at 189-90.

discuss the terms of the grievance decision:

Q: Given that you signed this on the 18th and right above it it indicates there was a meeting on the 14th, are you able to tell me as you sit here today, whether, in fact, a meeting was held on the 14th?

A: Did I remember the meeting, no.[25]

She also had no specific recollections of any conversations with union representatives regarding the shipwrights' grievance:

Q: …First, would it be fair to say that you cannot recall any specific conversations between you and any union steward regarding the shipwrights' high pay grievance after May 20, 1999?

A: I know they happened, but I don't recall specifics.

Q: So you can't tell me, for example, when those meetings took place, right?

A: No.

Q: Can't tell me how long they were –

A: No.

Q: -- right? Can't tell me who was there, right?

A: Right.

Q: Can't tell me what specifically was said at any of those meetings, right?

A: Right.[26]

And Ms. Tallman testified that she and Mr. Aiken had not discussed the possibility that the grievance decision would bar a future suit by the shipwrights:

Q: …You never discussed the subject of possible future lawsuits with Mr. Aiken or Mr. Hamel, did you?

---

[25] Deposition of Mary Jane Tallman at 143.
[26] *Id.* at 183.

A: No.

***

Q: You never talked with him, or made clear that a condition to your signing Exhibit 18 [the grievance decision] was that no lawsuits be brought?

A: Never discussed lawsuits.

Q: Okay. And you never discussed the individual rights of shipwrights to bring suits for individual relief in court, did you?

A: We never discussed lawsuits.[27]

Also like Mr. Aiken, Ms. Tallman had no recollection of drafting the grievance decision.[28]

Thus, as with the union representative in *Addison-Taylor*, neither of the individuals who placed their signature on the grievance decision discussed what it meant or stated that it would somehow work as an accord and satisfaction or bar further claims or lawsuits.

Assuming that Mr. Aiken and Ms. Tallman testify consistently with their deposition testimony (and it will be an interesting trial if they do not), they should not be allowed to offer free-ranging testimony about what they thought the grievance decision meant. Their unexpressed intentions and beliefs have no relevance and no bearing on the meaning or effect of the grievance decision.

The Court should exclude testimony regarding the private thoughts and feelings that Mr. Aiken or Ms. Tallman (or anyone else, for that matter) might have had regarding the meaning or impact of the grievance decision. It is irrelevant and

---

[27] *Id*. at 175.

inadmissible.

The Shipyard also may resort to non-verbal and ambiguous gestures, such as a handshake or Mr. Aiken's signature on the grievance decision, to attempt to prove that the grievance decision was a "settlement." To the extent that testimony regarding what these gestures meant is unsupported by, for example, a foundation to support the witness's unexpressed understanding of the gesture, it should be excluded.

For a party's understanding of an ambiguous gesture to be meaningful, the party must show some admissible foundation for that understanding, for example, a course of dealing between the parties that involves the gesture. Without such a foundation, evidence of what a party understood a gesture to mean has no basis. For example, the undersigned has shaken hands with the Shipyard's counsel on many occasions. Does this mean that the undersigned is now free to testify that the parties have settled this lawsuit and, further, to testify in detail about all the (unwritten) terms of that settlement? Of course not. A simple gesture is too thin a reed to support the complex structure – including all its terms – of a settlement agreement. Without foundation, testimony regarding ambiguous gestures is just as meaningless as the gestures themselves. The Court should exclude any testimony purporting to assign meanings to gestures relevant to an understanding of the terms of the grievance decision.

---

[28] *Id*. at 184.

## III. THE COURT SHOULD EXCLUDE POST-GRIEVANCE DECISION EXTRINSIC EVIDENCE TO THE EXTENT IT IS OFFERED TO PROVE ADDITIONAL UNWRITTEN "CONTRACT" TERMS[29]

The Shipyard has offered exhibits that were generated well after the grievance decision was signed. These include Defense Exhibit 1, the 2003 collective bargaining agreement, and Defense Exhibits 19 through 23, which are correspondence regarding efforts to ensure that shipwrights received interest on their high-pay awards. The latter include: a partial message from Joseph Hamel to Congressman Norm Dicks (Defense Exhibit 19); an email from Mr. Hamel to other union representatives regarding the message to Congressman Dicks (Defense Exhibit 20); a Federal Labor Relations Authority (FLRA) Charge against the Shipyard filed by the union for the Shipyard's refusal to pay interest on the high pay award (Defense Exhibit 21); a letter from the FLRA regarding the Charge (Defense Exhibit 22); and the notice of the FLRA's withdrawal of the Unfair Labor Practice Charge (Defense Exhibit 23). In its Memorandum, the Shipyard cites the email and the unfair labor practice charge as evidence that the union considered the grievance decision to be a settlement agreement.[30]

