**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., Plaintiffs, | No. 04-856C |
| vs. | Judge Miller |
| THE UNITED STATES, Defendant. | Electronically Filed on ________ |

**DECLARATION OF JENNIFER AMANDA KREBS**

I, Jennifer Amanda Krebs, aver as follows:

1. I am one of the attorneys of record for the Plaintiffs in this lawsuit. I am over the age of 18, have personal knowledge of the matters stated in this declaration and am competent to testify to those matters.

2. Attached to this Declaration as Exhibit A are true and correct copies of excerpts from the June 27, 2006 deposition of Barry Joe Aiken.

3. Attached to this Declaration as Exhibit B are true and correct copies of excerpts from the September 12, 2006 deposition of A. Rodger Brown.

4. Attached to this Declaration as Exhibit C are true and correct copies of excerpts from the June 26, 2006 deposition of Mary Jane Tallman.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct to the best of my knowledge and belief.

Jennifer Amanda Krebs

Jennifer Amanda Krebs
**Garvey Schubert Barer**
18th Floor, 2nd & Seneca Building
1191 Second Avenue
Seattle, Washington 98101-2939
Tel: 206-464-3939
Fax: 206-464-0125

October 20, 2006

**CERTIFICATE OF SERVICE**

I hereby certify on October 20, 2006, a copy of the foregoing "DECLARATION OF JENNIFER AMANDA KREBS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON D. HANBERG, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF
BARRY JOE AIKEN
Tuesday, June 27, 2006

**Exhibit A**

Q So you had not seen any version of the grievance decision until after you walked into the room with Ms. Tallman on January 14th?
A She is the one that presented me a copy of that document.
Q And the first time you saw a copy of that document was when she gave it to you during that meeting on January 14th, right?
A I believe so.
Q Can you recall why Mr. Hamel might not have attended this January 14, 2000, meeting?
A Why he did not attend it?
Q Yes.
A I have no idea.
Q Tell me everything that you and Ms. Tallman talked about during this 9 a.m. meeting on January 14th, 2000.
A What we talked about? I read her proposed decision. I said, I cannot commit myself to a yes or no without talking it over with my chief steward first.
Q What did Ms. Tallman tell you during the course of this meeting aside from that she'd run it by the powers that be and they were in general agreement to it?
A That was basically it.
Q Did she present it as a take it or leave it?
A I'm going to say yes.
Q Okay. Did she insist at this meeting that you sign the

decision?
A No.
Q Did she make it a condition to her signing the decision that you sign it with her?
A I don't believe she did.
Q Did she tell you what her expectations were with respect to the union if she signed the grievance decision she put in front of you on January 14th?
A You need to rephrase your question.
Q Did she tell you that she expected the union to drop the grievance if she signed the grievance decision that she had handed you on January 14, 2000?
A Can't drop the grievance.
Q All right. Let me put it a different way. Did she tell you that she expected the union not to demand arbitration if she signed the grievance decision that she handed you on January 14?
A No.
Q Did that topic ever come up during your conversation, the topic of whether the union would demand arbitration if she signed the grievance decision?
A No.
Q Did you commit at any point not to seek arbitration if you signed the grievance decision she put in front of you?

A No.
Q Did you make that commitment at any other time after January 14th?
A Give me your question back.
(Question on Page 160, Lines 2 through 3, read by the reporter.)
THE WITNESS: And the question was?
Q Let's --
MR. MAGER: You might want to go back to what that commitment was.
Q You had a January 14th meeting with Ms. Tallman, did you have any meetings with Ms. Tallman after January 14th but before the grievance decision was signed?
A No.
Q Okay. So the grievance decision ultimately is signed on January 18th, Tuesday, January 18th. It's your testimony that you did not meet with Ms. Tallman again on January 18th.
A I needed to talk to my chief steward on settling the grievance.
Q Right. But did you have another meeting with Ms. Tallman regarding the grievance decision on January 18, 2000, the date she signed it?
A 15th and 16th are Saturday and Sunday.
Q Correct.

