**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., Plaintiffs, | No. 04-856C |
| vs. | Judge Miller |
| THE UNITED STATES, Defendant. | Electronically Filed on Oct. 25, 2006 |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS TO EXHIBITS

### I. PLAINTIFFS' ER 1006 EXHIBITS ARE ADMISSIBLE

Plaintiffs have offered four summary exhibits under Fed. R. Evid. 1006, to which the Shipyard has objected. For a summary exhibit to be admissible, it must (in addition to being relevant) meet four criteria: (1) it must summarize writings "so voluminous so as to be unable to be conveniently examined in court," (2) the writings upon which it is based must be admissible, (3) copies of the summarized writings must be made available to the other party, and (4) "the proposed summary (or chart or calculation) must accurately summarize (or reflect) the underlying document(s) and only the underlying document(s)."[1]

Plaintiffs' summaries summarize documents that are not only admissible, but admitted as joint exhibits. Hence, the Shipyard has copies of them. Thus, the summaries satisfy the second and third criteria.

The Shipyard, however, insists that the summaries are irrelevant, are (at least in part) not based on sufficiently "voluminous" writings, and are not accurate

summaries. None of these objections is valid.

### A. The Exhibits Contain Relevant Information

The Shipyard first claims that the summaries offered by the plaintiffs "have no relevance to the question of whether or not there was a valid accord and satisfaction."[2]

As an initial matter, since the Shipyard has joined with plaintiffs in offering all of the underlying documents that are summarized, the Shipyard's relevance objection is difficult to fathom. How can the underlying documents be relevant and admissible while a summary of their contents is not? The Shipyard offers no answer to this conundrum.

Plaintiffs' four summary exhibits summarize 443 pages of data that the Shipyard used to calculate the individual high pay awards for the shipwrights. These exhibits collectively show just how the Shipyard calculated those awards.

Specifically, Plaintiffs' Exhibit 24 demonstrates how the ratings assigned to each shipwright changed (or didn't change) through the calculation process. Plaintiffs' Exhibit 25 shows how the Shipyard made the calculations to arrive at the number of high pay hours during the claim period for which each shipwright would be reimbursed. Exhibit 26 shows the adjustment the Shipyard made to account for the fact that some of the high pay hours were overtime hours, and Exhibit 27 pulls the preceding exhibits together, showing the calculation process for and amount paid to each shipwright who received a high pay award. Collectively, these four

---

[1] *Bath Iron Works Corp. v. United States*, 34 Fed. Cl. 218, 232-33 (1995).
[2] Def's Objections at 6.

exhibits show how the Shipyard arrived at its individual high-pay awards.

Why is the Shipyard's calculation of its individual high pay awards relevant? Simple. In its Memorandum of Contentions of Law and Fact, the Shipyard repeatedly points to the "generosity" of its high-pay awards as evidence that an accord and satisfaction took place. Indeed, the Shipyard uses variations of the word "generous" around a half-dozen times during that Memorandum. The Shipyard goes so far as to contend that the individual high pay awards were **so** generous that they served as consideration for the Shipyard's failure to pay the back high pay demanded in the grievance; specifically, the Shipyard claims that the union agreed "to limit back pay in return for a more generous monetary settlement."[3]

The Shipyard further asserts that these awards were the subject of intensive negotiations with the union. Page 12 of the Shipyard's Memorandum of Contentions of Fact and Law nicely encompasses the Shipyard's claims regarding this allegedly lengthy negotiation process:

> In deciding the amount of back pay, management, and in particular Mr. Winkler, worked very closely with the union to arrive at final figures. Mr. Winkler initially met with Mr. Aiken and identified those employees who performed high pay. They then assigned a numerical assessment in hours for the amount of high work that each employee would have worked. After making this assessment, Mr. Winkler met with his foremen and went over the list, name by name, to verify the numerical assessment. Many changes were made and these changes were presented to the union. The union reviewed the assessments and either concurred or disagreed. For those shipwrights who the union felt deserved a higher assessment, the parties negotiated further. Finally, they arrived at a numerical assessment for each shipwright.

Having elected to demonstrate the alleged "generosity" of its high-pay

awards, and having asserted that the awards were the subject of negotiation, the Shipyard has invited a response that demonstrates the absence of generosity or negotiation. That is just what plaintiffs' four summary exhibits do.

