**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., Plaintiffs, | No. 04-856C |
| vs. | Judge Miller |
| THE UNITED STATES, Defendant. | Electronically Filed Oct. 25, 2006 |

**DECLARATION OF JENNIFER AMANDA KREBS**

I, Jennifer Amanda Krebs, aver as follows:

1. I am one of the attorneys of record for the Plaintiffs in this lawsuit. I am over the age of 18, have personal knowledge of the matters stated in this declaration and am competent to testify to those matters.

2. I reviewed defendant's Objections to Certain of Plaintiffs' Trial Exhibits Submitted on the Issue of Accord and Satisfaction, document 111, filed on October 20, 2006. This Declaration relates only to the objection stated on pages 5-6 to Plaintiff's Exhibit 027, specifically the alleged "misleading" transcriptions for shipwrights Jerry Cockrum and David Collins. Defendant's allege that PX-027 is inaccurate because the numbers in the original "went off the edge of the page when copied or scanned". On Monday, October 23, 2006, I emailed defense counsel, Steven Mager, to ask him to identify what exhibit he was referring to and, if it was a document produced in discovery by the defendant, if he could provide us access to the original or a properly (i.e. better) scanned copy. Attached as Exhibit A to this

Declaration is a true and correct copy of my October 23, 2006 email to Mr. Mager.

3. The next day, October 24, 2006, I spoke to Mr. Mager by telephone about this matter. He identified the exhibit in question as being JX-044. He also said he would look for the original document and/or a properly scanned copy to provide plaintiffs. I have not spoken to or communicated with Mr. Mager on this topic since.

4. As of 5:15 p.m. (Pacific Time) on Wednesday, October 25, 2006, plaintiffs have not been able to examine the original document or a properly scanned copy and therefore have not been able to respond to defendant's objections to Mr. Cockrum and Mr. Collins' entries on PX-027.

5. Attached as Exhibit B to this Declaration are true and correct excerpts from the June 27, 2006 deposition testimony of Barry Joe Aiken.

6. Attached as Exhibit C to this Declaration are true and correct excerpts from the March 10, 2006 30(b)(6) deposition of Mark Winkler.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 25th day of October, 2006 in Seattle, Washington

s/Jennifer Amanda Krebs
Jennifer Amanda Krebs

**CERTIFICATE OF SERVICE**

I hereby certify on October 25, 2006, a copy of the foregoing "DECLARATION OF JENNIFER AMANDA KREBS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

# EXHIBIT A

**From:** Jennifer Krebs
**Sent:** Monday, October 23, 2006 10:39 AM
**To:** 'Steven.Mager@usdoj.gov'
**Cc:** Kristi Emigh
**Subject:** Jaynes: exhibit question

Hi Steve,
In the government's Objections to our exhibit summaries, on pp.5-6, you state that the "original exhibit went off the edge of the page when copied or scanned." We have been unable to identify which exhibit you are referring to. Can you please clarify as soon as possible?

Also, if it is, as I presume, one of the documents the shipyard provided to us, can you please make arrangements for us to have immediate access to the original document or a properly scanned copy?
Thanks.

JENNIFER AMANDA KREBS
*jkrebs@gsblaw.com*

GARVEY SCHUBERT BARER
GSBLAW.COM
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
TEL 206 464 3939 x1415 FAX 206 464 0125

This e-mail is for the sole use of the intended recipient(s). It contains information that is confidential and/or legally privileged. If you believe that it has been sent to you in error, please notify the sender by reply e-mail and delete the message. Any disclosure, copying, distribution or use of this information by someone other than the intended recipient is prohibited.

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON D. HANBERG, et al., )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

DEPOSITION UPON ORAL EXAMINATION OF
BARRY JOE AIKEN
Tuesday, June 27, 2006

---

Q I will try. Several of these questions I have felt have been fairly direct. So just an observation that you can speak, it will just take longer to complete, that's all. I'm not going to tell you not to say something or anything of the like. Okay.

Let's talk for a minute about your employment history. You have run through some of that in paragraph 2 of Exhibit 81. And you indicate there that your current position is as a waterfront safety supervisor in the shipyard. Waterfront safety office. You see that?

A Yes.

Q How long have you held that position?

A I believe since 2001, but I'm not sure on those dates. I think it will be five years this September, so go back five years to 2001. September 2001.

Q What position did you hold before becoming a waterfront safety supervisor?

A Trade instructor for Shop 64.

Q How long did you hold that position?

A Approximately four years.

Q So your recollection is that from roughly 1997 to 2001 you were a trade instructor for Shop 64?

A Pretty close.

Q And what did you do before that?

A Shipwright.

document you have right here.
Q Okay.
A When it says -- what's the effective date? 2/11?
Q Right.
A Okay.
Q Now, I'm trying to put together Exhibit 84, which you have right there in front of you, and 87. If I read 84 correctly, if you look at the action being taken in box 5-B, you are getting a temporary promotion for a period not to exceed February 10, 2001. Am I reading Exhibit 84 correctly?
A Correct.
Q And then Exhibit 87 extends that promotion for another roughly one-year period until February 9, 2002. Am I reading that correctly?
A Correct.
Q Is that consistent with your recollection?
A That's consistent with what I see on the paperwork, yes.
Q And why were your promotions temporary ones like this?
A All promotions in the shipyard at that particular time were temporary.
Q And why was that?
A Until you can demonstrate proficiency over a certain period of time and then it's management's prerogative on whether they want to make you permanent or not.

having?

A That could have been.

Q Can you think of any instance where Ms. Tallman, you know, called you to come to her office or to an office to discuss any topic in the 1999 to 2000 time frame?

A I'm trying to visualize this. That's why I'm closing my eyes. Other than maybe to discuss going up to the apprentice school and becoming an apprentice instructor, no.

Q Did your job duties in 1999 and January of 2000 require you to have any form of direct contact with Ms. Tallman?

A Yes.

Q Okay.

A As the apprentice instructor.

Q All right. And tell me what your reporting obligations were to Ms. Tallman as an apprentice instructor.

A Track the apprentices, track the helpers, make recommendations for letters of requirement for leave abuse, sick leave annually, administrative functions as the instructor that was up there.

Q Any other parts of your job description that required you to interface directly with Ms. Tallman in 1999?

A As far as the administrative aspects of running the apprentice program?

Q Or anything.

Q When did you complete your job duties as -- is what I should have asked. When did you complete your job duties as an apprentice trainer or instructor?
A 2001.
Q 2001, okay. During the time that the grievance was pending, did you have any discussions with Mr. Winkler about your promotion to shipwright trainer?
A During the grievance?
Q Yes.
A Yes.
Q About how many times did you have discussions while the grievance was pending?
A Once or twice.
Q Once or twice?
A We want you to consider applying for the apprentice school. We're going to bring Dave off the hill. Want somebody to take his place.
Q And so you needed to put your hat into the ring at that point; is that right?
A That's correct.
Q Okay. And when did you let Mr. Winkler know or Ms. Tallman know you wanted to be considered for that promotion to shipwright training leader?
A After I had a discussion with my wife.
Q About when did that discussion take place?

Q So you did not -- let's start with: You got calls, were those calls that you took at your desk?
A I have -- I had an answering machine at the apprentice school, yes.
Q So you received messages on the answering machine. Did you keep any of those messages that were left?
A No.
Q And can you remember responding to any of the calls -- I'm sorry, can you remember calling back in response to any of the messages you received regarding the grievance decision from Shop 64?
A If they had left a name, I would have responded.
Q Did anybody leave a name?
A No.
Q Was the general tenure of the comments that were left on your machine favorable or not?
A Some of them were, yes. About 50/50.
Q Did you ever tell any shipwrights to stop calling you regarding the grievance decision?
A No.
Q Did you ever let it be known that you did not want to receive further calls from Shop 64 employees regarding the grievance decision?
A The upper management people, yes, I did.
Q You told upper management people to convey to shipwrights

you didn't want additional calls regarding the grievance decision?

A No, but I told the upper-level managers that there are some people on the waterfront that seem to think that I was made an apprentice instructor, promoted to the apprentice instructor, based on my resolution of the grievance. You can take this job and--

Q Do --

A --stuff it.

Q So you had heard a rumor on the waterfront that you had essentially cut a favorable deal to management in order to procure a promotion to shipwright training leader?

A That's what I heard.

Q Who did you hear that from?

A It was written on a chalkboard.

Q Where was that?

A 457.

Q Building 457?

A Yes.

Q In a particular room?

A It's where -- the shipwrights' muster area.

Q What was written on the chalkboard?

A Words like, You sold out.

Q And you knew that those were directed at you?

A I assumed that.

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 7th day of July, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON HANBERG, et al. )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

MARK WINKLER

Thursday, March 10, 2005

---

Q About when did you make those?

A It would be one of the very first get-togethers we had once we came to the idea of the concept of the formula. As far as the actual date, I couldn't provide that.

Q Okay. And then how much later in time did you write down the four that appears next to Mr. Hurn's name?

A I think that was significantly later, because the first initial thing didn't quite work the way we were anticipating, so we regrouped.

Q Tell me what the four represents.

A The four represents, in an eight-hour period, how many hours that we felt that Mr. Hurn would have been in a high pay situation.

Q And so do the one and two also represent estimates of the number of hours in an eight hour day that were spent in high work?

A No. Our first initial thing was we were trying to rate them. One being a person that's spent a lot of time -- we kind of went in reverse. We were trying to say, okay, a number one is a person that probably does a lot of high work. A two is almost a lot, three...

So we tried that first. Figured that wasn't going to be the way we needed to do this. We needed to regroup. So that's when we regrouped and came up with this other one.

A Yes. Whenever we -- I would imagine, we would have had to know when the signing was going to be and how far we were going to go back on it.
Q Right. Did you, at some point, calculate the number of workdays between the date 15 days prior to the grievance and the January 18, 2000, grievance decision?
A Yes.
Q Okay. Now, let me show you what we'll have marked as the next exhibit.
(Exhibit Number 25 marked for identification.)
Q What was Exhibit 25 used for? I know that there is handwriting in that upper left-hand corner.
A I don't have a clue.
Q Okay. Here was my surmise, and maybe this is something you want to quickly confirm off the record.
A Off the record?
Q We can do that in a second.
It looks to me, like somebody at some point determined that there were 202 workdays between the date 15 days prior to the grievance filing and the grievance decision. Does that ring a bell with you?
A It doesn't ring a bell with me. I mean, I could go count them out, but it could have been.
Q All right. Well, let's hold that 202 in mind. If you want to check with counsel and see if they've got an

answer, that's fine. Or we can keep going and I think
you'll find that my surmise is probably on the money.
A Okay.
Q Okay. So let's do that. So somebody came up with a 207 less five equals 202 days on this calendar. And as you sit here right now, don't remember?
A Doesn't ring a bell to me.
Q Do you recognize the handwriting?
A No.
Q This is as good a point as any to just ask you one other question. I'm going to hand you what appears to be the declaration of Rodney Whitcher. We'll have that marked as the next exhibit in order.
(Exhibit Number 26 marked for identification.)
Q Have you seen Exhibit 26, Mr. Whitcher's declaration before?
A I don't remember seeing it, no.
Q In paragraph 6, second sentence -- or, let me read you two sentences; the first sentence and the second sentence.
Mr. Whitcher writes: "There are various duties preformed by Shipwrights at Puget Sound Naval Shipyard. One of the primary duties is the erecting and dismantling of staging, most, but not every Shipwright does this work." Do you see that?

Q I gather the document created first was Exhibit 22?
A Yep.
Q Okay. What was the next document to be created?
A I would venture to say 23.
Q And then what was the next document that was created?
A Either one of these two.
Q 27 or 28?
A Yeah.
Q And then what came after 27, slash, 28?
A Looks like 24. And then 29, I would venture to say.
MR. SCARAMASTRA: Let's give you Exhibit 30.
(Exhibit Number 30 marked for identification.)
Q And let's have you put that in the order where you think it should go.
A I think at the end.
Q I'm feeling very good about this exercise because that was my guess, so we're -- either I'm very clever or you're very wrong.
A Ouch.
Q What I want to do is quickly walk through a couple of representatives and see how, if at all, the numerical ratings change. I thought the best representatives would be my own clients.
A Okay.
Q So why don't we start with Don Baker. If you can tell me

A Okay.
Q And tell me what Exhibit 33 is.
A Appears to be a printout off of SUPDESK, of Mitch Bracking's crew at that present time--
Q Okay.
A --with a bunch of numbers, and pluses, and minuses, and all kinds of stuff.
Q Let's take -- there's Paul Scott, in that group. And it says, handwritten next to Paul Scott is 577.9, and then circled next to it is plus 23. Can you tell me what those figures represent?
A I'm guessing that 577 was a number and plus 23 is, maybe, he worked a bunch of overtime. They're not mine, so I can't tell you exactly what they are.
Q Okay. So you think it might be calculations of overtime for Mr. Scott? Not sure?
A Not sure.
Q Okay. Exhibits 34, and 35. Exhibit 34, do you recognize the handwriting?
A Yes, sir.
Q Whose is it?
A Gary Horne.
Q And who is Rick?
A Rick Whitcher.
Q Rick Whitcher?

Q I've done the math. I think it is. Would that be consistent with the process you were using?
A Okay. Yes.
Q If you look at Exhibit 42, what does that show you? Let me rephrase it. What does the printed portion of this show?
A Are you talking about this portion?
Q Correct. The left few columns, as opposed to the handwriting.
A It appears to be a job order that the individual was working on specific days.
Q And I'll note that the dates all appear to take place in that claim period, beginning 15 days before the grievance to the date of the grievance decision. Does that appear to be the case? Actually, with the exception of sometime towards the end?
A Okay. Yes.
Q Now, somebody, looks like, tallied in handwriting his overtime hours, Mr. Scott's overtime hours, and came up with 577.9. Is that what happened?
A Appears that.
Q Then it says, handwriting below, "232 prior OT." What does that refer to?
A I don't know.
Q Somebody subtracted that from 577.9 and got 345. Does

that appear to be what happened?
A Yes.
Q Then there is 163 with the word, "leave" written next to it?
A Mm-hm (answers affirmatively).
Q Do you see that? Is that a yes?
A Yes.
Q And does that come from Exhibit 41?
A Speculation. But yeah, I would imagine.
Q The same figure --
A It's the same number.
Q Okay. And then it looks like somebody subtracted 163 from 345 and got 183. Do you see that?
A Yes.
Q And then somebody divided 183 by eight and got 23 days. Is that right?
A Appears to be -- it's not quite there, but...
Q Just about.
A Okay.
Q Now, back in the series of documents we were looking at before, I'm going to show you Exhibit 33. Would you look at Mr. Scott's name. Can you find it on there?
A Yes, I do.
Q There is a handwritten number next to his name?
A Yes.

Q What is it?
A Plus 23.
Q Plus 23. That's the same number that is calculated on Exhibit 42, correct?
A Okay. Yes, sorry.
Q Okay. What was done with that plus 23 figure once it was computed?
A If I'm not mistaken, we went and assessed the same numerical number to the 23 days to come up with another number.
Q Okay. Why don't you take Exhibit 24. Mr. Scott's figures appear on the last page, about mid-way down the page.
A Okay.
Q What is the number of days in the claim period that's recorded for Mr. Scott?
A Appears to be 225.
Q Right. Does that include the 23 additional hours or days that were computed on Exhibits 41 and 42?
A I don't know.
Q If it did, then that would mean that the original number of days in the claim period was 202, right? 225 less the 23 days, correct?
A I don't know if there was 202 days. I don't know where you're going. But I guess if you subtracted 225 plus 23,

you would come up with 202. I agree with that.
Q Well, where I'm going with it is, there appears to be, on Exhibit 25, a calculation of the number of days in the claim period of 202. And yet Mr. Scott has 225 days in the claim period. And it just either is the most amazing coincidence ever or the 225 figure includes the 23 day adjustment for leave and overtime.
Now, let me ask you: Having said that, does this refresh your recollection as to whether the shipyard, in calculating the number of days that would then be multiplied by the numerical assessment, made an adjustment to the number of days to reflect overtime hours and leave hours?
A We did make an adjustment.
Q I understand that. What I'm asking is: When you look at, for example, Exhibit 24 in front of you, does Mr. Scott's figure of 225 reflect those adjustments?
A Speculation. I don't know.
Q Okay. How would you find out?
A I'd have to go through Mr. Scott's thing, step-by-step, to figure out we got to the 225.
Q Okay.
A I mean, I know what the formula was that we used. I'd have to, I guess, backtrack through that whole thing.
Q All right. Well, let's take, then, Exhibits 29 and 30.

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Thursday, March 10, 2005 Deposition of MARK WINKLER was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Thursday, March 10, 2005 Deposition of MARK WINKLER is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 22nd day of March, 2005.

Katie J. Nelson, RPR, CCR
Notary Public in and for the State of Washington, residing in Bothell.
My Commission expires October 19, 2007
CCR License No. 2971