**No. 04-856C**
Judge George W. Miller

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION IN LIMINE AND POSITION REGARDING THE ADMISSIBILITY OF DEFENSE EXHIBITS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7644

OF COUNSEL:

JOHN D. NOEL
Senior Trial Attorney
Department of the Navy
720 Kennon Street, S.E., Room 233
Washington, D.C. 20374-5013

STEVEN L. SEATON
Puget Sound Naval Shipyard
1400 Farragut Avenue
Bremerton, Washington 98314-5001

October 25, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


I. The Court Should Not Exclude Evidence of Intent, Where Such Evidence Is Mutual, But "Unexpressed" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Plaintiffs Fail To Cite Any Authority That Supports The Exclusion of Such Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. The Parole Evidence Rule Does Not Support Exclusion Here . . . . . . . . . 3

C. The Context Of The Parties' Agreement Is Relevant To The Question Of Intent, As Is The Parties' Common Understanding Of The Material Details Of The Agreement Reached . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Plaintiff's Motion To Exclude Post-Grievance Material Should Be Denied . . . . 13

III. The Government Does Not Intend To Offer A. Rodger Brown's Testimony Regarding Any Specific Discussions Between Mr. Aiken and Ms. Tallman . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES

**PAGE)S**

Addison-Taylor v. United States,
63 Fed. Cl. 345 (2004) . . . . . . . . . . 1, 3, 8

Ahrens v. United States,
62 Fed. Cl. 664 (2004) . . . . . . . . . . 2

Baltimore & Ohio R.R. v. United States,
261 U.S. 592 (1923) . . . . . . . . . . 2

Beta Sys. v. United States,
838 F.2d 1179 (Fed. Cir.1988) . . . . . . . . . . 4

Burlesque Artists Assoc. v. I. Hirst Enter., Inc.,
267 F.2d 414 (3d Cir. 1959) . . . . . . . . . . 14

California Sand & Gravel, Inc. v. United States,
22 Cl. Ct. 19 (1990) . . . . . . . . . . 5, 13

Chesapeake & Potomac Telephone Co. V. United States,
228 Ct. Cl. 101 (1981) . . . . . . . . . . 2

City of Tacoma v. United States,
31 F.3d 1130 (Fed. Cir.1994) . . . . . . . . . . 4

City of Tacoma v. United States,
38 Fed. Cl. 582 (1997) . . . . . . . . . . 4

Coggeshall Dev. Corp. v. United States,
29 Fed. Cl. 264 (1993) . . . . . . . . . . 4

David Nassif Assocs. v. United States,
214 Ct. Cl. 407 F.2d 249 (1977) . . . . . . . . . . 3

Fifth Third Bank of Western Ohio v. United States,
402 F.3d 1221 (Fed. Cir.2005) . . . . . . . . . . 2

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

First Allmerica Fin. Life Ins. Co. v. Minn. Life Ins. Co.,
188 F. Supp.2d 101 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

First Fed. Lincoln Park v. United States,
54 Fed. Cl. 446 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fischer v. First Chi. Capital Mkts., Inc.,
195 F.3d 279 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Greco v. Dep't of the Army,
852 F.2d 558 (Fed. Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Kmart Corp. v. United States,
31 Fed. Cl. 677 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

Pacific Gas & Elec. Co. V. United States,
--- Fed. Cl. -- 2006 WL 2925649 (Oct. 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Safeco Credit v. United States,
44 Fed. Cl. 406 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Smith v. Dotterweich,
93 N.E. 985, 200 N.Y. 299 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sperry Flight Systems v. United States,
212 Ct. Cl. 548 F.2d 915 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Sperry Corp. v. United States,
13 Cl. Ct. 453 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Texas Instr., Inc. v. United States,
922 F.2d 810 (Fed. Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Universal Match Corp. v. United States,
161 Ct. Cl. 418 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re Vic Supply Co., Inc.,
227 F.3d 928 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATUTES**

5 U.S.C. § 7121(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**MISCELLANEOUS**

Restatement (Second) of Contracts § 214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Restatement (Second) of Contracts § 218(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Corbin on Contracts § 576 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION IN LIMINE AND POSITION REGARDING THE ADMISSIBILITY OF DEFENSE EXHIBITS**

Pursuant to this Court's order, dated September 15, 2006, the United States respectfully submits its response to plaintiffs' motion in limine and position regarding the admissibility of defense exhibits.

## I. The Court Should Not Exclude Evidence of Intent, Where Such Evidence Is Mutual, But "Unexpressed"

### A. Plaintiffs Fail To Cite Any Authority That Supports The Exclusion of Such Evidence

Plaintiffs make the wholly unsupported argument that the Court should bar the Government from presenting any evidence of mutual, yet purportedly "unexpressed," intent. None of the cases cited by the plaintiffs supports their claim that the Government's evidence must be excluded. Safeco Credit v. United States, 44 Fed. Cl. 406 (1999), stands for the unremarkable proposition that the Court "cannot import ambiguity into unambiguous language" through the use of parol evidence.[1] 44 Fed. Cl. at 19. Similarly, in Addison-Taylor v. United States, 63 Fed. Cl. 345 (2004), the Court focused upon the plain language of the agreement, and

[1] Further, the language in Safeco regarding accord and satisfaction is merely dicta, as the Court had already determined that plaintiff's underlying claims were not meritorious. See 44 Fed. Cl. at 418.

rebuffed the plaintiff's attempts to use parol evidence to alter such language. Both Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21 (1971) and Chesapeake & Potomac Telephone Co. v. United States, 228 Ct. Cl. 101 (1981), stand for the proposition that unilateral intent is not enough to bind the parties. None of these cases establish that evidence of "uncommunicated," yet mutual, intent is not relevant to the issue of accord and satisfaction, nor do they limit communications to specific verbal or written forms of expressions.

Plaintiffs' assertions are contrary to the well settled proposition that a common understanding of the parties may be relevant to the question of contract formation. The goal of this Court is to determine the mutual intent of the parties, and it is well settled that the Court looks to the "totality of the circumstances." Ahrens v. United States, 62 Fed. Cl. 664, 670 (2004) (citing Texas Instr., Inc. v. United States, 922 F.2d 810, 815 (Fed. Cir.1990)). Accordingly, while unilateral subjective and uncommunicated intent cannot, by such description, be used as evidence of mutual intent, mutuality may be inferred "'from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Sperry Corp. v. United States, 13 Cl. Ct. 453, 458 (1987) (quoting Baltimore & Ohio R.R. v. United States, 261 U.S. 592, 597 (1923)). Ultimately, "[t]he parties' intent is the factor that controls." Ahrens, 62 Fed. Cl. at 670 (citing Safeco Credit, 44 Fed. Cl. at 419) (emphasis added).

Accordingly, in cases such as Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221 (Fed. Cir.2005), the United States Court of Appeals for the Federal Circuit held that "negotiations, contemporaneous documents, and the circumstances surrounding the transactions at issue [may establish that the parties] intended to enter into a binding agreement[.]" Id. at 1233. See also First Fed. Lincoln Park v. United States, 54 Fed. Cl. 446, 457, 459 (2002).

Mutual intent may exist where the parties share a common understanding of the meaning of their actions. In the present case, the parties' actions must be understood against the backdrop of the collective bargaining agreement and its grievance scheme, O'Connor v. United States, 308 F.3d 1233 (Fed. Cir. 2002), and the background of the individuals that entered into the agreement, none of whom were lawyers or had the consult of lawyers in drafting the settlement agreement.

**B. The Parole Evidence Rule Does Not Support Exclusion Here**

At its core, plaintiffs' objection to evidence pre-dating the settlement agreement should be read as a parol evidence objection. Indeed, the two cases upon which plaintiffs rely principally in their brief, Safeco Credit v. United States, 44 Fed. Cl. 406 (1999), and Addison-Taylor v. United States, 63 Fed. Cl. 345 (2004), both analyze the introduction of extrinsic evidence in the context of accord and satisfaction by using the parol evidence rule. Because such evidence goes to contract formation or serves to interpret an otherwise ambiguous and unintegrated document, however, the introduction of such evidence is clearly proper in this case. Thus, we respectfully request that the plaintiffs' motion in limine to exclude evidence of unexpressed intentions be denied.

The parol evidence rule is a rule of substantive law that prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement "in instances where the written agreement has been adopted by the parties as an expression of their final understanding." See, e.g., David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 557 F.2d 249, 256 (1977). The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). If the terms of a contract are clear and unambiguous, they must be given their plain

meaning – extrinsic evidence is inadmissible to interpret them. McAbee Constr., 97 F.3d at 1435; Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988) (noting that court will consider parol evidence only when contract is ambiguous). A contract is ambiguous if susceptible to more than one reasonable meaning. City of Tacoma v. United States, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); Beta Sys. v. United States, 838 F.2d 1179, 1183 (Fed.Cir.1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face.").

At the outset, the parol evidence rule does not work to exclude evidence related to contract formation. "Where oral testimony goes directly to the question of whether there is a written contract or not, it is always competent. . ." Smith v. Dotterweich, 93 N.E. 985, 200 N.Y. 299 (1911) (quoted in CORBIN ON CONTRACTS § 576 n. 20 (2002)). Indeed, this Court has held that it may use certain extrinsic evidence to clarify the parties' objective intent. City of Tacoma v. United States, 38 Fed. Cl. 582, 589 (1997); Kmart Corp. v. United States, 31 Fed. Cl. 677, 681 (1994). To the extent that plaintiffs seek to exclude testimony of intent with regard to the question of formation, such an exclusion is not proper.

Further, the parol evidence rule does not apply where the disputed agreement is ambiguous, or where it does not represent a single, fully integrated statement of the terms of the parties' agreement.[2] See Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d

[2] Parol evidence is admissible to show the extent to which a written agreement is integrated. McAbee, 97 F.3d at 1434 (citations omitted); Sylvania, 458 F.2d at 1006; Coggeshall Dev. Corp. v. United States, 29 Fed. Cl. 264, 269 (1993) (the court may consider both the document itself and extrinsic evidence to determine whether parties intended for the deed to be a final, integrated document).

994, 1005 (1972) ("Except as preventing the contradiction of written agreements [] the parol evidence rule is no bar, too, to extrinsic, parol evidence supplementing the terms of even a final written agreement by consistent additional terms, unless, in the words of the Uniform Commercial Code, 'the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.'" (internal citations omitted)); California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 25 (1990). In the present case, it appears that the Court regarded the settlement agreement as sufficiently ambiguous to require a trial on such matters, and, in any event, the testimony of the parties will indicate at trial that the agreement cannot be viewed as a wholly integrated one.

**C. The Context Of The Parties' Agreement Is Relevant To The Question Of Intent, As Is The Parties' Common Understanding Of The Material Details Of The Agreement Reached**

Plaintiffs broadly assert, in Part II B of their motion in limine, that "none of the signatories expressed that the grievance decision was a full and final settlement of the shipwrights' claims."[3] Pl. Mot. In Limine at 5. Plaintiffs cite to the deposition testimony of Mary Jane Tallman, shop superintendent for Shop 64, Puget Sound Naval Shipyard (the "Shipyard"), and Joe Aiken, the union steward of record for this grievance, claiming that neither witness recalled any conversation that the settlement achieved an accord and satisfaction. The testimony of both of these individuals, however, is replete with references that the union and the Shipyard worked together to resolve the grievance and to reach complete settlement of the

[3] The Government does not believe that plaintiffs' allegations of fact have any bearing on the question of admissibility, but rather go to possible issues to be raised at trial. Nevertheless, in order to guarantee that our right to respond is not prejudiced by silence, we respond to such allegations below.

dispute, and agreed that the January 18, 2006 agreement was to represent the final resolution of the dispute.

The settlement at issue in this dispute was reached in the context of a grievance under the collective bargaining agreement (the "CBA"). It involved an informal process, without the involvement of attorneys for either the Shipyard or the union. This is common at the Shipyard in resolving grievances because to goal is to resolve the grievance at the lowest level possible.[4] Even so, within the well-defined context of the employer/union collective bargaining relationship and the Civil Service Reform Act ("CSRA") required negotiated grievance procedure, it is clear that the parties settled the entire grievance.

Although the document was captioned "Grievance Decision," it was in fact a settlement agreement signed by both the union's representative and the employer's representative. Because the standard grievance decision is signed only by the employer and never by the union, the fact that both the union and the employer signed is a fact that can have no other meaning than that the parties were in agreement. As the evidence at trial will establish, the two representatives have exactly the same understanding of the settlement agreement. At the time they signed the settlement agreement, they mutually and identically understood the intent of their settlement – it was intended to resolve all claims (including the back pay claims now being pursued by the plaintiffs) that were included in the written grievance prepared by Mr. Aiken, in exchange for the backpay with interest and the future pay as set forth in the document entitled "Grievance Decision," that was prepared by Ms. Tallman's staff. The two representatives agree upon the

[4]CBA section 3001(b) reads in part, "The Employer and the Council recognize and endorse the importance of bringing to light and adjusting grievances promptly at the lowest possible level."

terms of the settlement, and both the union and the employer have complied with those terms over the last six years, because the settlement was in the context of the negotiated grievance process, and that process has been a standard course of conduct between them since the union and the employer signed the CBA in 1987.

In short, the context is important. Just as the document that is entitled "Grievance Decision" cannot be understood without understanding the grievance that led to the decision, the settlement agreement cannot be understood without understanding the context of the negotiated grievance procedures that bind the parties to the settlement.

The Federal Circuit has made it clear that even with the expanded right to seek judicial relief, the CSRA system of collective bargaining that mandates that every CBA will have procedures "for the settlement of grievances" remains in effect. O'Connor v. United States, 308 F.3d 1233, 1237 (Fed. Cir. 2002) (referencing 5 U.S.C. § 7121(a)(1)). And where a union enters into a settlement agreement on behalf of bargaining unit members, that agreement, to the extent it applies, will act as an accord and satisfaction. Id. at 1241. There is no dispute here that plaintiffs are within the bargaining unit for which Mr. Aiken was acting as steward. The duties of the steward are well defined in the CBA. Section 0604(d) provides "Stewards shall represent unit employees in processing and resolving complaints/grievances [within the "same Shop/Code"]." Mr. Aiken was part of Shop 64 where the grievance was filed, and was the proper union steward. The evidence will show that the grievance was initiated through Mr. Aiken's efforts, and he prepared the documents to file, including the language of the substance of the grievance. He was the party that wrote the language that the grievance sought "back environmental pay for high work at the rate of 1040 hours per year for all years in Shop 64 (plus interest)." Joint Exhibit 004

(emphasis added). Mr. Aiken was fully aware of the backpay claim that he had prepared, and was therefore fully aware of the compromise that was contained in the document entitled "Grievance Decision." Mr. Aiken was also fully aware of the enormous value in future pay being offered in the proposal to change the pay policy to approve High Pay for what amounts to work five feet off the ground and higher.

Moreover, unlike the plaintiffs in Addison-Taylor, 63 Fed. Cl. 345 (2004), the union official who settled this matter is in complete agreement with the management official that a settlement was reached and that the matter was fully resolved. In Addison-Taylor, the proffered testimony of the union officials was meant to show that the agreement was not meant to have resolved the entire dispute. In this case, the consistent testimony of both signatories is that despite the lack of any special legal terminology, the parties intended to and in fact did effect a complete settlement of this workplace dispute.

For example, Ms. Tallman testified, when asked about a portion of her prior declaration regarding changing the future high pay of the grievants:

> **A**. So this whole time period we worked – we meaning basically me and Mark Winkler, Lynnette – worked with the union to figure out how we would – how we would do this. So in working with the union – and Joe Aiken was the counsel representing the grievants – when we prepared the — we meaning me and Lynnette and Mark – prepared the decision, I signed the decision and Joe signed the decision for the union. By doing that Joe told me that this is a change for the future, that the grievance was resolved. The matter was settled. The whole grievance was resolved. And from now on, we will pay. And basically that was seen as a pretty good win for the shipwrights.
>
> **Q**. Let's go back – when you say "I was told that I was making a decision," are you saying Mr. Aiken is the person that told you you are making a decision changing only future pay of the shipwrights?
>
> **A**. By his signature on the piece of paper, his agreement with the grievance.

**Q**. Okay. So when you say, "I was told that I was making a decision changing only the future pay of the shipwrights," you are referring to Mr. Aiken's signature on your grievance decision.

**A**. Yes.

**Q**. – correct? Are you referring to anything else?

**A**. No.

**Q**. Okay. So you're not referring to anything Mr. Aiken said to you, right?

**A**. Well, I guess I could be referring to all conversations, whatever they were, that took place from the time the grievants sat in front of me at the second level and we came up with the decision letter, and the work that we did together between there.

**Q**. Okay. But as you sit here — so it's possible there was a conversation with Mr. Aiken in which he said something to the effect of, you, Ms. Tallman, are making a decision changing only the future pay of shipwrights, but while possible, you can't remember any such specific conversation; is that fair?

**A**. There were several conversations with Joe. Mark Winkler worked closely with Joe. Through this time period, we were working closely with Joe. Through this time period, we were working toward how would we resolve the – the time – the pay issue from the time the grievance was filed, the 15 days from the time before the grievance was filed. So I don't remember a specific conversation, but the general tone of the conversation was, This is how we're going to resolve this grievance in full.

Tallman Dep. 55:18-57:14.

Specifically regarding the issue of back pay, Ms. Tallman testified that the union clearly understood that the 15-day time period was meant to be the only period of backpay that would be offered, rather than the time period asked for in the grievance.

**Q**. But had you been required to pay those leading-edge guys, as you put it, more than 15 days prior to the filing of the grievance, would you have denied the grievance?

> **A**. If – when we started working with the union and we made the offer of – this is how – this is the offer we're putting on the table as part of the negotiation, if they'd come back and said, That's not good enough, we want back pay for the whole time that these people were shipwrights, I would have denied the grievance.

Id. 60:18 -61:1.

Finally, Ms. Tallman also testified that at the time the agreement was settled, Mr. Aiken expressed the clear intent of the union that the parties had fully resolved this grievance.

> **Q**. You never talked about whether any individual would lose their right to a lawsuit if the union or if you signed Exhibit 70 or Exhibit 18 [the settlement]?
>
> **A**. That was not specifically mentioned. However, I was under the understanding as to – with the union that this was the end of it.
>
> **Q**. Right.
>
> **A**. We shook hands and we said, This is the end of it.
>
> **Q**. You shook hands, he signed it, and did somebody use the specific words, This is the end of it?
>
> **A**. I believe we did after we shook hands.
>
> **Q**. We –
>
> **A**. I think it was, we done good. This is – we done good. This is the end of it. We done good by our folks.
>
> **Q**. It was the end of what?
>
> **A**. That it was settled. It was over, the grievance was over.

Id. 163:6-23.

Similarly, the testimony of Mr. Aiken indicates that the union, acting on behalf of the shipwrights, considered this a settlement of an employment dispute – a settlement that resolved all of the issues raised in the grievance.

> **Q**. What authority do you have as a steward of record to resolve grievances that you bring on behalf of union members?
>
> * * *
>
> **A**. This was a labor dispute between labor. I'm the representative of the UBC, the steward of record. And there is an offer. There is a negotiating point. If you go back to the original grievance form, you will see the nature of the charge that's listed in the original grievance form. And that that is our negotiating point to come to a decision, a settlement, if you want to say it for lack of better words, a settlement that's there. Okay. I asked for this, their counterproposal was this. That's where we're at. It was reasonable. Okay. That's there. And I have the power to – representing the union at that time to accept or reject that and go to invoking binding arbitration.

Aiken Depo. 76:25-77:17. Further evidence that the union considered this a settlement is found when Mr. Aiken testified regarding his discussion with his union supervisor regarding the settlement:

> **Q**. Can you tell me quickly what role Joe Hamel played in connection with the shipwright's high-pay grievance?
>
> **A**. I took the proposal, as it was a proposal, to Mr. Hamel, let him read it. He concurred that it was an acceptable settlement and that we should settle.

Id. 82:25-83:4. And again, regarding resolution, Mr. Aiken testified that his understanding was that management was also settling the grievance.

> **Q**. So no discussions with Ms. Tallman regarding the grievance between May 20, 1999, and November 10, 1999?
>
> **A**. I remember one specific discussion that she indicated that all parties were in agreement for us resolving the grievance.

Id. 119:23-120:2. Finally, when asked to give the union's position on whether this settlement resolved all of the issues, Mr. Aiken testified as follows:

> **Q**. Okay. So you're not in a position to testify under oath in court under penalty of perjury that you used the works "full and final settlement" or the words "full

> and final resolution" during your January 14th and January 18th, 2000, conversations with Ms. Tallman, right?
>
> **A**. Did I use those specific words?
>
> **Q**. Right.
>
> **A**. I know the answer you're looking for, but my answer is, I felt that when I put my signature on this line, that that was the full and final settlement without having to say the words, that I signed off on this document as the representative of the union, that that was the full and final settlement.

Id. 188:14 -189:1.

Plaintiffs incorrectly characterize the settlement agreement signed by the employer and the union on January 18, 2000. They omit the fact that the settlement agreement arose in the highly defined context of the negotiated grievance procedure. For example, during the deposition of Mr. Aiken, plaintiff's counsel asked "Did the topic ever come up during your conversation [with the Employer's representative] of whether the union would demand arbitration if she signed the grievance decision?" His answer was "No." Pl. Mot. In Limine 6. However, in light of settlement in the context of the collective bargaining agreement and grievance process, there was no need to have such specific discussions. Plaintiffs assert that if the parties had not expressed their intentions to the other party at the time of the agreement, evidence of their intentions must be excluded from evidence. This might make sense if one of the two parties disagreed with the other over the intent of the settlement contract. Or, this might make sense in an "arms length" agreement where only the contract itself defined the relationship of the parties.

But that is not the case here. The roles of the parties in this case are set by the CSRA, and by a collective bargaining. Both parties knew that there is only one thing that the union gives up

when it reaches a settlement, it gives up the right to go to binding arbitration. There was simply no need for a discussion of what Mr. Aiken's signature meant, because it could only mean one thing, and both parties agree even now as to its meaning. The intentions of the parties were not discussed as they would have been under other circumstances, because there was no need for discussion.

## II. Plaintiffs' Motion To Exclude Post-Grievance Material Should Be Denied

Plaintiffs object to the admission of documents that consistently refer to the January 18, 2000 agreement as a settlement agreement upon the ground of parol evidence. Specifically, plaintiffs cite to Restatement (Second) of Contracts § 214 and California Sand & Gravel, 22 Cl. Ct. 19 (1990), for the proposition that post-grievance contract material should be excluded to the extent that it is offered to prove additional contract terms. Plaintiffs' argument, however, is flawed in several respects, and we respectfully request that their motion on this point be denied.

At the outset, plaintiffs do not appear to be objecting to the introduction of such exhibits for purposes other than to prove additional contract terms. For example, such documents would be admissible under the parol evidence rule to demonstrate that consideration and that the union received the benefit of its bargain with the Shipyard. See RESTATEMENT (SECOND) OF CONTRACTS § 218(b) ("Evidence is admissible to prove whether or not there is consideration for a promise, even though the parties have reduced their agreement to a writing which appears to be a completely integrated agreement.") Indeed, plaintiffs apparently seek to introduce the settlement agreement for employee grievance 05518-K (M. Mascioli), JX-038 for the purpose of demonstrating that certain Shipyard officials knew how to prepare a settlement agreement.

Moreover, the parol evidence rule does not bar "'events subsequent to the writing that is claimed to be the statement of the parties' contract.'" Pacific Gas & Elec. Co. v. United States, --- Fed. Cl. ----, 2006 WL 2925649, n. 43 (Oct. 13, 2006) (quoting In re Vic Supply Co., Inc., 227 F.3d 928, 930-31 (7th Cir. 2000)) (also citing Fischer v. First Chi. Capital Mkts., Inc., 195 F.3d 279, 282 (7th Cir. 1999); Burlesque Artists Assoc. v. I. Hirst Enter., Inc., 267 F.2d 414, 416 (3d Cir. 1959) (refusing to apply the parol evidence rule to bar testimony regarding an agreement because it "did not . . . change the promises in the original contract but simply implemented the execution of those promises," and because it was made "subsequent to the execution of [the] contract"); First Allmerica Fin. Life Ins. Co. v. Minn. Life Ins. Co., 188 F. Supp.2d 101, 107 (D. Mass. 2002) ("The parol[ ] evidence rule does not, however, foreclose consideration of statements made after the integration of the agreement.")).

Plaintiffs' parol evidence argument, however, depends upon the basic premise that the settlement agreement is intended to be an integrated, unambiguous agreement, key factor which their motion does not demonstrate.

Finally, in Sperry Flight Systems v. United States, 212 Ct. Cl. 329, 548 F.2d 915, 923 (1977), the Court of Claims stated that "a course of dealing can supply an enforceable term to a contract (or may even supplement or qualify that contract) provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions-a reflection of their joint or common understanding." Id. at 923. Indeed, "[i]t is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention." Universal Match Corp. v. United States, 161 Ct. Cl. 418 (1963). In the present case, the union has consistently treated the high pay grievance

as matter that was settled by the January 18, 2000 agreement, and indeed, has used that settlement to receive additional benefits from the Government. The Government has repeatedly acknowledged such requests, under the premise that it was required to do so pursuant to the settlement agreement. For these reasons and the reasons set forth above, we respectfully request that plaintiffs' motion in limine to exclude post-grievance materials be denied.

## III. The Government Does Not Intend To Offer A. Rodger Brown's Testimony Regarding Any Specific Discussions Between Mr. Aiken and Ms. Tallman

Plaintiffs seek to exclude the testimony of A. Rodger Brown upon the basis that such testimony is inadmissable because it is not based on "personal knowledge." In support of their claim, they correctly note that Mr. Brown was not involved in any settlement discussion that preceded the signing of the settlement agreement. However, we have never asserted that we intend to offer A. Rodger Brown's testimony regarding any specific discussions that may have occurred between management and Joe Aiken regarding the settlement of the high pay grievance. Accordingly, because plaintiff presents no valid objection to Mr. Brown's proposed testimony, we respectfully request that his testimony not be excluded.

Mr. Brown will offer testimony regarding the settlement of the grievance of Mr. Mascioli, and the grievance process in general. Specifically, Mr. Brown will be able to testify as to how the union described the high pay grievance to him as "settled" and how they sought additional benefits for Mr. Mascioli from the Puget Sound Naval Shipyard on the basis that such grievance had been settled with the Shipyard. He also will be able to offer the Court his knowledge of the grievance process in general, and why a signed "decision" would represent a settlement in this context. Finally, to the extent that plaintiffs attempt to argue that the settlement of

Mr. Mascioli's grievance demonstrates that the Shipyard generally knew how to prepare a settlement agreement, Mr. Brown will be able to testify to the special context of this agreement, as well as his relative experience in such matters as compared to Ms. Tallman.

Because we do not intend to offer Mr. Brown's testimony for any purpose ascribed by the plaintiffs, we respectfully request that plaintiffs' motion to exclude his testimony be denied.

## CONCLUSION

For all of the above reasons, the Government respectfully requests that the Court deny plaintiffs' motion in limine.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th floor
Washington, D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7644

Attorneys for Defendant
October 25, 2006

OF COUNSEL .
JOHN D. NOEL
Senior Trial Attorney
Department of the Navy
720 Kennon Street, S.E., Room 233
Washington, D.C. 20374-5013

STEVEN L. SEATON
Puget Sound Naval Shipyard
1400 Farragut Avenue
Bremerton, Washington 98314-5001

**CERTIFICATE OF FILING**

I hereby certify that on this 25th day of October, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION IN LIMINE AND POSITION REGARDING THE ADMISSIBILITY OF DEFENSE EXHIBITS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice