**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., | No. 04-856C |
| Plaintiffs, | Judge Miller |
| vs. | |
| THE UNITED STATES, | Electronically Filed on Oct. 27, 2006 |
| Defendant. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE**

## I. UNEXPRESSED INTENTIONS, IMPRESSIONS, AND THOUGHTS ARE INADMISSIBLE FOR PURPOSES OF CONTRACT INTERPRETATION

### A. Overview: The Shipyard Must Prove the Terms, and Not Merely the Existence, of the Alleged Settlement Agreement

The Shipyard has the burden not just of proving the **existence** of a settlement agreement. It must also prove the **terms** of that agreement.

It now becomes clear that the Shipyard is attempting to shirk that duty. First, the Shipyard is at war with the Federal Circuit's decision in *Mudge v. United States*.[1] It now argues that it may prove an implied-in-fact contract based upon the parties' "conduct" and that "there is only one thing that the union gives up when it reaches a settlement, it gives up the right to go to binding arbitration."[2]

The trouble with this position is that unless the union pursues arbitration, it **always** gives up the right to demand it at some point. There are numerous ways this could come about: (1) the union could mistakenly fail to timely demand arbitration; (2) the union could decide not to seek arbitration without informing management; (3) the union could tell management that if

[1] 308 F.3d 1220 (Fed. Cir. 2002).

management resolved the grievance in a certain way, the union did not intend to demand arbitration, or (4) the union could enter into a formal settlement agreement in which the union promised not to demand arbitration without making further promises. In each case, all the union has done is decide not to arbitrate. *Mudge* teaches that this is not enough.

In *Mudge*, the same panel that decided *O'Connor v. United States*[3] on the same day, held that the union's failure to demand arbitration did **not** bar individual lawsuits by employees. The union's decision not to seek arbitration cannot, without more, support an accord and satisfaction. If it did, *Mudge* would be a dead letter.

Far more important, though, the Shipyard's position – that "there is only one thing that the union gives up when it reaches a settlement, it gives up the right to go to binding arbitration"[4] – runs afoul of *Ahrens v. United States.*[5] For in fact, the union here could have reached a number of different understandings with the Shipyard. At least three options suggest themselves.

First, the union and Shipyard could have agreed that if the Shipyard reached a particular decision, the union would not challenge it, but that the agreement did not waive the right of shipwrights to pursue individual claims. Nothing in *O'Connor*, the collective bargaining agreement, or statute, would prohibit the union from reaching such an understanding with the Shipyard. Such an understanding, moreover, would not preclude this lawsuit.

Second, the union and the Shipyard could have agreed that Ms. Tallman's grievance decision represented a full, final, and binding settlement of all claims for high pay between March 23, 1999 and January 18, 2000, while reserving the shipwrights' rights to challenge Ms. Tallman's denial of high pay for the period before that period. That, too, would have been a

---

[2] Def.'s Resp. to Pls.' Mot. in Limine at 12-13.
[3] 308 F.3d 1233 (Fed. Cir. 2002).
[4] Def.'s Resp. to Pls.' Mot. in Limine at 12-13.
[5] 62 Fed. Cl. 664 (2004).

perfectly within the union's power (subject to the other terms and conditions of the collective bargaining agreement and the OPM Operating Manual, which have been debated *ad nauseam* elsewhere). Such an agreement might bar shipwrights from obtaining further relief for period between March 23, 1999 and January 18, 2000, but would have no effect on lawsuits for high pay outside this period.

Third, the union and the Shipyard could have reached a deal (again, subject to other issues and assuming all four elements of accord and satisfaction were met), in which the union accepted the terms of a grievance decision as full and final payment for **all** claims by shipwrights for high pay. This is the deal the Shipyard claims was struck.

The Shipyard's filings, from its initial Memorandum of Contentions of Law and Fact through its opposition to plaintiffs' motion in limine, assume that a settlement could **only** have been on the terms reflected in the third option above. The exhibits and the case law, however, show otherwise.

The exhibits – namely joint exhibit 38 and plaintiffs' exhibit 4 – show otherwise because each document reflects an attempt to craft the scope of an agreement's coverage. Both documents are captioned "settlement agreements". Joint Exhibit 38 (unlike Ms. Tallman's grievance decision) expressly recites that it is a "full and final resolution of this employee grievance." And it states that the settlement "creates no precedent for any future dispute between the parties." Likewise, plaintiffs' exhibit 4 contains a variety of provisions that detail exactly what is, and is not, being resolved. Most notably, paragraph 3(b) of that exhibit clarifies that with certain exceptions, the "payment of differential in accordance with this Agreement is considered to be completed … 2) for all qualifying employees who worked on Dry Dock 6 projects between 6 January 1997 through 12 May 1997.

The case law, particularly *Ahrens v. United States,*[6] also shows that a settlement can take many forms. There, the Court interpreted a memorandum of understanding between union and employer and found that it was **not** intended to apply to all disputes. There, the Court reviewed the memorandum of understanding between the parties and concluded that the MOU only intended to FLSA grievances that had already been filed, but that it did not extend to settle FLSA grievances that had not been.[7] The court went further. After agreeing with the government's contention that the "parties reached a meeting of the minds with regard to the Plaintiffs' FLSA status,"[8] the court explained that this "does not really support Defendant's case" because it was irrelevant to the "pertinent question." This two-part question, the court ruled, included the question "whether Plaintiffs had agreed to refrain from filing individual **future** claims."[9]

If the Shipyard's all-or-nothing view of union settlements were correct, the result reached in *Ahrens* would be inexplicable and untenable. But *Ahrens* rejects that view, and makes clear that the scope of claims released by a union agreement can vary. So this court must carefully review the language of the parties' "agreement" to discern the parties' intent.

*Mudge* precludes the argument that there is only one kind of agreement the union can make – an agreement not to pursue arbitration. *Ahrens* precludes the argument that such an agreement can only have one effect – a complete and total bar on future claims.

The Shipyard's burden is not only to prove an agreement, but to prove the terms of such an agreement. Facile or conclusory statements that a "settlement was reached" are insufficient, without more, to meet that burden.

### B. The Collective Bargaining Agreement Required a Decision Resolving a Grievance To Be In Writing

---

[6] 62 Fed. Cl. 664 (2004).
[7] *Id.* at 670.
[8] *Id.*
[9] *Id.* (emphasis in original).

As the Shipyard correctly notes in its opposition to plaintiffs' motion in limine, the issue at trial will be the parties' intent. But as the plaintiffs have demonstrated, the best evidence of that intent by far is the parties' written expression of their agreement. So the starting place for the Court's analysis is the language of the alleged settlement agreement: the grievance decision.

This rule of contract interpretation is amplified by the language of the collective bargaining agreement itself. As set forth in plaintiffs' memorandum of contentions of law and fact, Section 3003(b) requires all Step 2 grievance decisions to be put in writing, providing that "the Shop/Branch Head **shall** issue a written decision …."[10]

*Ahrens* also confirms the importance of a writing. There, the court held that the MOU at issue **did** operate as an accord and satisfaction as to those employees who had already filed grievances regarding matters covered by the MOU. The court explained that "there was sufficient expression in the MOU to make it unreasonable for them not to realize that the performance offered by the government was made in full satisfaction of their claims."[11]

Here, there was **no** written expression of an agreement, much less of terms that would have the effect of releasing **all** future claims for high pay. As the Court is aware, the language of the decision is of no help to the Shipyard. The Court's summary judgment order recognized that the decision was ambiguous as to whether it was an agreement at all. Certainly it contains no language evidencing what the terms of the alleged agreement might have been (an issue taken up in a moment).

Also important is the deliberate failure of the union and the Shipyard to provide a copy of the written grievance decision to affected employees. The Shipyard dismisses the importance of this in its reply to plaintiffs' memorandum of contentions of law and fact, but it is relevant to the

[10] *See* Joint Ex. 1.
[11] *Ahrens*, 62 Fed. Cl. at 672.

issues presented by section 3003(b) of the collective bargaining agreement and by *Ahrens.* In short, how was an employee to know that the grievance decision was in full satisfaction of all further claims for high pay?

In other words, **every single term** that might have suggested a settlement was **entirely** unwritten. By relying on *Sperry Corp. v. United States,*[12] an implied-in-fact contract case, the Shipyard's response suggests that the Shipyard will seek to prove an implied-in-fact agreement rather than an express contract. Such an unwritten agreement would, of course, violate section 3003(b) of the collective bargaining agreement.

Further, and more important, "in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied."[13] Here, the parties clearly intended, and were contractually required to, reduce any resolution of the grievance to writing. An implied-in-fact contract is unavailable to the Shipyard.

### C. Plaintiffs' Motion In Limine Does Not Invoke, Or Rely on, The Parol Evidence Rule

The Shipyard's next strategy is to mischaracterize plaintiffs' argument, creating a straw man for the Shipyard to pummel. "At its core," the Shipyard argues, "plaintiffs' objection to evidence pre-dating the settlement agreement should be read as a parol evidence objection."[14]

No, it should not.

The terms extrinsic evidence and parol evidence are often used interchangeably. Both describe the same thing: evidence outside the four corners of the contract itself.[15]

---

[12] 13 Cl. Ct. 453 (1987).
[13] *Pacific Gas & Elec. Co. v. United States,* 3 Cl. Ct. 329, 339 (1983) (cited by *Sperry Corp. v. United States,* 13 Cl. Ct. 453, 459 (1987)) (citing *DeMatteo Const. Co. v. United States,* 600 F.2d 1384, 1388 (Ct.Cl. 1979); *American Gen. Leasing, Inc. v. United States,* 587 F.2d at 58; & *Ship Const. & Trading Co. v. United States,* 91 Ct.Cl. 419, 456 (1940), *cert. denied,* 312 U.S. 699, 85 L. Ed. 1133, 61 S. Ct. 737 (1941)).
[14] Def.'s Resp. to Pls.' Mot. in Limine at 3.
[15] *Nicholson v. United States,* 29 Fed. Cl. 180, 193 n2 (1993).

The parol evidence rule, however, is not a rule of contract interpretation and plaintiffs' motion in limine does not invoke it. Put another way, the parol evidence rule does not govern the use of extrinsic evidence to **interpret** a contract. Rather, it governs the use of extrinsic evidence to **alter** a contract.

Contesting this, the Shipyard cites page 1435 of *McAbee Construction, Inc. v. United States*,[16] for the proposition that the "rule thus renders inadmissible evidence introduced to modify, supplement, **or interpret** the terms of an integrated agreement."[17] In fact, however, the Shipyard has slipped the word "interpret" into the statement. What *McAbee Construction* actually says is that "the parol evidence rule prohibits the use of extrinsic evidence to **add to or to modify** its terms."[18] That statement appears on page 1434. The following page, the one the Shipyard cites, moves on from the parol evidence rule to the question of contract interpretation.

*McAbee Construction* supports plaintiffs in other respects. The issue in *McAbee Construction* was whether an easement that allowed the government to deposit fill on the plaintiff's property limited the height to which fill could be deposited. The easement was silent as to whether it imposed such a height restriction. The Court of Federal Claims held that this silence was an ambiguity and ruled that the parties could offer extrinsic evidence of such a height restriction. The Federal Circuit reversed. It first held that the easement was a complete integration, so no extrinsic evidence could be offered.

The Federal Circuit then turned to the question of whether the easement could be interpreted to include such a height limitation. It reasoned that "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'"[19] Finding that the written

---

[16] 97 F.3d 1431 (Fed. Cir. 1996).
[17] Def.'s Resp. to Pls.' Mot. in Limine at 3 (emphasis added).
[18] *McAbee Construction*, 97 F.3d. at 1434 (emphasis added).
[19] *Id.* at 1435.

terms were unambiguous, the Court of Appeals reversed the trial court's admission of extrinsic evidence.

Here, the Court has found an ambiguity as to whether the parties intended the grievance decision to be a settlement agreement. But there is no ambiguity in the written terms of the grievance decision. Those terms include no language expressing an intention to bar employees from suing for high pay. Under the reasoning of *McAbee Construction*, therefore, the language of the grievance decision is unambiguous and all extrinsic evidence is inadmissible. *McAbee Construction* thus bars the admission of **all** extrinsic evidence.

Putting *McAbee Construction* to one side, and returning to the parol evidence rule, the fact that this rule governs the modification rather than interpretation of contracts explains why – as the Shipyard notes – the parol evidence rule does not bar the admission of post-contract evidence. Absent an agreement to the contrary, the parties are free to modify a contract after it is signed and, by very definition, the only way to prove that a contract was modified is to offer evidence outside the contract. Saying that the parties may offer post-contract statements of negotiations to show that they **modified** the contract is different from saying the parties may offer such evidence to **interpret** it.

Likewise, the Shipyard correctly notes that the parol evidence rule does not bar the introduction of evidence to prove that a contract was formed. Plaintiffs have never contested that point.

The Shipyard correctly recites case law applying the parol evidence rule. But as the Court will see when it reviews those cases, the parol evidence rule does not distinguish between various types of extrinsic evidence. It is an all-or-nothing affair. If the parol evidence bars evidence regarding a matter, then **all** evidence, including evidence of negotiations, writings, and

other circumstances, is inadmissible. This is important, as the next section shows.

The Shipyard seems to assume that if the parol evidence rule does not apply, it is open season and that it may offer whatever evidence of the "totality of the circumstances" that it wishes. In fact, however, the rules of contract interpretation still apply. Two of those rules, as the following sections show, are: (1) unexpressed intentions and unilateral beliefs are irrelevant and inadmissible to the interpretation of a contract; and (2) post-contractual statements (as opposed to performance) are of no real weight either.

### D. Unexpressed Intentions Are Inadmissible

The Shipyard's Response limits its discussion of the rule that unexpressed intentions are irrelevant to the parties' intent to two quick pages. In the middle of that discussion, the Shipyard grudgingly admits that "unilateral subjective and uncommunicated intent cannot, by such description, be used as evidence of mutual intent."[20] This concession, forced by case law, recognizes what contracts professors have been teaching for a generation: the objective manifestation theory of contracts.

The Shipyard whistles past this graveyard for its case and rushes to the argument that the "conduct of the parties" may evidence an agreement.[21] Well, sure, but private unexpressed intentions are not "conduct," and no case holds otherwise.

The Shipyard then cites *Fifth Third Bank of Western Ohio v. United States*[22] for the proposition that "negotiations, contemporaneous documents, and the circumstances surrounding the transaction at issue" may be evidence of an agreement. But negotiations and contemporaneous documents are obviously different from private, unexpressed feelings. And *Fifth Third Bank* nowhere holds, or even implies, that private unexpressed intentions are

---

[20] Def.'s Resp. to Pls.' Mot. in Limine at 2.
[21] *Id.*

included among the "circumstances surrounding the transaction at issue."

Finally, the Shipyard conclusorily asserts, at the top of page 3 of its response, that "Mutual intent may exist where the parties share a common understanding of the meaning of their actions." Here, the Shipyard drops even the pretense of support for its claim, for no citation accompanies it.

This leaves only the Shipyard's claim, in a single paragraph on page 1 of its response, that the exclusion of unexpressed intentions is "wholly unsupported." Having made this assertion, the Shipyard is forced to admit, on the top of page 2 of its response, that plaintiffs have, indeed, uncovered two Court of Claims decisions that support it: *Firestone Tire & Rubber Co. v. United States,*[23] and *Chesapeake & Potomac Telephone Co. v. United States.*[24] The Shipyard also ignores the provisions from the Second Restatement of Contracts that are cited in footnote 9 of plaintiffs' motion.

The Shipyard then seeks to distinguish plaintiffs' cases on the grounds that in each case, the Court invoked the parol evidence rule. It is true that in those cases, the courts invoked the parol evidence rule as an additional reason in support of their holdings. But the courts did not rely solely upon that rule. In each case, the court went on to invoke the principle that unexpressed intentions are irrelevant. If the court in *Addison-Taylor v. United States*[25] intended to rely exclusively on the parol evidence rule, there would have been no need for the court to note that the evidence in question "does not attest that the union negotiators' understanding was expressed to agency negotiators."[26] Likewise, it would have unnecessary for the court in *Safeco*

[22] *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221 (Fed. Cir. 2005).
[23] 195 Ct. Cl. 21 (1971).
[24] 228 Ct. Cl. 101 (1981).
[25] 63 Fed. Cl. 345 (2004).
[26] *Id*. at 351.

*Credit & Fraley Associates, Inc.*,[27] to hold that a party "must show something more than 'subjective intent.'" The parol evidence rule does not concern itself with the particular **type** of parol evidence involved. Once a document is found to be a complete integration of the parties' agreement, then **all** parol (or extrinsic) evidence is inadmissible. If *Addison-Taylor* and *Safeco Credit* had merely applied the parol evidence rule, it would have been unnecessary for either court to reject the evidence in question on the grounds that it was merely evidence of subjective intent.

Finally, it is worth noting that plaintiffs limited their recitation of cases to those by the Federal Circuit, this Court, or their predecessors. Although plaintiffs have not burdened the Court with a string-cite to cases from other jurisdictions to make this unexceptional point, the proposition these cases support finds far-reaching support throughout every jurisdiction in this nation, as a Lexis or Westlaw search reveals (using a natural-language search such as "are unexpressed intentions relevant to the interpretation of a contract").

In short, the notion that the parties may not offer unexpressed intentions to interpret a contract is not only supported, but is a bedrock principle of modern contract law.

### E. The Parties Never Expressed the Terms of the Agreement

The Shipyard insists that the testimony of the signatories to the grievance decision "is replete with references that the union and the Shipyard worked together to resolve the grievance and to reach complete settlement of the dispute."[28] Examination of the excerpts provided by the Shipyard – presumably the ones the Shipyard believes are its best evidence of what the parties actually expressed to each other – demonstrate that although the union and the Shipyard may have "worked together," they did not express to each other the terms on which they were

[27] 44 Fed. Cl. 406 (1999).
[28] Def.'s Resp. to Pls.' Mot. in Limine at 5-6.

"settling" the shipwrights' grievance.

For example, the Shipyard quotes Ms. Tallman's testimony that **by signing the decision**, Joe Aiken "told" her that the matter was settled and the grievance was resolved.[29] She does not say that Mr. Aiken literally told her this. And she identifies no basis – beyond her own subjective impressions – for why she thought Mr. Aiken's signature "told" her this.

She also refers to "all conversations, whatever they were" between the Shipyard and the union that signaled to her that the grievance decision was to be a full and final settlement of the shipwrights' claims.[30] The problem is she cannot identify a single one of those conversations. All she can remember is their "general tone."[31] She cannot recollect exchanging words with anyone from the union to the effect that the grievance decision would effect a full and final settlement of the shipwrights' claims. While "general tone" of "all conversations, whatever they were," may suggest an intent to settle, it is worthless as evidence of what the settlement terms actually were.

The closest Ms. Tallman comes to remembering a specific exchange between herself and anyone from the union regarding the terms of the "settlement agreement" is that after signing the decision she shook Mr. Aiken's hand and said "we done good."[32] Although this may show that Mr. Aiken and Ms. Tallman were pleased with themselves after signing the decision, "we done good" does not objectively manifest assent to any particular settlement terms.

Mr. Aiken's testimony suffers from the same infirmity. In fact, the Shipyard does not attempt to argue that the union expressed its understanding of the "agreement's" terms to the Shipyard. Rather, it states that "the testimony of Mr. Aiken indicates that the union …

---

[29] Deposition of Mary Jane Tallman at 55:11-56:18.
[30] *Id*. at 56:19-25.
[31] *Id*. at 57:12-13.
[32] *Id*. at 163:6-19.

considered this a settlement of an employment dispute – a settlement that resolved all of the issues raised in the grievance."[33] Of course, *Addison-Taylor* teaches that what the union "considers" is meaningless unless it is expressed to the other side.[34]

The Shipyard relies on Mr. Aiken's statement that when Joe Hamel was presented with the grievance decision, he "concurred that it was an acceptable settlement and that we should settle." Because the statements were not expressed to the Shipyard, they are irrelevant to whether a "meeting of the minds" occurred and are inadmissible for that purpose.

Mr. Aiken did remember "one specific discussion that she indicated that all parties were in agreement for us resolving the grievance." This statement is equally true of counsel for the Shipyard and the plaintiffs in this case. Counsel have worked diligently to "resolve" this matter. That does not mean that we have agreed to the terms of a settlement. Further, Mr. Aiken does not say that he discussed this resolution with Ms. Tallman, nor that the "parties" discussed the terms of a resolution. Also, when pressed for details of the meeting, he had no specific recollection:

> Q: Did she make that comment to you within a few days of when you signed the grievance decision?
>
> A: I don't recall, honestly. I don't recall.[35]

This "memory" does not prove a meeting of the minds concerning any particular contract term.

Perhaps most telling is when Mr. Aiken stated that he felt that when he signed the grievance decision, "that was the full and final settlement without having to say the words, that I signed off on this document as the representative of the union, that that was the full and final settlement." Like Ms. Tallman, Mr. Aiken cannot point to particular conduct, or a course of

---

[33] Def.'s Resp. to Pls.' Mot. in Limine at 10.
[34] *Addison-Taylor,* 63 Fed. Cl. at 341.
[35] Deposition of Barry Joe Aiken at 120:9-12.

dealing between the parties, that would establish his understanding that signing the grievance decision was an appropriate, or even permissible, method for waiving the shipwrights' claims to back high pay.

The Shipyard points to the grievance resolution procedures in the collective bargaining agreement as providing the context for the understanding that the decision represented a full and final settlement of the shipwrights' claims. But of course, the collective bargaining agreement contains no provisions that discuss, or approve, unwritten waivers or releases of employee claims under it. More significantly, the parties didn't follow the CBA's procedures that supposedly provided the basis for the parties' understanding: they didn't allow all the grievants to attend the Step 2 meeting, they didn't follow the correct procedure for either a council or an employee grievance, and they didn't put all the terms of the grievance decision into writing as the CBA requires.

The other Shipyard and union representatives also testified that they never told each other that the grievance decision representing a full and final settlement of all of the shipwrights' high pay claims, or that the decision would bar the shipwrights from suing for back high pay. For example, Joe Hamel, Chief Steward of the union during the time of the grievance and co-steward of record for the shipwrights' grievance testified to the following:

> Q: During this period of time of the grievance resolution process, did you ever discuss with Mr. Aiken whether the shipwrights would have the right to sue for the back high pay?
>
> A: No.
>
> Q: Did you ever discuss with Ms. Tallman whether the shipwrights would lose the right to sue over back high pay?
>
> A: No.[36]

Mr. Winkler testified in a similar fashion:

[36] Deposition of Joseph Hamel at 78:8-16.

> Q: Okay. The subject of a possible lawsuit by individual shipwrights never came up during your discussions with Mr. Aiken regarding possible resolution of the grievance decision, did it?
>
> A: No.
>
> ***
>
> Q: Sure. Mr. Aiken never told you that by signing Exhibit 18 he was promising you that no individual shipwright would ever sue in court for high pay, did he?
>
> A: No. He just -- he signed it as a settlement to the grievance and I felt that it was -- all of us felt that it was done at that particular stage of the juncture.
>
> Q: Right. But he never told you that by signing Exhibit 18 he was committing to you that no individual shipwright would sue in court for high pay?
>
> A: No.
>
> Q: Right. And he never told Ms. Tallman that in your presence either, did he?
>
> A: No.[37]

None of the Shipyard or union representatives ever expressed to each other that the grievance decision was intended to fully and finally settle all of the shipwrights' high pay claims that it would bar the shipwrights from seeking a judicial remedy. To the extent this "understanding" was never expressed to the other side, it is irrelevant to the question of whether there was a meeting of the minds, and should not be admitted.

To be clear, plaintiffs do not seek to exclude evidence of objectively manifested intent. To the extent the Shipyard offers testimony regarding specific conversations during the negotiation or drafting of the grievance decision, it may do so. What it may **not** do is offer testimony regarding unexpressed intentions to prove an agreement, or its terms.

## II. IRRELEVANT POST-GRIEVANCE MATERIALS ARE INADMISSIBLE

In urging the Court to deny plaintiffs' motion, the Shipyard mischaracterizes plaintiffs'

[37] Deposition of Mark Winkler, 6/28/2006, at 94:14-95:10.

argument, contending that the plaintiffs are invoking the parol evidence rule. That is not what plaintiffs are arguing, as they made clear in footnote 28 of their Motion. There plaintiffs stated that what they were arguing was a different issue than the parol evidence rule barring introduction of certain evidence. In fact, other than in that footnote, plaintiffs do not mention the parol evidence rule at all in that section. (Of course, the parol evidence rule does create problems for the Shipyard, but this motion does not address them.)

Plaintiffs raise rules of contract interpretation. Under those rules, after-the-fact characterizations of a particular document are inadmissible to show the intentions of the parties at the time of drafting because their probative value is minimal or non-existent.

Plaintiffs agree that post-grievance evidence can be used for certain purposes. In the example of joint exhibit 38, the Mascioli settlement agreement, the Shipyard correctly surmises that plaintiffs intend to offer it for the purpose of showing that the Shipyard did, in fact, use "settlement agreements" to settle grievances. It is admissible for that purpose.

It would also be relevant to show the parties' performance under the contract.[38] However, the Shipyard is not offering the Mascioli settlement agreement or the documents related to the Unfair Labor Practice Charge the union filed to show that (or how) the parties performed their "deal." It is offering them in an effort to show that because the union called the grievance decision a "settlement," it really was a settlement. Such testimony would also run afoul of the rule against hearsay, as discussed more fully in the next section.

Finally, the post-grievance evidence that is available is at best ambiguous for the purpose of discerning the parties' (unexpressed) intent at the time of contracting. In plaintiffs' exhibit 12,

[38] On page 14 of its Response, the Shipyard suggests that post-contractual statements are admissible if supported by a "course of dealing." Course of dealing is only relevant to the extent it informs the parties' understanding at the time of contracting. By definition, there is no post-contractual course of dealing.

for example, Lynnette Niemi refers to the grievance decision as Ms. Tallman's decision. Mr. Seaton makes no reference to a settlement agreement in plaintiffs' exhibit 9, his March 2000 letter to Byron Holcomb. The variance in the way the decision is described by the parties after the fact demonstrates why such evidence is inadmissible for this purpose: it is irrelevant, or if relevant, it is so inconsequential that its probative value is far outweighed by the waste of time it involves.

## III. THE TESTIMONY OF RODGER BROWN REGARDING SEVERAL MATTERS IS INADMISSIBLE

Plaintiffs have sought to exclude Mr. Brown's testimony both on the basis of substantive contract law which, as set forth above, renders post-contract statements about what the contract means irrelevant, and on the basis that Mr. Brown lacks personal knowledge of events surrounding the processing or resolution of the shipwrights' high-pay grievance. Plaintiffs have already addressed the former issue above and will not repeat the effort here.

In response to plaintiffs' objections based on Mr. Brown's lack of personal knowledge, the Shipyard opposes the exclusion of Rodger Brown's testimony. The Shipyard concedes that Mr. Brown has no personal knowledge regarding the shipwrights' high-pay grievance or its resolution and the Shipyard disclaims any intention of calling Mr. Brown to testify regarding this matter. The Court should enter an appropriate exclusionary order.

The Shipyard's response also identifies one or two subjects that may be permissible topics of inquiry. For example, the Shipyard suggests that Mr. Brown will testify regarding "the grievance process in general" and "why a signed 'decision' would represent a settlement." It is premature to tell to what extent this testimony will be admissible. Plaintiffs do not seek to exclude Mr. Brown's testimony regarding that subject at this time. Plaintiffs agree with the Shipyard that determinations regarding the admissibility of this evidence will have to await trial.

Likewise, the Shipyard suggests that Mr. Brown will testify regarding "his relative experience" in resolving union grievances "as compared to Ms. Tallman." It is unclear what this testimony will entail. It seems to suggest that Mr. Brown knew what he was doing, and therefore drafted a "settlement agreement" to settle a grievance, whereas Ms. Tallman did not. Plaintiffs agree with the Shipyard that assessment of the admissibility of this evidence must await trial.

Finally, the Shipyard states that Mr. Brown "will offer testimony regarding the settlement of the grievance of Mr. Mascioli." If Mr. Brown simply intended to testify regarding how he handled Mr. Mascioli's grievance, it would be too early to assess the admissibility of that testimony (although it is difficult to see how the details concerning the handling of a grievance that was settled some two years after Ms. Tallman signed her grievance decision is relevant to the underlying issue of accord and satisfaction).

The Shipyard goes on, however, to explain that when it means when it says Mr. Brown will testify regarding the settlement of the Mascioli grievance. What it means, the Shipyard makes clear, is that "Mr. Brown will be able to testify as to how the union described the high pay grievance to him as 'settled.'" This testimony is inadmissible.

The union representative who signed the Mascioli grievance was an individual named Dean Benton. According to Mr. Brown's deposition testimony, Mr. Benton was the union representative with whom he dealt concerning the Mascioli grievance.[39] According to the testimony of all concerned, Mr. Benton played no role in the handling or resolution of the shipwrights' high-pay grievance.

Thus, it appears that the Shipyard intends to call Mr. Brown to testify that Mr. Benton told him the earlier high-pay grievance had been "settled." Since the Shipyard intends to offer Mr. Benton's alleged out-of-court statement for the truth of the matter asserted, i.e., it intends to

offer Mr. Benton's statement that the decision was a settlement to prove that the decision was a settlement, Mr. Benton's statement is hearsay. And since Mr. Benton could not have come by his "knowledge" directly, i.e., since he lacked personal knowledge of this issue and could only have acquired this knowledge from what he heard from someone else, Mr. Brown ultimately would be testifying to hearsay within hearsay. As such, the Shipyard would need to prove that each layer of hearsay satisfies an exception to the hearsay rule. Since Mr. Benton was not representing any of the plaintiffs in this case, the Shipyard cannot claim that his alleged out-of-court statements were an admission by any party to this case. And no exception to the rule against hearsay applies. Thus, to the extent Mr. Brown would testify about what someone told Mr. Benton and what Mr. Benton told him, the testimony is double hearsay. It is, therefore, inadmissible, and should be excluded at trial.

## IV. CONCLUSION

For the reasons above, and except to the extent noted above, plaintiffs' Motion in Limine should be granted.

DATED this 27th day of October, 2006.

Respectfully Submitted,

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

[39] Deposition of A. Rodger Brown at 32-35 & 38-39.

**CERTIFICATE OF SERVICE**

I hereby certify on October 27, 2006, a copy of the foregoing "Reply in Support of Plaintiff's Motion in Limine" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

SEA_DOCS:823678.1