IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., | No. 04-856C |
| Plaintiffs, | Judge Miller |
| vs. | |
| THE UNITED STATES, | Electronically Filed Oct. 27, 2006 |
| Defendant. | |

## DECLARATION OF JENNIFER AMANDA KREBS

I, Jennifer Amanda Krebs, aver as follows:

1. I am one of the attorneys of record for the Plaintiffs in this lawsuit. I am over the age of 18, have personal knowledge of the matters stated in this declaration and am competent to testify to those matters.

2. Attached as Exhibit A to this Declaration is are true and correct excerpts from the June 27, 2006 deposition of Barry Joe Aiken.

3. Attached as Exhibit B to this Declaration are true and correct excerpts from the September 12, 2006 deposition of A. Rodger Brown.

4. Attached as Exhibit C to this Declaration are true and correct excerpts from the June 29, 2006 deposition of Joseph Hamel.

5. Attached as Exhibit D to this Declaration are true and correct excerpts from the June 26, 2006 deposition of Mary Jane Tallman.

6. Attached as Exhibit E to the Declaration are true and correct excerpts from the June 28, 2006 deposition of Mark Winkler.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 27th day of October, 2006 in Seattle, Washington

s/Jennifer Amanda Krebs
Jennifer Amanda Krebs

**CERTIFICATE OF SERVICE**

I hereby certify on October 27, 2006, a copy of the foregoing "DECLARATION OF JENNIFER AMANDA KREBS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, | ) | |
| DAVID S. PETERSON, DONALD BAKER, | ) | |
| and GORDON D. HANBERG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 04-856C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF

BARRY JOE AIKEN

Tuesday, June 27, 2006

that all the parties were in agreement for us resolving the grievance.
Q Did that happen before November 10, 1999?
A I don't know when that was, to be honest with you. I have no date in question.
Q Okay. Was that comment made in connection with the execution or signing of the grievance decision?
A Was it made in execution of that?
Q Let me ask it a different way. Did she make that comment to you within a few days of when you signed the grievance decision?
A I don't recall, honestly. I don't recall.
Q Do you recall how many discussions you had with Ms. Tallman regarding the subject of the grievance between May 20, 1999, and January 18, 2000?
A I remember meeting in her office. She -- whatever the grievance form that was sitting there, the proposed resolution was sitting there also. And she had stated that all the parties are willing to put this to bed.
Q Is that the only meeting you remember specifically having with Ms. Tallman between May 20, 1999, and the date the grievance decision was signed?
A There may have been a couple before then, but I don't have any definitive dates in question.
Q Did you maintain any kind of record book of your meetings

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Tuesday, June 27, 2006, Deposition of BARRY JOE AIKEN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 7th day of July, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, | ) | |
| DAVID S. PETERSON, DONALD BAKER, | ) | |
| and GORDON D. HANBERG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 04-856C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

DEPOSITION UPON ORAL EXAMINATION OF

A. RODGER BROWN

Tuesday, September 12, 2006

---

about either the calculation of the back high-pay amounts or whether or not interest would be paid?
A To within a month or two from now, I didn't know how much we'd paid or how many people got paid.
Q Okay. So I am going to move on, I promise, but if you just bear with me while I review.
So my understanding of what you're saying is that you had no involvement in the grievance resolution process from the time the grievance was filed until the grievance decision was issued?
A That's correct.
Q You had no involvement in drafting the grievance decision, the language of the grievance decision, how it would be signed, the form it would take?
A Correct.
Q And you had no role in calculating the high-pay award, any type of discussions that went on with regard to that?
A That's correct.
Q Thank you very much. Now I'm going to move on.
So in 2002, there was a grievance brought by Mark Mascioli regarding his involvement with high work and the fact he hadn't received high pay. Can you describe to me what you know about that grievance and the subsequent resolution?
A Sure.

Q In a fairly detailed manner, if you could.
A Dean Benton had come and talked to me. He said, Hey, I have an employee by the name of Mascioli, that he was missed in the original settlement agreement when we settled with all the previous folks. And he filed a grievance and it went through the grievance process first and second step. It was denied because of timeliness issues.
And he says, Hey, I understand you don't have any obligation because of timeliness issues to resolve this, but this guy really deserved payment along with the rest of the folks based on the process that was agreed upon. So he basically asked me if I would make it right and overturn the fact that the grievance was denied.
I asked him a few questions because I didn't know much about the previous one, the previous settlement, as I've testified today. And he said that quite a few of the folks got some amount of money and that there was a settlement. And this guy was missed and he would like me to fix that.
I said, Well, I guess -- I guess I'm okay with that. I talked to Mark Winkler to validate that, you know, the guy was one of the guys that should have been included and his name was overlooked. Mark denied it based on timeliness. He didn't deny it based on whether the guy

was working at heights or not.

So I told Dean, I says, I don't have a problem doing that. Dean offered to me, he said, Hey, I'll make sure that this will be a firm agreement just like we did before.

I said, Well, I want to make sure that -- I'm not entitled to do a settlement here, so I'm really trying to just make things right and continue with a good working relationship. And it sounds like the employee it was an oversight that he didn't, I think he was loaned to the laggers or some other area and didn't realize that he was supposed to come forward.

So he said, No, I'll make sure that we do this to where it's a final, binding agreement and you won't have to worry about any future recourse. I said, Okay.

So we put together a settlement agreement and you're probably pretty familiar with the settlement agreement. It was -- covered Mr. Mascioli and it made sure that it was clear that it was a final settlement. That the -- this was a final payment, that he wouldn't be able to come pursue any other additional payment on it.

And in addition to that I said, Hey, what happens if three weeks from now or the next six months from now, you come to me with somebody else. I said, I'm not going to keep tapping into and paying people, because I don't

really have a budget for it. I need to understand is this really the last person we missed, or is there somebody else out there. So I made sure I had a clause in there that didn't set precedence for future claims of similar nature.

So we established a settlement agreement. He concurred with the wording and signed it prior to me signing it. I think Lynnette Niemi probably built the settlement agreement for me. She's the one that does that stuff for me. And I think, you know, actually Dean received it prior to me signing it. I mean, that's kind of it in a nutshell.

Q I appreciate that. I'd like to unpack it a little bit just to make sure I have all the details.

So do you know when Mr. Benton came to talk to you approximately?

A I'd have to look at the dates themselves.

Q We'll dig those out. I just wanted to talk it through first.

A I'm thinking that when Dean come and talked to me, probably within a week or so, we built the settlement agreement. I'm going by memory, and I could be off a little bit, but normally I work pretty close with Dean. He was pretty responsive if they have an issue they think is important. So I don't think that it was something

A Mm-hm (answers affirmatively).
Q Or felt you should step in?
A Right, if the guy didn't deserve that based on the settlement that Mary Jane had negotiated with BMTC, then I wouldn't have intervened. But sounded like, based on the settlement, that he qualified. You know, we were trying to make the -- make it right for the employee.
Q And so were you involved at all -- let me rephrase that. Was that the first time you had heard of the grievance, when Mr. Benton came to you--
A To the best of my knowledge --
Q --about his particular grievance, Mr. Mascioli's grievance?
A To the best of my knowledge. I don't normally get involved with grievances. They happen all the time. There's hundreds of them. They happen all the time. Usually I don't hear about them unless some are resolved, some aren't. Some are resolved at the first step, some aren't. They go to the second step. Some go to mediation or wherever we -- we have a process we can go to if they want to go to -- arbitration.
Q Because in a minute I was going to bring out the grievance document and there's a little confusion and I was hoping you can help me sort of figure it out. I guess we can see at that point if you have knowledge, but

from what you're saying now it sounds like you had no knowledge of the underlying grievance when it was first brought?

A It was real simple. Dean Benton come to me and said, They denied this grievance. I think the guy deserved the pay. They denied it because it wasn't on time. I think he was qualified. Will you pay him. I said, Yes.

Q Do you know if any members of shipyard management were involved before you or whether Mr. Benton went to anybody else before he went to you?

A I don't. I wouldn't know that. I don't know.

Q Okay.

A Something to add, I'm the primary contact point for the production department. And I mean, I get calls from different folks in the union many times every week. So I'm not sure who else they would go to that would have the authority to help them.

Q Okay. And do you know if arbitration had been demanded on Mr. Mascioli's behalf?

A Not that I'm aware of. I mean, it would have been a moot point. He missed his timeline.

Q Is that documented at all when the union -- I mean, if the union demands arbitration, do they fill out a form and turn it in; do you know?

A They do. They do it through the labor -- through HRO.

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Tuesday, September 12, 2006, Deposition of A. RODGER BROWN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Tuesday, September 12, 2006, Deposition of A. RODGER BROWN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 25th day of September, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Redmond.
My Commission expires October 19, 2007
CCR License No. 2971

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON D. HANBERG, et al., )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
JOSEPH HAMEL
Thursday, June 29, 2006

me rephrase it. Does it say anywhere in Exhibit 18 that the union will not go to arbitration?
A No.
Q Do you know how someone reading that -- if a shipwright wanted to read that, how they would know that the union had chosen not to go to arbitration?
A No, they would not.
Q During this period of time of the grievance resolution process, did you ever discuss with Mr. Aiken whether the shipwrights would have the right to sue for the back high pay?
A No.
Q Did you ever discuss with Ms. Tallman whether the shipwrights would lose the right to sue over back high pay?
A No.
Q Is there anything in Exhibit 18 about a shipwright's right to sue for back high pay?
A Nope.
Q Do you know how a shipwright reading that document would know if he or she had lost the right to sue for the back high pay?
A I don't know how they would know.
Q Okay. Thank you. I'd like to revisit the settlement agreement that we looked at. It's Exhibit 43. Now, if I

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Thursday, June 29, 2006, Deposition of JOSEPH HAMEL was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Thursday, June 29, 2006, Deposition of JOSEPH HAMEL is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 11th day of July, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON D. HANBERG, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

---

DEPOSITION UPON ORAL EXAMINATION OF

MARY JANE TALLMAN

Monday, June 26, 2006

---

decided not to award retroactive high pay earlier than 15 days before the grievance was filed?
A Repeat.
Q Yes, that was a little convoluted. Did the same budgetary factors you just described play a role in your decision not to award high pay more than 15 days before the grievance was filed?
A A part of it.
Q Okay.
A It was also untimely.
Q Moving on then. You state in the next sentence of paragraph 6 of Exhibit 52, "I was told and believed that I was making a decision changing only the future pay of the Shipwrights beginning approximately when the grievance was filed." You can probably guess what my question is going to be. It is, who told you this information you convey?
A So this whole time period, we worked -- we meaning basically me and Mark Winkler, Lynnette -- worked with the union to figure out how we would -- how we would do this. So in working with the union -- and Joe Aiken was the counsel representative representing the grievants -- when we prepared the -- we meaning me and Lynnette and Mark -- prepared the decision, I signed the decision and Joe signed the decision for the union. By doing that Joe

told me that this is a change for the future, that the grievance was resolved. The matter was settled. The whole grievance was resolved. And from now on, we will pay. And basically that was seen as a pretty good win for the shipwrights.

Q Let's go back -- when you say "I was told that I was making a decision," are you saying Mr. Aiken is the person that told you you are making a decision changing only the future pay of the shipwrights?

A By his signature on the piece of paper, his agreement with the grievance.

Q Okay. So when you say, "I was told that I was making a decision changing only the future pay of the shipwrights," you are referring to Mr. Aiken's signature on your grievance decision--

A Yes.

Q --correct? Are you referring to anything else?

A No.

Q Okay. So you're not referring to anything Mr. Aiken said to you, right?

A Well, I guess I could be referring to all conversations, whatever they were, that took place from the time the grievants sat in front of me at second level and we came up with the decision letter, and the work that we did together between there.

Q Okay. But as you sit here -- so it's possible there was a conversation with Mr. Aiken in which he said something to the effect of, you, Ms. Tallman, are making a decision changing only the future pay of shipwrights, but while possible, you can't remember any such specific conversation; is that fair?
A There were several conversations with Joe. Mark Winkler worked closely with Joe. Through this time period, we were working toward how would we resolve the -- the time -- the pay issue from the time the grievance was filed, the 15 days from the time before the grievance was filed. So I don't remember a specific conversation, but the general tone of conversations was, This is how we're going to resolve this grievance in full.
Q And as you -- let's put it this way, if Mr. Aiken were to testify -- I'm not saying he will or he won't -- I never told Ms. Tallman nor anyone else in the union that this decision changed only the future pay of the shipwrights; you can't point to a specific conversation that you remember that would contradict Mr. Aiken's testimony?
A I can point to a specific signature on a piece of paper.
Q Other than that, you can't point to anything?
A Not specific conversations.
Q Okay. Good. Paragraph 7, I want to question here about that last sentence. You say, "I was simply trying to

MR. MAGER: I said she was quicker than me.
Q Now, did you and the union discuss the possibility of lawsuits by individual shipwrights at any point during your discussions?
A We never had discussions about lawsuits. We had...
Q You never talked about whether any individual would lose their right to a lawsuit if the union or if you signed Exhibit 70 or Exhibit 18?
A That was not specifically mentioned. However, I was under the understanding as to -- with the union that this was the end of it.
Q Right.
A We shook hands and we said, This is the end of it.
Q You shook hands, he signed it, and did somebody use the specific words, This is the end of it?
A I believe we did after we shook hands.
Q We --
A I think it was, We done good. This is -- we done good. This is the end of it. We done good by our folks.
Q It was the end of what?
A That it was settled. It was over, the grievance.
Q The grievance was over?
A Grievance was fully settled and over.
Q One other question that I have, and you can take Exhibit 18, Page 1, second paragraph, you wrote, After careful

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 5th day of July of 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON D. HANBERG, et al., )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
MARK WINKLER
Wednesday, June 28, 2006

Q Don't remember Mr. Aiken ever promising you or Ms. Tallman that the union would not pursue arbitration if Ms. Tallman signed the grievance decision?
A Not that I remember.
Q And neither you nor Ms. Tallman ever told Mr. Aiken that that was a condition to Ms. Tallman signing Exhibit 18, right?
A No, I didn't. I don't know if Ms. Tallman did.
Q Well, you never told Mr. Aiken that?
A No.
Q And Ms. Tallman never told Mr. Aiken that in your presence, did she?
A Not in my presence, no. Not that I remember.
Q Okay. The subject of a possible lawsuit by individual shipwrights never came up during your discussions with Mr. Aiken regarding possible resolution of the grievance decision, did it?
A No.
Q So Mr. Aiken never told you that by signing Exhibit 18, it was his intent to preclude individual shipwrights from suing the shipyard for high pay, right?
A Can you say that again, please.
Q Sure. Mr. Aiken never told you that by signing Exhibit 18 he was promising you that no individual shipwright would ever sue in court for high pay, did he?

A No. He just -- he signed it as a settlement to the grievance and I felt that it was -- all of us felt that it was done at that particular stage of the juncture.

Q Right. But he never told you that by signing Exhibit 18 he was committing to you that no individual shipwright would sue in court for high pay?

A No.

Q Right. And he never told Ms. Tallman that in your presence either, did he?

A No.

Q I take it the issue of lawsuits just never came up during your discussions with Mr. Aiken about possibly resolving the grievance?

A No, don't usually see those situations. I don't generally see those situations.

Q Do you remember Mr. Aiken ever using words like "full and final settlement" or "full and final resolution" in your presence during the discussions regarding the resolution of the grievance?

A I mean, we talked settlement agreement, whatever word you want to use, during the whole thing. And I thought by signing that, that was a settlement to the grievance. So those were the words that were used continually, so resolution.

Q The words used were "resolution" and "settlement"; is

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Wednesday, June 28, 2006, Deposition of MARK WINKLER was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Wednesday, June 28, 2006, Deposition of MARK WINKLER is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 10th day of July, 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971