**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al., Plaintiffs, | No. 04-856C |
| vs. | Judge Miller |
| THE UNITED STATES, Defendant. | Electronically Filed on 10/30/06 |

**NOTICE OF FILING**

The parties hereby give notice that pursuant to the Court's Case Management Procedure, the following joint excerpts from the 30(b)(6) deposition testimony of the Puget Sound Naval Shipyard are hereby filed with the Court.

**JOINT TRIAL DESIGNATIONS**

## I. Niemi, Lynnette 03/09/05 testimony:

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 16:11 - 17:1
Q How long have you been employed with the Puget Sound Naval Shipyard?
A Since 1978.
Q And what departments are you currently working with?
A I work for the production resources department.
Q What's your title?
A Administrative officer.
Q And before that, what were you? What was your job?
A My job previous to that was human resources specialist with Navy Region Northwest.
Q Okay. And how long have you been the production resources department administrative officer?
A Since November of 2000.
Q All right. And how long were you a human resources specialist with Navy Region Northwest?
00017
A For about three and a half years prior to that.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 20:7-15
Q Who is responsible for entering the time charge records for a given employee?
A The supervisor.

Q And that is the first line supervisor?
A Correct.
Q And when is the supervisor supposed to enter this information?
A The same day is when they're supposed to do that, sometime during the day.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 21:10 - 22:6

Q You started going into this and I wanted to finish up or clarify, what is the information that the supervisor enters on a daily basis?
A The job order that depicts the work being done, the numbers of hours because they may do more than one type of job. If there's any additional pay, there's pay codes for that. If the employee is on leave, there's leave codes for that. If there's overtime, there's charging for that. You know, it all goes onto this charge sheet.
Q So they'll enter the job number. You mentioned something about they may do more than one type of job?
A Correct.
Q And I lost you on that. Do you mean working on more than one job number?
A Yes.
Q In a given day?

00022

A Exactly.
Q In which case they'll record time under each specific job number at the end of the day?
A Exactly.
Q So then they'll enter the base time and hours?
A Yes.

: Niemi, Lynnette 30(b)(6) 03/09/05 - Page 23 Line 3 to Page 24 Line 5

Q Okay. So we have these detail sheets. Are employees expected to fill out any records regarding their time?
A No. Not that I'm aware of. The production side of the house, for sure, does not do that. To clarify, you mean their work time; is that correct?
Q Correct.
A Okay.
Q If my answer were otherwise, is there something that they are required to document?
A If they take leave they fill out requests for leave.
Q And I think I've actually seen the leave form on your website; is that right?
A It is on the website.
Q Aside from leave are the employees required to report any information to the first line supervisors for purposes of filling out this detail sheet?
A Well, I'd say yeah. For instance, if they finish one job, they're supposed to go back and tell their boss they're done so they can get another job.
Q Okay.
A They're also --

Q That's a fair one.
A They're also expected if they feel that, for instance, an
00024
environmental differential is warranted based on what they're doing, they're excepted to go to their boss and address that.
Q Anything else?
A Not that comes to mind

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 34:14-21

Q Does the shipyard currently keep any records of how much time the shipwrights spend on the leading edge of staging work?
A No.
Q Does the shipyard currently maintain any records of how much a shipwright spends passing materials up and down the staging while that shipwright is actually on it?
A No.

Niemi, Lynnette 30(b)(6) 03/09/05 – Page 35: 1-17

Q We had a discussion to clarify some questions, and do you want to -- based on the discussion off the record -- do you want to clarify or supplement what you just said?
A Well, in addition to your -- or in response to your specific questions, do we know if it's leading edge? Do we know if they were handling materials? What we know is what the timekeeping records show, which is they either did or didn't get high pay. If they got high pay it could have been for differing reasons. So to explain why I say no to those specific questions, is because the records don't show what version of shipwright work they were doing.
Q Okay. So in other words, while the shipyard doesn't keep any of the records I just described in my question, there is a general record of how much high pay was paid to a shipwright on a given date, is that fair?
A Correct.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 35:18-22

Q Okay. Let me ask you just one more specific one. Does the shipyard currently keep any records of dates and times and when shipwrights are doing staging work during steady rain?
A No, not that I know of.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 35:23 - 36:8

Q How would you go about determining for sure whether the shipyard maintains those records?
A Ask the shipwrights. I mean, if they keep some records
00036
I'm unaware of, I don't know about. The records I'm aware of, the official records, no, they do not address that.

Q So apart from the possibility that an individual shipwright might somehow report time he's spending on staging in steady rain, there are no other records of that activity that the shipyard keeps?
A That would be correct.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 36;9-17

MR. FATOUROS: Again, for clarification purposes, we talked specifically about steady rain or adverse weather conditions, I believe there is a code for environmental differential pay because of that. I don't know.
THE WITNESS: It's the same code no matter what high work it is. The very same code.
Q And that's EB, is that the code that's entered?
A It could be. I'd have to look.

Niemi, Lynnette 30(b)(6) 03/09/05 - Page 39:25 - 41:16

Q Let's start a different way. If the Court ultimately
00040
rules that the shipwrights are entitled to additional high pay for work that is not being compensated under the current system, what records will the shipyard have to document the amount of work that has been performed?
MR. FATOUROS: Objection; calls for speculation.
THE WITNESS: I really -- I don't know. I don't think there is anything there that would tell when they performed the high work.
Q Given that the shipwrights are claiming that they're entitled to high pay -- let me start over.
Given that the shipwrights are claiming or certain of the shipwrights are claiming that they perform high work that is not currently receiving environmental differential, why isn't the shipyard trying to maintain records of that activity the shipwrights claim is high work?
A I don't know. And I don't know about the claim that we're currently not paying high work that should be paid.
Q I understand. You don't have to agree with me that the shipwrights perform high work that doesn't receive an environmental differential. My question is simply: Given that there is a claim that they are doing high work and that they're not receiving high pay for, why isn't the shipyard trying to document the amount of time that
00041
is being spent on this alleged additional high work?
MR. FATOUROS: Objection; calls for legal conclusion. Are you asking her to interpret your complaint to then understand why we're not documenting what you've alleged in your complaint we should be paying the people for?
MR. SCARAMASTRA: We have -- that's worthy of a little discussion. Our complaint alleges that certain

activities of the shipwrights, basically any activity on staging, is high work. And so my question is, given that the shipyard is well aware of those allegations, why are they making no efforts to record the amount of work that's being spent on staging? That's the question.
MR. FATOUROS: Objection; calls for legal conclusion. She can answer to the best of her ability.
THE WITNESS: I don't know.

## II. Niemi, Lynette 03/10/05 testimony:

Niemi, Lynette 30(b)(6) v.2 03/10/05 - Page 21:16-24
down right out of the git-go if you need to. I gather that there have been two different policies, which I'm going to call the old policy and the new policy, and that the old policy was one that was in effect basically until the grievance decision, and that there is now a different policy, which I'll call the new policy, with respect to how high pay is paid and high work is treated. Is that assumption a fair one?
A Yes.

Niemi, Lynette 30(b)(6) v.2 03/10/05 - Page 26:4-6
Q Did anyone actually obtain any sort of legal advice as part of the process of formulating the old policy?
A I don't know.

Niemi, Lynette 30(b)(6) v.2 03/10/05 - Page 26:19-28:3
Q Okay. Well, let's talk about the formulation of the new policy for a couple minutes since I think that probably is a topic a little nearer and dearer to your heart and something you know more about. Can you tell me, in very general terms, how the shipyard developed the new policy? And I don't mean blow by blow, just a general when it happened and who did it.
00027
A Okay. Well, it started with a grievance -- with several named grievances submitted by the union and employees. And at that point, I was in the human resource office. The shop came to me for assistance and so I assisted them through processing that grievance, looking into the issue of high pay, both that work, the shipyard -- or the shipwright work being done, and into some other areas that high pay was being granted, and then consulted with the shop on reaching what we felt was the best way to resolve the grievance.
Q When did you first get pulled into the grievance process?
A Early on, so it was -- I believe the grievance was in April of '99, so April, May of '99.
Q And how is it that you were the lucky person who was selected from the human resource office to assist with the grievance resolution?
A Shop 64 was one of the organizations that I was assigned to service.

Q And what generally were your specific job responsibilities in connection with the resolution of the grievance?
A Well, one of my job responsibilities was to advise management with regards to grievances and their resolutions. That's the role I took on. The fact that the classification advising role that used to exist, as
00028
we discussed with Marilyn Barnes, was no longer there, just took on part of that role as well in helping them through the grievance.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 31:5 - 32:8
Q All right. Exhibit 11 has a number of references. It mentions the grievance meeting of May 20th. And I think yesterday we reviewed some notes by Mary Walls of that meeting, right?
A Correct.
Q Then it mentions a discussion with management SME. I'm sorry; what does SME stand for?
A Subject matter expert.
Q And that is Mr. Winkler?
A That's correct.
Q Was he your principle point of contact during the resolution of the shipwright grievance?
A He was.
Q And then there's a tour of the staging that you mention. Do you recall who attended that tour?
A Mr. Winkler; Mr. Aiken, the union representative; and, I believe, Joe Hamel, the other union rep involved.
Q About how long did that tour take?
A Couple hours maybe or so.
Q I don't want to get into all of the details of it today, but just generally did it consist of going out to the
00032
yard and observing the construction of or dismantling of staging?
A Yes, in various location and with various types of features.
Q And did you actually go up on any of this staging?
A Only the stuff that was fit for -- other than shipwrights -- to be on. Only shipwrights can be on incomplete staging.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 33:5-7
Q And since the planks are being moved, are they fastened in any way prior to moving to the working level?
A No. They were just laid on the staging.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 33:8-13
Q The next page is your recommendation. And, I guess, my first question is: Was this your personal recommendation, by you, or was this recommendation being

joined in by anybody else, like Mr. Winkler?
A No. This was my recommendation to the shop which includes Mr. Winkler and Ms. Tallman.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 36:1-13
Q Once you prepared Exhibit 11, did you have any follow-up discussions with anyone in management or at the union about the grievance and how it should be resolved?
A It's hard to remember the timing. I would have met and spoke with Ms. Tallman and Mark Winkler either in conjunction with it or shortly thereafter.
Q Okay. And the one thing, I guess I can infer is given than you're referring to the tour of staging on November 10, 1999, and given that the grievance decision was dated, I believe, January 18, 2000, is it fair to say that you prepared Exhibit 11 sometime after November 10th but before January 18th?
A Yes.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 37:2-9
Q Does reference H, in Exhibit 11, refer to what I've just handed you that's been marked as Exhibits 13 and 14?
A It does.
Q Do you have any general familiarity with the OPM Operating Manual as part of your role as an -- either your previous job in human resources or your current job in the production resources department?
A Yes.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 41:20-25
Q No? Okay. With respect to the old policy, I had asked you whether the shipyard had developed it with input from legal counsel, and you didn't know. I have the same question now with respect to the new policy. Was that policy implemented with input from legal counsel?
A No.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 42:1-6
Q Was there a reason why nobody went to counsel for help in understanding either the operating manual or the regulations or the terms of the collective bargaining agreement?
A I don't know there was a particular reason. We just worked it out in the HR office.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 48:6-10
I gather under the old policy there might have been some high pay for work in the rain, but you don't know whether any such high pay was ever paid. Is that a fair summary of the truth?
A I don't know for a fact what was paid for that rain.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 52:1-10

Q I recognize somebody else is going to talk to us about fall protection, so I don't need you to go into all of the details, but do you have an understanding of, generally speaking, what are the circumstances when fall protection devices are deemed to be capable of being properly used?
A In a general way? I mean, primarily, the anchor point has to be accessible and above you. And in the case of the shipwrights that are erecting scaffolding, that's rarely able to happen.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 52:11-14
Q Okay. All right. Even as of today's date, shipwrights, as I understand it, are rarely able to hook into a proper anchor point for fall protection?
A Correct, that's my understanding.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 54:10-17
Has the shipyard provided any guidelines or instruction to management or to its employees regarding what constitutes steady rain for purposes of receiving high pay?
A Not that I know of.
Q How is the determination made that the rain is such that high pay is called for?
A I don't know.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 54:18-20
Q Who would make that decision under the new policy?
A The second level in the shop. In this case, in the shipwrights.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 56:7-25.
Q If you turn to Exhibit 13 -- you can keep 14 in front of you. I have 13 here. This is excerpts from the OPM manual, right?
A It is.
Q And if you turn to page 2, and that's Section S8-7(c); you with me so far?
A I am.
Q This part of Section S8-7 is one you are pretty familiar with?
A It is.
Q If you look five lines down, there is a sentence and it reads: "Exposure to a hazard, physical hardship, or working condition of an unusually severe nature listed in appendix J is not taken into consideration in the job-grading process, and additional pay for exposure to these conditions is provided only through the environmental differentials authorized by this section." Did I read that right?
A You did.
00057

Niemi, Lynnette 30(b)(6) v.2 03/10/05 – 57:18-59:19.

Q All right. And did you, in fact, read the provision I just read from?
A Yes.
Q Exhibit 13? Okay. Did that play a role in the recommendations that you made in Exhibit 11?
A It did.
Q Did you have any discussions with anybody else in management about the provision in Exhibit 13 we just

00058

read?
A I talked about the case in general, and my conclusions with my supervisor in the human resources office.
Q Who was that?
A Her name was Joene Lott.
Q How do you spell Ms. Lott's name?
A J-o-e-n-e, L-o-t-t. And then, also, with Ms. Tallman and Mr. Winkler.
Q Okay. And can you describe what you recall of your conversation with Ms. Lott about Exhibit 13's provisions that we just quoted?
A With regard to that particular point?
Q Yes.
A That -- you know, that I hadn't found anything, and this wasn't the only thing I looked at to support a conclusion that we could blanketly say shipwrights aren't entitled to high pay because they're shipwrights.
Q You mentioned not finding anything that supported that. Did you find other sources of information that tended to agree with what we just read in Exhibit 13?
A I did.
Q What else did you find?
A Well, I did some case law research, and, you know, some grievance decisions, arbitrations, FLRA and comp general, just to get a feel for what was going on out there in

00059

this kind of a case. So I relied on that too. I couldn't tell you what the cases were or anything.
Q I was going to ask you, did you document what you found in the cases in any way?
A I may have at the time, but I don't -- those records were left behind in HRO and have since, as far as I've been told, been cleaned up. I don't know if they exist.
Q When you say "cleaned up," meaning?
A Periodically purge their files after two to three years.
Q Okay. Would it have been your practice to have printed copies of the comptroller or arbitration or other decisions, court decisions that you had found and thought were relevant?
A Some of them. My practice would be to look at a lot, and print one or two that were on the most point.
Q And how did you find those decisions? Did you use a legal research computer database or something else.
A Yeah, I used a computer database cyberFEDS, I believe,

was what we had at the time.

Niemi, Lynnette 30(b)(6) v.2 03/10/05 - Page 63:11-16

Q Can you think of circumstances where there aren't those differences, where members of other shops receive high pay for work on staging or incomplete staging where shipwrights in Shop 64 do not?

A No. In fact, I believe other workers cannot be on incomplete staging.

## III. Winkler, Mark 03/10/05 testimony:

Winkler, Mark 30(b)(6) 03/10/05 - Page 12:5 - 13:9
What is your current job position?
A I'm a superintendent overseeing the blasters and painters
in Shop 71 in Puget Sound Naval Shipyard.
Q How long have you been doing that?
A About a year and a month in that capacity.
Q What were you doing before that?
A Numerous positions. If you want to go through the
history, I started in the shipyard in 1980, came in as a
work study. Went in the shipwright apprenticeship,
started in 1981. 1985, I made shipwright mechanic. From
1985 to 1990, I think I was the shipwright foreman on the
waterfront. I was a foreman till, I think it was 1996,
when I became shipwright general foreman overseeing all
shipwrights for Shop 64. 1999, I think I became senior
process manager over Shops 57, 64 and 71. It was
numerous trades. I don't know if you want to hear all
the various trades. And subsequently, after that, I
became painter superintendent in Shop 71 a year ago.
Q Is the move to this current position a promotion?
A Yes.
Q So I don't want to go through all of those positions. I
00013
want to just capture the ones really from right before
the grievance was filed during the period for which we're
seeking high pay, forward. So it sounds like your job
changed in 1996 from a foreman--
A I think --
Q --to the general foreman?
A Yes.
Q Supervising the other foremen?
A Absolutely.

Winkler, Mark 30(b)(6) 03/10/05 - Page 13:10 – 14-6
Q Can you tell me what that general foreman position
entailed? And then we'll work forward to the present.
A I was responsible for all processes, all costs and
schedules, all hiring, firing, removing. I basically was
the person directly in charge of roughly a hundred plus
people, i.e., the people that, one, held the shipwright
trade designator or were loaned in to help or assist the
shipwrights during that time period.
Q So did you oversee all of the first level foreman and
supervisors in Shop 64?
A Just shipwrights.
Q Just the shipwright foreman?
A Yes.
Q Okay. Gotcha. And then that changes?
A About 1999, I think, is when I oversaw all general
foremen and all foremen throughout all three of the
00014
shops.

Q Okay. That was 71, 64 and--
A And 57.
Q --57. All right. And you were in that position until about a year and a half ago?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 14:16-15:5

Q Who do you currently report to?
A Captain Mazzone.
Q Okay. And in your prior position before that, who did you report to?
A Mary Jane Tallman.
Q So that's from '99 till about a year and a half ago?
A Yes.
Q Okay. And from '96 to '99, who did you report to?
A Mary Jane Tallman.
Q Okay. Did they add a level?
00015
A Yes.
Q A layer in '99?
A Yes.
Q I see. And promoted you into that?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 23:5-24:5

I gather you played some roll in the resolution of the shipwrights' high pay grievance that was brought in 1999?
A Yes.
Q Okay. Can you tell me, in general terms, what your role was?
A Basically, from start to finish, to negotiate with the union on the settlement agreement on how we were going to go settle the grievance that was brought forward by the shipwrights.
Q Okay. What role did you play before the grievance decision was issued?
A I was the shipwright general process general foreman.
Q I'm sorry. What role did you play in the grievance resolution process, before the decision was issued?
A We got into discussions on how we were going to go settle that. Primarily, it was I got with Lynnette Niemi. She was primarily assigned to kind of go look at the work in progress, look at the regulations. I was the go-between; any issues, questions, things for her.
I also had conversations with the union on how we
00024
were going to go about trying to settle this particular grievance. So even before it was signed, there was quite a bit of dialogue; one, between myself and the union; and, two, myself and Lynnette Niemi who was kind of taking a look at it as a third party.

Winkler, Mark 30(b)(6) 03/10/05 - Page 27:2 - 31:2
Q Let's walk through Exhibit 17, then we'll come back to the process a little more.
A Okay.
Q I asked Ms. Niemi about paragraph 2, which indicates that, "shop 64 pays shipwrights environmental high pay for operating or working from the basket of a JLG or manlift." Do you see that?
A Yes.
Q I understand that that is the result of an arbitration decision; is that correct?
A I don't know.
Q You don't know? Okay. It indicates that it's been in effect since 1985. What happened in 1985 to bring this into effect?
A I remember that, I don't know why, but roughly around that particular time, some employees -- one received some back pay for operation of JLGs and then, at that particular stage of the junction, anybody that was, one, operating or, one, in the basket got high pay anytime they were working out of the JLGs.
Q Let's go to paragraph 4. It says, "When erecting staging inside a slope tank for the first ring of the staging or until level footing is established." Do you see that?
A Mm-hm (answers affirmatively).
00028
Q It says that's been in effect for about two years. Do you see that?
A Yes.
Q What brought about that change?
A I'm sure it had to do with a lot of work at that particular stage of the junction and clarification of the union agreement. As we went through processes in here, we continually were asked by the employees on the definitions of what was in the union contract. And this went on for years on trying to get some clarifications on what the intent of those particular paragraphs in the union contract were. So I would imagine that came out of the agreement; that we felt that that was another justification for the unsure footing situation that it talks about in the union contract. Speculation, but that's what I would say.
Q Okay. Paragraph 5 says that Shop 64 pays shipwrights environmental high pay when working on staging in extreme weather conditions at the supervisor's discretion. Did I read that correctly?
A Yes, sir.
Q Is that statement true?
A Yes, sir.
Q And what's meant by, "extreme weather conditions"?
A That was, like it says before, the supervisor's
00029
discretion on what we felt primarily that had to do with

wind, rain -- excessive rain and wind. Of course, in this area, sometimes you get rain all the time, so more had to do with the combination of rain and wind. And then possibly, if there was any snow on those particular situations. So those were kind of some examples that we went through at that particular stage.
Q Who went through at that particular stage?
A Like I stated before, the clarification of which was actually identified in the union contract. When I took over as shipwright general foreman, there was questions about the intent of or some of examples of when high pay would have been paid.
Q That's back in 1996?
A I think that's when I made general foreman.
Q Did you make or anyone else under your command or that you were reporting to document these decisions that were being made about where high pay should be paid and where not?
A Not that I'm aware of. This appears to be an example of trying to put some of that stuff together so that we could get some additional clarification for the supervisors out there on the waterfront.
Q You sort of gave me a description of what you thought extreme weather conditions would mean.

00030

A Mm-hm (answers affirmatively).
Q I gather that by the end it was possibly a combination of wind and rain?
A Mm-hm (answers affirmatively).
Q Right?
A Yes.
Q Rain alone without more would not qualify as an extreme weather condition?
A Depend on how much rain.
Q And that's what I was getting at. So just the fact that it's raining isn't enough to warrant high pay under this policy, right?
A No.
Q It had to be some amount of rain. Did you come up with some objective measurement of how much rain would qualify as an extreme weather condition?
A No.
Q How did you expect supervisors to know how much was enough?
A Get with the employee, come to a mutual agreement on what they felt was excessive. I didn't appear to get to the -- if it's raining three inches an hour is a time period where we felt we wanted to go. I didn't want to get to that level of detail. It was more of a, Hey, let's sit down. If we need some additional

00031

clarification, then you get myself involved to come out and take a look at the situation.

Winkler, Mark 30(b)(6) 03/10/05 – Page31:3-32:3

Q Is the supervisor being referred to when you mention supervisor discretion, the general foreman or the foreman at the first level?
A Foreman.
Q So in '96 that would have been you?
A Depends.
Q I goofed. Is it the first level supervisors--
A Yes.
Q --who had that discretion?
A Yes.
Q And were there any cases where first line supervisors came to you to consult with you about whether the weather conditions justified high pay?
A Yes.
Q Can you describe the circumstances where that happened?
A I remember some situations of disagreements between the employees and the supervisors on what they felt it was. So I would go out, take a -- do an evaluation on that particular thing. I can honestly say most of the time I erred on the employee side with regards to why didn't we pay him high pay because of conditions that were out there.
Q About how many times during the time you were the general
00032
foreman in Shop 64 were issues about weather conditions brought to your attention?
A Maybe half a dozen.

Winkler, Mark 30(b)(6) 03/10/05 - Page 33:15 - 34:3

Q How would you go about determining if the wind was severe enough that you had to go shut down?
A Just by going out and looking at the specific job and where they were working.
Q What were you looking for?
A Looking to see the effect on the wind, as far as, was it pushing me around; kind of where it was coming from; how high the people were off the ground. A lot of different factors that I would take a look at; visibility. That was probably a lot of the issues that I dealt with is because when the wind and rain combined, it really
00034
affected the visibility of the employees as far as -- of course, hand-eye coordination is crucial to that particular thing.

Winkler, Mark 30(b)(6) 03/10/05 - Page 37:22 - 38:16

Q Is it true that each level of staging is planked and that the planks are fastened to the frame with wire before proceeding to the next level?
A Not a hundred percent.
00038
Q Okay. About what percentage of the time do shipwrights

actually create a stable floor by wiring planks to a
level of incomplete staging before going to the next
level?
A Depending on the staging, if you're looking for an
overall average, it would be small. Most of the time
they move the planks as they go up. But if the staging
to be built requires a planking and lifeline of that
particular level as they go up, they might lifeline wire
that level as they go up. It really depends on the
staging and the use of that particular staging.
So I would say if you're asking a percentage of how
many times that's happens, it's probably less than ten
percent on a high staging. But there is multiple
different types of staging that are built throughout the
ship.

Winkler, Mark 30(b)(6) 03/10/05 - Page 40:20 - 42:5
Q For the planks that are being used by the shipwrights for
temporary platforms, what's the width of the planks that
are typically used for that purpose?
A One foot wide.
Q And how many are typically used side-by-side to establish
a temporary work surface?
00041
A Two.
Q So you've got a 24-foot wide surface?
A Yes.
Q Are those two planks fastened together in any way, as a
general rule?
A Required, yes. Are they, no.
Q Does the shipyard take any action to discipline employees
who don't fasten them together?
A Not that I'm aware of.
Q And then my understanding is that when a level is
complete, those planks are moved up to the next level to
continue construction more often than not. Is my
understanding correct?
A I'd say half and half. Sometimes additional planks are
brought up from below or those are moved up because
people subsequently either stand on those particular
areas to pass material up. Or if you're in this
particular situation as you've identified here that the
JLGs use, then those planks would be moved up because the
means of getting the material up is mechanical.
Q These planks, are they metal planks or wooden or some
other substance?
A Could be wood, could be metal -- steel or aluminum.
Q And what are the lengths that are typically used? We
talked width. What's the length?
00042
A In our aluminum plankings, we've got anywhere up, I think
to 16 feet is kind of the general, usually 8s, 12s, 16s.
In our -- we've got eight-footers primarily with our
system staging, and wood planking could be at any level,

or, excuse me, any length.

Winkler, Mark 30(b)(6) 03/10/05 - Page 53:3-20

general understanding of this. Okay? But at the time you were involved in the grievance, were the shipwrights typically tied into the structure of the staging?
A No.
Q Is that something that's the case now?
A No.
Q Typically, shipwrights still don't tie into the framing of the staging?
A No.
Q How about other anchorage points?
A Yes.
Q And were they tying into anchorage points, typically, back then, aside from the staging itself?
A We had started experimenting with it. It was a process that we were trying to evaluate when I first took over. And we were trying to see in how many areas we could. We're making an asserted effort to try to reduce the hazard to employees.

Winkler, Mark 30(b)(6) 03/10/05 - Page 57:2-58:7

Q Okay. And did you work with Mr. Aiken on the grievance before the January 18, 2000, decision came down?
A Yes.
Q Tell me what your work with Mr. Aiken before the grievance came down entailed.
A If I remember right, we were trying to come up with a means of, one, identifying all the applicable people; two, how we would go about coming up with a fair and equitable estimate on how to settle it, i.e., how much high pay these people would actually be entitled to; and then work through a lot of the -- a lot of the details of high pay, overtime, and stuff like that, as part of my calculations in there. So it was kind of a back and forth thing that went on for a number of months.
Q Okay. And about how many meetings did you have with Mr. Aiken before the 2000 employment grievance came down?
A Before?
Q Yes.
MR. FATOUROS: Just for clarification, when you say, "the grievance," you mean the grievance decision, correct?
MR. SCARAMASTRA: I thought I said that. But, yes, the grievance decision.
THE WITNESS: I wouldn't even be able to guess

00058

on that, sir.
Q Let's at least pin it down to range. More than 20?
A I would say it was less than 20.
Q Less than 10?
A No.
Q More than 10, less than 20?

A Yeah, that's an estimate

Winkler, Mark 30(b)(6) 03/10/05 - Page 59:1-5

Q Okay. Did you play any role in the actual investigation of the grievance? You've talked about negotiations, but did you play any role in investigating the facts of the grievance?

A No, I don't think so.

Winkler, Mark 30(b)(6) 03/10/05 - Page 60:11-13

Q Did you and Ms. Niemi meet together with Mr. Aiken at any point during the course of the grievance?

A I don't remember meeting with the two of them.

Winkler, Mark 30(b)(6) 03/10/05 - Page 76:4-23

reached in just a minute. But first, how did you come up with these numerical ratings or assessments initially?

A Took the cover page of the grievance. I think I sat down with the union, went through everybody on that list, started putting a numerical assessment based on who we felt were the people that were doing the leading edge work -- that we felt were doing the leading edge work more than the other ones. So if --

Q Okay. Before we go further, why don't I show you what we'll have marked as the next exhibit.

(Exhibit Number 22 marked for identification.)

Q This will be Exhibit 22. Is Exhibit 22 what you were referring to just a minute ago? The pages you pulled from the grievance?

A Yes.

Q Are these then the numbers or initial numerical assessments that appear there next to the names?

A Yes.

Q Okay.

A That was the first crack.

Winkler, Mark 30(b)(6) 03/10/05 - Page 76:24 - 77:16

Q First crack at it? You can tell from this? Okay. Now, before we go too far, let's take the first name up here,

00077

David J. Hurn.

A Yes.

Q There are actually three different numbers. There's a "1" in a circle, then there is a "2" in a circle, and then there's a "4" without a circle. Can you tell me what each of those figures represent?

A Okay. The first one was two different opinions on Mr. Hurn and what we felt his rating as far as being in a high pay situation.

Q So one person opined that he should get a one and another person opined he should get a two?

A Yes.

Q Who were the people who provided these opinions regarding

the various shipwrights?
A I'm thinking this was between Mr. Aiken and myself. It
was the first initial crack.

Winkler, Mark 30(b)(6) 03/10/05 - Page 78:7 - 81:1
Q Okay. Which of these two figures represents your number?
The one or the two?
A I don't -- I don't know.
Q And whose handwriting appears here? Whose handwriting is
the one with the circle around it next to Mr. Hurn's
name?
A I think it's mine.
Q Okay. And same with the two with the circle around it?
A Yes.
Q How about the four that's not circled?
A I think that's mine, also.
Q Did you make all of these three numbers at about the same
time?
A No.
Q Tell me when you made the first two sets of numbers. I
assume those two were made about the same time?
A Yes.
Q The one and the two?
A Yes.
00079
Q About when did you make those?
A It would be one of the very first get-togethers we had
once we came to the idea of the concept of the formula.
As far as the actual date, I couldn't provide that.
Q Okay. And then how much later in time did you write down
the four that appears next to Mr. Hurn's name?
A I think that was significantly later, because the first
initial thing didn't quite work the way we were
anticipating, so we regrouped.
Q Tell me what the four represents.
A The four represents, in an eight-hour period, how many
hours that we felt that Mr. Hurn would have been in a
high pay situation.
Q And so do the one and two also represent estimates of the
number of hours in an eight hour day that were spent in
high work?
A No. Our first initial thing was we were trying to rate
them. One being a person that's spent a lot of time --
we kind of went in reverse. We were trying to say, okay,
a number one is a person that probably does a lot of high
work. A two is almost a lot, three...
So we tried that first. Figured that wasn't going to
be the way we needed to do this. We needed to regroup.
So that's when we regrouped and came up with this other
one.
00080
Q I see.
A You understand?
Q So a one would have been the highest level of high work

under this initial system?
A Yes.
Q What was the lowest rate?
A Zero, I think -- or five. Excuse me.
Q One to five?
A Yeah.
Q Would five basically represent little to no high work?
A Yes.
Q Under the new ranking system, what did the rankings run from? I assume from zero, for zero hours per day, theoretically?
A Yes.
Q Did you actually rate anyone at zero?
A Yes.
Q What was the highest ranking you gave anyone. I'll tell you the highest I've seen is a five. Does that correspond to your recollection?
A Yes, it corresponds to my recollection.
Q So the most hours that you credited a shipwright with doing was five hours of high pay per day?
A In a--
Q Per eight-hour day?
00081
A In a high pay situation, yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 81:2 - 82:11
Q When you came up with this initial assessment, how did you go about doing that?
A Like I said, we met with the union first, then we meant with every one of the supervisors that worked for me at that particular time to go over name-by-name, to -- I guess what I consider, help validate the information that would -- we had had.
Q When you went into that initial meeting, though, had you received any input from your foreman as to what each individual's ratings ought to be?
A I don't think so.
Q Okay. How did you come up with the numbers to give? And there were quite a number of people, right?
A Yes.
Q I think there were. I think, 99 signatories that you concluded, right?
A Yes.
Q And then you went through and found everyone else in Shop 64 as well, correct?
A And other shops.
Q Okay. So well over a hundred people?
A Mm-hm (answers affirmatively).
Q How is it that you, on your own, came up with ratings for each one of these over 100 people?
00082
A I didn't. Myself and Mr. Aiken did.
Q And presumably you went into that meeting with Mr. Aiken with some notion of where people ought to fall in the--

A Oh, yeah.
Q --one to five on either way?
A Absolutely.
Q Okay. What inputs of data did you have to come up with those initial ratings that you had in mind?
A Personal observation.
Q Just personal observation? Okay.
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 83:20-25
Q So based on those, sort of, observations, you came up with these initial numerical assessments that you took to discuss with Mr. Aiken; is that right?
A I didn't take them with me. We sat down together. That's why you're seeing two different numbers, his and my opinions.

Winkler, Mark 30(b)(6) 03/10/05 - Page 84:15-85:9
What was the basis for topping out the number of hours per eight-hour day of high work at five?
A We felt that five was the absolute most we felt a person, on an average, could be in a high pay situation in an eight-hour day. And I want to emphasize, average. Because the building of staging is a portion of the shipwright job. And during those evolutions, there is lots of jobs that they do on a daily basis that doesn't warrant any high pay.
So when we were talking about those particular things and personal observations of, one, being a shipwright;
00085
and, two, seeing what goes on in a shipwright. By the time you muster in the morning, do your safety briefs, do your job interactive brief, take a break in the morning, quit for lunch, i.e., go wash up, get cleaned up, go through your briefs in the afternoon, take a break in the afternoon, and shut down at the end of the day, at least a certain amount before quitting time so you could get cleaned up and things, it was a pretty generous observation based upon an eight-hour day.

Winkler, Mark 30(b)(6) 03/10/05 - Page 86:20-24
Q After you met with Mr. Aiken and came up with Exhibit 22, did you present this to anyone in shipyard management before going further down the road towards coming up with a high pay calculation?
A Probably not this exhibit, no.

Winkler, Mark 30(b)(6) 03/10/05 - Page 86:25-87:1
Q That would have taken place later in the process?
00087
A Yeah.

Winkler, Mark 30(b)(6) 03/10/05 - Page 89:20 - 90:7
I had a little surprise. At some point I gather somebody did a calculation to figure out the number of workdays for which each shipwright was going to receive high pay.
A Yes.
Q Wasn't the starting point of that to come up with the total number of working days in the claim period itself?
00090
A Yes. Whenever we -- I would imagine, we would have had to know when the signing was going to be and how far we were going to go back on it.
Q Right. Did you, at some point, calculate the number of workdays between the date 15 days prior to the grievance and the January 18, 2000, grievance decision?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 94:12 - 96:17
Q Okay. Now you can put Mr. Whitcher's declaration aside. And I want to go back to yours. In fact, I'll take it. Let's go to paragraph 8. I think that's where we were.
The last sentence begins, on page number 62, goes to next page, says: "After the union and I completed this," this referring to initial numerical assessment, "I met with my foremen and went over the list, name by name, to verify our numerical assessment." Do you see that?
A Mm-hm (answers affirmatively).
Q That's a yes?
A Yes, sorry.
Q And I'll try to keep those questions to a minimum.
At this initial meeting to go over the list and verify the numerical assessment, did you or the other
00095
foremen rely on any documents?
A No.
Q Did you meet with the foremen as a whole in one big group session, or did you have individual meetings with various foremen, or did you do it some other way?
A It was a group of the foremen. All of them pretty much together except for I had to meet independently with the back shift guy because he wasn't in on that particular time. But it was day shift supervisors that I was responsible for.
Q Was there a single meeting to do this or several meetings?
A I only remember one long meeting.
Q Okay. The record won't reflect this, but you stretched out the word long quite a bit. How long was this meeting? And I don't need it down to the minute.
A It took, I'd say, in excess of two hours to go through name-by-name, and there was quite a dialogue between the supervisors.
Q Would you describe there as being a fair amount of

disagreement over the proper assessments for individuals?
A Some individuals. I mean, it wasn't a huge disparity. It was, no, he's a three. No, he's a four. No, she's two. No, she's a three. Conversations like that based on the supervisors' observations.

00096

Q About when did this meeting take place?
A I would say later in '99, I would imagine.
Q Do you remember about when, or where this meeting took place?
A In the Ocun Loft. That's where most of -- I know that.
Q Where all the work gets done?
A It was a place to go where you wouldn't be distracted.
Q Okay. Were there any union personnel or representatives at that meeting?
A I don't honestly remember if Joe was there or not.
Q Was Lynnette Niemi at this meeting?
A No.
Q Was Ms. Tallman at the meeting?
A No.
Q Aside from the foremen and you, were there any other management representatives at the meeting?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 97:4-7

Q The final set of uncircled numbers that appear on Exhibit 22, did you write those numbers down before or after this meeting with your foremen?
A It looks like after.

Winkler, Mark 30(b)(6) 03/10/05 - Page 97:8-13

Q When you went into the meeting with the foremen, were you still going with the initial system of rating, one being the highest--
A No.
Q --amount of high work?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 100:10-23

Q We've handed you Exhibits 27 and 28.
A Okay.
Q Can you tell me what these two exhibits contain?
A Looked like they've got a numerical assessment and I would imagine the number of days in that particular period. I should say for 27 and 28 they look pretty close to the same to me, but I'd have to go validate that. But they're just in different forms based on, it looks like 28 is based upon badge number, so we sorted it by badge number. 27 -- I don't know why it's sorted that particular way, but --
Q That was going to be my next question. So 27 is sorted by badge number?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 101:7-19
Q Now we have Exhibit 29 in front of you. That appears to be yet another compilation of the data concerning hours of high work, right?
A Yes.
Q Now, a question was asked off the record and might as well get it on the record.
The last question I asked you about the preparation was who prepared or who input them. Now let me ask you, these are records that were manually input by someone, correct?
A Yes.
Q And into a computer?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 102:1-10
Q I gather the document created first was Exhibit 22?
A Yep.
Q Okay. What was the next document to be created?
A I would venture to say 23.
Q And then what was the next document that was created?
A Either one of these two.
Q 27 or 28?
A Yeah.
Q And then what came after 27, slash, 28?
A Looks like 24. And then 29, I would venture to say.

Winkler, Mark 30(b)(6) 03/10/05 - Page 106:6 - 107:13
Let's take Walt Jaynes. He's in each of these.
A Okay. Walt Jaynes, Walk Jaynes --
MR. FATOUROS: Walt Jaynes?
MR. SCARAMASTRA: Yes.
THE WITNESS: Can you find him?
Q On Exhibit 23?
A 22.
Q I'm sorry, yes, I can find him. He's on page 2 about six names down. And he's a four, right?
A Yep.
Q So now we're going to Exhibit 23. And I will tell you there that Mr. Jaynes is on page J2512, almost halfway down.
A Four.
Q He's four, again. Want to take a look at 24?
A Four.
Q Four, again. Exhibit 27.
A I don't have it.
Q Oh, excuse me, sorry. He should be on --
MR. HOLCOMB: Page 1, he's about ten down.
00107
MR. SCARAMASTRA: Yep.
THE WITNESS: Four.
Q He's a four, again. And so let's take 28 and 29, if you would. On 28 Mr. Jaynes is on page 3, 2516, three down from the top.

A Four.
Q Okay. And go ahead and take 29, if you would.
A Four.
Q Four, again. Okay. I'm going to stop this exercise. So far each of these three individuals, their ratings have held constant through the process. Would you agree with me?
A Mm-hm (answers affirmatively).

Winkler, Mark 30(b)(6) 03/10/05 - Page 113:19 - 115:4

If you concluded that someone had spent two hours, out of an eight-hour day, on average, doing high work, you'd rank them a two?
A Yes.
Q Okay. Now, you're going to multiply that two by something else to come up with hours of high pay?
A Yes.

00114

Q I want to talk about that something else. And that's your next sentence. You add up his hours based on workdays--
A Yes.
Q --subtract days of leave, and added his overtime.
A Yes.
Q Is that what you say in paragraph 9?
A Yes.
Q Okay. How did you come up with the hours based on workdays?
A I would imagine we went from the agreed upon date of 14 or 15 days prior to the grievance and to the date it was signed.
Q And this is where we started -- we left off before. You then calculated that -- somewhere, someone must have done a calculation of the number of workdays in the claim period, right?
A Yes.
Q Okay. And then you're going to subtract leave days from that number?
A Yes.
Q Right. And then add overtime hours back in; is that right?
A Yes.
Q Okay. But first, you could convert overtime hours to

00115

days; is that right?
A Yes.
Q And did you convert hours to days by dividing by eight?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 115:16 - 116:3

Q Looks like Exhibit 31 is another one of the charts that you prepared?
MR. HOLCOMB: Is this 31, now?
MR. SCARAMASTRA: Yes.

THE WITNESS: Yes.
Q That's a yes?
A Yes.
Q Do you want to do the same exercise with these and sort of put them in what you think is roughly chronological order?
00116
A Way out here.
Q Okay. So you've got 31 is the last one.
A Mm-hm (answers affirmatively).

Winkler, Mark 30(b)(6) 03/10/05 - Page 116:25 - 117:2
Q So you have them in order. It's 27, 28, 24, 29, 30, and
00117
31; is that right?
A Yep.

Winkler, Mark 30(b)(6) 03/10/05 - Page 126:16 - 127:12
Q That's the claim period. And Exhibit 40 is collecting the amount of overtime hours and leave hours for a series of employees, right?
A Yes, that appears so.
Q Okay. For Jay Neitzel, it's got 12.7 overtime hours and 222 leave hours. Do you see that?
A Yes.
Q And then there is handwritten, next to it, minus 26. Do you know what that represents?
MR. SCARAMASTRA: You're not writing on it, are
00127
you?
THE WITNESS: Yes.
MR. SCARAMASTRA: Oh, boy. Go ahead and write on it. We'll make another one. You're using a blue pen?
THE WITNESS: Yeah.
MR. SCARAMASTRA: Go ahead and mark in blue.
THE WITNESS: Sorry.
MR. SCARAMASTRA: No, it's okay. We'll know we need a clean exhibit later.
Q Is it a conversion from hours to days, as best as you can tell?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 127:13 - 128:15
Q Okay. Let's turn to Exhibit 38. Whose handwriting is this?
A Speculation?
Q Go ahead?
A Jim Jazuk.
Q And that's the name that appears in the upper right-hand corner?
A I don't know that for sure.
Q Is he one of your foremen?
A Could have been at this time.
Q All right. Now, let's take an example here, Greg Corey,

two down.
A Okay.
00128
Q Someone has written 245 combined hours of leave and written next to it 30.6 days. Do you see that?
A Yep.
Q And then it's put 383 hours of overtime and has written 47.8 days.
A Okay.
Q Then appears to have taken 47.8 and subtracted 30.6 to get 17, which is circled and put next to Mr. Corey's name.
A Okay.
Q Would you agree with me that that's what happened?
A Yes.
Q Is this the system that was being used to adjust the work hours for each shipwright?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 129:8 - 132:5
handle on it. I'm going to show you what I'll have marked as Exhibits 41 and 42.
(Exhibit Numbers 41 and 42 marked for identification.)
Q Okay. You have those two exhibits in front of you?
A Yes.
Q Can you tell me what Exhibit 41 is?
A It appears to be a report that was taken out of a program to look at how much leave Mr. Scott used from -- let's say, 2/1/99 to 1/7/2000.
Q Now, looks like someone crossed out the entries for February 1999 down there, right?
A Yeah.
Q Okay. And then there is a number of eights that follow, and one three. And then next to it in handwriting it says "163 leave." Is that the sum total of the number of hours of leave that appears on Exhibit 41?
A Can I take your word for it?
00130
Q I've done the math. I think it is. Would that be consistent with the process you were using?
A Okay. Yes.
Q If you look at Exhibit 42, what does that show you? Let me rephrase it. What does the printed portion of this show?
A Are you talking about this portion?
Q Correct. The left few columns, as opposed to the handwriting.
A It appears to be a job order that the individual was working on specific days.
Q And I'll note that the dates all appear to take place in that claim period, beginning 15 days before the grievance to the date of the grievance decision. Does that appear to be the case? Actually, with the exception of sometime

towards the end?
A Okay. Yes.
Q Now, somebody, looks like, tallied in handwriting his overtime hours, Mr. Scott's overtime hours, and came up with 577.9. Is that what happened?
A Appears that.
Q Then it says, handwriting below, "232 prior OT." What does that refer to?
A I don't know.
Q Somebody subtracted that from 577.9 and got 345. Does
00131
that appear to be what happened?
A Yes.
Q Then there is 163 with the word, "leave" written next to it?
A Mm-hm (answers affirmatively).
Q Do you see that? Is that a yes?
A Yes.
Q And does that come from Exhibit 41?
A Speculation. But yeah, I would imagine.
Q The same figure --
A It's the same number.
Q Okay. And then it looks like somebody subtracted 163 from 345 and got 183. Do you see that?
A Yes.
Q And then somebody divided 183 by eight and got 23 days. Is that right?
A Appears to be -- it's not quite there, but...
Q Just about.
A Okay.
Q Now, back in the series of documents we were looking at before, I'm going to show you Exhibit 33. Would you look at Mr. Scott's name. Can you find it on there?
A Yes, I do.
Q There is a handwritten number next to his name?
A Yes.
00132
Q What is it?
A Plus 23.
Q Plus 23. That's the same number that is calculated on Exhibit 42, correct?
A Okay. Yes, sorry.

Winkler, Mark 30(b)(6) 03/10/05 - Page 137:2-14
Q How did you convert overtime hours into days?
A Divided by eight, I would imagine.
Q Divide by eight, right?
A Yes.
Q In fact, that's exactly what you did or someone did in Exhibit 42, right? They came up with a net hours of 183 for Mr. Scott?
A Which number?
Q Exhibit 42?
A Okay.

Q They divided by eight hours per day and came up with a 23-day adjustment, right?
A Yes.

Winkler, Mark 30(b)(6) 03/10/05 - Page 139:1-140:5

individuals, but we're running out of time, so let's move on to the next thing.
Let's take your declaration. Let's go to paragraph 7. The very last sentence of paragraph 7, reads: "Our decision was in the nature of a compromise in settlement of the union grievance." Do you see that?
MR. SEATON: Where is that? Paragraph 7?
MR. SCARAMASTRA: Paragraph 7, last sentence of paragraph 7.
THE WITNESS: Yes.
Q Why do you say that?
A When we were going through this process, we honestly felt that we were erring far on the extreme when we looked at the number of hours in a high pay situation for every employee. We also didn't go in and get real nitpicky with the training they were in; the subsequent times they could have been TDY or any other limiting factors. We limited it -- me and the union both communicated that this was erring very generously on the amount of hours that we felt they were in a high pay situation so that we could get this behind us and settle the grievance. That's what that is.
Q Did someone from you the union tell you they thought this was a generous proposal from management?
A Absolutely.
00140
Q Who did?
A Mr. Aiken said it was generous to the employees, not the management. He felt it was a good win-win for the employees and was also communicating that with his union affiliates.

Winkler, Mark 30(b)(6) 03/10/05 - Page 140:12-15

Q Okay. So you are not saying that the employment grievance decision that's Exhibit 18 was negotiated with the union?
A I wasn't -- I didn't negotiate it.

Winkler, Mark 30(b)(6) 03/10/05 - Page 140:16:143:14

Q Okay.
A I don't have that...
Q All right. So you did not participate in any negotiations concerning the substance of the employee grievance decision or the terms that were written in it. Is that fair?
MR. FATOUROS: Objection; foundation.
MR. SCARAMASTRA: I'm actually laying foundation, so...

THE WITNESS: I worked on, I guess what you
00141
consider, some of the -- how would you say that -- the essence of why it was settled. I worked on all the precursor things to the signature. So I guess I had part in it, but I wasn't the ultimate citing official.
00142
Q Were you present for the signing of Exhibit 18 by any party to it?
A Is this Exhibit 18?
Q Exhibit 18. Were you present when Mr. Aiken signed Exhibit 18?
A Yes, I was.
Q And you were present in the room--
A Yes, I was.
Q --when Ms. Tallman signed it?
A Yes, I was.
Q Where was it signed?
00143
A In her office.
Q Were there any discussions before it was signed or after it was signed?
A We met -- I remember Mr. Aiken leaving for a period of time to consult with the employees that had signed the grievance to get, I guess, nothing more than their perception on signing off this grievance. He went and spent what seemed like an hour, hour and a half, to go talk to employees that signed the back of this, asking if they felt it was a fair and equitable resolution settlement to the grievance, came back about, I'm thinking an hour afterwards, and stated that the employees wanted to settle the grievance and that he was signing. And so subsequently the signing took place.

Winkler, Mark 30(b)(6) 03/10/05 - Page 147:16-148:1
Q Have you seen -- that's more leading, but -- have you seen instances where employees or union officials sign grievance decisions where it didn't reflect satisfaction with the outcome?
A Well, usually the union, at least in my thing, doesn't sign on those particular things. It's a decision made by management as to the outcome, usually on a grievance. So this was -- this was -- I guess in my opinion, different, because the union signed. And I guess I got the impression, and also the union said they agreed with the
00148
settlement decision.

Winkler, Mark 30(b)(6) 03/10/05 - Page 141:17-19
Q You didn't participate in the drafting of Exhibit 18, did you?
A I didn't draft it, no.

Winkler, Mark 30(b)(6) 03/10/05 - Page 143:15 - 144:13
Q Okay. Let me show you what I'll have marked as 43.
(Exhibit Number 43 marked for identification.)
Q Have you seen Exhibit 43 before?
A No, but it's what I think it was when I stated earlier, a decision that was agreed upon by -- things for high pay.
Q This is the settlement agreement, is it not?
A That's what it says at the top.
Q And it's signed by a member of the union, correct?
A Yep.
Q And by an A. Burton, for the employees. Do you see that?
A Yep.
00144
Q And it refers to employees who are assigned to work inside main ballast tanks. This is a settlement agreement associated with a 1998 grievance by insulators in Shop 64, right?
A I don't know.
Q Obviously the shipyard knows how to prepare a settlement agreement when it wants because this is one, correct?
A That's what it says at the top.
Q Why didn't the shipyard draft a settlement agreement like Exhibit 43 to resolve the high pay grievance?
A I wasn't the deciding official on this one.
Q You don't know why?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 145:20-25
Q First of all, did you or anyone you know actually consult with legal counsel to find out if high work was required by law or regulation?
A I didn't.
Q Did anybody else alert you that they had done that?
A No.

Winkler, Mark 30(b)(6) 03/10/05 - Page 146:3-12
Q Given that there was, as you described it, uncertainty on your part and on the management's part as to whether law or regulation required the payment of high pay, is there a reason why nobody went to legal counsel to find an answer?
A We don't usually go to law and counsel when answering -- or settling grievances.
Q Even when there is uncertainty as to what the law requires?
A It wasn't mine to go do. I had my own portion.

Winkler, Mark 30(b)(6) 03/10/05 - Page 146:18 - 147:1
Q Does the fact that an employee or union representative signs the resolution of a grievance always indicate to you satisfaction with management's actions?
A No, but he said personally.
Q What's that?
A No. But Mr. Aiken said it personally that he thought it

was a good thing for the employees, and subsequently he told me that his union officials, i.e., the president,
00147
thought it was a good decision on the employees' behalf.

Winkler, Mark 30(b)(6) 03/10/05 - Page 152:4-7
Q Did you condition the settlement high pay award on the union giving up any rights on behalf of its members to further high pay?
A I wouldn't know that.

Winkler, Mark 30(b)(6) 03/10/05 - Page 152:20 - 153:3
Q But, in other words, leaving aside the legal stuff--
A Okay.
Q --or how it might have put in legalese, did Ms. Tallman or you or anyone else in your presence tell anybody from the union that a condition of the high pay award was that the union and the Shop 64 employees not pursue additional
00153
high pay?
A No. We were just trying to resolve the issue with what we considered a fair settlement.

DATED this 30th day of October 2006.

Respectfully Submitted,

s/ Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

s/Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Telephone (202) 616-2377
Facsimile (202) 305-7644
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify on October 30, 2006, a copy of the foregoing "Notice of Filing" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs