IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON HANBERG, et al. | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

LYNETTE NIEMI

VOLUME I

Wednesday, March 9, 2005

past answer, that's the August 15, 2001, memo from the commander of the Puget Sound Naval Shipyard regarding implementation of changes and SUPDESK S-U-P-D-E-S-K for time and attendance?
A Yes.
Q Since we're not making it an exhibit it's a bit of a formality. Let me ask a couple of questions about who you are, what you've been doing. Can you tell me what post-secondary degrees you hold, if any?
A None.
Q How long have you been employed with the Puget Sound Naval Shipyard?
A Since 1978.
Q And what departments are you currently working with?
A I work for the production resources department.
Q What's your title?
A Administrative officer.
Q And before that, what were you? What was your job?
A My job previous to that was human resources specialist with Navy Region Northwest.
Q Okay. And how long have you been the production resources department administrative officer?
A Since November of 2000.
Q All right. And how long were you a human resources specialist with Navy Region Northwest?

Q That was going to be my next question. So is there a paper input? Does someone enter information on paper that's input into SUPDESK?
A No, not that I know of.
Q SUPDESK is sort for supervisor's desk; is that right?
A That's correct.
Q Who is responsible for entering the time charge records for a given employee?
A The supervisor.
Q And that is the first line supervisor?
A Correct.
Q And when is the supervisor supposed to enter this information?
A The same day as when they're supposed to do that, sometime during the day.
Q Is it they're supposed to do that, do they in fact do it?
A Usually there are occasions when they don't.
Q Does the first line supervisor -- is that a desk job?
A No.
Q Okay.
A There's some desk time, but they're expected to be out and about on the waterfront as well.
Q And so there are, I take it, computer terminals available for them somewhere where they can enter this data?
A Yes.

Q How are they supposed to go about collecting this data regarding their employees?
A They have the data because they assign out the jobs to the employees and those job assignments that they make are connected to the job order that they charge.
Q How many employees does a given first line supervisor have responsibility for?
A It varies. It would commonly be between six and 12 to 15 depending on the type of work being done.
Q You started going into this and I wanted to finish up or clarify, what is the information that the supervisor enters on a daily basis?
A The job order that depicts the work being done, the numbers of hours because they may do more than one type of job. If there's any additional pay, there's pay codes for that. If the employee is on leave, there's leave codes for that. If there's overtime, there's charging for that. You know, it all goes onto this charge sheet.
Q So they'll enter the job number. You mentioned something about they may do more than one type of job?
A Correct.
Q And I lost you on that. Do you mean working on more than one job number?
A Yes.
Q In a given day?

on one project; is that right?
A Exactly.
Q Okay. So we have these detail sheets. Are employees expected to fill out any records regarding their time?
A No. Not that I'm aware of. The production side of the house, for sure, does not do that. To clarify, you mean their work time; is that correct?
Q Correct.
A Okay.
Q If my answer were otherwise, is there something that they are required to document?
A If they take leave they fill out requests for leave.
Q And I think I've actually seen the leave form on your website; is that right?
A It is on the website.
Q Aside from leave are the employees required to report any information to the first line supervisors for purposes of filling out this detail sheet?
A Well, I'd say yeah. For instance, if they finish one job, they're supposed to go back and tell their boss they're done so they can get another job.
Q Okay.
A They're also --
Q That's a fair one.
A They're also expected if they feel that, for instance, an

environmental differential is warranted based on what they're doing, they're excepted to go to their boss and address that.

Q Anything else?

A Not that comes to mind.

Q How about overtime, is that something that employees are expected to track or monitor or report to the supervisors?

A No. It's to be approved in advance by the supervisor.

Q This may be something that's better asked of Ms. Bullard later, but can you tell me just very generally what SUPDESK is? And I don't mean what's going on behind it. Let me start over: What is SUPDESK used for at the shipyard?

A I can only tell you parts of that.

Q That's fair.

A I mean I know that it's used for a tool to record timekeeping as we've been talking about. It also controls the assignment of job orders for, you know, an administrator level down to the people that will be doing the work. There's features in there to request and authorize overtime. There's features in there to maintain leave information so supervisors can look back and check on people's leave and so forth. It provides notification to supervisors of appointments, dispensary,

A Okay. Well, it started with a grievance -- with several named grievances submitted by the union and employees. And at that point, I was in the human resource office. The shop came to me for assistance and so I assisted them through processing that grievance, looking into the issue of high pay, both that work, the shipyard -- or the shipwright work being done, and into some other areas that high pay was being granted, and then consulted with the shop on reaching what we felt was the best way to resolve the grievance.
Q When did you first get pulled into the grievance process?
A Early on, so it was -- I believe the grievance was in April of '99, so April, May of '99.
Q And how is it that you were the lucky person who was selected from the human resource office to assist with the grievance resolution?
A Shop 64 was one of the organizations that I was assigned to service.
Q And what generally were your specific job responsibilities in connection with the resolution of the grievance?
A Well, one of my job responsibilities was to advise management with regards to grievances and their resolutions. That's the role I took on. The fact that the classification advising role that used to exist, as

we discussed with Marilyn Barnes, was no longer there, just took on part of that role as well in helping them through the grievance.

Q Did you stay involved in the process after the January 2000 grievance decision was issued?

A No, I didn't.

Q Okay. What I'm going to do now is hand you a couple of documents and see if you just recognize them so I know. I think you're the right person to ask. I will show you what will be marked as the next in order, I believe it's 10.

(Exhibit Number 10 marked for identification.)

Q Do you recognize Exhibit 10?

A Yeah. I created this document. It's a summary of the issues that were brought up in the grievances.

Q All right. See, all right. My first guess was a good one. Do you remember about when you prepared this?

A No.

Q Was this kind of one of the initial documents you prepared in the process, or was this later?

A This would have been late in it, after the meetings and after touring around looking at the work.

Q Okay. And obviously, there's some stuff referring to an insulator grievance. I'm not going to ask you about that here today. So this represents 20 different work

Work already paid." Is the shipyard aware of any means to document or approximate which shipwrights did high work before the grievance?
A Not to my knowledge, no.
Q Does the shipyard currently keep any records of how much time each shipwright spends on staging either assemblage or disassemblage?
A No, I don't believe the records would say when they were on the staging.
Q Does the shipyard currently keep any records of -- by the way when I refer to "the shipyard," do you understand I'm referring to the Puget Sound Naval Shipyard?
A Sure.
Q Does the shipyard currently keep any records of how much time the shipwrights spend on the leading edge of staging work?
A No.
Q Does the shipyard currently maintain any records of how much a shipwright spends passing materials up and down the staging while that shipwright is actually on it?
A No.
MR. SEATON: Could I go off the record here a second?
MR. SCARAMASTRA: Yes.
(Discussion held off the record.)

Q We had a discussion to clarify some questions, and do you want to -- based on the discussion off the record -- do you want to clarify or supplement what you just said?
A Well, in addition to your -- or in response to your specific questions, do we know if it's leading edge? Do we know if they were handling materials? What we know is what the timekeeping records show, which is they either did or didn't get high pay. If they got high pay it could have been for differing reasons. So to explain why I say no to those specific questions, is because the records don't show what version of shipwright work they were doing.
Q Okay. So in other words, while the shipyard doesn't keep any of the records I just described in my question, there is a general record of how much high pay was paid to a shipwright on a given date, is that fair?
A Correct.
Q Okay. Let me ask you just one more specific one. Does the shipyard currently keep any records of dates and times and when shipwrights are doing staging work during steady rain?
A No, not that I know of.
Q How would you go about determining for sure whether the shipyard maintains those records?
A Ask the shipwrights. I mean, if they keep some records

I'm unaware of, I don't know about. The records I'm aware of, the official records, no, they do not address that.

Q So apart from the possibility that an individual shipwright might somehow report time he's spending on staging in steady rain, there are no other records of that activity that the shipyard keeps?

A That would be correct.

MR. FATOUROS: Again, for clarification purposes, we talked specifically about steady rain or adverse weather conditions, I believe there is a code for environmental differential pay because of that. I don't know.

THE WITNESS: It's the same code no matter what high work it is. The very same code.

Q And that's EB, is that the code that's entered?

A It could be. I'd have to look.

Q That's okay. We'll probably take a break at some point and we can confirm. But there is a single code and all that code designates is high pay that's been paid by the shipyard, right?

A Exactly.

Q While that high paid should correlate to the high work performed that's really an indirect -- first of all, that's an indirect measurement of high work?

A No.

MR. FATOUROS: Objection; misstates former testimony.

Q How did I go wrong?

A Okay. There is one code for high work.

Q Okay.

A The definition for that code, that high work, is, work above 100 feet, at or above I believe it is, or work at lesser heights if these things exist. That's one definition of high work, 25 percent. There's another high work definition, work at extreme heights which is a separate high work definition which wasn't at play in this grievance.

Q All right. So it's one code or the other depending on whether it falls into?

A The extremeness of the work.

Q Sorry, we were ships passing in the night there. Sorry for the pun.

Does the shipyard understand or believe that it has an obligation to maintain records of all high work shipwrights perform?

A I'm not sure. We have an obligation to maintain the attendance records which includes the high work that's paid.

Q Let's start a different way. If the Court ultimately

rules that the shipwrights are entitled to additional high pay for work that is not being compensated under the current system, what records will the shipyard have to document the amount of work that has been performed?

MR. FATOUROS: Objection; calls for speculation.

THE WITNESS: I really -- I don't know. I don't think there is anything there that would tell when they performed the high work.

Q Given that the shipwrights are claiming that they're entitled to high pay -- let me start over.

Given that the shipwrights are claiming or certain of the shipwrights are claiming that they perform high work that is not currently receiving environmental differential, why isn't the shipyard trying to maintain records of that activity the shipwrights claim is high work?

A I don't know. And I don't know about the claim that we're currently not paying high work that should be paid.

Q I understand. You don't have to agree with me that the shipwrights perform high work that doesn't receive an environmental differential. My question is simply: Given that there is a claim that they are doing high work and that they're not receiving high pay for, why isn't the shipyard trying to document the amount of time that

is being spent on this alleged additional high work?

MR. FATOUROS: Objection; calls for legal conclusion. Are you asking her to interpret your complaint to then understand why we're not documenting what you've alleged in your complaint we should be paying the people for?

MR. SCARAMASTRA: We have -- that's worthy of a little discussion. Our complaint alleges that certain activities of the shipwrights, basically any activity on staging, is high work. And so my question is, given that the shipyard is well aware of those allegations, why are they making no efforts to record the amount of work that's being spent on staging? That's the question.

MR. FATOUROS: Objection; calls for legal conclusion. She can answer to the best of her ability.

THE WITNESS: I don't know.

Q You're familiar with Leave and Earnings statements?

A Yes.

Q What are those?

A Those are the statements we get every two weeks, every pay period that tells us what we've earned and how much leave we've used and how much we have and everything about our pay for that pay period including added-pay overtime.

Q How are those generated?

# Melissa J. Watkins & Associates, Inc.
## Certified Court Reporters

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181


June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Lynnette Neimi, Vol I
Date Taken: March 09, 2005

This letter is to advise you of the following:

_______ Signature was waived. The original transcript is being served upon you at this time for filing.

__X____ Deponent has completed reading and signing. The original transcript and correction sheet is being served upon you at this time for filing.

__X____ A copy of the deponent's corrections are enclosed for your reference.

_______ No corrections were returned by the deponent.

_______ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

_______ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey
Dawn Lindsey

cc: Mr. Thomas B. Fatouros

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON HANBERG, et al. )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

DEPOSITION UPON ORAL EXAMINATION OF

LYNNETTE NIEMI

Volume II

Thursday, March 10, 2005

---

Tallman, and Rodney J. Whitcher, submitted to the Court in the above-captioned action." Do you see that?
A I do.
Q First of all, I think we misspelled your first name. You need a second "N"?
A You did.
Q My apologies there. I understand that you're here today to talk about the shipyard's current and past high pay policies with respect to high work and high pay?
A Yes.
Q But Mr. Winkler will come in to testify regarding the specific issue of how high pay awards were calculated in connection with the resolution of the grievance?
A That's correct.
Q Okay. Here's my working assumption so you can shoot it down right out of the git-go if you need to. I gather that there have been two different policies, which I'm going to call the old policy and the new policy, and that the old policy was one that was in effect basically until the grievance decision, and that there is now a different policy, which I'll call the new policy, with respect to how high pay is paid and high work is treated. Is that assumption a fair one?
A Yes.

ATTY3: Can we go off the record.

A For the old policy?
Q Correct.
A I'm not aware of any other.
Q Did anyone actually obtain any sort of legal advice as part of the process of formulating the old policy?
A I don't know.
Q Is there someone who would know the answer to that question?
A I'm not sure anyone that was around back then is even with us, or maybe even still alive. That policy may have gone back many, many years.
Q Well, that was going to be another question. Do you know when this policy first came to be in the shipyard?
A I don't.
Q Do you know what role, if any, the union representing Shop 64 shipwrights played in the formulation of the old policy?
A I don't.
Q Okay. Well, let's talk about the formulation of the new policy for a couple minutes since I think that probably is a topic a little nearer and dearer to your heart and something you know more about. Can you tell me, in very general terms, how the shipyard developed the new policy? And I don't mean blow by blow, just a general when it happened and who did it.

you get a warning that you've now overloaded your reserve space on the J drive and you have to unload some of the items in it?
A You have to clean house or stop, yes.
Q All right. Exhibit 11 has a number of references. It mentions the grievance meeting of May 20th. And I think yesterday we reviewed some notes by Mary Walls of that meeting, right?
A Correct.
Q Then it mentions a discussion with management SME. I'm sorry; what does SME stand for?
A Subject matter expert.
Q And that is Mr. Winkler?
A That's correct.
Q Was he your principle point of contact during the resolution of the shipwright grievance?
A He was.
Q And then there's a tour of the staging that you mention. Do you recall who attended that tour?
A Mr. Winkler; Mr. Aiken, the union representative; and, I believe, Joe Hamel, the other union rep involved.
Q About how long did that tour take?
A Couple hours maybe or so.
Q I don't want to get into all of the details of it today, but just generally did it consist of going out to the

yard and observing the construction of or dismantling of staging?
A Yes, in various location and with various types of features.
Q And did you actually go up on any of this staging?
A Only the stuff that was fit for -- other than shipwrights -- to be on. Only shipwrights can be on incomplete staging.
Q I haven't gone through the materials you mentioned reviewing for today's deposition. Is Exhibit 11 one of the documents that you reviewed--
A No.
Q --to prepare? Okay. Just one question. That last couple of sentences on page 1, it says that: "Shipwrights typically use two planks in building a staging (one on each side of the level), and move them from level to level as they work. When the staging reaches a working level (where other workers will be using it), the level is fully planked and lifelines (safety rails) are installed." Is that still, in your view, an accurate summary of this portion of the process of building staging?
A In my view, yes.
Q And these planks -- about how wide are they?
A It's been a while, but I would think, 18, 20 inches or

somewhere in there.
Q Your hands looked to me more like 12 inches, but I'm not going to hold you to the exact.
A Yeah, I don't know. 18 inches maybe.
Q And since the planks are being moved, are they fastened in any way prior to moving to the working level?
A No. They were just laid on the staging.
Q The next page is your recommendation. And, I guess, my first question is: Was this your personal recommendation, by you, or was this recommendation being joined in by anybody else, like Mr. Winkler?
A No. This was my recommendation to the shop which includes Mr. Winkler and Ms. Tallman.
Q The very last sentence of that page says: "Adverse environmental conditions under b(3) are also reoccurring factors in the work." Do you see that?
A Let me catch up.
Q I'm sorry.
A Okay.
Q So you see that last sentence?
A Mm-hm (answers affirmatively).
Q And b(3) is the provision immediately above that you're quoting?
A Right.
Q That mentions a number of adverse environmental

Q Once you prepared Exhibit 11, did you have any follow-up discussions with anyone in management or at the union about the grievance and how it should be resolved?
A It's hard to remember the timing. I would have met and spoke with Ms. Tallman and Mark Winkler either in conjunction with it or shortly thereafter.
Q Okay. And the one thing, I guess I can infer is given than you're referring to the tour of staging on November 10, 1999, and given that the grievance decision was dated, I believe, January 18, 2000, is it fair to say that you prepared Exhibit 11 sometime after November 10th but before January 18th?
A Yes.
Q Among the references you have there is reference H. And that refers to OPM Operating Manual 532-1, Subchapter 8-7, and Appendix J. And what I'll do -- and it looks like you have a copy there in your binder -- I'm going to have a copy marked as an exhibit. Exhibit 13 will be some subchapters from the OPM manual, and Exhibit 14 will be Appendix J.
(Exhibit Numbers 13 and 14 marked for identification.)
ATTY2: J is 14.
MR. SCARAMASTRA: J is 14. The wage system is 13.
(Discussion held off the record.)

MR. SCARAMASTRA: Let's go back on.
Q Does reference H, in Exhibit 11, refer to what I've just handed you that's been marked as Exhibits 13 and 14?
A It does.
Q Do you have any general familiarity with the OPM Operating Manual as part of your role as an -- either your previous job in human resources or your current job in the production resources department?
A Yes.
Q Okay. And have you had any training in the use of the OPM manual?
A No.
Q Okay. Is that a document that you have cause to refer to in the course of your own day-to-day duties either in your current position with the production resource department or in your past role in human resources?
A In both.
Q Okay. Would you -- and I think you either said this off the record or on the record. Would you consider yourself fairly familiar with the provisions, that is to say, Subchapter 7-6, and 7-7, and 8-8, of Exhibit 13, and then Appendix J, which is 14?
A A --
Q Let me restart. That was a terrible question.
Would you consider yourself fairly familiar with the

authorized, to inform the employee of that.
Q Now, if you would, take Exhibit 16 and just put my nose in the part of that instruction that creates a requirement for an employee to request environmental differential pay in advance?
A It's on page 3. And it's under the, employees will, Paragraph D. And it's notifying their supervisor when they feel they are working in hazardous or unsafe conditions.
Q Okay. So that's -- for the record, that's Section 5(d)(2) that appears on page 3 of Exhibit 16?
A Yes.
Q All right. Is there anything in the OPM Operating Manual that also, to your knowledge, imposes a requirement like this on an employee?
A I'm not sure without reading it.
Q And I'm not going to put you to that task right now unless you know exactly where you'd read.
A No.
Q No? Okay. With respect to the old policy, I had asked you whether the shipyard had developed it with input from legal counsel, and you didn't know. I have the same question now with respect to the new policy. Was that policy implemented with input from legal counsel?
A No.

Q Was there a reason why nobody went to counsel for help in understanding either the operating manual or the regulations or the terms of the collective bargaining agreement?
A I don't know there was a particular reason. We just worked it out in the HR office.
Q Is it a situation where it -- just nobody thought to do it, or was it a situation where the possibility was raised and then people decided not to do it?
A It wasn't the latter. It was an issue of we would just typically work these things out in the HR office, and the management.
Q I'm going to show you what I'll have marked as Exhibit 17. This, I think, I saw in your binder.
(Exhibit Number 17 marked for identification.)
Q Have you seen Exhibit 17 before?
A Only in connection with preparing for this.
Q All right.
A Recently, a day or two ago.
Q Okay. That's fair. And am I correct that Exhibit 17 -- a copy of that is in the binder of materials you brought today?
A That's correct.
Q So you have only reviewed Exhibit 17 for purposes of preparing to testify today?

BY MR. SCARAMASTRA:
Q Having walked through a couple of documents, I want to now go to the subject that I indicated we were headed towards, which is old policy versus new policy. What's kind of different between the two?
I gather under the old policy there might have been some high pay for work in the rain, but you don't know whether any such high pay was ever paid. Is that a fair summary of the truth?
A I don't know for a fact what was paid for that rain.
Q Okay. Is this policy, regarding high pay for work in the rain any different under the new policy than it was under the old?
A Well, under the new policy, it doesn't require rain, so meaning if they're working on the unprotected scaffolding they're receiving high pay if it's not raining.
Q Right. And you're talking about the leading edge workers there?
A Correct.
Q What about the workers who are not on the leading edge that are working on the scaffolding in the rain, under the new policy, do they get high pay?
A If the scaffolding was complete, they wouldn't get high pay in the rain.
Q When you say "complete" --

Q I recognize somebody else is going to talk to us about fall protection, so I don't need you to go into all of the details, but do you have an understanding of, generally speaking, what are the circumstances when fall protection devices are deemed to be capable of being properly used?
A In a general way? I mean, primarily, the anchor point has to be accessible and above you. And in the case of the shipwrights that are erecting scaffolding, that's rarely able to happen.
Q Okay. All right. Even as of today's date, shipwrights, as I understand it, are rarely able to hook into a proper anchor point for fall protection?
A Correct, that's my understanding.
Q Is the majority of the time shipwrights spend on staging, but not on the leading edge, work for which high pay is being paid under the new policy?
A I don't know because I don't know when they finish each layer. Mr. Winkler can better answer that.
Q Okay. And when you say, "finish each layer," each ring up of the staging?
A Correct, each level of staging.
Q And you referred to in Exhibit 18 that high pay wouldn't be paid where flooring and safety rails are installed?
A Correct.

A Correct.
Q And Mr. Winkler would know?
A I would think so, yes.
Q Very well. A few minutes ago I asked you in the context of the old policy whether the shipyard had any policies or documents or instructions that define what constitutes steady rain that would justify high pay, remember that?
A I do.
Q I have the same question with respect to the new policy. Has the shipyard provided any guidelines or instruction to management or to its employees regarding what constitutes steady rain for purposes of receiving high pay?
A Not that I know of.
Q How is the determination made that the rain is such that high pay is called for?
A I don't know.
Q Who would make that decision under the new policy?
A The second level in the shop. In this case, in the shipwrights.
Q And currently, who would the second level supervisor be?
A I don't know.
Q Is that Mr. Whitcher by any chance?
A It could be Mr. Whitcher.
Q At the time of the grievance was the second level

particular trade would qualify for high pay or --
A Yes, it was.
Q And how did the shipyard arrive at this determination that only a condition unusually severe for the particular trade involved warranted high pay?
A I don't know.
Q If you turn to Exhibit 13 -- you can keep 14 in front of you. I have 13 here. This is excerpts from the OPM manual, right?
A It is.
Q And if you turn to page 2, and that's Section S8-7(c); you with me so far?
A I am.
Q This part of Section S8-7 is one you are pretty familiar with?
A It is.
Q If you look five lines down, there is a sentence and it reads: "Exposure to a hazard, physical hardship, or working condition of an unusually severe nature listed in appendix J is not taken into consideration in the job-grading process, and additional pay for exposure to these conditions is provided only through the environmental differentials authorized by this section." Did I read that right?
A You did.

Q Were you familiar with the language I just read, and was the shipyard generally familiar with the language I just read at the time Exhibit 4 was prepared?

A I wasn't involved at the time Exhibit 4 was prepared, so I don't know what was considered then.

Q Did the shipyard, at some point, conclude that the statement I read earlier from Exhibit 4 was, in fact, not accurate?

MR. FATOUROS: Objection; there's no basis in the record for that question. It assumes facts not in evidence or testimony not in evidence. Go ahead.

THE WITNESS: Okay. I can only answer on my knowledge. So when I was involved in looking into the shipwright grievance, I didn't find anything that supported the conclusion that because they were shipwrights, they shouldn't be entitled to that hazard pay.

Q All right. And did you, in fact, read the provision I just read from?

A Yes.

Q Exhibit 13? Okay. Did that play a role in the recommendations that you made in Exhibit 11?

A It did.

Q Did you have any discussions with anybody else in management about the provision in Exhibit 13 we just

read?
A I talked about the case in general, and my conclusions with my supervisor in the human resources office.
Q Who was that?
A Her name was Joene Lott.
Q How do you spell Ms. Lott's name?
A J-o-e-n-e, L-o-t-t. And then, also, with Ms. Tallman and Mr. Winkler.
Q Okay. And can you describe what you recall of your conversation with Ms. Lott about Exhibit 13's provisions that we just quoted?
A With regard to that particular point?
Q Yes.
A That -- you know, that I hadn't found anything, and this wasn't the only thing I looked at to support a conclusion that we could blanketly say shipwrights aren't entitled to high pay because they're shipwrights.
Q You mentioned not finding anything that supported that. Did you find other sources of information that tended to agree with what we just read in Exhibit 13?
A I did.
Q What else did you find?
A Well, I did some case law research, and, you know, some grievance decisions, arbitrations, FLRA and comp general, just to get a feel for what was going on out there in

this kind of a case. So I relied on that too. I couldn't tell you what the cases were or anything.
Q I was going to ask you, did you document what you found in the cases in any way?
A I may have at the time, but I don't -- those records were left behind in HRO and have since, as far as I've been told, been cleaned up. I don't know if they exist.
Q When you say "cleaned up," meaning?
A Periodically purge their files after two to three years.
Q Okay. Would it have been your practice to have printed copies of the comptroller or arbitration or other decisions, court decisions that you had found and thought were relevant?
A Some of them. My practice would be to look at a lot, and print one or two that were on the most point.
Q And how did you find those decisions? Did you use a legal research computer database or something else.
A Yeah, I used a computer database cyberFEDS, I believe, was what we had at the time.
Q Ms. Barnes' memo that's Exhibit -- 4 goes through considerable amount of discussion of what's involved in the assemble or disassembly of staging. I am taking, from some of your earlier testimony, that it would be better to ask Mr. Winkler about the accuracy of the -- for example, noting that each level of the staging is

they're in their helmets and respirators and gear, to where they can't even see what their footing is.

So certain trades have particular types of tasks that enhance the danger.

Q Okay. So those are, I guess in my view at least -- I appreciate you walking me through that. That would be an instance where the work conditions are materially different, at least in the shipyard's view, from typical work assembling or disassembling staging?

A Correct, very different.

Q Can you think of circumstances where there aren't those differences, where members of other shops receive high pay for work on staging or incomplete staging where shipwrights in Shop 64 do not?

A No. In fact, I believe other workers cannot be on incomplete staging.

Q At this stage in the shipyard's history, are there any instructions, policies, guidance documents, other records that try to identify circumstances under which high pay should be paid for workers other than Shop 64 shipwrights?

MR. FATOUROS: Objection to the form of the question.

THE WITNESS: I don't really understand the question.

Melissa J. Watkins & Associates, Inc.
Certified Court Reporters

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181

June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Lynnette Neimi, Vol II
Date Taken: March 10, 2005

This letter is to advise you of the following:

______ Signature was waived. The original transcript is being served upon you at this time for filing.

__X___ Deponent has completed reading and signing. The original transcript and correction sheet is being served upon you at this time for filing.

__X___ A copy of the deponent's corrections are enclosed for your reference.

______ No corrections were returned by the deponent.

______ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

______ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey

cc: Mr. Thomas B. Fatouros