# Mark Winkler deposition transcript excerpts, Part 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON HANBERG, et al. | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

MARK WINKLER

Thursday, March 10, 2005

why he's asserting an objection and nothing seems to happen, sometimes that's what's going on. Okay?
A Okay.
Q Let's start with a little getting to know you phase. What is your current job position?
A I'm a superintendent overseeing the blasters and painters in Shop 71 in Puget Sound Naval Shipyard.
Q How long have you been doing that?
A About a year and a month in that capacity.
Q What were you doing before that?
A Numerous positions. If you want to go through the history, I started in the shipyard in 1980, came in as a work study. Went in the shipwright apprenticeship, started in 1981. 1985, I made shipwright mechanic. From 1985 to 1990, I think I was the shipwright foreman on the waterfront. I was a foreman till, I think it was 1996, when I became shipwright general foreman overseeing all shipwrights for Shop 64. 1999, I think I became senior process manager over Shops 57, 64 and 71. It was numerous trades. I don't know if you want to hear all the various trades. And subsequently, after that, I became painter superintendent in Shop 71 a year ago.
Q Is the move to this current position a promotion?
A Yes.
Q So I don't want to go through all of those positions. I

want to just capture the ones really from right before the grievance was filed during the period for which we're seeking high pay, forward. So it sounds like your job changed in 1996 from a foreman--
A I think --
Q --to the general foreman?
A Yes.
Q Supervising the other foremen?
A Absolutely.
Q Can you tell me what that general foreman position entailed? And then we'll work forward to the present.
A I was responsible for all processes, all costs and schedules, all hiring, firing, removing. I basically was the person directly in charge of roughly a hundred plus people, i.e., the people that, one, held the shipwright trade designator or were loaned in to help or assist the shipwrights during that time period.
Q So did you oversee all of the first level foreman and supervisors in Shop 64?
A Just shipwrights.
Q Just the shipwright foreman?
A Yes.
Q Okay. Gotcha. And then that changes?
A About 1999, I think, is when I oversaw all general foremen and all foremen throughout all three of the

shops.
Q Okay. That was 71, 64 and--
A And 57.
Q --57. All right. And you were in that position until about a year and a half ago?
A Yes.
Q And now what additional responsibilities have you taken on in your current position?
A My current position?
Q Yes.
A I oversee a lot of safety organizations, groups within the shipyard. I'm part of the superintendent association. I primarily don't have a whole lot of affiliation with the shipwrights in this particular stage and junction anymore.
Q Who do you currently report to?
A Captain Mazzone.
Q Okay. And in your prior position before that, who did you report to?
A Mary Jane Tallman.
Q So that's from '99 till about a year and a half ago?
A Yes.
Q Okay. And from '96 to '99, who did you report to?
A Mary Jane Tallman.
Q Okay. Did they add a level?

A Yes.
Q A layer in '99?
A Yes.
Q I see. And promoted you into that?
A Yes.
Q I'm going to show you what's been marked as Exhibit 1. Have you seen Exhibit 1 before?
A I think I've seen a lot of the same situation. I thought it was a little bit longer, the one I'd seen, but, yes.
Q All right. And if you turn to page 4, and it's captioned up at the top, "Matters for Examination." Are you with me?
A Yep.
Q Matter number 3 reads: "All aspects of the Shipyard's high pay policy for high work including the development, implementation of the policy and the method of calculating the amount of back pay awarded pursuant to the Shipyard's January 18, 2000 employee grievance decision. This specifically includes the substance, veracity, and accuracy of the statements related to the policy made in the declaration of Mark Winkler, Lynette Niemi, Mary Jane Tallman, and Rodney J. Whitcher, submitted to the Court in the above-captioned action."
My understanding is that you are going to be providing testimony concerning matters reasonably

the persons that continually stood in for me whatever endeavor I may be doing.
Q So let's do a little sleuthing and see if we can narrow the range of possibility for this.
I gather you played some roll in the resolution of the shipwrights' high pay grievance that was brought in 1999?
A Yes.
Q Okay. Can you tell me, in general terms, what your role was?
A Basically, from start to finish, to negotiate with the union on the settlement agreement on how we were going to go settle the grievance that was brought forward by the shipwrights.
Q Okay. What role did you play before the grievance decision was issued?
A I was the shipwright general process general foreman.
Q I'm sorry. What role did you play in the grievance resolution process, before the decision was issued?
A We got into discussions on how we were going to go settle that. Primarily, it was I got with Lynnette Niemi. She was primarily assigned to kind of go look at the work in progress, look at the regulations. I was the go-between; any issues, questions, things for her.
I also had conversations with the union on how we

were going to go about trying to settle this particular grievance. So even before it was signed, there was quite a bit of dialogue; one, between myself and the union; and, two, myself and Lynnette Niemi who was kind of taking a look at it as a third party.

Q So Ms. Niemi's role was sort of to figure out what the regulations and contract, things like that required and to understand what the shipwrights' job responsibilities were?

A Yes.

MR. FATOUROS: Objection; misstates former testimony.

Q Did I misstate your testimony in any way?

A I didn't hear you misstate it.

Q Okay. What was that?

A Too fast.

MR. FATOUROS: I think everything you said was accurate. I don't think he said any of those things. But it's all very accurate, coupled together with what Lynnette had to say.

Q Okay. Then your role -- let me make sure I understand, was, I think you put it, to negotiate with the union on resolution of the grievance? That was part of your role?

A Some of the particulars in how we were going to go settle the thing, I was in contact with the union.

months of my time.
Q Let's walk through Exhibit 17, then we'll come back to the process a little more.
A Okay.
Q I asked Ms. Niemi about paragraph 2, which indicates that, "shop 64 pays shipwrights environmental high pay for operating or working from the basket of a JLG or manlift." Do you see that?
A Yes.
Q I understand that that is the result of an arbitration decision; is that correct?
A I don't know.
Q You don't know? Okay. It indicates that it's been in effect since 1985. What happened in 1985 to bring this into effect?
A I remember that, I don't know why, but roughly around that particular time, some employees -- one received some back pay for operation of JLGs and then, at that particular stage of the junction, anybody that was, one, operating or, one, in the basket got high pay anytime they were working out of the JLGs.
Q Let's go to paragraph 4. It says, "When erecting staging inside a slope tank for the first ring of the staging or until level footing is established." Do you see that?
A Mm-hm (answers affirmatively).

Q It says that's been in effect for about two years. Do you see that?
A Yes.
Q What brought about that change?
A I'm sure it had to do with a lot of work at that particular stage of the junction and clarification of the union agreement. As we went through processes in here, we continually were asked by the employees on the definitions of what was in the union contract. And this went on for years on trying to get some clarifications on what the intent of those particular paragraphs in the union contract were. So I would imagine that came out of the agreement; that we felt that that was another justification for the unsure footing situation that it talks about in the union contract. Speculation, but that's what I would say.
Q Okay. Paragraph 5 says that Shop 64 pays shipwrights environmental high pay when working on staging in extreme weather conditions at the supervisor's discretion. Did I read that correctly?
A Yes, sir.
Q Is that statement true?
A Yes, sir.
Q And what's meant by, "extreme weather conditions"?
A That was, like it says before, the supervisor's

discretion on what we felt primarily that had to do with wind, rain -- excessive rain and wind. Of course, in this area, sometimes you get rain all the time, so more had to do with the combination of rain and wind. And then possibly, if there was any snow on those particular situations. So those were kind of some examples that we went through at that particular stage.

Q Who went through at that particular stage?

A Like I stated before, the clarification of which was actually identified in the union contract. When I took over as shipwright general foreman, there was questions about the intent of or some of examples of when high pay would have been paid.

Q That's back in 1996?

A I think that's when I made general foreman.

Q Did you make or anyone else under your command or that you were reporting to document these decisions that were being made about where high pay should be paid and where not?

A Not that I'm aware of. This appears to be an example of trying to put some of that stuff together so that we could get some additional clarification for the supervisors out there on the waterfront.

Q You sort of gave me a description of what you thought extreme weather conditions would mean.

A Mm-hm (answers affirmatively).
Q I gather that by the end it was possibly a combination of wind and rain?
A Mm-hm (answers affirmatively).
Q Right?
A Yes.
Q Rain alone without more would not qualify as an extreme weather condition?
A Depend on how much rain.
Q And that's what I was getting at. So just the fact that it's raining isn't enough to warrant high pay under this policy, right?
A No.
Q It had to be some amount of rain. Did you come up with some objective measurement of how much rain would qualify as an extreme weather condition?
A No.
Q How did you expect supervisors to know how much was enough?
A Get with the employee, come to a mutual agreement on what they felt was excessive. I didn't appear to get to the -- if it's raining three inches an hour is a time period where we felt we wanted to go. I didn't want to get to that level of detail. It was more of a, Hey, let's sit down. If we need some additional

clarification, then you get myself involved to come out and take a look at the situation.
Q Is the supervisor being referred to when you mention supervisor discretion, the general foreman or the foreman at the first level?
A Foreman.
Q So in '96 that would have been you?
A Depends.
Q I goofed. Is it the first level supervisors--
A Yes.
Q --who had that discretion?
A Yes.
Q And were there any cases where first line supervisors came to you to consult with you about whether the weather conditions justified high pay?
A Yes.
Q Can you describe the circumstances where that happened?
A I remember some situations of disagreements between the employees and the supervisors on what they felt it was. So I would go out, take a -- do an evaluation on that particular thing. I can honestly say most of the time I erred on the employee side with regards to why didn't we pay him high pay because of conditions that were out there.
Q About how many times during the time you were the general

foreman in Shop 64 were issues about weather conditions
brought to your attention?
A Maybe half a dozen.
Q Okay. And do you remember which supervisors brought
those issues, those questions, to your attention about
whether high pay was warranted for weather conditions?
A I don't remember the specific supervisors, no.
Q Do you remember any specific employees who were involved
on the other side of the issue?
A No.
Q Do you remember any of the specific conditions that were
at issue in any of those approximately half dozen times
you had a meeting about whether the weather warranted
high pay?
A I remember most of the time I got involved it had to do
with excessive wind associated with rain. I remember
some had to do with snow; snow and ice.
Q Okay. Well, with snow and ice, was there ever a time
when you said, No, that is not an extreme weather
condition; that does not justify high pay?
A No, I don't remember that. In fact, I remember actually
shutting down operations because of the conditions.
Q And then with the wind, I was going to ask you sort of
the same thing. In evaluating the wind, did you have --
let me call it a wind meter, wind sock?

A No.
Q So you didn't have some objective way of measuring the velocity of the wind?
A Other than at the shipyard at 20 miles an hour, most aerial work platforms and cranes are shut down, so that's kind of our indicator that if it's a severe enough wind to shut those particular operations down. But by building staging, you could be in a situation where the wind wasn't affecting you whatsoever.
So it's not a catchall for those because you could be building inside a building; you could be building on the other side of a building. So it wasn't a general, at 20 miles an hour we're going to shut down all these particular operations, as far as wind staging.
Q How would you go about determining if the wind was severe enough that you had to go shut down?
A Just by going out and looking at the specific job and where they were working.
Q What were you looking for?
A Looking to see the effect on the wind, as far as, was it pushing me around; kind of where it was coming from; how high the people were off the ground. A lot of different factors that I would take a look at; visibility. That was probably a lot of the issues that I dealt with is because when the wind and rain combined, it really

affected the visibility of the employees as far as -- of course, hand-eye coordination is crucial to that particular thing.

Q I would think. And then, at the end of this memo that's written under your name, it says: "These are the situations where shipwrights are currently being given high pay. All of these situations require second level approval of high pay conditions." At the time this memo was created, would that second level approval have come from you for Shop 64?

A Yeah. At that particular time we were -- there was no what we would call codification that -- how do I put this? There was issues in the shipyard at that time. It had to do with overall environmental pay. I think my light bulb just went off on why this was initiated.

There was some practices in the shipyard that the supervisors were paying environmental pay; could be any type of environmental pay. And they found some fraudulent issues in the shipyard of supervisors paying employees environmental pay for things that they didn't actually do. And, if I'm not mistaken, I'd have to go validate, but my light bulb is going off. I have a feeling this has to do with you had to have some type of validation that that particular person did work because they found issues of fraud where supervisors were paying

remember the talk of it, extensively.
Q All right. I just want to walk you through a few paragraphs, and what I'm going to -- the general thing I'm trying to get at is whether you agree with that description of the assembly and disassembly of staging. In other words, staging that's not complete is accurately depicted in Exhibit 4.
So let's start with paragraph 5. And it starts by saying: "The nature of the Shipwright trade is such that high work is a given, but the policies, procedures and safety practices that have been established are considered to have adequately alleviated the hazards of the work. By following the established guidelines, Shipwrights build safe staging as they go. Each level is to be stabilized before they proceed on to construct the next level. To stabilize, each level is to be "planked" and secured with wire, thereby providing stable footing." Have I read paragraph 5 correctly?
A Mm-hm (answers affirmatively).
Q That's yes?
A Yes.
Q Is it true that each level of staging is planked and that the planks are fastened to the frame with wire before proceeding to the next level?
A Not a hundred percent.

Q Okay. About what percentage of the time do shipwrights actually create a stable floor by wiring planks to a level of incomplete staging before going to the next level?
A Depending on the staging, if you're looking for an overall average, it would be small. Most of the time they move the planks as they go up. But if the staging to be built requires a planking and lifeline of that particular level as they go up, they might lifeline wire that level as they go up. It really depends on the staging and the use of that particular staging.
So I would say if you're asking a percentage of how many times that's happens, it's probably less than ten percent on a high staging. But there is multiple different types of staging that are built throughout the ship.
Q But less than 10 percent of the time, would each level be planked and secured with wire before moving to the next level, as a general rule across the shipyard?
A Yes, in that situation.
Q So paragraph 7, then, goes on to say that devices and mechanisms that are used, that are considered to adequately alleviate the hazards are, planking the staging, wiring enforcement, and using a JLG to lift materials. A harness and a lifeline can be used, but are

floor that's planked to create a work area?
A Probably anywhere from two feet wide to 13 feet wide.
Q Is it common to have a two-foot wide work surface on the final?
A No.
Q That would be in a situation, I take it, where there was something about how the vessel was protruding and you couldn't --
A General rule is four foot for a working platform, but in some situations you don't have four feet, so you give them the most that you can for that particular situation.
Q Are there any rules about where the safety rail or lifeline has to be placed? At what heights it has to be placed around the work platform?
A Yes.
Q What are the rules?
A General rules are from, usually, 21 for the lower rail, 42 for the upper rail or for the work platform, is the general rule of thumb.
Q For the planks that are being used by the shipwrights for temporary platforms, what's the width of the planks that are typically used for that purpose?
A One foot wide.
Q And how many are typically used side-by-side to establish a temporary work surface?

A Two.
Q So you've got a 24-foot wide surface?
A Yes.
Q Are those two planks fastened together in any way, as a general rule?
A Required, yes. Are they, no.
Q Does the shipyard take any action to discipline employees who don't fasten them together?
A Not that I'm aware of.
Q And then my understanding is that when a level is complete, those planks are moved up to the next level to continue construction more often than not. Is my understanding correct?
A I'd say half and half. Sometimes additional planks are brought up from below or those are moved up because people subsequently either stand on those particular areas to pass material up. Or if you're in this particular situation as you've identified here that the JLGs use, then those planks would be moved up because the means of getting the material up is mechanical.
Q These planks, are they metal planks or wooden or some other substance?
A Could be wood, could be metal -- steel or aluminum.
Q And what are the lengths that are typically used? We talked width. What's the length?

A In our aluminum plankings, we've got anywhere up, I think to 16 feet is kind of the general, usually 8s, 12s, 16s. In our -- we've got eight-footers primarily with our system staging, and wood planking could be at any level, or, excuse me, any length.

Q Okay. Let's go to paragraph 8 of Exhibit 4. And in it, Ms. Barnes writes, "In order to assess the staging first hand, I went to Dry Dock 5 and observed how staging is constructed." She goes on to write, "The staging was very solid, the frame was held in place with large clamps, preventing sway or shaking." Let's stop there.

Is that typical of the temporary planking that's used that it's held in place with large clamps to prevent sway or shaking?

A Not planks, but it doesn't say planks.

Q I'm sorry -- with. I misread, I'm sorry.

The next sentence, "The planking is constructed of metal with 3 planks side by side creating a footing 3 to 4 feet wide, and it was wired to the frame to prevent slipping." That's where I wanted to stop.

Is that the typical way that temporary work surfaces are constructed for shipwrights to use during building or disassembly of staging?

A For shipwrights to use?

Q Right.

of the grievance, and I know someone else is going to come and talk in some more detail, I just want your general understanding of this. Okay? But at the time you were involved in the grievance, were the shipwrights typically tied into the structure of the staging?
A No.
Q Is that something that's the case now?
A No.
Q Typically, shipwrights still don't tie into the framing of the staging?
A No.
Q How about other anchorage points?
A Yes.
Q And were they tying into anchorage points, typically, back then, aside from the staging itself?
A We had started experimenting with it. It was a process that we were trying to evaluate when I first took over. And we were trying to see in how many areas we could. We're making an asserted effort to try to reduce the hazard to employees.
Q When you were coming up with the back pay award amount, what assumptions, if any, did you make concerning the availability or use of fall protection by shipwrights who are not on the leading edge?
A We were going to subsequently -- in the future we were

the primary person that I worked with.
Q Okay. And did you work with Mr. Aiken on the grievance before the January 18, 2000, decision came down?
A Yes.
Q Tell me what your work with Mr. Aiken before the grievance came down entailed.
A If I remember right, we were trying to come up with a means of, one, identifying all the applicable people; two, how we would go about coming up with a fair and equitable estimate on how to settle it, i.e., how much high pay these people would actually be entitled to; and then work through a lot of the -- a lot of the details of high pay, overtime, and stuff like that, as part of my calculations in there. So it was kind of a back and forth thing that went on for a number of months.
Q Okay. And about how many meetings did you have with Mr. Aiken before the 2000 employment grievance came down?
A Before?
Q Yes.
MR. FATOUROS: Just for clarification, when you say, "the grievance," you mean the grievance decision, correct?
MR. SCARAMASTRA: I thought I said that. But, yes, the grievance decision.
THE WITNESS: I wouldn't even be able to guess

on that, sir.
Q Let's at least pin it down to range. More than 20?
A I would say it was less than 20.
Q Less than 10?
A No.
Q More than 10, less than 20?
A Yeah, that's an estimate.
Q Okay. Where did these meetings take place?
A Let's see, probably the Ocun Loft.
Q The what?
A The place that we call the Ocun Loft. It was an employee muster area, supervisory area.
Q Can you spell that for the court reporter?
A I knew you were going to ask me that.
Q There has to be a spelling test.
A I'm going to -- O-c-u-n.
Q Loft?
A Yes, L-o-f-t.
Q Okay.
A It was an area that I met with my supervisors. Probably my office, which was in building 457. And probably another office building 851, I imagine.
Q And then, after that, did you just -- were these telephonic meetings, any of them or all in person?
A Probably most all in person.

Q Okay. Did you play any role in the actual investigation of the grievance? You've talked about negotiations, but did you play any role in investigating the facts of the grievance?
A No, I don't think so.
Q Who did that?
A I would imagine Lynnette. She was primarily the, I guess, what I consider the resident expert on where we were heading with that.
Q Let me hand you what's been marked as Exhibit 11, and ask you if you've seen that before.
A Doesn't ring a bell, but there's a lot of information in here.
Q Right. Ms. Niemi testified earlier that she was the person who drafted this. Was the union given a copy of Exhibit 11 at any point during the grievance process?
A I don't know.
Q Did they have any input into the preparation of Exhibit 11?
A Don't know.
Q And among the references is reference C, which mentions discussions with what Ms. Niemi said were you, the subject matter expert, Mr. Winkler. About how many meetings did you have with Ms. Niemi about the grievance?
A I don't remember too many meetings with her. My -- like

I said before, was primarily going out and showing her the actual work in execution, so she would -- she would contact me. I would go out and show her some of the multi-various things that go on in the shipwright trade when she was doing, I guess what I consider the investigation or the analysis of what the shipwrights do. So I don't remember having a whole lot of meetings, other than she would call me and say, I need to go take a look at this. So I showed her what was going on out at the waterfront.
Q Did you and Ms. Niemi meet together with Mr. Aiken at any point during the course of the grievance?
A I don't remember meeting with the two of them.
Q Did you attend the grievance meeting that took place on May 20, 1999?
A Grievance meeting?
Q Yes.
A I don't remember that, but --
Q I'll show you Exhibit 3, which has been -- earlier witnesses testified are notes of the meeting. And you look at the top and it indicates the attendees. I think you'll agree with me that your name does not come up.
A True.
Q Why is it that you didn't attend the May 20, 1999, meeting?

other words, notes of meetings?
A No.
Q We're going to turn to the numerical assessments that you reached in just a minute. But first, how did you come up with these numerical ratings or assessments initially?
A Took the cover page of the grievance. I think I sat down with the union, went through everybody on that list, started putting a numerical assessment based on who we felt were the people that were doing the leading edge work -- that we felt were doing the leading edge work more than the other ones. So if --
Q Okay. Before we go further, why don't I show you what we'll have marked as the next exhibit.
(Exhibit Number 22 marked for identification.)
Q This will be Exhibit 22. Is Exhibit 22 what you were referring to just a minute ago? The pages you pulled from the grievance?
A Yes.
Q Are these then the numbers or initial numerical assessments that appear there next to the names?
A Yes.
Q Okay.
A That was the first crack.
Q First crack at it? You can tell from this? Okay. Now, before we go too far, let's take the first name up here,

David J. Hurn.
A Yes.
Q There are actually three different numbers. There's a "1" in a circle, then there is a "2" in a circle, and then there's a "4" without a circle. Can you tell me what each of those figures represent?
A Okay. The first one was two different opinions on Mr. Hurn and what we felt his rating as far as being in a high pay situation.
Q So one person opined that he should get a one and another person opined he should get a two?
A Yes.
Q Who were the people who provided these opinions regarding the various shipwrights?
A I'm thinking this was between Mr. Aiken and myself. It was the first initial crack.
Q And why do you think that?
A Because I'm almost positive -- well, let me read my declaration just a second. I'm sure I met with Mr. Aiken first before I sat down with the supervisors. But I better refresh my memory.
MR. SCARAMASTRA: Exhibit 2 is right in that pile. Let's go off the record.
(Discussion held off the record.)
MR. SCARAMASTRA: Okay. Let's go back on the

record.
Q You checked your declaration?
A Yes.
Q Okay.
A And it says that I met with Mr. Aiken first when I started this numerical assessment.
Q Okay. Which of these two figures represents your number? The one or the two?
A I don't -- I don't know.
Q And whose handwriting appears here? Whose handwriting is the one with the circle around it next to Mr. Hurn's name?
A I think it's mine.
Q Okay. And same with the two with the circle around it?
A Yes.
Q How about the four that's not circled?
A I think that's mine, also.
Q Did you make all of these three numbers at about the same time?
A No.
Q Tell me when you made the first two sets of numbers. I assume those two were made about the same time?
A Yes.
Q The one and the two?
A Yes.

Q About when did you make those?
A It would be one of the very first get-togethers we had once we came to the idea of the concept of the formula. As far as the actual date, I couldn't provide that.
Q Okay. And then how much later in time did you write down the four that appears next to Mr. Hurn's name?
A I think that was significantly later, because the first initial thing didn't quite work the way we were anticipating, so we regrouped.
Q Tell me what the four represents.
A The four represents, in an eight-hour period, how many hours that we felt that Mr. Hurn would have been in a high pay situation.
Q And so do the one and two also represent estimates of the number of hours in an eight hour day that were spent in high work?
A No. Our first initial thing was we were trying to rate them. One being a person that's spent a lot of time -- we kind of went in reverse. We were trying to say, okay, a number one is a person that probably does a lot of high work. A two is almost a lot, three...
So we tried that first. Figured that wasn't going to be the way we needed to do this. We needed to regroup. So that's when we regrouped and came up with this other one.

Q I see.
A You understand?
Q So a one would have been the highest level of high work under this initial system?
A Yes.
Q What was the lowest rate?
A Zero, I think -- or five. Excuse me.
Q One to five?
A Yeah.
Q Would five basically represent little to no high work?
A Yes.
Q Under the new ranking system, what did the rankings run from? I assume from zero, for zero hours per day, theoretically?
A Yes.
Q Did you actually rate anyone at zero?
A Yes.
Q What was the highest ranking you gave anyone. I'll tell you the highest I've seen is a five. Does that correspond to your recollection?
A Yes, it corresponds to my recollection.
Q So the most hours that you credited a shipwright with doing was five hours of high pay per day?
A In a--
Q Per eight-hour day?

A In a high pay situation, yes.
Q When you came up with this initial assessment, how did you go about doing that?
A Like I said, we met with the union first, then we meant with every one of the supervisors that worked for me at that particular time to go over name-by-name, to -- I guess what I consider, help validate the information that would -- we had had.
Q When you went into that initial meeting, though, had you received any input from your foreman as to what each individual's ratings ought to be?
A I don't think so.
Q Okay. How did you come up with the numbers to give? And there were quite a number of people, right?
A Yes.
Q I think there were. I think, 99 signatories that you concluded, right?
A Yes.
Q And then you went through and found everyone else in Shop 64 as well, correct?
A And other shops.
Q Okay. So well over a hundred people?
A Mm-hm (answers affirmatively).
Q How is it that you, on your own, came up with ratings for each one of these over 100 people?

A I didn't. Myself and Mr. Aiken did.
Q And presumably you went into that meeting with Mr. Aiken with some notion of where people ought to fall in the--
A Oh, yeah.
Q --one to five on either way?
A Absolutely.
Q Okay. What inputs of data did you have to come up with those initial ratings that you had in mind?
A Personal observation.
Q Just personal observation? Okay.
A Yes.
Q When you were -- sorry. This was when you were the processing foreman?
A Process general foreman.
Q Process general foreman?
A Mm-hm (answers affirmatively).
Q Is that an office job?
A Nope.
Q So you're out on the deck?
A (Witness shakes head affirmatively.)
MR. FATOUROS: You have to answer audibly.
THE WITNESS: Yes.
Q Do have you a workstation that you mobilize out of every day?
A Yes.

Q Where is that?
A Building 457.
Q Building 457. And this is when you're the process general foreman?
A Yeah.
Q And so it's not a full-blown office? Is it sort of like a cubbyhole or what do you have?
A It's a full-blown office similar to what's out here.
Q Okay. You do have an office. I'm sorry, I asked you if it was an office job. I apologize.
So you had an office. About what percentage of your day was spent in the office?
A No more than 20 percent.
Q View of the dry docks from there?
A Yes. Well, a dry dock.
Q A dry dock. Okay. Then the rest of your time was spent walking the floors and watching what was going on; is that fair?
A Yes.
Q So based on those, sort of, observations, you came up with these initial numerical assessments that you took to discuss with Mr. Aiken; is that right?
A I didn't take them with me. We sat down together. That's why you're seeing two different numbers, his and my opinions.

Q Okay. You're being literal and that's fine. This is a -- we've got to be a little literal. But in other words, you had a set of numbers sort of roughed out in your head that when you met with Mr. Aiken you talked to him about, and those just came from your general walking about, observing operations at the yard; is that right?

MR. FATOUROS: Objection; foundation.

THE WITNESS: I didn't go in with literal numbers because I couldn't keep track of that many numbers. We went down one-by-one. And based on my personal observations, this is what I came up. I didn't have -- I didn't have a pre-conceived notion on each individual person.

Q I understand now. Okay. Thank you.

What was the basis for topping out the number of hours per eight-hour day of high work at five?

A We felt that five was the absolute most we felt a person, on an average, could be in a high pay situation in an eight-hour day. And I want to emphasize, average. Because the building of staging is a portion of the shipwright job. And during those evolutions, there is lots of jobs that they do on a daily basis that doesn't warrant any high pay.

So when we were talking about those particular things and personal observations of, one, being a shipwright;

and, two, seeing what goes on in a shipwright. By the time you muster in the morning, do your safety briefs, do your job interactive brief, take a break in the morning, quit for lunch, i.e., go wash up, get cleaned up, go through your briefs in the afternoon, take a break in the afternoon, and shut down at the end of the day, at least a certain amount before quitting time so you could get cleaned up and things, it was a pretty generous observation based upon an eight-hour day.

Q So the eight-hour day you have in mind includes the lunch break?

A No. But you shut down prior to or you leave the job site prior to the lunch break to clean up.

Q And did you have some figure in mind for time spent leaving the job site for lunch and returning to the job site from lunch in mind?

A Well, generally the rule is you couldn't be in the muster area any more than 10 minutes prior to lunch. You tried to leave 10 to 15 minutes from the particular job site to go get cleaned up prior to going to lunch. But you were, 99 percent of the time, in that particular area that they muster prior to the commencement of lunch, which could be -- which could be a mile away, depending on the individuals and where they work.

Q So the answer is you didn't have a specific number in

mind for the time spent going to lunch and coming back to lunch?
A No. We don't condone the fact that they come back at 11:00 and hang out in the shack, but we try and afford them a reasonable amount of time to clean up.
Q Did you come up with calculations of any of the other time where they were punched in but not directly performing work?
A No.
Q Who came up with or proposed the five hour upper limit on number of hours per day average high pay?
A I would probably say it was me.
Q Okay. And you obviously presented it to Mr. Aiken, or did you present that to Mr. Aiken?
A I don't ever remember presenting it to him as we were going to have an upper limit. It just -- when we went through this thing, this is what we came up with. I don't remember actually saying, We're not going to pay anybody more than five, but --
Q After you met with Mr. Aiken and came up with Exhibit 22, did you present this to anyone in shipyard management before going further down the road towards coming up with a high pay calculation?
A Probably not this exhibit, no.
Q That would have taken place later in the process?

A Yeah.
Q Why don't you put that aside. We'll come back to it.
What I would suggest, because I know there is a bunch of different calculations, you might want to keep in a separate pile because I'm going to come back and ask you to walk me through the different numbers.
A Okay.
Q I gather that one of the first things you did as part of this process was coming up with the number of days, workdays in the claim period?
A No.
MR. FATOUROS: Objection; foundation.
Q You did not? Did you at some point come up with the number of workdays in the period for which you were going to make a back pay award?
A No. It was the formula -- at that particular time we hadn't -- I don't think we got actual number of days.
Q All right. What I will do then, since that wasn't the answer I was expecting -- bear with me one more minute. I apologize. Why don't I show you what I'll have marked as the exhibit next in order.
(Exhibit Number 23 marked for identification.)
Q Can you tell me what Exhibit 23 is?
A This appears to be another work sheet that we were developing for the numerical assessment of the

the date it was agreed.
Q Number of workdays for the individual during the claim period, right? Okay. The claim period meaning 15 days prior to the grievance up until issuance of the grievance decision.
A Yes, the signing of it. Yes.
Q So for example, for Randolf Abbott, he would have been on record with 105 workdays for which a high pay award was going to be made? Do I have that right?
A He probably was in a pay situation 105 days between -- what was it? April and January.
Q So then what you would do, that third column typewritten under "Total Hours," that's what you get for Randolf Abbott, it's 315. That's what you get when you multiply three, the hours per day, times 105, the number of days?
A Yes.
Q So you get 315 hours of high pay?
A Yes.
Q Now, I want to turn back to the question, and that's why I had a little surprise. At some point I gather somebody did a calculation to figure out the number of workdays for which each shipwright was going to receive high pay.
A Yes.
Q Wasn't the starting point of that to come up with the total number of working days in the claim period itself?