# Mark Winkler deposition transcript excerpts, Part 2

A Yes. Whenever we -- I would imagine, we would have had to know when the signing was going to be and how far we were going to go back on it.
Q Right. Did you, at some point, calculate the number of workdays between the date 15 days prior to the grievance and the January 18, 2000, grievance decision?
A Yes.
Q Okay. Now, let me show you what we'll have marked as the next exhibit.
(Exhibit Number 25 marked for identification.)
Q What was Exhibit 25 used for? I know that there is handwriting in that upper left-hand corner.
A I don't have a clue.
Q Okay. Here was my surmise, and maybe this is something you want to quickly confirm off the record.
A Off the record?
Q We can do that in a second.
It looks to me, like somebody at some point determined that there were 202 workdays between the date 15 days prior to the grievance filing and the grievance decision. Does that ring a bell with you?
A It doesn't ring a bell with me. I mean, I could go count them out, but it could have been.
Q All right. Well, let's hold that 202 in mind. If you want to check with counsel and see if they've got an

subject to that.
Q So three or four crews?
A No, one crew. Three or four individuals on that crew are primarily assigned to the docking crew.
Q Okay.
A Are you talking about my period? I hope.
Q Yes.
A Yes.
Q And then everybody else, their primary duties would be the staging? Assembling and disassembly of staging?
A Yes.
Q Okay. Now you can put Mr. Whitcher's declaration aside. And I want to go back to yours. In fact, I'll take it. Let's go to paragraph 8. I think that's where we were.
The last sentence begins, on page number 62, goes to next page, says: "After the union and I completed this," this referring to initial numerical assessment, "I met with my foremen and went over the list, name by name, to verify our numerical assessment." Do you see that?
A Mm-hm (answers affirmatively).
Q That's a yes?
A Yes, sorry.
Q And I'll try to keep those questions to a minimum.
At this initial meeting to go over the list and verify the numerical assessment, did you or the other

foremen rely on any documents?
A No.
Q Did you meet with the foremen as a whole in one big group session, or did you have individual meetings with various foremen, or did you do it some other way?
A It was a group of the foremen. All of them pretty much together except for I had to meet independently with the back shift guy because he wasn't in on that particular time. But it was day shift supervisors that I was responsible for.
Q Was there a single meeting to do this or several meetings?
A I only remember one long meeting.
Q Okay. The record won't reflect this, but you stretched out the word long quite a bit. How long was this meeting? And I don't need it down to the minute.
A It took, I'd say, in excess of two hours to go through name-by-name, and there was quite a dialogue between the supervisors.
Q Would you describe there as being a fair amount of disagreement over the proper assessments for individuals?
A Some individuals. I mean, it wasn't a huge disparity. It was, no, he's a three. No, he's a four. No, she's two. No, she's a three. Conversations like that based on the supervisors' observations.

Q About when did this meeting take place?
A I would say later in '99, I would imagine.
Q Do you remember about when, or where this meeting took place?
A In the Ocun Loft. That's where most of -- I know that.
Q Where all the work gets done?
A It was a place to go where you wouldn't be distracted.
Q Okay. Were there any union personnel or representatives at that meeting?
A I don't honestly remember if Joe was there or not.
Q Was Lynnette Niemi at this meeting?
A No.
Q Was Ms. Tallman at the meeting?
A No.
Q Aside from the foremen and you, were there any other management representatives at the meeting?
A No.
Q You go on to say, "a lot of changes were made," in paragraph 8 of your declaration. And is that accurate?
A Yeah.
Q When you say a lot of changes, do you have in mind what percentage of the ratings changed as a result of this meeting?
A I wouldn't say any more than 20 percent. There were just a lot of numbers that changed. I mean, I could go figure

it out because there is objective evidence right there on what Joe and I thought it was versus what the supervisors thought it was. So I'm guessing at 20 percent.
Q The final set of uncircled numbers that appear on Exhibit 22, did you write those numbers down before or after this meeting with your foremen?
A It looks like after.
Q When you went into the meeting with the foremen, were you still going with the initial system of rating, one being the highest--
A No.
Q --amount of high work?
A No.
Q Okay. So you'd come up with the other system?
A Yeah, because the other one wasn't going where we wanted it to.
Q Right. Did you present the foremen with initial ratings in the format that you ended up adopting? That is to say the number of hours per day of high work?
A Yeah. I'm pretty sure we said how many hours do you think this particular individual spent in the high pay situation.
Q By that point, did you have each shipwright or most of the shipwrights ranked under the new system? The five being the most high work per day on average and zero

Q Rod. Did he do this in Excel or in spreadsheet format? Do you know?
A Yes.
Q Let me show you the next exhibit, which will be Exhibit 27.
(Exhibit Number 27 marked for identification.)
MR. SCARAMASTRA: Off the record.
(Exhibit Number 28 marked for identification.)
MR. SCARAMASTRA: Okay. Let's go on.
Q We've handed you Exhibits 27 and 28.
A Okay.
Q Can you tell me what these two exhibits contain?
A Looked like they've got a numerical assessment and I would imagine the number of days in that particular period. I should say for 27 and 28 they look pretty close to the same to me, but I'd have to go validate that. But they're just in different forms based on, it looks like 28 is based upon badge number, so we sorted it by badge number. 27 -- I don't know why it's sorted that particular way, but --
Q That was going to be my next question. So 27 is sorted by badge number?
A Yes.
Q And Exhibit 28 is a mystery to you?
A It's a mystery to me.

Q All right. Well, you can only do so much. And as long as I'm here, just so we've got a complete set -- is this a computer print out here?
A No.
(Discussion held off the record)
(Exhibit Number 29 marked for identification.)
Q Now we have Exhibit 29 in front of you. That appears to be yet another compilation of the data concerning hours of high work, right?
A Yes.
Q Now, a question was asked off the record and might as well get it on the record.
The last question I asked you about the preparation was who prepared or who input them. Now let me ask you, these are records that were manually input by someone, correct?
A Yes.
Q And into a computer?
A Yes.
Q Can you tell from looking at them essentially which Exhibit -- let's take 22, 23, 24, 27, 28, and 29.
MR. FATOUROS: Maybe we can go through those numbers again.
MR. SCARAMASTRA: 22, 23, 24, 27, 28, 29. So 25 and 26 are not in the running right now.

Q I gather the document created first was Exhibit 22?
A Yep.
Q Okay. What was the next document to be created?
A I would venture to say 23.
Q And then what was the next document that was created?
A Either one of these two.
Q 27 or 28?
A Yeah.
Q And then what came after 27, slash, 28?
A Looks like 24. And then 29, I would venture to say.
MR. SCARAMASTRA: Let's give you Exhibit 30.
(Exhibit Number 30 marked for identification.)
Q And let's have you put that in the order where you think it should go.
A I think at the end.
Q I'm feeling very good about this exercise because that was my guess, so we're -- either I'm very clever or you're very wrong.
A Ouch.
Q What I want to do is quickly walk through a couple of representatives and see how, if at all, the numerical ratings change. I thought the best representatives would be my own clients.
A Okay.
Q So why don't we start with Don Baker. If you can tell me

Q He's a four, again?
A Yep.
Q And then go to Exhibit 29.
A Appears to be a four.
Q So, again, constant throughout.
Let's take Walt Jaynes. He's in each of these.
A Okay. Walt Jaynes, Walk Jaynes --
MR. FATOUROS: Walt Jaynes?
MR. SCARAMASTRA: Yes.
THE WITNESS: Can you find him?
Q On Exhibit 23?
A 22.
Q I'm sorry, yes, I can find him. He's on page 2 about six names down. And he's a four, right?
A Yep.
Q So now we're going to Exhibit 23. And I will tell you there that Mr. Jaynes is on page J2512, almost halfway down.
A Four.
Q He's four, again. Want to take a look at 24?
A Four.
Q Four, again. Exhibit 27.
A I don't have it.
Q Oh, excuse me, sorry. He should be on --
MR. HOLCOMB: Page 1, he's about ten down.

MR. SCARAMASTRA: Yep.

THE WITNESS: Four.

Q He's a four, again. And so let's take 28 and 29, if you would. On 28 Mr. Jaynes is on page 3, 2516, three down from the top.

A Four.

Q Okay. And go ahead and take 29, if you would.

A Four.

Q Four, again. Okay. I'm going to stop this exercise. So far each of these three individuals, their ratings have held constant through the process. Would you agree with me?

A Mm-hm (answers affirmatively).

Q I will just represent to you, and you need not take my word for it, but I have found the same for Mr. Peterson, who is ranked five on Exhibits 23, 24, 27 and 29, and Mr. Scott, who is consistently ranked a four throughout the course of this.

Does this consistency with the five named plaintiffs surprise you, given the statement in the declaration that a lot of changes were made to the numerical assessments?

A No, because they were some of the better employees and recognized as that. We didn't seem to have an issue with the people that we felt were doing some of that work. It was the lower end of the rating system.

A Yes.
Q So you would give that person a numerical assessment of one, correct? Or, no, you wouldn't -- out of eight hours, it's one-fifth of eight. I'm sorry.
A Yes.
Q So let's -- it's not going to be a nice fraction, so never mind. Let's change it a little and make it a nice fraction. Let's say you concluded that it was a quarter of the time rather than a fifth of the time.
A Okay.
Q Then you would give that person a numerical rate of two, correct? Two hours out of an eight-hour day?
A No, because they're not in -- they're not in a high pay situation for eight hours.
Q Okay. If you concluded that a particular employee spent a quarter of an average eight-hour day.
A We didn't go quarters, but --
Q Okay. Then let's forget about it.
If you concluded that someone had spent two hours, out of an eight-hour day, on average, doing high work, you'd rank them a two?
A Yes.
Q Okay. Now, you're going to multiply that two by something else to come up with hours of high pay?
A Yes.

Q I want to talk about that something else. And that's your next sentence. You add up his hours based on workdays--
A Yes.
Q --subtract days of leave, and added his overtime.
A Yes.
Q Is that what you say in paragraph 9?
A Yes.
Q Okay. How did you come up with the hours based on workdays?
A I would imagine we went from the agreed upon date of 14 or 15 days prior to the grievance and to the date it was signed.
Q And this is where we started -- we left off before. You then calculated that -- somewhere, someone must have done a calculation of the number of workdays in the claim period, right?
A Yes.
Q Okay. And then you're going to subtract leave days from that number?
A Yes.
Q Right. And then add overtime hours back in; is that right?
A Yes.
Q Okay. But first, you could convert overtime hours to

days; is that right?
A Yes.
Q And did you convert hours to days by dividing by eight?
A Yes.
Q Okay. What I'd like you to do is keep handy Exhibits 27, or pull Exhibits 27, 28, 29, and 24.
A Okay.
Q And I'm going to give you two more that I think -
A Can I take a break?
Q Yes, absolutely.

(Recess taken from 3:19 to 3:26 p.m.)

(Exhibit Number 31 marked for identification.)

E X A M I N A T I O N - (Continuing)

BY MR. SCARAMASTRA:
Q Looks like Exhibit 31 is another one of the charts that you prepared?
MR. HOLCOMB: Is this 31, now?
MR. SCARAMASTRA: Yes.
THE WITNESS: Yes.
Q That's a yes?
A Yes.
Q Do you want to do the same exercise with these and sort of put them in what you think is roughly chronological order?

A Way out here.
Q Okay. So you've got 31 is the last one.
A Mm-hm (answers affirmatively).
Q What's the next in time?
A I don't think I have a next in time.
Q Is there an Exhibit 30?
MR. NOEL: Well, would it still be the same order as before?
MR. SCARAMASTRA: There is actually some different ones at the beginning, so they sort of overlap a bit.
Q Okay. So we're going --
A 31 is after 30, I think.
Q All right. So starting with 27 --
A Okay.
Q And we're going to work our way through to 31.
Is there anything you need to fill in the gaps? Looked to me like Exhibit 24 might be dated around the same time as Exhibit 28, and 29. Can you tell?
MR. HOLCOMB: Isn't the time sequence the same as the numerical sequence?
MR. SCARAMASTRA: No, it's not. Oh, if it were that easy, Byron.
THE WITNESS: Okay.
Q So you have them in order. It's 27, 28, 24, 29, 30, and

31; is that right?
A Yep.
Q Good. That's the order I got. And let's just walk through and take one example. And let's take Walt Jaynes.
A Again?
Q Yes. And what I want to now do is have you walk through the process of Mr. Jaynes' hours changing as you perform this calculation you were describing before the break. So if you turn to Exhibit 27, and Mr. Jaynes is on the first page.
A Yep.
Q You have a total hours calculation for him of 796; is that right?
A Yep.
Q Then you go to Exhibit 28 and he has the same calculation. You've got to go to page 2516. See him up there at the top?
MR. HOLCOMB: I read 796 on 27.
MR. SCARAMASTRA: 796?
MR. HOLCOMB: My number 27 says 796 for Walter Jaynes.
MR. SCARAMASTRA: Did I not say that?
THE WITNESS: No, that's what you said.
MR. SCARAMASTRA: Okay.

Q And there's Jay Neitzel and there's a handwritten figure of minus 26. Do you know what that represents?
A This one?
Q On Exhibit 38. Are you on Exhibit 38?
A Yes.
Q Then I goofed. I'm sorry. Can I see that for a second? I transposed my numbers. I apologize. All right. Never mind.
(Discussion held off the record.)
MR. SCARAMASTRA: What I thought was Exhibit 38 -- I'll have this marked as Exhibit 40.
(Exhibit Number 40 marked for identification.)
Q Okay. Now, you've got another chart there with 3/23/99 to 1/18/00.
A Yes.
Q That's the claim period. And Exhibit 40 is collecting the amount of overtime hours and leave hours for a series of employees, right?
A Yes, that appears so.
Q Okay. For Jay Neitzel, it's got 12.7 overtime hours and 222 leave hours. Do you see that?
A Yes.
Q And then there is handwritten, next to it, minus 26. Do you know what that represents?
MR. SCARAMASTRA: You're not writing on it, are

you?
THE WITNESS: Yes.
MR. SCARAMASTRA: Oh, boy. Go ahead and write on it. We'll make another one. You're using a blue pen?
THE WITNESS: Yeah.
MR. SCARAMASTRA: Go ahead and mark in blue.
THE WITNESS: Sorry.
MR. SCARAMASTRA: No, it's okay. We'll know we need a clean exhibit later.
Q Is it a conversion from hours to days, as best as you can tell?
A Yes.
Q Okay. Let's turn to Exhibit 38. Whose handwriting is this?
A Speculation?
Q Go ahead?
A Jim Jazuk.
Q And that's the name that appears in the upper right-hand corner?
A I don't know that for sure.
Q Is he one of your foremen?
A Could have been at this time.
Q All right. Now, let's take an example here, Greg Corey, two down.
A Okay.

Q Someone has written 245 combined hours of leave and written next to it 30.6 days. Do you see that?
A Yep.
Q And then it's put 383 hours of overtime and has written 47.8 days.
A Okay.
Q Then appears to have taken 47.8 and subtracted 30.6 to get 17, which is circled and put next to Mr. Corey's name.
A Okay.
Q Would you agree with me that that's what happened?
A Yes.
Q Is this the system that was being used to adjust the work hours for each shipwright?
A Yes.
Q Can you show me Exhibit 39? Can you tell me what Exhibit 39 is?
A No clue.
Q All right. Okay. So that process didn't help us much. Let's come at it a different way. I'm going to give you some records for Mr. Scott.
MR. FATOUROS: Can we put some of these exhibits away?
MR. SCARAMASTRA: You may.
THE WITNESS: All of them?

MR. SCARAMASTRA: No, you're probably going to need some of them back in a minute. Take the ones, that first set, and throw them aside. Keep the charts.

MR. FATOUROS: When you say, the first set --

MR. SCARAMASTRA: You're fine. That's right. You did good.

Q Let's do this process for Paul and see if we can get a handle on it. I'm going to show you what I'll have marked as Exhibits 41 and 42.

(Exhibit Numbers 41 and 42 marked for identification.)

Q Okay. You have those two exhibits in front of you?

A Yes.

Q Can you tell me what Exhibit 41 is?

A It appears to be a report that was taken out of a program to look at how much leave Mr. Scott used from -- let's say, 2/1/99 to 1/7/2000.

Q Now, looks like someone crossed out the entries for February 1999 down there, right?

A Yeah.

Q Okay. And then there is a number of eights that follow, and one three. And then next to it in handwriting it says "163 leave." Is that the sum total of the number of hours of leave that appears on Exhibit 41?

A Can I take your word for it?

Q I've done the math. I think it is. Would that be consistent with the process you were using?
A Okay. Yes.
Q If you look at Exhibit 42, what does that show you? Let me rephrase it. What does the printed portion of this show?
A Are you talking about this portion?
Q Correct. The left few columns, as opposed to the handwriting.
A It appears to be a job order that the individual was working on specific days.
Q And I'll note that the dates all appear to take place in that claim period, beginning 15 days before the grievance to the date of the grievance decision. Does that appear to be the case? Actually, with the exception of sometime towards the end?
A Okay. Yes.
Q Now, somebody, looks like, tallied in handwriting his overtime hours, Mr. Scott's overtime hours, and came up with 577.9. Is that what happened?
A Appears that.
Q Then it says, handwriting below, "232 prior OT." What does that refer to?
A I don't know.
Q Somebody subtracted that from 577.9 and got 345. Does

that appear to be what happened?
A Yes.
Q Then there is 163 with the word, "leave" written next to it?
A Mm-hm (answers affirmatively).
Q Do you see that? Is that a yes?
A Yes.
Q And does that come from Exhibit 41?
A Speculation. But yeah, I would imagine.
Q The same figure --
A It's the same number.
Q Okay. And then it looks like somebody subtracted 163 from 345 and got 183. Do you see that?
A Yes.
Q And then somebody divided 183 by eight and got 23 days. Is that right?
A Appears to be -- it's not quite there, but...
Q Just about.
A Okay.
Q Now, back in the series of documents we were looking at before, I'm going to show you Exhibit 33. Would you look at Mr. Scott's name. Can you find it on there?
A Yes, I do.
Q There is a handwritten number next to his name?
A Yes.

Q What is it?
A Plus 23.
Q Plus 23. That's the same number that is calculated on Exhibit 42, correct?
A Okay. Yes, sorry.
Q Okay. What was done with that plus 23 figure once it was computed?
A If I'm not mistaken, we went and assessed the same numerical number to the 23 days to come up with another number.
Q Okay. Why don't you take Exhibit 24. Mr. Scott's figures appear on the last page, about mid-way down the page.
A Okay.
Q What is the number of days in the claim period that's recorded for Mr. Scott?
A Appears to be 225.
Q Right. Does that include the 23 additional hours or days that were computed on Exhibits 41 and 42?
A I don't know.
Q If it did, then that would mean that the original number of days in the claim period was 202, right? 225 less the 23 days, correct?
A I don't know if there was 202 days. I don't know where you're going. But I guess if you subtracted 225 plus 23,

(Discussion held off the record.)
Q How did you convert overtime hours into days?
A Divided by eight, I would imagine.
Q Divide by eight, right?
A Yes.
Q In fact, that's exactly what you did or someone did in Exhibit 42, right? They came up with a net hours of 183 for Mr. Scott?
A Which number?
Q Exhibit 42?
A Okay.
Q They divided by eight hours per day and came up with a 23-day adjustment, right?
A Yes.
Q Okay. Now, let's just work backwards and take that 183 out. Okay? If you were going to add -- convert it to -- keep it in hours at 183 hours, and you wanted to make an adjustment to the total hours for Mr. Scott, you'd add that to 743 in Exhibit 29, right?
A I'm -- can I tell you what I did?
Q Sure.
A Everything was based on days.
Q I understand.
A So I tried to compute it back to days, an eight-hour day. Okay? So once I got it back to an eight-hour day, i.e.,

individuals, but we're running out of time, so let's move on to the next thing.

Let's take your declaration. Let's go to paragraph 7. The very last sentence of paragraph 7, reads: "Our decision was in the nature of a compromise in settlement of the union grievance." Do you see that?

MR. SEATON: Where is that? Paragraph 7?

MR. SCARAMASTRA: Paragraph 7, last sentence of paragraph 7.

THE WITNESS: Yes.

Q Why do you say that?

A When we were going through this process, we honestly felt that we were erring far on the extreme when we looked at the number of hours in a high pay situation for every employee. We also didn't go in and get real nitpicky with the training they were in; the subsequent times they could have been TDY or any other limiting factors. We limited it -- me and the union both communicated that this was erring very generously on the amount of hours that we felt they were in a high pay situation so that we could get this behind us and settle the grievance. That's what that is.

Q Did someone from you the union tell you they thought this was a generous proposal from management?

A Absolutely.

Q Who did?
A Mr. Aiken said it was generous to the employees, not the management. He felt it was a good win-win for the employees and was also communicating that with his union affiliates.
Q In paragraph 8, skip one sentence from what I just read. It says: "In essence we negotiated the decision with the union." Do you see that? Are you referring to the employment grievance decision?
A No. I'm referring to the concept of how we were going to go back and pay.
Q Okay. So you are not saying that the employment grievance decision that's Exhibit 18 was negotiated with the union?
A I wasn't -- I didn't negotiate it.
Q Okay.
A I don't have that...
Q All right. So you did not participate in any negotiations concerning the substance of the employee grievance decision or the terms that were written in it. Is that fair?
MR. FATOUROS: Objection; foundation.
MR. SCARAMASTRA: I'm actually laying foundation, so...
THE WITNESS: I worked on, I guess what you

consider, some of the -- how would you say that -- the essence of why it was settled. I worked on all the precursor things to the signature. So I guess I had part in it, but I wasn't the ultimate citing official.

Q So you worked on the formula and coming up with the inputs to the formula, correct?

A Yes.

Q You didn't actually participate in drafting the employment grievance decision, did you?

A What's the employment grievance decision?

Q Exhibit 18, that's signed by Ms. Tallman.

MR. FATOUROS: We don't have the record copy, but we have a copy of it.

MR. SCARAMASTRA: That's great. I'm just making sure I am, in fact, referring to the correct exhibit number.

Q You didn't participate in the drafting of Exhibit 18, did you?

A I didn't draft it, no.

Q You didn't participate in any discussions with union representatives about what the terms of Exhibit 18 would be, did you?

A None other than probably Number 2 in the award. There was some preliminary discussions.

Q About the decision to allow high pay for building and

dismantling staging?
A No. In reference to management will work at the union to develop a means.
Q I'm sorry, where? Would you put my nose right into where --
A Under "Awards," Section 2, where it says, "Management will work with the union to develop the means of determining the appropriate amount of back pay for each grievant."
Q Under Roman Numeral IV, section 2?
A Yes.
Q Okay. Are you identified as one of the individuals who was present at the May 20th grievance meeting?
A No.
Q Were you present for the signing of Exhibit 18 by any party to it?
A Is this Exhibit 18?
Q Exhibit 18. Were you present when Mr. Aiken signed Exhibit 18?
A Yes, I was.
Q And you were present in the room--
A Yes, I was.
Q --when Ms. Tallman signed it?
A Yes, I was.
Q Where was it signed?

A In her office.
Q Were there any discussions before it was signed or after it was signed?
A We met -- I remember Mr. Aiken leaving for a period of time to consult with the employees that had signed the grievance to get, I guess, nothing more than their perception on signing off this grievance. He went and spent what seemed like an hour, hour and a half, to go talk to employees that signed the back of this, asking if they felt it was a fair and equitable resolution settlement to the grievance, came back about, I'm thinking an hour afterwards, and stated that the employees wanted to settle the grievance and that he was signing. And so subsequently the signing took place.
Q Okay. Let me show you what I'll have marked as 43.
(Exhibit Number 43 marked for identification.)
Q Have you seen Exhibit 43 before?
A No, but it's what I think it was when I stated earlier, a decision that was agreed upon by -- things for high pay.
Q This is the settlement agreement, is it not?
A That's what it says at the top.
Q And it's signed by a member of the union, correct?
A Yep.
Q And by an A. Burton, for the employees. Do you see that?
A Yep.

Q And it refers to employees who are assigned to work inside main ballast tanks. This is a settlement agreement associated with a 1998 grievance by insulators in Shop 64, right?
A I don't know.
Q Obviously the shipyard knows how to prepare a settlement agreement when it wants because this is one, correct?
A That's what it says at the top.
Q Why didn't the shipyard draft a settlement agreement like Exhibit 43 to resolve the high pay grievance?
A I wasn't the deciding official on this one.
Q You don't know why?
A No.
MR. SEATON: Can we go off the record a second?
MR. SCARAMASTRA: Sure.
(Discussion held off the record.)
MR. SCARAMASTRA: Let's go back on the record.
Q Okay. I've been corrected. This settlement agreement does not concern Shop 64 insulators, but otherwise is what it purports to be, which is a settlement agreement.
Anything that you'd like to add given the discussion off the record?
A It appears to be a settlement agreement with the work that was going on in Code 350 -- I don't know if that's true -- which was a portion of the work. I don't know if

it goes on to talk about all the rest of the work that was going on in the shipyard, but it may. I haven't read this whole thing. But Mr. Burton was the Code 350 superintendent, so...
Q Okay. In paragraph 1 of your affidavit or declaration --
A Which one?
Q Your declaration, Exhibit 2.
A Okay.
Q Sorry.
Paragraph 11, I'm sorry. You write: "The union signed the management decision and decided not to seek binding arbitration." Do you see that?
A Yes.
Q Then you go on to say: "I believe this indicated the union was satisfied with management actions, and I also believe all of us were uncertain as to whether pay for high work by shipwrights is really required by law or regulation." Do you see that?
A Yes.
Q First of all, did you or anyone you know actually consult with legal counsel to find out if high work was required by law or regulation?
A I didn't.
Q Did anybody else alert you that they had done that?
A No.

Q Are you aware of anybody having done that?
A I think I know the shipwrights did.
Q Given that there was, as you described it, uncertainty on your part and on the management's part as to whether law or regulation required the payment of high pay, is there a reason why nobody went to legal counsel to find an answer?
A We don't usually go to law and counsel when answering -- or settling grievances.
Q Even when there is uncertainty as to what the law requires?
A It wasn't mine to go do. I had my own portion.
Q You go on to say that the fact that the union signed the management decision and elected not to seek binding arbitration indicated to you that the union was satisfied with management's actions. Do you see that?
A Yes.
Q Does the fact that an employee or union representative signs the resolution of a grievance always indicate to you satisfaction with management's actions?
A No, but he said personally.
Q What's that?
A No. But Mr. Aiken said it personally that he thought it was a good thing for the employees, and subsequently he told me that his union officials, i.e., the president,

thought it was a good decision on the employees' behalf.
Q Is there a reason why you didn't refer to that in your declaration here?
A No. But there is probably a bunch of details I didn't put in.
Q Okay. So you have seen instances, I take it, where an employee and union official sign a grievance decision even though they're not satisfied with the outcome; have you not?
MR. FATOUROS: Objection; foundation.
MR. SCARAMASTRA: That was a, "have you seen," so that was to get to the foundation.
MR. FATOUROS: I believe you preference it with, "you have seen."
MR. SCARAMASTRA: Fair point.
Q Have you seen -- that's more leading, but -- have you seen instances where employees or union officials sign grievance decisions where it didn't reflect satisfaction with the outcome?
A Well, usually the union, at least in my thing, doesn't sign on those particular things. It's a decision made by management as to the outcome, usually on a grievance. So this was -- this was -- I guess in my opinion, different, because the union signed. And I guess I got the impression, and also the union said they agreed with the

settlement decision.
Q I'm going to show you what I'll have marked as the next two exhibits in order, 44 and 45.
(Exhibit Numbers 44 and 45, marked for identification.)
(Discussion held off the record.)
MR. SCARAMASTRA: Okay. Let's go on the record.
Q Exhibit 44 -- is that your signature on Line 36 of page 2?
A Yes, it is.
Q Okay. And this is denying a grievance that seeks environmental differential pay, correct? If you look at page 1, the text, the handwriting says: "I have been aggrieved in that I was not paid the appropriate amount of EDP for high work in Shop 64." Right?
A Yes.
Q So this is a denial of a claim for high pay?
A Yes.
Q Is it signed by the employee?
A Yes.
Q Is it signed by Mr. Aiken?
A Yes.
Q Is a box checked indicating a grievance is not resolved?
A I don't know. Can you point to me that one?

A I don't remember him saying he was going to go any further with it. He just said that between him and the employees and the union, they agreed to the settlement.
Q Did you condition the settlement high pay award on the union giving up any rights on behalf of its members to further high pay?
A I wouldn't know that.
Q Who would?
A I guess somebody that would understand by signing that. I -- you know, I didn't sign it. I was just part of the --
Q That would be a question for Ms. Tallman or someone else?
MR. FATOUROS: I'm objecting to this line of questioning. It calls for a legal conclusion. I believe that's where the confusion is coming for Mr. Winkler.
THE WITNESS: True. I don't know about all the legal --
Q I'm not asking for anything legal. I'm --
A You said legal -- you can't go any further.
Q But, in other words, leaving aside the legal stuff--
A Okay.
Q --or how it might have put in legalese, did Ms. Tallman or you or anyone else in your presence tell anybody from the union that a condition of the high pay award was that the union and the Shop 64 employees not pursue additional

high pay?
A No. We were just trying to resolve the issue with what we considered a fair settlement.
Q Okay. Thank you very much.
(Signature reserved.)
(Deposition concluded at 4:31 p.m.)

# Melissa J. Watkins & Associates, Inc.
## Certified Court Reporters

1001 Fourth Avenue Plaza, Suite 4400, Seattle, Washington 98154
Tel (206) 622-4044 - Fax (206) 622-4192
www.melissajwatkins.com

Seattle (206) 622-4044 - Tacoma (253) 272-2023 - Toll Free (800) 588-4181


June 9, 2005

To: MR. DONALD B. SCARAMASTRA
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939

Case Name: Jaynes, et al. v. The United States
Deposition of: Mark Winkler
Date Taken: March 10, 2005

This letter is to advise you of the following:

_______ Signature was waived. The original transcript is being served upon you at this time for filing.

_______ Deponent has completed reading and signing. The original correction sheet is being served upon you at this time for filing.

_______ A copy of the deponent's corrections are enclosed for your reference.

_______ No corrections were returned by the deponent.

__X____ Deponent did not complete reading and signing within thirty (30) days. Signature is considered waived. The original transcript is being served upon you at this time for filing. If any correction sheets are returned by the deponent in the future, copies will be distributed to attorneys ordering transcripts.

_______ Signature reserved. Original deposition transcript is now being filed upon you due to impending trial date. Any correction sheets returned by the witness will be immediately provided to your office.

Dawn Lindsey

cc: Mr. Thomas B. Fatouros