# In the United States Court of Federal Claims

No. 04-856C
Filed February 14, 2007
TO BE PUBLISHED

| | |
|---|---|
| WALTER JAYNES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Back pay, "high work," Environmental Differential Pay, "high pay," collective bargaining agreement, Back Pay Act, 5 U.S.C. § 5596, Prevailing Rate Systems Act, 5 U.S.C. § 5341 *et seq.*, Civil Service Reform Act of 1978, 5 U.S.C. 7101 *et seq.*, subject matter jurisdiction, effect of 1994 amendment to the Civil Service Reform Act of 1978, *bona fide* dispute, accord and satisfaction, proper subject matter, competent parties, meeting of the minds, consideration, plain meaning, ambiguity, doctrine of *contra proferentem* |

Donald B. Scaramastra and Jennifer A. Krebs, Garvey Schubert Barer, Seattle, Washington, for plaintiffs.

Steven M. Mager, Trial Attorney, Mark A. Melnick, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. John D. Noel, Senior Trial Attorney and Steven L. Seaton, Puget Sound Naval Shipyard, Bremerton, Washington, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court after a three-day trial held in Seattle, Washington, from November 6–8, 2006. The Court must determine whether the parties entered into an accord and satisfaction of the claims asserted by plaintiffs in this action. Plaintiffs' claims relate to (1) the criteria used by the Puget Sound Naval Shipyard (the "Shipyard") to determine the circumstances under which it would pay certain Environmental Differential Pay, and (2) plaintiffs' entitlement to back Environmental Differential Pay. Defendant argues that the Shipyard's January 18, 2000, resolution of an April 13, 1999, grievance relating to those issues brought by the Bremerton Metal Trades Counsel (the "BMTC") effected an accord and satisfaction of plaintiffs' claims. Rule 52 of the Rules of the United States Court of Federal Claims ("RCFC") governs "actions tried upon the facts," and provides that findings of fact may be "based on oral or documentary evidence . . . and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." RCFC 52(a). In order to determine the facts relating to the alleged

accord and satisfaction, the Court heard testimony from thirteen witnesses, including representatives of Shipyard management, union officials, and shipwrights who were affected by the resolution of the grievance.

## BACKGROUND[1]

### I. Procedural Background

The plaintiffs in this case are employees of the Shipyard located in Bremerton, Washington. On April 13, 1999, the BMTC, the exclusive representative of the shipwrights, filed a grievance on behalf of ninety-nine employees, including plaintiffs, demanding Environmental Differential Pay (an additional 25% of the shipwright's base salary, referred to in the grievance proceeding and this opinion as "high pay") for high work, as mandated by Article 10 and Appendix II of the BMTC Agreement (the collective bargaining agreement ("CBA") between the BMTC and the Shipyard), as well as by Office of Personnel Management ("OPM") regulations, 5 C.F.R. § 532.511 (2006) and 5 C.F.R. part 532, subpart E, appendix A (2006). (5 C.F.R. part 532, subpart E, appendix A is hereinafter referred to as "OPM Regulatory Appendix A" or "OPM Reg. App. A.")[2] On January 18, 2000, Barry Joe Aiken, a shipwright at the Shipyard and the Union Steward of Record for local 2317 of the BMTC, and Mary Jane Tallman, Superintendent of Shops 57, 64 (to which all shipwrights are assigned), and 71 at the Shipyard, signed a decision that resolved the grievance. Under that decision, the Shipyard agreed to pay shipwrights high pay prospectively for "building and dismantling staging beginning from the first level above the ground/deck" unless safety rails were installed or other fall protection devices could properly be used.[3] Joint exhibit admitted at trial ("JX") 009 at J0000707. The Shipyard also agreed to pay the shipwrights an amount representing back high pay owed each shipwright for the period beginning fifteen working days prior to the date on which the grievance was filed and ending January 18, 2000. The decision provided that "[m]anagement will work with the union to develop a means of determining the appropriate amount of back pay for each grievant." JX 009 at J0000708.

---

[1] The recitation of facts contained in the Background section constitutes the Court's principal findings of fact in accord with RCFC 52(a). Other findings of fact and rulings on questions of mixed fact and law are set out in the Analysis section at pages 11–24, *infra*.

[2] The relevant regulatory provisions defining high work have remained unchanged in all material respects since April 13, 1993, the earliest date of entitlement alleged in Count One of the third amended complaint.

[3] The first level generally started at five feet above the ground, deck, floor or roof, or from the bottom of a tank or pit. *See, e.g.*, Trial transcript ("Tr.") at 69:25–70:16, 495:14–18, 571:16–21, 593:24–594:1, 660:18–21. Hereinafter, references to the "ground" will also include the deck, floor, roof, and bottom of a tank or pit.

On April 14, 2000, fifty-six individual plaintiffs filed a complaint against the Secretary of the Navy, the Commander of Naval Sea Systems Command, the Commander of the Shipyard, the Superintendent of Shops 57, 64, and 71 (at the time, Ms. Tallman), and the Shipyard in the United States District Court for the Western District of Washington under the Back Pay Act, 5 U.S.C. § 5596 (2000). The plaintiffs sought review of the grievance decision's fifteen-working-day limit on the back pay awarded for high work allegedly performed prior to the filing of the grievance and a grant of class-wide[4] relief declaring an entitlement to six years' back pay with interest. *Jaynes v. Danzig*, No. C00-5221RJB (W.D. Wash. dismissed May 29, 2001), *aff'd*, *Jaynes v. Johnson*, 65 F. App'x 176 (9th Cir. 2003). The district court denied class certification on December 6, 2000. *See* Order Den. Pls.' Mot. to Certify Matter as Class Action, *Jaynes v. Danzig,* No. C00-5221RJB (W.D. Wash. Dec. 6, 2000). In March 2001, the defendants moved for dismissal for lack of subject-matter jurisdiction. The district court granted that motion. On July 9, 2001, plaintiffs appealed to the United States Court of Appeals for the Ninth Circuit, seeking review of the district court's orders denying class certification and dismissing the case on jurisdictional grounds. On May 22, 2003, the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction and remanded the case to the district court with instructions to transfer the case to the United States Court of Federal Claims. *See Jaynes*, 65 F. App'x at 178 (9th Cir. 2003).[5] Having affirmed the district court's decision to dismiss the case for lack of jurisdiction, the Ninth Circuit declined to review the order denying plaintiffs' motion for class certification. *Id.* at 180. The case was transferred to this court on May 18, 2004, pursuant to 28 U.S.C. § 1631 (2000).

Plaintiffs filed their complaint in the Court of Federal Claims on June 15, 2004, alleging that defendant, the United States, had failed to pay—and was continuing to fail to pay—high pay for high work as mandated by federal laws, regulations, and their CBA.[6]

---

[4] In the district court, plaintiffs requested certification of a class "generally to be composed of all Shipwrights and others authorized to receive High Pay while assigned as Shipwrights, including retired Shipwrights and those who have terminated employee status as Shipwrights while eligible for High Pay." Compl. ¶ 9, *Jaynes. v. Danzig*, No. C00-5221RJB (W.D. Wash. Apr. 14, 2000).

[5] The Ninth Circuit held that the district court lacked jurisdiction over plaintiffs' back pay claims because, among other things, the Back Pay Act was not an independent basis for district court jurisdiction, plaintiffs could not meet the requirements for mandamus jurisdiction under 28 U.S.C. § 1361, and plaintiffs could not establish jurisdiction under the Administrative Procedure Act because an adequate remedy was available in this court in the form of an action under the Back Pay Act based upon jurisdiction conferred by the Tucker Act. *See Jaynes*, 65 F. App'x at 178–79.

[6] Plaintiffs filed a motion for class certification contemporaneously with the original complaint, which the Court denied in an unpublished opinion on August 19, 2005. Plaintiffs filed a motion for reconsideration of the denial of class certification on September 2, 2005, which

Plaintiffs filed an amended complaint on July 14, 2004, asserting their claims in three counts. On August 13, 2004, defendant filed an answer to plaintiffs' amended complaint. On November 5, 2004, plaintiffs filed a motion for partial summary judgment on Count One of the amended complaint. Defendant filed a cross-motion for summary judgment and opposition to plaintiffs' motion for partial summary judgment on June 3, 2005. The Court denied plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment on December 7, 2005. *Jaynes v. United States*, 68 Fed. Cl. 747 (2005).

On March 20, 2006, plaintiffs filed a motion for leave to file a second amended complaint, and then, on March 31, 2006, filed a motion for leave to file a third amended complaint. On April 7, 2006, this Court denied as moot plaintiffs' motion for leave to file a second amended complaint and granted plaintiffs' motion for leave to file a third amended complaint. Plaintiffs filed their third amended complaint on April 7, 2006. At that point, there were seventy-two plaintiffs. On July 6, 2006, the Court ordered a separate trial on defendant's affirmative defense of accord and satisfaction. *See* RCFC 42(b). Defendant filed its answer to plaintiff's third amended complaint on August 21, 2006. On August 21, 2006, defendant filed its memorandum of contentions of fact and law ("Def.'s Memo.," docket entry 94), and on September 11, 2006, plaintiffs filed their memorandum of contentions of fact and law ("Pls.' Memo.," docket entry 102). In response to the Court's order of September 15, 2006, defendant filed a reply to plaintiffs' memorandum ("Def.'s Reply," docket entry 107) on October 6, 2006.

## II. High Work

Plaintiffs were employed and classified as shipwrights or were otherwise doing the work of shipwrights at the Shipyard. Third Am. Compl. ¶ 2. All shipwrights working at the Shipyard are assigned to Shop 64. Shop 64 also includes insulators, pattern makers, and plastics fabricators. Tr. at 482:9–11. The primary duties of shipwrights involve the erecting and dismantling of staging or scaffolding in and around naval ships in dry dock. *Id.* at 410:25–411:13. Plaintiffs contend that shipwrights regularly work under conditions and circumstances that would qualify as high work under Appendix II of the BMTC Agreement and OPM Regulatory Appendix A. *See, e.g.*, *id.* at 660:17–661:20.

Federal statute and regulations mandate that federal civilian workers, whose positions are covered by the Federal Wage System and who are paid on an hourly basis in accordance with a local prevailing-rate pay schedule, receive additional compensation, known as Environmental Differential Pay, when exposed to working conditions or hazards that fall within one of the categories determined by OPM. 5 U.S.C. § 5343(c)(4) (2000); 5 C.F.R. § 532.511; *see generally* Prevailing Rate Systems Act ("PRSA"), 5 U.S.C. §§ 5341–5349; 5 C.F.R. §§ 532.101–532.801 (2006). One such category is high work, which is defined by OPM Regulatory Appendix A, part I.2 and by Appendix II of the BMTC Agreement to include:

---

this Court denied January 5, 2006. *Jaynes v. United States*, 69 Fed. Cl. 450 (2006).

a. Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor or roof, or from the bottom of a tank or pit;

b. Working at a lesser height:

(1) If the footing is unsure or the structure is unstable; or

(2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or

(3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.[7]

The Back Pay Act provides, in relevant part:

> An employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee—
>
> (A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect—
>
> (i) an amount equal to all or any part of the pay, allowances, or differentials, as applicable[,] which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period . . . .

5 U.S.C. § 5596(b)(1) (2000). An "unjustified or unwarranted personnel action" includes "an act of omission (*i.e.*, failure to take an action or confer a benefit) that an appropriate authority subsequently determines, on the basis of substantive or procedural defects, to have been unjustified or unwarranted under applicable law . . . rule, regulation, or mandatory personnel policy established by an agency or through a collective bargaining agreement." 5 C.F.R. § 550.803 (2000). Unjustified or unwarranted personnel actions include pay actions. *Id.* The

[7] Work performed at or above thirty meters (100 feet) is not at issue in this case because the Shipyard's management had recognized its duty to pay a high work differential for work at such heights and had consistently done so. *See, e.g.*, Tr. at 47:10–11.

Act also provides that back pay is payable with interest. 5 U.S.C. § 5596(b)(2). "[I]n no case may pay, allowances, or differentials be granted under this section for a period beginning more than 6 years before the date of the filing of a timely appeal or, absent such filing, the date of the administrative determination." *Id.* §5596(b)(4).

The BMTC CBA became effective on October 1, 1987. Article 30 of the CBA sets forth the procedures for resolving employee and union grievances:

> For the purpose of this Article the written [BMTC] Agreement is defined as Article 01 through 39, and any Appendices and Addendums thereto. Except as provided for in the [Civil Service Reform] Act, the procedures specified in this Article are the exclusive procedures available to employees, the Employer and the Council for resolving grievances which fall within its coverage.

JX 001 § 3001(a). The Agreement's definition of a grievance includes any complaint by an employee, the Council, or the Shipyard concerning "[t]he effect or interpretation, or a claim of breach of this collective bargaining agreement" or "[a]ny claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* § 3001(c)(3).

Plaintiffs seek "back pay retroactive to six years prior to the date of the grievance less the 15 days back pay awarded by [Shipyard] management." Third Am. Compl. ¶ 58. It appears, therefore, that the period of alleged entitlement runs from April 13, 1993, until March 23, 1999 (the latter date being 15 working days prior to April 13, 1999, the date the grievance was filed).[8] Plaintiffs base their claim on: (1) the Government's failure to pay back pay for high work as defined in OPM Regulatory Appendix A, part I.2(b)(1) and (b)(2) "in violation of" the Back Pay Act, 5 U.S.C. § 5596, *see* Third Am. Compl., Count One; and (2) the Government's failure to pay for high work performed during adverse conditions in violation of Appendix II of the BMTC Agreement and OPM Regulatory Appendix A, part I.2(b)(3), *see* Third Am. Compl., Count Two. The amended complaint appears to assert the Back Pay Act claim based on failure to pay for high work as defined by (b)(1) and (b)(2) (Count One) as separate from the adverse conditions claim (Count Two), although both claims appear to seek back pay. Plaintiffs also seek a declaratory

[8] Although the third amended complaint alleges entitlement to high pay from April 13, 1993 until March 23, 1999, plaintiffs modified their class definition in this court to include "[a]ll persons who were assigned as shipwrights of Puget Sound Naval Shipyard from April 14, 1994 to the present" in part because "the controlling date for the purposes of the six year statute of limitations is April 14, 2000, the date of the filing of Plaintiffs' original class action in the [district court]." Pls.' Supplemental Br. in Support of Class Certification at 2 (docket entry 31, Jan. 7, 2005). Plaintiffs tendered the current version of the definition of the putative class during a November 22, 2004, status conference as part of a "Proposed Notice of Class Certification." *See Jaynes v. United States*, No. 04-856C, slip op. at 2 (Fed. Cl. Aug. 19, 2005) (docket entry 61, Opinion and Order denying class certification).

judgment and injunctive relief requiring Shipyard management to provide high pay in the future as required by law, regulation, and the BMTC Agreement. *See* Third Am. Compl., Count Three.[9]

## III. The Grievance

In late 1998 or early 1999, Mr. Aiken was working on bulkhead staging twenty-seven feet in the air on a rainy, windy day, when he decided "enough is enough. You know, I felt that this was of an unusually severe nature and that I was warranted High Pay."[10] Tr. at 32:21–33:7. Over the next four or five months, he spent between 300 and 500 hours preparing the grievance. His preparation included researching whether he had enough justification to demand high pay, both in arrears for high work he had previously done for which he had not received high pay and prospectively for high work he would perform in the future. *Id.* at 33:22–35:7, 46:15–18. In his research he discovered that, even though shipwrights had been working for the Shipyard in conditions that could merit high pay for the previous twenty-nine years, no high pay grievances had ever been filed. *Id.* at 36:6–11. In spite of the fact that no shipwright had previously complained about the lack of high pay, he determined that he and the other shipwrights were owed back high pay. *Id.* at 34:7–20.

Mr. Aiken decided to file an employee grievance with the Shipyard but, because he was the Union Steward, "I did not want to give the appearance that I was soliciting union activity on company time, on government time," so he enlisted David Hurm, a coworker and fellow shipwright, to collect other shipwrights' signatures on the grievance. *Id.* at 34:3–11. Ultimately, ninety-nine shipwrights signed the high pay grievance.[11] *Id.* at 35:24–36:1. The grievance was

---

[9] Regarding Count Three, the Court of Federal Claims lacks jurisdiction to grant such a declaratory judgment or injunctive relief on the facts alleged. *See Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994); *Marcinkowsky v. United States*, 44 Fed. Cl. 610, 613 (2000), *aff'd*, 206 F.3d 1419 (Fed. Cir. 2000).

[10] Mr. Aiken testified that his epiphany occurred on a "day similar to today. I was 27 feet in the air, winds coming in horizontally, the rains coming in horizontally . . . ." Tr. at 33:2–4. The Court got a first-hand view of the conditions a rainy, windy Washington day at the Shipyard could produce: the week of trial saw the end of the worst storm Seattle had experienced in recent memory. Monday, November 6, 2006, the day Mr. Aiken testified, was "the third rainiest day on record in the past 50 years." Mike Lewis, Amy Rolph, and Scott Gutierrez, *Rains Start With Vengeance: Man Dies; Hundreds Evacuate; Rivers to Swell 10 Feet Above Banks*, SEATTLE POST-INTELLIGENCER, Nov. 7, 2006, at A1, *available at* 2006 WLNR 19358489.

[11] The grievance was brought as an employee grievance rather than as an On Behalf Of ("OBO") grievance. Tr. at 202:14–17. In contrast to a regular employee grievance, an OBO grievance is "any grievance filed by a Council Representative to which the named employee(s) is not signatory and which is specific to the named employee(s)." JX 001 § 3012(a)(2). Lynnette Niemi, a human resource specialist at the Shipyard in 1999 and 2000, Tr. at 290:4–6, initially

filed on April 13, 1999. JX 004 at J0001056. According to his testimony, Mr. Aiken had, in January 1999, been promoted to apprentice instructor. Tr. at 198:9–20.[12]

Although he believed that the Shipyard owed shipwrights back high pay, Mr. Aiken was afraid the grievance would be denied should it go to arbitration. He believed that the shipwrights' case had two major weaknesses. The principal weakness was timeliness: no shipwright had ever raised the issue of high pay before, even though shipwrights had been working for the Shipyard in conditions that could merit high pay for the previous twenty-nine years. In addition, he thought it unlikely that the shipwrights would be able to present evidence of specific work they had done which would merit high pay. *Id.* at 57:11–58:11.

The union grievance went to "Step 2."[13] At Step 2, management must meet with the grievant(s) within ten working days of the receipt by the Shop Head of the grievance form, and must issue a written decision within fifteen working days of that meeting. JX 001 § 3003(b). The Shipyard management held a Step 2 meeting on May 20, 1999. Tr. at 91:12–13. Although each grievant had the right to participate according to the CBA, JX 001 § 3003(b), management thought it would be "inhumane punishment," JX 014, to deal with that many grievants individually and, in the end, Mr. Aiken agreed that only five or six grievants would be called to

---

thought the grievants had intended to file an OBO grievance, because she had never seen an employee grievance with "a whole bunch of signatories without a whole bunch of grievance forms." *Id.* at 296:9–11. But Mr. Aiken told her that he intended to file an employee grievance, *id.* at 202:15–17, 296:14–17, and the claims of the ninety-nine grievants were consolidated into a single grievance proceeding. *Id.* at 296:17–19.

[12] Plaintiffs attempted to discredit Mr. Aiken's testimony, based largely on (1) his memory of the date of his promotion (which plaintiffs contend is erroneous), (2) the fact that, after the grievance, he received a temporary promotion from Ms. Tallman, and (3) the fact that he received a significant award of high pay for a period in which he was working as an apprentice instructor, rather than as a shipwright. *See* Tr. at 738:10–739:15. However, Danny Haas, the head of the employee development division at the Shipyard at the time of Mr. Aiken's promotion, *id.* at 681:11–13, testified for the defendant that he had recommended Mr. Aiken for a promotion. When he made the recommendation, he was unaware of the grievance relating to high pay, and, although Shop 64 ultimately decided to promote Mr. Aiken, Mr. Haas testified that "I was the one who approached them about him filling the vacancy." *Id.* at 681:21–683:25. Plaintiffs admittedly "do not contend that there was an express quid pro quo." *Id.* at 738:15–16. They similarly fail to demonstrate that there was an implicit agreement; the Court found Mr. Aiken to be a credible witness, and has given commensurate weight to his testimony.

[13] At Step 2 the grievance is considered by a higher level of management than at Step 1. Step 2 contemplates the presentation of witnesses, and is the final step before the union may elect to pursue arbitration. Tr. at 293:22–294:4. In this case there was no decision at Step 1 because management missed certain Step 1 deadlines required by the CBA. *Id.* at 211:11–13.

testify. Tr. at 46:1–10. However, this was a "big grievance," *id.* at 484:19, and, on June 4, 1999, management asked for and was granted a six-month extension in which to issue a written decision. *Id.* at 91:19–23. During the pendency of the grievance, Ms. Tallman and Mr. Aiken had a "continual dialogue" about progress on resolving the grievance. *Id.* at 488:10–11. On November 10, 1999, Ms. Niemi, the human resource specialist, was given an approximately two-hour tour of the Shipyard staging area, where she observed the conditions under which shipwrights worked. *Id.* at 315:16–20, 336:13–14; JX 27 at J0008731. Based on her observations and research, Ms. Niemi wrote a memorandum recommending that the Shipyard pay high pay to shipwrights for any work done at the first level or higher above the ground. JX 027; Tr. at 300:11–301:1.

On November 16, 1999, Joseph L. Hamel, the BMTC chief steward, requested that the Shipyard issue its decision, JX 026, but on November 23, 1999, management asked for and received a further extension of one month. JX 029. When, on January 4, 2000, no decision was yet forthcoming, the BMTC filed a Council grievance,[14] complaining that the Shipyard had "failed to provide a written decision within the negotiated time frame" and had not requested an extension. JX 032; Tr. at 96:12–17. On Friday, January 14, 2000, Ms. Tallman called Mr. Aiken into her office, where she showed him a copy of the decision. Tr. at 67:8, 68:7–12. Mr. Aiken thought it would be "stupid not to accept" the grievance decision, *id.* at 69:6–7, but he told Ms. Tallman that he could not sign it until he showed it to other grievants. Mr. Aiken then left and took the decision with him. He discussed the decision with Mr. Hamel and with Mr. Hurm, both of whom told him to accept the proposal. *Id.* at 71:19–21, 73:23–74:3. On Tuesday, January 18, 2000, Mr. Aiken returned to Ms. Tallman's office, where both signed the "Employee Grievance Decision, Shipwright Highpay Grievance #05153-K." JX 009. While signing, Mr. Aiken told Ms. Tallman, "I'm glad this is finally over." Tr. at 74:13. After Mr. Aiken signed the decision, Ms. Tallman shook his hand and said, "It's settled. It's over. We done good." *Id.* at 494:20–22.

In the grievance decision, Ms. Tallman found that "[c]ertain work situations encountered by Shipwrights in erecting and dismantling staging do meet the criteria for 25% high pay in accordance with Article 10 and Appendix II of the BMTC Agreement and the Schedule of Environmental Differentials at 5 CFR 532, Subpart E, Appendix E [sic]." JX 009 at J0000707. The decision established that in the future shipwrights would receive high pay when: (1) building and dismantling staging beginning from the first level above the ground/deck unless flooring and safety rails are installed or fall protection devices can be properly used; and (2) building and dismantling hanging staging working from similar heights under similarly unguarded situations when fall protection devices cannot be properly used. *Id.* The decision limited the award of high pay to the period beginning fifteen working days prior to the filing on April 13, 1999 of the grievance (March 23, 1999) and ending on the date of the grievance decision (January 18, 2000). *Id.* at J0000708. According to Ms. Niemi, management limited the back pay award to fifteen

---

[14] A Council grievance is "a complaint which is not identifiable to a specific individual employee but is the result of an action by either party that significantly affects the provisions of [the CBA]." JX 001 § 3012(a)(1).

working days before the grievance was filed because, based on her research, she believed it was permissible to so limit the back pay, and recommended that the Shipyard do so. Tr. at 361:4–16. There had been no review of the grievance decision by the Shipyard's legal counsel. *Id.* at 498:13–14. Ms. Tallman signed the grievance decision first, then noticed there was no place for Mr. Aiken to sign. She called the administrative office and told them to prepare another copy with a line for Mr. Aiken's signature. *Id.* at 496:13–17.

After the grievance decision had been signed, shipwrights received news of the resolution of the grievance through different channels. Mr. Aiken called Mr. Hurm at home to tell him that each employee would be given $5,000 (which proved incorrect), and that the Shipyard would start paying high pay for work performed at or above the first level off the ground. *Id.* at 593:23–594:1. Paul Scott, a shipwright at the Shipyard and one of the grievants, learned that the grievance had been resolved from a co-worker and immediately called Mr. Aiken to ask about it. *Id.* at 667:22–668:5. According to Mr. Scott's testimony, Mr. Aiken refused to talk to him about the grievance decision. *Id.* at 668:12–13. Mr. Aiken did not respond to the many calls he received and, in fact, told management that he did not want to receive further calls from shipwrights regarding the grievance decision. *Id.* at 178:4–23.

The testimony at trial indicates that copies of the signed grievance decision were not distributed to the shipwrights. *See, e.g.*, *id.* at 274:2–10. In order for Mr. Scott to receive a copy of the decision, he unsuccessfully requested it from Mr. Aiken, from Mr. Hamel, and from the vice president of the BMTC. Finally he made a successful request to the president of the BMTC. It took him at least ten days from his first request to obtain a copy of the grievance decision. *Id.* at 668:16–670:25.

After signing the grievance decision on behalf of the BMTC, Mr. Aiken believed that the matter was settled. He testified that, if any shipwrights were unhappy with the decision, they could file another grievance "but it wouldn't have did [sic] them any good. . . . Because the grievance had been settled, that it was over, that it was finished, that it was done." *Id.* at 74:17–21. Ms. Tallman also believed that the grievance had been settled. *Id.* at 495:22–25. In response to shipwright inquiries, Mr. Hamel stated that the union maintained its position that the grievance had been settled. *Id.* at 276:6–9.

Beginning in late 1999, while Shipyard management was considering the grievance, Mark Winkler, who, at the time, was the Senior Process Manager for Shops 57, 64, and 71 at the Shipyard, worked with the BMTC to "come up with the proposed settlement to the grievants and how we were going to try and figure out the back pay situation once that was done." *Id.* at 402:7–10. After the grievance decision was signed, Mr. Winkler "followed up with comprising the rest of the back pay calculations that were agreed upon at the settlement of the grievance." *Id.* at 398:8–10. Mr. Winkler testified that he "didn't want to go give a blanket amount to each one of the shipwrights because some of the shipwrights did more high work than other shipwrights." *Id.* at 403:25–404:3. He initially assigned each shipwright a number between one and five, with one representing the maximum time performing high work and five representing the minimum time engaged in high work. *Id.* at 404:8–11. He abandoned that system as

unhelpful, *id.* at 404:16–20, and instead, with input from the shipwrights' supervisors, assigned each shipwright a number representing the average number of hours in an eight-hour day, to a maximum of five, *id.* at 408:18–20, that the shipwright performed high work. *Id.* at 405:19–23, 573:23–574:2. As they assigned hours to the shipwrights, Mr. Winkler and his associates had no clear definition in mind of what constituted high work, nor of exactly how many hours any individual had performed high work. Rather than reflecting the actual number of hours worked at a certain height, the numbering system represented the supervisors' impressions of how much high work was performed by shipwrights. *See, e.g.*, *id.* at 458:18–459:12. From Mr. Winkler's first to last set of estimates, the number of hours credited to most shipwrights stayed the same; two shipwrights' hours went up, while several others' went down. Plaintiffs' exhibit admitted at trial ("PX") 024.

On November 8, 2001, Mark Mascioli filed a grievance seeking back high pay. JX 037 at J0060717. Although he had temporarily been assigned to work in Shop 64, he was reassigned back to Shop 57 before the grievance was filed. PX 005. He heard that the shipwrights had received back high pay, but it took him some time to confirm that. *Id.* Mr. Mascioli's grievance was denied because it was not timely filed, so Dean Benton, the chief steward of the BMTC, spoke with Alva Roger Brown, the Shipyard's Production Resources Manager. Tr. at 547:2–6. Mr. Brown thought that, because Mr. Mascioli had been overlooked and was the only person who had performed high work during the relevant period as a shipwright in the Shipyard and had not received back high pay, it was only fair that he be paid. *Id.* at 547:21–548:4. Mr. Mascioli received back pay for 100 hours of high work, and the BMTC agreed "to make no additional claims for backpay in connection with the high pay grievance settlement of 18 January 2000." JX 038.

## ANALYSIS

### I. Jurisdiction

Like all federal courts, the Court of Federal Claims is a court of limited jurisdiction. *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). "[T]he jurisdiction of the Court of Federal Claims . . . is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *Id.* at 1461 (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Such consent to be sued "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). The Tucker Act states: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon . . . any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1) (2000). In order for this Court to have jurisdiction over plaintiffs' complaint, the Tucker Act requires that the plaintiffs identify an independent substantive right enforceable against the United States for money damages. *See Rosano v. United States*, 9 Cl. Ct. 137, 141 (Ct. Cl. 1985) (citing 28 U.S.C. § 1491).

The Back Pay Act, 5 U.S.C. § 5596, "does not, itself, provide a statutory basis for invoking this Court's jurisdiction." *Sacco v. United States*, 63 Fed. Cl. 424, 428 (2004) (citing *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983)). Rather, "[t]he Back Pay Act is merely derivative in application; it is not itself a jurisdictional statute." *Connolly*, 716 F.2d at 887. In order for this Court to have jurisdiction over plaintiffs' claims, "some provision of law other than the Back Pay Act must first mandate . . . money damages to an employee suffering an unjustified or unwarranted personnel action." *Sacco*, 63 Fed. Cl. at 428 (citing *Walker v. United States*, 11 Cl. Ct. 77, 80 (1986)).

In the present case, the Court's subject matter jurisdiction may be founded upon either plaintiffs' CBA or the PRSA, which mandate the payment of high pay when an employee does high work. *Bosco v. United States*, 931 F.2d 879, 882 (Fed. Cir. 1991) ("Our precedent clearly establishes that the 'prevailing rate' legislation is a pay-mandating statute."); *see also Adair v. United States*, 70 Fed. Cl. 65, 69 (2006) ("It is only when applied to a claim for which the statute mandates compensation that the statute can be said to be 'money-mandating.'"). Plaintiffs submitted a grievance in accordance with the procedures mandated by their CBA. The procedures outlined in a federal employee's CBA are the "exclusive administrative procedures for resolving grievances which fall within its coverage." 5 U.S.C. 7121(a)(1) (2000). Prior to 1994, under the Civil Service Reform Act ("CSRA"), courts did not have jurisdiction to hear any claim of a federal employee if the claim fell within the coverage of the employee's CBA. *See Carter v. Gibbs*, 909 F.2d 1452, 1454 (Fed. Cir. 1990) (en banc). The 1994 amendment of 5 U.S.C. § 7121(a)(1), a provision of the CSRA, however, gave federal employees the "right to seek a judicial remedy for employment grievances subject to the negotiated procedures contained in [their] CBA[s]." *Mudge v. United States*, 308 F.3d 1220, 1227 (Fed. Cir. 2002). The amended statute provided that the grievance procedures contained in a federal employee's CBA are "the exclusive *administrative* procedures for resolving grievances that fall within [the CBA's] coverage," 5 U.S.C. § 7121(a)(1) (emphasis added), rather than the "exclusive procedures" for resolving such grievances, as the statute had previously provided. *Mudge*, 308 F.3d at 1227. The court held that its decision in *Carter* was no longer applicable to the extent it held section 7121(a)(1) to preclude a judicial remedy. *Id.*[15]

---

[15] The Court of Appeals for the Eleventh Circuit expressly adopted the Federal Circuit's holding in *Mudge*, stating that the 1994 amendment to the CSRA "established a federal employee's right to seek a judicial remedy for employment grievances subject to the negotiated grievance procedures contained in his or her collective bargaining agreement." *Asociacion de Empleados del Area Canalera v. Panama Canal Comm'n*, 329 F.3d 1235, 1241 (11th Cir. 2003). The Court of Appeals for the Ninth Circuit disagreed, however, holding that

> CSRA § 7121(a)(1) does not confer federal court jurisdiction over statutory and constitutional claims concerning employment-related matters within the scope of the negotiated grievance procedures of a federal employee's collective bargaining

Plaintiffs' CBA states that the grievance procedures specified in the CBA "are the exclusive procedures available to employees, the Employer and the Council for resolving grievances which fall within its coverage." JX 001 § 3001(a). The CBA's exclusivity provision does not remove plaintiffs' claims from the Court's jurisdiction, however; the CBA took effect prior to the 1994 amendment to the CSRA, and its "exclusivity provision cannot evidence a conscious intent by the parties to divest an individual right that did not yet exist at the time the agreement was written." *Mudge*, 59 Fed. Cl. at 535. Furthermore, "the arbitration clause at issue is general and does not explicitly waive plaintiffs' FLSA claims." *Curtis v. United States*, 59 Fed. Cl. 543, 549 (2004) (citing *Mudge*, 59 Fed. Cl. at 535). In light of the provisions of plaintiffs' CBA, the Tucker Act, the PRSA, and OPM Regulatory Appendix A, part I.2, this Court has jurisdiction over plaintiffs' claims that they are entitled to additional back high pay.

## II. The Parties Did Not Enter Into an Accord and Satisfaction That Would Bar Plaintiffs' Claims Because the Plain Language of the Grievance Decision Does Not Preclude the Grievants from Seeking Additional High Pay in Court

In *O'Connor v. United States*, 308 F.3d 1233 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit held that a settlement agreement between a union and an agency, pertaining to employment grievances of federal workers, can operate as a valid accord and satisfaction of the employees' claims, thereby barring further litigation of those claims. *See O'Connor*, 308 F.3d at 1244. Defendant argues that plaintiffs' claims are barred by the doctrine of accord and satisfaction because they were settled during the negotiated grievance stage of the administrative process. Def.'s Memo. at 6.

Plaintiffs argue that this Court need not reach the question whether a valid accord and satisfaction occurred because "[a] prerequisite to finding an accord and satisfaction is the existence of a bona fide dispute." Pls.' Memo at 20. According to plaintiffs, they had performed work meriting high pay and the Shipyard had not paid them the amount prescribed by law; it would follow, then, that there would be no *bona fide* dispute and no possibility of accord and satisfaction.

---

> agreement, and . . . Congress's 1994 addition of the word "administrative" to the statute does not constitute an express grant of federal court jurisdiction over such claims.

*Whitman v. Dep't of Transp.*, 382 F.3d 938, 944 (9th Cir. 2004). The Supreme Court of the United States vacated the judgment of the Ninth Circuit and remanded the case. The Supreme Court agreed with the Ninth Circuit that the CSRA does not confer federal court jurisdiction. However, "[t]he question . . . is not whether 5 U.S.C. § 7121 confers jurisdiction, but whether § 7121 (or the CSRA as a whole) removes the jurisdiction given to the federal courts." *Whitman v. Dep't of Transp.*, 126 S. Ct. 2014, 2015 (2006); *cf. Mudge v. United States*, 59 Fed. Cl. 527, 530 (2004) ("In effect, the 1994 amendment lifted a statutory bar to an individual member's invocation of a remedy in court.").

Defendant has met its burden, however, of demonstrating that a dispute existed. Although the grievance decision set five feet as the level at which the Shipyard would pay high pay in the future, that level was not specifically required by the regulations or by the CBA. Rather, the authority to determine in what circumstances employees are entitled to high pay for work below 100 feet (*i.e.*, the circumstances that constitute "environmental factors [that] render working at such height(s) hazardous," JX 001 Appendix II) had been delegated to each installation or activity. *See* 5 C.F.R. § 532.511(a)(2). At the time the high pay grievance was instituted, the PSRA provided that the Office of Personnel Management ("OPM") was to prescribe by regulation "proper differentials . . . for duty involving unusually severe working conditions or unusually severe hazards." 5 U.S.C. § 5343(c)(4) (2000). At the time the grievance was filed, the relevant OPM regulations provided:

> (a) Entitlements to environmental differential pay.
>
> (1) In accordance with section 5343(c)(4) of title 5, United States Code, an employee shall be paid an environmental differential when exposed to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management.
>
> (2) Each installation or activity must evaluate its situations against guidelines issued by the Office of Personnel Management to determine whether the local situation is covered by one or more of the defined categories.

5 C.F.R. § 532.511(a). Rather than determining the precise circumstances in which shipwrights who worked at heights less than 100 feet above the ground were to be regarded as performing high work, OPM left that determination to be made locally by each installation or activity. The purpose of the grievance was to make that determination. Thus, there existed a *bona fide* dispute as to whether and to what extent the Shipyard's "situations," when measured against the OPM guidelines, were such as to entitle the shipwrights to high pay.

In addition, Shipyard management paid the shipwrights back high pay based on a formula developed by management in consultation with the BMTC, rather than requiring the shipwrights to individually establish the number of hours they had performed high work. The number of hours utilized in the formula, as plaintiffs went to great lengths to demonstrate, was simply an estimate of the number of hours of high work performed by a given shipwright in an average eight-hour day. Thus, both the circumstances in which high pay was to be paid and the number of hours of back high pay to which each shipwright was entitled were the subject of *bona fide* disputes. Those disputes were therefore capable of being resolved through the grievance process and, potentially, through an accord and satisfaction.

An accord and satisfaction occurs when "'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" *O'Connor*, 308 F.3d at 1240 (quoting *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n.7 (Fed. Cir. 1996)). A valid accord and satisfaction consists of four

elements: (1) proper subject matter; (2) competent parties; (3) consideration; and (4) a meeting of the minds of the parties. *Id*. Accord and satisfaction is an affirmative defense, upon which defendant has the burden of persuasion. *See O'Connor v. United States*, 60 Fed. Cl. 164, 168 (2004). As set forth in Sections II.A–D *infra*, the grievance decision meets the first three criteria of an accord and satisfaction, but is silent regarding whether, in accepting the grievance decision, the BMTC, on behalf of the shipwrights, agreed that they would not seek additional relief in court. Thus, the plain language of the grievance decision does not reflect a meeting of the minds that the shipwrights agreed to give up their right to seek additional redress in court in exchange for the relief provided by the grievance decision.

**A. Proper Subject Matter**

In order to demonstrate that there was proper subject matter, defendant must show that the subject matter of the complaint is the same as the subject matter of the grievance decision. *Green Mgmt. Corp. v. United States*, 42 Fed. Cl. 411, 432 (1998) (citing *King Fisher Marine Corp. v. United States*, 16 Cl. Ct. 231, 237 (Ct. Cl. 1989)). In the present case, the CBA contained a provision incorporating the statutory and regulatory requirements for the payment of high pay in certain circumstances. JX 001 § 1003. Plaintiffs' third amended complaint relates to the criteria used by the Shipyard to determine the circumstances under which it would pay high pay as well as claims for back high pay. Third Am. Compl., Counts One–Three. Likewise, the grievance decision purported to resolve the criteria under which the Shipyard would pay high pay, as well as determine back high pay for the shipwrights. JX 009 at J0000708.

Plaintiffs claim that eligibility for high pay was not a proper subject matter because it is excluded from the scope of the CBA. Pls.' Memo. at 33–36. Under the CBA, plaintiffs argue, matters "that are not 'conditions of employment' as defined by the [Civil Service Reform] Act" are excluded from the "Negotiated Grievance Procedure." JX 001 § 3001(d)(1). The CSRA defines "conditions of employment" as "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters . . . to the extent such matters are specifically provided for by Federal statute." 5 U.S.C. § 7103(a)(14). The United States Court of Appeals for the Third Circuit held that, under this provision, the Navy could not be required to bargain with an employee union over the pay of civilian mariners because "Congress did not intend to subject the pay of federal employees to collective bargaining under [5 U.S.C. § 7103(a)(14)(C)]." *Dep't of the Navy v. Fed. Labor Relations Auth.*, 836 F.2d 1409, 1419 (3d Cir. 1988). However, the United States Court of Appeals for the District of Columbia Circuit held that "insofar as the Third Circuit's decision in *Department of the Navy* . . . stood for the proposition that § 7103(a)(14)(C) categorically removed *all* aspects of wage-setting from potential bargaining, . . . it cannot survive." *United States Dep't of Treasury v. Fed. Labor Relations Auth.*, 995 F.2d 301, 304 (D.C. Cir. 1993).

In determining whether Environmental Differential Pay falls within the ambit of matters about which collective bargaining is permissible, the Federal Circuit looked to the PRSA, which authorizes OPM to promulgate regulations establishing environmental differentials. *Harris v.*

*United States*, 841 F.2d 1097, 1100 (Fed. Cir. 1988). The PRSA provides for "participation at all levels by representatives of organizations accorded recognition as the representatives of prevailing rate employees" in establishing the environmental differentials. 5 U.S.C. § 5343(c)(2). The Federal Circuit stated that "[i]t seems clear . . . that differentials for hazardous or otherwise severe working conditions are among the conditions thus declared suitable for collective bargaining." *Harris*, 841 F.2d at 1100.

Section 3001(d)(1) of the CBA appears to have been drafted in order to exclude from the Negotiated Grievance Procedure matters governed by statute. Although that category generally includes pay, *see Dep't of the Navy*, 836 F.2d at 1418, it does not include all pay issues. *Harris*, 841 F.2d at 1100. Environmental Differential Pay, including high pay, is suitable for collective bargaining, and the high pay grievance decision therefore embodied a proper subject for an accord and satisfaction between the BMTC on behalf of the shipwrights and the management of the Shipyard.

**B. Competent Parties**

The second element of an accord and satisfaction is that all parties to the accord and satisfaction must be competent parties. *Thomas Creek Lumber & Log Co. v. United States*, 36 Fed. Cl. 220, 238 (1996). In order to be competent, the representatives negotiating and signing an accord and satisfaction must have authority to bind the respective parties to the agreement. *Id.*

Ms. Tallman had authority to bind the Government to the grievance decision. She was a representative of the management of the Shipyard, and was authorized to enter into an agreement to settle the grievance. Under the CSRA, any agreement she signed was subject to approval by the head of the agency. 5 U.S.C. § 7114(c)(1). If after thirty days, however, the head of the agency had taken no action to accept or reject the agreement, it would take effect and "be binding on the agency."[16] *Id.* § 7114(c)(3).

---

[16] Plaintiffs refer to section 3905 of the CBA, which requires that agreements be approved by the head of the agency and states:

> No agreement, understanding, variation, waiver, or modification of any terms or conditions contained herein shall be made by any employee or group of employees with the Employer, and in no case shall it be binding upon the parties hereto unless such agreement is made and executed in writing between the parties hereto and approved by the Secretary of the Navy.

JX 001 § 3905. Although plaintiffs do not explain why they find this section helpful, presumably they mean to suggest that, because the Secretary of the Navy did not, in fact, approve the resolution of the grievance, it is not an agreement binding on the parties. However, as discussed *supra*, thirty days passed without the Secretary of the Navy taking any action, meaning that,

The BMTC was a competent party to resolve the grievance on behalf of the shipwrights. The CSRA requires that the CBA include procedures assuring "an exclusive representative the right . . . on behalf of any employee in the unit represented by the exclusive representative, to present and process grievances." 5 U.S.C. § 7121(b)(1)(C)(I). An "exclusive representative" is defined as any labor organization which "is certified as the exclusive representative of employees in an appropriate unit pursuant to [5 U.S.C. § 7111]." 5 U.S.C. § 7103(a)(16). The BMTC is the exclusive representative of the shipwrights, whether or not members of the BMTC, employed by the Shipyard. JX 001 § 0101. Furthermore, the CBA states that the BMTC "may process a grievance on behalf of employee(s) in accordance with Sections 3002 and 3012." *Id.* § 0604(a)(1). Section 3002 of the CBA governs the submission of employee grievances, while Section 3012 governs the procedure for Council and OBO grievances. In *O'Connor*, the Federal Circuit held that, pursuant to a CBA provision authorizing the union to process grievances, "the union acted on behalf of appellants to settle their FLSA claims. Appellants are therefore bound." *O'Connor*, 308 F.3d at 1241. The BMTC was similarly competent to enter into a settlement of the shipwrights' grievance that would bind them.[17]

Plaintiffs argue that, even if the BMTC could have been, in theory, a competent party, under the facts of the present case it was not. Plaintiffs contend that the BMTC failed to file the proper type of grievance. Because it was not entitled, in this case, to file an employee grievance, the BMTC, according to plaintiffs, was not a competent party to enter into an accord and satisfaction with respect to the grievance. According to plaintiffs, the CBA "required the union to treat any grievance that was 'not identifiable to a specific individual employee' but instead 'was the result of an action . . . that significantly affects the provisions of this written Agreement' as a council grievance." Pls.' Memo. at 33 (quoting JX 001 § 3012(a)(1)). Plaintiffs allege that the grievance should have been filed as a Council grievance, that the BMTC failed to follow the procedures required to maintain a Council grievance, and that, therefore, the BMTC was not a competent party, in this case, to resolve the grievance.

The Court concludes, however, that the grievance was properly filed as an employee grievance. It could have been filed as an OBO grievance, but Mr. Aiken did not want to do so. It would not have been appropriate as a Council grievance, however, because the complaint—that a specific shipwright had not received the high pay due him—was identifiable to that individual shipwright. The CBA permitted parties "to join similar issues from the same or separate parties for the purpose of conducting a single grievance hearing," JX 001 § 3001(b), and the parties here

---

under the CSRA, 5 U.S.C. § 7114(c)(3), the grievance decision, assuming *arguendo* that it constituted an agreement, took effect and was binding on the parties.

[17] Because the Court finds that the parties did not effect an accord and satisfaction that would bar plaintiffs' claims, it does not need to reach the issue addressed by Judge Lettow in *Mudge*, namely, whether the BMTC's authority to process grievances, and thereby act on behalf of members of the bargaining unit, "entails the power to waive or elide an individual employee's right to present employment claims in a judicial forum." *Mudge*, 59 Fed. Cl. at 531.

chose to do so. Joining the ninety-nine grievances did not, however, cause the grievants' complaints to cease to be "identifiable to a specific individual employee."

Plaintiffs also contend that the BMTC made procedural errors in its prosecution of the grievance, including failing to permit each grievant to come to the Step 2 meeting, as authorized by the CBA. Pls.' Memo. at 33. These errors do not, however, invalidate the BMTC's representation of the shipwrights. In general, employees are bound by the result of an authorized union's negotiations. *Del Costello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983). In certain circumstances:

> [W]e recognize[] that this rule works an unacceptable injustice when the union representing the employee in the grievance . . . acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding.

*Id.* If plaintiffs thought that the BMTC had breached its duty of fair representation, they could have filed a complaint against the BMTC and the Shipyard asserting such a breach. However, that the BMTC allegedly did not comply with certain procedures required by the CBA did not cause the BMTC to cease to be a competent party.

**C. Consideration**

"[A] valid accord and satisfaction must be supported by consideration." *Thomas Creek*, 36 Fed. Cl. at 242. To effect a valid accord and satisfaction, the parties must exchange consideration that constitutes a payment or performance in satisfaction of the claim or demand at issue. *Id.* (citing *Brock & Blevins v. United States*, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (Ct. Cl. 1965); *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir. 1949)). Consideration consists of a "'detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor.'" *Ahrens v. United States*, 62 Fed. Cl. 664, 672 (2004) (quoting *Estate of Bogley v. United States*, 206 Ct. Cl. 695, 705, 514 F.2d 1027, 1033 (Ct. Cl. 1975)).

The shipwrights received two types of consideration for the alleged accord and satisfaction. First, they received a cash payment based on negotiations between the BMTC and the Shipyard management to estimate how much high work they performed between March 23, 1999, and January 18, 2000. The 134 shipwrights who ultimately received back high pay under the grievance decision were paid between $100.17 and $5,929.11 based upon an agreed estimate, as contemplated by the grievance decision, of the number of days each performed high work and the average number of hours of high work each performed in an eight-hour day during the approximately ten-month period. PX 014. The Shipyard paid the shipwrights a total of $334,190.97 in back high pay, *id.*, an arithmetic mean of $2,493.96 per shipwright. The

Shipyard also agreed to pay high pay in the future for work at the first level above the ground, unless flooring or safety rails were installed or fall protection could properly be used.[18] PX 009.

Plaintiffs argue that fulfilling a preexisting duty can never constitute consideration, and that the Shipyard had a preexisting legal duty to pay back high pay to plaintiffs. Pls.' Memo. at 28. However, because prior to the 1999 grievance no shipwright had requested high pay from a supervisor, and the shipwrights presented no records to support their claims, it is not evident from the record that the Shipyard had a preexisting duty to pay $334,191.09 to the 134 shipwrights. Moreover, neither the CBA nor the OPM guidelines define precisely the circumstances under which a shipwright working below 100 feet is entitled to high pay. Rather, authority is delegated to each installation or activity to determine whether and when "footing is unsure or the structure is unstable," protective facilities are "not adequate," or "adverse conditions . . . render working at such height(s) [*i.e.*, heights less than thirty meters (100 feet) above the ground] hazardous." OPM Regulatory Appendix A; *see also* JX 001 Appendix II. It is not clear, then, that the Shipyard had a preexisting duty to pay back high pay in the amounts or under the circumstances provided for in the grievance decision.

**D. Meeting of the Minds**

A meeting of the minds is "the critical element" of an accord and satisfaction. *McDonald v. United States*, 13 Cl. Ct. 255, 260 (1987) The parties' intent is the controlling factor in determining whether there has been a meeting of the minds. *Ahrens*, 62 Fed. Cl. at 670 (citing *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419 (1999)).

Plaintiffs argue that the grievance decision was not in the form of a contract; rather, it "was worded unilaterally. It contained no recitation of an agreement. It contained no language that its terms were in full and final payment of disputed claims. It contained no release. It contained no expression of any agreements, promises, or commitments by the union." Pls.' Memo. at 11. From this, plaintiffs conclude that the grievance decision did not constitute a contract and, therefore, could not embody an accord and satisfaction.

---

[18] Ms. Niemi testified that she recommended paying high pay for work beginning at the first level above ground (unless flooring and safety rails were installed or fall protection could properly be used) because Occupational Safety and Health Administration ("OSHA") regulations require shipwrights to wear fall protection equipment when working at a height of at least five feet, and she "didn't find anything else that would identify a certain height." Tr. at 356:18–357:5. There was no requirement, however, that the Shipyard use the OSHA standard. *Id.* Rodney J. Whitcher, the Shipwright Supervisor at Shop 64, testified that no shipwright was concerned about working at a height of five feet; in his opinion, twenty-five feet was a good height at which to pay high pay. *Id.* at 570:1–13. He further testified that most shipyards start paying high pay for work starting at approximately twenty-five feet. *Id.* at 569:18–19; *see also, id.* at 61:14–15, 418:23–24.

Defendant argues that the parties engaged in "a series of back and forth negotiations to resolve the grievance." Def.'s Memo. at 11. Ms. Tallman testified that she and Mr. Aiken "had continual dialogue . . . . We would talk about the status of coming to resolution, talk about how it was going with Mark Winkler, what we were working on." Tr. at 488:6–15. Mr. Aiken testified that, after signing the grievance decision, "the grievance had been settled, that it was over, that it was finished, that it was done." Tr. at 74:20–21. Likewise, Ms. Tallman, upon signing the grievance decision, expressed to Mr. Aiken her belief that "[i]t's settled. It's over. We done good." *Id.* at 532:9–16. Mr. Aiken testified that he did not believe dissatisfied grievants had any recourse, other than filing an unfair labor practice charge against the BMTC. *Id.* at 75:14–16.

Other shipwrights and union officers, however, did not believe the grievance decision effected an accord and satisfaction of the shipwrights' claims for additional back high pay. Messrs. Hamel and Hurm, whom Mr. Aiken consulted, and who encouraged him to accept the grievance decision, did not believe that the grievance decision prevented individual shipwrights, if dissatisfied with the grievance decision, from seeking further relief in court. When the Court asked Mr. Hamel, the chief steward of the BMTC, whether the grievance decision prevented a dissatisfied shipwright from seeking further relief by means of a lawsuit, he responded, "No. If he wants to go and seek other relief that's his decision." *Id.* at 284: 9–23. Similarly, Mr. Hurm testified that he understood that, if shipwrights were unhappy with the grievance decision, "they could have to probably get an attorney themselves, [the BMTC] had taken this as far as [it] could." *Id.* at 594:7–11. Furthermore, on February 14, 2000, less than one month after the grievance decision was signed, J. Byron Holcomb, attorney for Mr. Scott and Walter Jaynes, both plaintiffs in this action, wrote to Ms. Tallman on behalf of Messrs. Scott and Jaynes and asserted that "we have rights of our own under the law which will allow a federal court to decide the issue" of whether back high pay should have been paid for work before March 23, 1999. Defendant's exhibit admitted at trial ("DX") 028 at BMTC000060.

The grievance decision itself is silent regarding its effect on the grievants' right to file suit for additional relief relating to high pay. The grievance decision describes the background of the grievance, sets forth criteria for the payment of high pay, determines that, insofar as the grievance sought back pay beyond fifteen days prior to the filing of the grievance, the grievance was untimely, and describes the relief to be granted the shipwrights as follows:

> 1) Shop 64 will start immediately to pay shipwrights 25% high pay under the circumstances noted in part II above.[[19]]

---

[19] Part II of the grievance decision states that high pay will be paid for work performed under the following circumstances:

> 1) For shipwright building and dismantling staging beginning from the first level above the ground/deck **unless**:

> 2) Grievants will be paid an appropriate amount of back pay for straight time and overtime, including appropriate interest, for the period from 23 March 1999 (fifteen work days prior to the filing of this grievance) through the present. Management will work with the union to develop a means of determining the appropriate amount of back pay for each grievant. The grievants' typical work assignments over the back pay period will be considered in making the determination.

JX 009 at J0000707–08. Nowhere in the grievance decision do the shipwrights give up any right to seek to recover, in another forum, additional back pay or to seek the imposition of a less demanding standard for payment of high pay in the future. In fact, there is no indication in the language of the grievance decision that the shipwrights agreed to give up anything.

Defendant asserts that the Court should find that the parties entered into an accord and satisfaction, in spite of the grievance decision's silence regarding the plaintiffs' right to seek judicial relief, because:

> *O'Connor* did not require that the parties specifically discuss and specifically intend to pursue lawsuits in federal court. . . . [T]he settlement at issue in the *O'Connor* case focused upon a union going to arbitration and there was no evidence that the parties specifically discussed or intended to prevent filing in federal court.

Tr. at 697:14–20. In *O'Connor*, however, the plaintiffs conceded on appeal that the settlement agreement met all four criteria for an accord and satisfaction; they argued instead that (1) claims brought under the FLSA were not amenable to resolution through an accord and satisfaction; (2) the plaintiffs could not settle back pay claims without the consent of the Department of Labor or a court; and (3) any accord and satisfaction was binding only on the union, not on the individual employees represented by the union. *O'Connor*, 308 F.3d at 1240. In contrast, plaintiffs in the present case do not concede that the parties had a meeting of the minds, and the Court finds, as a factual matter, there was no meeting of the minds with respect to whether the plaintiffs gave up their right to seek additional relief in court. Furthermore, the Federal Circuit in *O'Connor* held that the plaintiffs' union had entered into a "global settlement agreement . . . resolving the eleven locals' overtime grievances against the agency." *Id.* at 1237. The Federal Circuit affirmed the Court of Federal Claims' decision that the parties' global settlement agreement constituted a valid accord and satisfaction, and precluded the plaintiffs from pursuing their claims in court. *Id.*

---

> a) flooring and safety rails are installed, **or**
>
> b) fall protection devices can be properly used.
>
> 2) Building and dismantling hanging staging working from similar heights under similarly unguarded situations when fall protection devices cannot be properly used.

JX 009 at J0000707 (emphasis in original).

at 1241. The global settlement agreement provided that the union gave up its right to seek arbitration or pursue individual employees' claims to arbitration, except as otherwise permitted in the global settlement agreement. *Id.* at 1238. Furthermore, the global settlement agreement stated that the amount paid by the agency represented "all backpay, interest, liquidated damages and attorneys' fees and costs . . . incurred in the Union grievances up to the date that this Agreement is signed." *Id.* Because the global settlement agreement in *O'Connor* contained a clear statement that the amount paid constituted all the back pay, etc., to which the employees claimed they were entitled, the global settlement agreement necessarily precluded further claims for back pay, etc. It is therefore distinguishable from the high-pay grievance decision, and *O'Connor* is not controlling here.

The Court must "give clear and unambiguous terms of a contract their plain and ordinary meaning." *Am. Capital Corp. v. F.D.I.C.*, 472 F.3d 859, 2006 WL 3055912, at *3 (Fed. Cir. 2006) (citing *Landmark Land Co., Inc. v. F.D.I.C.*, 256 F.3d 1365, 1373 (Fed. Cir. 2001)). Furthermore, the Court "cannot rewrite a contract or insert words to which a party has never agreed." *Id.* (citing *Coast Fed. Bank v. United States*, 323 F.3d 1035, 1039 (Fed. Cir. 2003) (en banc)). A contract is ambiguous if "it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language." *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct. Cl. 358, 372, 393 F.2d 807, 815–16 (Ct. Cl. 1968). Where, as here, the language of an agreement is clear on its face, the Court may not use extrinsic evidence in order to interpret the contract.[20] *See, e.g.*, *Gardiner, Kamya, & Assoc., P.C. v. Jackson*, 467 F.3d 1348, 1353–54 (Fed. Cir. 2006); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76 (Fed. Cir. 2004). The language of the grievance decision does not preclude grievants from seeking additional relief in court; it is not ambiguous on the point. The Court declines to add terms to the grievance

---

[20] In spite of Federal Circuit precedent employing the so-called "plain-meaning rule," certain commentators have criticized its application. *See, e.g.*, Ralph C. Nash, *The Plain Meaning Rule*, 20 NASH & CIBINIC REP. ¶ 57 (2006) ("We would all be better served if the court went back to the position of the Court of Claims where the judges were willing to look at all of the evidence before they arrived at the interpretation of the contract that reflected the intent of the parties."). In addition, the RESTATEMENT (SECOND) OF CONTRACTS states that the meaning of contractual language "commonly depends on [its] context" and, in order to interpret the contractual language, a court must "seek[] to put itself in the position [the parties] occupied at the time the contract was made." RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. b (1981).

However, as discussed in Section III *infra*, even were the Court to interpret the grievance decision in light of the totality of the extrinsic evidence, rather than relying solely upon its plain meaning, it would reach the same conclusion. The extrinsic evidence relied upon by defendant is simply not sufficient to support a finding that, at the time the grievance decision was signed, the parties intended to effect an accord and satisfaction that would bar claims such as those plaintiffs assert in this action.

decision that the parties did not include, and therefore holds that the grievance decision did not effect an accord and satisfaction of plaintiffs' claims asserted in this action.

## III. Even if the Grievance Decision Were Assumed to be Ambiguous as to Whether It Precluded Plaintiffs from Seeking Additional Relief in Court, the Extrinsic Evidence Does Not Resolve That Ambiguity and the Grievance Decision Must Be Interpreted Against the Drafter

Even if the Court were to assume *arguendo* that the grievance decision is ambiguous, however, defendant's affirmative defense of accord and satisfaction would fail. Plaintiffs argue that the analysis of an accord and satisfaction is "governed by ordinary contract law principles. One of those principles is that any writing alleged to embody the agreement must be construed against the drafter." Pls.' Memo. at 19–20 (internal citations omitted). Plaintiffs are correct that the accord and satisfaction must be evaluated under ordinary contract principles. They are also correct that one of those principles is the *contra proferentem* rule, which is that a court "will adopt a contractor's reasonable interpretation of a latent ambiguity . . . construing an ambiguity against the drafter." *Travelers Cas. & Sur. of Am. v. United States*, 74 Fed. Cl. 75, 88 (2006). However, before the Court may apply the doctrine of *contra proferentem*, it must first determine whether extrinsic evidence resolves the ambiguity. *Gardiner, Kamya, & Assoc.*, 467 F.3d at 1354 (quoting *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006)).

Defendant relies principally upon two types of extrinsic evidence: (1) documents prepared after the grievance decision was signed in which the BMTC referred to the grievance decision as constituting an agreement or settlement, and (2) Ms. Tallman's and Mr. Aiken's interaction in connection with their signing the grievance decision. In a letter dated July 7, 2000, from Mr. Hamel to Congressman Norman D. Dicks, Mr. Hamel stated that "[t]he issue was *resolved* with an *agreement* reached on 1/18/00, signed by Joe Aiken of the Union and M J Tallman of the Agency." DX 019 (emphasis added). On August 22, 2000, the BMTC filed an unfair labor practice charge against the Shipyard for "refusing to comply with a *negotiated grievance settlement*, Grievance #05153-K, . . . by refusing to pay the appropriate interest for the back pay." DX 021 (emphasis added). Finally, in the settlement of Mr. Mascioli's grievance, the BMTC agreed "to make no additional claims for backpay in connection with the high pay grievance *settlement* of 18 January 2000." JX 038 (emphasis added). In addition, when signing the grievance decision, Mr. Aiken said to Ms. Tallman, "I'm glad this is finally over." Tr. at 74:14. Likewise, Ms. Tallman, upon signing the grievance decision, expressed to Mr. Aiken her belief that "[i]t's settled. It's over. We done good." *Id.* at 532:9–16.

Neither the documentary extrinsic evidence nor the interaction of Mr. Aiken and Ms. Tallman is sufficient, however, to resolve the assumed ambiguity as to whether, as part of the settlement, the grievants or the BMTC on their behalf waived claims the shipwrights might have to seek additional relief in court. Because the extrinsic evidence does not resolve that assumed ambiguity, the Court must determine whether such assumed ambiguity was latent or patent. *Interwest Constr. v. Brown*, 29 F.3d 611, 614 (Fed. Cir. 1994) (citing *Newsom v. United States*,

230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (Ct. Cl. 1982)). A patent ambiguity is "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *WPC Enterprises, Inc. v. United States*, 163 Ct. Cl. 1, 6, 323 F.2d 874, 876 (Ct. Cl. 1963). What constitutes a patent ambiguity must be determined "on an *ad hoc* basis by looking to what a reasonable man would find to be patent and glaring." *L. Rosenman Corp. v. United States*, 182 Ct. Cl. 586, 590, 390 F.2d 711, 713 (Ct. Cl. 1968). Where there is a patent ambiguity, the non-drafting party has a duty to inquire about the error. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

In this case, there was no patent ambiguity. It is not clear on the face of the grievance decision that the parties inadvertently omitted, for example, a clause in which the grievants agreed that the grievance decision constituted a complete settlement of any and all obligations and liabilities of the Shipyard with respect to high pay, the effect of which was to cause the Shipyard to be "fully discharged from any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity." *See Holland v. United States*, 74 Fed. Cl. 225, 233 (2006). Mr. Aiken testified that he believed the omission of language indicating that the grievance decision was a settlement agreement was due to an oversight, Tr. at 172:24–173:4, but he conceded that there was no discussion of the shipwrights' waiving the right to sue for additional high pay. *Id.* at 164:17–165:16.

The parties may have believed that any explicit statement that the shipwrights waived their right to sue for further back high pay was unnecessary; at the time, *Carter v. Gibbs*, 909 F.2d 1454 (Fed. Cir. 1990), was generally understood to "foreclose judicial remedies for employee grievances covered by a CBA." *O'Connor*, 308 F.3d at 1238. In 2002, well after the signing of the grievance decision, the Federal Circuit held that the 1994 amendment of the CSRA had overruled *Carter*. *Mudge*, 308 F.3d at 1224–33; *O'Connor*, 308 F.3d at 1239–40; *see supra* page 12.

In light of the contemporaneous understanding of the CSRA, the failure of the grievance decision to address any judicial recourse available to the grievants did not create a patent ambiguity. If one were to assume *arguendo* that there was an ambiguity, it was latent. *Newsom*, 230 Ct. Cl. at 304 676 F.2d at 650. In that situation, if the interpretation of the party or parties who did not draft the document is "reasonable, we apply the rule of *contra proferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed. Cir. 1987)). Because the grievance decision contains no language precluding the shipwrights from seeking additional relief in court, plaintiffs' interpretation of the grievance decision is reasonable. Thus, even assuming *arguendo* that there was a latent ambiguity, the Court would construe any such ambiguity against defendant, whose agents drafted the grievance decision.

## CONCLUSION

Based upon the foregoing, the Court finds that the grievance decision did not effect an accord and satisfaction of the claims asserted by plaintiffs in this action. Defendant's affirmative defense of accord and satisfaction must therefore fail. The Court will schedule a status conference to consider the nature and timing of further proceedings.

IT IS SO ORDERED.

s/ George W. Miller
GEORGE W. MILLER
Judge