**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES; PAUL S. SCOTT; DAVID S. PETERSON; DONALD BAKER; GORDON D. HANBERG; et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-856C<br><br>Judge Miller<br><br>Electronically Filed on March 13, 2007 |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S FEBRUARY 27, 2007 ORDER**

The Court's February 27, 2007 Order expressed the Court's belief that it would be beneficial for each of the parties to submit a memorandum addressing six questions. Having considered the Court's questions, plaintiffs submit this response.

## I. Statement of Claims and Parties

Plaintiffs are 72 current or former employees of Puget Sound Naval Shipyard who were assigned work as Shop 64 shipwrights. As such, they constructed and dismantled staging for the Shipyard at some time between 1993 and the present.

Plaintiffs assert three causes of action. The first and the third causes differ only in the period of time covered: the first seeks an award of back environmental differential pay for high work (i.e., "high pay") from before the Shipyard's grievance decision was issued, while the third seeks high pay from the date this action was first filed in federal district court through the date of judgment. These two causes call upon the Court to determine what shipwright work constitutes high work, how much high work each plaintiff did during the claim period, and how much of that

high work went uncompensated by an environmental differential. The second cause of action differs from the other two in that it specifically seeks environmental differential pay for work in adverse weather conditions, particularly rain. Plaintiffs do not seek declaratory or injunctive relief; they withdrew that request in their Third Amended Complaint.

## II. Unresolved Legal and Factual Issues

The Court's Order first asks the parties to identify the material legal issues that remain unresolved. It also asks the parties to identify the factual issues that must be resolved to determine how much high pay is owed, if any, to each plaintiff.

The remaining issues in the case – whether characterized as legal, factual, or mixed – generally cluster around the following matters.

### A. Claim Period for Each Plaintiff

Establishing the claim period for each plaintiff will require the Court to make several determinations: (1) when each plaintiff was employed by or loaned to Shop 64; (2) when each plaintiff's claims accrued; and (3) when each plaintiff is deemed to have brought the claims now before the Court. This will require consideration or application of *American Pipe* equitable tolling and RCFC 15(c)'s relation-back rule (both of which the parties have previously briefed in connection with plaintiffs' motion for class certification)

### B. What Shipwright Work Constitutes "High Work"

In resolving this issue, the Court will need to identify the tasks associated with shipwright work at the Shipyard and determine which of that work falls within the regulatory and contractual definitions of "high work."

In doing so, the Court must assess whether and to what extent the unsecured, 12-inch-wide planks on which shipwrights typically work are "unsure footing." The Court must also assess whether and to what extent unfinished staging constitutes an "unstable structure." The Court will also need to determine on which days the Shipyard experienced "steady rain" or other adverse work conditions.

In making these determinations, the Court will need to consider the effect of OSHA regulations. It will also need to decide whether the availability and use of fall protection is of any relevance in defining what constitutes high work.

### C. Amount of High Work Performed by Each Plaintiff

Plaintiffs anticipate that proof of each plaintiff's individual claim will be in the form of anecdotal evidence. This may be corroborated (or contradicted, as the case may be) by whatever Shipyard records exist of repair projects and crew assignments.

The Court will need to determine the effect of the Shipyard's failure to keep records of the plaintiffs' high work. Under *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), if a plaintiff meets his burden of showing that he "has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employees' evidence." *Id.* at 687-88. The Claims Court and Federal Circuit have each adopted *Anderson*'s burden-shifting requirement. *See Savering v. United States*, 18 Cl. Ct. 704, 708 (Cl.

Ct. 1989); *see also Adams v. United States*, 471 F.3d 1321, 1326 (Fed. Cir. 2006).

### D. Amount of Environmental Differential Pay and Other Damages Owed To Each Plaintiff

Once the Court has determined the appropriate claim period for each plaintiff, the circumstances that require payment of an environmental differential, and the level of proof required by each plaintiff, the Court will need to draw a "just and reasonable inference" of the damages suffered by each plaintiff.

This will require the Court to decide several, primarily factual, issues, including:

(1) How much compensation for high pay has each plaintiff already received?

(2) Under what circumstances and/or policy was this compensation paid?

(3) Was this pay properly calculated under the applicable regulations, including those that govern how to pay environmental differentials for multiple exposures to the same hazard in a given period of time?

(4) What were the retirement contributions of each plaintiff, and to what extent would those have increased if all high pay owed had been paid?

(5) How much interest is owed to each plaintiff?

(6) What would be an appropriate award of attorney fees and costs?

## III. How Best To Address the Remaining Legal and Factual Issues

The Court next asked the parties to suggest how "to best address these unresolved factual and legal issues in a comprehensive and efficient manner."

### A. Claim Period for Each Plaintiff

Issues concerning the claim period applicable to each plaintiff are amenable

to summary judgment. These issues simply call for the application of the statute of limitations to uncontested facts (*e.g.,* when did the plaintiff start working at the Shipyard, when did he or she stop, when did this suit commence, when did the Court deny class certification, etc.) and its interplay with such notions as class-action equitable tolling and RCFC 15(c)'s relation-back rule.

### B. What Shipwright Work Constitutes "High Work"

Issues concerning what aspects of shipwright work constitute "high work" within the meaning of pertinent regulations and the collective bargaining agreement appear to require trial. Most of what Shop 64 shipwrights do – and what circumstances they work under – is uncontested. There appear to be no serious disputes regarding what work is involved in building or dismantling staging, nor what materials are used. Likewise, there appears to be no dispute concerning the planking on which shipwrights stand while working, whether that planking is unsecured to the staging frame, and whether guardrails exist.

Disputes do exist regarding: (1) whether the staging structures are, at times, unstable; (2) whether certain shipwrights ascend staging at all; (3) whether there is a difference between work at various heights on the staging; and (4) whether there is a difference between work on the uppermost level of staging as compared to work on unfinished staging below that level. Resolution of these particular issues probably must await lay and expert testimony at trial.

A dispute may also exist around the question of just how much rain constitutes "steady rain." The Court, as its recent Opinion and Order reflects, has personally experienced some of what this region has to offer in terms of rain and

one suspects that no one would dispute that conditions during the week of November 6, 2006 would constitute steady rain. That said, conditions in the Pacific Northwest, while notoriously rainy, usually fall short of that deluge.

The parties need to confer further and identify those issues that truly are disputed. Plaintiffs suspect that a trial limited to determining what shipwright work constitutes high work would not require a trial of more than about four days.

### C. Amount of High Work Performed by Each Plaintiff

The next issue – how much high work each plaintiff performed during the claim period – will require trial. Because the Shipyard does not have records of high work performed beyond that for which it has already paid an environmental differential, evidence will largely be presented through lay or expert testimony, perhaps corroborated by Shipyard records concerning ongoing projects. (To give one example, the fact that a carrier was in the Shipyard for repairs might tend to corroborate evidence of a particularly large amount of high work.)

But one issue probably needs to be addressed before trial, and can be addressed via summary judgment. This is the impact of the Shipyard's failure to keep records of high work performed during the claim period. As discussed above, this failure should result in a shift to the Shipyard to disprove each plaintiff's claims, once each plaintiff has established that he or she performed compensable work. Before the parties begin trial, it will be necessary to resolve exactly what their respective burdens will be.

Depending on how proof of these matters is to be elicited, trial of these issues could take as long as four or five weeks. This would certainly be the case if all 72

plaintiffs were expected to testify in support of their claims.

### D. Amount of Environmental Differential Pay and Other Damages Owed To Each Plaintiff

The amount of environmental differential pay that plaintiffs have already received should be beyond dispute. The Shipyard's records identify environmental differential pay that the Shipyard has paid. The Shipyard's written and oral policies also establish what, in general terms, those payments were for (i.e., for work in man-lifts and for work above 100 feet). Plaintiffs expect that the parties could submit this information to the Court by stipulation, probably through exhibits containing spreadsheets.

Certain other facts will presumably be undisputed as well, because they should be a matter of Shipyard record-keeping. For example, one issue identified above, but not yet fully explored, is the extent to which individual plaintiffs arranged for automatic contributions toward retirement plans.

## IV. Necessary Pre-Trial Proceedings

The Court asked the parties to identify the further pre-trial proceedings that are needed to prepare the case for trial.

### A. Trial

Before addressing what is needed to prepare the case for trial, it makes sense to address what that trial might involve. Trial regarding all issues except those concerning each individual plaintiff's performance of high work shouldn't be extraordinarily demanding or complicated and, as set forth above, should not require much more than about four days.

Presenting proof regarding the amount of work performed by each of the 72 plaintiffs, however, is obviously another matter. This is exacerbated by the Shipyard's failure to keep records as the law requires.

Plaintiffs suggest three alternatives for presenting this evidence. The first is to call all 72 plaintiffs to the stand to testify regarding the work they've done during the relevant claim period. The disadvantages of this approach are clear enough and require no great enumeration. It suffices to say that if the parties examined four witnesses per day, presenting all 72 plaintiffs would consume 18 trial days.

The second alternative is to assemble a group of plaintiffs whom the parties agree are representative of the others and only call those plaintiffs as trial witnesses. At this juncture, it is unclear whether this approach will be feasible; shipwright work assignments may have been sufficiently fluid to preclude this. Further discovery, particularly from first-line supervisors, may help determine whether this is the case.

The third alternative is to present some or all of the plaintiffs' direct testimony by declaration. If this approach were adopted, the next question would be whether to present cross-examination live or via deposition. The parties need to confer, but an approach that is worth exploring is one in which the plaintiffs submit declarations of those plaintiffs who will "testify" via that method, after which the Shipyard may depose them, with the transcript of the Shipyard's cross-examination and plaintiff's redirect being presented by way of the resulting deposition transcript.

It is probably premature to choose from these three options now. Some further discussion between the parties, and guidance from the Court, will be useful.

### B. Dispositive Motion Practice

As mentioned above, at this time plaintiffs have identified two potential areas for resolution by summary judgment: (1) the applicable claim period for each plaintiff; and (2) the effect of the Shipyard's failure to keep records.

### C. Discovery

#### 1. Plaintiffs Discovery from Shipyard

Additional discovery is needed. Plaintiffs require additional records from the Shipyard, primarily payroll records for each plaintiff. The Shipyard has provided some, but not all, of these records. Plaintiffs have also requested additional records regarding ship repairs, particularly from the Shipyard's electronic database concerning the issue.

The Shipyard left much of its daily operations, including making crew assignments and determining whether work warranted payment of environmental differentials, to its first-line supervisors. Consequently, plaintiffs expect that they will need to depose those supervisors.

#### 2. Shipyard's Discovery from Plaintiffs

The Shipyard's counsel has expressed a tentative interest in wanting to depose at least some of the plaintiffs. If the Shipyard wants to depose all of them, and if plaintiffs are all to testify live at trial, this raises the specter of unwieldy and inefficient trial and pretrial proceedings. And if the Shipyard wishes to depose all 72 plaintiffs, then it will be necessary to impose reasonable limitations on those

depositions. While the nature of those limits need not be resolved now, it is plaintiffs' view that the cost of the Shipyard may not foist the costs of its failure to maintain legally-required records on plaintiffs or their counsel. Hence, extensive deposition practice to find out what should have been in the records is inappropriate and the parties and Court should work to avoid that prospect. (Also, at least three of the plaintiffs have been assigned by the Shipyard to a "tour of duty" in San Diego for the next six months, which may further complicate discovery from these plaintiffs.)

The prospect of these inefficiencies and potential disputes lends further support for the option of having most plaintiffs provide direct testimony by declaration. In that case, it might make sense for plaintiffs to provide those declarations in advance and then allow the parties to perpetuate their cross- and redirect examination by deposition.

### D. Experts

The parties still need to designate experts and disclose their testimony. Plaintiffs expect that they will call one or two experts, each of whom may need access to the Shipyard.

## V. Scheduling

The Court next asked "on what schedule would the parties propose to accomplish such further pre-trial proceedings." This raises an immediate issue. Lead counsel in this case, Mr. Scaramastra, will be on sabbatical for three months beginning April 1, 2007. (A colleague, Gary Swearingen, has graciously agreed to fill in during the interim.)

Plaintiffs expect that it will take around five months to complete the remaining discovery that is needed. To some extent, this schedule is dependent upon the speed with which the Shipyard can provide plaintiffs' counsel and their experts with access to the Shipyard. The process might take longer if the Court adopts a proposal that allows the parties to perpetuate the plaintiffs' testimony before trial, but this will be compensated by a much shorter and more manageable trial. Based on this estimate, plaintiffs suggest that a September 1, 2007 cut-off for all remaining discovery might make sense, with trial date set as soon thereafter as Appendix A to the Rules of the Court of Federal Claims will allow.

## VI. Duration and Location of the Trial

Plaintiffs propose that the trial take place in Seattle, Washington, because that is the federal courthouse closest to all of the witnesses. The duration of the trial will greatly depend on how many efficiencies the Court is willing to incorporate into the process. For example, will each individual plaintiff need to testify or will the Court accept declarations or the testimony of representative plaintiffs? If every plaintiff is required to individually testify, trial might take six weeks or more. If

/ / / /

/ / / /

some of the other options presented here are adopted, trial could take as little as one to two weeks.

DATED this 13th day of March, 2007.

Respectfully Submitted,

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on March 13, 2007, a copy of the foregoing "Plaintiffs' Memorandum in Opposition to Defendants' Motion in Limine" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs