No. 04-856C
Judge George W. Miller

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO REMAND AND FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7644

OF COUNSEL:

TELIN W. OZIER
Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street, S.E.
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Navy Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

July 2, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT OF THE ISSUES ..................................................................................... 1

STATEMENT OF THE CASE ..................................................................................... 2

ARGUMENT ..................................................................................... 8

I. Standards Of Review ..................................................................................... 8

II. Environmental Differential Pay Is A Local Determination ................................. 10

III. The Court Should Dismiss The Above-Captioned Case For Failure To State A Claim Upon Which Relief May Be Granted ..................................... 16

IV. In The Event That The Court Declines to Dismiss, The Proper Action For This Court To Take Is To Remand To The Shipyard To Complete The Grievance Process And To Make A Valid Determination ...... 19

A. The Matter Of The Grievance Must Be Remanded To The Parties For Administrative Processing Pursuant To The Federal Service Labor-Management Relations Statute ....................................... 20

B. The Initial Determination For Entitlement To EDP For High Work Should Be Remanded To The Local Navy Activity ............. 23

V. The Back Pay Period For Each Of The Plaintiffs Begins On The Date That They Each Filed In Federal Court ..................................................... 26

VI. The Back Pay For Each Of The Plaintiffs' Claims Cannot Extend Earlier In Time Than October 28, 1994 ............................................................ 30

CONCLUSION ..................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

AFGE Local 933 v. Department of Veterans Affairs,
58 FLRA No. 118 .......... 28

AFGE, Local 1156,
57 FLRA 602 (2001) .......... 28

Abbott Lab. v. Gardner,
387 U.S. 136 (1967) .......... 18

Adkins v.United States,
68 F.3d 1317 (Fed. Cir. 1995) .......... 19

Agwiak v. United States,
347 F.3d 1375 (2003) .......... 19

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) .......... 16

Allen Howarth, Jr. v. The United States,
41 Fed. Cl. 160 (1998) .......... 15

American Nat'l Bank & Trust Co. v. United States,
22 Cl. Ct. 7 (1990) .......... 9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 9

Anjelino v. The New York Times Co.,
200 F.3d 73 (3d Cir. 2000) .......... 10

Bailey v. United States,
52 Fed. Cl. 105 (2002) .......... 32

Bell Atlantic Corp. v. Twombly,
550 U. S. ____, 2007 WL 1461066 (May 21, 2007) .......... 9

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988) .......... 10

Bush v. Lucas,
462 U.S. 367 (1983) .......... 20

Carter v. Gibbs,
909 F.2d 1452 (Fed. Cir.1990),
cert. denied, Carter v. Goldberg, 498 U.S. 811 (1990) .......... 31

Celotex Corp v. United States,
477 U.S. 317 (1986) .......... 9

Cornelius v. Nutt,
472 U.S. 648 (1985) .......... 20, 21

Department of Navy, Charleston Naval Shipyard, SC and Federal Employees Metal Trade Council,
39 FLRA No 84, 39 FLRA 987 (March 5, 1991) .......... 14, 15

Director of Rev. v. CoBank ACB,
531 U.S. 316 (2001) .......... 31

Doyle v. United States,
220 Ct. Cl. 285; 599 F.2d 984 (1979) .......... 25

Glidden Co. v. Zdanok,
370 U.S. 530 (1962) .......... 27

Hans v. Louisiana,
134 U.S. 1 .......... 27

Heckler v. Chaney,
470 U.S. 821 (1985) .......... 19

Hinck v. United States,
64 Fed. Cl. 71 (2005) .......... 19

International Ass'n of Machinists & Aerospace Workers, District Lodge 725, Local Lodge 726 & United States Navy, Naval Air Depot, North Island,
60 FLRA No. 44, 60 FLRA S 196 (August 26, 2004) .......... 15

Jaynes v. Danzig,
No. C00-5221RJB (W.D. Wash. dismissed May 29, 2001), aff'd, Jaynes v. Johnson, 65 F. App'x 176 (9th Cir. 2003) .......... 7

Jaynes v. United States,
68 Fed. Cl. 747 (2005) .......... 8, 13

Jaynes v. United States,
74 Fed. Cl. 218 (2007) .......... 16, 25, 26

Jaynes v. United States,
75 Fed. Cl. 218 (2007) .......... 8

Kanemoto v. Reno,
41 F.3d 641 ( Fed. Cir. 1994) .......... 28

Lindhal v. Office of Personnel Management,
470 U.S. 768 (1985) .......... 20

Lujan v. Defenders of Wildlife,
504 U.S. 555 .......... 10

Lynch v. United States,
292 U.S. 571 (1934) .......... 27

Mayne v. United States,
3 Cl. Ct. 60 (1987) .......... 18

McNutt v. Gen. Motors Acceptance Corp.,
298 U.S. 178 (1936) .......... 16

Mudge v. United States,
50 Fed. Cl. 500 (2001), rev'd, 308 F.3d 1220 (Fed. Cir. 2002) .......... 31, 32

Mudge v. United States,
308 F.3d 1220 (Fed Cir. 2002) .......... 27, 31

Nat'l Park Hospitality Ass'n v. Dep't of Interior,
538 U.S. 803 (2003) .......... 18

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002) .......... 9

Ramirez v. United States,
36 Fed. Cl. 467 (1996) .......... 27, 28

Rochman v. United States,
27 Fed. Cl. 162 (1992) .......... 9

Southern Cal. Edison Co. v. Federal EnergyRegulatory Comm'n,
770 F.2d 779 (9th Cir. 1985) .......... 18

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 9

United States v. Fausto,
484 U.S. 439 .......... 31

Valley Forge Christian Coll. v. Americans United For Separation of Church & State, Inc.,
454 U.S. 464 (1982) .......... 10

Voge v. United States,
844 F.2d 776 (Fed. Cir.1988) .......... 19

Williams v. United States,
289 U.S. 553 (1933) .......... 27

**STATUTES & REGULATIONS**

5 U.S.C. §§ 5341 et seq. .......... 11

5 U.S.C. § 5343(c)(4) .......... 11, 12, 23

5 U.S.C. § 5596 .......... 7, 16, 30

5 U.S.C. § 5596(b) .......... 17, 26, 27, 28, 30

5 U.S.C. §§ 7101 et seq .......... 2, 18, 20

5 U.S.C. § 7103(a)(9)(C)(ii) .......... 21

5 U.S.C. § 7111(a) .......... 21

5 U.S.C. § 7114 .......... 2, 3, 21

5 U.S.C. § 7116 .......... 2

5 U.S.C. § 7120 .......... 2

5 U.S.C. § 7121 .......... 2, 22

5 U.S.C. § 7121 (a) .......... passim

5 U.S.C. § 7121 (b) .......... 3, 22

5 U.S.C. § 7122(a) .......... 22

5 U.S.C. § 7123 .......... 22

28 U.S.C. 1491 .......... 20, 30

28 U.S.C. § 1631 .......... 8

5 C.F.R. § 532.511 .......... 12, 16, 23

5 C.F.R. § 535 .......... 24

5 C.F.R. § 550.804 .......... 28

5 C.F.R. § 591.304(a)(2) .......... 19

H.R. Rep. No. 105-532, at 342 (1998) .......... 28

Pub. L. No. 94-454, 92 Stat. 1111 (1978) .......... 20

**MISCELLANEOUS**

C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE §1216 .......... 9

Stephen R. Munzer, Retroactive Law, 6 J. LEGAL STUD. 373 (1977) .......... 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO REMAND AND FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") and this Court's orders, dated April 3, 2007 and May 31, 2007, defendant, the United States respectfully requests that the Court dismiss this matter for failure to state a claim upon which relief may be granted, because plaintiffs cannot establish final agency action on the grievance or that there is a justiciable controversy for this Court to review. In the alternative, pursuant to RCFC 52.2 we respectfully request that the Court remand this matter to the agency to complete the grievance process and/or to make a local determination as to environmental differential pay for high work. Further, we respectfully request that the Court grant partial summary judgment in favor of the United States upon: (1) the effect of the "grievance decision" upon this Court's role and tasks, (2) the applicable limitations period(s), and (3) the effect of the 1994 amendments to the Civil Service Reform Act. In support of this motion, we rely upon the following brief, the allegations of the complaint, and the concurrently filed defendant's proposed findings of uncontroverted facts, and attached appendix.

**STATEMENT OF THE ISSUES**

1. Whether the local determination and requirements of the collective bargaining agreement control the parameters of this Court's review of this case.

2. Whether there is final agency action or a justiciable controversy regarding plaintiffs' Back Pay Act claims, where the grievance remains open and there is no local determination.

3. Whether this Court must remand to permit the agency to complete the grievance process and/or make a local determination with regard to an environmental differential for high work for the shipwrights at Puget Sound Naval Shipyard.

5. Whether the applicable statute of limitations period runs back from the date that each plaintiff filed in Federal court.

6. Whether the 1994 amendments to the Civil Service Reform Act limits the claim period for each plaintiff.

## STATEMENT OF THE CASE

In 1978, Congress enacted the Federal Service Labor-Management Relations statute ("FSLMRS"), 5 U.S.C. §§ 7101 et seq., which created a statutory basis for labor-management relations. The FSLMRS established certain rights for employees, labor organizations, and agencies. It also established obligations for labor organizations and agencies and set up various means of redressing violations of those obligations.

The obligations imposed upon labor organizations can be found in various sections of the FSLMRS, particularly 5 U.S.C. §§ 7114, 7120, 7116 and 7121. 5 U.S.C. § 7114 provides, in pertinent part:

> (a)(1) A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.
>
> * * *
>
> (4) Any agency and any exclusive representative in any appropriate unit in the agency, through appropriate representatives,

> shall meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement. In addition, the agency and the exclusive representative may determine appropriate techniques, consistent with the provisions of section 7119 of this title, to assist in any negotiations.

5 U.S.C. § 7114. 5 U.S.C. § 7121 (a) requires that any collective bargaining agreement ("CBA") provide procedures for the settlement of grievances, and that these procedures be the exclusive procedures for matters which fall within the coverage of the CBA. 5 U.S.C. § 7121 (b) provides the exclusive representative the right to represent bargaining unit employees in the grievance process and requires the parties engage in final binding arbitration for any grievance not satisfactorily settled under the CBA.

The named plaintiffs in this action are employees and former employees of the Puget Sound Naval Shipyard ("the shipyard") located in Bremerton, Washington. Compl. ¶ 2.[1] The plaintiffs allege that they are classified as "shipwrights" or have been assigned to do shipwright work in the shipyard's Shop 64. Id.

The plaintiffs, and all shipwrights, are represented by the Bremerton Metal Trades Council ("BMTC" or "union"), a union that is comprised of affiliated local unions. Compl. ¶ 2; App. 40.[2] One of the affiliated unions is the United Brotherhood of Carpenters and Joiners, local 2317. In accordance with the FSLMRS, BMTC is recognized as the exclusive representative for plaintiffs and all non-supervisory shipwrights. App. 1-2 (Second Declaration of Lynnette Niemi ("Second Niemi Decl.") ¶¶ 3-4); 13-15.

The collective bargaining agreement at issue in this case took effect in 1987.[3] App. 11.

---

[1] "Compl. ___" refers to the plaintiffs' Fourth Amended Complaint.

[2] "App. ___" refers to a page in the appendix filed with Defendant's Motion to Dismiss or, in the Alternative, Motion to Remand and for Partial Summary Judgment.

[3] A new agreement was negotiated and took effect in 2003.

Pursuant to this agreement, the parties negotiated the right of employees to receive environmental differential pay ("EDP"), including high pay.[4] App 17-21.

Article 10, section 1002 of the collective bargaining agreement states the general conditions under which EDP is authorized. App. 17-18. In part, "Pay for environmental differential is authorized: (1) for exposure to an unusually severe hazard which could result in significant injury, illness, or death, such as on a high structure when the hazard is not adequately alleviated by mechanical equipment or protective devices being used or on an open structure when adverse conditions such as darkness, lightning, steady rain, snow, sleet, ice or high wind velocity exist ...." Id. Section 1003 provides that "Employees will be paid environmental differentials, when warranted, in accordance with FPM Supplement 532-1 and Appendix J attached thereto." App. 18. Pursuant to Appendix J of the Federal Personnel Manual Supplement ("FPM") (contained in Appendix II of the CBA), "high work" is defined as "working on any structure at least 100 feet above the ground, deck, floor or roof or from the bottom of a tank or pit." It also includes "working at a lesser height if the footing is unsure or the structure is unstable ...." App. 41. Section 1004 provides that immediate supervisors will notify employees when environmental pay is authorized, and that "[i]f at any time during a job assignment an employee believes that additional pay is warranted, the employee will call the matter to the attention of the immediate supervisor who will advise the employee if additional high pay may be allowed." App. 19. Any complaint regarding high pay not resolved in such discussions between the employer and the employee could be resolved through the negotiated grievance procedures. Id.

One of the principal jobs of shipwrights is to build and dismantle staging for ships that are being built, repaired, or decommissioned. Between fifty to one hundred stagings are built per

---

[4] All references are to the 1987 collective bargaining agreement unless otherwise stated.

week. Most staging that is constructed is less than twenty feet high and is built by teams of two shipwrights. On occasion, higher staging is built which, depending upon the size, may have teams of four to ten shipwrights. Although very high staging may be built, even up to 130 feet, that is extremely rare and occurs usually only once every couple of years. App. 1, 2 (Second Winkler Decl. ¶¶ 2, 8-10).

Prior to 1999, the shipyard did not have a specific height trigger for the payment of an environmental differential to shipwrights for high work under 100 feet. Instead, consistent with the CBA, shipwrights could request high pay from a supervisor in specific instances, who was to assess the particular job conditions and determine whether additional pay was warranted. See App. 19, 110.

On April 13, 1999, the BMTC, the exclusive representative of the shipwrights, filed a grievance on behalf of ninety-nine employees, including some of the plaintiffs,[5] demanding back pay for high work. See App. 49-60. The grievance stated that : "I have been aggrieved in that Shop 64 [Puget Sound Naval Shipyard] has continually denied me the appropriate amount of high pay, 25% additional environmental differential, for performing high work as outlined by the Code of Federal Regulations and the BMTC Agreement." App. 50. The corrective action sought was "to be compensated back environmental pay for high work at a rate of 1040 hours per year for all years in Shop 64 (plus interest). Compensation for back environmental pay for high work must also be included for overtime worked during the same period (plus interest.)." App. 51 (emphasis added).

[5] Eighteen of the current plaintiffs did not sign the original grievance, including Dwight J. Ambler, Ireneo G. Amable, Ralph Bergman, Harry R. Calhoun, Berend Freese, Frederick A, Green, Jarrod Hogue, Stephen A. Jacobson, James M. Jazuk, Joseph M. McKinnon, Roy E. Moreland, Denny D. Parsons, Ross K. Provoe, Clifford L. Reinbold, Tally K. Roy, Greg Williams, Shawn Williams, and Joseph Wodyga. Compare App. 53-60 with Compl. 1.

Messrs. Joe Hamel and Joe Aiken were named as the union representatives. App. 50. The grievance number assigned was 05153-K. Id. Ms. Mary Jane Tallman was the Superintendent for several trade shops, including Shop 64, and the management official responsible for resolving the grievances. Id. Ms. Tallman created a management team to investigate the grievance. Included on this team were Mr. Mark Winkler and Ms. Lynnette Niemi. App. 4 (Second Winkler Decl. ¶ 21); App. 9 (Second Niemi Decl. ¶ 5); 100-02.

In investigating the grievance, the management team examined how EDP had been handled elsewhere within the shipyard, and other shipyards. The team also wanted to work with the union to amicably resolve the matter if possible. The management team met with the union and eventually an agreement was reached to settle the grievance. See App. 61-75, 87-88, 107. The grievance settlement provided that high pay would be provided prospectively to shipwrights who build or dismantle staging beginning from the first level above the ground or deck unless flooring and safety rails are installed or fall protection devices can be properly used. App. 65. High pay would also be paid prospectively to shipwrights who build or dismantle hanging staging under similarly unguarded situations when fall protection devices cannot properly be used. Id. The grievance settlement also provided that shipwrights who had performed such high work would, in accordance with the grievance provisions of the CBA, receive high pay from 15 days prior to the filing of the grievance, to the date of resolution on January 18, 2000. Id.; App. 4 (Second Winkler Decl. ¶¶ 21-23).

On or about January 14, 2000, Mr. Aiken met with Ms. Tallman to sign the grievance settlement. App. 87-88. After discussing the grievance settlement, Mr. Aiken left and met with the grievants to discuss the settlement agreement. App. 89-90. Later, he returned and signed the settlement. Although the settlement was termed a "decision," it was fully negotiated and mutually agreed to by both the shipyard and Mr. Aiken. Mr. Aiken's signature on the "decision"

constituted the union's agreement that the grievance was resolved and the union would not proceed to arbitration. App. 96, 97. The union did not seek arbitration.[6] Id.; App. 6-7 (Second Winkler Decl. ¶¶ 30-32).

On April 14, 2000, fifty-six individual plaintiffs filed a complaint against the Defendant in the United States District Court for the Western District of Washington under the Back Pay Act, 5 U.S.C. § 5596 (2000). The plaintiffs sought review of the grievance decision's fifteen-working day limit on the back pay awarded for high work allegedly performed prior to the filing of the grievance and a grant of class-wide relief declaring an entitlement to six years' back pay with interest. Jaynes v. Danzig, No. C00-5221RJB (W.D. Wash. dismissed May 29, 2001), aff'd, Jaynes v. Johnson, 65 F. App'x 176 (9th Cir. 2003). The district court denied class certification on December 6, 2000. See Order Den. Pls. Mot. to Certify Matter as Class Action, Jaynes v. Danzig, No. C00-5221RJB (W.D. Wash. Dec. 6, 2000).

In March 2001, the defendants moved for dismissal for lack of subject-matter jurisdiction. The district court granted that motion. On July 9, 2001, plaintiffs appealed to the United States Court of Appeals for the Ninth Circuit, seeking review of the district court's orders denying class certification and dismissing the case on jurisdictional grounds. On May 22, 2003, the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction and remanded the case to the district court with instructions to transfer the case to the United States Court of Federal Claims. See Jaynes, 65 F. App'x at 178 (9th Cir. 2003). Having affirmed the district court's decision to

[6] The agreement called for the payment of interest upon the back pay. App. 65. Payment was to be made by the Defense Finance and Accounting Service ("DFAS") which processes all civilian pay for Navy civilians. As of August 2000, the interest payments had not been made. Consequently, on August 30, 2000, the union filed an unfair labor charge against the shipyard. In this charge, the union alleged that the shipyard commander had violated the terms of grievance 05153-K by not paying the agreed upon interest without giving the union notice or the opportunity to bargain further. It also charged that DFAS had refused "to comply with [the] negotiated settlement agreement, Grievance #05153-K, sub paragraph IV (2) by refusing to pay the appropriate interest for the back pay ...." App. 78.

dismiss the case for lack of jurisdiction, the Ninth Circuit declined to review the order denying plaintiffs' motion for class certification. Id. at 180. The case was transferred to this Court on May 18, 2004, pursuant to 28 U.S.C. § 1631.

Plaintiffs filed their complaint in the Court of Federal Claims on June 15, 2004, alleging that defendant, the United States, had failed to pay back pay for high work as mandated by Federal laws, regulations, and their CBA. As in the original grievance, the plaintiffs allege they are entitled to six years of back pay for high pay under the Back Pay Act.

On May 27, 2005, Defendant filed a Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment wherein it stated that "[p]laintiffs' claims are barred by the provisions of the collective bargaining agreement. In the alternative, plaintiffs' claims are barred by the doctrine of accord and satisfaction." On December 7, 2005, the Court found the claims in Federal court were not barred by the provisions of the collective bargaining agreement and ordered a separate trial on Defendant's alternative affirmative defense of accord and satisfaction. Jaynes v. United States, 68 Fed. Cl. 747 (2005). After a three-day trial held in Seattle, Washington, on February 14, 2007, the Court issued an opinion which stated, in pertinent part, that "the Court finds that the grievance decision did not effect an accord and satisfaction of the claims asserted by plaintiffs in this action. Defendant's affirmative defense of accord and satisfaction must therefore fail." Jaynes v. United States, 75 Fed. Cl. 218, 236 (2007).

## ARGUMENT

### I. Standards Of Review

Pursuant to RCFC 12(b)(6), the Court may dismiss a complaint if, as a matter of law, it fails to state a claim upon which relief can be granted. Unlike a RCFC 12(b)(1) disposition, however, "dismissal of plaintiff's complaint . . . for failure to state a claim does not have the legal

effect of divesting this court of jurisdiction," and thus operates as a final adjudication, with prejudice, upon the merits. American Nat'l Bank & Trust Co. v. United States, 22 Cl. Ct. 7, 18 (1990). The Supreme Court has provided that, to survive a motion to dismiss for failure to state a claim upon which relief can be granted, "factual allegations must be enough to raise a right to relief above the speculative level," upon the assumption that all the allegations in the complaint are true even if doubtful in fact. Bell Atlantic Corp. v. Twombly, 550 U. S. ____, 2007 WL 1461066 at *8 (May 21, 2007) (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE §1216, pp. 235.236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")). Before a party is entitled to present facts in support of its claim, it must first establish that it has adequately stated a claim. Id. at *11. Further, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, because "legal conclusions, deduction, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (citation omitted).

Summary judgement is proper if no genuine question of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp v. United States, 477 U.S. 317, 322 (1986). A fact qualifies as "material" if it would affect the outcome of the case. Anderson, 477 U.S. at 248. The burden of showing the absence of a genuine question of material fact rests with the movant. And, the court must view all evidence in the light most favorable to the non-movant, resolving all doubts in that party's favor. O'Connor v. United States, 308 F.3d 1233 (Fed. Cir. 2002).

After the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine issue of factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). The non-movant's burden is to set forth

specific facts that generate issues for trial. This burden "is not met by reliance on its pleadings alone, or by conclusory allegations and generalizations." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988). The non-movant must present sufficient evidence of a dispute as to "material fact such that the trier of fact could reasonably find in favor of the non-movant." Id. at 105.

## II. Environmental Differential Pay Is A Local Determination

Counts I and III of plaintiffs' complaint seeks to have this Court determine shipwright's entitlement to high pay by reviewing, as a factual matter, if shipwrights as a group[7] worked under conditions in which the footing is unsure or the structure is unstable; safe scaffolding, enclosed ladders or other similar protective facilities were not adequate; and adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors rendered working at such height(s) hazardous. Consideration of these factors, however, are beyond the scope of the Court's review. In determining a monetary entitlement to EDP for high work, it is the shipyard's local determination that would govern.

---

[7] Although plaintiffs' motion for class certification has been denied, plaintiffs' fourth amended complaint continues to treat this matter as though it were a class action, providing particularized claims of harm for only the "lead" plaintiffs. While, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, "[s]tanding is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent." Anjelino v. The New York Times Co., 200 F.3d 73, 88 (3d Cir. 2000) (emphasis added). "[A]n injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks, footnote, and citations omitted) (emphasis added); see Valley Forge Christian Coll. v. Americans United For Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) ("party who invokes the court's authority [must] show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" (internal quotation marks omitted)). "[P]articularized ... mean[s] that the injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 & n.1. (emphasis added). Accordingly, it appears that plaintiffs' current complaint is inadequate to establish standing for all but the lead plaintiffs.

Plaintiffs in this case are wage-grade employees. Pay for wage-grade employees is set by the Prevailing Rate Systems Act, 5 U.S.C. §§ 5341-49. Under this Act, the Office of Personnel Management ("OPM") is tasked with conducting wage surveys in the local commuting area and determining what the prevailing wages are for similar, private sector wage-type jobs. These surveys are then used to set the base wages for the Federal wage-grade employees in that wage area. In addition, OPM is also statutorily tasked with establishing another component of this pay, namely the payment of Environmental Differential Pay ("EDP") – which is paid for duty involving unusually severe working conditions or hazards. There are numerous categories for EDP, such as working with poisons, working in pressure chambers, exposure to asbestos, or in this case, high work.[8]

At the time the grievance and subsequent lawsuit was initially filed, 5 U.S.C. § 5343(c)(4) provided, in part, that:

> The Office of Personnel Management, by regulation shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide–
>
> ***
>
> (4) for proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards; . . . .[9]

5 U.S.C. § 5343(c)(4).

---

[8] All EDP is a percentage of the salary of a WG-10/Step 2. The percentage varies depending upon the type of severe working condition or hazard. In the case of high work, it is 25%.

[9] On November 24, 2003 Congress amended the statute and specifically stated that EDP for asbestos exposure must be based upon the OSHA Permissible Exposure Limit. The importance of this will be discussed below with respect to whether EDP is a "condition of employment" and therefore excluded from coverage of the Collective Bargaining Agreement.

OPM initially published these "proper differentials" (that is, Environmental Differential Pay) as Appendix J to the Federal Personnel Supplement Part 532-1, Subchapter S8-7. With respect to this matter, the CBA that covers the plaintiffs discusses EDP in Article 10 and references the Federal Personnel Supplement. In the 1990s, the Federal Personnel Manual and Supplements were retired, and these differentials are now published in 5 C.F.R. § 532.511.

Pursuant to the statutory mandate cited above, when OPM issued its regulations providing for EDP for categories of working conditions, rather than providing specific levels or triggers for EDP entitlement, it specifically left these determinations up to the local installation or activity. Thus, at the time this grievance and lawsuit were initiated, 5 C.F.R. § 532.511 provided, in pertinent part:

> (a) Entitlements to environmental differential pay.
>
> (1) In accordance with Section 5343(c)(4) of Title 5, United States Code, an employee shall be paid an environmental differential when exposed to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management.
>
> (2) <u>Each installation or activity</u> must evaluate its situations <u>against guidelines</u> issued by the Office of Personnel Management to determine whether the <u>local situation is covered by one or more of the defined categories</u>.

5 C.F.R. § 532.511 (emphasis added).

Under OPM regulations, and included in the collective bargaining agreement between the parties, high pay is "authorized" when:

> a. Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor or roof, of from the bottom of a tank or pit;
>
> b. Working at a lesser height:
>
> (1) if the footing is unsure or the structure is unstable;

> (2) if safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or
>
> (3) if adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.[10]

5 C.F.R. Part 532 Appendix A to Subpart E. Aside from the 100-foot trigger in paragraph (a),[11] there is no specific trigger for when high pay is authorized. While the OPM regulations provide guidelines to the agency, those guidelines are subject to local determination, and when to pay high pay remains a matter of local determination. Stated another way, although entitled to EDP, there must be a local determination translating these general standards into an vested entitlement to EDP in a particular situation.

The regulations for the payment of EDP are published in the Code of Federal Regulations by OPM. OPM also publishes a manual to guide Federal agencies in the application of OPM's regulations. One subchapter of the OPM Manual, S8-7, is devoted to explaining how a Federal agency is to determine the proper EDP entitlement. The OPM Manual makes clear that the determination of when EDP is to be paid is to be made by the local Federal activity. It goes on to explain that the collective bargaining process is a completely acceptable means to make the local determination. Therefore, not only is the determination of when to pay EDP not "provided for by statute," but Federal pay guidelines expressly permit that such a determination can be made through bargaining with the participation of the union. Indeed, this manual describes the

---

[10] As this Court held in Jaynes v. United States, 68 Fed. Cl. 747 (2005), work above 100 feet is not at issue in this case.

[11] The Government does not contest that, to the extent that plaintiffs claim that they worked at over 100-feet, this Court would possess jurisdiction pursuant to the CBA over plaintiffs claims.

situations listed by plaintiffs as merely illustrative of when EDP shall be paid. The OPM Manual, chapter S8-7 reads in pertinent part:

> g. Determining <u>local situations</u> when environmental differentials are payable.
>
> 1. Appendix J defines the categories of exposure for which the hazard, physical hardships, or working conditions are of such an unusual nature as to warrant environmental differentials, and gives <u>examples</u> of situations which are <u>illustrative</u> of the nature and degree of the particular hazard, physical hardship, or working condition involved in performing the category. The examples of the situations are not all inclusive but are intended to be <u>illustrative only</u>.
> 2. Each installation or activity must evaluate its situations against the guidelines in appendix J to determine whether the <u>local situation</u> is covered by one or more of the defined categories.
>    a. When the local situation is determined to be covered by one or more of the defined categories (even though not covered by a specific illustrative example), the authorized environmental differential is paid for the appropriate category.
>    b. When the local situation is not covered by one of the defined categories but is considered to be unusual in nature so as to warrant payment of an environmental differential, a differential may not be paid, but action is to be initiated to request OPM to consider authorizing the payment of an environmental differential.
> 3. Nothing in this section shall preclude negotiations through the collective bargaining process for:
>    a. Determining the coverage of additional local situations under appropriate categories in appendix J and application of appendix J categories to local work situations. For example, local negotiations may be used to determine whether a local work situation is covered under an approved category, even though the work situation may not be described under a specific <u>illustrative example</u>.

OPM Manual, chapter S8-7 (emphasis added). <u>See</u> App. 82-83.

This is also the clear position of the Federal Labor Relations Authority. In <u>Department of Navy, Charleston Naval Shipyard, SC and Federal Employees Metal Trade Council</u>, 39 FLRA No 84, 39 FLRA 987 (March 5, 1991), the FLRA stated its oft repeated holding that:

> FPM Supplement 532-1, appendix J, is a Government-wide regulation which lists categories of situations, such as "high work" requiring the payment of environmental differentials. However, the specific work situations for which EDP is payable under the categories of appendix J are left to local determination, including arbitration.

Id. See also International Ass'n of Machinists & Aerospace Workers, District Lodge 725, Local Lodge 726 & United States Navy, Naval Air Depot, North Island, 60 FLRA No. 44, 60 FLRAS 196 (August 26, 2004) (emphasis added). Similarly in Allen Howarth, Jr. v. The United States, 41 Fed. Cl. 160 (1998), the plaintiffs sought EDP for asbestos exposure, arguing that any exposure entitled them to payment. The Court disagreed, noting that the statute and OPM regulations were silent regarding a specific level of exposure warranting EDP thereby leaving the determination of a triggering point to the local agency. Id. at 163. Thus, just because the plaintiffs are authorized to receive EDP does not mean they get it. Rather, the relevant question before the Shipyard was determining the circumstances for when their employees would be entitled to it.

The critical importance of a local determination in setting the standard for high pay was explained in an April 15, 1977 letter by Frank S. Meller, Acting Chief for the Pay Policy Division of the Civil Service Commission to the American Federation of Government Employees. Mr. Meller observed that:

> During the deliberations regarding the language to be used in the listing of environmental differential categories, both labor and management members of the Prevailing Rate Advisory Committee ultimately agreed that some situations, like "dirty work," for example, were not susceptible to specific or numerical parameters. Consequently, these categories had to be expressed in more general terms, and it was agreed that local agency management should determine eligibility based upon (1) the language of appendix J, (2) knowledge of the work environment and trade practices, and (3) the fundamental concept of the program, which requires that the hazard, physical hardship or working condition be of an "unusually severe nature." Serious difference of interpretation were to be resolved by negotiations at the local level or through the appropriate grievance process.

App. 85 (emphasis added).

This Court has acknowledged that the initial determination as to the payment of EDP is to be made locally, as it has noted,

> the authority to determine in what circumstances employees are entitled to high pay for work below 100 feet (i.e., the circumstances that constitute "environmental factors [that] render working at such height(s) hazardous," JX 001 Appendix II) had been delegated to each installation or activity. See 5 C.F.R. § 532.511(a)(2).

Jaynes v. United States, 74 Fed. Cl. 218, 228 (2007) (emphasis added).

Finally, the requirement that there must be a local determination makes sense in the context of the regulation, because the entitlement is for unusually severe working conditions or unusually severe hazards. The regulations are not designed to provide EDP pay for merely severe hazards or severe working conditions. Instead, the regulations make clear that EDP is only provided in "unusual" situations. Rather than rigidly define the terms "unusually severe," which may vary from activity to activity and from situation to situation, OPM expressly delegated this matter to local installations and activities.

The critical question in this case, thus, is whether there exists a local determination which would have entitle these 74 plaintiffs to EDP for high work at the Bremerton Naval Shipyard. As a critical jurisdictional fact, plaintiffs bear the burden of demonstrating the existence of such a determination. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir.1998). Because plaintiffs cannot establish that there was a valid local determination entitling them to an EDP for high work, this Court must dismiss this case, or, in the alternative, remand this matter to the agency.

## III. The Court Should Dismiss The Above-Captioned Case For Failure To State A Claim Upon Which Relief May Be Granted

Plaintiffs have filed this action against the United States based upon the Back Pay Act, 5 U.S.C. § 5596, alleging that they are entitled to monetary compensation in the form of EDP for

"high work" performed but not compensated as such. However, because the grievance now remains open and because there is no local determination against which to weigh plaintiffs' claims, plaintiffs fail to state a claim upon which relief may granted.

The Back Pay Act provides, in pertinent part, that:

> An employee of an agency who, on the basis of a timely appeal or an administrative determination … is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee -
> (A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect -
> (I) an amount equal to all or any of the pay, allowances, or differentials . . .

5 U.S.C. § 5596(b)(1). Thus, in order to possess a claim for back pay pursuant to the Back Pay Act, an "appropriate authority" must first find, pursuant to applicable law, that a Federal employee was affected by an unjustified or unwarranted personnel action resulting in withdrawal or reduction of pay.

In the present case, however, there are two basic limitations upon this Court's ability to grant relief. First, as a result of the Court's determination that the grievance decision was not a settlement of the grievance, the grievance itself remains open,[12] and thus there is no final agency action on the grievance. Second, this Court cannot adjudicate the current controversy without the agency having made a local determination, and the question of entitlement is not justiciable without such a local determination.

[12] "In Section IV(a) of this motion, we include an extensive discussion regarding the consequence of this Court's determination that the parties failed to have the requisite meeting of the minds necessary to produce a valid settlement of the grievance is that the grievance is unresolved; remains open; and must necessarily be remanded for processing under the procedures mandated by the FSLRS. In order to avoid repetition, we will no restate this discussion here.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 148-49 (1967)). In Mayne v. United States, 3 Cl. Ct. 60 (1987), this Court's predecessor noted that:

> In a dispute between a government agency and a private party, the issues presented are fit for judicial review if they are ripe and if the administrative remedies available to the parties have been exhausted. Judicial evaluation of agency action is ripe if the agency action is final and if legal issues are present.

3 Cl. Ct. at 63 (citing Southern Cal. Edison Co. v. Federal Energy Regulatory Comm'n, 770 F.2d 779, 785 (9th Cir.1985)). However, as we set forth in more detail below, because this Court has determined that the grievance brought by the plaintiffs was not settled, the grievance remains an open action, subject to resolution pursuant to the Federal Service Labor-Management Relations statute, 5 U.S.C. §§ 7101-35, through negotiations with the union.

This is particularly pertinent because the plaintiffs pled and this Court has treated the CBA as one basis for this Court's jurisdiction over this matter. With an open grievance pending pursuant to the CBA, this Court cannot function as an "appropriate authority under . . . [the] collective bargaining agreement" without allowing the union and the Government the opportunity to first complete the grievance provisions of the CBA. The union and shipyard began the grievance process, and pursuant to the FSLMRS, they possess the express authority to settle it.

Nor is there a justiciable case for this Court to decide without a local determination. "Even where a court possesses jurisdiction to hear a claim, it may not do so in cases where the

claim presents a nonjusticiable controversy." Adkins v.United States, 68 F.3d 1317, 1322 (Fed. Cir. 1995). See, e.g., Hinck v. United States, 64 Fed. Cl. 71 (2005). "A controversy is justiciable only if it is one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence." Voge v. United States, 844 F.2d 776, 780 (Fed. Cir.1988) (internal quotations omitted). "Agency actions committed to agency discretion by law, however, are nonjusticiable." Heckler v. Chaney, 470 U.S. 821, 830 (1985). This Court is not competent to set the local determination for the shipyard, a prerequisite to providing plaintiffs with the monetary relief that they seek and a task expressly delegated to the local activity. Compare Agwiak v. United States, 347 F.3d 1375, 1381 (2003) (determination of whether a work site is remote pursuant to 5 C.F.R. § 591.304(a)(2) is justiciable). Plaintiffs do not allege that there was a local determination prior to the January 2000 grievance decision. Indeed, the entire premise of the grievance was that the shipyard had not paid the grievants an EDP for high work and had failed to comply with the OPM's regulations.[13] Rather, plaintiffs' complaint focuses upon the OPM regulations, which provide that the agency is to make a local determination, and the grievance decision, which sets no local determination for back high work, remains open, and has been effectively invalidated by this Court's decision.

Accordingly, we respectfully request that this case be dismissed for lack of subject matter jurisdiction.

## IV. In the Event That The Court Declines To Dismiss, The Proper Action For This Court To Take Is To Remand To The Shipyard To Complete The Grievance Process And To Make A Valid Determination

This Court possesses the express authority to remand any case within this Court's jurisdiction. Pursuant to the Tucker Act,

[13] This is not to say that there was no policy in place. The CBA allowed for high pay upon notice to supervisors. However, there was no height trigger for high work below 100 feet.

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . . In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

28 U.S.C. § 1491(a)(1), (2) (emphasis added). In the event that this Court determines that this claim should not be dismissed, the Court should remand to the shipyard to complete the grievance process and/or to make a valid local determination.

**A. The Matter of the Grievance Must Be Remanded To The Parties For Administrative Processing Pursuant To The Federal Service Labor-Management Relations Statute**

In the Civil Service Reform Act of 1978, Pub. L. No. 94-454, 92 Stat. 1111 (1978), Congress enacted a comprehensive revision of civil service law. The CSRA "comprehensively overhauled the civil service system." Lindhal v. Office of Personnel Management, 470 U.S. 768, 733 (1985). It created an "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations." Bush v. Lucas, 462 U.S. 367, 388 (1983). Among the main purposes of the CSRA is the "preservation of the ability of federal managers to maintain effective and efficient Government, and the strengthening of the position of federal unions, and making the collective bargaining process a more effective instrument of the public interest." Cornelius v. Nutt, 472 U.S. 648, 650-51 (1985) (citations, brackets, and internal quotes omitted).

The very labor law statute which has been interpreted to provide the opportunity for the plaintiffs to proceed to the Court of Federal Claims contains a section[14] which directs the government to "accord exclusive recognition to a labor organization if the organization has been

[14] Specifically, 5 U.S.C. §§ 7101-35, the Federal Service Labor-Management Relations statute, which is part of the Civil Service Reform Act.

selected as the representative… ." 5 U.S.C. § 7111(a). A labor organization that has been recognized as the exclusive representative of the bargaining unit is empowered to "act for, and negotiate collective bargaining agreements covering all employees in the unit." 5 U.S.C. § 7114(a)(1). Congress has recognized that the exclusive representative - the union - can bind a bargaining unit employee to a grievance procedure:

> The rights of an exclusive representative under the provisions of this subsection shall not be construed to preclude an employee from -
>
> (A) being represented by an attorney or other representative, other than the exclusive representative, of the employee's own choosing in any grievance or appeal action; or
>
> (B) exercising grievance or appellate rights established by law, rule, or regulation;
>
> <u>except in the case of grievance or appeal procedures negotiated under this chapter</u>.

5 U.S.C. § 7114(a)(5)(emphasis added). Thus, while having recognized an employee's right to be represented by an attorney of his or her own choosing, and to grieve pursuant to law, Congress also recognized that the exclusive representative can bind a covered employee or employees to a grievance procedure. <u>Id.</u>

Congress specifically defined the term "grievance" to encompass alleged violations of "any law" relating to the conditions of employment:

> "grievance" means any complaint … (C) by any employee, labor organization, or agency concerning . . . (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

5 U.S.C. § 7103(a)(9)(C)(ii).

The procedures mandated by the statute "provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which

may invoked by either the exclusive representative or the agency." 5 U.S.C. § 7121(b)(3)(C). See also Cornelius, 472 U.S. at 652.

The statute also contains direction as to how "[e]ither party to arbitration under this chapter may file with the [Federal Labor Relations] Authority an exception to any arbitrator's award pursuant to the arbitration," 5 U.S.C. § 7122(a), and, upon receipt of a decision by the Federal Labor Relations Authority, if those employees are still dissatisfied with the outcome of the arbitration, they may seek judicial review. 5 U.S.C. § 7123.

Article 30 of the parties collective bargaining agreement, negotiated pursuant to the provisions of 5 U.S.C. § 7121, contains a two-step grievance procedure applicable "to all eligible employees of the unit who pursue a grievance with Council representation." App. 28 (CBA § 3003). In the first step, the employees submit their grievances to their immediate supervisor and in the second step, they are submitted to the shop or branch head. Id. Article 31 of the CBA covers arbitration provisions. "Arbitration may be invoked only by the Council or the [shipyard]. Arbitration on an employee grievance may be invoked only by the Council. Written requests for arbitration must be submitted within 30 calendar days after the date of the second-step grievance." App. 35 (CBA § 3101).

The plaintiffs' claims in this case were filed pursuant to the Back Pay Act, seeking enforcement of OPM pay regulations for the six years prior to the date the grievance was filed with the shipyard, and are subject first to the negotiated grievance procedures. David Hurm submitted a grievance, signed by 99 bargaining unit employees, on April 13, 1999. App. 50, 53-60. The grievance asked for "back environmental pay for high work [ ] for all years in Shop 64 (plus interest)." App. 51. The exclusive representative, as represented by Mr. Aiken, worked with management, as represented by Ms Tallman, to reach a grievance decision. Their uncontradicted testimony is that they both believed that had reached a settlement agreement on

January 18, 2000.[15] App. 87, 93, 95, 107-08. However, this Court has held that the grievance decision cannot be interpreted to be an accord and satisfaction of the back pay claims of the plaintiffs who were the signatories to the grievance itself.

The April 13, 1999 grievance was, in and of itself, solely a claim for back pay. The primary purpose of the January 18, 2000 grievance decision was to settle the claims for back pay. If the grievance decision did not, as this Court has held, satisfy that claim for back pay, then it necessarily failed to settle the back pay grievance. If it did not settle the grievance, then the grievance decision is void ab initio and cannot be construed to still exist as a management decision under the CBA. The result, then, of this Court's February 14, 2007 Opinion and Order is that the grievance filed on April 13, 1999 is still an active and viable complaint under the negotiated grievance procedures of the collective bargaining agreement between the parties - one that has not received a decision from management which is subject to binding arbitration. As such, this Court should remand the matter to the parties to re-process the grievance according to the requirements of the CBA and the Federal Service Labor-Management Relations statute.

**B. The Initial Determination For Entitlement To EDP For High Work Should Be Remanded To The Local Navy Activity**

As discussed above, a local determination is required by OPM regulation as part of determining an entitlement to EDP for high work. Accordingly, in addition to remand being required to complete the grievance process, the statutory and regulatory procedures for the payment of EDP independently require remand for a local determination at the Navy activity level. 5 C.F.R. § 532.511(a)(2). The regulation is mandatory in nature.

The local determination has two components. The first component is statutory – does the "local situation" expose employees to one or more "unusually severe hazards." 5 U.S.C.

---

[15] Further, the union and the shipyard treated the matter as settled. See, e.g., App. 76-77 (letter from union to Congressman Norm Dicks), 78 (FLRA charge), 79 (Mascioli grievance settlement).

§ 5343(c)(4). The second is regulatory – does the "local situation" meet the "guidelines" set out in the OPM regulation that states that a 25% differential for work at heights below 100 feet is to be paid:

> (1) If the footing is unsure or the structure is unstable, or
>
> (2) If safe scaffolding, enclosed ladders, or other protective facilities are not adequate, for example, working from a swinging stage, boatswains chair, or a similar support, or
>
> (3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.

5 C.F.R. 535, Appendix A.

Since none of the work at the Puget Sound Naval Shipyard involved a "swinging stage" or "boatswains chair,"[16] the only two specific examples supplied by OPM regarding work on scaffolding, the remainder of the regulation becomes a matter of application based on knowledge of the "local situation."

While it might be argued that the purpose of the grievance was to create the local determination, such was not the demand made in the grievance. And, in fact, neither the grievance process nor the local determination was ever complete. This Court has recognized that the representative of the employer, Ms. Tallman, and the representative of the union, Mr. Aiken, attempted to use the grievance decision as the means to settle the back pay claim that was the focus of the grievance. This Court has concluded, however, that while the two parties to the settlement believed they were resolving the back pay claim, the expression of that settlement was inadequate to actually preclude further claims for that same back pay.

Plaintiffs, who argued that the grievance process was a nullity because it neither conformed to the collective bargaining agreement nor involved the proper parties to reach a

[16] Both a swinging platform and a boatswain's chair involve being lowered or suspended by ropes or wires as window washers might use being lowered from the top edge of a building.

decision, cannot now assert that the grievance decision should be applied to their claim for back pay. "Plaintiffs cannot have their cake and eat it too." Doyle v. United States, 220 Ct. Cl. 285, 311-312; 599 F.2d 984, 1000-1001 (1979). This would undermine the entire purpose of the EDP regulations that include a process for the local activity to make an initial determination based on the statute and the OPM guidelines.

The intent of the grievance settlement was to compensate shipwrights with generous future pay in order to resolve the back pay claim. As this Court has noted, "[t]he decision established that in the future shipwrights would receive high pay [under the described conditions]." Jaynes, 74 Fed. Cl. at 224 (emphasis added). See also App. 91-92, 103-04, 105-06, 108-09, 110-13. In other words, the future pay policy of paying for work over five feet, as approved by Ms. Tallman in accordance with her authority to settle the grievance, was never intended to be applied to any grievance pay claims that related to the years before the grievance was filed, rather it was intended to cancel those claims. There is no evidence that the generous five-foot pay rule was ever intended to be applied retroactively to the back pay claims; rather, all testimony indicated that the grievance decision was intended to cancel such back pay claims. The understanding of Ms. Tallman, representing the shipyard, and Mr. Aiken, as the voice of the exclusive representative of the employees, was that the parties were dropping their back pay claim based upon generous future pay. App. 93, 95-96, 107.

Therefore, if this Court were to apply that generous future pay settlement, which was intended to compensate the employees for dropping their back pay claim, as the "local determination" for the payment of the back pay, the effect would be just the opposite of the result that the parties intended. As such, it could not legitimately represent the actual local determination made at the Navy activity. See App. 98-99. The attempted, albeit unsuccessful, settlement cannot be treated as a required local determination of the EDP entitlement for the back pay portion of the grievance because it is clear that the five foot standard would never had been

adopted except in exchange for a complete waiver of the back pay grievance claim. As that same back pay claim is the only claim that is now before this Court, this court should, in accordance with the pay regulations, remand for an initial EDP determination by the local activity.

The generosity of the future pay policy has been noted by this Court in its reference to what other Navy shipyards were paying.

> Rodney J. Whitcher, the Shipwright Supervisor at Shop 64, testified that no shipwright was concerned about working at a height of five feet; in his opinion, twenty-five feet was a good height at which to pay high pay. He further testified that most shipyards start paying high pay for work starting at approximately 25 feet.

Jaynes, 74 Fed. Cl. at 231 n.18 (citations omitted). In fact, since paying EDP for high work is predicated on exposure to "an unusually severe hazard," paying it for work starting at five feet cannot be seen as anything but a compromise in the attempt to settle the back pay claim.

Only one of two conditions could have existed prior to March 1999. The first is that the local determination for all time periods prior to March 1999 was that "local situation" did not warrant EDP for work being done by shipwrights on staging except in rare cases of adverse weather or above 100 feet. The second is that no determination had ever been made locally, and it was not until the 1999 grievance that the matter was even raised.

## VI. The Back Pay Period For Each Of The Plaintiffs Begins on the Date That They Each Filed in Federal Court.[17]

The appropriate date upon which each individual plaintiff's Back Pay claim arises, 5 U.S.C. § 5596(b), must be construed as of the date any individual officially filed in Federal court. Specifically, the date of accrual would be April 14, 2000 for 45 of the remaining named plaintiffs

[17] While the Government believes that the statute of limitations issue would be more appropriately raised in plaintiffs' anticipated cross motion, rather than the Government's motion for summary judgment, we are addressing the matter herein in accordance with the Court's order. Because we do not know plaintiffs' arguments at this time, we address several possible accrual arguments herein.

who filed in the United States District Court for the Western District of Washington; March 20, 2006 for the 21 additional plaintiffs who filed in the United States Court of Federal Claims; and April 7, 2006 for the 5 additional plaintiffs named in the Third Amended Complaint.

It is well settled that the Federal sovereign's consent to be sued must be explicit.[18] "The United States, as sovereign, cannot be sued without an express waiver of its sovereign immunity." Ramirez v. United States, 36 Fed. Cl. 467, 471 (1996) (citing Kanemoto v. Reno, 41 F.3d 641, 644 ( Fed. Cir. 1994) (emphasis added).

In 1994, when Congress amended the CSRA by adding the contested term "administrative" to the phrase "shall be the exclusive procedures for resolving grievances," 5 U.S.C. § 7121(a)(1), it effectively provided Federal employees with the opportunity to file in Federal court. See Mudge v. United States, 308 F.3d 1220 (Fed Cir. 2002). The Back Pay Act and Tucker Act serve as the waivers of sovereign immunity upon which the plaintiffs rely to file in Federal court. Section 5596(b)(4) of the Back Pay Act provides, in pertinent part, that "in no

---

[18] The principle of sovereign immunity has been an aspect of American jurisprudence since the founding of the United States. Alexander Hamilton wrote in The Federalist:

> It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the sovereign's] consent. This is the general sense and the general practice of mankind .... The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will .... [T]o ascribe to the federal courts , by mere implication, and in destruction of a preexisting right of the State governments, a power which would involve such a consequence, would be altogether forced and unwarrantable.

The Federalist, No. 81, at 487-88 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis in original). Although Hamilton was writing to quell concerns over states being brought into Federal court and subject to the whimsy of citizens of another state, his description of the tradition of sovereign immunity is also applicable to the Federal sovereign. See Glidden Co. v. Zdanok, 370 U.S. 530, 563-64 (1962); Lynch v. United States, 292 U.S. 571, 580-81 (1934); Williams v. United States, 289 U.S. 553, 577 (1933); Hans v. Louisiana, 134 U.S. 1, 15. The courts have repeatedly affirmed that the Federal government is liable for its actions only to the extent that it has waived this immunity. Ramirez v. United States, 36 Fed. Cl. 467, 471 (1996).

case may pay, allowances, or differentials be granted under this section for a period beginning more than 6 years before the date of a filing of a timely appeal or absent such filing, the date of the administrative determination." 5 U.S.C. 5596(b)(2)(B)(4) (emphasis added). On its face, this provision establishes the earliest date from which an award of back pay may commence. See H.R. Rep. No. 105-532, at 342 (1998) (stating that § 5596(b)(4) limits the "amount of redress available" for back pay awards); see also AFGE, Local 1156, 57 FLRA 602, 603 (2001); AFGE Local 933 v. Department of Veterans Affairs, 58 FLRA No. 118.

The term "timely appeal" has been interpreted by OPM regulation to be when:

> (1) An employee or an employee's personal representative initiates an appeal or grievance under an appeal or grievance system, including appeal or grievance procedures included in a collective bargaining agreement; a claim against the Government of the United States; a discrimination complaint; or an unfair labor practice charge; and
> (2) An appropriate authority accepts that appeal, grievance, claim, complaint, or charge as timely filed.

5 C.F.R. § 550.804.

If the agency serves as the "appropriate authority" for such purposes, plaintiffs might argue that the date of accrual would be April 13, 1999 for the 99 grievants, the date of the filing of the grievance. However, the agency did not accept all the claims as timely filed, but rather expressly provided that any claims for 15 days outside of the filing of the grievance were untimely. Thus, plaintiffs cannot use April 13, 1999 as the date that a "timely appeal" for back pay was filed, since "an appropriate authority" did not accept "that appeal, grievance, claim, complaint, or charge as timely filed."

If the court serves as an "appropriate authority," the first filing of a timely appeal under the jurisdiction of the Tucker Act and the Back Pay Act took place on April 14, 2000 when 56 employees of the shipyard filed in the United States District Court for the Western District of

Washington. Only 45 of those original plaintiffs remain in this suit and the time period for which a Back Pay claim, if any, would be calculated for those 45 individuals as of April 14, 2000.[19]

When the individuals plaintiffs filed in the United States Court of Federal Claims, 21 additional individual plaintiff joined those remaining 45 plaintiffs from district court, brining the total to 66 individuals. The appropriate time period for which a Back Pay Claim, if any, would be calculated for those 21 additional individual plaintiffs would be as of March 20, 2006.[20]

On April 7, 2006, a third amended complaint was filed in the United States Court of Federal Claims and 5 additional individual plaintiffs were named, bringing the total to 71 individual plaintiffs. The appropriate time period for which a Back Pay claim, if any, would be calculated for those 5 additional individual plaintiffs would be as of April 7, 2006.[21]

On May 16, 2007, a fourth amended complaint was filed in the United States Court of Federal Claims and 2 additional individual plaintiffs were named (David Forbes and John T. Hawkins), bringing the total to 73 individual plaintiffs. Of those two plaintiffs, David Forbes appears to have been a party to the original action in the district court, but was not previously a party to the action filed in this Court. Thus, while the date of his timely appeal would have been

[19] The original set of plaintiff contained 56 named plaintiffs, however by the time the plaintiffs were named in the United States Court of Federal Claims, eleven named plaintiffs had dropped out: Russell Allen, Thomas Conmay Jr., Charles Foley, David Forbes, Jim Groat, Gordon Hanberg, Richard Martin, James Minaker, Mark Morgan, Patrick O'Dell, and David Peterson.

[20] Joining the 45 remaining named plaintiffs are John Barth, Mitchell Bracking, Harry R. Calhoun, Jeff A. Carlson, David Collins, Randall Cook, Edward L. Deven, Orlando Garcia, Joshua Glitch, Jarrod Hogue, David J. Hurm, Stephen J. Jacobson, James M. Jazuk, Robert Longcrane, David McCrary, Joseph R. McKinnon, Denny D. Parsons, Roy Perry, Clifford L. Reinbold, Greg Williams and Shawn Williams.

[21] Joining on April 7, 2006 through a Third Amended Complaint, were Dwight J. Abler, Ralph E. Bergman, Mark B. Morgan, Ross K. Provoe, and Tally K. Roy. It should be noted that Mark B. Morgan may be the "Mark Morgan" who dropped out of this case after the class was not certified in U.S. District Court, although this is not entirely clear on the face of the amended complaint.

April 14, 2000, he subsequently failed to pursue his claims, and only re-initiated his appeal on May 16, 2007. Also, Mr. Hawkins does not appear to have previously been a party to this action. Accordingly, the appropriate time period for which a Back Pay claim, if any, would be calculated for Mr. Hawkins would be as of May 16, 2007.

## VII. The Back Pay Period For Each Of The Plaintiffs' Claims Cannot Extend Earlier In Time Than October 28, 1994

On October 24, 1994, Congress amended 5 U.S.C. § 7121 by adding subsection (g), limiting the scope of the exclusivity provision of § 7121(a)(1) and allowing public employees to pursue financial claims against the government in Federal court which had been previously restricted to the administrative process. As a result, October 28, 1994 became the date the Back Pay Act, 5 U.S.C. § 5596(b) became applicable to claims such as those made by the plaintiffs and the date for which any such back pay claims are tolled.

In 1988, and prior to the CSRA amendments in 1994, the Supreme Court held that the CSRA's "integrated scheme of administrative and judicial review" precluded Federal employees from obtaining judicial review in a suit for back pay under the Tucker Act, 28 U.S.C. 1491, where the CSRA did not explicitly provide for that remedy. United States v. Fausto, 484 U.S. 439, 445. Considering both the language and the structure of the CSRA, at the time the Court held "that the absence of provision for these employees to obtain judicial review is not an uninformative consequence of the limited scope of the statute, but rather a manifestation of a considered congressional judgment that they should not have statutory entitlement to review." Id. at 448-449. At that time, the relevant section of the Labor Law Statute did not contain the term "administrative," rather, section 7121(a)(1) stated that the grievance procedures set forth in a CBA would "be the exclusive procedures for resolving grievances which f[ell] within its coverage." 5 U.S.C. § 7121(a)(1) (1988) (emphasis added).

Two years later, the Federal Circuit had interpreted the pre-1994 language to preclude Federal employees from resolving grievances covered by their CBA in court. Relying on the text of unamended section 7121(a)(1), which stated that "the procedures shall be the exclusive procedures for resolving grievances which fall within its coverage," the Federal Circuit held that the statute limited the resolution of such grievances to the negotiated procedures set forth in an employee's CBA. Carter v. Gibbs, 909 F.2d 1452, 1454 (Fed. Cir.1990) (en banc), cert. denied, Carter v. Goldberg, 498 U.S. 811 (1990).

There is no discrepancy between the Federal Circuit's conclusion in Carter that section 7121(a) contained no ambiguity to be resolved," and the decision twelve years later in Mudge wherein the Federal Circuit took the position that it "can only interpret Congress's subsequent addition of the word 'administrative' as a change in the law that [changed] the scope of § 7121(a)(1)'s exclusivity provision." Mudge v. United States, 308 F.3d 1220, 1226 (Fed Cir. 2002). The Court of Federal Claims rejected the argument that Congress did not intend to substantively change section 7121(a)(1) when it added the word "administrative" to that subsection because it did so via a technical and conforming amendment. Indeed, citing Mudge, this Court has stated that it presumed that "Congress intends to change the law when it enacts amendments." Bailey v. United States, 52 Fed. Cl. 105, 110 (2002).

The one-word amendment to the CSRA was implemented "without discussion, explanation, or debate." Mudge v. United States, 50 Fed. Cl. 500, 506 (2001), rev'd, 308 F.3d 1220 (Fed. Cir. 2002). There is no section affecting retroactivity; there is no section indicating prior years are to be grandfathered. The Supreme Court has admonished courts to be cautious about interpreting technical and conforming amendments to make substantive changes to the law where "there is no indication that Congress intended to change" the law. Director of Rev. v. CoBank ACB, 531 U.S. 316, 323 (2001). The Back Pay Act, on its face, established the earliest date from which an award of back pay may commence.

"A law is retroactive if it alters the legal status of acts that were performed before it came into existence." Stephen R. Munzer, Retroactive Law, 6 J. LEGAL STUD. 373 (1977). However, there is no indication that, by allowing employees access to Federal court for their claims, Congress intended the Back Pay Act to be applied retroactively under the CSRA. After Mudge and Bailey, it stands to reason that, in the eyes of this court, the intent of Congress must have been to create a substantive change at that time. It would be presumptuous for us now to say that when Congress changed that limited scope, they were so uninformed that they simply neglected to make it retroactive.

If, as this Court has adopted, the addition of the word "administrative" to section 7121(a) changed the law and, at that time, created the right to seek a judicial remedy, then October 28, 1994, the date of the amendment, is the first date of the commencement period for right to back pay.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court grant the defendant's motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

OF COUNSEL:
TELIN W. OZIER
Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street., SE
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.Mager@usdoj.gov

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Naval Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

July 2, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

This is to certify that on this 2nd day of July, 2007, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO REMAND AND FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice