IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-856C (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## Second Declaration of Mark Winkler

**Pursuant to 28 U.S.C. §1746, I, Mark Winkler, declare that the following is true and correct:**

1. I am over 18 years of age and am competent to testify as to the facts and matters set forth in this Declaration.

2. I am the Superintendent for Shop 71, Painter Shop, at the Puget Sound Naval Shipyard, Bremerton, Washington (the shipyard). I assumed this position in January 2004. Prior to this position, I held several other jobs, including Senior Process Manager for Shop 64. I was also General Foreman in Shop 64 in charge of the shipwrights for the shipyard. I held this position from October 1997 to December 2000. I have been in the shipwright trade at the shipyard for more than 20 years. While I was General Foreman, there were approximately 120 shipwrights employed at the shipyard. The shipwrights are a relatively stable workforce with minimal turnover. I was the Shop 64 General Foreman in April 1999 when 99 employees filed grievances seeking Environmental Differential Pay for high work.

3. One of the principal functions performed by shipwrights at the shipyard is the erecting and dismantling of staging (scaffolding). Most ship repair projects require use of some form of staging.

4. Staging is erected by connecting specially made staging pipe to form a rigid platform. It is erected in stages with one level being finished and then adding the next level above and so on until the desired height is completed.

5. Staging is built throughout the shipyard. The purpose of the staging is to allow other shipyard workers to stand on it while they perform their job, be it deconstruction of a ship, painting, blasting, installation of parts, etc.

6. Staging can be built on all types of surfaces, to include the inside of ships, but most staging is built on flat surfaces.

7. If staging is built on metal surfaces, such as the inside of a ship, or on a sloped surface, the staging is anchored so that it does not move about.

8. The height of staging can vary, but most staging that is constructed on the shipyard is considered small, being less than 20 feet in height. Stagings of 20 feet or less are typically built by just 2 shipwrights.

9. Staging at heights of up to 130 feet may occur, but are very rare, and occur at most once every couple of years.

10. There are between 10 - 15 crews of shipwrights, with each crew assigned to a foreman. Within each crew, teams of shipwrights are assigned various assignments. The size of these teams may vary. Teams of 4 - 10 shipwrights build larger stagings, that is stagings greater than 20 feet in height. Based on my experience, shipwrights spend anywhere from 4 to 6.5 hours working on staging in an eight hour workday.

11. During the construction of staging, the shipwright or shipwrights who are actually building at the upper-most level are said to be working on the leading edge. That is, they are receiving the staging pipe and other materials, and installing it.

12. Shipwrights who are not working on the leading edge are passing material to either another shipwright higher up or to the shipwright working the leading edge. Materials are generally not carried up the scaffolding, but rather are passed or rope-hauled up the staging.

13. Freestanding staging, that is staging that is not tied in to existing structures, may not exceed a height more than four times its width. Unlike freestanding staging, staging that is tied in to an existing structure does not have a height-to-width standard.

14. Once a working level has been completed, guardrails are installed. These guardrails may be installed before the entire staging project is complete. The installation of guardrails does not interfere with the construction of higher levels of staging.

15. Although not always, a ladder is generally attached to staging that reaches a level of 20 feet. This allows the shipwrights to climb up and down the ladder while working on the staging.

16. The shipyard functions 24 hours a day. Therefore staging work takes place at all hours and in different types of weather. The shipwrights may work in rain. However, in cases of severe weather, staging is not constructed outside. However, staging work may still be constructed inside. If staging is constructed at night, the work area is properly lit. Lighting standards are established by the Shipyard Safety Office.

17. Shipwrights receive formal and informal training and practice in performing their job. The formal training can include a 4-year Apprenticeship, but there is always on-the-job training on the actual staging. Before anyone is assigned "leading edge" work, there is an observation and practice period. This practice includes teaching them how to climb up scaffolding and how to install scaffolding when they are working on the leading edge.

18. Although it would not be considered safe for a non-shipwright, with no training, to construct or otherwise work on incomplete scaffolding, shipwrights, and loan-overs trained and assigned to do shipwright work, have the specialized training and skill to safely construct staging. Fall Safety Instructions for the Shipyard, based on a thorough Safety Office review of the technical training, on-the-job training, supervision, and actual work experience all shipwrights receive prior to leading edge work, provide an exception that allows only shipwrights to work on incomplete staging without full fall protection.

19. Many shipwrights do not perform leading edge work.

20. At the Puget Sound Naval Shipyard, I am aware of shipwrights having been injured from falls while on the job. Most of these falls have been unrelated to work being done while on staging, such as just tripping and falling, but I am unaware of any serious injuries or death resulting from falls while either erecting or dismantling staging.

21. On April 13, 1999, ninety-nine shipwrights filed a grievance in which they demanded high pay for all of the years that each shipwright had worked in Shop 64. I am unaware of any prior shipwright grievance filed through the negotiated grievance procedure seeking high pay. I was assigned by my supervisor, Ms. Mary Jane Tallman, as part of the management team that investigated this grievance. In doing this, we looked at how high pay was handled in other shops in the shipyard. Our goal was to treat our employees fairly and to settle the grievance.

22. The management team concluded that a fair resolution would be for prospective payment of high pay for shipwrights who build or dismantle staging beginning from the first level above the ground or deck unless flooring and safety rails are installed or fall protection

devices can be properly used. It would also be paid prospectively to those working under similarly unguarded situations when fall protection devices could not be properly used.

23. The management team also concluded that back pay would be paid from the date of resolution back to 15 days prior to the filing of the grievance. This time period was picked because the collective bargaining agreement states, in part, that a grievance must be filed within 15 days of the event giving rise to the grievance or from when the grievant knew or should have known that he had been aggrieved. We also agreed that interest would be paid on the back pay.

24. Mr. Joe Aiken was the union representative representing all of the grievants. I met with Mr. Aiken at least 12 times during our negotiations with the union about this grievance. During the first several meetings with Mr. Aiken, I discussed with him management's proposed resolution. Although we had no agreement until the end of the negotiations, Mr. Aiken agreed with management's proposal in principle, with an understanding that we had many details yet to negotiate.

25. Mr. Aiken and I then met and discussed how we would arrive at a backpay figure for each grievant. He and I agreed that some shipwrights did much more leading edge work than others, and that some shipwrights never left the ground (but passed materials up to shipwrights higher up). We agreed to assign a numerical assessment that corresponded to the number of hours that each shipwright would have performed work similar to the new policy. We wrote these numbers down on a paper that contained a list of names of all the grievants.

26. After that meeting with Mr. Aiken, I met with the foremen in Shop 64. These foremen were the first line supervisors of the shipwrights. I had the foremen review the list of names with the numerical assessment to see if they agreed or disagreed with the assessments that the union and I had initially come up with. For those shipwrights where there was initial

agreement, the assessment was accepted and no further action was taken. However, for a good number of shipwrights, the foremen recommended different assessments.

27. After my meeting with the foreman, I again met with Mr. Aiken. He looked at the revised numerical assessments and either concurred (whereby no further action was taken) or disagreed. For those shipwrights where we disagreed, I wrote down the proposed numerical assessment.

28. After considering Mr. Aiken's input, I subsequently went forward with the union's position in those few cases where there was still some disagreement over the hours worked.

29. I met with Mr. Aiken several more times discussing adding addition employees to the agreement, how we were going to factor in overtime, and the set off of high pay that had already been paid. The final outcome for the hours paid as backpay ranged widely, from zero to 1,264 hours.

30. On January 18, 2000, Mr. Aiken met with Ms. Tallman to sign the settlement. I was present at that meeting. After they discussed it for a while, Mr. Aiken left saying that he wanted to discuss the final settlement with the grievants before he signed. About an hour later he returned and indicated that he had talked to the grievants and that he was ready to sign the settlement.

31. The entire time period from filing the grievance to investigating it and negotiating the amount of back pay with Mr. Aiken took approximately nine months.

32. Although the document that was signed is entitled "Employee Grievance Decision, Shipwright Highpay Grievance #05153-K," it was in fact a negotiated settlement agreement that involved more than just the written document. For example, it also included the specific amount of backpay for each grievant. The union agreed to this resolution of the grievance and was

actively involved in determining the number of hours that would be paid to each employee as a result of the settlement.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on the** 20 **day of May, 2005, in Bremerton, Washington.**

[signature]
**Mark Winkler**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**Second Declaration of Lynnette Niemi**

**Pursuant to 28 U.S.C. §1746, I, Lynnette Niemi, declare that the following is true and correct:**

1. I am over 18 years of age and am competent to testify as to the facts and matters set forth in this Declaration.

2. I am the Administrative Officer for the Production Department, Code 900, Puget Sound Naval Shipyard, Bremerton, Washington ("the shipyard"). I have held this position since November 19, 2000. Prior to this position, I was a Personnel Management Specialist employed by Commander, Navy Region Northwest and assigned to the Puget Sound Naval Shipyard. I held this position for three and one-half years. Part of my duties as a Personnel Management Specialist included the responsibility for processing union grievances pursuant to management's obligations under the collective bargaining agreement.

3. The Bremerton Metal Trades Council ("BMTC") is the largest union at the shipyard and it is comprised of affiliated local unions. Pursuant to a collective bargaining agreement between the shipyard and BMTC, BMTC is recognized as the exclusive representative of most of the non-supervisory employees at the shipyard, excluding, for example, professional employees. All shipwrights are covered employees and are represented by the BMTC. The Collective

Bargaining Agreement in effect at the time of the high pay grievance was signed in October 1987. A new agreement, which also recognizes BMTC as the exclusive representative, took effect in 2003.

4. One of the affiliated unions is the United Brotherhood of Carpenters and Joiners, local 2317. The entire list of affiliated unions is set out in Appendix I of both collective bargaining agreements.

5. In April 1999, 99 Shop 64 employees (shipwrights) filed employee grievances pursuant to the BMTC collective bargaining agreement seeking high pay. The identification number assigned to this grievance was 05153-K. I was part of the management team that processed and investigated the claims raised in the grievances.

6. I am aware that a settlement of the consolidated grievance was reached on January 18, 2000. Pursuant to this agreement, management created a new policy for the payment of high pay. Management also agreed to pay high pay and interest to the 99 grievants, plus an additional 35 employees who were identified during the settlement process as doing similar work and who had not been previously included in the grievance. Under this settlement, the amount of back pay (for high pay) was to be for the time period between the filing of the grievance and its settlement, plus fifteen days prior to the filing of the grievance.

7. I am aware that the grievants received a pay adjustment for high pay on July 15, 2000 and that they subsequently received interest payments on the high pay adjustment.

8. I have reviewed the spreadsheet prepared by Dr. Kathleen M. Maher of the American Institutes for Research. The information on the spreadsheet is consistent with back pay information that I reviewed from the shipyard payroll office. I am aware that the Defense Finance and Accounting Service maintain all payroll information for the military services.

9. This spreadsheet documents that all of the grievants received a pay adjustment on July 15, 2000 in the amount of 25% of the then current hourly pay rate of a grade 10 step 2 wage grade employee and an interest payment on that adjustment.

10. It is my opinion that the spreadsheet accurately reflects the pay adjustments that each grievant received as part of the settlement of grievance #05153-K.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20th day of May, 2005 at Bremerton, Washington.

Lynnette Niemi

Lynnette Niemi