History
EX

APR 15 1977

Mr. Delf Lovato, President
American Federation of Government
Employees, Local 2354
P. O. Box 9604
F. E. Warren AFB, Wyoming 82001

Dear Mr. Lovato:

This is in response to your letter of January 14, 1977, to the United States General Accounting Office, in which you requested interpretations of certain terms and aspects of the environmental differential program. Because the Civil Service Commission is responsible for issuing the instructions which provide for the differentials, the General Accounting Office forwarded your letter to us for reply.

During the deliberations regarding the language to be used in the listing of environmental differential categories, both labor and management members of the Federal Prevailing Rate Advisory Committee ultimately agreed that some situations, like "dirty work," for example, were not susceptible to specific or numerical parameters. Consequently, these categories had to be expressed in more general terms, and it was agreed that local agency management should determine eligibility based on (1) the language of appendix J, (2) knowledge of the work environment and trade practices, and (3) the fundamental concept of the program, which requires that the hazard, physical hardship or working condition be of an "unusually severe nature." Serious differences of interpretation were to be resolved by negotiations at the local level or through the appropriate grievance process.

Furthermore, labor and management wanted to emphasize the continuing responsibility of agency officials to reduce the potential for hazards and to ameliorate undesirable working conditions, while retaining the essential and express statutory prerequisite of "unusual severity." To have expressed their intention in terms of "eliminating" the hazard would have opened the door to an absolute, and unintended interpretation. The word "practically" was inserted as a modifier to make it clear that an environmental situation need not be "absolutely" eliminated before the differential became inapplicable, but that it should be eliminated (or "reduced") to the extent that the situation no longer reasonably warranted the payment of a differential because

the situation could no longer be characterized as "unusually severe." Because attempting to list an endless variety of examples was found to be impractical, the parties agreed that local management would be in the best position to determine when the differential should be paid, subject, of course, to the guidelines provided in appendix J, and, in the event of disagreement, to local negotiations or grievance procedures, as appropriate.

As for the phrase "Personal Protective Devices used as a controlling or eliminating factor," an interpretation is difficult beyond what is stated above since the phrase is not found in the Commission's instructions and we do not know the context from which it is taken.

Regarding your third question, an environmental differential for wage employees, when otherwise authorized, is paid regardless of the terms of the job description, in accordance with the provisions of par. c., subchapter S8-7, FPM Supplement 532-1.

Your fourth question deals with both toxic chemicals and explosives. Operations involving loading, unloading, storage and hauling of explosive and incendiary material other than small arms ammunition fall into the "low degree" category (4%), except when raw nitroglycerine is involved, when 8%, for "high degree" exposure, may be authorized. Similarly, the "handling for shipping, marking, labeling, hauling and storing loaded containers of toxic chemicals that have been monitored" falls within the "low degree" category (4%), while only the actual process of monitoring, examining for signs of leakage or deteriorated material, decontaminating or disposing of deteriorated material qualifies for the "high degree" (8%) category. Thus, distinctions are made for different degrees of risk based on the nature of the exposure.

Your final question deals with local agency determinations on compliance with OSHA standards. Section 19 of the Occupational Safety Act of 1970 requires Federal agencies to establish and maintain effective and comprehensive occupational safety and health programs, and places sole responsibility for occupational safety and health, including compliance with the standards, on the head of each agency. Under Executive Order 11807, dated September 28, 1974, it is the agency's responsibility to determine, within its own technical competence, the extent to which working conditions within the control of the agency meet OSHA standards.

I trust the above information will be helpful in clarifying the questions you raised.

W. T. A. Baxter 4/14/77 LMR

Sincerely yours,

PPW:WTABaxter:mes
PV:77-182
4/13/77

E-2

R. Newbold PPW 4/14

for Frank S. Mellor, Acting Chief
Pay Policy Division