time you met with her or the third time you met with her?

A The second time I met with her.

Q Okay. I'm asking about the third time you met with her, what was that?

A The third time I met with her was to finally put my signature on the paper and to end the grievance.

Q All right. I'm going to ask that you turn to in what is marked as Joint Trial Exhibits binder, Volume 1 of 2. It's the one you were looking at before.

A The first one?

Q The first one, yes, that's correct.

A Yes, sir.

Q Could you please turn to JX-005?

A Yes, sir.

Q Could you take a minute and review that document?

A (Witness reviews document.)

I recognize it, yes.

Q What is it?

A The document I saw on the 14th, the Friday before I signed off on the grievance.

Q Now can you turn to page that's marked, if

you look at the bottom, the bottom right-hand corner there's a small number there, could you turn to page number marked J0001041?

A J0001039?

Q Yes.

A Or 41?

THE COURT: Four-one.

THE WITNESS: Four-one. Okay, I follow the page number.

BY MR. MAGER:

Q And if you can also look at the next page, 42?

A Four-two. Yes, sir.

Q And again, have you seen that particular document before today?

A Yes, sir.

Q What is it?

A This is the final agreement reached between the shop and the union.

Q And when did you first see at least the text of that document?

A I'm going to say on that previous Friday I saw a copy of it, yes.

Q All right. And who would have given that document to you?

A Only Mrs. Tallman would have had this document in her possession.

Q Do you remember Mrs. Tallman giving you that document or?

A On what specific date?

Q On the, when you testified you first saw it on the 14th; correct?

A On the 14th.

Q Yes. What if anything did Mary Jane Tallman tell you when you received this document?

A What did she tell me when I received this document on Friday?

Q Yes. Did she just hand you the document or?

A No, she didn't hand me the document. I just told her that I could not sign the document without talking it over with the people on the waterfront on that particular Friday.

THE COURT: I think the question was before you said that, what did she say to you as she tendered the document to you?

THE WITNESS: Your Honor, I don't get the dates. What dates are we talking about?

THE COURT: You're on the 14th on Friday. You were asked to come in and review the document. You walk in, what does she say to you?

THE WITNESS: Honestly I can't remember what it would have been.

THE COURT: Okay.

BY MR. MAGER:

Q Okay, that's fine. But you did testify before that she called you on the phone and said --

A On the phone, yes.

Q -- that she wanted to settle this grievance or something along those lines?

A Just that I don't remember what happened in her office. On the phone she called me down to say I want to settle the shipwright High Pay grievance.

Q All right, thank you.

A I was up at the apprentice school.

Q Okay.

A I don't remember what happened in her office.

Q That's fine.

What did you think when you received this settlement proposal?

MR. SCARAMASTRA: Your Honor, just to remind the Court of the motion in limine to the extent you have to offer interpretation.

THE COURT: Yes. I understand the motion in limine and I'm going to overrule that objection.

Go ahead, Mr. Mager.

MR. MAGER: Thank you, Your Honor.

BY MR. MAGER:

Q What did you think about the settlement proposal when you received it?

A I thought that I would be stupid not to accept it, to be honest.

Q Why?

A Based on my research. And since I have the document here and on page J0001042 under the paragraph where it says "timeliness of the grievance," I felt that the shop saw through my bluff, if you may want to put it that way, where it says the union has presented nothing in this grievance to indicate any reason why this issue could have not been raised long ago. And yet they're willing to give X number of months of environmental differential pay which could have been according to my research exactly what we would have received had we proceeded to arbitration.

And then we had an outstanding High Pay policy going forward from this that's going to benefit the employees. They may have as many as 20 to 40 years left in tenure in the shipyard.

Q What do you mean by an outstanding policy?

A They are going to start paying staging at 5

feet above the ground level.

Q How do you know that?

A Because it states so in this particular proposal.

Q Where?

A Certain work situations it says, paragraph 2, subsection 1 says "for shipwrights building and dismantling staging beginning from the first level above the ground/deck unless flooring and safety rails are installed or fall protection devices cannot be properly used."

Q And that would be 5 feet?

A Usually that's 5 feet. According to the standard for fall protection, fall protection requires a five -- anything above 5 feet requires a person to be in fall restraint or in a fall arrest situation. However, the shipwrights are going to be the ones that put the plank, platform, ladder access, lifeline around that platform to make it safe for the other employees to access it. That is why that particular issue was probably implemented in there.

Q I realized you testified somewhat to this but I just want to make sure I'm clear about a couple of points. Do you recall, or what if anything did Ms. Tallman say to you on the telephone when she called

the apprentice school other than this we want to settle this, to the best of your memory?

A When we signed off of it I believe her remarks were glad that this is finally over.

Q I'm not asking you actually about that. I'm asking about on the 14th.

A On the 14th?

Q On the 14th what did she say, if anything, about, for example -- well, what did she say basically if anything else besides we want to settle this thing, on the 14th?

A I do recall that she stated that all the players are in agreement. She stated that the checkbook is open, okay, if we would like to settle the High Pay grievance for the shipwrights.

Q And she presented you with the text that's on J0001041. What did you do after receiving this document?

A I went to my chief steward, talked to my chief steward, this is our proposal. He gave me the green light in which to settle that.

Q Who was your chief stewart?

A Bill Hamel.

Q And when did you talk to him?

A I believe it was that Friday.

his answer for use on other grounds. It's just again the same as before for the object to it being used for that limited purpose of proving that there was an alleged agreement.

THE COURT: I think the parties are in agreement then. And the question as I understand it was when Mr. Aiken went to discuss the subject with the chief steward Mr. Hamel what was said between them?

MR. MAGER: Yes.

THE COURT: Okay.

THE WITNESS: What was said between us?

THE COURT: Yes.

THE WITNESS: I believe I said, Joe, this is going to be the best thing we have. If we take this to arbitration we could probably lose.

BY MR. MAGER:

Q And what was his response?

A He told me to go ahead and settle the grievance.

Q Who if anyone else did you talk to about this?

A I went and talked to Mr. David Hurm and explained the scenario. All this is not particular clear as a bell to me. The last thing I remember

Dave, remember telling me are they going to start paying High Pay? And I said yes. He did not object to me accepting the proposal.

I went back to Mary Jane Tallman's office and I signed off on the grievance.

Q When did you go back to Mary Jane Tallman's office?

A That would have been Monday. Not Monday, Monday was a holiday. That would have been Tuesday, first workday after the 3-day weekend.

Q And what, if anything, did you tell Mary Jane Tallman when you were signing the decision?

A I'm glad this is finally over.

Q After signing the settlement agreement based on your experience as steward if the shipwrights weren't happy with your decision what could they do?

A They could have attempted to file another grievance but it wouldn't have did them any good.

Q Why not?

A Because the grievance had been settled, that it was over, that it was finished, that it was done.

Q What else could they do? Anything else?

A That I'm not aware of. I guess they could have sought action in --

Q Well, could they have, for example, what

management that certain terms would have to be included in the grievance decision for the union not to take the decision to arbitration, did you?

A Not to my recollection.

Q You and Mr. Aiken didn't discuss taking the decision to arbitration until after he had signed it, did you?

A Well, I don't think we would talk about arbitration after he signed it because it was resolved in our favor.

Q I'd like to draw your attention to your deposition transcript again, please. I'll tell you the page once I find it.

Can you please turn to page 41? It says 41 at the bottom.

A Uh-huh.

Q Up at the top there is a Q and an A which I will ask you about in just a moment. And then another Q and I said, "And again just going over things, you and Mr. Aiken did not discuss arbitration, the potential for going to arbitration over the grievance decision until after the grievance decision was signed and some shipwrights had complained; is that correct?"

A You're on page 41?

Q Page 41, yes. I can come point it out.

MS. KREBS: May I approach, Your Honor?

THE COURT: Yes, you may.

(Pause.)

THE WITNESS: Okay.

BY MS. KREBS:

Q I'll read that again, Mr. Hamel. I said, "you and Mr. Aiken did not discuss arbitration, the potential for going to arbitration over the grievance decision until after the grievance decision was signed and some shipwrights had complained; is that correct?"

And you said, "That's correct."

A I did say that at the time, yes.

Q So you and Mr. Aiken didn't discuss taking the decision to arbitration until after it had been signed and some grievants had complained?

A It's kind of hard to take a matter to arbitration after it's already been settled. So there really wouldn't be any point in discussing arbitration at that time. We would have had to discuss arbitration before the decision was made and its consequences if it was an adverse decision.

Q But you did not discuss arbitration with Mr. Aiken before the decision was signed, did you?

A I don't really recall.

Q And your testimony that I've just read

the second level supervisor of the shipwrights at the time. And so he was who I talked with about what they did and how they did it. And he took me and the union rep on a tour of the work.

Q How often, if at all, did management discuss how it was going to resolve this grievance?

A The times I was involved there were a few discussions with Mr. Winkler and then I just believe one toward the end, probably in December of '99, with Ms. Tallman and Mr. Ellis about how to pursue a resolution.

Q And what do you recall about that December discussion?

A That we talked about the shop contacting Mr. Aiken and talking with them about a way to settle it, proposing a resolution of a policy sort of with regard to High Pay that would, you know, that we would be willing to do if the union was willing to settle the grievance.

Q Did you discuss what you would do if the union was not willing to settle the grievance?

A We discussed that we would get back together, that there were several options. If they weren't interested in that result, if the union wasn't interested in that result that we would get back

together and talk. That we could deny the grievance entirely, that we could come up with a different decision or a different result, some lesser amount or lesser conditions for High Pay or, you know, or grant it.

There were options and we would figure out the final, you know, the final one if the union wasn't interested in that, in that offer.

Q All right. I'm going to refer you now to some of the documents in the binder. If you could please turn, there ar four different binders there in front of you. Two of them are labeled Joint Exhibits, one is labeled Defendant's Exhibits, another is labeled Plaintiffs' Exhibits. I'm going to refer you to the binder that's marked Joint Exhibits 1 of 2.

A Okay.

Q And specifically I'm going to ask you to look at Tab JX-19.

A Okay.

Q Have you seen this document before today?

A I have.

Q And what is it?

A It's a list that I made of the issues raised in this grievance. And there was another grievance going on at the same time. So the types of work that

to about 2000.

Q How long have you worked at the shipyard?

A Twenty-six plus years.

Q How many of those years have you been involved in the shipwright trade?

A I'd say just the shipwright trade probably 20 of those years.

Q Are you familiar with a grievance filed by Shop 64 shipwrights for High Pay in 1999?

A Yes.

Q When did you first become aware of this grievance?

A I think it was filed in 1999. But I had actually heard, heard of it prior to the actual filing of it.

Q How?

A I can't be specific but I remember hearing it. I don't remember if it was from the employees as I went around and talked but I did catch wind that something was coming prior to the actual grievance being filed.

Q Could you summarize your role, if any, in the resolution of that grievance?

A At first I was part of the management team that was comprised of myself and some other

individuals too, and I was labeled the I guess process expert so that if any questions came up in regards to the shipwrights I would be able to answer those questions. So I was that first initially. And then later part I was working with the union on trying to come to a resolution to the back pay calculations. I worked with the union in that particular situation.

And then after the signing of it I followed up with comprising the rest of the back pay calculations that were agreed upon at the settlement of the grievance.

Q You mentioned other individuals being involved. Who else was involved from the management side?

A Lynnette Niemi and Mary Jane Tallman.

Q What was Lynnette Niemi's role?

A She was the HR person that Mary Jane Tallman asked to be part of it as a third party initially to go get a third party representation instead of maybe having a biased person like myself. So she was appointed to go out and look at the process, look at some of the rules and regulations and stuff similar to that.

Q What do you mean by biased like yourself?

A I think Mary Jane felt that there was

numerous opinions on this particular situation so she wanted to have somebody that wasn't affiliated with the shipwrights or part of the shipwrights go provide a third party opinion.

Q What was Mary Jane Tallman's role?

A Mary Jane Tallman was the I think we could call it acting official. She was the one that was overseeing the overall grievance and she was my boss.

Q How often did management discuss the resolution of this grievance?

A I couldn't tell you exactly how many times. We met during the course of 1999 a few times. I don't think we met a whole lot of times. So I couldn't pin you down to exactly how many times we met.

Q All right, that's fine.

Prior to the filing of this grievance when did shipwrights receive High Pay at Puget Sound?

A They received it if they were in a crane bucket, if they were in a JLG, some situations in inclement weather were probably about the only times prior to that that they were paid High Pay.

Q There's a set of binders to your left. Each of those binders has a label on it. There actually may be some strewn about at this point but they are labeled Defendant's Exhibits, Plaintiffs' Exhibits and

A To go further calculate the number of hours of back pay we were going to pay the individuals.

Q Are you aware of other documents like JX-83 and JX-80 which have similar dates which lead you to the same conclusion that negotiations regarding the calculation of High Pay began before signature of the settlement agreement?

A Yeah, there are some additional ones.

MR. MAGER: I'm not, for the benefit of the Court, I'm not going to make him go through all of the documents.

THE COURT: Uh-huh.

BY MR. MAGER:

Q What do you think about the amount of back pay, the generosity of the amount of back pay given in settlement?

A In my personal opinion I think we were very generous in the numerical assessment that we provided to the individuals.

Q Well, why?

A It was part of the negotiation in regards to try and settle the grievance. We felt that this was part of trying to settle the grievance. So I guess we were going to be generous with the back pay.

THE COURT: And again I will just object and

raise the objection I raised before based on the rule of contract interpretation as statements to the effect that they felt there was a settlement agreement, unless he's going to establish they were expressed, are inadmissible, for that one purpose.

MR. MAGER: And I'd note that he's primarily just talking about consideration issues.

THE COURT: I'm going to overrule the objection.

BY MR. MAGER:

Q We talked about the settlement of the grievance. Were you involved in any meetings with Mary Jane Tallman and Mr. Aiken regarding the resolution of the grievance?

A The only meeting I remember Mr. Aiken, myself and Ms. Tallman being at was the proposal that we gave the union. I don't remember any other meetings that Mr. Aiken was present at.

Q When was that?

A January of 2000.

Q Do you remember a specific day or?

A No. By going through and looking at all the documentation it appears it was on the 14th of January is when that happened.

Q What documentation are you referring to?

following conditions." Do you see that?

A Yes, I do.

Q Could you take a quick minute to read that?

A (Witness reviews document.)

Q From reading that document can you tell at what height shipwrights would be paid High Pay?

A Well, in this particular thing it basically says from the first level above the deck they would be paid High Pay.

Q And what does that mean?

A That means it could be generally our first ring is about 8 inches high, so anything above about 8 inches they could be considered to be paid High Pay.

Q What is your belief regarding the height at which High Pay was set in this document?

A I didn't agree with it.

Q Why not?

A I just didn't feel that 8 inches off the ground or that height in my opinion warranted High Pay.

Q What height did you believe warranted High Pay in your experience as a shipwright?

A Well, my own personal opinion was around 20 foot area was when I felt somebody would be High Pay. In the shipyard we can be on ladders and you don't get

High Pay when you're on a ladder. But a lot of the fall protection things don't actually work at that height anyway so I just thought it was, I don't know how to say it.

Q Would you know if you communicated this opinion to Mrs. Tallman or Ms. Niemi at any point?

A Yes, I did.

Q Do you know when?

A I would say it was prior to us giving it to Mr. Aiken as part of the resolution.

Q But you don't remember a specific date?

A No. It would be, I would say it was in 1999, early 2000.

Q Do you remember any context? Was it in a meeting or was it just a discussion or you don't remember?

A I don't remember a specific meeting. I just, it probably came, came out when this meeting, this proposal came out.

Q Do you know who Jerry Main is?

A Yes.

Q And who is he?

A At that particular time?

Q Yes.

A He was the Code 900 production manager.

Q Do you recall telling him anything else that day either on the telephone or in person?

A No.

Q I know I'm stretching your memory. I apologize.

What did Joe Aiken do when you gave him this document?

A He left with it.

Q Did he tell you why he left with it?

A To go talk to folks.

Q Did he say why he had to talk to folks?

A I don't remember.

Q Fair enough.

What happened next?

A Yet that day nothing. And so then on the 18th we eventually got together on the 19th and both of us signed it.

Q Okay. Do you recall any discussions when you signed the document?

A When I signed it and then when Joe signed it we shook hands and I said to Joe, It's settled. It's over. We done good.

Q Okay. What did the union receive in settling this grievance?

A Well, one thing is they received the back

pay from 15 days before they filed the grievance.

Another thing that the workers received was since the union contract laid down that if a supervisor doesn't tell an employee I'm giving you High Pay today then the employee has to ask the supervisor. And if there is disagreement there the employee would have to go to the union and file a grievance. So what this did for the employees was basically set a policy for them to make it clear for them and for the supervisors exactly when they would pay.

Q What did the shipyard get out of settling this grievance?

A One more thing the union got was basically 95 feet because we had been paying at 100 foot or more and so using the fall protection standard of 5 foot they got that 95 foot in between where they hadn't been paid.

What did the shipyard get out of it?

Q Yeah. I'm sorry to have cut off your thought process.

A The shipyard got resolution of a big grievance. The grievance had got settled at the lowest possible level that it could have got settled at, which is one of our goals. The shipyard got

better morale for their folks.

Q Is that all that you can think of?

A At this second.

Q All right, that's fine.

I'm going to ask you to turn to a document that's been marked JX-006. Have you seen that document before today?

A Yes, I have.

Q What is it?

A Basically it's a draft of what Joe and I eventually signed.

Q Okay. And why do you say it's a draft?

A When I, when I got this from the Admin. folks and read it through and it read how I would have wanted it to read and I signed it I noticed there was no place for Joe to sign. So I called Admin. on the phone, said redo this. And basically put it in a folder on my desk, on my office.

Q So after you signed this document you just put it in a folder on your desk?

A Yes. So it was never given to anyone in the shipyard.

Q Okay.

A It was I recognized the mistake as soon as I was dating it and kind of just reached up, put it in a

Prior to the filing of the grievance when, if ever, did the shipwright pay High Pay?

A We paid High Pay over 100 feet or during bad weather when people were working. There was some, there was some latitude with the supervisors for paying High Pay. You know, if someone was in a real slippery situation. You know, sometimes you work in tanks that had grease in them or. But primarily always over 100 feet. And most supervisors were close, you know, I mean they didn't go up with a tape measure. And usually in bad weather.

Q Did you discuss the High Pay grievance with the shipwrights that worked for you?

A I just, we had discussed -- specifically this grievance I can't recall. But at times over the last 30 years, you know, that was always a subject, especially with the guys that came up from Bear Island, Hunter's Point. And basically most of the other shipyards paid High Pay around 25 feet. And they were not happy when they came up here and it was 100.

We don't do a lot of staging over 100 feet. So there's a fair bit of staging over 25 feet.

Q You mentioned 25 feet. In your view was this a reasonable height to start paying High Pay?

A I think that 25 feet's a pretty good height. Most of the guys, like I told you before, we're not like a lot of people and we don't think about working at heights the way other people work at heights. Most of the people that do, leave the trade. We're pretty comfortable working there. And I'll tell you that nobody's thinking about it at 5 feet. You know, nobody's concerned about the height.

So it says a significant fall hazard. At 5 feet it's kind of like working, I mean next thing you know you'd be paying off a step ladder. You know, you let your kids go up a slide and that's more than 5 feet and you're only standing on the step, so.

Q Were you a shipwright supervisor around, near the Christmas break 1999?

A Yes, sir.

Q And if I'm incorrect let me know. You mentioned that you were sort of working in the office or something along those lines?

A Yes.

Q Who else was working in the office with you?

A Well, Mary Jane was the superintendent. Mark was the general foreman. And I was the process supervisor I guess is what we call them.

Q Why were you process supervisor in the

office then?

A Just to -- if you're a permanent supervisor in between projects, if you didn't have a job they set you up to, again you know, work on little tasks, different things. I don't know what, process improvements, go out and monitor and assess the work that the other supervisors are doing.

Q While you were in the office did you ever discuss the High Pay grievance with Ms. Tallman?

A Yes, I did.

Q When?

A Now, Mary Jane was a superintendent so she didn't ask, didn't ask my advice but she did ask my opinion. And she said that she was thinking about settling the grievance. And I said, well, you know, that you should. But when she told me she was going to settle it at 5 feet because that was the height that 106 said you had to start installing falling protection I just told her that I wouldn't settle at 5 feet. And she said Joe was pretty adamant about it and was negotiations going on.

But like I told her, I wouldn't. I'd go to court and fight it before I would settle at 5 feet. That was just my opinion. Though I don't know much about court; this is my first time.

Q That's fine.

Did you see a draft of any decision or agreement that she was planning on reaching with the union?

A I didn't read it. I mean she had it, they had it. Her and Mark didn't -- and again when I was talking to them giving them my opinion, of course I'm kind of opinionated, so I think they knew what my feelings on it were. But again, you know, I care about this thing, you know, this trade. I've done this for 30 years, it's pretty much my life. So, you know, I thought that we should, there should be some compensation when guys are building hanging staging and working at heights at 40, 50, 60 feet. But I mean, like I said, I thought that that was unfair to the guys docking ships, doing heavy construction you know.

There's a lot greater hazard from straining your back, breaking your arms humping material than there is from falling. I mean we get a lot more, we have a lot more injuries there. That's my biggest concern.

Q You mentioned before that you were involved in some of the calculations with regards to back High Pay; is that correct?