**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES, et al., Plaintiffs, vs. THE UNITED STATES, Defendant. | No. 04-856C (Judge George W. Miller) |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

1. Plaintiffs in this case are wage-grade employees and former employees of the Puget Sound Naval Shipyard ("the shipyard") located in Bremerton, Washington.

   This is undisputed.

2. The plaintiffs, and all shipwrights, are represented by the Bremerton Metal Trades Council ("BMTC" or "union"), a union that is comprised of affiliated local unions. Compl. ¶ 2; App. 40.[1] One of the affiliated unions is the United Brotherhood of Carpenters and Joiners, local 2317. In accordance with the Federal Service Labor-Management Relations statute, BMTC is recognized as the exclusive representative for plaintiffs and all non-supervisory shipwrights. App. 1-2 (Second Declaration of Lynnette Niemi ("Second Niemi Decl.") ¶¶ 3-4); 13-15.

   The first sentence is undisputed. The factual assertions in the last sentence are undisputed. The cited materials do not support the middle

[1] "Compl. _____" refers to the plaintiffs' Fourth Amended Complaint. "App. ____" refers to a page in the appendix filed with Defendant's Motion to Dismiss or, in the Alternative, Motion to Remand and for Partial Summary Judgment.

sentence.

3. The collective bargaining agreement ("CBA") at issue in this case took effect in 1987. App. 11. Pursuant to this agreement, the parties negotiated the right of employees to receive environmental differential pay ("EDP"), including high pay. App 17-21.

The first sentence is partly correct in that a CBA took effect in 1987. It was superseded by another CBA in 2003. *See* DX-001.

The second sentence is unsupported by the cited source. Moreover, the second sentence is vague and plaintiff are unsure what event or negotiation it is referring to.

4. Article 10, section 1002 of the CBA states the general conditions under which EDP is authorized. App. 17-18. In part, "Pay for environmental differential is authorized: (1) for exposure to an unusually severe hazard which could result in significant injury, illness, or death, such as on a high structure when the hazard is not adequately alleviated by mechanical equipment or protective devices being used or on an open structure when adverse conditions such as darkness, lightning, steady rain, snow, sleet, ice or high wind velocity exist ...." Id.

This is undisputed.

5. Section 1003 of the CBA provides that "Employees will be paid environmental differentials, when warranted, in accordance with FPM Supplement 532-1 and Appendix J attached thereto." App. 18.

Pursuant to Appendix J of the Federal Personnel Manual Supplement

("FPM") (contained in Appendix II of the CBA), "high work" is defined as "working on any structure at least 100 feet above the ground, deck, floor or roof or from the bottom of a tank or pit." It also includes "working at a lesser height if the footing is unsure or the structure is unstable ...." App. 41.

This is undisputed.

6. Section 1004 of the CBA provides that immediate supervisors will notify employees when environmental pay is authorized, and that "[i]f at any time during a job assignment an employee believes that additional pay is warranted, the employee will call the matter to the attention of the immediate supervisor who will advise the employee if additional high pay may be allowed." App. 19. Any complaint regarding high pay not resolved in such discussions between the employer and the employee could be resolved through the negotiated grievance procedures." Id.

Plaintiffs do not dispute that Section 1004 of the CBA contains language that is largely identical (save for typographical errors) to the language quoted above.

7. Article 30 of the CBA contains a two-step grievance procedure applicable "to all eligible employees of the unit who pursue a grievance with Council representation." App. 28 (CBA § 3003). In the first step, the employees submit their grievances to their immediate supervisor and in the second step, they are submitted to the shop or branch head. Id.

This is undisputed.

8. Article 31 of the CBA covers arbitration provisions. "Arbitration may be invoked only by the Council or the [shipyard]. Arbitration on an employee grievance may be invoked only by the Council. Written requests for arbitration must be submitted within 30 calendar days after the date of the second-step grievance." App. 35 (CBA § 3101). This is undisputed.

9. One of the principal jobs of shipwrights is to build and dismantle staging for ships that are being built, repaired, or decommissioned. Between fifty to one hundred stagings are built per week. Most staging that is constructed is less than twenty feet high and is built by teams of two shipwrights. On occasion, higher staging is built which, depending upon the size, may have teams of four to ten shipwrights. Although very high staging may be built, even up to 130 feet, that is extremely rare and occurs usually only once every couple of years. App. 1, 2 (Second Winkler Decl. ¶¶ 2, 8-10).

The cited source supports some, but not all, of the factual assertions in this statement. Nor are the contents of this paragraph material to any of the arguments raised in the Shipyard's motion.

10. Prior to 1999, the shipyard did not have a specific height trigger for the payment of an environmental differential to shipwrights for high work under 100 feet. Instead, consistent with the CBA, shipwrights could request high pay from a supervisor in specific instances, who was to

assess the particular job conditions and determine whether additional pay was warranted. See App. 19, 110.

The facts in the first sentence are undisputed.

The factual assertions in the second sentence are disputed. Nothing in the CBA authorized the Shipyard's failure to identify those work conditions that constituted high work. The CBA merely authorized employees who believed that "additional pay is warranted" to "call the matter to the attention of the immediate supervisor." The CBA did not delegate responsibility for determining whether work conditions constituted high work to employees. Nor, under the OPM Manual for the Federal Wage System, could they be.

11. On April 13, 1999, the BMTC, the exclusive representative of the shipwrights, filed a grievance on behalf of ninety-nine employees, including some of the plaintiffs, demanding back pay for high work. <u>See</u> App. 49-60.

This is undisputed.

12. Eighteen of the current plaintiffs did not sign the original grievance, including Dwight J. Ambler, Ireneo G. Amable, Ralph Bergman, Harry R. Calhoun, Berend Freese, Frederick A. Green, Jarrod Hogue, Stephen A. Jacobson, James M. Jazuk, Joseph M. McKinnon, Roy E. Moreland, Denny D. Parsons, Ross K. Provoe, Clifford L. Reinbold, Tally K. Roy, Greg Williams, Shawn Williams, and Joseph Wodyga. <u>Compare</u> App. 53-60 <u>with</u> Compl. 1.

It is undisputed that the above-named individuals did not sign the

original grievance.

13. The grievance stated that: "I have been aggrieved in that Shop 64 [Puget Sound Naval Shipyard] has continually denied me the appropriate amount of high pay, 25% additional environmental differential, for performing high work as outlined by the Code of Federal Regulations and the BMTC Agreement." App. 50.

The contents of the grievance are undisputed, though immaterial to the Shipyard's summary judgment motion.

14. The corrective action sought was "to be compensated back environmental pay for high work at a rate of 1040 hours per year for all years in Shop 64 (plus interest). Compensation for back environmental pay for high work must also be included for overtime worked during the same period (plus interest.)." App. 51.

The contents of the grievance are undisputed, though immaterial to the Shipyard's summary judgment motion.

15. Messrs. Joe Hamel and Joe Aiken were named as the union representatives. App. 50. The grievance number assigned was 05153-K. Id. Ms. Mary Jane Tallman was the Superintendent for several trade shops, including Shop 64, and the management official responsible for resolving the grievances. Id. Ms. Tallman created a management team to investigate the grievance. Included on this team were Mr. Mark Winkler and Ms. Lynnette Niemi. App. 4 (Second Winkler Decl. ¶ 21); App. 9 (Second Niemi Decl. ¶ 5); 100-02.

This is undisputed.

16. In investigating the grievance, the management team examined how EDP had been handled elsewhere within the shipyard, and other shipyards. The team also wanted to work with the union to amicably resolve the matter if possible. The management team met with the union on several occasions. See App. 61-75, 87-88, 107.

The cited sources do not support any of these factual assertions. Accordingly, the Shipyard has failed to meet its burden of establishing that these facts are undisputed.

17. Joe Aiken and the shipyard believed that they reached an agreement was reached to settle the grievance. See App. 61-75, 87-88, 107. The grievance settlement provided that high pay would be provided prospectively to shipwrights who build or dismantle staging beginning from the first level above the ground or deck unless flooring and safety rails are installed or fall protection devices can be properly used. App. 65. High pay would also be paid prospectively to shipwrights who build or dismantle hanging staging under similarly unguarded situations when fall protection devices cannot properly be used. Id. The grievance settlement also provided that shipwrights who had performed such high work would, in accordance with the grievance provisions of the CBA, receive high pay from 15 days prior to the filing of the grievance, to the date of resolution on January 18, 2000. Id.; App. 4 (Second Winkler Decl. ¶¶ 21-23).

The sources cited after the first sentence support the proposition that

upon signing the grievance decision, Ms. Tallman told Mr. Aiken that the grievance was "over" and "settled" and that the two of them had "done good."

The contents of the grievance decision are undisputed. To the extent that the statements above are consistent with those contents, they are undisputed as well.

18. On or about January 14, 2000, Mr. Aiken met with Ms. Tallman to sign the grievance settlement. App. 87-88. After discussing the grievance settlement, Mr. Aiken left and met with the grievants to discuss the settlement agreement. App. 89-90. Later, he returned and signed the settlement. Although the settlement was termed a "decision," it was fully negotiated and mutually agreed to by both the shipyard and Mr. Aiken. Mr. Aiken's signature on the "decision" constituted the union's agreement that the grievance was resolved and the union would not proceed to arbitration. App. 96, 97. The union did not seek arbitration. Id.; App. 6-7 (Second Winkler Decl. ¶¶ 30-32).

The first sentence is unsupported by the sources cited. It is undisputed, though, that Mr. Aiken met with Ms. Tallman on January 14, 2000 and received a draft of the proposed grievance decision.

To the extent that the second sentence implies that Mr. Aiken met with all 99 high-pay grievants, it is unsupported by the cited sources or any other evidence. It is undisputed, however, that Mr. Aiken testified that he met with David Hurm on January 14, 2000 to discuss the draft grievance decision.

19. The agreement called for the payment of interest upon the back pay.

App. 65. Payment was to be made by the Defense Finance and Accounting Service ("DFAS") which processes all civilian pay for Navy civilians. As of August 2000, the interest payments had not been made. Consequently, on August 30, 2000, the union filed an unfair labor charge against the shipyard. In this charge, the union alleged that the shipyard commander had violated the terms of grievance 05153-K by not paying the agreed upon interest without giving the union notice or the opportunity to bargain further. It also charged that DFAS had refused "to comply with [the] negotiated settlement agreement, Grievance #05153-K, sub paragraph IV (2) by refusing to pay the appropriate interest for the back pay ...." App. 78.

The facts in this paragraph are undisputed, but immaterial to the Shipyard's motion.

20. On April 14, 2000, fifty-six individual plaintiffs filed a complaint against the Defendant in the United States District Court for the Western District of Washington under the Back Pay Act, 5 U.S.C. § 5596 (2000). The plaintiffs sought review of the grievance decision's fifteen-working day limit on the back pay awarded for high work allegedly performed prior to the filing of the grievance and a grant of class-wide relief declaring an entitlement to six years' back pay with interest. James v. Danzig, No. C00-5221RJB (W.D. Wash. dismissed May 29, 2001), aff'd, Jaynes v. Johnson, 65 F. App'x 176 (9th Cir. 2003). The district court denied class certification on December 6, 2000. See Order Den. Pls. Mot. to Certify Matter as Class Action, Jaynes v. Danzig, No. C00-5221RJB (W.D. Wash. Dec. 6, 2000).

These facts are a matter of court record. There appears to be no dispute.

21. In March 2001, the defendants moved for dismissal for lack of subject-matter jurisdiction. The district court granted that motion. These facts are a matter of court record. There appears to be no dispute.

22. On July 9, 2001, plaintiffs appealed to the United States Court of Appeals for the Ninth Circuit, seeking review of the district court's orders denying class certification and dismissing the case on jurisdictional grounds. On May 22, 2003, the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction and remanded the case to the district court with instructions to transfer the case to the United States Court of Federal Claims. See Jaynes, 65.F. App'x at 178 (9th Cir. 2003). Having affirmed the district court's decision to dismiss the case for lack of jurisdiction, the Ninth Circuit declined to review the order denying plaintiffs' motion for class certification. Id. at 180. These facts are a matter of court record. There appears to be no dispute.

23. The case was transferred to this Court on May 18, 2004, pursuant to 28 U.S.C. § 1631. Plaintiffs filed their complaint in the Court of Federal Claims on June 15, 2004, alleging that defendant, the United States, had failed to pay back pay for high work as mandated by Federal laws, regulations, and their CBA. As in the original grievance,

the plaintiffs allege they are entitled to six years of back pay for high pay under the Back Pay Act.

These facts are a matter of court record. There appears to be no dispute.

24. None of the work at issue in this case involves a "swinging stage" or "boatswains chair."

No source is cited for this proposition. The Shipyard has failed to meet its burden of establishing that this fact is undisputed.

25. The intent of the grievance settlement was to compensate shipwrights with generous future pay in order to resolve the back pay claim. See also App. 91-92, 103-04, 105-06, 108-09, 110-13. In other words, the future pay policy of paying for work over five feet, as approved by Ms. Tallman in accordance with her authority to settle the grievance, was never intended to be applied to any grievance pay claims that related to the years before the grievance was filed, rather it was intended to cancel those claims.

This is disputed. The cited sources do not support any of the statements set forth above. There is no evidence that it is "generous" to pay high pay for work building or dismantling staging above five feet. Nor is there any evidence that it is "generous" to refuse to pay high pay for work performed where fall protection is available, as set forth in plaintiffs' motion no. 2 for summary judgment. As set forth in plaintiffs' proposed findings of undisputed fact, treating work above five feet as high work was compelled by Ms. Niemi's findings, by OSHA regulations, by the language of the OPM

Operating Manual for the Federal Wage System, and OPM regulations issued to implement 5 U.S.C. § 5343.

Nor do the cited sources support the factual assertions in this paragraph. For example, Mr. Winkler testified that his calculations of numerical awards were, in his "personal opinion," generous. He did not, however, testify regarding the intent of the grievance decision. Mr. Aiken did not testify that the grievance decision was "generous." He did opine that paying high pay starting at 5 feet above the ground was "outstanding" policy, but noted that in exchange, the union dropped all claims for back high pay. No witness offered any admissible basis for refusing pay high pay for work building or dismantling staging at heights greater than five feet, as set forth in plaintiffs' motion no. 2 for summary judgment.

Finally, none of the sources above establish that the policy was intended to "cancel" claims for high pay that accrued before the grievance was filed and this Court's February 2007 opinion and order has ruled otherwise.

26. There is no evidence that the generous five-foot pay rule was ever intended to be applied retroactively to the back pay claims; rather, all testimony indicated that the grievance decision was intended to cancel such back pay claims. The understanding of Ms. Tallman, representing the shipyard, and Mr. Aiken, as the voice of the exclusive representative of the employees, was that the parties were dropping their back pay claim based upon generous future pay. App. 93, 95-96, 107.

This is disputed. There is no reference in the cited sources to an agreement to drop back pay claims in exchange for a "generous" policy in the future. There is no evidence that paying high pay for shipwright work above five feet is generous. The cited evidence is consistent with the Court's opinion and order, in that it suggests an agreement by the union not to demand arbitration if the grievance decision were issued in the form signed by Ms. Tallman and Mr. Aiken.

DATED this 4th day of September, 2007.

Respectfully Submitted,

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify on September 4, 2007, a copy of the foregoing PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs