NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4: REGARDING EFFECT OF SHIPYARD'S FAILURE TO KEEP RECORDS AS REQUIRED BY FEDERAL LAW

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# TABLE OF CONTENTS

**Page**


I. Introduction and Relief Requested ........ 1

II. Issues Presented ........ 2

III. The Shipyard Was Legally Required To Keep Records of High Work Performed by Shipwrights ........ 2

IV. The Shipyard Did Not Keep Records of High Work ........ 2

V. The Shipyard's Failure to Keep Proper Records Reduces the Plaintiffs' Burden of Proof and Imposes a Burden of Production on the Shipyard ........ 6

VI. The Plaintiff's Burden is "Light" and May Be Met Through the Testimony of Representative Plaintiffs ........ 11

VII. Where Do We Go From Here? ........ 15

A. Testimony by Plaintiffs ........ 16

B. Shipyard Records ........ 17

VIII. Conclusion ........ 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aamold v. United States*, 39 Fed. Cl. 735 (1997) ........ 8, 9
*Adams v. United States*, 471 F.3d 1321 (Fed. Cir. 2006) ........ 8, 9
*Amcor v. Brock,* 780 F.2d 897 (11th Cir. 1986) ........ 8
*American Waste Removal v. Donovan,* 748 F.2d 1406 (10th Cir. 1984) ........ 8
*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) .. 1, 2, 6, 7, 8, 9, 10, 11, 13, 14, 15, 17
*Arias v. United States Serv. Indus.*, 80 F.3d 509 (D.C. App. 1996) ........ 12
*Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) ........ 12, 13
*Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.,* 839 F.2d 1333 (9th Cir. 1988) ........ 8, 11
*Bull v. United States*, 68 Fed. Cl. 212 (2005) ........ 8, 14
*Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002) ........ 12, 13
*Combs v. King,* 764 F.2d 818 (11th Cir. 1985) ........ 8, 11, 15
*Donovan v. New Floridian Hotel, LLC*, 676 F.2d 468 (11th Cir. 1982) ........ 13
*Gatto v. Mortgage Specialists*, 442 F. Supp. 2d 529, 535 (N.D. Ill. 2006) ........ 11
*Savering v. United States*, 18 Cl. Ct. 704 (1989) ........ 8, 11, 12
*Sec'y of Labor v. DeSisto*, 929 F.2d 789 (1st Cir. 1991) ........ 11, 14, 15

## Statutes

29 U.S.C. § 203(d) ........ 2
29 U.S.C. § 203(x) ........ 2
29 U.S.C. § 211(c) ........ 2

## Rules

5 C.F.R. § 551.402(b) ........ 2

## I. Introduction and Relief Requested

Before issuing its January 2000 grievance decision, the Shipyard kept no records of the work the decision found to be high work. In fact, the Shipyard kept no records other than payroll records of environmental differential pay for working at heights greater than 100 feet or in a manlift (or "JLG").

The parties agree on one thing: shipwrights perform high work on staging at heights below 100 feet. Plaintiffs first two summary judgment motions filed today address that issue.

But the Shipyard failed to keep legally-required records of that work. The Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*[1] dictates the consequences. Under *Anderson* and progeny, once plaintiffs prove (1) the fact of damage that can be inferentially determined and (2) the Shipyard's failure to keep records, they have discharged their burden of proof. The burden then shifts to the Shipyard to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the plaintiffs' evidence.

*Anderson*'s burden-shift has an obvious impact on trial and on further discovery and pre-trial proceedings. Accordingly, plaintiffs seek a ruling that the Shipyard has failed to keep legally-mandated records, triggering *Anderson*. At the end of this motion, plaintiffs also address some of the impacts of such a ruling on further proceedings.

---

[1] 328 U.S. 680 (1946).

## II. Issues Presented

The Shipyard had a statutory obligation to keep records of the work, hours, and work conditions affecting its employees but the Shipyard failed to comply with this obligation. Are the plaintiffs entitled to burden-shifting under *Anderson v. Mt. Clemens* and progeny and, if so, what effect will that shift have on further proceedings?

## III. The Shipyard Was Legally Required To Keep Records of High Work Performed by Shipwrights

The Shipyard is under a legal obligation to keep records of work, hours, and work conditions involving its employees. Section 11(c) of the Fair Labor Standards Act[2] requires "every employer" to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…." The term "employer" is defined to "include[] a public agency,"[3] and the term "public agency" is defined to include "the Government of the United States."[4] (The Office of Personnel Management has implemented that statutory requirement in part through 5 C.F.R. § 551.402, which provides in pertinent part: "An agency shall keep complete and accurate records of all hours worked by its employees."[5])

## IV. The Shipyard Did Not Keep Records of High Work

Before January 18, 2000, the Shipyard did not pay shipwrights an environmental differential for high work unless they were working more than 100

[2] 29 U.S.C. § 211(c).
[3] 29 U.S.C. § 203(d).
[4] 29 U.S.C. § 203(x).
[5] 5 C.F.R. § 551.402(b).

feet above the dock, from a JLG ("manlift"), or (the Shipyard claims) occasionally in inclement weather.[6] Accordingly, the Shipyard did not track time spent performing high work as defined by the grievance decision. This was why Mark Winkler was forced to develop the method he did for estimating the amount of high work each shipwright did from 15 days before the grievance was brought until it was decided.

The Shipyard has confirmed that it failed to track all high work performed by shipwrights. During its Rule 30(b)(6) deposition, the Shipyard (through its designee, Lynnette Niemi) testified regarding the "identity, general contents, custodian and location of all Shipyard or Navy records pertaining to high work and high pay."[7] When Ms. Niemi was asked about the Shipyard's high work records before issuance of the Grievance Decision on January 18, 2000, she testified: "They [the Shipyard] weren't paying for high work except in those circumstances, so that would be the only records that would be there would be the payment of it."[8] When asked if the Shipyard was "aware of any means to document or approximate which shipwrights did high work before the grievance," she stated she was not.[9]

Likewise, Mark Winkler averred -- in a declaration attached to the Shipyard's Opposition to Plaintiffs' Motion for Summary Judgment -- "Prior to the filing of the grievance the Shipyard had never kept any record of High Work hours except in cases of work over 100 feet, inclement weather, or work in manlift equipment."[10]

---

[6] *See*, e.g., Decl. of Mark Winkler, ¶ 3, Ex. 1 to Defendant's Opposition to Plaintiffs' Motion for Class Certification, as corrected. Appendix ("App.") at 8.
[7] 30(b)(6) Dep. 12:11-23 (Niemi). App. at 2.
[8] 30(b)(6) Dep. 33:6-8 (Niemi). App. at 3.
[9] 30(b)(6) Dep. 34:1-4 (Niemi). App. at 4.
[10] Winkler Decl. ¶ 12, at 6-7. App. at 9-10.

He also declared, "I can say that the Shipyard has maintained no records whatsoever of who performed High Work prior to the grievance, except for work over 100 feet, inclement weather, and manlift operations. …I am not aware of any means to document or even approximate who among the Shipwrights did the High Work."[11]

In her declaration, Ms. Niemi independently confirmed that, "Because Shipwrights were not paid for High Work prior to filing the union grievance there has been no reason to record this work for each employee. Hence, no such records exist now or have ever existed."[12]

Consequently, the plaintiffs and the Court find themselves without any records of the work performed before January 2000 that plaintiffs allege is high work. Nor are there records of pre-January 2000 work that the grievance decision concluded was high work.

Since the issuance of the grievance decision, the problem has continued, although perhaps on a smaller scale. During the 30(b)(6) deposition, Ms. Niemi was asked if the Shipyard "currently keep[s] any records of how much time each shipwright spends on staging either assemblage or disassemblage," Ms. Niemi answered, "No, I don't believe the records would say when they were on the staging."[13] And when asked if the Shipyard "currently maintain[s] any records of

[11] Winkler Decl. ¶ 14, at 8. App. at 11,
[12] Niemi Decl. ¶ 10, at 5. App. at 13,
[13] 30(b)(6) Dep. 34:5-9 (Niemi). App. at 4,

how much a shipwright spends passing materials up and down the staging while the shipwright is actually on it," she, again, answered no.[14]

As set forth in plaintiffs' first two motions for summary judgment (filed concurrently with this motion), plaintiffs are entitled to high work for work performed building and dismantling staging starting from the first level. It is undisputed that the Shipyard has failed to keep records of that work. And, it bears repeating, the Shipyard kept no records of pre-January 2000 work that its own grievance decision defined as high work.

The Shipyard appears to be unclear as to whether it has an obligation to keep records of high work shipwrights do. When asked whether the Shipyard "under[stood] or believe[d] that it has an obligation to maintain records of all high work shipwrights perform," Ms. Niemi responded (in her capacity as the Shipyard's 30(b)(6) designee, "I'm not sure. We have an obligation to maintain the attendance records which includes the high work that's paid."[15] When asked specifically about whether the Shipyard was taking any steps to record hours of high work in the event that this Court determines the Shipwrights had not been fully compensated, Ms. Niemi (over objection), "I don't think there is anything there that would tell when they performed the high work."[16]

---

[14] 30(b)(6) Dep. 34:18-21 (Niemi). App. at 4.
[15] 30(b)(6) Dep. 39:19-24 (Niemi). App. at 5.
[16] 30(b)(6) Dep. 39:25-40:9 (Niemi). App. at 5-6.

## V. The Shipyard's Failure to Keep Proper Records Reduces the Plaintiffs' Burden of Proof and Imposes a Burden of Production on the Shipyard

In *Anderson v. Mt. Clemens Pottery Co.,*[17] the Supreme Court addressed how to deal with an employer's failure to keep legally-required records of wages, hours, and other conditions and practices of employment. In *Anderson*, employees at a pottery factory brought suit under the Fair Labor Standards Act (FLSA) for uncompensated overtime they earned while preparing for and leaving their work stations.

The district court held that the employees had not sustained their burden of proof on the merits. On appeal, the Sixth Circuit Court of Appeals held that employees seeking back pay under the FLSA had the burden "to prove by a preponderance of the evidence that they did not receive the wages to which they were entitled …and to show by evidence rather than conjecture the extent of overtime worked, it being insufficient for them merely to offer an estimated average of overtime worked."[18]

The Supreme Court reversed. The Court held that the Sixth Circuit imposed an "improper standard of proof" that would have the practical effect of "impairing" benefits guaranteed by the FLSA.[19] "Due regard must be given," the Court reasoned, "to the fact that it is the employer who has the duty …to keep proper records of wages, hours and other conditions of employment and who is in the

[17] 328 U.S. 680 (1946).
[18] 328 U.S. at 686.
[19] *Id.*

position to know and to produce the most probative facts concerning the nature and amount of work performed."[20]

The "solution" to an employer's failure to keep such record was not, the Court ruled, "to penalize the employee" because he is "unable to prove the precise extent of uncompensated work."[21] Nor was it to "allow the employer to keep the benefits of an employee's labors without paying due compensation…."[22]

Accordingly, the Court imposed a burden-shifting mechanism. In a situation where the employer has failed to keep the required records of wages, hours, and other conditions of employment, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he provides sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[23] Once the employee does that, the Court held, the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."[24] "If the employer fails to produce such evidence," the Court warned, "the court may then award damages to the employee, even though the result be only approximate."[25]

The Court held that this reduction of the employee's burden of proof and its corresponding shift of a burden of production to the employer is required "even

---

[20] *Id.* at 687.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.* at 687-88.
[25] *Id.*

where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances."[26]

That *Anderson* applies to employers acting in good faith demonstrates that it is not intended to be punitive in nature. Rather, as the language above makes clear, the intent is to avoid penalizing the employee for the employer's failure and to prevent the employer from profiting from that failure.[27]

Courts have consistently rejected employer arguments to restrict *Anderson* to claims under the FLSA. Courts have found that the rationale underlying *Anderson* compel its application anytime an employer has failed to keep employment-related records, including under ERISA,[28] the Federal Employees Pay Act,[29] and the Service Contract Act.[30] The Court of Federal Claims has likewise imposed the *Anderson* burden-shift on the federal government when it has failed to keep proper records of work conducted by its employees.[31]

Here, it is undisputed that the Shipyard has failed to keep records of high work, as defined by its own grievance decision, that was performed by Shop 64 shipwrights. Nor has the Shipyard attempted to track work that would fall within

[26] *Id.* at 688.
[27] *Id.* at 687.
[28] *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.,* 839 F.2d 1333 (9th Cir. 1988); *Combs v. King,* 764 F.2d 818 (11th Cir. 1985).
[29] *Savering v. United States*, 18 Cl. Ct. 704, 709 (1989).
[30] *Amcor v. Brock,* 780 F.2d 897 (11th Cir. 1986); *American Waste Removal v. Donovan,* 748 F.2d 1406 (10th Cir. 1984).
[31] *See Adams v. United States*, 471 F.3d 1321 (Fed. Cir. 2006); *Bull v. United States*, 68 Fed. Cl. 212 (2005); *Aamold v. United States*, 39 Fed. Cl. 735 (1997).

the definition of "high work" advocated by plaintiffs in their first two motions for summary judgment, filed together with this motion. Whether the Shipyard's failure was due to good faith or otherwise, the result is the same under *Anderson.* As *Anderson* explains, any other result would be unjust to the employee.

Before invoking *Anderson,* plaintiffs must show that the activity for which they seek compensation is actually compensable work. In many cases, this is a real issue. For example, in *Aamold v. United States*,[32] the employee plaintiffs first had to show that their meal periods were "compensable," *i.e.*, that their meal times were interrupted so frequently that they were actually working during that period of time.[33] Similarly, in *Adams v. United States*,[34] the Federal Circuit held that plaintiffs had the burden to show "whether the alleged acts of the plaintiff constitute compensable 'work' at all," which necessarily involved proving "that what was performed falls into the category of compensable work."[35]

This does not present a problem for the plaintiffs. There is no doubt that the plaintiffs performed work, namely work building staging. The Court need look no further than to the fact that every hour for which plaintiffs seek high pay was one for which they already received their base pay. And the issue of whether that work is compensable high work is addressed in plaintiffs' first two summary judgment motions.

---

[32] 39 Fed. Cl. 735 (1997).
[33] *Id*. at 741. The Court later observed that plaintiffs' "evidence of meal-time interruptions is of a very general nature." *Id*. at 742.
[34] 471 F.3d 1321 (Fed. Cir. 2006).
[35] *Id*. at 1326.

At the beginning of this case, plaintiffs submitted declarations by the five proposed class representatives to this Court for consideration. One of those, the Declaration of Paul S. Scott, is enclosed with the appendix to this motion.[36] The declarations described the work each plaintiff did on unfinished staging. The information in these declarations is sufficient, as a matter of law, to establish that each declarant performed work building or dismantling staging on the first level of staging or higher.

Plaintiffs therefore ask this Court to enter summary judgment in their favor, holding that the Shipyard has failed to keep records of high work (whether or not it is defined as work building and dismantling staging, starting from the first level). Plaintiffs ask this Court to confirm that, as a result of this ruling, the parties' respective burdens at trial are modified as set forth in *Anderson.* Thus, the Shipwrights request, and are entitled to, a ruling that (1) the Shipyard failed to keep records it was required to; (2) at trial, plaintiffs need only present evidence that they performed high work for which they did not receive high pay, and provide sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference; and (3) the burden will shift to the Shipyard "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."[37] Plaintiffs request this ruling now because it will have an impact on the parties' discovery, pretrial preparation, and trial, as the following section explains.

---

[36] App. at 14.
[37] *Anderson*, 328 U.S. at 687-88.

## VI. The Plaintiff's Burden is "Light" and May Be Met Through the Testimony of Representative Plaintiffs

Under *Anderson,* plaintiffs carry the burden of proof. To carry that burden, plaintiffs will need to show that they have performed high work for which they have not received high pay.

The *Anderson* Court did not provide guidance regarding the amount and type of proof required such that the trier of fact could draw "reasonable inferences" as to the amount of damages; it remanded the case to the lower court for further factual development.[38] But cases since *Anderson* have described the initial burden on the employee as "minimal"[39] or "light."[40]

The Ninth and Eleventh Circuits have each held that employees discharge this light burden by proving: (1) the fact of damage (i.e., the failure to receive all compensation to which the employee was entitled); and (2) the employer's failure to keep the required records.[41]

Cases since *Anderson* have also addressed with some specificity the nature of proof that the employee may be required to present before the burden shifts to the employer to refute it. Courts have accepted evidence in the form of summaries

---

[38] The court in *Gatto v. Mortgage Specialists*, 442 F. Supp. 2d 529, 535 (N.D. Ill. 2006), viewed *Anderson* as approving the use of "employee timecards showing workweeks longer than forty hours" to "create[] a just and reasonable inference that the employees may be eligible for overtime compensation."

[39] *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991).

[40] *Savering v. United States*, 18 Cl. Ct. 704, 709 (1989).

[41] *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.,* 839 F.2d 1333, 1338-39 (9th Cir. 1988); *Combs v. King,* 764 F.2d 818, 825-27 (11th Cir. 1985).

based on available payroll records[42] and documentary evidence other than payroll records.[43]

Most notably (for purposes of case-planning), courts have accepted the testimony of representative plaintiffs[44] and are generally willing to take measures to alleviate the need for any live testimony by plaintiffs. The Fifth Circuit addressed this issue in *Brennan v. General Motors Acceptance Corp.*,[45] in which the defendant employer argued on appeal that the trial court erred in granting back pay to employees who had not testified at trial, because "there was no competent evidence in the record" to justify the award.[46] The Fifth Circuit rejected this argument on the basis that the trial court properly found that the plaintiffs worked unreported overtime hours "as a general rule."[47] This determination, which was not clearly erroneous, was based on the testimony of sixteen employees (out of 37) and a government investigator who interviewed six employees. Once the plaintiffs established a prima facie case that all the plaintiff employees had worked unreported overtime hours, the burden shifted to the employer to show that it had appropriately paid overtime for each of the plaintiffs. The employer was able to do for ten of them, and the trial court appropriately eliminated these plaintiffs from

[42] *Arias v. United States Serv. Indus.*, 80 F.3d 509 (D.C. App. 1996); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002).
[43] *Savering*, 18 Cl. Ct. at 710.
[44] *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973).
[45] 482 F.2d 825. This case also holds that it is a wage violation for managers to pressure employees to underreport hours, regardless of whether there was direct evidence that the employer knew of the pressure or the underreporting.
[46] *Id*. at 826.
[47] *Id*. at 829.

the award. However, the court was not required to hear testimony from each employee to grant judgment in his or her favor.[48]

In *Donovan v. New Floridian Hotel*,[49] the Eleventh Circuit likewise upheld an award of back pay to employees who did not testify at trial. The court stated, "it is clear that each employee need not testify in order to make out a prima facie case of the number of hours worked as a matter of 'just and reasonable inference.'"[50] The court found that the testimony of 23 employees, the Department of Labor compliance officer who investigated the case, and management officials, coupled with partial payroll records, was sufficient to establish a "pattern of working hours" for the 207 employees who were awarded back wages.[51] Because the defendant could not "negative the reasonableness of the inferences" used to calculate the amount of back pay, the award was upheld.[52]

Similarly, in *Vidtape*, the court concluded, "Testimony from a group of employee witnesses about the hours worked and pay received is sufficient representation to calculate the amount of wages owed to the enterprise's entire workforce," because the burden-shifting analysis of *Anderson* was applicable.[53] The court found that the testimony of 21 employees regarding their wages and hours

[48] *Id.*
[49] *Donovan v. New Floridian Hotel, LLC*, 676 F.2d 468 (11th Cir. 1982).
[50] *Id.* at 472.
[51] *Id.* The district court awarded back pay for 207 employees, *id.* at 469, but denied back pay to another 58 employees "because the evidence was insufficient to support the compliance officer's calculation of their entitlement to back wages." *Id.* at 470. The court's opinion provides no information regarding the difference in proof between the employees whose claims were granted and those whose claims were denied.
[52] *Id.* at 473.
[53] *Vidtape*, 196 F. Supp. 2d at 293.

was sufficient to establish the working conditions for all 67 employees on whose behalf the suit was brought.[54]

Considerable flexibility can be built into the process. In one case before the Court of Federal Claims, the parties agreed to designate six plaintiffs to testify for trial and the Court instructed each side to designate three of these witnesses, with the understanding that each side would designate their three "best" witnesses.[55] While plaintiffs don't advocate that approach here, the approach is illustrative of the flexibility with which back-wage plaintiffs may prove their cases.

Obviously there are limits to plaintiffs' freedom to limit their case to testimony by representative plaintiffs. In *Secretary of Labor v. DeSisto,*[56] for example, the First Circuit rejected the notion that one plaintiff could testify on behalf of 244 employees who worked in different locations and positions. While acknowledging that "[i]t is well established that not all employees need testify in order to …recoup back wages" and that plaintiffs "can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement"[57] the First Circuit held that usually, an employee may only testify on behalf of other employees who "perform substantially similar work."[58] Interestingly, footnote 1 from the *DeSisto* surveys cases that allowed representative testimony. The ratio of employee witnesses to total employees ranged considerably. In *Anderson,* only 8 out of 300 employees testified.

---

[54] *Id.*
[55] *Bull v .United States,* 68 Fed. Cl. 212, 214 (2005).
[56] 929 F.2d 789 (1st Cir. 1991).
[57] 929 F.2d at 792.
[58] *Id.* at 793.

*DeSisto* is important for another reason. It holds that testimony by even the representative plaintiffs "need not be given orally at trial, but it must be properly before the court as admitted evidence."[59]

Under *Anderson* and its progeny, therefore, plaintiffs need only present sufficient evidence to support a "just and reasonable inference" as to amount of high pay to be awarded. This evidence can be produced through a combination of testimony by a subset of the plaintiffs, which "need not be given orally," partial payroll records, other business records (such as job orders and invoices), and exhibits that summarize this evidence and propose just and reasonable inferences for the trier of fact.

Once plaintiffs discharge that burden, which they already have in this motion and those filed concurrently with it, the burden shifts to the Shipyard, which, having taken its chances with being in compliance, must disprove the plaintiffs' testimony that the Shipyard failed to pay high pay.[60]

All of this, obviously, has implications for how this case should proceed from here. Accordingly, the following section briefly discusses that issue.

## VII. Where Do We Go From Here?

Plaintiffs' first two motions for partial summary judgment demonstrate that high work, in the context of shipwright work at the Shipyard, includes work building or dismantling staging starting at the first level, regardless of whether fall protection is available. The third motion establishes the period of time for which

---

[59] *Id.*
[60] *Combs,* 764 F.2d at 826.

each plaintiff may recover unpaid high pay. This motion has established that the Shipyard failed to keep records that would allow the parties to document how much high work (no matter what work is deemed to fall within that term conducted by the Shipwrights), making it impossible for the parties to prove or contest the plaintiffs' damages with any degree of certainty. Meanwhile, as previously mentioned, plaintiffs already submitted five declarations in 2004 that generally describe shipwright work.

These submissions are enough to discharge plaintiffs' burden of proof (although the Court need not rule so broadly in response to this particular motion). So where do we go from here?

### A. Testimony by Plaintiffs

The first question concerns testimony by the plaintiffs. In past status reports and conferences, plaintiffs have proposed calling a limited set of representative plaintiffs, perhaps supplemented with declarations from the remaining plaintiffs. In the plaintiffs' view, calling each and every plaintiff to testify is unnecessary. (Indeed, under the authorities cited above, further testimony is "necessary" only if plaintiffs deem it necessary to present it, since plaintiffs have already submitted enough to discharge their burden of proof.)

The Shipyard, on the other hand, has suggested (although not yet demanded) that all plaintiffs be deposed and called to testify at trial. The cases above demonstrate that plaintiffs need only call witnesses who performed work substantially similar to the work performed by all plaintiffs. The Court's directives regarding further discovery, pre-trial proceedings, and trial should reflect this.

**B. Shipyard Records**

In the absence of statutorily-required payroll records, other Shipyard records will assume importance. Without detailed records of high work performed each day, this Court will need to draw inferences about the number of hours of high work shipwrights do, either generally or on particular types of projects.

Unless the Shipyard is willing to allow the Court to draw these inferences based on the anecdotal testimony of Shipyard employees, the Shipyard will be required, under *Anderson,* to come forward with pertinent records. Records may be especially helpful to the Court in three respects.

First, records that show when each plaintiff began or stopped performing shipwright work is relevant, for obvious reasons. Plaintiffs expect that Shipyard records identify these dates, but they have only recently received these records and have yet to complete their review. Presumably the Shipyard can readily identify these dates through a query of the database used by its human resources personnel, which is known as the Supplemental Administrative Employee Management, or "SAEM." The Court should direct the Shipyard, with plaintiffs' cooperation, to assemble these dates.

Second, as the Shipyard's own attempt to compute an award under the grievance decision has illustrated, records concerning the number of hours worked each pay period – including both hours paid at straight time and overtime – would likely be useful to this Court. Unfortunately, the Shipyard's document production in its current state probably won't allow the plaintiffs to develop this information. This is so because the Shipyard has produced the information from its databases in .txt

files that don't compile the information in a way plaintiffs can readily use. At an August 27 discovery conference, plaintiffs asked the Shipyard to confirm whether data regarding hours worked could be assembled through simple queries of its database. Shipyard counsel was unsure, but like most databases of this type, the answer is probably yes. In other words, plaintiffs expect that Shipyard personnel can, for example, request a report that identifies how many straight- and over-time hours a given individual worked in a specified period. Shipyard counsel promised to inquire and report back in September.

Plaintiffs envision a process in which the Shipyard, working cooperatively with plaintiffs, produces summaries of information from its database that show the number of straight- and over-time hours each plaintiff performed over the course of the pertinent claim period. The parties would then submit those summaries to the Court for consideration. To the extent that either party wished to challenge the accuracy of data in those summaries, they would, of course, be free to do so, but that shouldn't affect the admissibility of those summaries.

Third, records that identify the particular project each plaintiff worked on appear to exist. Again, however, it would be extremely difficult for plaintiffs to attempt to locate this information using the information produced by the Shipyard. To access this information, plaintiffs would likely have to build a database of their own that mimicked the Shipyard's and program it to perform queries that the Shipyard can already do. Again, to the extent the Shipyard wants to present

evidence regarding project assignments, it should work cooperatively with plaintiffs to produce summaries.

This section of the brief is replete with references to the parties' working cooperatively. What this means, in plaintiffs' eyes, is that the parties work to identify the relevant data fields in the databases and agree on search terms that would be used to obtain the data.

In plaintiffs' view, the process of obtaining this rudimentary information shouldn't take especially long if, as plaintiffs suspect, the database has already been programmed to produce this information. During the August 27, 2007 discovery conference, plaintiffs' counsel invited defense counsel to begin working on a protocol for obtaining and presenting this information from the database. Defense counsel has expressed some willingness to do so, but has not committed to doing so and has expressed reluctance to doing so until this Court rules on all pending motions. Plaintiffs counsel believes this process should start as soon as possible, and that the Court should direct the parties to begin that process at the November 13, 2007 status conference if it hasn't begun already. Once started, assuming the data exist and can be readily extracted from the database, the process should take no more than two months to complete.

In the end, plaintiffs contemplate a trial in which representative plaintiffs testify, with their testimony perhaps supplemented by declarations by other plaintiffs, as well as summaries from the database that show the number of hours worked, the projects worked on, and the environmental differentials already paid.

## VIII. Conclusion

The Shipyard was legally required to maintain records of all high work shipwrights performed. It is undisputed that it failed to do, both before and after the issuance of the grievance decision. This Court should grant summary judgment on this issue and hold that plaintiffs' burden of proof at trial is correspondingly reduced. Once that burden is met, the Court should rule, the burden will shift to the Shipyard to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the plaintiffs' evidence.

DATED this 4th day of September, 2007.

Respectfully Submitted,

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on September 4, 2007, a copy of the foregoing "PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4: REGARDING EFFECT OF SHIPYARD'S FAILURE TO KEEP RECORDS AS REQUIRED BY FEDERAL LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs