NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

# APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT NO. 4: REGARDING EFFECT OF SHIPYARD'S FAILURE TO KEEP RECORDS AS REQUIRED BY FEDERAL LAW

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# Table of Contents to Appendix


1. Excerpts from Deposition of Lynette Niemi, March 9, 2005 ........................................ 1
2. Excerpts from Declaration of Mark Winkler, August 6, 2004 ...................................... 7
3. Excerpts from Declaration of Lynnette Niemi, August 6, 2004 .................................. 12
4. Declaration of Paul S. Scott, September 4, 2004 ........................................................ 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON HANBERG, et al. | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 04-856C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

LYNNETTE NIEMI

VOLUME I

Wednesday, March 9, 2005

MR. SCARAMASTRA: No. I'm not going to ask her to actually testify right now. My thought right now is you're here as an advisor and can kick people under the table or whatever.

MR. HOLCOMB: Sorry to interrupt.

MR. SCARAMASTRA: No, that's okay.

THE WITNESS: I'm not sure. I think I've seen this before.

Q All right. If you would turn to page 4.

A (Witness complies.)

Q And there's a number of "Matters For Examination." And the first one is: "The identity, general contents, custodian and location of all Shipyard or Navy records pertaining to high work and high pay, including but not limited to Civilian Leave and Earning Statements, time sheets, punch cards, job detail sheets, other pay or work records, databases, and other electronic records (e-mail), that the Shipyard currently maintains or maintained in the past, concerning Shipyard employees at the Shipyard's facilities in Bremerton, Washington and/or Bangor, Washington." First of all, did I read that correctly?

A Yes.

Q I understand that you are here to provide testimony as to matter number 1 with a possible exception of the details

High Work hours except in cases of work over 100 feet, inclement weather, or work in manlift equipment." Did I read that right?
A You did.
Q Is that statement true?
A They weren't paying for high work except in those circumstances, so that would be the only records that would be there would be the payment of it.
Q Okay. So --
A That's what I believe that means.
Q All right. But the statement as you read it is true?
A Yes.
Q And if you go another page and paragraph 14.
A (Witness complies.)
Q Basically he's got that first sentence the second line there's a phrase and he says: "I can say that the Shipyard has maintained no records whatsoever of who performed High Work prior to the grievance, except for work over 100 feet, inclement weather, and manlift operations." Again, is that statement I just read to you true?
A Yes.
Q And if you go the end of paragraph 14, second to last sentence: "I am not aware of any means to document or even approximate who among the Shipwrights did the High

Work already paid." Is the shipyard aware of any means to document or approximate which shipwrights did high work before the grievance?
A Not to my knowledge, no.
Q Does the shipyard currently keep any records of how much time each shipwright spends on staging either assemblage or disassemblage?
A No, I don't believe the records would say when they were on the staging.
Q Does the shipyard currently keep any records of -- by the way when I refer to "the shipyard," do you understand I'm referring to the Puget Sound Naval Shipyard?
A Sure.
Q Does the shipyard currently keep any records of how much time the shipwrights spend on the leading edge of staging work?
A No.
Q Does the shipyard currently maintain any records of how much a shipwright spends passing materials up and down the staging while that shipwright is actually on it?
A No.
MR. SEATON: Could I go off the record here a second?
MR. SCARAMASTRA: Yes.
(Discussion held off the record.)

A No.

MR. FATOUROS: Objection; misstates former testimony.

Q How did I go wrong?

A Okay. There is one code for high work.

Q Okay.

A The definition for that code, that high work, is, work above 100 feet, at or above I believe it is, or work at lesser heights if these things exist. That's one definition of high work, 25 percent. There's another high work definition, work at extreme heights which is a separate high work definition which wasn't at play in this grievance.

Q All right. So it's one code or the other depending on whether it falls into?

A The extremeness of the work.

Q Sorry, we were ships passing in the night there. Sorry for the pun.

Does the shipyard understand or believe that it has an obligation to maintain records of all high work shipwrights perform?

A I'm not sure. We have an obligation to maintain the attendance records which includes the high work that's paid.

Q Let's start a different way. If the Court ultimately

rules that the shipwrights are entitled to additional high pay for work that is not being compensated under the current system, what records will the shipyard have to document the amount of work that has been performed?

MR. FATOUROS: Objection; calls for speculation.

THE WITNESS: I really -- I don't know. I don't think there is anything there that would tell when they performed the high work.

Q Given that the shipwrights are claiming that they're entitled to high pay -- let me start over.

Given that the shipwrights are claiming or certain of the shipwrights are claiming that they perform high work that is not currently receiving environmental differential, why isn't the shipyard trying to maintain records of that activity the shipwrights claim is high work?

A I don't know. And I don't know about the claim that we're currently not paying high work that should be paid.

Q I understand. You don't have to agree with me that the shipwrights perform high work that doesn't receive an environmental differential. My question is simply: Given that there is a claim that they are doing high work and that they're not receiving high pay for, why isn't the shipyard trying to document the amount of time that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**Declaration of Mark Winkler**

**Pursuant to 28 U.S.C. § 1746, I, Mark Winkler, declare that the following is true and correct.**

1. I am over 18 years of age and am competent to testify as to the facts and matters set forth in this Declaration.

2. I am the Superintendent for Shop 71, Painter Shop, at the Puget Sound Naval Shipyard, Bremerton, Washington. I assumed this position in January 2004. Prior to this position I held several other jobs, including Senior Process Manager for Shop 64. I was also General Foreman in Shop 64 in charge of the Shipwrights for the Puget Sound Naval Shipyard. I held this position from October 1997 to December 2000. I have been in the Shipwright trade within the Puget Sound Naval Shipyard for more than 20 years. While I was General Foreman there were approximately 120 Shipwrights employed at the Puget Sound Naval Shipyard. The Shipwrights are a relatively stable workforce with minimal turnover. I was the Shop 64 General Foreman in April 1999 when 99 employees filed grievances seeking Environmental Differential Pay for High Work. As an example of the slow turnover of employees, when I was still the General Foreman, I know that of the original 99 grievants only six of those 99 had left Shop 64.

3. One of the principle functions performed by Shipwrights at the Shipyard is the

erecting and dismantling of staging (scaffolding). Most ship repair or recycle projects require use of some form of staging. As an active Shipwright myself for many years, I have been aware that Shipwrights have not been paid an Environmental Pay Differential for High Work except in limited circumstances. Pay for High Work has been authorized for work that is at heights equal or higher than 100 feet, and it has been authorized for work on staging during difficult weather conditions, for example, periods of high wind. Also, pay for High Work has been authorized for all trades when an employee is working from inside a basket of a hydraulic "manlift."

4. The way staging is erected is that specially made staging pipe is connected to form a rigid platform. It is erected in stages, with one level being finished and then adding the next level above and so on until the desired height is completed. A crew of Shipwrights is assigned to do this work, with one or two of the crew doing the climbing and assembly on the top incomplete section, and other members of the crew handing up the pieces to be set in place. Even though the one or two members of the crew that were working on the incomplete staging were working at heights above ground level, they were not paid for High Work because it was considered that such work was a core part of the trade and was therefore already factored in for the level of grade and wage that has been paid to Shipwrights.

5. A couple of years ago, several other Naval Shipyards were closed as part of the overall downsizing of the military. Skilled Shipwrights were hired from these now-closed Shipyards. These workers began to discuss the fact that these other shipyards did pay Shipwrights for High Work under circumstances where it was not paid at Puget Sound Naval Shipyard. This came to the attention of the union.

6. The Bremerton Metal Trades Council is the exclusive representative for all the Shipwrights at the Puget Sound Naval Shipyard. To my knowledge this union had never raised

2) Building and dismantling hanging staging working from similar heights under similarly unguarded situations when fall protection devices cannot be properly used.

11. The union signed the management decision and elected not to seek binding arbitration. I believe this indicated the union was satisfied with management's actions, and I also believe all of us were uncertain as to whether pay for High Work by Shipwrights was really required by law and regulation. Had the matter gone to arbitration, this legal issue would have been decided and may have been decided either for or against the Shipwrights. I believe the union made a decision to accept management's action as the best possible resolution of the grievance.

12. The decision was made effective from a date that was 15 workdays prior to the date the grievance had been filed by the union. This is consistent with other union grievance matters because the collective bargaining agreement requires the union to file all grievances within 15 workdays of the matter in dispute. The union made no issue of the effective date when the matter was decided by management, in fact, part to the negotiations with union was the idea that back pay would be calculated on a generous formula in exchange for an understanding that the backpay would only be effective 15 workdays prior to the grievance. Since it had taken about nine months to reach the decision on the grievance, I was in charge of calculating the money owed in back pay to the Shipwrights for that nine-month (plus 15 days) period of time[1]. Prior to

[1] We actually ended up paying backpay to 135 employees, more than the 99 named grievants, because there were a few employees who returned from temporary duty assignments after the grievance had been filed and they had not been here to sign up, and there was a class of apprentice workers that arrived in the Shop after the grievance was filed, who also had not been

the filing of the grievance the Shipyard had never kept any record of High Work hours except in cases of work over 100 feet, inclement weather, or work in manlift equipment

13. Based on our agreement with the union as to hours of High Work, it was clear that some individuals do a lot more of the High Work than other individuals. This is very consistent with my observations over the many years I have been a Shipwright and supervised Shipwright work. Worker crews were assigned to particular staging jobs, but it was normal for the same workers to choose to do the High Work, just as it was normal for certain workers to choose to avoid the High Work. This explains the reason for the wide variation in the back pay under the grievance.

Space not used

able to sign up for the grievance. Although not required by the contract, we felt it a gesture of good faith to include these employees as well.

14. Even though we reached a consensus on the back pay for the purpose of the grievance, I can say that the Shipyard has maintained no records whatsoever of who performed High Work prior to the grievance, except for work over 100 feet, inclement weather, and manlift operations. Furthermore, during the nine-month period following the filing of the grievance, because the grievance issue was widely discussed, supervisors and employees were more aware of who was doing the work that could have been considered High Work if the grievance was approved. This is not the case prior to the grievance except as to High Work already paid. I am not aware of any means to document or even approximate who among the Shipwrights did the High Work. This is especially true the farther back in time this information would be needed.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on the** 6th **day of** August **at** 2004.

[signature]

Mark Winkler

Signed at Bremerton, WA 98314

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**Declaration of Lynnette Niemi**

**Pursuant to 28 U.S.C. § 1746, I, Lynnette Niemi, declare that the following is true and correct.**

1. I am over 18 years of age and am competent to testify as to the facts and matters set forth in this Declaration.

2. I am the Administrative Officer for the Production Department, Code 900, Puget Sound Naval Shipyard, Bremerton, Washington. I have held this position since November 19, 2000. Prior to this position, I was a Personnel Management Specialist employed by Commander, Navy Region Northwest and assigned to the Puget Sound Naval Shipyard. I held this position for three and one-half years. Part of my duties as a Personnel Management Specialist included the responsibility for processing union grievances pursuant to management's obligations under the collective bargaining agreement.

3. In April 1999, the Bremerton Metal Trades Council filed employee grievances for 99 named bargaining unit employees in the Shipwright trade. The list of employees and their signatures as well as the list of six who have since separated from the Shipyard is attached as Tab 1[1] and the collective bargaining agreement Article on the grievance procedure is attached as Tab

[1]Please note that the typed list has removed the names of Gary D Horne, Gary Witt, and

10. After the new pay practices went into effect all supervisors were required to keep detailed records documenting which individual Shipwrights performed High Work and for exactly what hours. I am aware that such information is not available for any time period prior to the filing of the grievance. Because Shipwrights were not paid for High Work prior to the filing of the union grievance there has been no reason to record this work for each employee. Hence, no such records exist now or have ever existed.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on the** 6th **day of** August 2004 **at** Bremerton, Washington.

Lynnette Niemi

**Signed in Bremerton, Washington**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER JAYNES, PAUL S. SCOTT, DAVID S. PETERSON, DONALD BAKER, and GORDON HANBERG, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES<br><br>Defendant. | No. 04-856C<br><br>**CLASS ACTION**<br><br>JUDGE MILLER |

**DECLARATION OF PAUL S. SCOTT**

I, Paul S. Scott, declare as follows:

1. I am one of the named plaintiffs in the above-captioned lawsuit. I am over 18 years of age and competent to testify to the matters set forth in this Declaration.

## I. CAREER AND BACKGROUND

2. For many years, I worked in Shop 64 at the Puget Sound Naval Shipyard ("PSNS"). Virtually all shipwrights at PSNS are assigned to Shop 64.

3. I was initially hired by PSNS as a WG-5, Step 1, Shop 72 Shipwright Helper in September 1989. In March 1992, I was rated up to a WG-10, Step 1 Shipwright Mechanic. In August 1999, I became a WG-10, Step 5, Journeyman Shipwright Mechanic. I converted to career conditional status as a shipwright in February 1998 and was appointed a career employee in February 2001. I served as a temporary shipwright supervisor from April 11, 1999 to May 16, 1999 and as a Production Shop Planner from February 18, 2001 to June 30, 2001. I retired for medical reasons in August 2003. Thus, I have worked as a shipwright from August 1989 to August 2003; except for my time as a plannerman.

4. A union known as the Bremerton Metal Trades Council, Local 2317, represents Shop 64 shipwrights. I didn't belong to the union and neither did many of the other shipwrights in Shop 64.

## II. ORGANIZATION AND JOB RESPONSIBILITIES OF SHOP 64 SHIPWRIGHTS

5. The Shop 64 shipwrights are divided into six or seven crews of ten to fifteen workers each. Crew assignments are fairly flexible, and workers may rotate through different jobs. I have been assigned to various crews from time to time.

6. One crew has particular expertise working aboard nuclear vessels, especially in the reactor core (this is the so-called "nuclear crew" or "nuke crew"). A second crew (the "docking crew") sets keel blocks, on which vessels are positioned during repairs, in the drydocks. (Setting these blocks involves work several feet off the floor without adequate fall protection.)

7. All of the crews in Shop 64 are responsible for the construction and disassembly of scaffolding (or staging). We erect the staging so that other workers can access various work levels on naval vessels during repair or deconstruction projects. Shipwrights assigned to the nuclear and docking crews typically do less of this work (although they still devote over half their time to staging). The construction and disassembly of scaffolding took up well over 80-90% of my work. My experience was typical of the other shipwrights whom I observed and worked with (other than those in the nuclear and docking crews, as I mentioned above).

8. At the time of my retirement, the work day at PSNS began at 7:20 a.m. and ended at 4:02, with two breaks plus a 42-minute lunch period during the day. First thing each morning, each shipwright was assigned to a project for the day. During this 8-hour day, I typically spent a good 6.5 hours at work on scaffolding. This was typical of other shipwrights, most of whom I had occasion to work with or observe working.

## III. CONSTRUCTION OF SCAFFOLDING

9. Shipwrights in Shop 64 build scaffolding just about anywhere. Sometimes we build it on the floor of the dry dock, or on a barge or pier, in order to reach the exterior hull of a ship or submarine. Other times we build staging in the interior of a ship or submarine or in one of its holding tanks. We also build scaffolding in and around buildings in the shipyard. We build staging wherever the other trades need to work. The staging can extend up to 130 feet in height (when the staging is for the mast of an aircraft carrier).

10. When we build scaffolding inside ships, we frequently have to assemble the scaffolding on uneven and unlevel surfaces, which makes the work very difficult. When we're building on a sloped metal floor, such as the holding tank of a ship, it gets even more dangerous because both the ship's surface and the scaffolding frame are made of metal. This makes the structure very slippery. Many shipwrights say it's like building on ice.

11. The scaffolding we erect is a free-standing structure although, when possible, we try to secure the scaffolding to the vessel. When completed, the scaffolding has work platforms at various locations to allow other trades to reach the vessel to repair or deconstruct it. It is the responsibility of the shipwrights to design and build scaffolding in such a way that it accommodates the needs of the crews that will use it within the space available, and so that it avoids obstacles (such as outcrops and overhangs) in the design of the vessels being worked on.

12. Teams of three to four shipwrights assemble scaffolding by erecting a frame of two-inch galvanized steel pipe. Before 1997-98, we used mostly "Tube-lock" staging material; since then, the shipyard has been converting to the "Systems" staging material. The two types of material differ in some of the details of their design and assembly, but these details don't change the basic nature of the staging work that shipwrights do. In my declaration, I'll describe how we install staging using Tube-lock materials.

13. The frame of the staging consists of one or more "bays." Each bay consists of

four vertical "legs" of pipe to which we clamp four horizontal pipes at right angles to make a "ring." Normal bays are approximately 4 to 13 feet long and from 4 to 8 feet wide. After finishing one ring, we move up to the next. Each ring is between 3.5 and 6 feet above the one below it. (To reinforce the frame, we fasten pipes diagonally along the frame at various intervals.) A two-dimensional schematic of staging with three bays would look something like this (this schematic doesn't show the diagonal cross-bracing):




14. As a general rule, the height of the staging can be no more than four times the width (i.e., the foundation). If the height of the scaffolding will be more than four times the width of a single bay, we will use a double bay (or more, depending on the exact height of the final structure).

15. Once we start building rings off the ground or deck, we place 12-inch wide aluminum planks on the frame so we have a place to stand. We usually set two planks side by side to create a 24-inch wide working surface, but shipwrights occasionally use more planks if they need a larger work surface for some reason. The planks can be up to 16 feet long, depending on the length of the bays. We leave these temporary work planks loose (i.e., we don't fasten them to the frame) so that we can slide them from side to side inside a bay, or move them to another bay, or move them quickly up to the next level. We do, however, fasten down the final horizontal work surfaces intended for use by other trades, so that they can use them safely.

It is also impractical to install guardrails because it would interfere with the shipwrights' ability to assemble the frame. But we do put guardrails around the final, permanent working levels so that other trades can use the platform safely.

16. On each level, we build a horizontal series of bays, placing the minimum of two planks on each outer edge of the bays to stand on for safety. To build the next vertical level of bays, we leave the planks for crewmembers to stand on while passing staging material up to the crew at the top and move up more planks to lie on the top level. Once we do so, one or two shipwrights climb up and start assembling the next level. Moving up to the next level is particularly tricky because it requires crawling up the staging onto the work planks above. We refer to the shipwrights who assemble the top ring of the structure as being on the "leading edge." I have worked the leading edge during the construction of staging, including when the leading edge was at heights of less than 100 feet.

17. We carry all tools and supplies up the scaffolding ourselves. Moving building material (e.g., pipe and clamps) up to the upper rings requires one or two shipwrights to climb onto the lower completed ring levels and manually bring the materials up to the workers at the top. (One member of the team stays on or near the ground to hand material up to the other team members, who then relay it to the top.) Every few rings, we leave three to four planks in a bay for use by the shipwrights moving up and down the scaffolding.

18. Shipwrights generally climb up and down the scaffolding using the frame and clamps for handholds and footholds, at least until the scaffolding exceeds 25 feet in height. Once we start building higher than that, we will attach a ladder to the outside of the frame. The ladder is not enclosed to prevent a fall.

19. A single-bay scaffold under construction on a flat surface would look something like this:




20. If there are projections from the hull of the ship or in the ship's interior, we have to design and build our scaffolding to avoid them. For example, we may have to create a "breakout," meaning that we extend the scaffolding horizontally until we clear the obstacle and then we resume building vertically. We often have to build the staging around, and work above, jagged pieces of metal, especially if the ship is being taken apart.

21. Under windy conditions or after adding rain gear if it is raining, it can become very difficult to handle building materials. If one of the workers passing up materials or working the leading edge drops something (because it is necessary to have all tools and materials with

you, there is always the danger that things will be accidentally dropped or kicked onto the levels below), the workers below have to do their best to duck and cover their heads to avoid being hit by the falling material because nothing in the structure will prevent the material from falling all the way down to the deck or ground below. To avoid that risk, I often worked on the leading edge.

## IV. THE ABSENCE OF FALL PROTECTION

22. It is impractical to wear fall protection while erecting the scaffolding. Before 1999, the shipyard didn't require any fall protection whatsoever, and shipwrights didn't use it.

23. It is impossible for the workers on the leading edge to tie in to the structure, because until they build it, there is nothing to tie in to. Whenever I have worked on the leading edge, I have not used any fall protection whatsoever.

24. For shipwrights lower on the structure, the only protection available is to tie one's harness to the frame of the scaffolding using a lanyard. This can actually create a more dangerous situation because it creates a line that you can trip over. Moreover, because the lanyard is three feet long (before a fall), it must continually be hooked and unhooked to allow the necessary movement back and forth along the scaffolding.

25. Even tying in doesn't eliminate fall hazards. After a fall, the lanyard extends to six or seven feet in length. This may stop a long and lethal fall to the floor. But it won't stop someone from falling off the platform and dropping six or seven feet with a full belt of tools and supplies. Between the fall and the resulting swinging (I have fallen short distances on two occasions and no fall protection was involved) back and forth like a pendulum, the fallen shipwright is certain to hit something, which is enough to seriously injure, if not kill. This is especially true on deconstruction projects, where jagged metal often protrudes from the hull of the vessel.

## V. LACK OF HIGH PAY

26. The only times I recall receiving high pay was when I worked in a man-lift or at heights of over 100 feet. When I asked management about receiving high pay for work on scaffolding below 100 feet in height (including work on the leading edge of the construction and other work where shipwrights weren't required to use fall protection), I was told that high pay was unavailable for those situations. I was told that high pay wasn't available unless I was working in a man-lift or higher than 100 feet off the ground. During my entire career at PSNS, I might have received an hour or two of high pay for staging work on other occasions, but I can't recall the specifics.

27. Along with Walter Jaynes, David S. Peterson, Donald Baker and Gordon Hanberg, I joined in the April 1999 grievance seeking payment of our high pay. I did not agree with the union decision not to continue forward with the high pay grievance, and I expressed that to the union representatives. I did not agree with Ms. Tallman's refusal to award back pay for high pay I should have received and I certainly never agreed to settle my claim for back pay.

28. Along with Walter Jaynes, David S. Peterson, Donald Baker and Gordon Hanberg, I also was one of the plaintiffs in this lawsuit when it was first filed in the United States District Court for the Western District of Washington.

29. Together with the other four plaintiffs, I have been advised of my duties as a class representative by counsel. We will more than adequately represent the class. None of us knows of any conflict of interest between or among us or the other members of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Spanaway, Washington this 4th day of September, 2004.

Paul Scott