NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

# APPENDIX TO PLAINTIFFS' MOTION NO. 2: FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING REGARDING VALIDITY OF GRIEVANCE DECISION THAT WORK ON OR ABOVE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# Table of Contents to Appendix


1. Joint Exhibit No. 5 ........ 1
2. Joint Exhibit No. 27 ........ 15
3. Excerpts from Trial Testimony, November 7, 2006 ........ 18
4. Excerpts from Deposition of Mark Winkler, June 28, 2006 ........ 52
5. Excerpts from Trial Testimony, November 6, 2006 ........ 58
6. Excerpts from Deposition of Mary Jane Tallman, June 26, 2006 ........ 65
7. 29 CFR § 1915.77 ........ 68
8. 29 CFR § 1915.73 ........ 69
9. Declaration of Donald B. Scaramastra ........ 70

# EMPLOYEE GRIEVANCE (BREMERTON METAL TRADES COUNCIL)

PSNS 12770/1 (REV 10-87)

Please print information

1. EMPLOYEE'S NAME: Dave Hamel et al (see attached)
2. POSITION TITLE: Shipwright
3. SHOP & BADGE NUMBER: 64-16135
4. DATE GRIEVANCE OCCURRED: -
5. PLACE GRIEVANCE OCCURRED (If Applicable): Shop 64, PSNS
6. SHIFT TO WHICH ASSIGNED: Days
7. NAME OF IMMEDIATE SUPERVISOR: Mary Jane Tallman
8. PROVISION(S) OF AGREEMENT, LAW, RULE OR REGULATION ALLEGED VIOLATED: Art 3, para 0301, & Appendix J of the BMTC Agreement, Title 5 CFR Subp. 532 [illegible] but not limited to

**NOTE:** An appeal of an adverse action as defined in Article 28, or a discrimination complaint as defined in Article 29, may be appealed under Article 30 at the election of the employee. To so elect, complete Blocks 14 and 15.

9. THE SPECIFIC NATURE OF THIS GRIEVANCE IS: We have been aggrieved in that Shop 64, PSNS has continually denied me the appropriate amount of high pay, 25% additional environmental differential for performing high work as outlined by the Code of Federal Regulations and the BMTC Agreement.

10. THE DESIRED CORRECTIVE ACTION PERSONAL TO EMPLOYEE IS: see attached

11. I WANT TO HAVE COUNCIL REPRESENTATION (Check One) ☒ YES ☐ NO
If yes, Steward completes Blocks 14-18. If no, see Section 3006 of the PSNS-BMTC Agreement

12. SIGNATURE OF AGGRIEVED EMPLOYEE: [signature]
13. DATE: 4-13-99
14. NAME OF REPRESENTATIVE: Joe Hamel & Joe Asher
15. SHOP/CODE: 64
16. REPRESENTATIVE'S AFFILIATE: [illegible]
17. SIGNATURE OF REPRESENTATIVE: [signature]
18. DATE: 4-13-99

## FOR OFFICIAL USE ONLY

COUNCIL'S CONTROL NUMBER
05153
~~05154~~-K DJH 4-13

EMPLOYER'S JOB ORDER NUMBER
Grievant's cost center / Shop/Code Admin*
9 9 6 4 - 23 - 2 9 3 6
*1=REPRESENTATIVE 2=GRIEVANT 3=SUPERVISION 4=WITNESS

Rec'd 4/14/99 mw

Cald 4/14/99 mw

Returned 1/18/00 [initials]

J0001039

~~STEP 1~~ STEP 2

| 19. NAME OF SUPERVISOR TO WHOM GRIEVANCE IS PRESENTED | 20. POSITION TITLE | 21. DATE REC'D | 22. DATE OF MEETING |
|---|---|---|---|
| Mary Jane Tallman | Superintendent | | 1/14/00 |

23. **DECISION:**

See attached.

| 24. SIGNATURE OF SUPERVISOR | 25. DATE OF DECISION |
|---|---|
| Mary Jane Tallman | 18 Jan 00 |

| 26. DATE RECEIVED BY EMPLOYEE | 27. GRIEVANCE RESOLVED? | 28. EMPLOYEE SIGNATURE | 29. DATE |
|---|---|---|---|
| | ☐ YES ☐ NO | 30. REPRESENTATIVE SIGNATURE | 31. DATE |

STEP 2

| 32. SHOP/BRANCH HEAD (GROUP/DIVISION HEAD if appropriate) OR DESIGNEE | 33. DATE RECEIVED | 34. DATE OF MEETING |
|---|---|---|
| | | |

35. **DECISION:**

| 36. SIGNATURE OF SHOP/BRANCH HEAD (GROUP/DIVISION HEAD if appropriate) | 37. DATE |
|---|---|
| SEE ABOVE | |

PSNS 12770/1 (REV 10-87) BACK

J0001040

Subj. Employee Grievance Decision, Shipwright Highpay Grievance #05153-K

I. The second step meeting for this grievance was held on 20 May 1999. Present were Mr. J. Aiken, representing the grievants; Mr. J. Hamel, Chief Steward, Ms. M. Walls, Administrative Officer, Ms. L. Niemi, Human Resource Office, and myself. The union also presented several of the grievants to testify concerning their work as it relates to the grievance.

After careful consideration of the information presented in the grievance, during the grievance meeting, and through further investigation of this matter, I have reached the following conclusions.

II <u>High Pay</u>

Certain work situations encountered by Shipwrights in erecting and dismantling staging do meet the criteria for 25% high pay in accordance with Article 10 and Appendix II of the BMTC Agreement and the Schedule of Environmental Differentials at 5 CFR 532, Subpart E, Appendix E Situations warranting high pay occur when the Shipwrights climb or perform work while standing on staging pipe or unguarded planking <u>and</u> fall protection devices cannot be adequately used because adequate anchoring is not available. Specifically, 25% high pay will be paid for work under the following circumstances:

1) For shipwrights building and dismantling staging beginning from the first level above the ground/deck <u>unless</u>:

a) flooring and safety rails are installed, <u>or</u>

b) fall protection devices can be properly used

2) Building and dismantling hanging staging working from similar heights under similarly unguarded situations when fall protection devices cannot be properly used.

III. <u>Timeliness of Grievance</u>

The union seeks back pay to begin when each grievant started to work in a shipwright position. Section 3002 a 3. of the Negotiated Agreement requires that grievances of this nature be filed within fifteen work days from the occurrence of the matter out of which the grievance arose or the time the aggrieved party or employee became aware of, or should reasonably have been aware of, being aggrieved. In addition, Section 1004 of the Negotiated Agreement requires that employees bring the matter to their supervisor's attention when they feel environmental pay is warranted. Section 1004 refers employees to the Grievance Procedure if the complaint is not promptly resolved through the supervisor contact

J0001041

The union has presented nothing in this grievance to indicate any reason why this issue could not have been raised long ago When asked why this matter was just now being raised, the representative indicated that people have been unwilling to grieve the matter in the past.

I conclude that this grievance, as it relates to the back pay requested, is untimely.

IV. Award

1) Shop 64 will start immediately to pay shipwrights 25% high pay under the circumstances noted in part II above.

2) Grievants will be paid an appropriate amount of back pay for straight time and overtime, including appropriate interest, for the period from 23 March 1999 (fifteen work days prior to the filing of this grievance) through the present. Management will work with the union to develop a means of determining the appropriate amount of back pay for each grievant The grievants' typical work assignments over the back pay period will be considered in making the determination

Barry Joe Aiken
JOE AIKEN
Union Representative

Mary Jane Tallman
MARY JANE TALLMAN
Superintendent, Shops 57, 64, 71 1/18/00

Date: 18 January 2000.

J0001042

**10) The desired corrective action personal to the employee is:**

The shop is requested to show just cause why I am not entitled to environmental differential pay for high work (as outlined by the Bremerton Metal Trades Agreement and the Code of Federal Regulations).

Furthermore, I request to be compensated back environmental pay for high work at a rate of 1040 hours per year for all years in Shop 64 (plus interest). Compensation for the back environmental pay for high work must also be included for overtime worked during the same period (plus interest).

Compensation shall be remunerated no later than the first pay period following the resolution of this grievance.

It is further requested that Shop 64 Management and the Management of Puget Sound Naval Shipyard, Bremerton, Washington be required to follow the intent of the Bremerton Metal Trades Agreement and the Code of Federal Regulations. This action will be in accordance with the policies of other Naval Shipyards who currently pay environmental differential pay to their employees conducting high work.

It is understood that it is the employers responsibility to withhold the appropriate amount of Federal Income Tax, Social Security Tax, Medicare, Retirement deductions, Thrift Savings deductions, and any other deductions as prescribed by law, rule, or regulation in making my record whole.

**Council Control Number:** 25153-K

J0001043

# Bremerton Metal Trades Council

A.F.L. - C.I.O.

632 Fifth Street
Bremerton, WA 98337
377-0811

Post Office Box 448
Bremerton, WA 98337
476-2125

## Employee's Designation of Representation

I, DAVID J HURM in accordance with applicable laws, rules, and regulation, do hereby authorize my representative, JOE AIKEN, the power and right, on my behalf, to review and receive copies of any records and documents on file with the agency / installation / office that pertains to and / or concerns me.

These records include, but are not limited to, shop/code records, Official Personnel Folder, Medical records, etc.

[signature]
Signature of Employee

4-13-99
Date

5/64
Shop or Code

161135
Badge Number

Barry Joe Aiken
Signature of Representative

4-13-99
Date

Grievant Copy
Steward Copy
Union Copy
Management Copy
4/5/97

J0001044

| NAME PRINTED | SIGNATURE | |
|---|---|---|
| DAVID J HURM | [illegible] | 1. |
| DION D PINKERTON | [illegible] | 2. |
| Barry Joe Aiken | Barry Joe Aiken | 3. |
| MICHAEL C BESSLER | [illegible] | 4. |
| Walter Bruce Cliber | [illegible] | 5. |
| Randolph S. Abbott | [illegible] | 6. |
| John T HAWKINS | [illegible] | 7. |
| DONALD K ERBE | [illegible] | 8. |
| ERIC P KENDZIOR | [illegible] | 9. |
| ROBERT R. THACKERAY | [illegible] | 10 |
| CHARLES T Foley | Charles T Foley | 11. |
| ALFRED M CUSIMANO | Alfred M Cusimano | 12. |
| Richard L. Foster | [illegible] | 13. |
| CHARLES E BEISTLINE | Charles E Beistline | 14. |
| THOMAS M. WELSH | Thomas M. Welsh | 15. |
| Kelly Jo Watson | Kelly Jo Watson | 16. |
| Kevin J. Naud | [illegible] | 17 |
| DOUGLAS J IMPEY | [illegible] | 18. |
| Boggs, BRADLEY E. JR 168112 | [illegible] | 19. |
| Lewis, LARRY W. | Larry W Lewis | 20. |
| JOHN J ZIEBER | [illegible] | 21. |
| Minesker James L | James L Minesker | 22. |
| LEAVITT JOHN | John Leavitt | 23. |
| Farmer Martin | Martin R Farmer | 24. |
| Cook. Randall L. | Randall L. Cook | 25. |
| Morgan Mark B | Mark Morgan | 26. |
| David S. Peterson | David S. Peterson | 27. |
| Luis M. Cruz | L - M. C | 28. |

Counsel's Control No: C5153-K

[illegible] 4/13/99

[illegible]

J0001045

| NAME PRINTED | SIGNATURE | |
|---|---|---|
| Michael Cramer | Michael Cramer | 1. |
| Theron Bergland | Theron Bergland | 2. |
| Kevin Wall | Kevin Wall | 3. |
| Tim K-BAK | [illegible] | 4 |
| James M Twogood | M. Twogood | 5 |
| David A. Collins | David A Collins | 6 |
| Walter L Jaynes | Walter L Jaynes | 7 |
| DAVID D FORBES | David D Forbes | 8. |
| Greg Corey | Gregory J Corey | 9. |
| Bill McKay | William B. McKay | 10 |
| Gordon Hanberg | Gordon D. Hanberg | 11. |
| Kevin Cockerill | Kevin Cockerill | 12. |
| CURTIS OHAIR | C. O'Hair | 13. |
| Dostie, J.W. | Jeffrey W. Dostie | 14. |
| CAIN BOBBY W. | Bobby W Cain | 15 |
| Dawson, Lonnie R. | Lonnie Dawson | 16. |
| Williams Eddie JR | Eddie W Williams JR | 17. |
| Joccenberg Joshua | [illegible] | 18. |
| ASHBURN M.F. | M Fulashburn | 19. |
| Kadlecek, RJ | Randy Kadlecek | 20. |
| SAEL, J | James Sael | 21. |
| Sampson, J. | Joe Sampson | 22 |
| Michael Hayden | Michael J. Hayden | 23. |
| JEFF ROGERS | Jeffrey L Rogers | 24 |
| Trevor Kemper | Trevor Kemper | 25 |
| Josh Glitch | Joseph Glitch | 26 |
| MARTIN, BOBBY | Bob Martin | 27. |

Lennie's Control No:

J0001046

| NAME PRINTED | SIGNATURE | |
|---|---|---|
| Brian Fischer | [signature] | 1 |
| Margaret M. Pinkerton | [signature] | 2 |
| Robert F Long Crane | [signature] | 3 |
| John A. Barth | [signature] | 4 |
| Henry L. Carnes | [signature] | 5 |
| Jeff A Carlson | [signature] | 6 |
| Ron R. Werner | [signature] | 7 |
| Michael R Johannes | [signature] | 8 |
| ~~Dennis Piehl~~ Dennis Piehl | [signature] | 9 |
| Thomas P. Conway Jr | [signature] | 10 |
| Ezra M. Richards | [signature] | 11 |
| Orlando Garcia | [signature] | 12 |
| Warren E Erickson | [signature] | 13 |
| Paul T Langowski | [signature] | 14 |
| Jeff Schnock | [signature] | 15 |
| Kathleen M Boink | [signature] | 16 |
| Paul S. Scott | [signature] | 17 |
| James A. Keller Jr | [signature] | 18 |
| Gary D Horne | [signature] | 19 |
| Gary Witt | | |
| Destry Whit | | (19) |

Council Control #:
05153-K

4/13

P.G. 3-4 B Bgh 5-4-99

J0001047

Name Printed

Kimberley S Martin
Roy E Perry
Howard A. Allison
Russell D. Allen
Edward L. Devin
David J McCrary
William L Carter III

Signature

Kimberley S Martin
Roy Perry
[illegible]
Russell D. Allen
Edward L. Devin
David McCrary
William L. Carter III

Council Control Number: 05153-K

mw 4/13

J0001048

SHIPWRIGHTS
HIGH WORK

| Name Printed | Badge | Signature |
| --- | --- | --- |
| David C. Webster | 151169 | David C. Webster |
| Donald E Baker JR | 153106 | [illegible] |
| Henry J. CARNAGHI | 161818 | [illegible] |
| Royce D Blankenship | 168334 | [illegible] |
| Art B. Harper | 149907 | Art B. Harper |
| PATRICK K. O'DELL | 169563 | Patrick K. O'Dell |

(1)

Council Control Number:
05153-K

MW
4/13

-31-

J0001049

SHIPWRIGHT HIGH PAY

NAME PRINTED SIGNATURE

Anthony Schackmann 169565 Anthony Schackmann

Council Control #:
C5153-K

mw 4/13

NGTAFB
6 of 8 pgs
-1-99

J0001050

COUNCIL CONTROL # 05153-K

| PRINTED NAME | | SIGNATURE |
|---|---|---|
| DAVID S. BOYLE | | [signature] |
| David A. Day | | [signature] |
| DALE J. Leible | 151754 | [signature] |
| JAMES E. ZENBEST | 163727 | [signature] |
| David L Christiansen | 137458 | [signature] |
| Jerry W. Cockrum | 168521 | [signature] |
| CHARLES T FOLEY | 164054 | [signature] |

(1)

COUNCIL CONTROL NO: 05153-K

5-4-99
BGA
Page 7 of 7

J0001051

HIGH PAY GRIEVANCE
SHIPWRIGHTS

| NAME PRINTED | SIGNATURE |
| --- | --- |
| JERRY DEAN GRAY | Jerry Dean Gray |
| Gregory Scott Denton | Gregory S. Denton |
| Jacobsen michael D. | michael D. Jacobsen |
| DEBORAH L. DIVITTS | [illegible] |
| CHRISTOPHER A [illegible] | [illegible] |
| Cooper, Allen W. | Allen W. Cooper |

(6)

COUNCIL CONTROL NO:
05153-K

8 of 8

J0001052

Subj: HIGH PAY GRIEVANCE – SHIPWRIGHT WORK

Ref: (a) Grievance 05153-K of 4/13/99
(b) Grievance Meeting of 5/20/99
(c) Discussion with management SME (Winkler), various dates
(d) Tour of Staging on 11/10/99
(e) BMTC Agreement, Article 10 and Appendix II
(f) 5 USC 5343(c)(4)
(g) 5 CFR 532.511 and Appendix A to Subpart E
(h) OPM Operating Manual 532-1, Subchapter 8-7 and Appendix J

SUMMARY OF UNION'S POSITION

BMTC asserts that work performed by Shipwrights in building and dismantling staging warrants high pay (25%) under references (e) through (h). Examples of claimed qualifying work include: building or dismantling staging while standing on unguarded planks, pipe, or staging couplings, work from other unguarded edges (eg ships/submarine decks or hulls), and similarly unguarded work in heavy rain, wind, or darkness.

INVESTIGATION

Information concerning the work situations at issue in this matter was gathered through references (a) through (d). During the grievance meeting, the union representative and several witnesses described various staging work situations. The management SME confirmed that work situations described were accurate depictions of typical staging work. The tour of staging provided by the union representative and the management SME further illustrated those descriptions.

The following illustrates the typical process for erecting staging. Variables exist, including height of the staging, location of the staging (ground, hanging, ships deck, carrier mast), size and weight of the staging material, and environmental conditions (weather, darkness).

The work begins on the ground/deck (except for hanging staging), and shipwrights work up from the previously built level. The build work is typically performed in teams of two, with other shipwrights working from the ground or from a JLG providing materials to the builders. The shipwrights building the structure are standing on the pipe or on one nine to twelve inch plank while building up to the next level. The shipwrights are handling and installing staging materials weighing up to 100 pounds while standing there. There are no lifelines, railings, or other enclosures around the unfinished staging levels. These shipwrights are also climbing the pipe, using vertical pipe and staging couplings as foot holds, to move from level to level. The height between levels varies based on staging material used, but is typically between 7 to 11 feet. The shipwrights typically use two planks in building the staging (one on each side of the level), and move them from level to level as they work. When the staging reaches a working level (where other workers will be using it), the level is fully planked and lifelines (safety rails) are installed.

J0000730

Dismantling the staging consists basically of the building process in reverse. Lifelines (on worker levels) come down, planking is removed, and the staging is dismantled from the top down. Shipwright dismantlers are standing on the pipe, one plank, or staging couplings while dismantling, and are climbing the pipe and staging couplings to move down from level to level. The two working planks are moved down level by level as the dismantlers work down. The dismantled staging materials are handed to Shipwrights in JLG's or are passed down to the ground.

Shipwrights receive 25% high pay differential when working on structures at or above 100 feet from the ground, deck, or other surface. They also receive the differential on occasion when environmental conditions make the work unusually hazardous (such as during high winds and heavy rain). The Shipwrights in the JLG's receive 25% high pay.

The Shipwrights also build lifelines around the edges of ships and submarines, both in dock and in the water. Ships structures or other stable fixtures are available to properly secure fall protection when performing this work.

<u>RECOMMENDATION</u>

Pertinent regulations governing this matter dictate payment of the high pay environmental differential when workers are exposed to an unusually severe hazard that cannot be adequately alleviated by mechanical equipment or protective devices. The definition of the 25% high work differential applicable to this grievance is:

*b. Working at lesser height:*

*(1) If the footing is unsure or the structure is unstable;*
*Or*
*(2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swing stage, boatswain chair, or similar support);*
*Or*
*(3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.*

The work of the staging builders and dismantlers does frequently meet the definition of unsure footing under b.(1) (pipe, single plank, staging couplings), and frequently lacks the protective enclosures or facilities contemplated under b.(2). Adverse environmental conditions under b.(3) are also recurring factors in the work.

J0000731

Payment of the 25% high pay differential is recommending for the following work situations:

1) Building and dismantling staging beginning from the first level above ground/deck unless:

   a) flooring and safety rails are installed, or
   b) fall protection devices can be properly used.

2) Building and dismantling hanging staging under similarly unguarded situations when fall protection devices cannot be properly used.

J0000732

00308

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES; PAUL S. SCOTT; )
DAVID S. PETERSON; DONALD )
BAKER; GORDON D. HANBERG; )
et al., )
Plaintiffs. )
v. ) Docket No.: 04-856C
THE UNITED STATES, )
Defendant. )

Courtroom 18206
U.S. District Court
Western District of
Washington
700 Stewart Street
Seattle, Washington 98101
Tuesday,
November 7, 2006

The parties met, pursuant to notice of the Court, at 9:10 a.m.

BEFORE: HONORABLE GEORGE W. MILLER
Judge

APPEARANCES:

For the Plaintiffs:

DONALD B. SCARAMASTRA, Esquire
JENNIFER AMANDA KREBS, Esquire
Garvey Schubert Barer
1191 2nd Avenue, 18th Floor
Seattle, Washington 98101-2939
(206) 464-3939

00315

A There still has to be a grievance meeting because a grievance can't proceed to arbitration without a decision on the merits.

Q So if the shipyard misses a deadline that doesn't mean that the grievance is granted?

A It does not.

Q Okay. Can the parties agree to extend the deadline at Step 2 after they've missed a deadline?

A They can.

Q Yesterday you mentioned a staging tour that you took. Who again was on this tour?

A Mark Winkler was the management person and Joe Aiken the union rep. and Joe Hamel I believe was also there, the other union rep.

Q How long did the tour last?

A I believe it was about two hours.

Q And what happened on this tour?

A We went to see staging being built and disassembled in various configurations at various locations on ships and dry dock.

Q Did Joe Aiken talk with you on this tour?

A He did.

Q How much?

A Quite a bit. He was a shipwright so he was able to explain what was going on and he did much of

00316

the talking.

Q What did he say in particular that you remember?

A Oh, he talked about what they were doing and how they were doing it and pointed out different features, ways that scaffolding was built around things, those kinds of things.

Q What about Mark Winkler?

A He did the same, he talked again about what was being done and why and pointed out different ways that scaffolding is erected.

Q While we're talking about Mr. Winkler, you mentioned that Mr. Winkler served as a subject matter expert?

A I did.

Q And what role, if any, what other role, if any, did Mr. Winkler play in the grievance?

A That was the main role as far as my involvement with it.

Q Okay. Are you aware if Mr. Winkler met with Mr. Aiken to discuss the grievance at any point?

A I believe he did but I wasn't present when that happened.

Q Okay. After meeting with Mary Jane Tallman that you mentioned yesterday discussing the options

00332

language to section S8-7g(2); do you see that?

A Yes, I do.

Q Okay. So my first couple questions for you concern this requirement that each installation activity must evaluate its situation against the categories in Appendix J. Okay?

A Okay.

Q After the High Pay grievance was filed, the shipwrights' High Pay grievance, did the shipwrights do anything to fulfill this duty to evaluate its situation?

A After the grievance was filed?

Q Yes.

A Yeah. Well, we worked it out through the grievance, yes.

Q Okay. And you were a part of that process; right?

A I was.

Q Okay. Your part of the process I gather was to conduct an investigation into the nature of the work and to advise the shop as to whether you thought the work met one or more of the categories of Appendix J; correct?

A That's correct.

Q Okay. And specifically the category for

00333

high work; right?

A Correct.

Q Okay. Now, if you would please turn back to -- you can put the Defense binder aside so we can kind of keep you with just one binder on there, on the stand at a time. And if you would return to Plaintiffs' Exhibit 1 which should still be in front of you?

A Okay.

Q Okay. Turn if you would to section S8-7c. And let me know when you have that section in Plaintiffs' Exhibit 1 in front of you.

THE COURT: What was the section again, Mr. Scaramastra?

MR. SCARAMASTRA: It is, I'm sorry, it is section 8-7c, Your Honor.

BY MR. SCARAMASTRA:

Q Have you found that, Ms. Niemi?

A Yes.

Q Okay. I'm going to skip the first sentence. You see the second sentence reads "Exposure to a hazard, physical hardship or working condition of an unusually severe nature listed in Appendix J is not taken into consideration in the job-grading process and additional pay for exposure to these conditions is

00334

provided only through the environmental differentials authorized by this section." You see that?

A I do.

Q Okay. And I read that right?

A Yes.

Q Okay. You read that provision during the course of your investigation of the shipwrights' High Pay grievance; right?

A I did.

Q Okay. And during your investigation you found other sources or other legal authority that agreed with that passage I just read from subsection 8-7c; right?

A I did.

Q Okay. And you specifically researched case law, arbitration decisions, other grievance decisions, Comptroller General decisions, and decisions by the Federal Labor Relations Authority; right?

A Yes.

Q Okay. Now, after doing that research you informed your supervisor in the Human Resources Office that you couldn't find anything that supported the conclusion that shipwrights were not entitled to High Pay simply because of the work they typically do?

A That's correct.

00339

your findings, your factual findings about the nature of shipwright work; right?

A Yes.

Q Okay. And as you sit here I want you to quickly review, if you don't mind, the last paragraph on the first page of Joint Exhibit 27. And just let me know when you've had a chance to do that.

A (Witness reviews document.) Okay.

Q Okay. As you sit here today you see nothing I take it that's inaccurate or incomplete in that paragraph?

A No, that's how I remember it being described and demonstrated.

Q All right. And what you're purporting to describe -- let me take the legalism out -- what you're describing is the process of assembling staging; correct?

A Yes.

Q And then the following paragraph why don't you take a minute to read it and then I will ask you a quick question on that. So this is the first paragraph on the top of page 2 of Joint Exhibit 27.

A (Witness reviews document.) Okay.

Q All right. That same question, there is nothing that appears in that paragraph that appears to

00345

vessels; correct?

A I'm not sure how many but I believe that it's a lesser volume of their work --

Q Okay.

A -- than staging.

Q So what you saw when you reviewed the staging, the only time the shipwrights would build a permanent, fully planked platform was when they thought welders or someone else is going to need to work on that level after the staging was complete; correct?

A That's correct.

Q All right. Otherwise what they would do is when they finished the level they would take the two planks you saw and just lift them up to the next level, climb up and repeat the process; is that right?

A That was my understanding, yes.

Q And did anybody ever express any disagreement with that understanding?

A No.

Q Okay. Did anybody who reviewed Joint Exhibit 27 ever tell you they disagreed with any of the findings that are set forth in your investigation section?

A With regard to how the work was done, no.

00348

couplings that allow the shipwrights to join the vertical and horizontal framing elements together?

A That's correct.

Q I should go back on one other question. When they fully plank a surface for other trades they fasten that surface to the staging framing; correct?

A That's correct.

Q Okay. So back to where I was. This statement I just read to you about the work of staging builders and dismantlers frequently meeting the definition of unsure footing, that was your finding at the time you prepared Joint Exhibit 27; right?

A Yes. That was my recommendation of finding.

Q Well, it was what you believed to be true at the time you wrote it; right?

A Yes.

Q Okay. And as you sit here today you still believe that at the time you wrote that that statement was true; right?

A That's right.

THE COURT: But the decision making process was such that someone else would make the final decision based on your recommendation presumably?

THE WITNESS: In considering my recommendation.

00350

that right?

A Yes. That would be true.

Q And did you find anything in your review of the OPM Operating Manual for the Federal Wage System that suggested that that was an appropriate consideration in determining whether work met the category, the high work category?

A Not definitely.

Q And in fact that goes back to subsection S8-7c that we just talked about that said that unusually sever conditions are not factored into the work, the position descriptions of the various trades; correct?

A That's true.

Q When you refer to work on single planks here you are using that term to distinguish the works the shipwrights do on planks from work on fully planked surfaces for other trades; right?

A Yes.

Q Okay. Now, you then go on to say, and I'm going to use some ellipses here so I can skip the stuff we just covered, this same section reads, "The work of the staging builders and dismantlers," skip down a line, "frequently lacks the protective enclosures or facilities contemplated under b(2)." Do you see that?

00351

A I do.

Q Okay. And that again was your finding at the time?

A Yes.

Q You thought that was true?

A I did.

Q Did anybody ever disagree with that statement who -- let me strike that.

Did anybody in the management team that's helping resolve the grievance ever disagree with that statement?

A No.

Q Okay. And then you go on at the last sentence of page 2 to write, "Adverse environmental conditions under b(3) are also recurring factors in the work." Did you see that?

A I do.

Q And again that was your finding at the time you drafted Joint Exhibit 27; right?

A That's correct.

Q And you believed it to be true at the time?

A Yes.

Q Still do?

A I do.

Q And no one on the management team

00352

investigating the High Pay grievance ever told you they disagreed with that finding, did they?

A Correct.

Q Now, in the course of your investigation you also reached an understanding as to whether fall protection devices were able to be used by the shipwrights while assembling or disassembling staging; right?

A I did.

Q And you came to understand that the anchor points for the fall protection had to be accessible to the shipwright and had to be above the shipwright who was seeking to tie in; right?

A That's right.

Q And in the case of the shipwrights erecting scaffolding that was rarely able to happen?

A That's correct.

Q And in fact that remains your understanding of the work as you sit here today; right?

A Yes.

Q The shipwrights are the only trade in the shipyard that are allowed to work on incomplete staging; is that right?

A It is.

Q Now, I want to focus on page 3 of your Joint

00356

Q And it says. "Exhibit F, Main's e-mail."
You see that?
A I do.
Q All right. Now, if you turn back to Defense Exhibit 6 you will see -- oh, you put it away?
A They were getting to high.
Q Sorry.
A I won't be able to see over the top of them.
Q Sorry.
A Okay.
Q Okay. If you turn to Defense Exhibit 6 you will see the handwriting Exhibit F. e-mail Jerry Main.
A Got it. Yes.
Q Does that refresh your recollection as to whether you saw Defense Exhibit 6 in the May 20 Step 2 meeting?
A Yes, it did.
Q Okay. Can you think of anything that would have played a role in your recommendation to pay high work above the first level other than the OSHA regulation that required fall protection above 5 feet?
A No, that, that's what I considered in making that recommendation. What I didn't feel was that it was required to pay High Pay just because you wear fall protection. But it was something that identified

00357

a footmark. And I didn't find anything else that would identify a certain height.

Q Okay. So it was the only line you could find that you could draw below 100 feet, wasn't it?

A It was a line that we could find, yes.

Q Okay. And because you understood at the time that the federal safety regulations required fall protection above 5 feet and you also understood that shipwrights were seldom able to use fall protection while assembling or disassembling staging above 5 feet; right?

A Did consider that, yes.

Q Okay. And why don't you turn back to Plaintiffs' Exhibit 1. And when you have that in front of me just let me know.

A I do.

Q Okay. First page you'll find section S8-7a. You see that?

A Yes.

Q Okay. And the very bottom, it's in the very bottom right corner and I want you to focus on the sentence that begins at the end of the page and goes on to the next one and it reads the existence of environmental differentials is not intended to condone work practices which circumvent federal safety laws.

00360

to refer to OSHA safety standards in determining
whether work was unusually severe within the meaning
of Appendix J?
A No. I don't recall that.
Q Okay. Aside from a difference in height did
you find any difference between the type of work that
a shipwright was doing 6 feet above the deck and work
that a shipwright was doing 26 feet above the deck?
A Aside from the height, no.
Q Okay. So you couldn't find anything that
suggested that the work should be treated differently
for purposes of Appendix J; right?
A Well, you mean with regard to the height, 5
feet versus 20?
Q Right.
A Well, yeah, there was certainly argument to
be made that 5 feet didn't reach unusually severe.
Q Right. But from a practical standpoint you
found nothing different in the nature of the work at 5
versus 25 feet, the same work?
A The same work.
Q Okay. Now, one thing I noticed that you
don't cover in Joint Exhibit 27 is how to treat
payment for high work done more than 15 days before
the grievance was filed. Did you at any point do

00397

to about 2000.

Q How long have you worked at the shipyard?

A Twenty-six plus years.

Q How many of those years have you been involved in the shipwright trade?

A I'd say just the shipwright trade probably 20 of those years.

Q Are you familiar with a grievance filed by Shop 64 shipwrights for High Pay in 1999?

A Yes.

Q When did you first become aware of this grievance?

A I think it was filed in 1999. But I had actually heard, heard of it prior to the actual filing of it.

Q How?

A I can't be specific but I remember hearing it. I don't remember if it was from the employees as I went around and talked but I did catch wind that something was coming prior to the actual grievance being filed.

Q Could you summarize your role, if any, in the resolution of that grievance?

A At first I was part of the management team that was comprised of myself and some other

00398

individuals too, and I was labeled the I guess process expert so that if any questions came up in regards to the shipwrights I would be able to answer those questions. So I was that first initially. And then later part I was working with the union on trying to come to a resolution to the back pay calculations. I worked with the union in that particular situation.

And then after the signing of it I followed up with comprising the rest of the back pay calculations that were agreed upon at the settlement of the grievance.

Q You mentioned other individuals being involved. Who else was involved from the management side?

A Lynnette Niemi and Mary Jane Tallman.

Q What was Lynnette Niemi's role?

A She was the HR person that Mary Jane Tallman asked to be part of it as a third party initially to go get a third party representation instead of maybe having a biased person like myself. So she was appointed to go out and look at the process, look at some of the rules and regulations and stuff similar to that.

Q What do you mean by biased like yourself?

A I think Mary Jane felt that there was

00418

following conditions." Do you see that?

A Yes, I do.

Q Could you take a quick minute to read that?

A (Witness reviews document.)

Q From reading that document can you tell at what height shipwrights would be paid High Pay?

A Well, in this particular thing it basically says from the first level above the deck they would be paid High Pay.

Q And what does that mean?

A That means it could be generally our first ring is about 8 inches high, so anything above about 8 inches they could be considered to be paid High Pay.

Q What is your belief regarding the height at which High Pay was set in this document?

A I didn't agree with it.

Q Why not?

A I just didn't feel that 8 inches off the ground or that height in my opinion warranted High Pay.

Q What height did you believe warranted High Pay in your experience as a shipwright?

A Well, my own personal opinion was around 20 foot area was when I felt somebody would be High Pay. In the shipyard we can be on ladders and you don't get

00419

High Pay when you're on a ladder. But a lot of the fall protection things don't actually work at that height anyway so I just thought it was. I don't know how to say it.

Q Would you know if you communicated this opinion to Mrs. Tallman or Ms. Niemi at any point?

A Yes, I did.

Q Do you know when?

A I would say it was prior to us giving it to Mr. Aiken as part of the resolution.

Q But you don't remember a specific date?

A No. It would be, I would say it was in 1999, early 2000.

Q Do you remember any context? Was it in a meeting or was it just a discussion or you don't remember?

A I don't remember a specific meeting. I just, it probably came, came out when this meeting, this proposal came out.

Q Do you know who Jerry Main is?

A Yes.

Q And who is he?

A At that particular time?

Q Yes.

A He was the Code 900 production manager.

00424

going to ask you whether you find anything at fault.
to fault in the description of the work in these
provisions?

A (Witness reviews document.)

Q You've had a chance to review those two
paragraphs?

A Yes, I have.

Q Okay. To the best of your knowledge they're
an accurate and complete description of what
shipwrights do during the process of assembling or
disassembling staging, aren't they?

A Some stagings, yes.

Q Okay. Well, most stagings: right?

A I'd say the majority, yes.

Q All right. Vast majority. wouldn't you?

A I wouldn't say vast.

Q Okay.

A But I'd say definitely well more than 50
percent.

Q All right. Well, this is. the work that's
set forth here is what you had described as work on
staging, is it not?

A Yes.

Q Okay. Now, just picking up a couple of
points that Ms. Niemi -- I'm sorry, do you need water?

00425

A No, sir, go ahead.

Q Guard rails are only installed when a working level is completed; right?

A I wouldn't say only but for the most part they are installed after the planks are installed, yes.

Q Almost always that's where you install guardrails is on the working surfaces for other trades; correct?

A Yes.

Q So I'll move on to the next thing. I would like you to turn if you would to Plaintiffs' Exhibit 11.

(The document referred to was marked for identification as Plaintiffs' Exhibit PX-011.)

A Is that 011?

Q What's that?

A JX-011?

Q No. I'm sorry. You'll find another binder that reads Plaintiffs' Additional Trial Exhibits.

A Oh.

Q You see it?

A Yes.

Q Okay. Sorry, I should have made that clear.

00442

referring to: correct?

A I didn't personally draft them, no, sir, that I remember.

Q Now, I want to talk for a few minutes about the processing of the grievance. As I understand it Ms. Niemi was to come in as you put it and give an unbiased view: is that right?

A Yes, sir.

Q And she was to identify the shipwrights, the characteristics of shipwrights' work and compare them against the definition of high work in Appendix J; is that right?

A Yes. sir.

Q Your role in contrast was to serve as the subject matter expert; right?

A Yes. sir.

Q And the subject matter was shipwright work; correct?

A High work in regards to shipwright work.

Q Okay. And so your role was to take Ms. Niemi around and show her aspects of the work; is that right?

A Aspects of the high work.

Q shipwright work.

A High work. Shipwrights performing high