NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

APPENDIX TO
PLAINTIFFS' MOTION NO. 2: FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING REGARDING VALIDITY OF GRIEVANCE DECISION THAT WORK ON OR ABOVE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

00461

going to pay high work -- High Pay for work done 8 inches off the ground, did they?

A No.

Q All right.

THE COURT: But when you read the language "first level" in the grievance decision/settlement did you interpret it to mean that under the decision High Pay would be paid people who were working 8 inches above the ground?

THE WITNESS: No, sir.

THE COURT: What did you interpret that first level language to mean?

THE WITNESS: It would mean generally right where you reach and you could put the stuff up, that would be the first level.

THE COURT: Oh. Approximately feet would that be?

THE WITNESS: About 5 feet.

THE COURT: Okay.

MR. SCARAMASTRA: Okay. Thank you, Your Honor.

BY MR. SCARAMASTRA:

Q A minute ago you had Joint Exhibit 27 in front of you. I'd like for you to turn back to it for just a second.

00490

that. And basically the shipwrights were fighting the use of fall protection and we kept catching them not using it. And so we said specifically 25 percent High Pay will be paid for work for the following circumstances: shipwrights building or dismantling staging beginning from the first level above the ground or deck unless flooring and safety rails were installed or fall protection devices could be properly used.

Now, fall protection might be hooking up with the lanyard and it might be putting yourself behind the handrail. And the shipwrights as they were building the staging we had told them to build themselves safe enclosures as they went up. So basically this would be the leading edge guys, the first one or two that were going up where there was nothing to hook fall protection to potentially and they were building the safety for the rest.

Q So what exactly was the standard involved in this? You've mentioned you drew upon this from Safety, can you interpret that language any further?

A Well, we made a decision in Safety that fall protection would be required at 5 feet or more. Now, there was, there was no definite CFR on safety that said 5 foot. It was basically a figure that we came

00508

A I know I have read it. I don't know exactly when I read it.

Q After you read it you agree with me that there was nothing in it that jumped out at you as being inaccurate: right?

A I'd have to re-read it to answer .

Q Okay. Well, let's do that exercise with a couple of provisions I'm particularly interested in. I particularly want us to go through portions of Ms. Niemi's investigation section. So let's take the last paragraph on page 1, okay. Let me read to you then we'll just kind of go back and forth and see if this rings a bell.

That paragraph begins, The work begins on the ground/deck, except for hanging staging, and shipwrights work up from the previously built level. The build work is typically performed in teams of two with other shipwrights working from the ground or from a JLG providing materials to the builders." Do you see that?

A Yes.

Q That was to your knowledge accurate and complete at the time you read it; right?

A Yes.

Q Okay. Ms. Niemi went on to write, "The

00509

shipwrights building the structure are standing on the pipe or on one 9 to 12-inch plank while building up to the next level. The shipwrights are handling and installing staging materials weighing up to 100 pounds while standing there. There are no lifelines, railings or other enclosures around the unfinished staging levels."

All of that I just read you was accurate at the time you got it, wasn't it?

Let me ask this: the language I just read you was accurate at the time you first received Joint Exhibit 27, wasn't it?

A It shouldn't have been.

Q But it was, wasn't it?

A I don't know.

Q You don't know?

A It's not written according to what they were told to do.

Q And you're referring to the fact that lifelines weren't being used: is that right?

A They were supposed to be installing lifelines at every level and two planks.

Q Okay. And you never found out whether they were in fact doing that, did you?

A I asked the shipwright general foreman to go

00511

A No.

Q Okay. Rather than me read the rest of this back and forth to you I'd like you to pick up where I stopped off and read the rest of the paragraph at the bottom of page 1 of Joint Exhibit 27. And let me know when you've done that.

A (Witness reviews document.)

Okay.

Q All right. Everything you read in the remainder of the bottom paragraph first page of Joint Exhibit 27 is accurate, is it not?

A Today or back then?

Q Back then.

A I don't know.

Q You don't know. Okay.

I'm going to ask you some questions about statements you made during your deposition, Ms. Tallman. Do you recall coming to my office for that deposition on Monday, June 26?

A Yes.

Q I asked you questions there and you answered them; right?

A Yes.

Q And the court reporter took down my questions and your answers; right?

00512

A Yes.

Q And your answers were given under oath, weren't they?

A Yes.

Q All right.

MR. SCARAMASTRA: If I may approach, Your Honor?

THE COURT: Yes, you may.

BY MR. SCARAMASTRA:

Q I'm showing you what's a copy of your deposition transcript. And I would like you to turn to page 129.

MR. SCARAMASTRA: And for the Court's benefit while you're doing that, the Exhibit 11 that's referred to here is Joint Exhibit 27, Your Honor.

THE COURT: No dispute about that I take it?

MR. MAGER: I don't believe so. I'll double check that afterwards.

THE COURT: All right.

BY MR. SCARAMASTRA:

Q Are you on page 129, ma'am?

A Yes, sir.

Q Okay. If you look on line 19 I asked you, "When you were reading Exhibit 11 just now did you see anything in it that jumped out as being inaccurate?"

00513

And you answered, "No."

Right?

A Excuse me. This was Exhibit 11?

Q That's right. Joint Exhibit 27 was Deposition Exhibit 11. Your answer to my question in any event was "No;" right?

You need to say yes so I can hear you. I can't hear you. I'm sorry.

A Oh, the answer to that question was "no."

Q All right. And then I went on to ask you, "Were there any statements or conclusions that were made in Exhibit 11 that you disagreed with as you were reading it just now?"

A My answer was "no."

Q Your answer then was "No;" right?

A Correct.

Q Joint Exhibit 27 states -- well, let me put your attention to the bottom paragraph of page 2 of Joint Exhibit 27. And I'm going to edit out some of the information in the middle of a sentence I want to read to you. The sentence reads, "The work of staging builders and dismantlers," and then you jump to line 2, "frequently lacks the protective enclosures or facilities contemplated under (b)(2)."

You see that?

00514

A I'm sorry, no.

Q All right.

A Where am I?

Q Are you on Joint Exhibit 27?

A Yes.

Q All right. So turn to page 2 of that exhibit. Go to the very last paragraph. And do you see where it says, "The work for the staging builders and dismantlers," then drop down a line, "frequently lacks the protective enclosures or facilities contemplated under (b)(2)." Do you see that?

A Yes.

Q Okay. That was true back in November 199, wasn't it?

A Let me read the whole paragraph please?

Q Absolutely. Let me know when you're finished.

A (Witness reviews document.)

Okay, your question again?

Q Yes. The statement I just read to you, "The work of the staging builders and dismantlers frequently lacks the protective enclosures or facilities contemplated under (b)(2)." That statement was accurate in November 199, was it not?

A Yes.

00519

you another section. I just want to read you the first two lines. "The work of the staging builders and dismantlers does frequently meet the definition of unsure footing." You see that?

A Where'd you go?

THE COURT: Yes. We're on a different document.

MR. SCARAMASTRA: I'm sorry. I apologize.

BY MR. SCARAMASTRA:

Q Please turn back to Joint Exhibit 27. Okay, turn back if you would to the second page, bottom paragraph, of Joint Exhibit 27. You're there?

A The same paragraph you read before?

Q Exactly.

A Uh-huh.

Q And I thought you were still there before and I apologize.

First two lines read, "The work of the staging builders and dismantlers does frequently meet the definition of unsure footing under (b)(1)." Do you see that?

A Yes.

Q And again, you can't recall any discussions in which anybody on the management team disagreed with Ms. Niemi's conclusion, can you?

00520

A No.

Q And then, finally, let's turn to the last sentence of this paragraph? "Adverse environmental conditions under (b)(3) are also recurring factors in the work." You see that?

A Yes.

Q Everybody on the management team agreed with that assessment, did they not?

A As far as I know.

Q Okay. As far as you can recall. That's fair.

Now, ma'am, if I can have you turn to Joint Exhibit 31 for just a second. Are you there?

A Yes.

Q Okay. This is a series of e-mails to which you appear to have been a party, all of which were dated Monday, December 13. I'm sorry, all the ones on the first page which were Monday, December 13. And they appear to be attempting to set up a meeting among you, Lynnette Niemi and Mary Walls and William Ellis to discuss the grievance. You see that?

A Let me take a look.

Q Absolutely. Why don't you tell me when you're ready.

A Okay.

00569

Prior to the filing of the grievance when, if ever, did the shipwright pay High Pay?

A We paid High Pay over 100 feet or during bad weather when people were working. There was some, there was some latitude with the supervisors for paying High Pay. You know, if someone was in a real slippery situation. You know, sometimes you work in tanks that had grease in them or. But primarily always over 100 feet. And most supervisors were close, you know, I mean they didn't go up with a tape measure. And usually in bad weather.

Q Did you discuss the High Pay grievance with the shipwrights that worked for you?

A I just, we had discussed -- specifically this grievance I can't recall. But at times over the last 30 years, you know, that was always a subject, especially with the guys that came up from Bear Island, Hunter's Point. And basically most of the other shipyards paid High Pay around 25 feet. And they were not happy when they came up here and it was 100.

We don't do a lot of staging over 100 feet. So there's a fair bit of staging over 25 feet.

Q You mentioned 25 feet. In your view was this a reasonable height to start paying High Pay?

00570

A I think that 25 feet's a pretty good height. Most of the guys, like I told you before, we're not like a lot of people and we don't think about working at heights the way other people work at heights. Most of the people that do, leave the trade. We're pretty comfortable working there. And I'll tell you that nobody's thinking about it at 5 feet. You know, nobody's concerned about the height.

So it says a significant fall hazard. At 5 feet it's kind of like working, I mean next thing you know you'd be paying off a step ladder. You know, you let your kids go up a slide and that's more than 5 feet and you're only standing on the step, so.

Q Were you a shipwright supervisor around, near the Christmas break 1999?

A Yes, sir.

Q And if I'm incorrect let me know. You mentioned that you were sort of working in the office or something along those lines?

A Yes.

Q Who else was working in the office with you?

A Well, Mary Jane was the superintendent. Mark was the general foreman. And I was the process supervisor I guess is what we call them.

Q Why were you process supervisor in the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, PAUL S. SCOTT, )
DAVID S. PETERSON, DONALD BAKER, )
and GORDON D. HANBERG, et al., )
)
Plaintiffs, )
)
vs. ) No. 04-856C
)
THE UNITED STATES, )
)
Defendant. )

---

DEPOSITION UPON ORAL EXAMINATION OF
MARK WINKLER
Wednesday, June 28, 2006

---

recommendation section, Ms. Niemi first quotes from what she describes as the pertinent regulations. And she writes, The definition of the 25 percent high work differential applicable to this grievance is: B, working at a lesser height: 1, if the footing is unsure or the structure is unstable. See that?

A Yes.

Q Okay. Does Ms. Niemi's presentation of the pertinent regulations thus far seem accurate to you?

A I think it's taken right off --

MR. MAGER: Objection to the extent it calls for a legal conclusion. You can answer.

THE WITNESS: I think it's just nothing taken more than out of the union contract.

Q So you are familiar with this language by virtue of the documents you had reviewed during the processing of the grievance, right?

A It seems the same as what's in the union contract.

Q And you were therefore familiar with it?

A I'm familiar with it.

Q Okay. The last paragraph of the text on Page 2 of Exhibit 11 states, The work of the staging builders and dismantlers does definitely meet the definition of unsure footing under b(1), parens, pipe single plank, staging, couplings, end parens. You see that?

A Yes.
Q Did you agree with that statement back in November 1999?
A Yes.
Q And did you think that was an accurate presentation of the facts?
A Yes.
Q Okay. Ms. Niemi goes on to write -- well, let's go back to the definitions and the regulations. I'll re-plow through a different section of it. She writes, The definition of the 25 percent high work differential applicable to this grievance is: B, working at a lesser height: 2, if safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swing stage, boatswain chair or similar support). You see that?
A Yes, sir.
Q And that language was taken, as best you can recall, from the union contract as well?
A Yes.
Q And you were familiar with that language in November of 1999?
A Yes.
Q All right. Ms. Niemi writes -- and I'm going to edit out some of what I just read to you from that last paragraph. She writes that, "The work of the staging builders and

Q Which other shipyards were those?
A I guess it would be -- I'm guessing, I'm just trying to refresh my memory. Norfolk, maybe Long Beach. I think there was a trip that happened in Long Beach where something like that happened. So that's the best...
Q Did you or anybody else in management do anything to investigate what the practices of other naval shipyards were regarding the payment of high pay to shipwrights?
A I'm pretty sure somebody did because I remember getting that information on the differencing in the union contract and what had been negotiated.
Q Was that something you did?
A I don't remember if it was specifically me or Ms. Niemi, but I do remember seeing quite a difference in the way that the vary -- there was a huge variation between the shipyards on what constituted their impression of high pay.
Q Aside from the possible practice of paying shipwrights high pay from the moment they entered the gate till the moment they left, can you think of any other practices that you learned of regarding the -- let me start over. Aside from the example you just mentioned, paying high pay from the moment a shipwright entered the shop to the moment they left, were there other instances of overly generous payment of high pay to shipwrights that you

discovered during the handling of the grievance?
A That's probably the one I can remember just right off the top of my head. There -- I just remember there was huge differences in how we were going to or how the foreign naval shipyards paid high pay.
Q Were there other -- recognizing that you can't -- let me start over. Recognizing that you can't remember any other specific examples as you sit here today, were there other examples of what you believed were over generous payments of high pay to shipwrights?
A Just the one -- just the one that as soon as people walked in the gate they were giving...
Q Did you conclude that? Sorry, go ahead.
A They were given eight hours or 10 hours or however many hours they worked, that's how many hours they got. I don't have any objective evidence of that. It's just what was communicated to us.
Q Is that the only instance you learned of what you thought was the over generous payment of high pay to shipwrights?
A To my memory right now I'd have to go back and re-look at what those things were because there was -- no one shipyard was the same.
Q All right. We started this frolic and detour to see if there was anything in any of your declarations that you could point to that would serve as the basis for your

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Wednesday, June 28, 2006, Deposition of MARK WINKLER was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Wednesday, June 28, 2006, Deposition of MARK WINKLER is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 10th day of July, 2006.

______________________________________
Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES; PAUL S. SCOTT; )
DAVID S. PETERSON; DONALD )
BAKER; GORDON D. HANBERG; )
et al., )
Plaintiffs, )
v. ) Docket No.: 04-856C
THE UNITED STATES, )
Defendant. )

Courtroom 18206
U.S. District Court
Western District of
Washington
700 Stewart Street
Seattle, Washington 98101
Monday,
November 6, 2006

The parties met, pursuant to notice of the Court, at 9:23 a.m.

BEFORE: HONORABLE GEORGE W. MILLER
Judge

APPEARANCES:

For the Plaintiffs:
DONALD B. SCARAMASTRA, Esquire
JENNIFER AMANDA KREBS, Esquire
Garvey Schubert Barer
1191 2nd Avenue, 18th Floor
Seattle, Washington 98101-2939
(206) 464-3939

00061

arbitration cases, short arbitration cases. They didn't hear all of the facts that were there but then they made a ruling. And then I compared how I would. for example this is a no-brainer, and yet I had three arbitrators that ruled for it and I had three arbitrators that ruled against it.

That was a risk that I was not going to take.

Q Thank you.

In the course of your legal and factual research what conclusions, if any, did you reach about the height at which shipwrights should receive high pay?

A I would say 27 feet, 25 feet, 27 feet in the air.

Q Why did you feel that?

A The day I was up at 27 feet in the air on a day like today.

Q What happened after the second step hearing?

A I remember Lynnette Niemi was given a period of time in which to research data that was given her and then she was to respond back to Mrs. Tallman. But I continued to collect data and still process information as if our grievance was denied, you know, were we going to proceed to arbitration, was I going

00070

feet above the ground level.

Q How do you know that?

A Because it states so in this particular proposal.

Q Where?

A Certain work situations it says, paragraph 2, subsection 1 says "for shipwrights building and dismantling staging beginning from the first level above the ground/deck unless flooring and safety rails are installed or fall protection devices cannot be properly used."

Q And that would be 5 feet?

A Usually that's 5 feet. According to the standard for fall protection, fall protection requires a five -- anything above 5 feet requires a person to be in fall restraint or in a fall arrest situation. However, the shipwrights are going to be the ones that put the plank, platform, ladder access, lifeline around that platform to make it safe for the other employees to access it. That is why that particular issue was probably implemented in there.

Q I realized you testified somewhat to this but I just want to make sure I'm clear about a couple of points. Do you recall, or what if anything did Ms. Tallman say to you on the telephone when she called

00135

A Page 2?

Q Yep.

A Nine fifty you're talking about?

Q Exactly; J0000950. Exactly.

A Okay.

Q The last three lines read, "The shipyard can expect two citations from this event. One, violation of 29 C.F.R. 1915.73(d): failure to use fall protection equipment when working at heights greater than 5 feet." Do you see that?

A Yes, sir.

Q And I read that correctly?

A Yes, sir.

Q Okay. You were aware of 29 C.F.R. 1915.73(d)?

A Yes, sir.

Q And you were aware of it at the Step 2 meeting, weren't you?

A Yes, sir.

Q And that regulation is one reason you brought Exhibit F to the attention of management; right?

A That's correct, sir.

Q Because you wanted them to know that the OSHA regulations required people above five feet to be

00136

hooked up to some form of fall protection, didn't you?

A Yes, sir.

Q And that regulation played a role in your argument to management that they needed to pay High Work for work above five feet, didn't it?

A Yes, sir.

Q Now, aside from the height involved -- and I appreciate that there are differences in the height people work -- there is nothing inherently different in what a shipwright is doing 6 feet off the ground and what a shipwright might be doing 26 feet off the ground; right? In connection with the construction staging.

A In connection with the construction, no, sir.

Q Okay. The same basic work of assembling the pipes, assembling the frame, working on the same work surface and all the rest; right?

A Well, let's put it this way, I built my first platform, my first ring, okay, that's 5 feet above the deck. Okay, there's planks that's put on there and then it's wired down. Even if it's a intermediate level, in other words we're going to go up another level, okay, the person now comes off the ground they have to install one ring of lifeline

00137

around there to prevent them from being up against the leading edge.

Then the next person goes up, you pass material on up to -- let's say we have 5-foot rings, okay, I have a base ring and then I have another 5-foot ring and then I have another 10-foot ring, okay, I'm going to pass planks up there. And then I have one person that's going to be doing leading edge work all the time. Okay. And then as you go you're going to brace that specific staging that gets up there. And then say we're going to go up to 20 feet, okay, or 25 feet, that falls within the position description to providing staging services, to build staging, to work outside in the weather.

Q And we'll come back to the permanent surfaces issue in a moment.

A Okay.

Q But basically a shipwright doing leading edge work at 5 feet is doing the same basic movements and same basic operations as a shipwright at 15 feet above the ground surface doing leading edge work; right?

A Pretty much so.

Q Okay. Put it this way -- no, we'll come back to it.

00181

right?

A I'm only 5 feet so many inches tall, I'm not dealing with a 7-foot ring.

Q That's right, and I appreciate that.

Let's do the same exercise very quickly with the first paragraph on the top of page 2 of Joint Exhibit 27.

A Okay, the next page you're referring to?

Q Exactly.

A Okay.

Q And let me know when you've had a chance to read that.

A Just the first full paragraph?

Q Just the first full paragraph, that's right.

A (Witness reviews document.) Okay.

Q Again, nothing that as you read that paragraph you find to be inaccurate or incomplete in any way as you sit here today?

A That's correct.

Q Okay. Now, sir, you've never seen provisions from the Office of Personnel Management Operating Manual for the Federal Wage System have you, other than what's in Appendix J?

A No, sir, I don't believe I have. I may have ran across it in my research but I don't recall that.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| WALTER JAYNES, PAUL S. SCOTT, | ) | |
| DAVID S. PETERSON, DONALD BAKER, | ) | |
| and GORDON D. HANBERG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 04-856C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

DEPOSITION UPON ORAL EXAMINATION OF

MARY JANE TALLMAN

Monday, June 26, 2006

---

Q If you turn to Page 2 of Exhibit 11 there's a heading that says, "Recommendation." You see that?
A Yes.
Q And at the end of the first paragraph under recommendation it says, The definition of the 25 percent high work differential applicable to this grievance is: B, working at a lesser height: One, if the footing is unsure or the structure is unstable. Do you see that?
A Yes.
Q And then down below the quote, Exhibit 11 reads, The work of the staging builders and dismantlers does frequently meet the definition of unsure footing under b(1), parens, pipe, single plank, staging couplings, end parens, and frequently lacks the protective enclosures or facilities contemplated under b(2). You see that?
A I see it.
Q Do you remember getting a report to that effect from Mr. Winkler or Ms. Niemi or anyone else during the course of your investigation of the high-pay grievance?
A I don't remember.
Q Now, in the provisions I've just read, do you find anything that you disagree with?
A No.
Q And is there anything that, to your knowledge, is inaccurate in the provisions of the recommendation

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
County of King )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am not a relative or an employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the annexed transcript of the Monday, June 26, 2006, Deposition of MARY JANE TALLMAN is a full, true, and correct transcript, including all objections, motions, and exceptions of counsel made and taken at the time of the foregoing proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 5th day of July of 2006.

Katie J. Nelson, CCR, RPR
Notary Public in and for the State of Washington, residing in Kenmore.
My Commission expires October 19, 2007
CCR License No. 2971

(2) When the ventilation ducts required by these regulations must pass through these means of access, the ducts shall be of such a type and so arranged as to permit free passage of an employee through at least two of these means of access.

**§ 1915.77 Working surfaces.**

(a) Paragraphs (b) through (d) of this section shall apply to ship repairing and shipbuilding operations, and shall not apply to shipbreaking. Paragraph (e) of this section shall apply to shipbuilding, ship repairing and shipbreaking operations.

(b) When firebox floors present tripping hazards of exposed tubing or of missing or removed refractory, sufficient planking to afford safe footing shall be laid while work is being carried on within the boiler.

(c) When employees are working aloft, or elsewhere at elevations more than 5 feet above a solid surface, either scaffolds or a sloping ladder, meeting the requirements of this subpart, shall be used to afford safe footing, or the employees shall be protected by safety belts and lifelines meeting the requirements of §§ 1915.159 and 1915.160. Employees visually restricted by blasting hoods, welding helmets, and burning goggles shall work from scaffolds, not from ladders, except for the initial and final welding or burning operation to start or complete a job, such as the erection and dismantling of hung scaffolding, or other similar, nonrepetitive jobs of brief duration.

(d) For work performed in restricted quarters, such as behind boilers and in between congested machinery units and piping, work platforms at least 20 inches wide meeting the requirements of § 1915.71(i)(1) shall be used. Backrails may be omitted if bulkheading, boilers, machinery units, or piping afford proper protection against falling.

(e) When employees are boarding, leaving, or working from small boats or floats, they shall be protected by personal flotation devices meeting the requirements of § 1915.158(a).

[47 FR 16986, Apr. 20, 1982, as amended at 67 FR 44543, July 3, 2002]

## Subpart F—General Working Conditions

**§ 1915.91 Housekeeping.**

The provisions of this section shall apply to ship repairing, shipbuilding and shipbreaking except that paragraphs (c) and (e) of this section do not apply to shipbreaking.

(a) Good housekeeping conditions shall be maintained at all times. Adequate aisles and passageways shall be maintained in all work areas. All staging platforms, ramps, stairways, walkways, aisles, and passageways on vessels or dry docks shall be kept clear of all tools, materials, and equipment except that which is in use, and all debris such as welding rod tips, bolts, nuts, and similar material. Hose and electric conductors shall be elevated over or placed under the walkway or working surfaces or covered by adequate crossover planks.

(b) All working areas on or immediately surrounding vessels and dry docks, graving docks, or marine railways shall be kept reasonably free of debris, and construction material shall be so piled as not to present a hazard to employees.

(c) Slippery conditions on walkways or working surfaces shall be eliminated as they occur.

(d) Free access shall be maintained at all times to all exits and to all firealarm boxes or fire-extinguishing equipment.

(e) All oils, paints thinners, solvents, waste, rags, or other flammable substances shall be kept in fire resistant covered containers when not in use.

**§ 1915.92 Illumination.**

The provisions of this section shall apply to ship repairing, shipbuilding and shipbreaking.

(a) All means of access and walkways leading to working areas as well as the working areas themselves shall be adequately illuminated.

(b) Temporary lights shall meet the following requirements:

(1) Temporary lights shall be equipped with guards to prevent accidental contact with the bulb, except that guards are not required when the construction of the reflector is such that the bulb is deeply recessed.

which will impair its strength. The use of low density woods is prohibited.

(2) Side rails shall be dressed on all sides and kept free of splinters.

(3) All knots shall be sound and hard. The use of material containing loose knots is prohibited. Knots shall not appear on the narrow face of the rail and, when in the side face, shall be not more than ½ inch in diameter or within ½ inch of the edge of the rail or nearer than 3 inches to a tread or rung.

(4) Pitch pockets not exceeding ⅛ inch in width, 2 inches in length and ½ inch in depth are permissible in wood side rails, provided that not more than one such pocket appears in each 4 feet of length.

(5) The width between side rails at the base shall be not less than 11½ inches for ladders 10 feet or less in length. For longer ladders this width shall be increased at least ¼ inch for each additional 2 feet in length.

(6) Side rails shall be at least 1⅝x3⅝ inches in cross section.

(7) Cleats (meaning rungs rectangular in cross section with the wide dimension parallel to the rails) shall be of the material used for side rails, straight-grained and free from knots. Cleats shall be mortised into the edges of the side rails ½ inch, or filler blocks shall be used on the rails between the cleats. The cleats shall be secured to each rail with three 10d common wire nails or fastened with through bolts or other fasteners of equivalent strength. Cleats shall be uniformly spaced not more than 12 inches apart.

(8) Cleats 20 inches or less in length shall be at least 25/32x3 inches in cross section. Cleats over 20 inches but not more than 30 inches in length shall be at least 25/32x3¾ inches in cross section.

(c) *Construction of portable wood cleated ladders from 30 to 60 feet in length.* (1) Ladders from 30 to 60 feet in length shall be in accordance with the specifications of paragraph (b) of this section with the following exceptions:

(i) Rails shall be of not less than 2x6 inch lumber.

(ii) Cleats shall be of not less than 1x4 inch lumber.

(iii) Cleats shall be nailed to each rail with five 10d common wire nails or fastened with through bolts or other fasteners of equivalent strength.

[47 FR 16986, Apr. 20, 1982, as amended at 67 FR 44542, July 3, 2002]

### § 1915.73 Guarding of deck openings and edges.

(a) The provisions of this section shall apply to ship repairing and shipbuilding operations and shall not apply to shipbreaking.

(b) When employees are working in the vicinity of flush manholes and other small openings of comparable size in the deck and other working surfaces, such openings shall be suitably covered or guarded to a height of not less than 30 inches, except where the use of such guards is made impracticable by the work actually in progress.

(c) When employees are working around open hatches not protected by coamings to a height of 24 inches or around other large openings, the edge of the opening shall be guarded in the working area to height of 36 to 42 inches, except where the use of such guards is made impracticable by the work actually in progress.

(d) When employees are exposed to unguarded edges of decks, platforms, flats, and similar flat surfaces, more than 5 feet above a solid surface, the edges shall be guarded by adequate guardrails meeting the requirements of § 1915.71(j) (1) and (2), unless the nature of the work in progress or the physical conditions prohibit the use or installation of such guardrails.

(e) When employees are working near the unguarded edges of decks of vessels afloat, they shall be protected by personal flotation devices, meeting the requirements of § 1915.158(a).

(f) Sections of bilges from which floor plates or gratings have been removed shall be guarded by guardrails except where they would interfere with work in progress. If these open sections are in a walkway at least two 10-inch planks placed side by side, or equivalent, shall be laid across the opening to provide a safe walking surface.

(g) Gratings, walkways, and catwalks, from which sections or ladders have been removed, shall be barricaded with adequate guardrails.

[47 FR 16986, Apr. 20, 1982, as amended at 67 FR 44542, July 3, 2002]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WALTER L. JAYNES, et al.,<br>Plaintiffs,<br>vs.<br>THE UNITED STATES<br>Defendant. | No. 04-856C<br><br>Judge George W. Miller |

## DECLARATION OF DONALD B. SCARAMASTRA

I, Donald B. Scaramastra, aver as follows:

1. I am the attorney of record for the Plaintiffs in this lawsuit. I am over the age of 18, have personal knowledge of the matters stated in this Declaration and am competent to testify to those matters.

2. Attached to this Declaration as Exhibit A are true and correct copies of excerpts from the *Handbook for Public Playground Safety*, Pub. No. 325, U.S. Consumer Product Safety Commission.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

September 4, 2007

Donald B. Scaramastra
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

SEA_DOCS:861107.1

## CERTIFICATE OF SERVICE

I hereby certify on September 4, 2007, a copy of the foregoing "DECLARATION OF DONALD B. SCARAMASTRA" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

# Handbook for Public Playground Safety



U.S. Consumer Product
Safety Commission
Washington, DC 20207

Pub. No. 325

U.S. CONSUMER PRODUCT SAFETY COMMISSION
WASHINGTON, D.C. 20207

We're pleased to provide you with the latest edition of the U.S. Consumer Product Safety Commission's (CPSC) *Handbook for Public Playground Safety*.

CPSC created its playground safety guidelines as a detailed working blueprint to help local communities, schools, day care centers, corporations, and other groups build safe playgrounds. This *Handbook* includes technical safety guidelines for designing, constructing, operating, and maintaining public playgrounds. To highlight some of the most important safety issues for parents and community groups, we've developed a "Public Playground Safety Checklist," which can be found on the inside back cover.

Playgrounds are a fundamental part of the childhood experience. They should be safe havens for children. All of us have memories of playing on playgrounds in our neighborhood park and at recess in the schoolyard.

Unfortunately, more than 200,000 children are treated in U.S. hospital emergency rooms each year for injuries associated with playground equipment. Most injuries occur when children fall from the equipment onto the ground.

Many of these injuries can be prevented. To address the issue of falls, these guidelines emphasize the importance of protective surfacing around playground equipment. In this revised edition, we've added information about using shredded tires as a protective surfacing material. Other noteworthy changes here include revised or additional information about maximum equipment height, maintenance, lead paint on playground equipment, use zones, and clothing entanglement on equipment. For a more complete list, check Appendix E.

Since 1981, CPSC has issued its *Handbook for Public Playground Safety*. Communities all across the country build their playgrounds to these safety specifications. We've included here everything we know today about making playgrounds as safe as possible. As new information becomes available, we are committed to getting it to you as soon as possible.

All of our children deserve a safe place to play. Let us work together to make that happen.

- Handrail Height (10.3.1)
- Guardrails and Protective Barriers (11.3, 11.4, and 11.5)
- Stepped Platforms (11.7)
- Climbers (12.1.2)
- Horizontal Ladders and Overhead Rings (12.1.5)
- Merry-Go-Rounds (12.2)
- Spring Rockers (12.5)
- Single-Axis Swings (12.6.2)
- Tot Swings (12.6.3)

The intended user group should be obvious from the design and scale of equipment. Some playgrounds, often referred to as "tot lots," are designed only for preschool-age children, so separation is not an issue.

In playgrounds intended to serve children of all ages the layout of pathways and the landscaping of the playground should show the distinct areas for the different age groups. The areas should be separated at least by a buffer zone, which could be an area with shrubs or benches. Signs posted in the playground area can be used to give some guidance to adults as to the age appropriateness of the equipment.

### 6.4 Supervision

Playgrounds that are designed, installed and maintained in accordance with safety guidelines and standards can still present hazards to children in the absence of adequate supervision.

Depending on the location and nature of the playground, the supervisors may be paid professionals (full-time park or school/child care facility staff), paid seasonal workers (college or high school students), volunteers (PTA members), or the parents of the children playing in the playground. The quality of the supervision depends on the quality of the supervisor's knowledge of safe play behavior. Therefore, supervisors should understand the basics of playground safety.

Playground supervisors should be aware that not all playground equipment is appropriate for all children who may use the playground. Supervisors should look for posted signs indicating the appropriate age of the users and direct children to equipment appropriate for their age. Supervisors may also use the information in Section 6.3 of this handbook to determine the suitability of the equipment for the children they are supervising.

It is important to recognize that preschool-age children require more attentive supervision on playgrounds than older children.

## 7. INSTALLATION AND MAINTENANCE OF EQUIPMENT

### 7.1 Assembly and Installation

Proper assembly and installation of playground equipment are crucial for structural integrity, stability, and overall safety. The people who assemble and install playground equipment should not deviate from the manufacturer's instructions. After assembly and before its first use, equipment should be thoroughly inspected by a person qualified to inspect playgrounds for safety.

The manufacturer's assembly and installation instructions, and all other materials collected concerning the equipment, should be kept in a permanent file.

#### 7.1.1 Stability

When properly installed as directed by the manufacturer's instructions and specifications, equipment should withstand the maximum anticipated forces generated by active use which might cause it to overturn, tip, slide, or move in any way. Secure anchoring is a key factor to stable installation, and because the required footing sizes and depths may vary according to equipment type, the anchoring process should be completed in strict accordance with the manufacturer's specifications.

### 7.2 Maintenance

Inadequate maintenance of equipment has resulted in injuries on playgrounds. Because the safety of playground equipment and its suitability for use depend on good inspection and maintenance, the manufacturer's maintenance instructions and recommended inspection schedules should be strictly followed.

A comprehensive maintenance program should be developed for each playground. All equipment should be inspected frequently for any potential hazards, for corrosion or deterioration from rot, insects, or weathering. The playground area should also be checked frequently for broken glass or other dangerous debris. Loose-fill surfacing materials should be inspected to

**TABLE 2**

Recommended Dimensions for Access Slope, Tread or Rung Width, Tread Depth, Rung Diameter, and Vertical Rise for Rung Ladders, Stepladders, Stairways, and Ramps.

| Type of Access | Age of Intended User: 2-5 Years | Age of Intended User: 5-12 Years |
|---|---|---|
| **Rung Ladders** | | |
| Slope | 75°–90° | 75°–90° |
| Rung Width | ≥ 12" | ≥ 16" |
| Vertical rise (tread to tread) | ≤ 12"** | ≤ 12"** |
| Rung Diameter | 0.95"–1.55" | 0.95"–1.55" |
| **Stepladders** | | |
| Slope | 50°–75° | 50°–75° |
| Tread Width – Single File | 12"–21" | ≥ 16" |
| – Two-Abreast | * | ≥ 36" |
| Tread Depth – Open Riser | ≥ 7" | ≥ 3" |
| – Closed Riser | ≥ 7" | ≥ 6" |
| Vertical Rise (tread to tread) | ≤ 9"** | ≤ 12"** |
| **Stairways** | | |
| Slope | ≤ 35° | ≤ 35° |
| Tread Width – Single File | ≥ 12" | ≥ 16" |
| – Two-Abreast | ≥ 30" | ≥ 36" |
| Tread Depth – Open Riser | ≥ 7" | ≥ 8" |
| – Closed Riser | ≥ 7" | ≥ 8" |
| Vertical Rise (tread to tread) | ≤ 9"** | ≤ 12"** |
| **Ramps (not intended for access by the disabled)*** ** | | |
| Slope (vertical:horizontal) | ≤ 1:8 | ≤ 1:8 |
| Width – Single File | ≥ 12" | ≥ 16" |
| – Two-Abreast | ≥ 30" | ≥ 36" |

* Not recommended for preschool-age children

** Entrapment provisions apply

*** For information on requirements for access to playground equipment by disabled children contact the U.S. Architectural and Transportation Barriers Compliance Board (**11**).

**Note:** ≥ means equal to or greater than and ≤ means equal to or less than

access slope, tread or rung width, tread depth, rung diameter, and vertical rise for rung ladders, stepladders, and stairways. Table 2 also contains slope and width recommendations for ramps. However, these recommendations are not intended to address ramps designed for access by wheelchairs.

Openings between steps or rungs and between the top step or rung and underside of a platform should prevent the possibility of entrapment. Risers on stairways and stepladders should be closed if the distance between opposing interior surfaces of consecutive steps is between 3.5 and 9 inches (see Section 9.6). Since the design of rung ladders does not permit risers to be closed, the space between rungs should not be between 3.5 and 9 inches.

When risers are closed, treads of stairways and ladders should prevent the accumulation of sand, water, or other materials on or between steps.

### 10.2.1 Rungs and Other Handgripping Components

Whereas the steps of stairways and stepladders are used only for foot support, the rungs of rung ladders are used for both foot support and for hand support by a climbing child since rung ladders generally do not have handrails.

Rungs are generally round in cross section and should have a diameter or maximum cross sectional dimension between 0.95 and 1.55 inches. Other components intended to be grasped by the hands such as the bars of climbers should also have a diameter or maximum cross sectional dimension between 0.95 and 1.55 inches.

To benefit the weakest child in each age group, a diameter of 1.25 inches is preferred. All rungs should be secured in a manner that prevents them from turning.

## 10.3 Handrails

Handrails on stairways and stepladders are intended to provide hand support and to steady the user. Continuous handrails extending over the full length of the access should be provided on both sides of all stairways and stepladders, regardless of the height of the access. Rung ladders do not require handrails since rungs or side supports provide hand support on these more steeply inclined accesses.

### 10.3.1 Handrail Height

Handrails should be available for use at the appropriate height, beginning with the first step. The vertical distance between the top front edge of a step (tread nosing) and

the top surface of the handrail above it should be as follows:

- Preschool-Age Children: between 22 and 26 inches.
- School-Age Children: between 22 and 38 inches.

### 10.3.2 Handrail Diameter

The diameter or maximum cross-sectional dimension of handrails should be between 0.95 and 1.55 inches. To benefit the weakest child in each age group, a diameter of 1.25 inches is preferred.

## 10.4 Transition from Access to Platform

On any transition from an access mode to a platform, handrails or handholds should be adequate to provide support until the child has fully achieved the desired posture on the platform. Any opening between a handrail and an adjacent vertical structure (e.g., vertical support post for a platform or vertical slat of a protective barrier) should not pose an entrapment hazard (see Section 9.6).

On accesses that do not have handrails, such as rung ladders, flexible climbers, arch climbers, and tire climbers, hand support should provide for the transition between the top of the access and the platform. Options include vertical handrails and loop handgrips extending over the top of the access.

# 11. PLATFORMS, GUARDRAILS AND PROTECTIVE BARRIERS

## 11.1 Design Considerations

Platforms should be within ±2° of a horizontal plane and openings should be provided to allow for drainage.

## 11.2 Guardrails and Protective Barriers

Either guardrails or protective barriers may be used to prevent inadvertent or unintentional falls off elevated platforms. Protective barriers, however, to provide greater protection, should be designed to prevent intentional attempts by children seeking to defeat the barrier either by climbing over or through the barrier.

For example, guardrails may have a horizontal top rail with infill consisting of vertical bars having openings that are greater than 9 inches. Such openings would not present an entrapment hazard but would not prevent a child from climbing through the openings. A protective barrier should prevent passage of a child during deliberate attempts to defeat the barrier. Any openings between uprights or between the platform surface and lower edge of a protective barrier should prevent passage of the small torso template (see Figure B-3 in Appendix B).

## 11.3 Minimum Elevation Requiring Guardrails and Protective Barriers

Guardrails or protective barriers should be provided on platforms, walkways, landings, and transitional surfaces in accordance with the following minimum elevation recommendations.

Preschool-Age Children: Since younger children have poorer coordination and balance and are more vulnerable to injury than school-age children, guardrails or protective barriers are warranted at lower elevations. An elevated surface that is more than 20 inches above the protective surfacing should have a guardrail or protective barrier to prevent falls. Guardrails are acceptable for platforms over 20 inches but not over 30 inches high, but a full protective barrier may be preferable for this age group since it affords a greater degree of protection from falls. Protective barriers should always be used for platforms that are over 30 inches above the protective surfacing.

School-Age Children: An elevated surface that is more than 30 inches above the protective surfacing should have a guardrail or protective barrier to prevent falls. For platforms over 30 inches but not over 48 inches high, guardrails are acceptable, although a full protective barrier always provides greater protection. Platforms that are over 48 inches above the protective surfacing should always have a protective barrier.

An elevated surface is exempt from these recommendations if a guardrail or protective barrier would interfere with the intended use of the equipment; this includes most climbing equipment, and platforms that are layered so that the fall height does not exceed 20 inches on equipment intended for preschool-age children or 30 inches on equipment intended for school-age children.

## 12.4 Slides

### 12.4.1 General

Although children under 6 years of age may be more likely to play on slides, older children will still use slides depending on their availability relative to other types of equipment. Children can be expected to descend slide chutes in many different positions, rather than always sitting and facing forward as they slide. They will slide down facing backward, on their knees, lying on their backs, head first, and will walk both up and down the chute. Younger children in particular often slide down on their stomachs, either head or feet first.

Slides may provide a straight, wavy, or spiral descent either by means of a tube or an open slide chute. They may be either free-standing (see Figure 17), part of a composite structure, or built on the grade of a natural or man-made slope (embankment slide). The recommendations in this section do not apply to water slides or swimming pool slides.

### 12.4.2 Slide Access

With the exception of embankment slides, access to a slide may be by means of a ladder with rungs or steps, a stairway with steps, or the slide may be a component of a composite play structure to which access is provided by other means. Whatever means of access is provided to a slide, it should conform to the guidelines specified in the general discussion of access to all playground equipment (see Section 10).

### 12.4.3 Slide Platform

All slides should be provided with a platform with sufficient length to facilitate the transition from standing to sitting at the top of the inclined sliding surface. The length of the platform will usually not be an issue when the slide is attached to the deck of a composite structure, because decks are generally at least 3 feet square. However, in the case of a free-standing slide, it is recommended that the platform have a minimum length of at least 22 inches.

The platform should be horizontal and have a width at least equal to the width of the slide.

Guardrails or protective barriers should surround a slide platform and should conform to the guidelines specified in the general discussion of platforms (see Section 11).

Slides should not have any spaces or gaps between the platform and the start of the slide chute.

With the exception of tube slides, handholds should be provided at the entrance to all slides to facilitate the




Figure 17. Typical Free-Standing Straight Slide

transition from standing to sitting and decrease the risk of falls. These should extend high enough to provide hand support for the largest child in a standing position, and low enough to provide hand support for the smallest child in a sitting position.

At the entrance to the chute there should be a means to channel a user into a sitting position. This may be a guardrail, a hood, or other device. Whatever means is provided, it should be of a design that does not encourage climbing.

**12.4.4 Sliding Section of Straight Slides**

It is recommended that the average incline of a slide chute be no more than 30 degrees. This can be measured by determining that the height to length ratio (as shown in Figure 18) does not exceed 0.577. No span on the slide chute should have a slope greater than 50 degrees.

Straight slides with flat open chutes should have sides with a 4 inch minimum height extending along both sides of the chute for the entire length of the inclined sliding surface.

The sides should be an integral part of the chute, without any gaps between the sides and the sliding surface. [Note: Roller slides are excluded from this recommendation.]

Slides may have an open chute with a circular, semicircular or curved cross section provided that:

**a.** the vertical height of the sides is no less than 4 inches when measured at right angles to a horizontal line that is 12 inches long when the slide is intended for preschool-age children and 16 inches long when the slide is intended for school-age children (see Figure 19);

*or*

**b.** the vertical height of the sides is no less than 4 inches minus two times the width of the slide chute divided by the radius of the slide chute curvature (see Figure 20).

Metal slides should be placed in shaded areas to prevent burns caused by direct sun on the slide chute.

**12.4.5 Exit region**

All slides should have an exit region to help children maintain their balance and facilitate a smooth transition from sitting to standing when exiting.

The exit region should be essentially horizontal and parallel to the ground and have a minimum length of 11 inches.




**Figure 18. Slide Slope**