**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S APPENDIX**
**IN SUPPORT OF RESPONSE TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.Mager@usdoj.gov

OF COUNSEL:
TELIN W. OZIER
Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street., SE
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Naval Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

November 5, 2007

Attorneys for Defendant

# INDEX

**Document** **Page**

Position Description, Puget Sound Naval Shipyard, Shipyard Production Superintendent (Shop 64). . . . . . . . . . 1-5

Excerpt Department of Defense Financial Management Regulation (DOD Directive 7000.14-R). . . . . . . . . . 6-10

Accord and Satisfaction Trial Transcript Excerpts, Jaynes v. United States, Fed. Cl. No. 04-856 (Nov. 6-8, 2006). . . . . . . . . . 11-24

Nov-02-07 10:17A C/900 360 476 1869 P.01

DEC 17 '91 15:52 FROM NAVSHIPYD PUGET IRO PAGE.002

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

1. Agency Position No. 34710

2. Reason for Submission: [X] Redescription [ ] New [ ] Reestablishment [ ] Other
Explanation *(Show any positions replaced)*: Replaces PD #05530

3. Service: [ ] Dept'l [X] Field

4. Employing Office Location: PSNS

5. Duty Station: Bremerton, WA

6. OPM Certification No.

7. Fair Labor Standards Act: [X] Exempt [ ] Nonexempt

8. Employment/Financial Stmt Required: [ ] Yes [X] No

9. Subject to IA Action: [ ] Yes [X] No

10. Position Status: [X] Competitive [ ] Excepted *(Specify)*

11. Position is: [ ] Supervisory [X] Managerial [ ] Neither

12. Sensitivity: [ ] Critical [X] Noncritical [ ] Nonsensitive

13. Competitive Level Code: RA34

14. Agency Use: 5XX62 5/23/90

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Civil Service Commission | | | | | | |
| b. Department, Agency, or Establishment | | | | | | |
| c. Bureau | | | | | | |
| d. Field Office | Shipyard Production Superintendent | GM | 1601 | 14 | PO | 11/4/88 |
| e. Recommended by Supervisor or Initiating Office | Production Superintendent | GM | 1601 | 14 | | |

16. Organizational Title of Position *(if different from official title)*

17. Name of Employee *(if vacancy, specify)*

18. Department, Agency, or Establishment: Puget Sound Naval Shipyard
a. First Subdivision: Production Department
b. Second Subdivision: Service Group
c. Third Subdivision: Code 970, Shop 397
d. Fourth Subdivision
e. Fifth Subdivision

19. Employee Review. This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*

20. Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor
Signature: [signature] Date: 10/27/88

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*
Signature: [signature] Date: 11/1/88

21. Classification/Job Grading Certification. I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the Civil Service Commission or, if no published standards apply directly, consistently with the most applicable published standards.

Typed Name and Title of Official Taking Action: THOMAS J. KOSLOWSKI, Principal Classifier
Signature: [signature] Date: 11/4/88

22. Standards Used in Classifying/Grading Position: OPM PCS – 1601 Series TS – 22, Aug 1975

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the Civil Service Commission. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the Commission.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks:
NM 2XRA
Bus Code 8858
Skills: DAN VMA 10090

25. Description of Major Duties and Responsibilities *(see attached)*

INTRODUCTION

This position is the senior manager of the Woodworking Shop (Shop 64). The shop is located within the Service Group in the Production Department. The incumbent is responsible for administration of shipyard policies, programs and funds while integrating technical factors required to successfully accomplish the shipyard's and shop's objectives. The incumbent is responsible for maintaining continuity of operations and open communications with superiors while pursuing schedule adherence during ships' availabilities.

Shop 64 is responsible for performing all woodworking operations incident to complex shipbuilding, repair, conversion and overhaul of surface ships and submarines. Constructs and repairs wood and plastic equipment used in ship construction and repair and drydocking operations. Installs thermal acoustic and damping tile and decorative laminate panels. This shop performs unique operations for other Naval customers.

This Shop Superintendent operates as a full-fledged corporate manager. Develops, and modifies to maintain, the Shop's most efficient/effective organizational posture and actively directs an innovative production program to compete against other Naval shipyards for ship and submarine overhaul, repair and modification work. Competitive packages cover major, complex work on the various classes of surface vessels and nuclear submarines. This function is critical to assuring a sustained workload and continued capability to meet the Fleet's ever increasing needs. The Shop Superintendent is accountable for completing work within schedule and budgeted cost.

MAJOR DUTIES AND RESPONSIBILITIES

1. Planning and Coordinating Responsibilities

As the Senior Production Manager and immediate technical authority, the incumbent is responsible for directing and coordinating through subordinate supervisors the operations of the Woodworking Shop to support the major modifications and repair of nuclear and non-nuclear ships, submarines and special projects. The incumbent establishes goals and schedules on an immediate, intermediate and long-range basis taking into consideration ship availabilities, manpower, budget constraints and priorities established by shipyard officials. Acts as consultant and advisor to all levels of top shipyard management on matters such as feasibility of workload commitments, change in work schedules, change in job scope, manpower availability, cost estimates, overhead operations, plant expansion and equipment modernization.

The incumbent is responsible for accomplishment of the shop's total operations and is accountable to superiors for the quality, quantity and suitability of work performed. Organizes, coordinates, prioritizes and directs subordinates in accomplishment of work activities and is the authoritative consultant and final technical authority for work performed by the shop. Coordinates nuclear work assignments with other trades, engineers, military advisors and production managers. Performs constant and complex coordination between shop work groups within the shop and between other shipyard organizations. Ensures production standards are equitable and requests changes when necessary. Identifies and establishes goals for quality workmanship, project completion, lead shop concept and budget management.

The incumbent is responsible for ensuring employees are adequately trained by administering shop training programs for trainees, apprentices, helpers and

journey level workers in nuclear and individual job skills areas. Continuous retraining of the work force is required due to acquisition of new machinery and the development and improvement of techniques for work accomplishment.

The type and priority of work continually shifts due to the type of availabilities assigned to the Shipyard and requires close attention and coordination to ensure schedule adherence. Changes are unpredictable and necessitate quick decision making to meet unexpected situations. These decisions require shifting resources, reallocating priorities and determining which jobs may be delayed to facilitate urgent work. These unpredictable work situations require constant attention to work progress, plans and schedules so action can be taken quickly to alleviate adverse impact on the schedule. The changing work situation requires the incumbent frequently to reprogram, reschedule and reassign work. This manager shifts priorities and personnel continuously to provide maximum "underway" and homeport work on any class of vessel. This includes a wide variety of "voyage repairs" and other demanding, short deadline, and one-of-a-kind work critical to the Fleet's operational needs. This includes significant expansion of the use of "mixed" jobs, versus strict trade alignment, to accomplish many tasks with fewer employees.

Promotes and administers management programs such as safety, cost reduction, productivity improvement, incentive awards, energy conservation, quality circles, and employee performance appraisals. Assures that subordinate supervisors effectively administer practices or policies in labor-management agreements, EEO/Affirmative Action programs and discipline enforcement.

The incumbent has a continuing responsibility to actively support and promote all aspects of the Equal Employment Opportunity Program and Affirmative Action Plan, as directed by applicable laws and regulations. Communicates this support to subordinates, minority groups, and women. Assures all employees receive equal consideration in determining qualifications, selections, promotions, training, details, discipline, and awards of employees. Full cooperation will be given in the investigation of any discrimination complaint so proper objective and expeditious action may be taken.

Prescribes internal organization of workforce and allocates personnel accordingly. Defines functional work group activities and responsibilities and delegates authority to perform the work.

2. Product Complexity

Shop 64 constructs and repairs wooden and plastic boats. Performs experimental work with plastics, manufactures and repairs fiberglass and plastic items. Repairs and manufactures furniture, side ladders, portable shelters, wooden tanks, hollow booms and positioning buoys. Performs cabinet work and wood joiner work. Manufactures shipping and storage boxes and cradles. Manufactures dummy torpedoes and plywood deck panels. Laminates, shapes and impregnates wooden members. Operates dry kilns. Performs all insulating and wood joiner work aboard ships. Installs and maintains protective coverings. Installs and repairs all types of sound damping materials. Installs and alters polyethylene shielding in and around nuclear reactors. Repairs and installs boat storage and shipping cradles, wooden booms, spars, bows and platforms. Repairs and installs wooden decks. Manufactures and installs wooden platforms for equipment machinery. Performs all wood caulking. Lays all linoleum and rubber, ceramic and asphalt tile. Installs, trowels and finishes magnesite, terrazzo, latex concrete and non-slip deck coatings. Installs cork, linoleum, vinyl sheet rock and concrete ballast. Many of the projects are one-of-a-kind

due to the unique requirements and situations of the ships. The projects are complex in nature and require special planning and detailed coordination. Exacting nuclear work projects are accomplished on a routine basis.

3. Complexity and Rigidity of Requirements

The final products of Shop 64 have a direct bearing on the ability of the shipyard to meet its customer's commitments of schedule adherence and cost estimate. Although as the shop's manager, the incumbent is responsible for determining priorities, manpower and resources to perform the work, little option is afforded in determining the schedules for completion of key events because of imposed ship operational requirements and the need to coordinate Shop 64 work with other production shops committed to the sequencing of their work within the fixed time frame. Therefore, the manager plays an important role in overall shipyard management in estimating time and resources to accomplish the work assignments in the shop. The manager has the flexibility to shift manpower, direct overtime and maintain good labor relations to accomplish the work. Most of the customers of this shop have very exacting and rigid quality and documentation requirements. When these rigid requirements are added to the one-of-a-kind projects the quality control, skills required, and stringent timing limitations place additional burdens on this manager.

4. Scope of Operations

The size of the workforce is approximately 175 employees, consisting of Insulators, Plastic Fabricators, and Material Expeditors. The trades personnel include journey level, workers, helpers, apprentices, trainees, training leaders, work leaders, planners, foremen and general foremen. The grade levels range from WG-01 through WS-14. The incumbent directs this organization through 15 subordinate supervisors. The manpower of Shop 64 is dispersed throughout the shipyard on a three shift (24 hour) basis.

CONTROLS OVER THE POSITION

The incumbent manages the operations of the Woodworking Shop under the general direction of the Service Group Superintendent. The type of supervision exercised over the position is general in nature and principally consists of identifying desired objectives. The incumbent is responsible for determining the methods and means to be used to accomplish these objectives efficiently. Policy matters are subject to review by the Group Superintendent. The incumbent keeps the Group Superintendent informed on matters of interest. The incumbent's performance is appraised in terms of fulfillment of overall program objectives.

QUALIFICATION REQUIREMENTS FOR THE POSITION

The incumbent must have trade related experience or training similar to that obtained through an apprenticeship or equivalent. Must possess a thorough technical knowledge of the most complex skills of the trades in the shop as well as allied trades in the organization. Experience as a supervisor in the trades which involved management or supervision and direction of productive processes in the shipbuilding industry is required. Progressive experience and responsibilities equivalent to the general foreman level are required. The incumbent must be nuclear trained and qualified and capable of accessing nuclear work areas and reviewing classified documents.

**WORK ENVIRONMENT**

The incumbent may be assigned to work areas where certain potentially harmful physical and chemical agents are present. These agents may include but are not limited to: fumes, dust, noise, heat, ionizing and non-ionizing radiation, chemicals, etc. To ensure employee safety and health, the shipyard maintains personnel protection programs consistent with applicable laws and regulations. These programs may include engineering controls, training, work procedures, use of personnel protective equipment, and medical surveillance. As part of medical surveillance programs, the incumbent may be required to take medical examinations to assess his or her medical qualification for duty involving work with these agents.

**SUMMARY OF MAJOR CHANGES TO**
**DOD 7000.14-R, VOLUME 8, CHAPTER 2**
**"TIME AND ATTENDANCE"**

**Substantive revisions are denoted by a ★ preceding the section, paragraph, table or figure that includes the revision.**

| PARAGRAPH | EXPLANATION OF CHANGE/REVISION | PURPOSE |
|---|---|---|
| 020903 | Updates the DFAS organization responsible for SDA system approval. | Update |

## TABLE OF CONTENTS

### TIME AND ATTENDANCE

0201 Introduction

0202 Requirements

0203 Time and Attendance Recording

0204 Time and Attendance Certification

0205 Time and Attendance Reporting

0206 Adjustments and Corrections

0207 Retention of Records

0208 Labor Distribution

0209 Source Data Automation (SDA) Systems

## CHAPTER 2

## TIME AND ATTENDANCE

0201 INTRODUCTION

020101. Objective. The payroll functional objective for time and attendance is to ensure that the attendance (i.e., presence or absence) of employees is accurately recorded and reported in order to compute pay, leave, and allowances.

020102. Responsibilities

A. Employing Activity's Responsibilities. Supervisors shall ensure that:

1. Individuals recording and approving time and attendance have been properly trained.

2. The recording and approval of time and attendance are performed timely and accurately as required by responsible individuals.

3. All required supporting documentation is available for audit purposes.

4. Procedural guidance is clear and adequate to ensure that timekeeping and time and attendance certification are correctly performed.

5. Individuals recording and approving time and attendance make every effort to correct errors in the pay period to which the changes apply.

6. All corrections or adjustments are approved by the authorizing official and promptly reported to the civilian payroll office.

B. Approving Official's Responsibilities

1. When approving time and attendance reports, supervisors, other equivalent officials, or higher level managers are representing that, to the best of their knowledge, the actual work schedules recorded are true, correct, and accurate. Review and approval shall be made by the official, normally the immediate supervisor, most knowledgeable of the time worked and absence of the employees involved. The approving official may assign responsibility for observing daily attendance or accurately recording time and attendance data to a timekeeper or, in limited circumstances as addressed in paragraph 020404 of this chapter, the individual employee. Assignment of these duties does not relieve the approving official of the responsibility for timely and accurate reporting of the time and attendance to which he or she

approves, including that leave is approved and administered in accordance with applicable policies, regulations, instructions, and bargaining agreements. The supervisor shall inform the timekeeper when an employee is on any type of leave, or has worked any type of premium work.

2. Normally, timekeeping responsibilities shall be assigned to individuals who are aware of employees' attendance and absence each day.

3. Supervisors shall ensure that exceptions to the employee's normal tour of duty are recorded in a timely and accurate manner.

4. An alternate timekeeper shall be appointed to maintain time and attendance during the absence of the primary timekeeper.

C. Timekeeping Responsibilities

1. Timekeeping is a critical function, which may be performed by the individual employee, timekeeper, supervisor, or a combination of these individuals. The timekeeping function requires the accurate and timely recording of time and attendance data and the maintenance of related documentation.

2. Timekeepers may be civilian, military, or contractor personnel.

3. Individuals performing the timekeeping function are responsible for:

a. Timely and accurate recording of all exceptions to the employee's normal tour of duty.

b. Ensuring that employees have attested to the accuracy of their current pay period’s time and attendance (including any exceptions such as use of leave) and any adjustments or corrections that are required after time and attendance is approved. These attestations shall be documented (in writing or electronically) including: a manually completed hard copy (e.g., a sign-in, sign-out sheet), a printout of an automated record (e.g., a time and attendance report) with the employee’s signature (written or electronic), or initials affirming the correctness of the data, or an automated or electronic record retained on magnetic medium. If the employee is not available prior to the approval of the time and attendance, attestation shall be documented as soon thereafter as possible.

c. Ensuring that all entries for overtime and compensatory time earned have been approved, and totals are correct before certification.

0202 REQUIREMENTS

020201. Daily Record of Time. For each civilian employee, a daily record of time in pay and nonpay status or piecework completed shall be maintained either by a designated timekeeper who takes no part in preparing the payroll or by electromechanical devices, unless

otherwise prohibited. When such devices are used, adequate supervisory surveillance shall be maintained to ensure proper and accurate time recording. Timekeepers responsible for time and attendance reports shall have positive knowledge as to the employee's presence and absence before marking the report.

020202. Time Period. The time period shown on time and attendance reports shall correspond to the length of a pay period. For example, if payment is made for a 2-week period, the time and attendance report shall cover a 2-week period.

020203. Charge of Annual Leave. Time and attendance data shall indicate clearly whether annual leave taken is to be charged against the employee's current leave account or to a separate leave account established for restored leave. Unless annual leave taken is identified to an employee's restored leave account, regular leave will be charged.

020204. Accounting for Time and Leave. The time and attendance data shall reflect a proper and accurate accounting of an employee's actual time and attendance and leave.

020205. Data Element Values. Minimum data element values to be included on time and attendance reports or supporting documentation for each employee are as follows:

A. Employee name and Social Security Number.

B. Pay period number or dates.

C. Number of hours worked by day and in total.

D. Number of hours of premium work, by type, to which employee is entitled.

E. Number of credit hours and compensatory time earned.

F. Number of leave hours (by type), credit hours and compensatory time used.

G. Dates leave is taken.

H. Any required supporting documentation for absences, e.g., court orders, Office of Personnel Management (OPM) Forms or military orders.

I. Handwritten signature or automated approval code of an authorizing official.

J. Such other information as may be required in support of operations.

Q And it says, "Exhibit F, Main's e-mail."
You see that?
A I do.
Q All right. Now, if you turn back to Defense Exhibit 6 you will see -- oh, you put it away?
A They were getting to high.
Q Sorry.
A I won't be able to see over the top of them.
Q Sorry.
A Okay.
Q Okay. If you turn to Defense Exhibit 6 you will see the handwriting Exhibit F, e-mail Jerry Main.
A Got it. Yes.
Q Does that refresh your recollection as to whether you saw Defense Exhibit 6 in the May 20 Step 2 meeting?
A Yes, it did.
Q Okay. Can you think of anything that would have played a role in your recommendation to pay high work above the first level other than the OSHA regulation that required fall protection above 5 feet?
A No, that, that's what I considered in making that recommendation. What I didn't feel was that it was required to pay High Pay just because you wear fall protection. But it was something that identified

a footmark. And I didn't find anything else that would identify a certain height.

Q Okay. So it was the only line you could find that you could draw below 100 feet, wasn't it?

A It was a line that we could find, yes.

Q Okay. And because you understood at the time that the federal safety regulations required fall protection above 5 feet and you also understood that shipwrights were seldom able to use fall protection while assembling or disassembling staging above 5 feet; right?

A Did consider that, yes.

Q Okay. And why don't you turn back to Plaintiffs' Exhibit 1. And when you have that in front of me just let me know.

A I do.

Q Okay. First page you'll find section S8-7a. You see that?

A Yes.

Q Okay. And the very bottom, it's in the very bottom right corner and I want you to focus on the sentence that begins at the end of the page and goes on to the next one and it reads the existence of environmental differentials is not intended to condone work practices which circumvent federal safety laws,

staging did you make in resolving this grievance?
A How many tours did I make? There was one tour.
Q Just one?
A Right.
Q And when, if ever, have you worked as a shipwright?
A Never.
Q And how often have you done work on incomplete staging?
A Never.
Q You stated that there was a dispute about height on the management team. Did those disputes mean that other members of the team felt that an unusually severe condition existed at another height?
A Well, it meant that people didn't feel that 5 feet would necessarily lead to an unusually severe level, that something higher would be more likely.
Q Were any other heights suggested?
A Somewhere in the 20 range was discussed.
Q You said that fall protection gave a possible height. Could you have recommended a different height?
A Personally, no.
Q Why?

A I just didn't feel I had the expertise.

Q Why are shipwrights the only employees that are allowed to work on incomplete staging?

A Because that's their specialty. That's what they do and what they're trained to do.

Q Okay. And what do the OSHA regulations say about work being of an unusually severe nature?

A I don't know.

Q Okay. You mentioned, Plaintiff had read some OSHA standards to you a little bit earlier with some regulations regarding, some rules regarding OSHA standards and EDP, and you said that's the new standard. Would you know when that was adopted?

A I don't know exactly but I believe it was within the last two or two or three years. Somewhere in there.

Q And would you know why you were able to identify that as the new standard?

A Well, because the asbestos language in it is familiar to me. That's what rang a bell as being new.

Q So the information that Plaintiff quoted to you was that applicable to asbestos primarily?

A I think so but I'm not sure.

Q I'm going to show you a letter that we've referenced obliquely in your cross-examination, a

folder and called Admin.

MR. MAGER: Your Honor, if I could have a quick minute I may have no further questions.

THE COURT: Certainly.

MR. MAGER: Thank you.

(Pause.)

MR. MAGER: Nothing further, Your Honor.

THE COURT: Thank you, Mr. Mager.

Mr. Scaramastra?

MR. SCARAMASTRA: Just one second.

THE COURT: Yes.

(Pause.)

CROSS EXAMINATION

BY MR. SCARAMASTRA:

Q Ms. Tallman, good afternoon.

A Good afternoon.

Q We've met before but for the record I'm Don Scaramastra and I represent the shipwrights in this matter. Needless to say I have a few questions for you before we let you go.

I wanted to turn first to the scope of the work that you performed leading up to the resolution of the grievance. Okay. In other words, I want to understand what your role was a little bit further.

During the course of your handling of this

grievance you didn't conduct any legal research into the merits of the grievance, did you?

A I did not conduct any legal research.

Q All right. And you didn't, you didn't ask anyone in the Human Resources Office to perform that research, did you?

A No.

Q Okay. And at the time you signed the January 18, 2000 grievance decision you had no idea whether and under what circumstances the shipyard was legally required to pay High Pay to Shop 64 shipwrights; right?

A I didn't involve the lawyers. I had not checked into the legal aspect.

Q So the answer to my question is that that's right, you didn't have any idea?

A Can you ask it again?

Q Sure, I'll ask it again.

At the time you signed the grievance decision you still had no idea whether and under what circumstances the shipyard was legally required to pay High Pay to Shop 64 shipwrights, did you?

A Not from doing legal research.

Q Okay. And not from any other source; correct?

A I knew of my union contract, sir.
Q Right. And you knew that Appendix 2 to that union contract was modeled after federal regulations, didn't you?
A Yes.
Q And Appendix 2 contained a schedule of the circumstances under which the shipwright had to pay an environmental differential; right?
A Excuse me, would you repeat?
Q I can.
Appendix 2 to the collective bargaining agreement contained, identified those circumstances under which the shipyard had to pay an environmental differential, didn't it?
A Yes.
Q Okay. And that included high work?
A Yes.
Q But at the time you signed the grievance decision you had no understanding as to whether and under what circumstances the Code of Federal Regulations required the shipyard to pay High Pay to shipwrights; correct?
A I knew the contract was modeled after the CFR.
Q Right.

A I had not read the CFR.

Q And so you had no idea what the CFR provided with respect to High Pay; right?

A Right.

Q Okay. Did it occur to you, Ms. Tallman, given that you were face with the largest grievance that you had ever seen or handled and given that the contractual provisions that resolved the matter were modeled on federal regulations that it might make sense to talk to a lawyer?

A No.

Q I gather you didn't discuss the advisability of talking to a lawyer with any other members of the management team while you were handling the grievance; is that right?

A No.

Q And you didn't discuss that issue with your boss Jerry Main?

A No.

Q And by the way, Jerry Main is Tyson Main's father; is that right? You don't know?

A No, he is.

Q He is. Okay.

A Just took me by surprise.

Q Okay. At the time you were handling the

High Pay grievance you didn't consider yourself an expert in the Federal Wage System, did you?

A I did not consider myself an expert in the Federal Wage System.

Q And you don't today either?

A I do not today.

Q Turn if you would to Plaintiffs' Exhibit 1 which are excerpts from what we have tentatively identified as the Operating Manual for the Federal Wage System.

THE COURT: Which exhibit is this?

MR. SCARAMASTRA: Plaintiffs' 1.

THE COURT: Thank you.

BY MR. SCARAMASTRA:

Q Do you have that in front of you, Ms. Tallman?

A Yes, I do.

Q Okay. You weren't familiar with the contents of Plaintiffs' Exhibit 1 at any time while you were handling the shipwrights' High Pay grievance, were you?

A I had not read this.

Q All right. And, fair enough. To your knowledge you didn't ask someone else to research the contents of the Office of Personnel Management's

Operating Manual for the Federal Wage System, did you?

A No.

Q Turn next to Plaintiffs' Exhibit 2 if you would. This is Appendix J of the Operating Manual. You didn't review Plaintiffs' Exhibit 2 at any point during your handling of the shipwrights' High Pay grievance, did you?

A This exact document, no.

Q Yes. I'm sorry, I didn't hear you answer.

A This exact document, no.

Q No. Okay.

Mr. Aiken quoted Appendix J during the May 20 Step 2 meeting regarding the grievance, didn't he?

A He could have. I don't know.

Q You don't know.

Now, during the Step 2 meeting Mr. Aiken made a statement to the effect that the collective bargaining agreement provisions regarding High Pay were modeled on the requirements in the Code of Federal Regulations, didn't he?

A I don't know. I'd have to look at Mary's minutes from the meeting.

Q All right. Did you do anything during the course of your handling of the grievance to find out whether in fact the collective bargaining agreement

A Did not.

Q All right. Given that the collective bargaining agreement contemplated or required that a grievance decision be put in writing was it your intent on January 18, 2000 to fully capture all the terms of the grievance decision in writing?

A We had conversations other than what as put in writing.

Q I understand that. My question was this: was it your intent to put all of the terms to which you say you agreed in writing on January 18, 2000?

A I can't say I had that intent.

Q Okay. Now, at some point after the grievance decision was signed you spoke with Mr. Seaton about a letter you'd received from Mr. Holcomb; is that right?

A Sorry, would you repeat?

Q Sure. Sometime after the grievance decision was signed you spoke with Mr. Seaton about a letter that you had received from Mr. Holcomb; is that right?

A I don't know if we spoke or it was e-mail.

Q Okay. You communicated with Mr. Seaton.

A Yes.

Q That's a fair point.

And you understood Mr. Holcomb was asking

question if I could, or I should say a series of questions picking up on Mr. Scaramastra's mode of expressing the same thought I think.

When you in your testimony I believe you were asked, Mr. Scott, about how much time you spent up on staging. And I think you said six hours on average. Is that correct?

THE WITNESS: Up to six-and-a-half. My feeling on it anywhere four hours is ridiculous because they'd fire me if I only worked four hours a day. But it's better for me to say that I give them an hour-and-a-half for the washup, moving to the job, I give the company an hour-and-a-half. And that cuts me to six-and-a-half hours. And that's a reasonable amount.

THE COURT: And when you say that's a reasonable amount you mean that's a reasonable approximation of the amount of time that you spent up on staging in an average day?

THE WITNESS: Doing high work.

THE COURT: Well, that was my question. Does it, is it necessarily the case that all working on staging is high work within the meaning of the relevant collective bargaining agreement --

THE WITNESS: Under the --

THE COURT: -- and regulations?

THE WITNESS: I'm sorry, Your Honor. Go ahead please.

THE COURT: Under the relevant regulations and provisions of the collective bargaining agreement?

THE WITNESS: It is, Your Honor. And it states so in Appendix J. It virtually just states when you get High Pay. And high work and work at extreme height, there's no debate here, it tells you precisely when you get High Pay.

THE COURT: But it didn't say anything about working 5 feet above the ground constitutes high work; isn't that correct?

THE WITNESS: No, no. That was, that came from the grievance.

THE COURT: Right.

THE WITNESS: Yes.

THE COURT: So what you're doing I take it when you say you worked six hours of high work per day on average is you're calculating high pay based on the notion that if you worked at a height above 5 feet that was high work?

THE WITNESS: Yes.

THE COURT: Okay. So the six hours to which you refer assumes a definition of high work which

equates to working at a height greater than 5 feet?

THE WITNESS: Yes.

THE COURT: Okay. If there are no further questions for Mr. Scott?

MR. MAGER: Nothing, Your Honor.

MS. KREBS: No, Your Honor.

THE COURT: Mr. Scott, I think you're excused. And thank you very much. We appreciate your testimony.

THE WITNESS: Thank you.

THE COURT: You're welcome.

(Witness excused.)

THE COURT: Mr. Scaramastra?

MR. SCARAMASTRA: Yes. With that, Your Honor, the Plaintiffs close their case-in-chief.

THE COURT: Thank you very much.

Mr. Mager, do you have a rebuttal case?

MR. MAGER: Yes. The Government would like to present Mr. Dan Haas as a witness.

THE COURT: Okay. Mr. Haas, welcome. If you'll just stop right there for a second and raise your right hand.

//

//

//

**CERTIFICATE OF FILING**

This is to certify that on this 5th day of November 2007, a copy of the foregoing "DEFENDANT'S APPENDIX IN SUPPORT OF RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice