No. 04-856C
Judge George W. Miller

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION NO. 2 FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE THE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:
TELIN W. OZIER
Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street, S.E.
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Navy Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

December 3, 2007

# TABLE OF CONTENTS

**PAGE(S)**

ARGUMENT. .......... 2

I. The Court Does Not Have The Evidence Before It To Render Judgment Upon The Issue As To Whether Shipwrights Should Receive Environmental Differential Pay When Working On Incomplete Staging Above The First Level. .......... 2

A. Plaintiffs Fail To Bring A Valid Motion Pursuant to Rule 52(c) Of The Rules Of The United States Court Of Federal Claims. .......... 2

B. Plaintiffs Fail To Meet The Standard For Summary Judgment. .......... 4

II. It Is Not Axiomatic That Building And Dismantling Staging Involves Work On Unsure Footing. .......... 5

III. A Five Foot Height Is Not The Obligatory And Predetermined Level At Which High Pay Is To Be Paid. .......... 6

A. Any Determination Must Account For The Statutory Requirement Of An Unusually Severe Hazard. .......... 6

B. Viable Alternatives To The 5-Foot Standard Exist. .......... 8

IV. The Court Must Consider Federal Labor Law When Considering The Issue Of Environmental Differential Pay. .......... 13

V. The Shipyard's Attempted Settlement Is In Accordance With Law, Rule And Regulation. .......... 15

CONCLUSION. .......... 20

## TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986). 4

Associacion De Empleados Del Area Canalera v. Panama Canal Comm'n,
329 F.3d 1235 (11th Cir. 2003). 13

Barnes v. United States,
68 Fed. Cl. 492 (2005). 6

Bendure v. United States,
695 F.2d 1383 (Fed. Cir. 1982). 8, 12

Celotex Corp v. United States,
477 U.S. 317 (1986). 4

Cooper v. United States,
37 Fed. Cl. 28 (1996). 3

Daluz v. United States,
73 Fed. Cl. 129 (2006). 14

Jaynes v. United States,
69 Fed. Cl. 450 (2006). 6

Jaynes v. United States,
68 Fed. Cl. 747 (2005). 12

Mudge v. United States,
308 F.3d 1220 (Fed Cir. 2002). 13, 15

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002). 4

O'Neall v. United States,
797 F.2d 1576 (Fed. Cir. 1986). 7

Persyn v. United States,
34 Fed. Cl. 187 (1995). 2

Todd v. United States,
386 F.3d 1091 (Fed. Cir. 2004)........ 14

Whitman v. Dep't of Transportation,
382 F.3d 938 (9th Cir. 2004). ........ 13

**STATUTES & REGULATIONS**

5 U.S.C. § 5343........ 6, 7

5 U.S.C. § 7121........ 13

5 U.S.C. § 7122........ 14

5 U.S.C. § 7123........ 14

5 C.F.R. § 532.501........ 7

5 C.F.R. § 532.511........ 19

29 C.F.R. § 1910.333........ 12

29 C.F.R. § 1926.760 ........ 12

**MISCELLANEOUS**

Marye Hefty, Sallie Ortiz, & Sara Nelson,
Sentence Diagramming: A Step-by-Step Guide To Learning Grammar
Through Diagramming........ 16

Softwood Export Council, Newletter, November 18, 2007
http://www.softwood.org/Douglas%20fir%20Web/eDougFir/EN/PGSA.htm. ........ 10

Webster's Collegiate Dictionary (10th ed. 2002)........ 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-856C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION NO. 2 FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE THE FIRST LEVEL OF INCOMPETE STAGING CONSTITUTES HIGH WORK**

Pursuant to Rules 52 and 56 of the Rules of the United States Court of Federal Claims ("RCFC") and this Court's order, dated October 5, 2007, defendant, the United States respectfully responds to "Plaintiffs' Motion No. 2 for Partial Summary Judgment or RCFC 52 Ruling That Work on or above the First Level of Incompete Staging Constitutes High Work" ("plaintiffs' second motion").

In plaintiffs' second motion, they argue that they are entitled to partial summary judgment (or judgment as a matter of law ) on issues pivotal to the allegations found in paragraphs 43(a), 43(c), 43(e), and 43(f) of their Fourth Amended Complaint. Pl. Mot. 2 at 1. Specifically, plaintiffs assert that the Court may establish 5 feet as the height at which "high pay" is to be paid to shipwrights when working on incomplete staging. Plaintiffs also argue that the portion of the attempted settlement upon which they rely for the 5-foot level should be ignored with regard to the fall protection. Plaintiffs argue that shipwright work on incomplete staging starting on the first level meets the Office of Personnel Management's ("OPM") regulatory definition of high work, and claim that it is undisputed that the grievance decision's denial of high pay for work where fall restraint devices are available does not meet OPM's regulatory definition of high work.

As demonstrated in our initial motion, however, Environmental Differential Pay ("EDP") is a local determination that has not yet been made by Puget Sound Naval Shipyard ("the Shipyard"). Further, because the Court has ruled the attempted settlement agreement is not supported by a meeting of the minds of the signing parties, there has not yet a final resolution of the grievance. Alternatively, even if the Court were to determine the decision to pay at 5 feet had been made, it only provided for a prospective 5-foot payment; the Shipyard did not discuss, intend, or contemplate that this standard would be applied retroactively. To apply, retroactively, the 5-foot standard for high pay circumvents the prerequisite requirement for local determination regarding unusually severe conditions, divests the Government of the right to present its case on the issue, and disregards the importance of Federal labor and employment law.

## ARGUMENT

### I. The Court Does Not Have The Evidence Before It To Render Judgment Upon The Issue As To Whether Shipwrights Should Receive Environmental Differential Pay When Working On Incomplete Staging Above The First Level

#### A. Plaintiffs Fail To Bring A Valid Motion Pursuant To Rule 52(c) Of The Rules Of The United States Court Of Federal Claims

RCFC 52(c) provides that:

> If during a trial a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

RCFC 52(c). In responding to a RCFC 52(c) motion, the Court of Federal Claims may weigh the evidence and is not required to resolve all credibility issues and make all reasonable inferences in favor of defendant, as is required by a motion for a directed verdict under Fed. R. Civ. P. 50(a). Persyn v. United States, 34 Fed. Cl. 187, 194-95 (1995). The trial may end at the close of a plaintiff's case if a plaintiff has failed to maintain its claim, RCFC 52(c), because "[a] plaintiff

has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case," Cooper v. United States, 37 Fed. Cl. 28, 35 (1996).

It should be noted that RCFC 52 contemplates the potential for action after a "trial" on the relevant facts. Rule 52(a) provides that

> In all actions tried upon the facts, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to RCFC 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. . . .

RCFC 52(a) (emphasis added). Similarly, RCFC 52(b) states that the ". . . motion may accompany a motion for a new trial under RCFC 59 ;" while RCFC 52(c) provides that ". . .the court may decline to render any judgment until the close of all the evidence." RCFC 52(b), (c) (emphasis added).

In accordance with RCFC 42(b), the hearing in November 2006, however, exclusively focused upon accord and satisfaction and not the nature of staging. RCFC 42(b). See Jaynes v. United States, Fed. Cl. No. 04-856C, Order at 1 (July 6, 2006). Accordingly, while there has been a trial on the affirmative defense of accord and satisfaction, there has been no trial or close of evidence on the issues set forth in plaintiffs' motion. Neither party appears to have presented its case, let alone been "fully heard."[1] Accordingly, plaintiffs are incorrect when they assert that

---

[1] It is unclear if plaintiffs are asserting that they have presented all evidence on this point, and are waiving the right to present any further evidence. By bringing a motion pursuant to RCFC 52, at (continued...)

this "Court has heard all the evidence, which is undisputed, regarding the nature of shipwright's work," has heard all relevant witnesses, received all requisite information regarding Occupational Safety and Health Administration ("OSHA") and OPM regulations and any reliance the Shipyard may or may not have placed on those regulations. Pl. Mot. 2 at 14-15. As a result, the plaintiffs inappropriately ask this Court to exercise its authority under either RCFC 52(c) to resolve a seminal issue in this case.[2]

**B. Plaintiffs Fail To Meet The Standard For Summary Judgment**

Summary judgement is only proper if no genuine question of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp v. United States, 477 U.S. 317, 322 (1986). A fact qualifies as "material" if it would affect the outcome of the case. Anderson, 477 U.S. at 248. The burden of showing the absence of a genuine question of material fact rests with the movant. And, the Court must view all evidence in the light most favorable to the non-movant, resolving all doubts in that party's favor. O'Connor v. United States, 308 F.3d 1233 (Fed. Cir. 2002).

As we demonstrate below, genuine issues as to material facts exist with regard to plaintiffs' motion. Material and relevant questions remain unresolved regarding "unsure footing," "hazardous" or "unusually severe" conditions, minimum and maximum thresholds for high work, and the adequacy of ameliorating fall protection and training.

Further, plaintiffs' motion does nothing to demonstrate that any of the individual plaintiffs worked under conditions that might entitle them to high pay. To the extent plaintiffs'

---

[1](...continued)
a minimum, a party would need to have closed its presentation of the evidence.

[2] Plaintiffs also present an argument pursuant to RCFC 52(b) but state that "[m]ost court opinions regarding RCFC 52(b) (or its identical counterpart, Fed. R. Civ. P. 52(b)) arise in one of two circumstances, neither of which is present here." Pl. Mot. 2 at 15. Because plaintiffs concede that "neither" circumstance under which this Court would exercise authority under RCFC 52(b) is present, we need not address this argument separately.

motion merely seeks to establish that they might be entitled to high pay, plaintiffs do not present an actual factual issue for this Court to decide.

## II. It Is Not Axiomatic That Building And Dismantling Staging Involves Work On Unsure Footing

In the absence of a hearing on the issue, the plaintiffs ask this Court to adopt as fact that, without exception, the building and dismantling staging involves work on unsure footing. Plaintiffs argue that the "trial" conducted in November of 2006 established this proposition. First and foremost, it should be noted that the hearing in November 2006 exclusively focused upon accord and satisfaction and not the nature of staging work. RCFC 42(b). See Jaynes v. United States, Fed. Cl. No. 04-856C, Order at 1 (July 6, 2006). Second, as noted in our initial motion, OPM's regulations merely provide "examples of situations which are illustrative of the nature and degree of the particular hazard, physical hardship, or working condition involved in performing the category," which are to be evaluated by the Shipyard "to determine whether the local situation is covered." OPM Manual, chapter S8-7. See Def. App. 82-83. Third, even the plaintiffs acknowledge that the regulations do not define the term "unsure." Accordingly, plaintiffs resort to dictionaries and the thesaurus to define the word "sure" and, by virtue of that exercise, define its opposite: "unsure." Pl. Mot. 2 at 18. As an initial matter, plaintiffs equation of "sure" with "safe," thereby requiring a reading of the OSHA regulations[3] into the high pay standards, is strained, as no where do the regulations on high work expressly adopt these standards. While safety does play a role in making a local determination, it is not the sole factor. Indeed, to the extent that plaintiffs are focused upon the concept of "unsure footing," the dictionary definition of "sure footed" ("not liable to stumble, fall, or err") might provide another relevant analogy. WEBSTER'S COLLEGIATE DICTIONARY 1182 (10th ed. 2002).

[3] If the OSHA regulations must be read into the high pay standards, then the question of both training and fall protection necessarily must also be read into the high pay standard. See n.6.

More importantly, if we are to discuss matters that are axiomatic by definition, then "unsure footing" would not be one of them. Unsure footing is a highly subjective determination. Unsure footing on ice is not the same as unsure footing on sand; unsure footing on snow is not the same as unsure footing in a fishing stream; and unsure footing when wearing shoes is not the same as unsure footing when wearing high heels. More to the point, unsure footing on a pipe or plank, on the leading edge or handing up materials, will vary.

That kind of list could become nonsensical, but these comparisons also require an examination ameliorating measures. For example, unsure footing on ice when wearing claw-like crampons, wielding an ice pick, and secured by a double rope system is not the same as unsure footing on ice when wearing a pair of slippers.

Indeed, this Court has recognized the multi-faceted nature of this inquiry when it stated that "inquiry into the unsureness of footing, the instability of a structure, the inadequacy of fall protection, or the adversity of weather conditions facing a particular employee is inherently . . . fact intensive." Barnes v. United States, 68 Fed. Cl. 492, 493 (2005) (emphasis added). The statement that all building and dismantling of staging involves work on unsure footing is over-reaching in scope and unsupported by the evidence currently before this Court. As the Court itself has reiterated, there is "doubt that 'work on staging' and 'high work' are necessarily coextensive." Jaynes v. United States, 69 Fed. Cl. 450, 458 n.11 (2006).

## III. A Five Foot Height Is Not The Obligatory And Predetermined Level At Which High Pay Is To Be Paid

### A. Any Determination Must Account For The Statutory Requirement Of An Unusually Severe Hazard

Contrary to plaintiffs' request, the local determination, or any determination for that matter, must account for both the statutory requirement of an "unusually severe hazard" found at 5 U.S.C. § 5343(c)(4), and the specific guidance set forth by OPM for that particular category of

Environmental Differential Pay. For example, if an employee was standing on a structure that is deemed to be "unstable" as described in the OPM regulation, but that structure was only an inch off the ground, notwithstanding that fact that the employee might have technically satisfied the definition in OPM regulation, the employee would not be entitled to high pay because the employee was never exposed to an "unusually severe hazard" as a result of working at height – the whole point of EDP for high work.

The "unusually severe hazard" requirement is an integral part of the relevant statute. 5 U.S.C. § 5343(c)(4). The specific OPM regulation on high pay, does not expressly reference the statutory "unusually severe hazard" requirement, although the general definitions section makes clear that this requirement is an essential part of EDP. 5 C.F.R. § 532.501. Further, the United States Court of Appeals for the Federal Circuit has found this requirement to be implicit in the OPM regulations, without which they would be "incomplete" in this regard. O'Neall v. United States, 797 F.2d 1576, 1581 (Fed. Cir. 1986). O'Neall is an asbestos EDP case, which – similar to high pay – is based on "actual exposure" to a hazard. The plaintiffs in O'Neall asked the court to award EDP for any exposure to airborne asbestos because the OPM EDP regulation described the conditions for payment merely as exposure that "may expose Employees to potential illness or injury." See id. at 1579. Similar to high pay, the OPM regulation on asbestos was, at that time, silent as to the statutory requirement of "an unusually severe hazard" that is set out in 5 U.S.C. § 5343(c)(4).[4] The Federal Circuit concluded that the fact that the OPM regulation did not expressly incorporate the "unusually severe hazard" language "compels the legal conclusion that the regulation is incomplete . . . [the language of the regulation must be] construed consistently with the language of § 5343(c)(4)." Id. at 1581. The Federal Circuit further noted that "[t]he regulation provides only general parameters of entitlement," id., and

[4] 5 U.S.C. § 5343(c)(4) was modified by Public Law 108-136, National Defense Authorization Act for Fiscal Year 2004, Section 1122, for EDP related to asbestos exposure.

proceeded to read the "unusually severe" requirement into the regulations. See also Bendure v. United States, 695 F.2d 1383, 1386-87 (Fed. Cir. 1982).

Thus, even if plaintiffs could succeed in demonstrating that they, as individuals, worked in conditions involving unsure footing, they would not necessarily be entitled to high pay. Accordingly, any determination must consider whether the work is of an "unusually severe" nature.

**B. Viable Alternatives To The 5-Foot Standard Exist**

Arguing that "no viable alternative to the five foot level has been identified," Pl. Mot. 2 at 9, and stating that the Court is "unfettered" by the Administrative Procedure Act ("APA") or the grievance decision, the plaintiffs declare that the Court should "engage[ ] in an independent analysis of the question whether shipwright work constitutes high work," and decide that, as a matter of law, id. at 20, "[s]hipwrights deserve environmental differential pay when building or dismantling staging above the first level."

Again, the hearing in Seattle, Washington conducted in November 2006 was not a hearing on the issue of high pay and the establishment of a five-foot height, but rather was a hearing focused solely upon the affirmative defense of accord and satisfaction. See Jaynes v. United States, Fed. Cl. No. 04-856C, Order at 1 (July 6, 2006). Despite this fact, the availability of viable alternatives to the 5-foot standard contained in the attempted settlement agreement were described at the hearing, by Lynnette Niemi (a former human resource specialist), Mark Winkler (the former shipwright process general foreman for Shop 64 and current production superintendent for the Shipyard), and Rick Whitcher (a former shipwright mechanic, former shipwright supervisor, and current shipwright general foreman). Def. App. 99, 105-106 ("20 foot area"), 110-11 ("25 feet"), 113 ("40, 50, 60 feet"); Def. Supp. App. 2 at 73-77 . For example,

Mr. Whitcher testified that "most of the other shipyards paid [h]igh [p]ay around 25 feet," and that

> I think that 25 feet's a pretty good height [for high pay]. Most of the guys, like I told you before, we're not like a lot of people and we don't think about working at heights the way other people work at heights. Most of the people that do, leave the trade. We're pretty comfortable working there. And I'll tell you that nobody's thinking about it at 5 feet. You know, nobody's concerned about the height.
>
> So it says a significant fall hazard. At 5 feet it's kind of like working, I mean next thing you know you'd be paying off a step ladder. You know, you let your kids go up a slide and that's more than 5 feet and you're only standing on the step, so.

Def. App. 110-11.

Plaintiffs base most of their argument on ridiculing Mr. Whitcher's candid response. Specifically, plaintiffs use the Handbook for Public Playground Safety, to argue the hazards of a playground slide. Pl. Mot. 2 at 10. A better source of guidance, however, would be the documents that govern a shipwright's work: the "Industrial Process Instruction Category III: Scaffolding; Installation, Use and Removal of" (hereinafter "Scaffolding Installation"), and the "Industrial Process Instruction Category IV Shop 64: Shipwrights Working Aloft" (hereinafter "Working Aloft"). See Def. Supp. App. 1-61, 63-69.

The Scaffolding Installation instruction reveals that there is a "design working load" that governs the materials used for building scaffolding based on the maximum intended weight, which is the total of all loads including the weight of the workers, materials, equipment, and platform. Def. Supp. App. 1 at 11. These definitions differ in entirety from the guidance provided for playground equipment and children. The definitions go on to clearly define no less than 6 different duty loads, from "light" duty (25 pounds per square foot) to "blasting" and "equipment" duty (125 pounds concentrated load per plank). Id. at 12. A "person load" is calculated at "250 pounds live load" which is somewhat heavier than a child on a slide. Id. at 13.

Non-wood planks are defined by their material, steel or aluminum and by their rating load (2-man). Id. at 17. The timber planks used in scaffolding are restricted to Douglas Fir[5] planks, and the timber used with scaffolding is hewn into 14x14 and 12x12 logs, a size rarely seen on playgrounds. Id. at 19. This same document requires a wardrobe not seen on a playground:

> 3.2 OCCUPATIONAL SAFETY PROTECTION
> 3.2.1 PPE. Personnel shall wear all Personal Protective Equipment (PPE) required for the task conducted at their physical location. This includes safety glasses, safety shoes, hard hat, protective clothing, and when required, fall restraint or arrest gear.

Id. at 20.

---

[5] When architects and engineers look for the best in structural timber, their first choice is often Douglas fir. It is universally recognized for its superior strength-to-weight ratio. It also provides excellent nail-holding and fastening capability that is documented with a superior performance record against wind, storms, and earthquakes.

> In strength properties, Douglas fir has the highest ratings of any western softwood for extreme fiber stress in bending; tension parallel-to-grain; horizontal sheer; compression perpendicular-to-grain and compression parallel-to-grain. It also has the highest modulus of elasticity (E) values of all North American softwood species. E is the ratio of the amount a piece of timber will deflect in proportion to an applied load. This reflection of stiffness is one of the most important considerations in the design of floors and other horizontal systems. Douglas fir is often selected for four- and five-storey timber frame buildings. Because of its physical working properties, as well as the moderate durability of its heartwood, and its excellent dimensional stability, all combine to provide the reasons why many builders worldwide prefer Douglas fir for framing timbers. It is truly the ideal, general-purpose softwood species for timber framing in residential, light commercial, multi-storey and industrial construction, and for structural formwork applications. Douglas fir products are also available preservative pressure treated for in-ground and ground-contact installations.

Softwood Export Council, Newsletter, November 18, 2007, http://www.softwood.org/Douglas%20Fir%20Web/eDougFir/EN/PGSA.htm.

The "method" to erect and disassemble scaffolding is outlined in twenty-three separate steps under the titles of "preliminary," "erection," "use," and "disassembly." Id. at 25-26. The "design" of the scaffolding requires that "scaffolds and their components shall be capable of supporting without failure at least four times the maximum intended load." Id. at 29. When using wood planks, shipwrights are required to use 2 planks (a width of 18 inches) "for use as a work platform for assembly or dismantling" scaffolding. Id. at 30. Aluminum planks "without end hooks shall be secured to bearers to prevent movement." Id. at 32. A Shop 64 supervisor shall inspect and ensure that all aluminum planks have been properly installed. Id. The entire scaffold shall be "shall be tied to and securely braced against the building (or structure) at intervals not to exceed 30 feet horizontally and 26 feet vertically," id. at 39, and guardrails "not less than 2x4 inches or the equivalent . . . with a mid-rail of 1x4 inch lumber or equivalent, shall be installed at all open sides on all scaffolds more than 5 feet above the ground or floor or at any distance above the water." Id. at 32.

Similarly, the Working Aloft instruction requires shipwrights to utilize all protection equipment. Id. at 63. The Working Aloft instruction also specifically requires the use of personal protective equipment on the leading edge process:

> 5.0 SECTION V: LEADING EDGE PROCESS
> 5.1 Fall protection is required when erecting/dismantling scaffolding unless fall protection anchorage points are not reasonably achievable. . . ."

Id. at 66. (emphasis in original).

The foregoing is all information is merely a portion of the information that may go into a high pay determination. The Shipyard's safety record, Def. Supp. App. 2 at 70-71, the 25-foot height set by other shipyards, Def. App. 110, and the shipwrights' training,[6] among other factors,

[6]The Shipyard allows shipwrights, and only shipwrights, to work on incomplete staging during erection and dismantling of the staging. Adopting an OSHA term, this work is called "leading (continued...)

also may be relevant to the Shipyard's EDP local determination. Benure, 695 F.2d at 1387. Nonetheless, it is clear that Mr. Whitcher's comments negatively comparing playground

---

[6](...continued)
edge" work. Thus, while this Court has expressed some doubt that such factor is a legitimate consideration, the Court expressly left this argument open for determination, and appears to have focused its doubt upon whether this factor is relevant to the question of "unsure footing," not whether it is relevant to the question of whether a shipwright faces an "unusually severe hazard." Jaynes v. United States, 68 Fed. Cl. 747, 763 (2005) ("Although the Court does not decide the issue of plaintiffs' entitlement here, defendant's argument that the shipwrights' training can negate an entitlement to high pay based upon unsure footing is unconvincing.") Shipwrights are trained and experienced in working on incomplete staging, and are exposed to less risk than untrained employees would be in the same circumstance. Def. App. 3-4.

This concept does not originate with the Navy, but rather, again, is a consideration applied by OSHA. Accordingly, to the extent that plaintiffs argue that OSHA is relevant, they necessarily open the door to the question of training. For example, in circumstances in which conventional fall protection cannot be utilized because it is "leading edge" work, OSHA requires the employer to establish a fall protection plan. In creating a sample for this fall protection plan, OSHA has suggested the following language: "Leading edge erection and initial connections are conducted by employees who are specifically trained to do this type of work and are trained to recognize the fall hazards." Sample Fall Protection Plan - Non-Mandatory Guidelines for Complying with 1926.502(k) - 1926 Subpart M Appendix E. Furthermore, while OSHA has a standard five-foot standard as the height for which fall protection is required, as has been discussed at length in this case, it has created several exception for particular industries, such as "steel work," again on the basis of particularized training for that unique occupation. Steel work includes working on the leading edge of building construction, not unlike the leading edge for staging construction. For "steel workers" the fall protection requirement begins at 15 feet. 29 C.F.R. § 1926.760(a)(1) ("Except as provided by paragraph (a)(3) of this section, each employee engaged in a steel erection activity who is on a walking/working surface with an unprotected side or edge more than 15 feet (4.6 m) above a lower level shall be protected from fall hazards by guardrail systems, safety net systems, personal fall arrest systems, positioning device systems or fall restraint systems."). This type of exception is prevalent throughout OSHA safety regulations, where the idea is that there needs to be a less rigid safety standard for a trained employee than for an untrained employee. For example, a skilled electrician is allowed to work closer to live electrical connections ("energized parts") than an employee with no training in electrical work. Compare 29 C.F.R. § 1910.333(c)(3)(i) with (ii). See also 29 C.F.R. § 1910.333(c)(2). Evidence will show that good shipwright training, experience, and effective safety processes for leading edge shipwright work all reduce the qualified employee's exposure to the risk of falling. As environmental differential pay is paid based on exposure to an unusually severe hazard, training, and safety qualifications are pertinent to the assessment of risk.

equipment to the work of shipwrights take on greater substance and validity when put in the context of the guiding instructions.

Simply put, a hearing on accord and satisfaction is not the appropriate place to establish a height at which high pay is to be paid; conjecture is not the appropriate basis upon which to establish a height level for such pay; and reference to the U.S. Consumer Product Safety Commissions Handbook for Public Playground Safety is not the appropriate source for such a determination.

## IV. The Court Must Consider Federal Labor Law When Considering The Issue Of Environmental Differential Pay

The Court is not "unfettered" by the requirements of Federal labor law. As discussed at length in the section requesting remand of the matter in our original motion and our reply on that plaintiffs' first motion, the procedures under the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations statute ("FSLMR Statute") preclude this Court from setting the "local determination" as to the payment of EDP for high work.

The case presents a legal collision between labor law and contract law. Mudge v. United States, 308 F.3d 1220 (Fed Cir. 2002), provided that Federal employees may file for monetary claims in this Court pursuant to the Back Pay Act.[7] This does not mean, however, that claims

[7] The Federal Circuit and Eleventh Circuit have held that § 7121(a)(1) no longer strips Federal courts of subject matter jurisdiction. These courts concluded that the word "administrative" merely made clear that the negotiated grievance procedure constituted the only avenue of redress except where § 7121 explicitly offers a choice of administrative remedies, as it does in subsections (d), (e), and (g). Associacion De Empleados Del Area Canalera v. Panama Canal Comm'n, 329 F.3d 1235 (11th Cir. 2003); Mudge v. United States, 308 F.3d 1220 (Fed. Cir. 2002). Hence, absent some other bar to subject matter jurisdiction, Federal employees may bring their grievable claim in Federal court, according to these Circuits.

In contrast, the Ninth Circuit has cited its general rule that Federal courts "have no power to review [F]ederal personnel decisions and procedures unless such review is expressly authorized by Congress in the CSRA or elsewhere." Applying this rule, the Ninth Circuit held that "5 U.S.C. § 7121(a)(1) preempts employment related claims which fall within collective bargaining agreements because the statute does not expressly provide for [F]ederal court

(continued...)

founded upon Federal labor law are cognizable in this Court. Indeed, plaintiffs inconsistently rely upon and reject the stricture of Federal labor law to support their claims. Plaintiffs urge this Court to adopt the five-foot standard from the attempted settlement agreement as having been reached as a "local determination," but insist the Court disregard that, if a local determination had been contemplated and determined, such took place under the auspices of an incomplete grievance process mandated by Federal labor law. Plaintiffs incorrectly rely upon Federal labor law to argue that litigation is a proper process through which to set a "local determination," but insist the Court ignore the Federal labor law requirement that would require the union's involvement in such a decision. The plaintiffs ask this Court to set the local determination without benefit of Federal labor law and disregard the implications of the rules, requirements, and processes governed by the Federal Labor Relations Authority.

In the Federal employment sector, the statutory authority for the grievance process provides for an appeal of a grievance decision through arbitration, then to the Federal Labor Relations Authority, and then, for cases involving unfair labor practices, to the appropriate Circuit Court of Appeals. This statutorily mandated judicial review process does not include the Court of Federal Claims. 5 U.S.C. §§ 7122(a), (b); 7123(a). As noted in our initial motion and our responses, plaintiffs may bring a claim for mandatory pay in this Court, but the Tucker Act requires plaintiffs to prove their Federal pay entitlement based upon Federal statute or regulation. See Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004); Daluz v. United States, 73 Fed. Cl. 129, 132-33 (2006). Because plaintiffs cannot or choose not to do that, they now ask this Court to simply apply a prospective high pay policy contained in a portion of the attempted grievance settlement that was created pursuant to Federal labor law and adopted as part of the

[7](...continued)
jurisdiction over such claims." Whitman v. Dep't of Transportation, 382 F.3d 938 (9th Cir. 2004). The Supreme Court has not yet resolved this split among the circuits.

negotiated grievance procedure. Plaintiffs make this request knowing that the Shop 64 superintendent that attempted to enter into this agreement was not deciding that such pay was required by law or regulation; would not have been qualified to make such a decision under any circumstances; and was not authorized to set a permanent pay policy for the entirety of the Shipyard. The genesis of their complaint is that they object to the fact that Ms. Tallman did not apply this pay policy to back pay, but only to the future pay of the grievants.

In essence, plaintiffs want the Court to find the attempted settlement, a matter developed and governed by the FSLMR Statute, should have been applied to the back pay as well as the prospective pay. This is the very claim that was dismissed in Federal district court. The district court found that it lacked jurisdiction to hear any claim that arose within the grievance process because under Federal labor law the statutory basis for the grievance process already had a judicial appeal process and that process did not include district court. Def. App. 79-81. To the extent the plaintiffs are attempting the same strategy here, the statutory basis for the grievance process does allow for judicial review, but that review does not include the Court of Federal Claims. Pursuant to Mudge v. United States, 308 F.3d 1220 (Fed. Cir. 2002), plaintiffs can bring their Tucker Act claim independent of the grievance process. What they cannot do, as the district court correctly found, is to introduce the attempted settlement of the grievance as a basis for their claim, which must, rather, be based solely on Federal law or regulation. Id.

This is an "either/or" situation for the plaintiffs. Either the attempted settlement agreement continues to be guided by the auspices of the CSRA and governed by the dictates of the FSLMR Statute and shall be remanded, or the 75 plaintiffs must each appear in this Court and prove their entitlement pursuant to the Back Pay Act using and applying the accordant or germane policies and practices in place during the relevant time period.

## V. The Shipyard's Attempted Settlement Is In Accordance With Law, Rule And Regulation[8]

Stated concisely, the plaintiffs argue that the attempted settlement agreement's condition that shipwrights would be paid high pay for building and dismantling staging above the first level unless flooring and safety rails are installed or fall protection devices can be properly used does not comport with the language of the collective bargaining agreement ("CBA") or the plain language of OPM regulations. The plaintiffs assert that "the plain language of OPM's regulations [does not] permit the Shipyard to condition the payment of high pay on the absence of fall protection." Pl. Mot. 2 at 21. The plaintiffs conclude that the OPM regulations require high pay for work on unsure footing without regard to a minimum height and without regard to whether ameliorating measures can be taken.

Plaintiffs first make an argument based upon grammar, stating that the applicable regulations and CBA are stated in the alternative (or "disjunctive"), but that the attempted settlement agreement is "conjunctive." Pl. Mot. 2 at 20. Only insofar as the plaintiffs take this foray into the study of linguistics, are they correct. Plaintiffs, however, fail to extend their morphological expedition to an appropriate conclusion. The attempted settlement agreement language, when grammatically diagramed, reveals the attempted agreement can be stated in the following alternative ways:

> a. High pay will be paid for…shipwrights building and dismantling staging beginning from the first level above the ground [when] flooring and safety rails are [not] installed **or** [when] fall protection can[not] be used.
>
> b. High pay will [not] be paid for…shipwrights building and dismantling staging beginning from the first level above the ground [when] flooring and safety rails are installed **or** fall protection can be used.

---

[8] Defendants adopt and incorporate by reference the entirety of the argument made on pages 11-16 under part II, "Environmental Differential Pay Is A Local Determination" in its original motion for partial summary judgment.

See MARYE HEFTY, SALLIE ORTIZ, & SARA NELSON, SENTENCE DIAGRAMMING: A STEP-BY-STEP GUIDE TO LEARNING GRAMMAR THROUGH DIAGRAMING. Either formulation of the language in the attempted settlement agreement reaches the same result: if the shipwrights are building or dismantling staging above the first level and flooring and safety rails are installed, high pay is not to be paid.

As noted in our original motion, pursuant to OPM's regulations, and included in the CBA, high pay is only "authorized" when:

> a. Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor or roof, of from the bottom of a tank or pit;
>
> b. Working at a lesser height:
>
> > (1) if the footing is unsure or the structure is unstable;
> >
> > (2) if safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or
> >
> > (3) if adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.

5 C.F.R. Part 532 Appendix A to Subpart E (emphasis added). Limiting ourselves to the issues in this case and stating the language found in the Code of Federal Regulations another way: in the absence of adverse/hazardous weather conditions, high pay is authorized when working above the ground on unsure footing when protective facilities are inadequate. This is what the language of the attempted settlement agreement provides.

The argument as to why our interpretation of the quoted language is correct leads back into a discussion of the nature of an "incomplete" statute as discussed at length in our response to plaintiff's fourth motion, and briefly reiterated here.

The statute directs OPM to create differentials for work that exposes an employee to "unusually severe working conditions or unusually severe hazards." As authorized by the Civil

Service Commission, OPM set those differentials and those became the current CFR Appendix A categories of EDP.

Plaintiffs argue that the Court, to the exclusion of all else, must focus solely on the CFR Appendix A definition for high work that says that for work below 100 feet it is paid if the employee is exposed to "unsure footing," which would support their implicit argument that because shipwrights worked at heights below 100 feet, and the staging they worked on allegedly constituted unsure footing, then they are owed back pay for high work. In defense of their position, plaintiffs argue that because the first part of the high work definition describing "unsure footing" is separate from the later language saying that safety practices can be "adequate," the Government is prohibited from relying, as is done in the grievance decision and as is done in the current practice at the Shipyard today, on the presence of adequate safety measures when determining payment of high pay.

As noted previously, the Federal Circuit has been faced with this situation before.[9] The Federal Circuit found the OPM asbestos regulation to be "incomplete" and provided that when a court evaluates any hazard-based EDP claim, it must, in effect, "complete" the OPM standard by assuming that the regulation includes that the risk must rise to the level of an "unusually severe hazard." Otherwise it does not satisfy the statutory basis for allowing the EDP in the first place.

The question then becomes the manner in which the high work standard is "completed" for the purpose of high pay. Completing the standard results in it only being payable in situations of "unsure footing or unstable platform that resulted in exposing the employee to an usually severe hazard. An evaluation requires a two-part analysis: (1) does it meet the EDP pay statute language, and (2) does it meet the OPM EDP regulation language? Both must be satisfied before EDP for high pay is owed under the complete definition.

[9]See the discussion regarding asbestos EDP claims in Section III, Subsection A of this response. The asbestos Appendix A regulation, like the high work regulation, has no language that requires that the exposure present "an unusually severe hazard."

A good example in which the "incomplete" argument makes a difference is the 5-foot rule. For the work building staging, a shipwright is standing first on bare pipe, and then on eighteen inches of plank. The plaintiffs argue that standing on bare pipe meets the definition of standing where there is "unsure footing." If an evaluation of whether this work meets the definition of high pay is made without regard to further considerations, plaintiffs' case would be satisfied because it is their position that this fulfills the CFR Appendix A standard: (1) they are working below 100 feet, and (2) they meet the "unsure footing" test. The CFR Appendix A standard is, however, by law, "incomplete" and – in order to be complete – one more statutory part must be implied into the CFR Appendix A standard, namely (3) that the combination of (1) and (2) must result in exposing the employee to a risk of an "unusually severe hazard." For this reason, setting aside the collective bargaining process, the 5 -foot standard is simply not high enough. A potential fall from 5 feet is not an "unusually severe hazard." Working on an unstable platform, but only a single inch off the ground satisfies the CFR Appendix A language, but it would be unreasonable to argue that high pay should be paid for such. When the Government makes a "local determination" for high work, it looks not only to see what work below 100 feet involves "unsure footing" and "unstable platforms" but complete the statute by examining whether after involving all available safety equipment and practices the employee is still exposed to an unusually severe hazard.

The question next to be addressed is whether, as plaintiffs contend, the language of OPM's regulations require payment of high pay at heights less then 100 feet without regard to any practical elimination through ameliorating measures. If that were the case, then the regulations would so state. If the intent of the language was simply to standardize all requirements for high pay, then 5 C.F.R. § 532.511(a)(2) would not require each "installation or activity" to "evaluate its" own unique "situation[] against guidelines issued by the Office of Personnel Management to determine whether the local situation is covered by one or more of the

defined categories" as there would be no need for such an evaluation; nor would 5 C.F.R. Part 532, Appendix A to Subpart E list alternative categories of potentially hazardous working conditions because it would not matter. If there were to be an absolute mandate issued by this regulation, there would be no reference to ameliorating measures such as found in that same section. And if there was no intent that the agency was to make an independent evaluation of what qualifies for high pay, then the subchapter of the OPM Manual S8-7, which explains how a Federal agency is to determine the proper EDP entitlement, would not exist.

As to the latter, OPM Manual S8-7, the plaintiffs argue that the regulation requiring a high pay differential is not one which can be mitigated by fall protection. They argue that section S8-7(d)(3) states that "[t]he category that defines when high pay should be paid does not state that the condition can be eliminated through protective measures…" However, Appendix J to S8-7 and Appendix A to Appendix A to Subpart E of 5 C.F.R. Part 532 both contain the language found in 5 C.F.R. Part 532 Appendix A to Subpart E: both iterations include the caveat that indicates if safe scaffolding, enclosed ladders or other similar protective facilities are adequate to practically eliminate a hazardous condition, high pay will not be paid. Hence, the OPM Manual S8-7 does indicate high pay is a category "subject to practical elimination" because it does "contain language to that effect in the definition."

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny the plaintiff's third motion for summary judgment regarding the effect of the statute of limitations, and grant the Government's motion, as it applies to the statute of limitations and the effect of the CSRA amendments.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.Mager@usdoj.gov

Attorneys for Defendant

OF COUNSEL:
TELIN W. OZIER
Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street., SE
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Naval Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

December 3, 2007

**CERTIFICATE OF FILING**

This is to certify that on this 3rd day of December, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION NO. 2 FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE THE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice