NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# TABLE OF CONTENTS

**Page**

I. Introduction: The Height of the High Pay Standard is Immaterial ..... 1

II. *Anderson*: Its Facts, Policy, and Rationale ..... 2

III. The Shipyard Was Required to Record the Time Employees Spent Performing High Work ..... 5

A. FLSA's Record-Keeping Requirement Extends to More than Just Wages and Hours ..... 5

B. OPM's Record-Keeping Regulations Do Not Exclude Wage Differentials from Their Scope ..... 6

C. Regulations Implementing FLSA Require Tracking of Differential Work and Pay ..... 8

IV. *Anderson* Is Not Limited to Statutory Record-Keeping Violations ..... 10

V. The Shipyard's Remaining Arguments ..... 12

A. Plaintiffs Do Not Seek to Shift the Burden of Proof ..... 12

B. High Work Is Recorded—and Paid—By the Hour ..... 13

C. Plaintiffs Do Not Claim that the Shipyard Was Required to Make Records of Environmental Differentials It Did Not Pay ..... 13

D. High Work Is Amenable to Record-Keeping ..... 14

E. Plaintiffs Didn't Waive Their Right to Accurate Record-Keeping ..... 15

VI. The Parties Need Guidance Regarding Trial Management ..... 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ........................................ 2, 3, 4, 5, 6, 10, 11, 12, 14, 15
*Arias v. United States Serv. Indus.*, 80 F.3d 509 (D.C. App. 1996) ...................... 12, 17
*Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 68 S. Ct. 1186 (1948) ..................... 9
*Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) ........... 15
*Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002) ............................ 12, 17
*Johnson v. Zerbst*, 304 U.S. 458 (1938) ........................................................ 16
*Mudge v. United States*, 308 F.3D 1220 (Fed. Cir. 2002) ........................................ 16
*Savering v. United States*, 18 Cl. Ct. 704 (1989) .................................................. 11

**Statutes**

14 U.S.C. § 432(g)(1) ................................................................ 6
2 U.S.C. § 1302 ................................................................ 6
22 U.S.C. § 3671(a)(2) ................................................................ 6
22 U.S.C. § 4102 ................................................................ 6
29 U.S.C. § 203 ................................................................ 5
29 U.S.C. § 204(a) ................................................................ 9
29 U.S.C. § 204(f) ................................................................ 7
29 U.S.C. § 207(e) ................................................................ 9
29 U.S.C. § 211(c) ................................................................ 6
44 U.S.C. § 3101 ................................................................ 6
5 U.S.C. § 7116(a)(2) ................................................................ 6

**Rules**

29 C.F.R § 516.2(a) ................................................................ 9
29 C.F.R. § 778.207(b) ................................................................ 9
46 FLRA No. 128 ................................................................ 16
5 C.F.R. § 532.513(c) ................................................................ 9
5 C.F.R. § 550.805(a)(2) ................................................................ 8
5 C.F.R. § 551.401 ................................................................ 8
5 C.F.R. § 551.401(a)(1) ................................................................ 7
5 C.F.R. § 551.401(a)(2) ................................................................ 7
5 C.F.R. § 551.401(a)(3) ................................................................ 7
5 C.F.R. § 551.401(a)-(c) ................................................................ 7
5 C.F.R. § 551.401(b) ................................................................ 7
5 C.F.R. § 551.401(d) ................................................................ 7, 8
5 C.F.R. § 551.401(f) ................................................................ 8
5 C.F.R. § 551.401(g) ................................................................ 8
5 C.F.R. § 551.402(b) ................................................................ 6, 7, 8
RCFC 1 ................................................................ 1

## I. Introduction: The Height of the High Pay Standard is Immaterial

Not until page 10 of its 18-page opposition does the Shipyard begin addressing the primary issue presented in Plaintiffs' Motion No. 4: the quantum of proof Plaintiffs must adduce to carry their burden.

The first ten pages are instead devoted to argument regarding the effect of the January 2000 grievance decision. That issue, while important, is irrelevant to this motion, and is addressed in connection with Motion No. 1.

Perhaps the Shipyard intends to argue that it is premature to decide Motion No. 4 until the effect of its grievance decision is resolved. If so, the argument fails because (as Motion No. 2 demonstrates) no witness has defended the Shipyard's pre-January, 2000 refusal to pay an environmental differential for work on staging below 100 feet.[1] Even Rodney Whitcher, that most strident critique of the grievance decision, admitted that work at or above 25 feet constituted high work.[2] Other witnesses testified that work on incomplete staging amounts to work on unsure footing.[3] Therefore, an obligation to pay an environmental differential was triggered somewhere between the first level of staging and 25 feet.

Consequently, no matter how this Court ultimately applies the regulatory definition of "high work" to shipwright work on incomplete staging, it will be constrained to conclude that some work below 100 feet meets that definition. And

[1] *See, e.g.*, Decl. of Mark Winkler, ¶¶ 3, 12 (App. at 8-10); 30(b)(6) Dep. 33:6-8 (Niemi) (App. at 3).

[2] Trial transcript at 570:1-13.

[3] Winkler Dep. at 59-60 (App. at 53-54); Tallman Dep. 130:10-23 (App. at 45-47; 66); Tr. at 181:5-19 (Aiken) (App. at 64). This understanding is also embodied in the Shipyard's Grievance Decision. JX 27 at 2 (App. at 16).

since the Shipyard didn't track "high work" on incomplete staging below 100 feet, the Court will find itself without contemporaneous payroll records to help it arrive at an accurate damage award.

This is exactly what happened in *Anderson*.[4] *Anderson* counsels how to address the situation where, as here, an employer has failed to pay statutorily-mandated wages and lacks payroll records that show how much the employee should have earned. The Shipyard, of course, argues that *Anderson* does not apply here. Because its arguments misread *Anderson,* some further discussion of the decision is in order.

## II. *Anderson*: Its Facts, Policy, and Rationale

*Anderson* arose from a dispute about, among other things, an employer's failure to pay wages for the 14 minutes after an employee punched in and the 14 minutes before an employee punched out. Some, but not all, of this time was spent walking from the clock to the employee's work station or getting dressed, sharpening tools, or performing other tasks needed before productive work could begin. The Supreme Court held that all of these activities were compensable work.[5] Trouble arose because the employer kept no records of the precise amount of time each employee performed this compensable work.

The Sixth Circuit dismissed the employees' claims, ruling that it was "insufficient" for them "merely to offer an estimated average of overtime worked" in

---

[4] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).
[5] *Id.* at 692-93.

order to prove their damages.[6] The Supreme Court reversed, holding that the Sixth Circuit "imposed upon the employees an improper standard of proof."[7] In so doing, *Anderson* lowered the quantum of proof employees must produce to prove their wage claims.

The *Anderson* Court did not rely on any detailed or nuanced statutory analysis in reaching this decision. Rather, in just three sweeping paragraphs, the Court invoked "fundamental principles of justice" and the "remedial nature" and "great public policy" embodied in Congress's statutory protection of workers' wages. The Court thus rejected the Sixth Circuit's standard of proof which would make the burden of showing damages with specificity "an impossible hurdle for the employee."[8]

"Due regard must be given," the Court counseled, to two "facts." One "fact" was that the employer had a duty to "keep proper records of wages, hours, and other conditions and practices of employment."[9] The other fact was that it was the employer "who was in position to know and to produce the most probative facts concerning the nature and amount of work performed."[10]

Meanwhile, the Court continued, "[e]mployees seldom keep such records themselves."[11] And "even if they do, the records may be and frequently are

---

[6] *Id.* at 686.
[7] *Id.*
[8] *Id.* at 687.
[9] *Id.*
[10] *Id.*
[11] *Id.*

untrustworthy."[12] "It is in this setting," the Court concluded, "that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof."[13]

Underlying *Anderson* is a concern for the integrity of the judicial process. *Anderson* eschews a rule that would reward employers who deny the courts (and employees) records adequate to accurately resolve a wage claim. If an employer could eliminate its liability to pay statutorily-mandated wages merely by failing to keep adequate records of what it owed, then the statute would become dead letter. Courts that approved this result would become accomplices, however unwitting, to the violation. Once a failure to pay statutorily-mandated wages is proven and the resulting "damage is ... certain," the Court held, the "uncertainty lies only in the amount of damages."[14] *Anderson* recognizes that "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."[15]

*Anderson* applies with full force here. The Shipyard decided to only pay an environmental differential to shipwrights working above 100 feet on incomplete staging, even though every witness queried testified that high work begins at some point below that. As in *Anderson,* Plaintiffs have no contemporaneous payroll records to show just how much time they spent below 100 feet doing high work, whether that work is defined to include work above the first level or above 25 feet.

---

[12] *Id.*
[13] *Id.*
[14] *Id.* at 688.
[15] *Id.* (internal citation omitted).

If the Shipyard had accurately identified the circumstances that constitute high work, it could have kept appropriate records, thus eliminating the uncertainty caused by their absence. Although the Shipyard never says as much, its "solution" to the uncertainty it created is, apparently, that of the Sixth Circuit in *Anderson*: dismissal. *Anderson* and its progeny do not countenance this result.

## III. The Shipyard Was Required to Record the Time Employees Spent Performing High Work

The Shipyard does not deny that it is an "employer" within the meaning of 29 U.S.C. § 203. Nor does it contend that FLSA's record-keeping provisions do not apply to it. Instead, the Shipyard argues that FLSA and its implementing regulations require little more than an employer accurately record aggregate "hours of work," which would not include high work, and that *Anderson* only applies when an employer fails to do so. Because FLSA and its implementing regulations provide otherwise, the Shipyard's argument fails.

### A. FLSA's Record-Keeping Requirement Extends to More than Just Wages and Hours

Neither *Anderson*'s nor FLSA's language supports the Shipyard's attempt to limit its record-keeping obligation to information regarding aggregate wages and hours. *Anderson* expressly applies to any employer who fails to "keep proper records of wages, hours and **other conditions and practices of employment**..."[16] By its own terms, *Anderson* applies to "conditions and practices of employment," not just wages and hours.

[16] *Id.* at 687 (emphasis added).

*Anderson* did not spin that language out of whole cloth; it comes from FLSA itself. FLSA requires employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and **other conditions and practices of employment** maintained by him...."[17] Thus, the FLSA's language rejects the Shipyard's claim that FLSA requires only records of wages paid and aggregate hours worked.[18]

### B. OPM's Record-Keeping Regulations Do Not Exclude Wage Differentials from Their Scope

Regulations implementing FLSA confirm that the Shipyard's record-keeping obligations extended beyond the mere recording of wages and hours, to time spent on work that required differential pay. 5 C.F.R. § 551.402(b), a regulation

[17] 29 U.S.C. § 211(c) (emphasis added). A Westlaw search reveals that 65 federal statutes use the term "conditions of employment." Most do not define the term, suggesting that Congress does not use the term in anything other than its commonly-understood meaning, *i.e.*, the circumstances under which work is conducted. The context in which a few statutes use the term indicates that it extends to all sorts of topics other than hours or wages, some of which have an impact on wages paid and some of which do not. *See, e.g.,* 2 U.S.C. § 1302 discussing terms and conditions of employment "including hiring, promotion, demotion, termination, salary, wages, overtime compensation, benefits, work assignments or reassignments, grievance and disciplinary procedures, protection from discrimination in personnel actions, occupational health and safety, and family and medical and other leave of employees"); 5 U.S.C. § 7116(a)(2) (referring to "hiring, tenure, promotion, or other conditions of employment"); 14 U.S.C. § 432(g)(1) (referring to "conditions of employment [that] result in confinement because of isolation or in long periods of continuous duty"). The few statutes that define the term give it a meaning broad enough to include hours spent doing work requiring a differential. *See* 22 U.S.C. § 3671(a)(2); 22 U.S.C. § 4102 (defining "terms and conditions of employment" to mean "personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions").

[18] At least one other statute imposes an overlapping record-keeping obligation. 44 U.S.C. § 3101 requires the Shipyard, as a federal agency, to "make and preserve records containing adequate and proper documentation" of the agency's transactions that are "designed to furnish the information necessary to protect the legal and financial rights ...of persons directly affected by the agency's activities." As persons affected by the Shipyard's activities, its employees fall within the class of persons this statute protects.

propounded by the Office of Personnel Management,[19] requires the Shipyard to "keep complete and accurate records of all hours worked by its employees."[20]

In footnote 15, the Shipyard mumbles that this regulation does not require it to keep accurate records concerning the number of hours an employee spends doing work requiring environmental differential pay. The Shipyard relies on one of the "basic principles" spelled out in section 551.401, a section that doesn't address the "scope" of the regulations, to assert that the regulations exempt high work from the obligation to keep accurate records of hours worked.

Specifically, the Shipyard points to subsection 551.401(d). This subsection immediately follows three others, which identify time periods that constitute "hours of work." These three subsections—subsections 551.401(a) through (c)— include the following within "hours of work": (i) time while on duty;[21] (ii) time when an employee is "suffered or permitted" to work;[22] (iii) waiting or idle time under agency control and for agency benefit;[23] and (iv) hours in a paid nonwork status (such as paid leave, holiday time, and the like).[24]

Having broadly encapsulated all of these activities within the definition of "hours of work," subsection 551.401(d) simply says that hours included in this definition "shall not be used to determine hours of work for pay administration." That is all well and good; what counts as hours for purposes of determining whether

---

[19] 29 U.S.C. § 204(f) authorizes the federal Office of Personnel Management to administer FLSA "with respect to any individual employed by the United States."
[20] 5 C.F.R. § 551.402(b).
[21] 5 C.F.R. § 551.401(a)(1).
[22] 5 C.F.R. § 551.401(a)(2).
[23] 5 C.F.R. § 551.401(a)(3).
[24] 5 C.F.R. § 551.401(b).

an agency has properly paid minimum wage and overtime might be different from what counts for other purposes. But nothing in subsection 551.401(d) exempts work requiring environmental differential pay from the scope of subsection 551.402(b)'s record-keeping requirement (which could explain why the Shipyard tucks this whole discussion in a footnote).

Two other provisions of section 551.401 also undercut the Shipyard's argument that subsection (d) exempts high work from its obligation to keep accurate records of hours worked. Subsections (f) and (g) provide that "[f]or the purpose of determining hours of work in excess of 8 hours in a day under this part," and "[f]or the purpose of determining hours of work in excess of 40 hours in a week or in excess of another applicable overtime work standard," each agency "shall credit hours of work under ... part 532 of this chapter...and part 550 of this chapter."[25] Part 532 pertains to environmental differentials. Meanwhile Part 550, Subpart H, covers back pay, the computation of which requires the inclusion of environmental differentials.[26]

### C. Regulations Implementing FLSA Require Tracking of Differential Work and Pay

The Shipyard contends that the regulations implementing FLSA only require employers to track aggregate hours. However, to properly administer these regulations, employers must also track differential pay and work.

---

[25] 5 C.F.R. § 551.401(f).
[26] 5 C.F.R. § 550.805(a)(2).

Regulations promulgated by the U.S. Department of Labor (the agency charged with administering FLSA for all employers[27]) show that environmental differentials are included in the calculation of overtime and other premium pay. 29 C.F.R § 516.2(a) specifies that employers must "maintain and preserve" records concerning, among other things, the "regular hourly rate of pay for any workweek in which overtime compensation is due" as well as hours worked each workday, total hours worked each workweek, total straight-time earnings or wages exclusive of overtime, and total premium pay for overtime hours. The "regular rate" is defined in pertinent part as "all remuneration for employment paid to, or on behalf of, the employee."[28] 29 C.F.R. § 778.207(b) explains that FLSA "requires the inclusion in the regular rate of such extra premiums as nightshift differentials (whether they take the form of a percent of the base rate or an addition of so many cents per hour) and premiums paid for hazardous, arduous or dirty work."[29]

OPM regulations, meanwhile, provide that "[e]nvironmental differential pay is part of basic pay and shall be used to compute premium pay (pay for overtime, holiday, or Sunday work)...."[30] In other words, environmental differential pay is used to compute the FLSA-mandated overtime pay rate. Hence, to accurately record the wages paid for overtime work, the Shipyard must accurately record the number

---

[27] 29 U.S.C. § 204(a).
[28] 29 U.S.C. § 207(e).
[29] As the Supreme Court has explained, "Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of work done . . . rather than an overtime premium. Such payments enter into the determination of the regular rate of pay." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 469, 68 S. Ct. 1186 (1948).
[30] 5 C.F.R. § 532.513(c).

of hours spent doing work that requires an environmental differential. An employer cannot accurately record what it owes and has paid its employees if it fails to record work for which differential pay was owed.

Accordingly, the Shipyard was under **both** a statutory **and** a regulatory obligation to maintain accurate records of time its employees spent performing high work. The Shipyard's failure to do so triggers *Anderson.*

## IV. *Anderson* Is Not Limited to Statutory Record-Keeping Violations

The preceding section assumes that it is necessary to prove the violation of a statutory or regulatory record-keeping obligation to trigger *Anderson*'s burden-shifting. In fact, this is not the case.

As mentioned above, the "setting" that led the *Anderson* court to impose a lower standard of proof included far more than the existence or violation of a record-keeping statute. It also included: (1) the presence of statutory protection for employees' wages; (2) the probability that an unduly demanding standard of proof would effectively defeat that statutory right; (3) the fact that employers are in the best position to keep appropriate records; and (4) employees seldom keep detailed records regarding their employment.

Nor did the Court articulate its rule as a response to or sanction for the employer's record-keeping violation. Rather, the Court's concern was to avoid announcing a rule that "would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair

Labor Standards Act."[31] It was the violation of a statutory right to **wages,** not the violation of a statutory record-keeping obligation, that triggered the Court's concern. And it was the concern for avoiding "a perversion of fundamental principles of justice"[32] that drove the Court to its decision.

Because *Anderson*'s language and policy rationale are so sweeping, cases applying the decision have not always troubled themselves with whether the lack of records violated a statute. In *Savering,* for example, a civilian professor at the Naval Academy sued for unpaid overtime under the Federal Employees Pay Act—not FLSA.[33] The court did not once refer to the existence—or violation—of a statute that required the government to keep a record of the plaintiff's time or hours. Nonetheless, the court applied *Anderson* because "employers are or should be in a better position than employees to prove such facts," i.e., facts regarding damages,[34] and "[t]here is no reason to believe that government employees are better situated than those in the private sector to keep track of their work hours."[35]

Likewise, courts have declined to narrowly construe *Anderson* or limit it to its facts. Indeed, the results of Plaintiffs' legal research suggests that this Court will search in vain for an opinion that has declined to adopt *Anderson's* "burden-shifting" in a wage-and-hour case. That no other court has accepted the Shipyard's position counsels against its adoption here. Since a statutory violation is not a

---

[31] *Anderson,* 328 U.S. at 687.
[32] *Id.* at 688 (internal citation omitted).
[33] *Savering v. United States,* 18 Cl. Ct. 704, 709 (1989).
[34] *Savering,* 18 Cl. Ct. at 709.
[35] *Id.*

necessary prerequisite to *Anderson* burden-shifting, the Shipyard's argument that it committed no such violation is ultimately irrelevant.

## V. The Shipyard's Remaining Arguments

The discussion above disposes of the Shipyard's principal arguments. But the Shipyard also offers a variety of other arguments. None requires much discussion.

### A. Plaintiffs Do Not Seek to Shift the Burden of Proof

The Shipyard accuses Plaintiffs of seeking to shift the burden of proof. Although *Anderson* and its progeny speak of "burden-shifting," that is not, strictly speaking, what these cases do. Rather, *Anderson* reduces the quantum of proof an employee must produce to satisfy his or her burden of proof. To the extent the employer is dissatisfied with Plaintiffs' damages evidence, *Anderson* shifts the burden to the employer to come forward with something better.

Plaintiffs understand that they have the burden of proving that they performed compensable high work and their resulting damages. The question this Motion raises is: what must Plaintiffs do to meet that burden?[36] Implicit in the Shipyard's opposition is that this case should be dismissed if Plaintiffs simply present the "estimated average of overtime worked." But this standard, which the Sixth Circuit embraced in *Anderson,* was roundly condemned by our Supreme Court as a "perversion of fundamental principles of justice."

[36] As discussed in Plaintiffs' Motion No. 4, if *Anderson* applies, Plaintiffs may do so through a combination of testimony and Shipyard records, a method often employed in wage-and-hour cases. *See, e.g., Arias v. United States Serv. Indus.*, 80 F.3d 509 (D.C. App. 1996); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002).

### B. High Work Is Recorded—and Paid—By the Hour

The Shipyard next contends that high pay is accrued under an "actual exposure" rather than hourly basis. Hence, it concludes, there was no failure to record "hours."[37] This argument ignores the statutes and regulations discussed above. It also ignores the fact, conceded in the Shipyard's own opposition, that high pay is paid based on "the specific time periods" of exposure to high work.[38] Reflecting that reality, the Shipyard's records (many of which were offered into evidence at trial) show the hours for which high pay was paid, not the number of exposures.

Further, when the Shipyard calculated the amount due to each shipwright during the time the grievance decision was pending, it estimated the amount of hours each shipwright conducted high work, which it compared to the number of hours it had recorded for each shipwright who received high pay for working at over 100 feet. Clearly, the Shipyard felt that environmental differential pay was amenable both to tracking in hours and estimation when it performed this exercise.

### C. Plaintiffs Do Not Claim that the Shipyard Was Required to Make Records of Environmental Differentials It Did Not Pay

The Shipyard mischaracterizes Plaintiffs' argument as demanding that the Shipyard "keep[] records of unpaid EDP" and then dismisses this straw man as mak[ing] no sense whatsoever."[39] Plaintiffs, of course, do not contend that the

---

[37] Opp. at 12.
[38] Opp. at 16.
[39] Opp. at 12 n.14.

Shipyard had an obligation to keep records of work not performed or wages not earned. That would, indeed, be a silly position to take.

Rather, Plaintiffs simply contend that if the Shipyard failed to keep records of work that later turned out to require high pay, the Shipyard must bear the consequences of that failure. In *Anderson,* the employer apparently believed that the employees' activities after punching in and before punching out were not compensable work and, as a result, it failed to record it. *Anderson* imposed the consequences of this failure on the employer, concluding that "even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances."[40]

### D. High Work Is Amenable to Record-Keeping

Next, the Shipyard complains that keeping accurate records of high work would be "well nigh impossible," either because it is difficult to track high work[41] or because the determination whether a task meets the "loosely defined"[42] regulatory description of high work is "highly subjective and variable."[43] (The Shipyard then dismisses the regulatory definition of high work as mere "guidance," a claim whose falsity will be demonstrated in Plaintiffs' reply regarding Motion No. 2.)

---

[40] *Anderson,* 328 U.S. at 688.
[41] Opp. at 12 n.14.
[42] Opp. at 13.
[43] Opp. at 14.

None of this, of course, matters. That it might be difficult to determine whether certain work is compensable or whether an employee did such work, is of no moment. Employers are routinely required to pay for (and record) work not actually witnessed, as when employees are required to self-report regarding the number of hours spent in the field.[44] Thus, the Shipyard cannot claim that because it did not actually witness the work, it did not have to pay for or record it.

### E. Plaintiffs Didn't Waive Their Right to Accurate Record-Keeping

Finally, the Shipyard blames Plaintiffs for the recordless state in which they now find themselves because they did not properly report to the Shipyard when they were working in a high pay situation. The Shipyard cites absolutely no authority for the proposition that employees can somehow waive their right to proper record-keeping by their employer. *Anderson* certainly doesn't suggest it.

Instead, the Shipyard cites a case for the proposition that someone who "prevents" someone else from doing something cannot complaint that the something was not done. The response to this of course is that Plaintiffs did not "prevent" the Shipyard from doing anything – the Shipyard made an erroneous determination requiring the payment of high pay and now must suffer the consequences.

The Shipyard also cites case law to the effect that a party who "violates" a collective bargaining agreement waived certain rights. But an employee's failure to assert a claim within 15 days does not constitute a "violation" of the collective bargaining agreement. The failure to assert a right is not a "violation." Moreover

---

[44] *See, e.g., Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973).

*Bremerton Metal Trades Council v. Puget Sound Naval Shipyard*[45] holds that failing to abide by the CBA's 15-day notice requirement does not constitute a bar to recovery, let alone a "violation" of the CBA. And *Mudge v. United States*[46] holds that a federal employee has the statutory right to sue to vindicate individual rights independently of administrative procedures set forth in a CBA. And this Court has already ruled that the CBA did not forbid Plaintiffs from asserting a lawsuit for high pay.

Nor does the Shipyard's attempt to push its own obligations onto its employees comport with reality. Perhaps the Shipyard's waiver argument would make more sense if the question were a factual one, as where a supervisor told an employee he thought the employee had only worked two hours on incomplete staging whereas the employee knew he had worked seven hours. Here, though, the Shipyard systematically refused to pay high pay based upon its legal argument that it did not have to. It is unreasonable to impose on shipwrights an obligation to perform legal research to find out whether the Shipyard's position was legally correct, and to bring this legal argument to the Shipyard in less than 15 days.

Ultimately, a waiver "is ordinarily an intentional relinquishment or abandonment of a known right or privilege."[47] Here, the Shipyard identifies no conduct by any Plaintiff that would meet that test.

---

[45] 46 FLRA No. 128 (Feb. 5, 1993).
[46] 308 F.3d 1220 (Fed. Cir. 2002).
[47] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

## VI. The Parties Need Guidance Regarding Trial Management

Plaintiffs' Motion No. 4 presents an approach to discovery and trial management in light of the reduced burden on the Plaintiffs to prove with specificity each and every uncompensated hour of high work. The Shipyard's opposition does not address these matters.

As mentioned above, it seems that the Shipyard contends that Plaintiffs must satisfy the very burden that the Supreme Court long ago rejected in wage-and-hour cases. In the absence of payroll records that precisely answer the question of how much high work each Plaintiff did over the last decade or more, the Shipyard would apparently condemn Plaintiffs, and this Court, either to dismissal or to a trial in which each of the 74 Plaintiffs testified individually and specifically about his daily activities on each of the thousands of days in the claim period, and would preclude damages for any date in which a Plaintiff could not prove with sufficient specificity that he conducted high work.

As Plaintiffs' Motion No. 4 shows, courts presented with large numbers of employees seeking back pay for which there is inadequate documentation have consistently rejected this approach. Instead, they have allowed employees to meet their burden of proof with representative plaintiff testimony, not all of which is presented live, together (in some cases) with summaries of some employer records.[48] Plaintiffs have proposed an approach like this since their March 2007 status report.

---

[48] *See, e.g., Arias v. United States Serv. Indus.*, 80 F.3d 509 (D.C. App. 1996); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281 (E.D.N.Y. 2002).

The Shipyard continues to ignore all of this. It fails to take a position as to what, precisely, is the quantum of evidence that Plaintiffs must introduce to meet their burden of proof. It fails to reference or support its earlier contention that all 74 Plaintiffs must testify (and submit to depositions before testifying). Put simply, the Shipyard fails to propose strategies for the "just, speedy, and inexpensive determination" of this case that RCFC 1 promises.

Plaintiffs are individual wage-earners. They are not mega-corporations with unlimited resources. They are not sophisticated and experienced parties-litigant. They are not independently wealthy and can hardly be expected to shoulder a six-figure expense for accountants and consultants to wade through a decade worth of Shipyard records to assemble data regarding the work they did that the Shipyard could easily and inexpensively have recorded at the time.

All Plaintiffs ask for is a prompt, fair, and accurate adjudication of the merits of the claim that their employer owes them wages. The Court should adopt an approach to further pre-trial and trial activities that will attain that result.

DATED this 7th day of December, 2007.

Respectfully Submitted,

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify on December 7, 2007, a copy of the foregoing "PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 4: REGARDING EFFECT OF SHIPYARD'S FAILURE TO KEEP RECORDS AS REQUIRED BY FEDERAL LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs