NO. 04-856C

Judge George W. Miller

---

UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

---

# PLAINTIFFS' REPLY IN SUPPORT OF MOTION NO. 2: FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK

---

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# TABLE OF CONTENTS

Page

I. Introduction ..... 1

II. Witnesses Agree that Most Shipwright Work on Incomplete Staging Below 100 Feet Falls Within OPM's Definition of "High Work" ..... 1

III. The Witnesses' Agreement that Building or Dismantling Staging Falls Within OPM's Definition of "High Work" Is Premised Upon the Unsure Footing that Incomplete Staging Affords ..... 2

IV. All of the Evidence Supports Ms. Tallman's Decision (and Ms. Niemi's Recommendation) that Work Above the First Level of Incomplete Staging Presents an Unusually Severe Hazard ..... 4

V. OPM's Definition of "High Work" Is Binding on the Shipyard ..... 9

VI. OPM Does Not Allow the Shipyard to Withhold High Pay for Work on Unsure Footing By "Alleviating" the Hazard ..... 12

VII. Motion No. 2 Presents an Issue for the Court Even Though It Does Not Seek a Ruling on Damages ..... 14

VIII. Plaintiffs Do Not Base Their Claim on Playground Safety Standards ..... 15

IX. Conclusion ..... 16



SEA_DOCS:873304.6

## TABLE OF AUTHORIES

**Page**

**CASES**

*Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007) .......... 13
*Carr v. United States*, 61 Fed. Cl. 326 (2004) .......... 6
*Howarth v. United States*, 41 Fed. Cl. 160 (1998) .......... 6
*O'Neall v. United States*, 797 F.2d 1576 (Fed. Cir. 1986) .......... 5, 6, 7, 8, 9, 11

**STATUTES**

29 U.S.C. § 654(a)(1) .......... 5
Occupational Safety and Health Act, § 5(a) .......... 5
U.S.C. § 5343(c)(4) .......... 6, 11, 12

**RULES**

RCFC 52 .......... 3, 9
RCFC 52(b) .......... 9

**REGULATIONS**

29 C.F.R. § 1910.23(b)(2) .......... 4
29 C.F.R. § 1915.77(c) .......... 4
29 C.F.R. § 1926.501(b) .......... 4
5 C.F.R. § 532.511(a)(1) .......... 10
5 C.F.R. § 532.511(a)(2) .......... 10
5 C.F.R. § 532.511(d) .......... 10

## I. Introduction

The Shipyard's opposition identifies no evidentiary basis for challenging its own decision that building or dismantling staging on or above the first level is high work. Not one witness, including each management witness involved in the resolution of the shipwrights' high-pay grievance, denies that building or dismantling staging below 100 feet constitutes high work at some point.

No witness testified that this work involves anything other than unsure footing.

No safety expert countered OSHA's considered determination that shipyard work above five feet without fall protection is "likely to cause death or serious physical harm."

Courts, meanwhile, have unanimously concluded that resort to OSHA safety standards is appropriate in determining whether working conditions require an environmental differential.

Meanwhile, OPM regulations prohibit the Shipyard from refusing to pay high pay for work an unsure footing on the grounds that it has "practically eliminated" the hazard through available fall protection.

Consistent with these facts and this law, the Court should grant partial summary judgment for Plaintiffs.

## II. Witnesses Agree that Most Shipwright Work on Incomplete Staging Below 100 Feet Falls Within OPM's Definition of "High Work"

During trial concerning the Shipyard's accord-and-satisfaction defense, this Court heard from every management official involved in the shipwrights' high-pay

grievance. **Every single witness** who was asked agreed that some shipwright work below 100 feet fell within OPM's definition of "high work."[1] No witness defended the Shipyard's prior practice of withholding high pay until shipwrights worked above 100 feet.

## III. The Witnesses' Agreement that Building or Dismantling Staging Falls Within OPM's Definition of "High Work" Is Premised Upon the Unsure Footing that Incomplete Staging Affords

The basis for the witnesses' consensus that building or dismantling staging is "high work" is that it involves work on unsure footing. Ms. Niemi, tasked by the Shipyard to investigate the shipwrights' grievance, prepared a November 1999 report that concluded that the "work of the staging builders and dismantlers does frequently meet the definition of unsure footing..." under the OPM regulations.[2] **Every single witness** asked about the subject agreed that her description of shipwright work was accurate.[3] **Every single witness** agreed with her conclusion that building or dismantling staging involved work on unsure footing within the meaning of OPM's definition of "high work," as described in her report.[4] No one testified that high work was limited to adverse weather conditions, to work above 100 feet, or to situations involving inadequate protective facilities.

"It is not axiomatic that building and dismantling staging involves work on

---

[1] Tr. at 61:10-15, 136:7-15, 137:18-23 (Aiken) (App. at 59, 62, 63); 418:21-419:4 (Winkler) (App. at 35-36, 39); 389:12-24 (Niemi) (Supp. App. at 1); 569:24-570:8 (Whitcher) (App. at 50-51).

[2] JX-027 at 2.

[3] Tr. at 424:8-14 (Winkler) (App. at 37); 181:5-19 (Aiken) (App. at 64); 508:25-509:15; 511:2-14; 512:24-514:25 (Tallman); Tallman Dep. 130:10-23 (App. at 42-43, 44, 45-47, 64, 66).

[4] Tr. at 61:10-15, 136:7-15, 137:18-23 (Aiken) (App. at 59, 62, 63); 418:21-419:4 (Winkler) (App. at 35-36, 39); 389:12-24 (Niemi) (Supp. App. at 1); 569:24-570:8 (Whitcher) (App. at 50-51); *see also* Winkler Dep. at 59-60 (App. at 53-54).

unsure footing," the Shipyard contends.[5] As a matter of abstract philosophical principles, this is quite true. But Plaintiffs argue from evidence, not philosophy. The witness testimony and the documentary evidence (e.g., Ms. Niemi's report, Mr. Aiken's step two grievance submissions, and Ms. Tallman's grievance decision) are clear and undisputed – work on staging does indeed involve unsure footing. This evidence makes it unnecessary to embark on the Shipyard's exegesis regarding the differences between walking on ice in slippers, through a creek in high heels, or barefoot on the beach.[6] The Shipyard's abstract inquiry into footwear choices is just that: abstract. Meanwhile, the "highly subjective determination" to which the Shipyard refers[7] has already been made by the witnesses.

If the Shipyard had any testimonial or documentary evidence to refute Plaintiffs' evidence that building or dismantling staging involves work on unsure footing, the deadline for filing its summary judgment opposition was the time to come forward with it. The Shipyard neither offered evidence nor a Rule 56(f) affidavit averring that it needed more time to do so.[8] Summary judgment as to this

[5] Opp. at 5.

[6] The Shipyard acknowledges that its musings regarding footwear "could become nonsensical." Opp. at 6. Substituting "have" for "could," Plaintiffs agree.

[7] Opp. at 6.

[8] The Shipyard claims that it has not been "fully heard" on this issue for purposes of RCFC 52. In its reply regarding Motion No. 1, it asserts "plaintiffs' [sic] are incorrect that this Court has been presented with all relevant witness testimony on the matter of high pay." Opp. and Reply at 20 n.12. But the Shipyard never identifies what additional evidence it possesses. Instead, it conclusorily relies on the fact that the trial was limited to accord and satisfaction. And it asserts, again conclusorily, that this Court is missing testimony "as to the risks, conditions, and heights at which work is done." What the missing evidence is, the Shipyard never says.

issue is appropriate.[9]

## IV. All of the Evidence Supports Ms. Tallman's Decision (and Ms. Niemi's Recommendation) that Work Above the First Level of Incomplete Staging Presents an Unusually Severe Hazard

The next task is to identify the height at which building or dismantling shipyard staging on unsure footing becomes sufficiently hazardous to constitute high work.

The grievance decision, of course, identifies the first level of staging as the appropriate height. The first level is, as Motion No. 2 discusses, at least five feet high, and often higher (Ms. Niemi's report stated that it was generally between seven and 11 feet high[10]). This exceeds both OSHA's fall-protection standards for shipyards (five feet)[11] and construction (six feet) [12] as well as its fall-protection standard of general application (four feet).[13]

OPM regulations do not explicitly identify the height at which the danger from a potential fall becomes so great that work on unsure footing is an unusually severe hazard. OSHA's regulations, of course, do provide a competent basis for identifying that height. They represent the judgment of the federal agency charged with ensuring safety in the work place[14] that a five-foot fall from shipyard staging is

---

[9] The "doubt" expressed in this Court's order denying Plaintiffs' motion to reconsider its class certification denial, 69 Fed. Cl. 450, 458 n.11, and to which the Shipyard's opposition alludes on page 6, predated the November 2006 trial—and the evidence introduced then—by nearly a year. That evidence erased whatever doubt might exist as to whether the building or dismantling of staging involved work on unsure footing.

[10] JX-027.

[11] 29 C.F.R. § 1915.77(c).

[12] 29 C.F.R. § 1926.501(b).

[13] 29 C.F.R. § 1910.23(b)(2).

[14] *O'Neall v. United States*, 797 F.2d 1576, 1582 (Fed. Cir. 1986).

too dangerous to permit.

The regulation was issued under the authority of section 5(a) of the Occupational Safety and Health Act, which requires employers to "furnish to each of his employees employment and a place of employment which are free from recognized hazards **that are causing or are likely to cause death or serious physical harm** to his employees."[15] OSHA's judgment that falls from heights of five feet or higher are "likely to cause death or serious physical harm" is not one to be lightly ignored, by the Shipyard or this Court. Work that is likely to cause such grave consequences would seem to pose an unusually severe hazard.

Plaintiffs do not argue that the Shipyard was legally required to adopt OSHA's standard. But the standard provides substantial support for Plaintiffs' position that work on unsure footing at heights above five feet poses a threat of death or serious injury. So does the fact that the only witness with a safety background, Mary Jane Tallman, adopted a threshold based on OSHA's standard.

Ms. Tallman—and this Court—could rely on the OSHA standard just as the Air Force could rely on OSHA's asbestos exposure standard in *O'Neall v. United States.*[16] Finding that the same principle of protection of worker safety underlay OSHA's regulations and the Air Force's determination,[17] *O'Neall* recognized the

[15] 29 U.S.C. § 654(a)(1). Section 5(a)(2) then requires employers to comply with regulations promulgated under the OSH Act.
[16] 797 F.2d 1576 (Fed. Cir. 1986).
[17] *Id.*, at 1582; *see also Carr v. United States*, 61 Fed. Cl. 326, 334 (2004) ("...the Air Force's utilization of OSHA standards as a guide was appropriate because the OSHA objective of ensuring safe and healthful working conditions paralleled the objective under the EDP mandate to compensate employees whose work involves unusually severe hazards.").

reasonableness of an agency's adoption of an exposure threshold that matches OSHA's. The Federal Circuit noted that an the Air Force's adoption of a standard identical to OSHA's was entitled to "some weight,"[18] since it comported with the authorizing statute.[19]

The Shipyard points to the absurdity of treating work an inch off the floor as high work. There is no denying that observation. But no one has ever proposed that work below the first level of staging, or below OSHA's fall protection standard, is high work. This distinguishes this case from a series of environmental differential cases arising from asbestos exposure. In these cases, the employees argued that their employer was obligated to ignore OSHA's standards and to pay an environmental differential for **any** asbestos exposure.[20]

Here, the Shipyard stands in the shoes of those asbestos plaintiffs, for the Shipyard is disputing the validity of its decision that high pay is warranted above the first level and suggests that it inappropriately incorporated OSHA's standard. The difference, of course, is that the Shipyard advocates for a higher, not lower, threshold than OSHA's safety regulations establishes. Indeed, and without purporting to have overturned every stone during legal research, it appears that

[18] *Id.*, at 1581 & n.7. Giving "some weight" to the grievance decision is, of course, a different matter from precluding the government from challenging its own grievance decision in court. Motion No. 1 takes up the latter issue.

[19] *Id.*, at 1581 ("A threshold must be set at a concentration in excess of which employees may have been exposed to 'potential illness or injury,' that phrase being construed consistently with the language of § 5343(c)(4)").

[20] *See, e.g., id.*, at 1580; *Howarth v. United States*, 41 Fed. Cl. 160, 165 (1998) ("Plaintiffs here are arguing... that "any exposure" qualifies as a matter of law..."). These cases are further distinguished because the present Plaintiffs are arguing for **adoption**, not rejection, of the Shipyard's local determination.

**every single court** to consider the issue has approved the use of OSHA exposure thresholds to determine when a working condition poses an unusually severe hazard.[21] This disposes of the Shipyard's argument that doing so is somehow inappropriate.

Having come forward with all this evidence, the burden shifted to the Shipyard to demonstrate the presence of an issue of fact by coming forward with conflicting evidence, i.e., evidence that the first-level threshold is unreasonable. But no witness other than Ms. Tallman had a safety background or knowledge about what heights pose what degree of risk. Nor did the Shipyard come forward with affidavits from additional witnesses to contradict Ms. Tallman's conclusions (or the recommendations of Ms. Niemi upon which they were based). Instead, the Shipyard relies on the conclusory and unsubstantiated trial testimony of Messrs. Whitcher and Winkler, neither of whom testified to any experience or expertise in safety matters generally, or the lethality of falls from heights in particular.[22]

Without any evidence to oppose Plaintiffs' initial summary judgment showing, the Shipyard resorts to legal argument. Specifically, the Shipyard contends that the words "unusually severe hazard" must be read into OPM's definition of "high work" because, citing *O'Neall,* it is "incomplete" without it.[23] Once those words are read into the regulatory definition of high work, the Shipyard concludes, Plaintiffs cannot obtain summary judgment.

---

[21] *O'Neall*, 797 F.2d at 1582; *Carr*, 61 Fed. Cl. at 334; *Howarth*, 41 Fed. Cl. at 162.

[22] Counsel's unsupported assertions that "the 5-foot standard is simply not high enough" and that a "potential fall from 5 feet is not an 'unusually severe hazard'," Opp. at 19, are obviously not evidence.

[23] Opp. at 7.

As a technical matter, the Shipyard's argument is wrong for two reasons. First, it misreads *O'Neall*. It is true that the Federal Circuit held that the regulatory definition of asbestos work, which encompassed asbestos that "may expose employees to potential illness or injury," was "incomplete." But the regulation was not "incomplete" because it excluded the words "unusually severe hazard." Rather, it was incomplete because it did not provide a "quantitative level of exposure" that was "reasonably related to 'potential illness.'"[24]

Second, the Shipyard ignores the structure of OPM's "high work" definition. One of the definition's three subparts expressly imports the notion of a hazard into it, applying whenever "adverse conditions ... or similar environmental factors render working at such height(s) hazardous." The other two subsections—addressing work on unsure footing or work without adequate protective facilities—do not. This counsels against reading language into these subsections that OPM deliberately omitted.

The only plausible reason for OPM's omission is that work at heights on unsure footing is, in OPM's view, an unusually severe hazard *per se*. Section S8-7(e)(1) of the OPM Manual supports this conclusion: it identifies Appendix J as a "schedule of environmental pay differentials which defines ... various degrees of hazards ... and working conditions, **each of an unusually severe nature** ...."[25] Thus, the regulation represents OPM's determination that work on unsure footing at heights below 100 feet is an unusually severe hazard.

[24] *O'Neall,* 797 F.2d at 1581.
[25] PX-002 (emphasis added).

Nonetheless, while the Shipyard's position is technically wrong, the parties are not as far apart as might appear. As previously mentioned, OPM's "high work" definition does not define the lower bound of high work. It simply refers to work at heights less than 100 feet. This is where the analysis in *O'Neall* enters the picture: as mentioned above, one must read OPM's regulation as encompassing the notion that the lesser height is sufficiently high to be hazardous.

This analysis brings us full circle. OSHA has determined that shipyard work above five feet is "likely to cause death or serious physical harm." The Shipyard has come forward with no competent, contradictory evidence. Summary judgment for Plaintiffs is therefore proper.[26]

## V. OPM's Definition of "High Work" Is Binding on the Shipyard

To avoid this result, the Shipyard takes a different tack, suggesting that it payment of environmental differentials is essentially discretionary. It does so via two arguments.

First, the Shipyard dismisses OPM's definition of high work as a mere "example" or "illustrative" guideline. To the extent it means the regulation is non-binding and that the Shipyard may disregard its "guidance," the Shipyard is wrong; OPM's regulations provide that "an employee **shall** be paid an environmental

[26] Because the Shipyard failed to come forward with such evidence, this Court may grant summary judgment without considering whether action under Rule 52 is also warranted. Accordingly, Plaintiffs do not revisit their arguments under that rule. Only one point is worth making: in footnote 4 of its opposition, the Shipyard argues, "Because plaintiffs concede that 'neither' circumstance under which this Court would exercise authority under RCFC 52(b) is present, we need not address this argument separately." In fact, even a quick skim of Motion No. 2 makes clear that plaintiffs made no such concession; rather, they observed that parties typically seek relief under Rule 52 in two different contexts. The cases do not support the "concession" the Shipyard concocted.

differential when exposed to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management."[27] And they provide that an agency "**must** evaluate its situations against the guidelines issued by the Office of Personnel Management to determine whether the local situation is covered by one or more of the defined categories."[28] They then provide that the "schedule of environmental differentials is set out as Appendix A to this subpart and is incorporated in and made a part of this section."[29] Nothing in the codified regulations suggests that its application is discretionary. Nothing supports the Shipyard brazen rewrite of the regulation—on page 18 of its reply to Motion No.1—to provide that high pay "may" be "appropriate" only when the Shipyard in its discretion deems it so.

Sections S8-7(e) and (g) of the Operating Manual do state that the "examples" given in Appendix J are "illustrative." But after doing so, each section makes clear that the intent of the "illustrative" remark is to **expand,** not limit, the regulations' coverage. Thus, section S8-7(e)(1) says that "these examples are illustrative only **and are not intended to be exclusive of other exposures which may be encountered under the circumstances which describe the listed category.**" And Section S8-7(g)(1) states that the "examples of the situations **are not all inclusive** but are intended to be illustrative only." Section S8-7(g)(2)(a) further clarifies that "[w]hen the local situation is determined to be covered by one or more

[27] 5 C.F.R. § 532.511(a)(1).
[28] 5 C.F.R. § 532.511(a)(2).
[29] 5 C.F.R. § 532.511(d).

of the defined categories **(even though not covered by a specific illustrative example(s)),** the authorized environmental differential is paid for the appropriate category." As these provisions make clear, a situation that falls within one of the "examples" or "illustrations" of high work fall within OPM's definition of high work.

The Shipyard's second argument is that work must do more than satisfy OPM's regulatory definition of "high work" to qualify as such. Rather, it claims, this Court has an independent obligation to perform a "two-part analysis" to ensure that work satisfies not just OPM's regulatory definition of "high work," but 5 U.S.C. § 5343(c)(4) as well.[30] This argument has several flaws. First, the Shipyard cites no authority to support it. It seems to suggest that *O'Neall* does, but that case simply addressed whether the Air Force's asbestos pay policy squared with OPM's regulatory definition of high work. Nowhere does the case hold that satisfying OPM's definition of asbestos work was insufficient to justify payment of an environmental differential.

Second, the language of 5 U.S.C. § 5343(c)(4) and OPM's regulations contradicts the Shipyard. Section 5343(c)(4) delegates to OPM the responsibility for promulgating regulations that provide for "proper differentials, **as determined by the Office,** for duty involving unusually severe working conditions or unusually severe hazards." Acting under its authority, OPM promulgated regulations that mandate (not merely suggest) the payment of an environmental differential for work that falls within its definition of high work. That definition, which first

[30] Opp. at 18.

appeared in Appendix J to its Operating Manual for the Federal Wage System, represents OPM's determination that the work described was work of an unusually severe nature. Section S8-7(e)(1) says this, identifying Appendix J as the "schedule of environmental pay differentials which defines ... various degrees of hazards ... and working conditions, **each of an unusually severe nature,** for which the differentials are payable."

The Shipyard's position would compel this Court to revisit OPM's determination that high work is unusually severe and decide for itself whether work that falls within OPM's regulatory definition of high work is, in fact, unusually severe. Congress, however, delegated the task of identifying those work conditions that involved unusually severe hazards to OPM, not the courts.[31]

Alas for the Shipyard, it is not above the law. It must comply with, and this Court may enforce, its statutory and regulatory obligation to pay an environmental differential for high work, as defined by OPM.

## VI. OPM Does Not Allow the Shipyard to Withhold High Pay for Work on Unsure Footing By "Alleviating" the Hazard

The Shipyard also defends its decision to exclude work on unsure footing

[31] It does not appear, moreover, that Congress created a provision for federal agencies to seek judicial review of OPM's promulgation of environmental differentials. And no statute provides for what the Shipyard effectively seeks here: de novo review of OPM's regulations in a suit for unpaid environmental differentials. For the reasons identified in Motion No. 1 (albeit in a different context), if the Shipyard were able to seek review of OPM's high pay definition, such review would presumably be limited to a standard of review akin to that provided by the APA, i.e., for arbitrary and capricious decision-making. For example, in *Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007), the Federal Circuit applied the *Chevron* standard of agency deference to analyze whether OPM regulations reasonably excluded second-hand smoke. Nowhere does the Shipyard allege, argue, or prove that OPM's regulatory definition of high work fails to meet that lenient standard, nor is this the venue in which to do so.

from high work if fall protection was available. That argument is based on the notion that the first two categories of high work in OPM's regulatory definition are, in fact, one.

Thus, in the Shipyard's world, work is high work if it involves work "if the footing in unsure or the structure is unstable" **and** "if ... protective facilities are not adequate." The regulation's structure and language belie this argument. In plain English, when one refers to "A, B, or C," an "or" between A and B is implied. In other words, "A, B, or C" means "A **or** B or C, not "A **and** B or C." The regulation, moreover, identifies three, not two, different situations by number, i.e., "**(1)** if the footing in unsure of the structure is unstable; **(2)** if ... protective facilities are not adequate; **or** **(3)** if adverse conditions ...." This indicates that three (not two) different conditions each independently satisfy the definition of high work.

The Shipyard's resort to sentence diagramming does not obscure that its grievance decision limits high pay to work involving **both** unsure footing **and** fall unavailable fall protection. This is a result that OPM regulations do not countenance.

In ordinary English usage, the regulation's use of "or" means that each of the three situations in OPM's high-work definition should be evaluated separately. The third situation, as mentioned above, applies when adverse conditions render work at heights "hazardous." The second situation contemplates situations where protective facilities are "inadequate." But the first situation does not contain such conditions; it applies whenever work is performed on unsure footing or unstable

structures, without exception. It makes no reference to elimination through ameliorating measures. This, as Motion No. 1 demonstrates, is dispositive because section S8-7(d)(3) of the OPM Operating Manual says that "categories which are subject to practical elimination contain language to that effect in the definition," while categories that are not subject to practical elimination contain no such language. The Shipyard complains that if high pay were authorized for work on unsure footing below 100 feet without regarding to ameliorating measures, "then the regulations would so state."[32] And so they do. The Shipyard erred in refusing to treat work on unsure footing as high work simply because fall protection was (or was alleged to be) unavailable.

## VII. Motion No. 2 Presents an Issue for the Court Even Though It Does Not Seek a Ruling on Damages

The Shipyard next urges denial of Motion No. 2 because the motion "does nothing to demonstrate that any of the individual plaintiffs worked under conditions that might entitle them to high pay."[33] "To the extent the motion merely seeks to establish that they might be entitled to high pay," the Shipyard insists, "plaintiffs do not present an actual factual issue for this Court to decide."[34]

This statement indicates that the Shipyard misunderstands the nature of the relief requested by Plaintiffs. Plaintiffs do not assert that granting Motion No. 2 will automatically entitle each Plaintiff to any given amount of high pay. But it will provide the parties and the Court with a standard against which to assess

---

[32] Opp. at 19.
[33] Opp. at 4.
[34] Opp. at 4-5.

Plaintiffs' claims for high pay. Further, it is impossible to square the Shipyard's assertion that this motion presents no factual issue for the Court to decide with its repeated references to the fact-intensive, highly subjective, localized nature of the determination whether conditions fall within OPM's definition of high work.

That said, if the Court wishes a more particularized statement of the nature of the work shipwrights do, it need look no farther than the five declarations Plaintiffs submitted in support of their original summary judgment motion regarding liability, or the testimony provided at trial by Messers. Scott and Hurm regarding the nature of shipwright work.[35] These establish that shipwrights work under conditions that constitute high work.

## VIII. Plaintiffs Do Not Base Their Claim on Playground Safety Standards

The Shipyard devotes considerable ink to its effort to distinguish between playgrounds and shipyard staging, including one footnote that spans nearly an entire page. Reference to playground safety standards, the Shipyard huffs, "is not the appropriate source" for a determination of when high pay should be paid to shipwrights.

Plaintiffs heartily agree. Plaintiffs did not offer playground safety information to prove their claim, but to rebut Rodney Whitcher's breezy equation of

[35] Tr. at 598:4-600:6 (Hurm) (Supp. App. at 2-4); 660:22-661:20 (Scott) (Supp. App. at 5-6).

shipwright work to child's play. Nothing further need be said on this point.[36]

## IX. Conclusion

There is no need for a trial to decide whether work building or dismantling staging between the first level and 100 feet falls within OPM's definition of high work. The witness testimony supports that determination. The documentary evidence supports that determination. OSHA regulations support that determination. And Shipyard officials reached that determination. That determination, moreover, was hardly unreasonable.

There is also no need for a trial to decide whether the availability of fall protection removes work on unsure footing that is otherwise covered "high work" from OPM's "high work" definition. The regulations are clear that it does not.

[36] Plaintiffs do feel compelled to point out, however, that the Shipyard mischaracterizes the nature of shipwright work. For example, the Shipyard sings an ode to the tensile strength of Douglas-fir wood. As the industrial process instruction documents and previous declarations by plaintiffs attest, shipwrights have used 2-inch thick wood or aluminum planks for support on staging. But the Shipyard suggests that staging is built with "14x14 or 12x12 logs," citing the industrial process instructions it submitted. Those instructions, however, do not support this assertion, and voluminous evidence shows that Shipyard staging is built with Tube-lock or System staging, which is made from aluminum or steel poles, using unsecured planks. See Tr. at 345:6-17 (Niemi) (App. at 25); 425:1-10 (Winkler) (App. at 38); 598:4-600:6 (Hurm) (Supp. App. at 2-4); 660:22-661:20 (Scott) (Supp. App. at 5-6).

This Court should so hold and grant Motion No. 2 for partial summary judgment.

DATED this 2d day of January, 2008.

Respectfully Submitted,

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
1191 Second Avenue, 18th Floor
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on January 2, 2008, a copy of the foregoing "PLAINTIFFS' REPLY IN SUPPORT OF MOTION NO. 2: FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE FIRST LEVAL OF INCOMPETE STAGING CONSTITUTES HIGH WORK" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

---

# SUPPLEMENTAL APPENDIX TO PLAINTIFFS' REPLY IN SUPPORT OF MOTION NO. 2: FOR PARTIAL SUMMARY JUDGMENT OR RCFC 52 RULING THAT WORK ON OR ABOVE FIRST LEVEL OF INCOMPLETE STAGING CONSTITUTES HIGH WORK

---

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

**Table of Contents to Supplemental Appendix**


1. Excerpts from Trial Testimony of Lynnette Niemi at p. 389 ........................................ 1
2. Excerpts from Trial Testimony of David Hurm at pp. 598-600 ................................ 2-4
3. Excerpts from Trial Testimony of Paul Scott at pp. 660-661 .................................... 5-6


SEA_DOCS:874217.1

staging did you make in resolving this grievance?
A How many tours did I make? There was one tour.
Q Just one?
A Right.
Q And when, if ever, have you worked as a shipwright?
A Never.
Q And how often have you done work on incomplete staging?
A Never.
Q You stated that there was a dispute about height on the management team. Did those disputes mean that other members of the team felt that an unusually severe condition existed at another height?
A Well, it meant that people didn't feel that 5 feet would necessarily lead to an unusually severe level, that something higher would be more likely.
Q Were any other heights suggested?
A Somewhere in the 20 range was discussed.
Q You said that fall protection gave a possible height. Could you have recommended a different height?
A Personally, no.
Q Why?

00598

the time it takes to climb up and down staging?

A Yes, ma'am.

Q Thank you.

What do you do during your workday?

A We build staging. We get you to a spot you cannot reach safely.

Q For the other trades?

A For the other trades, yes.

Q How much time do you spend on the ground typically?

A Myself not very much at all.

Q How high is the first level of staging off the ground?

A Approximately five feet would be the minimum.

Q Could you describe the staging as you're building it?

A Yeah. You build it with pipe and you have metal plank you put on there. They are not attached while you are erecting until you get to the actual worksite, the height that you want the person to get to.

Q Are there guardrails around?

A Not while you are building, no.

Q Are you tied in to fall protection?

00599

A No. We are not required to wear fall protection while erecting staging.

Q In that binder in front of you could you please turn to Joint Exhibit 27.

A Okay.

Q I'm going to read you some passages from this report and I would like you to tell me if you agree or disagree with the description of working on staging.

A Yes, ma'am.

Q I'm going to read from the third paragraph in the investigation section. "The shipwrights building the structure are standing on the pipe or on one 9 to 12-inch plank while building up to the next level. The shipwrights are handling and installing staging materials weighing up to 100 pounds while standing there."

Do you agree with that statement?

A Yes, ma'am.

Q "There are no lifelines, railings or other enclosures around the unfinished staging levels. These shipwrights are also climbing the pipe using vertical pipe and staging couplings as footholds to move from level to level."

Would you agree with that statement?

00600

A Yes, ma'am.
Q "The height between levels varies based on staging material used but is typically between 7 to 11 feet."
Would you agree with that statement?
A Yes, ma'am.
Q Do you ever have more than one work assignment during the day?
A Yes, ma'am.
Q How does that work?
A Sometimes you are given more than one job assignment. Other times you will be out on the jobsite, your supervisor will come and get you and assign you another job.
Q So is that a common occurrence?
A Yes, ma'am.
Q It's common to have two different exposures to jobs during the workday?
A Yes, ma'am.
Q Do you ever incur overtime?
A Yes, ma'am, we do.
Q When you incur overtime how long are the days that you're working?
A Ten to 12 hours.
Q How much of your overtime in a 10-hour day

00660

wash up in 10, 15 minutes.

Q So during the course of a day you have a 42-minute lunch that doesn't count towards your 8-hour day, two 15 breaks, some cleanup time and some time to climb up and down the staging; is that correct?

A Yes.

Q What do you do during your work day? I'm sorry. What do you do during your work day?

A Drawing a blank.

Q Can you --

A I build staging.

Q Okay. And do you do many jobs that don't involve building staging?

A No.

Q How much time do you spend off the ground? Excuse me, how much time do you spend on the ground?

A Very little. I was always up.

Q How high is the first level of staging off the ground typically?

A Depends on the shipwright but it will run 5 to 6 foot.

Q And can you please describe to us briefly how staging is built?

A You put the first ring up, the foundation ring to hold the legs up. Then you go up to your 5 or

00661

6 foot level and you hang clamps on the legs and you lay pipe in those clamps, close those up. You pull a couple of plank up, one on each side, and you crawl up on those planks and you start up. And each level it's repetitious, once you get the next ring up you change that plank up to the next and you just continue on up to the height you're seeking.

Q Are the planks attached?

A No.

Q Are there guardrails around the platforms?

A No.

Q Are you tied in to fall protection?

A No.

Q Why not?

A Just doesn't work. You can't, you can't work, you can't keep tying your fall protection up because you're moving all the time. And the lanyard's only 6 foot long and your staging may be 13 foot long so you'd be spending all your time hooking and it just doesn't work. Makes it more dangerous.

Q Mr. Scott, there are some binders to your right there. Can you please find the one that says Joint Trial Exhibits, Volume 1 of 2.

A Joint Trial Exhibits. Okay, got it.

Q And can you please turn to Joint Exhibit 27?