The Shipyard also relies on the language of a settlement agreement (Joint Exhibit 38) that resolved a grievance by Mark Mascioli, who was left off the list of

---

[29] This is a different issue than whether the parol evidence rule bars the introduction of *any* extrinsic evidence, if the "contract" was completely integrated, or, if the "contract" was only partially integrated, whether extrinsic evidence may be used to prove additional *inconsistent* terms. In the case of a totally integrated contract, extrinsic evidence is inadmissible because the contract itself expresses the complete understanding of the parties. *See Gutz v. United States*, 45 Fed. Cl. 291, 297 (1999); *Nicholson v. United States*, 29 Fed. Cl. 180, 193-196 (1993); *California Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 25-26 (1990). In the case of a partially integrated contract, the court may rely on extrinsic evidence, but only that which is consistent with the terms of the agreement, not that which varies those terms. *See Gutz*, 45 Fed. Cl. at 297.

shipwrights who received back high pay. The Shipyard argues that the fact that the Mascioli agreement describes the grievance decision as a settlement agreement is further evidence that the union intended the grievance decision to fully and finally settle the shipwrights' high pay claims.[31]

Neither the 2003 CBA nor the documents related to the unfair labor practice charge or the Mascioli settlement agreement are admissible as evidence of the parties' intent regarding the grievance decision. One party's *post hoc* attempt to "interpret" an earlier agreement should not be admitted as evidence of the parties' intentions at the time of the alleged agreement.

Only extrinsic evidence of conversations that took place prior to or contemporaneous with the execution of an alleged agreement is admissible to explain the parties' intent at the time an alleged contract was signed. Except under certain circumstances which are discussed below, the parties' actions after signing a document are irrelevant to their intentions at the time they entered into the agreement.

The doctrine that only evidence occurring prior to or contemporaneous with an agreement is admissible as to the parties' intent is embodied in § 214 of the Restatement (Second) of Contracts, which states, "Agreements and negotiations **prior to or contemporaneous with** the adoption of a writing are admissible in evidence to establish…the meaning of the writing…" The Court of Federal Claims has applied this doctrine to determine whether subsequent modifications to a

---

[30] Def's Memo at pp. 5, 13.
[31] *Id*. at pp. 5, 14.

contract indicated whether a written license was completely integrated.[32] The Court rejected this position, stating that "Only actions and negotiations prior to, or contemporaneous with, the execution of the license would have any relevance."[33] This comports with common sense. If parties were allowed to introduce post-contractual extrinsic evidence to demonstrate the parties' intent at the time of contracting, motivation would be high to manufacture such evidence. This is especially true where, as here, litigation relating to subjects addressed in the grievance decision had already commenced.

Extrinsic evidence that postdates a contract is admissible only under certain limited circumstances. Post-contract statements may be admissible for purposes other than to interpret the alleged contract. In *E.H. Sales Inc.*, the Court of Federal Claims implied that such evidence would only be admissible to show one party's acquiescence to changed conditions under the contract.[34] But this does not permit the offering of post-contract statements for the purpose of construing the contract itself. Thus, the concurring judge rejected findings of the Board of Contract Appeals that were based on "statements and occurrences" of the parties after the contract revision at issue, stating that there was no "no relevant extrinsic evidence as to the parties' intention prior to or at the time of the modification."[35]

Likewise, evidence of the parties' course of performance under the contract may be helpful to explain what the contract means because it provides the parties'

---

[32] *California Sand & Gravel v. United States*, 22 Cl. Ct. 19 (1990).
[33] *Id*. at 25.
[34] *E. H. Sales, Inc. v. United States*, 169 Ct. Cl. 269, 275-76 (1965), *Davis, J. concurring*.

"practical construction" of the contract terms.[36] Often this type of evidence is used to show that a party's actions following execution of a contract are at odds with the interpretation the party asserts in court. For example, in *Gemini Electronics*, in which the extent of a service area was in dispute, the court considered the fact that the plaintiff continued to seek permission to do business in the disputed area after it executed the contract as evidence that it did not consider the contract to include that area.[37] Similarly, in *Fincke*, the court found that because the plaintiff had sent letters arguing against the retention of a certain insurance company, it undermined his later argument that he understood he was to receive a brokerage fee from a contract with that company.[38]

Such "course of performance" evidence, however, is different from statements the parties make about a contract's meaning after the fact. What the parties **do** is relevant; what they **say** is not.

Here, to the extent the Shipyard wishes to offer post-grievance-decision evidence to show that it complied with the decision, it may do so without offending the law of contracts. But it is clear from the Shipyard's Memorandum of Contentions of Law and Fact that the Shipyard wants to do more. The Shipyard does not want to prove what the parties did, but what they said. To the extent it is offered to explain what the parties intended when the grievance decision was signed, it is irrelevant.

---

[35] *Id.* at 275.
[36] MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.16 (1998).
[37] *Gemini Elec., Inc. United States*, 65 Fed. Cl. 55, 65-66 (2005).
[38] *D. Dennison Fincke v. United States*, 230 Ct. Cl. 233, 244-45 (1982).

It is, moreover, inconsistent with the Shipyard's position. In the case of the Mascioli settlement agreement, the mere existence of a 2002 agreement to pay high pay to a shipwright suggests that no one believed the 2000 grievance decision barred further claims for high pay. Moreover, as set forth in Plaintiffs' Memorandum of Contentions of Law and Fact, other evidence, notably Plaintiffs' Exhibits 9 and 12, shows that Shipyard personnel did **not** understand the grievance decision to be anything other than what it was, a grievance decision. For example, Exhibit 12 contains a cover memorandum from one of the Shipyard personnel responsible for handling the grievance, in which she writes: "I understand you requested a copy of the grievance decision and something that identifies Ms. Tallman as having authority to make the decision. Enclosed is a copy of Ms. Tallman's decision …."

The inadmissibility of these statements is only reinforced by the fact that they were not only made after the grievance decision was signed, but after this lawsuit was filed in the Western District of Washington, on April 14, 2000. The actions and conduct of a party after a controversy has arisen is entitled to much less weight than conduct before a dispute occurs.[39] The parties' statements should not be considered by the Court as evidence of the parties' intent at the time the grievance decision was signed, or the legal significance of that decision. It is irrelevant and, even if it were relevant, its lack of serious probative effect is far outweighed by the waste of time that would ensue from offering it and requiring both direct and cross-examination regarding it.

## IV. THE COURT SHOULD EXCLUDE THE TESTIMONY OF A. RODGER BROWN

The Shipyard has indicated that it intends to offer the testimony of A. Rodger Brown. To the extent the Shipyard intends to offer his testimony as evidence of the parties' intent at the time of "contracting," his testimony is inadmissible.

Lay testimony is inadmissible if it is not based on personal knowledge.[40] Mr. Brown has testified that he has no personal knowledge regarding the discussions preceding the grievance decision or the signing of the grievance decision itself. For example, Mr. Brown was asked, "So my understanding of what you're saying is that you had no involvement in the grievance resolution process from the time the grievance was filed until the grievance decision was issued?"[41] He answered, "That's correct."[42] He was also asked, "You had no involvement in drafting the grievance decision, the language of the grievance decision, how it would be signed, the form it would take?"[43] He again answered, "Correct."[44]

Thus, any testimony he may have to offer on this subject is inadmissible, because he could only testify regarding what others told him regarding those discussions. The Court should exclude Mr. Brown as a trial witness, at least to the extent the Shipyard intends to offer him to testify regarding the intent, meaning, or effect of a grievance decision that, by his own admission, he had nothing to do with creating.

---

[39] *Gemini Elec., Inc.*, 65 Fed. Cl. at 64; *Fincke*, 230 Ct. Cl. at 244.
[40] Fed. R. Evid. 602.
[41] Deposition of A. Rodger Brown at 32.
[42] *Id.*
[43] *Id.*

## V. CONCLUSION

For the reasons above, this Court should exclude all evidence regarding the unexpressed intentions of the parties. The Court should exclude all evidence of statements the parties made after the grievance decision was signed, and after this lawsuit began as either irrelevant or a waste of time. And it should exclude the testimony of Rodger Brown regarding the intent, meaning, or effect of the grievance decision since he lacks personal knowledge regarding the creation of that document.

DATED this 20th day of October, 2006.

Respectfully Submitted,

s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

44 *Id.*