A Then Monday was a day in which I talked to Mr. Hamel and let him review the proposed settlement.
Q So --
A Tuesday I signed the document.
Q All right. And so that's a roundabout way of saying that you did not have another meeting with Ms. Tallman regarding the grievance decision between your meeting on January 14th, 2000, and the time you signed the grievance decision on January 18th; is that correct?
A As far as I remember, yes.
Q Okay. So we only have one -- this is good. So we only have one meeting between you and Mrs. Tallman that we've got to zero in on. Okay. During that meeting, did you have any discussion -- first of all, during that meeting did you promise that the union would not seek arbitration if Ms. Tallman signed the grievance decision she put in front of you?
A No.
Q Did that topic even come up during your conversation with Ms. Tallman?
A Not that I remember.
Q Okay. During your January 14, 2000, meeting with Ms. Tallman regarding the draft grievance decision, did you discuss specifically whether individual grievants would give up their right to sue in federal court if you signed

the grievance decision?
A Did they give up their right to sue in federal court? If the grievance is resolved, sustained, then it is settled. That particular item has been finished.
Q Did you discuss the possibility that individuals might sue for back pay, back high pay in federal court?
A I was never aware of that.
Q So that was not a subject of discussion?
A That was not a subject.
Q Between you and Ms. Tallman?
A That's right. I was not made aware of this until months down the road.
Q So it was not -- let me start over. Ms. Tallman never told you that one condition to her signing the employee grievance decision was that the union waive the rights of its members to sue in court for high pay, right?
A There was never any mention of suing.
Q I need you to answer my question.
MR. SCARAMASTRA: Go ahead and read it back.
(Question on Page 162, Lines 13 through 16, read by the reporter.)
THE WITNESS: And my answer is, the discussion of a suit was never discussed.
Q So the answer to my question is no, isn't it?
A If you want to put it that way, then the answer is no.

A I'm guessing.
Q And so when he said, Well, I don't want to bone the shipyard or the other shipwrights --
A Not the shipwrights, the shipyard.
Q Okay. So you took it that he was coming at it this way: I know we have a strong case, but I really want to give the shipyard a whopping with my strong case?
A That's his perception.
Q Okay. I understand it's not yours necessarily, but that's how you took it. He thought he had a strong case, and he didn't want to put the shipyard through the discomfort of losing that strong case.
A Over us losing it in arbitration.
Q After you spoke with Mr. Hurm and Mr. Hamel and you decided this grievance decision was okay by you, what did you do next?
A Went back to Mary Jane Tallman's office on the 18th of January and signed off on the grievance.
Q Again, you did not meet with her when you went in to do that; is that right?
A Was she present when I signed off on the grievance?
Q Yes.
A Yes, she was.
Q She was present. Did you have any discussion with Ms. Tallman on January 18th regarding anything?

A Other than Mr. Winkler and I would work out all the rest of the information on how much -- who is going to get what and...

Q Did you have any other discussion about what the grievance decision meant or what would happen, other than you and Mr. Winkler were going to work out the back pay awards?

A I believe that that would be not a case precedent setting for future grievances.

Q So you told Ms. Tallman, this grievance decision will not be a precedent in the event that future grievances for high pay come up; is that right?

A Did I tell her that?

Q Yes.

A No. I assumed that that is the reading they put on the end of every grievance.

Q That's the wording you typically insist on in a grievance decision --

A No, that's the wording that management typically insists on.

Q Okay. And did you want that wording in or out of the grievance decision?

A I don't recall it was in there at all.

Q Did you want that wording in if it was not? What I'm getting at is did you view that wording as something that

words anywhere in Exhibit 18?
A Oversight.
Q Just an oversight. Okay. Have you signed settlement agreements before, Mr. Aiken?
A This is the first one of this magnitude.
Q Have you ever signed a document that was denominated a settlement agreement?
A Monetary settlement?
Q Correct.
A No.
Q So for example if you look at Exhibit 43, you'll see something that's called a settlement agreement. Now I recognize that's not your signature.
A I know Mr. Healey well.
Q You know Mr. Healey well. Okay. Are you familiar with the settlement agreement that's embodied in Exhibit 43?
A Yes.
Q You'd seen it before January 18th, 2000?
A This particular issue here?
Q Exhibit 43, yes.
A Yes.
Q Can you find me the language in Exhibit 43 that indicates it's a full and final resolution of the grievance?
A Paragraph 5, line 5.
Q Paragraph 5, line 5. The first line of paragraph 5?

A There's only one line of paragraph 5.
Q Yes. Okay. You're talking about, "The parties agree this settlement will not be considered precedential"?
A "For any future environmental differential dispute between the parties."
Q You see any other language that indicates that it's a full and final resolution of the grievance?
A Subparagraph b.
Q 3 (b). Paragraph 3, subparagraph b?
A Yes.
Q Okay.
A For all employees -- qualifying employees for work performed to be completed.
Q Any other language that you see in Exhibit 43 that indicates that it is a full and final resolution of the grievance?
A Other than paragraph 4.
Q Okay.
A And, "The parties agree to attempt to mutually resolve complaints raised by employees assigned to Code 350 who believe they were not properly compensated under the terms of this agreement."
Q Mr. Aiken, was the shipwrights' high-pay grievance the largest grievance that you had handled as a steward of record in terms of number of grievants?

A Yes.
Q Was it also the largest grievance you'd handled as steward of record in terms of the potential money at stake?
A Yes.
Q Have you handled anything larger since January 18, 2000, as a steward of record? Let me clarify: Have you handled any grievances as steward of record since January 18, 2000, that were as large or larger than the shipwrights' high-pay grievance?
A Could have been.
Q But you don't know as you sit here today?
A Well, the grievance was denied based on timeliness.
Q Which one was that?
A The insulator high-pay grievance.
Q So the only other grievance that you handled that would have been as large or larger than the shipwrights' high-pay grievance was the insulators' high-pay grievance?
A That's correct.
(Exhibit Number 89 marked for identification.)
Q Showing you what's been marked as Exhibit 89. Mr. Aiken, have you seen that before?
A No, I have not.
Q Now, that is a document that addresses a high-pay

this is the end, that this is the final settlement.

Q You can set Exhibit 89 aside. As you sit here today, apart from what you've already described, can you describe any specifics of the conversation you had with Ms. Tallman on either January 14th, 2000, or January 18th, 2000?

A The conversation I believe we had on the 14th was, The key players are in agreement to say yes on the terms of this particular settlement. I came back and said, I will not accept this without going and talking to my chief steward.

Q Did you play any role in the physical drafting of what became Exhibit 18?

A I'm going to go back to Exhibit 18.

Q Sure.

A No.

Q I have a couple questions just to follow up on specifics on what you can and can't remember since I think we've exhausted what you can remember specifically of your conversation with Ms. Tallman. I gather as you sit here today that you can't remember specifically using the phrase "full and final resolution" or the phrase "full and final settlement" during your conversations with Ms. Tallman on January 14th or January 18th, 2000; is my understanding correct?

A No, your understanding is not correct.
Q So you can specifically remember something--
A Not--
Q --on that subject?
A --that I specifically remember.
Q What's that?
A Not that I can specifically remember. I'm trying to remember.
Q Okay.
A Trying to visualize this, as I'm a spatial type person.
Q Let that right brain go to work.
A You know, I'm not going to say definitive to something I cannot say yes or no to.
Q Okay. So you're not in a position to testify under oath in court under penalty of perjury that you used the words "full and final settlement" or the words "full and final resolution" during your January 14th and January 18th, 2000, conversations with Ms. Tallman, right?
A Did I use those specific words?
Q Right.
A I know the answer you're looking for, but my answer is, I felt that when I put my signature on this line, that that was the full and final settlement without having to say the words, that I signed off on this document as the representative of the union, that that was the full and

final settlement.
Q Let's a --
A Whether I said those words exactly -- to that words or not, that's what I'm saying. When I signed that document, that's what I meant.
Q We need to go back and get an answer to my question. I understand that's the question you want to answer. My question to you is you're not in a position to testify under oath under penalty of perjury in court that you ever used the words "full and final settlement" or "full and final resolution" during your January 14th and January 18th, 2000, conversations with Ms. Tallman, are you?
MR. MAGER: And I'm going to object to the extent the witness isn't competent to testify, except as he sits here today, what he believes. Although you can answer that question.
THE WITNESS: Did I verbally speak those words?
Q Correct.
A Yes or no? You need a yes or no answer?
Q I do.
A No.
Q Okay. And to address counsel's objection, we might as well follow up. As you sit here today you're not able to testify under oath that you definitely used the words

"full and final resolution" or "full and final settlement" during your conversations with Ms. Tallman on January 14th and January 18th, 2000, are you?

A Not that I can recall.

Q Same question on the other side. You aren't able, as you sit here today, to testify definitively that Ms. Tallman ever used the words "full and final resolution" or "full and final settlement" during your conversations with her on January 14th and January 18, 2000, can you?

A Without a written record what transpired in that office, no.

Q Now, let's go to the final set of questions I have for you. And I know nobody regrets that more than you. I want to talk about what happened a little bit after this grievance decision. In your view that grievance decision that was signed represents a settlement of the grievance between the union and management, and I understand that. Now, I want to take up the subject of what you did after that. First of all, what was done to notify the individual grievants of the grievance decision?

A It was verbally conveyed on the waterfront.

Q Verbally conveyed by whom?

A From the superintendent to the supervisors.

Q The superintendent being Ms. Tallman?

A Mm-hm (answers affirmatively).

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 7th day of July, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON D. HANBERG, et al., )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

DEPOSITION UPON ORAL EXAMINATION OF
A. RODGER BROWN
Tuesday, September 12, 2006

---

**Exhibit B**

about either the calculation of the back high-pay amounts or whether or not interest would be paid?
A To within a month or two from now, I didn't know how much we'd paid or how many people got paid.
Q Okay. So I am going to move on, I promise, but if you just bear with me while I review.
So my understanding of what you're saying is that you had no involvement in the grievance resolution process from the time the grievance was filed until the grievance decision was issued?
A That's correct.
Q You had no involvement in drafting the grievance decision, the language of the grievance decision, how it would be signed, the form it would take?
A Correct.
Q And you had no role in calculating the high-pay award, any type of discussions that went on with regard to that?
A That's correct.
Q Thank you very much. Now I'm going to move on.
So in 2002, there was a grievance brought by Mark Mascioli regarding his involvement with high work and the fact he hadn't received high pay. Can you describe to me what you know about that grievance and the subsequent resolution?
A Sure.

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Tuesday, September 12, 2006, Deposition of A. RODGER BROWN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Tuesday, September 12, 2006, Deposition of A. RODGER BROWN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 25th day of September, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Redmond.
My Commission expires October 19, 2007
CCR License No. 2971

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON D. HANBERG, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

---

DEPOSITION UPON ORAL EXAMINATION OF

MARY JANE TALLMAN

Monday, June 26, 2006

---

**Exhibit C**

64 shipwrights?
A No, only as stated in the union contract.
Q Did it, and I don't mean this to sound argumentative, but I can't think of a better way to ask it and I apologize. During the course of the handling of the grievance decision, did it occur to you at some point that it might be a good idea to get a legal opinion from counsel as to what the shipyard was legally obligated to in terms of paying high pay to shipwrights?
A No. We solve -- I hear many second-level grievances. And I don't take them to legal. They're basically -- they're not in my chain. If I had a question, I'd go to HR or I'd go to my admin. But the grievance procedure is outlined in the metal trades contract and it specifies what we do. And so to me a grievance procedure is a workplace settlement. It's a workplace dispute resolution. It's not a legal matter.
Q During the course of your career as a superintendent, how many grievances have you handled where there were 100 or more employees that were parties to the grievance?
A These two were unique.
Q Meaning the high pay one and insulator one?
A Yes. And that's why I had HR involved. Now that's in my chain. Legal is not in my chain of command.
Q Okay. Is there a procedure whereby you can request legal

Q Exhibit 69 should be a full, complete copy of the grievance. And if you turn to Page 2 of the exhibit, it's a form, you'll see in the top right corner under numeral 22, Date of meeting 1/14/00?
A Okay.
Q And below that in box 24 there's a signature. Whose signature is that?
A Mine.
Q When did you sign?
A Looks like the 18th of January of 2000.
Q Did you fill in the text that appears above that in boxes 19, 20, 22 and 23?
A No.
Q Do you recognize that handwriting?
A No.
Q Given that you signed this on the 18th and right above it it indicates there was a meeting on the 14th, are you able to tell me as you sit here today whether, in fact, a meeting was held on the 14th?
A Did I remember the meeting, no.
Q Was a meeting held?
A That I signed this saying there was a meeting, yes, I would say there was a meeting.
Q Was there, in fact, a meeting on January 14, 2000, regarding the grievance?

A 18?

Q 18 will be in the binder.

A It's my handwriting.

Q Who dated Mr. Aiken's signature?

A I don't know.

Q It's not your handwriting?

A No.

Q All right. See if we can summarize a few things. You never discussed the subject of possible future lawsuits with Mr. Aiken or Mr. Hamel, did you?

A No.

Q Mr. Aiken never promised that individual shipwrights would not bring lawsuits for high pay in court, right?

A We never discussed future lawsuits because both of us felt it was totally resolved.

Q You never talked with him or made clear that a condition to your signing Exhibit 18 was that no lawsuits be brought?

A Never discussed lawsuits.

Q Okay. And you never discussed the individual rights of shipwrights to bring suits for individual relief in court, did you?

A We never discussed lawsuits.

Q Of any sort?

A I was under the understanding that the BMTC was the

MR. SCARAMASTRA: Just one second. Go off the record.

(Discussion held off the record.)

Q Just some cleanup, then and I think we can finish up on the subject of accord and satisfaction. So I just have some questions of overview of everything we've discussed today. First, would it be fair to say that you cannot recall any specific conversation between you and any union steward regarding the shipwrights' high-pay grievance after May 20, 1999?

A I know they happened, but I don't recall specifics.

Q So you can't tell me, for example, when those meetings took place, right?

A No.

Q Can't tell me how long they were--

A No.

Q --right? Can't tell me who was there, right?

A Right.

Q Can't tell me what specifically was said at any of those meetings, right?

A Right.

Q I also gather that you can't recall any of the specifics of the draftings of what became your employee grievance decision that's Exhibit 18; is my understanding fair?

A Specifics, meaning the tour of the boat.

Q Let me start over. As I understand it, you cannot recall any of the specifics surrounding the drafting of the language that was included in the employee grievance decision, which is Exhibit 18?
A That's true.
Q Until you prepared for this deposition on Friday, you could not recall any of the specifics from Exhibit 11, Ms. Niemi's report to you, could you?
A Except that I knew I used it, no.
Q And okay. So what you could remember was you had used language from Exhibit 11 to draft what became your grievance decision, right?
A Right.
Q Okay. And you adopted virtually verbatim the description of work that was subject to high pay from Exhibit 11 and incorporated that into your grievance decision, right?
A Looks like it.
Q As of January 18, 2000, you saw no reason to think that any of the decisions reflected in Exhibit 18 were incorrect in any way, right?
A Right.
Q We've covered the legally required things. I think we can move on on that one. We did talk about this, the issue of you not doing any legal research or any research regarding the legal requirements done up to January 18,

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 5th day of July of 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971