As to the Shipyard's claims of "generosity," the summaries collectively demonstrate that the high-pay awards were mechanically based on an initial estimate of the number of hours of high work each employee performed per eight-hour day. Taken as a whole, the summary exhibits demonstrate that, far from incorporating generosity at every (or any) turn, the Shipyard applied, or in certain cases misapplied, mathematical formulae to determine how much high pay each shipwright was owed. Unless there is evidence that those initial estimates were negotiated or "generous," there is no basis for the Shipyard's conclusory assertion that its awards were negotiated or generous.

Since the awards were mathematically derived from the initial hourly ratings for each shipwright, the focus now falls on the calculation of those ratings. The above-quoted portion of the Shipyard's Memorandum of Contentions of Law and Fact suggests at least three stages of negotiation between the first estimate of these ratings and their final calculation: (1) an initial negotiation between Mr. Winkler and Mr. Aiken; (2) a review by Mr. Winkler and his first-line supervisors after which "many changes were made"; and (3) after Mr. Aiken reviewed these revised figures, the parties "negotiated further" in the case of "those shipwrights who the union felt deserved a higher assessment."

Plaintiffs' exhibit 24 summarizes the course of the calculation of these

---

[3] Def's Objections at 14.

figures. On page 4 of its objections, the Shipyard complains that this exhibit is incomplete because the first document summarized, Joint Exhibit 40, is not the "first initial crack" because the parties previously explored a different rating system – one that did not represent the number of hours of high work performed. It is true that exhibit 24 does not summarize the aborted efforts to employ a different rating system. But as the above-quoted language from the Shipyard's Memorandum of Contentions of Law and Fact makes clear, this does not matter. That Memorandum identifies three stages of negotiation, all of which, according the Memorandum, took place after the parties "assigned a numerical assessment **in hours** for the amount of high work that each employee would have worked." Since the Shipyard claims that all of this negotiation took place after the initial numerical assessment "in hours" was prepared, Exhibit 24 properly summarizes the changes – or, more accurately, the lack of changes – in those assessments over time. Exhibit 24 demonstrates that few, if any changes, were made, and that in all but two exceptions, those changes were downward, not upward, as one would expect if the Shipyard's calculations were challenged by the union and revised through negotiation.

Further, it was necessary for plaintiffs to prepare the calculations contained in the summaries because the Shipyard's designated witness on the subject could not explain the calculation process. For example, when Mark Winkler was asked how many days were in the claim period for the high pay award, he did not know.[4] He was similarly unhelpful when asked to go through the documents and explain

how the Shipyard made its calculations. For example, when asked to lead plaintiffs' counsel through the calculations of Paul Scott's high pay award, he was unable to do so.[5]

Because the Shipyard was unable to explain its own calculations, plaintiffs were forced to undertake this effort. The method of calculation and the results are crucial to determining whether the shipwrights' high pay awards were "generous" and "negotiated." The Shipyard continues to maintain that this generosity and negotiation evidences an alleged accord and satisfaction. Since the summaries show otherwise, they are highly – and obviously – relevant. If the Shipyard wishes to withdraw arguments based upon the computation of the individual high-pay awards and to strike all testimony and exhibits that might be used to support those arguments, then plaintiffs are willing to withdraw the summaries as exhibits.

### B. The Summaries Allow the Underlying Voluminous Documents to be Conveniently Examined

Fed. R. Evid. 1006 requires the materials underlying a summary to be sufficiently "voluminous" so that the summary helps the trier of fact conveniently examine the material. The test is one of convenience, not impossibility, and the documents do not have to be so voluminous that it would be impossible for the Court to review.[6] It is sufficient that comprehension of the underlying documents in the midst of trial be "difficult and …inconvenient."[7]

---

[4] 30(b)(6) Deposition of Mark Winkler at 90:18-23; 91:4-7; 132:18-24.
[5] *Id*. at 122:8-17; 130:18-131:9; 133:15-22.
[6] *United States v. Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).
[7] *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (internal quotation omitted); *see also United States v. Duncan*, 919 F.2d 981, 988 (5th Cir, 1990)

Plaintiffs' exhibits summarized approximately 443 pages of documents containing raw data and mathematical calculations, amounting to 101 out of a total 191 trial exhibits. In *United States v. Jennings*,[8] the Fifth Circuit found that for "the convenience of the jury" it was appropriate to summarize "almost two hundred pages of material and substantial amounts of mathematical calculations."[9] Because of the amount and complex nature of the underlying documents, it is appropriate to offer a summary for the convenience of the Court.

The Shipyard insists that two of the summaries only summarize a handful of exhibits. For example, the Shipyard claims that Exhibit 24 only summarizes only six exhibits. The argument is clever, but wrong. In fact, Exhibit 24 summarizes data from hundreds of underlying pages. As the Shipyard observes elsewhere in its brief, the exhibits mentioned in Exhibit 24 are themselves summarizes of that underlying data.

Indeed, one of the Shipyard's arguments is that plaintiffs should not be allowed to present summaries because the Shipyard has already gone to the trouble of doing so. The Shipyard identifies no authority for the proposition that one party is bound to use another's summaries, and plaintiffs have found none.

The underlying materials are sufficiently voluminous to render the summaries admissible.

("Examination of the individual records would have been burdensome and time-consuming without the aid of summaries.").

[8] *United States v. Jennings*, 724 F.2d 436 (5th Cir. 1984).

[9] *Id.* at 441-42.

### C. The Summaries Are Accurate

The Shipyard next challenges the accuracy of plaintiffs' summary exhibits. Initially, it should be noted that the four summaries collectively contain 2,835 cells containing numerical data. This large figure excludes names, headings, and duplicate entries.

As will be seen below, among all of these cells' worth of data, the Shipyard identifies only four cells that are erroneous, two of which are attributable to the Shipyard's own failure to produce a complete copy of the underlying exhibit.

The Shipyard begins by arguing that Plaintiffs' Exhibit 27 is "a compilation of computations, rather than a true summary."[10] It is unclear what, exactly, the Shipyard means by this cryptic statement. It is difficult to see how a summary of the Shipyard's high-pay calculations could be anything other than "a compilation of computations." Moreover, the Shipyard fails to show why the presence of "computations" is problematic. To the extent the Shipyard objects to the statistical and other computations that summarize data from underlying materials, Fed. R. Evid. 1006 expressly contemplates that result. The rule provides that the contents of voluminous materials may be presented as a "calculation." Moreover, "computations and evaluations are often permitted on the basis of such summaries."[11]

In any event, the Shipyard then claims to have identified four math errors in Columns D and F of Plaintiffs' Exhibit 27. Partly due to an error in Kristi Emigh's

---

[10] Def's Objections at 5.
[11] *Scales*, 594 F.2d at 564.

declaration, which suggests that the data in this Column are the product of a formula she inserted, the Shipyard blames these errors on the plaintiffs. In fact, however, Columns E, F, and H contain data input from Joint Exhibit 44.[12] Plaintiffs have submitted Ms. Emigh's amended declaration, which clarifies this point.

Because the numbers were merely copied over, two of the four math "errors" the Shipyard identified are in the underlying document. They were not plaintiffs' errors at all.

In four other cases, plaintiffs did mistranscribe a figure from Joint Exhibit 44. Frederick Green has a "27" on Joint Exhibit 44, which was mistranscribed as a "17," Mr. Norenberg's entry is a "16" when it could be read as "15" instead, Anthony Schackmann has "11" instead of "22", and James Twogood has "71" instead of "171".[13]

Thus, of the 2,835 cells' worth of data in the four summaries, the Shipyard identified only two legitimate errors in one of them, and plaintiffs have identified two more. That the Shipyard could only identify two errors is a testament to the overall accuracy of these summaries. Courts have recognized that such a minor number of errors is to be expected when summarizing such a large amount of data.[14] Still, in an effort to be as accurate as possible, plaintiffs have submitted a

[12] Declaration of Kristi Emigh in Response to Defendant's Objections to Certain of Plaintiffs' Trial Exhibits ¶ 2.
[13] *Id.* at ¶ 3.
[14] *See, e.g., White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1070 (W.D. Mo. 1985) ("it is obvious that a summary must be an accurate summarization of the underlying materials involved. …Once an appropriate foundation has been established, however, this requirement must be approached sensibly, particularly with summaries of the present sort, since some human error in transcribing or collating a 'voluminous' mass of figures, dates and names is practically inevitable.")

revised exhibit 27 with the errors corrected.

The Shipyard also identifies two "misleading transcriptions" in Plaintiffs' Exhibit 27. But the Shipyard itself demonstrates that these transcriptions are its own fault, because "the numbers in the original exhibit went off the edge of the page when copied or scanned."[15] Plaintiffs' transcription of the exhibits the Shipyard produced is accurate. It is the Shipyard's copies of those exhibits that are not. Plaintiffs have requested copies of these documents that are complete.[16] Thus far, the Shipyard's response has been that these are unavailable.[17]

1. Plaintiffs Are Not Responsible for the Shipyard's Illegible Entries

The Shipyard also finds fault in the fact that whereas it would find eleven of its own entries illegible, plaintiffs only found three to be illegible. First, as discussed above, the fact that the Shipyard would do something differently does not make the plaintiffs' summary "inaccurate."

Further, by federal regulation, the Shipyard has a duty to keep proper records.[18] It failed to do so, necessitating plaintiffs' efforts to elucidate the process, particularly because, as discussed above, the Shipyard (through Mark Winkler) did a very poor job of explaining the process for calculating the high pay awards. Plaintiffs used the limited information available from the Shipyard to recreate those calculations. Because the underlying documents are available, the Court can, if it finds it necessary, assess the degree to which plaintiffs succeeded.

(internal citations omitted).

15 Def's Objections at 5.

16 Declaration of Jennifer Krebs ¶ 2-3.

17 *Id.* at ¶ 3.

18 5 C.F.R. 551.402.

### 2. A Challenge to the Summary's Accuracy Does Not Mean it is Inadmissible

Even if the Shipyard could make a strong case that the plaintiffs' summaries are inaccurate, it would not preclude the summaries being admitted under Fed. R. Evid. 1006.

The Shipyard's challenges to plaintiffs' summaries are substantially different than those found in cases in which summaries have been excluded. For example, in *PEAT, Inc. v. Vanguard Research, Inc.*,[19] cited by the Shipyard, the Eleventh Circuit reversed the district court's admission of summaries that were based on "classic hearsay," and that contained conclusory allegations designating certain information as trade secrets.[20] These issues are not implicated by the plaintiffs' summaries. The Shipyard has not alleged, nor could it, that the underlying materials are inadmissible. Indeed, the parties agree that it may be admitted.

*United States v. Boyd*[21] provides illustrative examples of a summary exhibit whose admission was upheld, and one whose exclusion was upheld. In *Boyd*, the appellate court upheld the admission of a chart prepared by the prosecution "that listed the relevant entries from the vouchers and from the time sheets, and calculated the differences between the two for each particular employee."[22] The court upheld the exclusion of a chart offered by the defendant purporting to show the same thing, but, unlike the prosecution's chart, "which relied primarily upon the authenticated time sheets of employees …[the defendant's chart] relied upon a

[19] *PEAT, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154 (11th Cir. 2004).
[20] *Id*. at 1160-61.
[21] *United States v. Boyd*, 740 F.2d 50 (U.S. App. D.C. 1984).
[22] *Id*. at 52.

hodge-podge collection of personal memory, unauthorized evidence, surmise and *post hoc* contract interpretation."[23] Here, like the prosecution in *Boyd*, plaintiffs have summarized the Shipyard's own authenticated and admissible records.

The Shipyard alleges that the plaintiffs reach conclusions in the summaries that are "questionable."[24] Although it is less than clear to what "conclusions" the Shipyard objects, inclusion of subjective conclusions would not render the summaries inadmissible. As the Fifth Circuit states in *Jennings*, "Although certain of the conclusions in the summary charts are undoubtedly the product of assumptions made by the government, these assumptions are not *per se* inadmissible."[25] Rather, the court explained, it is the responsibility of the trier of fact to determine what weight should be given to the evidence.[26]

Further, the "distinction between valid summary testimony and argument is not a bright line."[27] In *United States v. Smyth*,[28] the Fifth Circuit upheld the admission of charts with such headings as "falsified data," and allowed the charts to be presented to the jury, with a limiting instruction.[29] The Shipyard has identified nothing in plaintiffs' summaries that amounts to this type of argument. If the Court is of the opinion that any material in the summaries is argumentative, it can take that into consideration when evaluating the summaries. Because this is a

---

[23] *Id*. at 53.
[24] Def's Objections at 4.
[25] *Jennings*, 724 F.2d at 442.
[26] *Id*.; *see also United States v. Bakker*, 925 F.2d 728, 737 (4th Cir. 1991) (upholding admission of summary exhibits (composite videotapes) over defendant's objection that they were "unrepresentative," because the objection went to "the weight to be accorded to [the summaries], not to their admissibility.").
[27] *United States v. Lemire*, 720 F.2d 1327, 1349 (U.S. App. D.C. 1983).
[28] *United States v. Smyth*, 556 F.2d 1179 (5th Cir. 1977).

bench trial, there is no specter of a prejudiced jury that might prevent presentation of the summaries.

Finally, any challenges to the summaries' accuracy or potential for mischaracterization is further alleviated by the fact that the Shipyard will have the opportunity to cross-examine the person who prepared them, Ms. Emigh, should they wish to undertaking the riveting exercise of exploring how they were prepared.[30]

### D. The Explanatory Footnotes Do Not Defeat the Admissibility of the Summaries

The Shipyard also challenges plaintiffs' use of explanatory footnotes in one of the summaries, Plaintiffs' Exhibit 25. The Shipyard seems to imply that these are "argument."

The footnotes, however, do not argue any aspect of the case. Generally speaking, they deal with discrepancies certain summarized data and indicate what appears to be the cause of these discrepancies. This information seems useful to the reviewer, because it identifies the discrepancies so that the reader does not have to and identifies possible reasons for the discrepancies for the Court's consideration.

This attempt to explain the data so that the reader can assess it is permissible. The Sixth Circuit came to this conclusion in *United States v. Bray* in the context of a defendant's challenge to plaintiff's summary charts.[31] Because the

---

[29] *Id*. at 1182-84.
[30] *Lemire*, 720 F.2d at 1348-49 (U.S. App. D.C. 1983) ("The defendants also had full opportunity to cross-examine [the witness who prepared the summary], further alleviating any danger of inaccuracy or unfair characterization."); *see also Jennings*, 724 F.2d at 442.
[31] 139 F.3d 1104.

charts covered two different time periods, the defendant argued that they should be excluded. The Sixth Circuit disagreed, finding that the differences were clearly delineated in the charts.[32] Similarly, the information provided by plaintiffs allows the Court to assess the validity of the information.

In any case, if the Court deems it more appropriate, plaintiffs will strike the explanatory footnotes from Exhibit 25 and submit those to the Court as argument instead of evidence. That would be the better remedy than the wholesale exclusion of otherwise valid data. The Shipyard cites no authority for the notion that the Court is obliged to throw the baby out with the bath water.

**E. Plaintiffs Are Not Obligated to Tailor Their Summaries To The Shipyard's Liking**

The Shipyard complains about the summaries on three other grounds, which it attempts to pigeon-hole into the rubric of accuracy. But none goes to the accuracy of the information. Rather, the Shipyard just does not like the information summarized.

First, the Shipyard complains that plaintiffs' exhibit 24 fails to include data from ratings that predated the first Joint Exhibit it summarizes. Second, the Shipyard argues that the exhibit fails to compute the mean and median of the "first known" hourly ratings for each employee. These arguments, even if correct, would be insufficient to render the summary exhibits inadmissible.

1. There Were No "Earlier" Hourly Ratings To Summarize

The Shipyard argues that plaintiffs should have selected a different number

[32] *Id*. at 1113. The court also found that "the differing time periods were relevant to

for the "first known" calculation of each shipwright's rating. In preparing that Exhibit, Kristi Emigh relied upon 30(b)(6) testimony in which Mark Winkler stated that Joint Exhibit 40 was the first document **that the Shipyard used** to establish the ratings.[33]

The Shipyard suggests that plaintiffs should have used an earlier exhibit, Joint Exhibit 39, because Mr. Winkler characterized it as the first attempt to come up with ratings. But Mr. Winkler also stated that although he "tried that first," he "[f]igured that wasn't going to be the way we needed to do this. We needed to regroup. So that's when we regrouped and came up with this other one."[34] The "other one" is Joint Exhibit 40, upon which Ms. Emigh relied.[35]

Moreover, as set forth above, the Shipyard's Memorandum of Contentions of Fact and Law makes much of all the negotiations that took place after the first hourly ratings were developed. Plaintiffs' exhibit 24 provides data that is devastatingly relevant to the Shipyard's claim.

### 2. Plaintiffs Were Not Obligated To Perform Statistical Analyses On Data Just Because the Shipyard Thinks They Would Be "More" Relevant

The Shipyard next complains about Exhibit 24's statistical summaries of each of six underlying joint exhibits. In each case, plaintiffs computed the mean and median for the hourly entries on the underlying exhibit. They then compared the mean and median of the first known calculations to the final ones. If the entry for a

---

evidentiary weight, not the threshold question of admissibility." *Id.*

[33] Winkler Deposition at 102. Mr. Winkler was referring to Deposition Exhibit 23, which has been designated Joint Exhibit 40.

[34] *Id.* at 79. Mr. Winkler was referring to Deposition Exhibit 22, which has been designated Joint Exhibit 39.

shipwright was unclear or missing on a particular exhibit, plaintiffs omitted that number from the sheet and it did not figure into the mean or median calculation.

The Shipyard does not complain that any of these statistical calculations are inaccurate. Rather, they argue that plaintiffs should have calculated the mean and median of the first known calculation for each shipwright and compared **that** figure to the final calculation.

There is nothing wrong or illegitimate about the Shipyard's proposed approach. But plaintiffs were not obliged to perform this calculation. They are not required to summarize the underlying data in the manner that the Shipyard would prefer. A summary exhibit need only be "what it purports to be;"[36] the party offering the summary does not have to represent the position of the other side as well as their own. All that is required is that the data summarized be clearly identified and explained.[37]

Further, the Shipyard's preferred figures still prove plaintiffs' point: the ratings went down, not up, during the course of the union's alleged negotiations with the Shipyard, rendering the claim that such negotiations took place less credible. The Shipyard calculated that if its method were used, the mean would have been 3.5 or 3.4, rather than the plaintiffs' 3.6. But the final mean, which the Shipyard does not challenge, was 3.3. Similarly, the Shipyard calculates the median at 3.5 rather than 4.0 using its alternative method. But this does not

[35] *Id*. at 102.
[36] *Flemister v. United States*, 260 F.2d 513, 517 (5th Cir. 1958); *see also Lemire*, 720 F.2d at 1349.
[37] *Flemister*, 260 F.2d at 517.

change the fact that the median still dropped to 3.0.

The Shipyard's own calculations demonstrate both the plaintiffs' point and why the summaries are relevant: as shown in the lengthy quote above from the Shipyard's Memorandum, the Shipyard alleges that the ratings were the result of negotiation by the union, particularly by Mr. Aiken. Given that the ratings became **less,** not more, favorable to the employees after Mr. Aiken completed his alleged negotiations, Mr. Aiken seems to have engaged in one of the least successful negotiations since the Lenape sold Manhattan. Assuming, of course, that these negotiations happened, an assumption that is unsupported by the material plaintiffs' summaries contain.

### F. Conclusion to ER 1006 Section

In sum, plaintiffs' summaries meet the requirements for admission under Fed. R. Evid. 1006. The materials summarized are sufficiently voluminous to necessitate a summary for the convenience of the Court. They are relevant to the issues of negotiation and consideration that are raised in the Shipyard's briefing. And any challenges the Shipyard makes to their accuracy can be determined by the Court, with reference to the underlying documents if necessary.

## II. Barry Joe Aiken "Impeachment Material"

The Shipyard next objects to the admission of Plaintiffs Exhibits 19 through 23. These are employment records that document Mr. Aiken's promotions. One of the documents, Plaintiffs Exhibit 21, shows that just four weeks after he put his signature on the grievance decision, Mr. Aiken's promotion from shipwright to shipwright training leader was approved. According to Box 4 of Exhibit 21, the

promotion took effect February 13, 2000, three days after it was approved (according to Box 49). According to Box 5, the promotion was requested on February 2, 2000, roughly two weeks after the January 18, 2000 grievance decision was issued. Collectively, Plaintiffs exhibits 19 and 21 reveal that Mr. Aiken held the position of shipwright from 1994 through his promotion to shipwright training leader. (In his deposition, Mr. Aiken referred to his new position as "apprentice instructor"[38] or "trade instructor."[39]

Exhibits 20 reveals that the term of Mr. Aiken's promotion was not to exceed one year. In his deposition, Mr. Aiken explained that all promotions, including his, were temporary:

> Q And why were your promotions temporary ones like this?
>
> A All promotions in the shipyard at that particular time were temporary.
>
> Q And why was that?
>
> A Until you can demonstrate proficiency over a certain period of time and then it's management's prerogative on whether they want to make you permanent or not.[40]

Thus, Mr. Aiken believed that it was management's "prerogative" whether they wanted to make him permanent.

Mr. Aiken acknowledged that he was accused of accepting a promotion in exchange for his refusal to challenge the grievance decision:

> Q Did you ever let it be known that you did not want to

[38] Deposition of Barry Joe Aiken at 51:10-14; 57:1-4.
[39] *Id*. at 27:16-23.
[40] *Id*. at 46:19-25.

receive further calls from Shop 64 employees regarding the grievance decision?

A The upper management people, yes, I did.

Q You told upper management people to convey to shipwrights you didn't want additional calls regarding the grievance decision?

A No, but I told the upper-level managers that there are some people on the waterfront that seem to think that I was made an apprentice instructor, promoted to the apprentice instructor, based on my resolution of the grievance.[41]

As well as potential exhibits for impeachment, these exhibits are pertinent to the merits. First, one of the elements of accord and satisfaction is the existence of a "bona fide dispute." This element quite clearly puts in contention the bona fides, the good faith, of the parties to the alleged accord. But if the parties were acting in bad faith, if the Shipyard "offered" the union a "settlement" that gave employees nothing to which they were not already entitled, and if the Shipyard attempted to achieve this goal by putting the union steward in a conflict of interest, this would go directly to the Shipyard's (and the union's) bona fides. The Shipyard seems to recognize this; its supplemental memorandum of contentions of law and fact appears to acknowledge that an attempt to promote Mr. Aiken as a quid pro quo for a union decision to acquiesce in Ms. Tallman's decision would amount to "fraud."

Second, Mr. Aiken himself was awarded 4 hours worth of high pay for 177 days during the claim period. The issue of Mr. Aiken's promotion is integral to the Shipyard's computation of Mr. Aiken's individual high pay award – and to the

[41] *Id*. at 198-99.

Shipyard's claims about the alleged "generosity" of his and other high-pay awards. The Shipyard has offered evidence (including the aforementioned Joint Exhibit 52) that address this issue. Plaintiffs' exhibits simply complete the record.

All that said, it may be unnecessary to use any of these exhibits at all. Indeed, plaintiffs have not decided whether they will use them; that decision must await hearing how the witnesses testify at trial. Given that, the admissibility of these exhibits is best reserved for trial.

## III. The Shipyard's Additional Objections

Finally, the Shipyard objects to two further exhibits, plaintiffs' exhibits 4 and 9.

Exhibit 4 is a document, signed by the Shipyard and a representative of the same union that signed the grievance decision. It is captioned a "settlement agreement." Its language states that it is resolving a grievance for high pay. The document's date is May 14, 1998. The Shipyard does not challenge its authenticity. (After all, it came from the Shipyard's own records.)

Plaintiffs offer exhibit 4 to show that the parties to the alleged January 18, 2000 "settlement agreement" do, in fact, know how to, and do, draft "settlement agreements" when they want to settle cases. To the extent that the Shipyard intends to argue that the parties have a custom or practice of using grievance decisions to embody settlement agreements, Plaintiffs Exhibit 4 shows otherwise. So does Joint Exhibit 38, the settlement agreement that resolved Mark Mascioli's high-pay grievance.

Nonetheless, the Shipyard first argues that plaintiffs must call a witness

familiar with the grievance. But for plaintiffs' purposes, this is unnecessary. The details of how the grievance was processed are irrelevant. Only the fact that the Shipyard and the union know how to, and do, draft settlement agreements is pertinent, and exhibit 4 will be presented to the Shipyard's witnesses for that purpose.

The Shipyard contends that the exhibit is irrelevant. With all due respect to the Shipyard, its relevance is obvious.

Finally, the Shipyard suggests that the document constitutes "classic hearsay." This would be true if Exhibit 4 were being used to prove the truth of any matters asserted within its four corners. But the form and existence of Exhibit 4, not the truth of the statements it makes, are why plaintiffs offer it. Since plaintiffs do not offer Exhibit 4 to prove the truth of the matters it asserts, Exhibit 4 is not hearsay at all, for Evidence Rule 801(c)'s definition of hearsay is limited to statements that are "offered in evidence to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c).

Further, even if exhibit 4 were hearsay, it would be admissible under the "business records exception," because it is a record of an activity regularly conducted by the Shipyard.[42]

Exhibit 9, meanwhile, is a letter from Steve Seaton. The Shipyard's motion concedes this, but nonetheless appears to suggest that the Shipyard will object to its authenticity. "[P]laintiffs cannot admit this exhibit," the Shipyard insists, "without Mr. Seaton's testimony."

The Shipyard cites no authority for the proposition that the only way to authenticate Mr. Seaton's letter is to call him.[43] There are numerous ways to authenticate a document, that is to say, to show that the document is what it purports to be, namely a letter Mr. Seaton wrote. The recipient of the letter may authenticate it.[44] So may individuals familiar with Mr. Seaton's handwriting.[45] And so may the custodian of records for the Shipyard.[46] Since the Shipyard appears to have taken the unfortunate step of objecting to the authenticity of Mr. Seaton's letter, plaintiffs will now issue subpoenas to the appropriate custodians of records. One hopes that the Shipyard will reconsider (or clarify) this point and thereby avoid the need to go to this trouble, expense, and inconvenience.

The Shipyard objects to the admission of Mr. Seaton's letter because it, like Exhibit 4, is "classic hearsay." Once again, however, plaintiffs do not offer the letter to prove that what Mr. Seaton says is true. They offer the letter to prove what Mr. Seaton said, and that what he said is inconsistent with positions the Shipyard now wishes to take in this litigation.

Yet even if plaintiffs sought to admit Mr. Seaton's letter for the truth of the matters asserted therein, the letter would not be hearsay. As the Shipyard admits, Mr. Seaton is "an attorney for the Department of the Navy at Puget Sound Naval Shipyard." The first paragraph of Mr. Seaton's letter indicates that he is responding to a letter by Byron Holcomb because "it has been passed to me in the Shipyard

---

42 Fed. R. Evid. 803(6).
43 *See* Fed. R. Evid. 903.
44 Fed. R. Evid. 901(b)(1).
45 Fed. R. Evid. 901(b)(2).

legal office." As such, Exhibit 9 falls within both Rule 801(d)(2)(C) and (D). Rule 801(d)(2) excludes admissions by a party-opponent from the definition of hearsay. Statements by agents of a party-opponent are encompassed if made: (C) "by a person authorized by the party to make a statement concerning the subject," or (D) "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Mr. Seaton's letter falls within both characterizations, he was clearly authorized to write to Mr. Holcomb and the act of doing so fell within the scope of his employment.

## IV. CONCLUSION

The plaintiffs' summary exhibits are admissible under Fed. R. Evid. 1006. They are relevant to issues raised in the Shipyard's Memorandum, and summarize sufficiently voluminous materials. Any challenges to the accuracy of the summaries have either been addressed, or can be assessed by the Court based on its review of the summaries and the underlying documents. Further, the personnel records of Barry Joe Aiken are pertinent to the merits of the plaintiffs' argument, because they relate to how "bona fide" the dispute between the Shipyard and the union actually was. With regard to the other objections raised by the Shipyard, the documents are either not hearsay or a hearsay exception applies, and plaintiffs intend to query witnesses regarding these documents. The Shipyard's Objections are without merit, and the Court should admit all of plaintiffs' proposed exhibits.

---

[46] Fed. R. Evid. 901(a).

DATED this 25th day of October, 2006.

Respectfully Submitted,

s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on October 25, 2006, a copy of the foregoing Plaintiffs' Response to Defendant's Objections to Exhibits was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs