NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFFS' REPLY IN SUPPORT OF CROSS-MOTION NO. 1: FOR SUMMARY JUDGMENT OR FOR JUDGMENT ON ADMINISTRATIVE RECORD

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

## Table of Contents


Page

I. Overview ....... 1

II. Issues Presented: A Reprise ....... 2

III. Plaintiffs Have Not Made Many of the Concessions and Arguments the Shipyard Attributes to Them ....... 3

IV. This Court May Decide Whether Working Conditions Fall Within OPM's Definition of "High Work" ....... 4

A. The CSRA Does Not Prohibit This Court from Identifying Working Conditions That Fall Within OPM's Definition of "High Work" ....... 5

B. OPM Regulations Do Not Prohibit This Court from Identifying Working Conditions That Fall Within OPM's Definition of "High Work" ....... 8

C. Conclusion Regarding this Court's Authority to Decide Whether Working Conditions Fall Within OPM's Definition of "High Work" ....... 11

V. The Grievance Decision Represents the Shipyard's Determination That Certain Working Conditions Fall Within OPM's Definition of High Work ....... 11

A. Mary Jane Tallman Had the Authority to Decide Whether Working Conditions in Her Shop Fell Within OPM's Definition of "High Work" ....... 12

B. The Determination Is Neither Voidable Nor Void ....... 13

1. The Grievance Decision Is Not Voidable Due to Mistake ....... 13

2. The Union and the Shipyard Had the Power to Settle the Grievance Without Settling Individual Lawsuits ....... 15

VI. The Shipyard May Not Challenge Its Own Grievance Decision ....... 17

VII. Conclusion ....... 19

# Table of Authorities

Page

## CASES

*Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007) ........ 7

*Bendure v. United States*, 544 F.2d 427 (Ct. Cl. 1977) ........ passim

*Department of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) ........ 18

*Harris v. United States*, 841 F.2d 1097 (Fed. Cir. 1988) ........ 6, 7

*Jaynes v. United States*, 75 Fed. Cl. 218 (2007) ........ 16

*Judie v. Hamilton*, 872 F.2d 919 (9th Cir. 1989) ........ 16, 17, 18

*Kawatra v. Medgar Evans College,* 700 F.Supp. 648 (E.D.N.Y. 1988) ........ 17

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803) ........ 11

*Mays v. United States Postal Service,* 995 F.2d 1056 (Fed. Cir. 1993) ........ 15, 16, 17

*Mudge v. United States*, 308 F.3d 1220 (Fed. Cir. 2002) ........ 5

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........ 19

*O'Neall v. United States,* 797 F.2d 1576 (Fed. Cir. 1986) ........ 7

*Okonko v. Union Oil Co. of California,* 519 F.Supp. 372 (D.C. Cal. 1981) ........ 17

*Perez v. Maine*, 760 F.2d 11 (1st Cir. 1985) ........ 17, 18

*Scherer v. Davis*, 543 F.Supp. 4 (N.D. Fla. 1982) ........ 17

## STATUTES

5 U.S.C. § 7114 ........ 6

5 U.S.C. §§ 7101-35 ........ 5

5 U.S.C. §§ 7121(a) ........ 5

## REGULATIONS

5 C.F.R. § 532.511(a)(1) ........ 4, 7, 12

5 C.F.R. § 532.511(a)(2) ........ 8

## I. Overview

Plaintiffs are 74 individual wage-grade employees who seek unpaid compensation for their work. They are not corporate or governmental entities with internal accounting and legal affairs departments.

Congress enacted laws to safeguard their wages. The Shipyard posits a Byzantine system to enforce these laws, which requires an employee first to proceed through an administrative system for setting, supplementing, or correcting a "local determination," an appeal (apparently to either an arbitrator or, through the Federal Labor Relations Authority, to the United States Court of Appeals) of that "local determination" if necessary, and a subsequent and separate lawsuit to collect wages, presumably some years later. Meanwhile, according to the Shipyard's Opposition to Plaintiffs' Motion No. 3, the clock ticks, because the process of obtaining, correcting, and enforcing this "local determination" does not toll the statute of limitations.

A system as expensive, slow, and cumbersome as this has nothing to commend it. Under the Shipyard's theory, an employee with a right to compensation must, to enforce it, slog through a multi-forum, multi-year process that will consume a small fortune in litigation costs. Individual wage-grade employees cannot afford a system like this; such a system would render Congress's protection of their wages a dead letter. The course of this case proves the point amply. Excluding the four years spent in district court, this case has been pending for three and one-half years. Yet if the Shipyard's filings regarding the current motions and its status reports are to be believed, the end is nowhere in sight. A system like the one the Shipyard proposes is an affront to, not an instrument of, justice.

Of course, if Congress had intended to create such a system, these complaints might (and perhaps should) fall on deaf ears. But here Congress expressed no such intent, as Motion No. 1 demonstrates. So the Shipyard tries to infer this intent from just two threads: (1) Congress's requirement that collective bargaining agreements contain dispute resolution procedures; and (2) OPM's mandate that federal agencies identify situations that require the payment of an environmental differential. These, however, do not come close to proving an implied Congressional intent to create a system for vindicating statutory wage rights that is so costly and unwieldy that it takes the better part of a decade to complete it.

## II. Issues Presented: A Reprise

The factual question this motion presents is, at bottom, simple: did the Shipyard decide that shipwright work on incomplete staging without available fall protection above the first level is high work? The answer is equally simple: yes. All of the rigmarole about whether or not it is enforceable as a contract is beside the point. All the hair-splitting about Ms. Tallman's lack of authority to decide what constitutes high work is unsupported; the Shipyard cites no evidence that she lacked authority to decide whether conditions in her Shop fell within OPM's definition of high work.

The two legal issues this motion presents are just as easily answered. The first is whether Congress precluded this Court from deciding whether work conditions fall within OPM's definition of high work. The answer is straightforward: Congress did nothing to prohibit this Court from deciding this issue.

The second legal issue concerns the effect of the Shipyard's grievance decision on this Court's decision-making process. The answer here is simple, too: that decision does

not bind this Court. But it does bind the Shipyard, precluding it from challenging its own decision in court.[1]

## III. Plaintiffs Have Not Made Many of the Concessions and Arguments the Shipyard Attributes to Them

The Shipyard's latest brief imputes a series of concessions, assumptions, and arguments to Plaintiffs that they have not made. For example, the Shipyard's opposition contends that "if [Plaintiffs] choose to rely on the attempted settlement and ramifications thereof ...this Court must remand the matter back to the agency to complete that process."[2] The key word in that sentence is "if." Because Plaintiffs do not, and have never before this Court, sued to enforce an agreement created by the grievance decision; they seek to vindicate their statutory, regulatory, and contractual (that contract being the collective bargaining agreement) rights.

The Shipyard alternatively claims that Plaintiffs "rejected" the grievance "process" yet seek to enforce it. Not true. Rather, Plaintiffs contended (and proved) that the grievance decision was not an accord and satisfaction. And they simply assert that the Shipyard is precluded from challenging its own decision in court, whether or not it is an enforceable contract between Shipyard and union.

The Shipyard next claims that Plaintiffs concede that this Court's role is limited to APA review. Again, not true. Plaintiffs raised the APA because the Shipyard's motion offered cases under the APA and raised several APA-refined concepts. Plaintiffs pointed out that if this Court's role were restricted to APA-style review of the grievance

---

[1] And even if it could, Motion No. 2 demonstrates that the Shipyard has failed to offer sufficient evidence to successfully do so.
[2] Opp. and Reply at 11.

decision, then with that reduced task would come limited review on the record, a deferential standard of review, and a standing requirement that would doom the Shipyard's attempt to avoid its own grievance decision.

This leads to the Shipyard's next argument—that until the Shipyard sets a "local determination" through some formal process, Plaintiffs have no judicially enforceable right to environmental differential pay. According to the Shipyard, this Court may not independently determine whether an employee was, in the words of OPM's regulation, "exposed to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management."[3] The next section addresses this contention.

## IV. This Court May Decide Whether Working Conditions Fall Within OPM's Definition of "High Work"

The Shipyard persists in arguing that this Court lacks the power or competence to decide whether work conditions fall within OPM's definition of "high work." In so doing, it has dropped all mention of the doctrine of exhaustion of administrative remedies[4] and the notion that the issue of whether shipwright work is "high work" is not yet ripe. Instead of arguing that this Court must stay its hand until further "administrative" proceedings take place, the Shipyard now claims that this Court may **never** decide this issue. Because the Shipyard can identify no statute or regulation that expressly says this, it tries to concoct an implied prohibition, first from the CSRA and then from OPM's regulations. Neither supports its argument.

---

[3] 5 C.F.R. § 532.511(a)(1).
[4] A wise move, because the presumption in Tucker Act suits is that a plaintiff is not required to exhaust permissive remedies, and because the Court of Claims rejected this argument nearly thirty years ago. Motion No. 1, at 11; *Bendure v. United States*, 544 F.2d 427 (Ct. Cl. 1977).

### A. The CSRA Does Not Prohibit This Court from Identifying Working Conditions That Fall Within OPM's Definition of "High Work"

The Shipyard first argues that Congress's mandate to include dispute resolution procedures in collective bargaining agreements somehow removes certain disputes from this Court's jurisdiction. The Shipyard relies exclusively on Section 701 of the Civil Service Reform Act,[5] which enacted 5 U.S.C. §§ 7101-35. The Shipyard discusses Section 701's various provisions. But all are immaterial save for 5 U.S.C. §§ 7121(a), which (as amended), requires collective bargaining agreements to include grievance procedures, which in turn are designated as the exclusive **administrative** procedures for resolution of grievances. It is settled law that these administrative procedures do not preclude or limit judicial remedies.

The Shipyard tries to circumvent the plain language of § 7121(a)(1) by reciting various other structural elements of Section 701 and noting that Section 701 as a whole expresses Congress's preference that employment disputes be resolved through collective bargaining or negotiated grievance procedures. This, however, simply reasserts the fifth of the government's unsuccessful arguments in *Mudge*, that this Court "should not construe amended § 7121(a)(1) according to its plain text because such a construction would disrupt the congressional preference for collectively bargained grievance procedures expressed in the CSRA."[6] The Federal Circuit, of course, rejected this argument, as this Court is now bound to do, too.[7]

---

[5] Pub. L. No. 95-454 (1978).
[6] *Mudge v. United States*, 308 F.3d 1220, 1231 (Fed. Cir. 2002).
[7] Further, to the extent that Section 701 has any relevance to the pending controversy, it demonstrates that the Shipyard must honor its grievance decision, regardless of the effect it claims it thought the decision might have. The Shipyard quotes 5 U.S.C. § 7114 for the proposition that the union is the shipwrights' sole representative (an undisputed point insofar

Finally, the Court of Claims has rejected the notion that Congress mandated the use of administrative procedures to resolve disputes over environmental differential pay. In *Bendure v. United States,*[8] the court concluded that Congress "failed to provide[] a mechanism to resolve disputes concerning the applicability of EDP to particular situations"[9] and, thus, that resort to collective bargaining or other grievance procedures for pursuing environmental differential pay was not required.[10]

The Shipyard next charges that if the Court were to determine which working conditions qualify shipwrights for environmental differential pay it would force the Shipyard into an unfair labor practice. This is so, the Shipyard argues, because the union's involvement is indispensable to making this determination.

First, as discussed below, this Court will issue no declaratory or injunctive relief. It will simply enter a damages award, so there will be no decision for the Shipyard to "implement."[11]

Next, no cases support the Shipyard's position that the union is a necessary party

---

as the administrative collective bargaining procedures are concerned), but fails to note that section 7114(c) provides that an agreement between an agency and the employees' exclusive representative is "binding on the agency."

[8] 544 F.2d 427, 431 (Ct. Cl. 1977).

[9] *Id.*, 544 F.2d 427, 431 (Ct. Cl. 1977).

[10] *Id.* at 434-35. *Bendure*'s holding was premised on the absence of statutory language requiring the exclusive use of grievance procedures. As such, its holding was effectively overruled by the CSRA as originally enacted, since the CSRA initially made grievance procedures the exclusive remedy. *See Harris v. United States*, 841 F.2d 1097, 1100 (Fed. Cir. 1988). But the 1994 CSRA amendment returned this aspect of the law to its pre-CSRA state, thereby resurrecting *Bendure*.

[11] The Shipyard never explains why, exactly, the union would object to the "implementation" of a standard equal to, or more favorable than, the one set forth in the grievance decision.

And in any event, to the extent the Shipyard feels compelled to comply with this Court's decision in the future (as it should), the Shipyard can alleviate its professed concerns about union non-participation by inviting the union to join this lawsuit. Nothing in this Court's rules of procedure appears to preclude the union from joining or intervening in this action. The union is well aware of this action already, because it and its representatives have received document and deposition subpoenas in this case and its representatives have testified at trial in this matter at the behest of both sides.

to setting a local determination. In *O'Neall v. United States*,[12] a case on which the Shipyard extensively relies, there is no mention of the Air Force negotiating the threshold at which it would pay an environmental differential for asbestos exposure.[13] Similarly, the Shipyard relies on *Harris v. United States*, in which the court approved, but did not require, the use of the collective bargaining process to decide when environmental differentials were required.[14]

Further negating the assertion that the union must participate in identifying which work requires an environmental differential is *Adair*, in which the court independently examined the plaintiffs' working conditions to determine whether they warranted an environmental differential for exposure to second-hand smoke.[15] In *Adair*, the agency did not make a "local determination" at all; the employees petitioned the court to decide in the first instance whether their working conditions met the applicable standard for an environmental differential. *Adair* makes no mention of the role of the union or suggest that any determination would be improper without the union's involvement.[16] Thus, the Shipyard has no support for its contention that under the statute the union must be involved in setting a local determination.

---

[12] 797 F.2d 1576 (Fed. Cir. 1986)

[13] *Id.* at 1582. The Court does refer to negotiations, but only the negotiations concerning the language of the regulation.

[14] *Harris*, 841 F.2d at 1100 ("differentials for hazardous or otherwise severe working conditions are among the conditions thus declared suitable for collective bargaining.").

[15] 497 F.3d 1244 (Fed. Cir. 2007) (upholding Court of Federal Claims' determination that prison employees were not entitled to environmental differential pay for exposure to second-hand smoke).

[16] *Adair* also undermines the Shipyard's insistence that this Court cannot decide in the first instance whether certain work conditions require environmental differential pay.

### B. OPM Regulations Do Not Prohibit This Court from Identifying Working Conditions That Fall Within OPM's Definition of "High Work"

OPM's regulations also do not preclude this Court from determining whether a working condition falls within the regulatory definition of high work. The Shipyard's attempt to fabricate an implied prohibition from OPM's regulations fails.

It fails in part because in *Bendure,* the Court of Claims rejected an argument similar to the one the Shipyard now renews: that OPM's regulations, particularly OPM's Manual for the Federal Wage System, required exhaustion of administrative remedies.[17] The Court of Claims noted that OPM's "regulations provide no specific machinery for processing or settling disputes between an agency and its employees as to whether or not a particular employment situation qualifies [for EDP] under the broad categories of the appendix."[18] While those "regulations do make allusion to two possible methods for resolving EDP disputes"[19] (i.e., grievance procedures and collective bargaining), the court held that employees were not required to "exhaust" these procedures before pursuing a judicial remedy. If these regulations do not require exhaustion, they do not bar a plaintiff from going to court, as the Shipyard argues. Although this Court need not revisit this issue, if it does, it can only conclude that *Bendure* was correctly decided.

OPM regulations provide that "an employee **shall** be paid an environmental differential when exposed to a working condition or hazard that falls within one of the

[17] The government in *Bendure* apparently did not have the audacity to advance the more sweeping proposition the Shipyard now urges: that those regulations completely preclude courts from deciding whether local conditions fall within OPM's schedule of environmental differentials.
[18] *Bendure,* 544 F.2d at 429.
[19] *Id.*

categories approved by the Office of Personnel Management."[20] Two things stand out about this language. First, it confers no discretion whatsoever on an agency. It mandates; it does not delegate or authorize. This disposes of the Shipyard's claim that "just because the plaintiffs are authorized to receive EDP does not mean they get it."[21]

Second, this regulatory language does not condition payment on a "local determination." It would have been easy to word the regulation to support the Shipyard's position that "although entitled to EDP, there must be a local determination translating these general standards into an vested entitled [sic] to EDP in a particular situation."[22] For example, the regulation could require payment of a differential "when exposed to a working condition or hazard **that the agency determines** is covered by one of the categories approved by" OPM. Or, better yet, the regulation could have read, "upon **the local agency's local determination that a working condition or hazard falls within one of the categories approved by the Office of Personnel Management**, an employee shall be paid an environmental differential when exposed to that working condition or hazard."

But subsection 532.511(a)(1) makes no mention of the need for a "local determination" before accrual of an employee's right to an environmental differential. So the Shipyard turns to subsection (a)(2).

5 C.F.R. § 532.511(a)(2) provides that an agency "**must** evaluate its situations against the guidelines issued by the Office of Personnel Management to determine whether the local situation is covered by one or more of the defined categories." The

[20] 5 C.F.R. § 532.511(a)(1) .
[21] Def.'s Mot. at 15.
[22] Def.'s Mot. at 13.

Shipyard argues that this requirement precludes this Court from somehow usurping the agency's "right" to comply with this regulation. But Plaintiffs do not argue that the Court should do the Shipyard's job for it. Rather, they contend that in deciding this case, this Court may (and, indeed, must) determine whether and under what circumstances Plaintiffs performed high work. As the Shipyard so frequently points out, this Court will not issue declaratory or injunctive relief (thereby imposing a "local determination" on the Shipyard), it will simply award damages.

The OPM Manual does provide that "nothing in this section shall preclude negotiations through the collective bargaining process."[23] But this is a far cry from saying that the section **requires** those negotiations, as *Bendure* recognizes.[24] As discussed above, federal agencies may unilaterally identify work conditions that require environmental differential pay. The comments of Frank Meller, cited on page 15 of the Shipyard's original motion, do not suggest that every single decision to pay an environmental differential must be run through collective bargaining or grievance procedures; to the contrary, they (like the regulations) contemplate that "local agency **management** should determine eligibility" and that "serious difference of interpretation" may be resolved through collective bargaining or grievance procedures.

All of this assumes, as does the Shipyard, that OPM has the power to oust this Court of its jurisdiction. The notion that a federal agency has the raw power to divest a court of jurisdiction to decide a case that is otherwise within the court's jurisdiction, however, is a dubious one under our Constitutional system: "It is emphatically the

[23] OPM Manual, ch. S8-7(b)(3).
[24] *Bendure*, 544 F.2d at 429-430.

province and duty of the judicial department to say what the law is."[25]

Thus, OPM's regulations make short work of the Shipyard's attempt to portray its statutory and regulatory mandate to pay environmental differentials as a "discretionary" function that is thereby shielded from judicial review. In fact, the Shipyard is bound by a series of mandates. It is required (not just allowed) to pay environmental differentials by statute and regulation. And it is required (not just allowed) to determine when it is required to pay those differentials.

### C. Conclusion Regarding this Court's Authority to Decide Whether Working Conditions Fall Within OPM's Definition of "High Work"

In short, nothing precludes this Court from deciding the extent to which shipwright work involves exposure "to a working condition or hazard that falls within one of the categories approved by the Office of Personnel Management," namely, for high work.[26] The next question is whether the Shipyard's grievance decision is, as the Shipyard claims, a nullity.

## V. The Grievance Decision Represents the Shipyard's Determination That Certain Working Conditions Fall Within OPM's Definition of High Work

To avoid its decision, the Shipyard now argues that it was a nullity, "void ab initio." If a unilateral decision, Mary Jane Tallman lacked the authority to make it, the Shipyard says. If a contract, it is void or, at very least, voidable due to mistake, the argument continues. Contrary to the Shipyard's claims, Plaintiffs do not assume the validity of either characterization of the decision. But whether it is a unilateral decision or the product of an agreement, the decision is not a nullity. Put another way, the

[25] *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803).
[26] 5 C.F.R. § 532.511(a)(1) .

Shipyard undeniably reached the grievance decision it did.

### A. Mary Jane Tallman Had the Authority to Decide Whether Working Conditions in Her Shop Fell Within OPM's Definition of "High Work"

If the grievance decision was a unilateral one, the issue is especially simple. The Shipyard's argument comes down to one sentence: "Outside the grievance process ..., Ms. Tallman did not possess the authority to make a high work determination for the Shipyard."[27] There are two problems with this assertion.

First, Ms. Tallman did not issue her decision "outside the grievance process." To the contrary, she acted in response to a Step 2 grievances. That her grievance decision was not an accord and satisfaction does not change the fact that she issued that her decision resolved a Step 2 grievance.

The second and far more serious problem is the lack of any support for the notion that Ms. Tallman lacked authority to identify which working conditions in her Shop were high work. The only "evidence" the Shipyard cites is the CBA provision that allows Shop heads like Ms. Tallman to resolve Step 2 grievances in their shops. But this provision says nothing about Ms. Tallman's authority outside a Step 2 grievance.

Notably, the Shipyard never identifies exactly **who** has the authority to decide whether work conditions require environmental differential pay. The (unsupported) implication is that it was someone senior to Ms. Tallman, but that seems counterintuitive, since Ms. Tallman was the head of Shop 64. Why outsource what the Shipyard contends is a highly fact-specific decision to people outside the Shop who

[27] Reply & Opp. at 14.

likely have no direct experience with shipwrights or their work?[28]

The Shipyard's attack on Ms. Tallman's authority is also contradicted by the Shipyard's portrayal of pre-grievance decision practice, under which (according to the Shipyard) first-line supervisors decided whether shipwrights were performing high work on a daily, ad hoc basis. If first-line supervisors had the authority to identify the work conditions that constituted high work, why did the Shop Head, perched at least two levels above them on the command chain, lack it?

There is, accordingly, no evidence that Ms. Tallman lacked the authority to act to issue her decision.

**B. The Determination Is Neither Voidable Nor Void**

The Shipyard next contends that the grievance decision, if a contract, is voidable under the doctrines of unilateral and mutual mistake. Alternatively, it is void because, it claims, the parties lacked the power to settle one avenue for redress while preserving another. Both arguments find no support.

**1. The Grievance Decision Is Not Voidable Due to Mistake**

The Shipyard argues that the grievance decision is voidable due to mutual mistake because the union and Shipyard shared a mistaken belief that the grievance decision would bar a subsequent lawsuit. As a factual matter, this argument fails because Ms. Tallman and Mr. Aiken never communicated or shared any beliefs whatsoever as to the effect of the grievance decision on a subsequent suit; the parties

[28] Also, to the extent this point is relevant, Ms. Tallman testified that she had the approval of her "boss," Jerry Main, when she decided the grievance. Tr. at 491:11-492:2; 493:20-24. [Supp. App. at 5-7.]

never discussed the decision's effect on potential judicial remedies.[29] And nothing in the written grievance decision speaks to a judicial remedy at all. Moreover, Mr. Hamel, who also represented the union, expressed his belief that the shipwrights could sue individually.[30] Thus, the Shipyard cannot meet its initial burden of showing that the parties made a mutual mistake.

The Shipyard also argues that the grievance decision is voidable due to unilateral mistake – its alleged mistake that the grievance decision barred the shipwrights' judicial remedy. Here, however, in addition to being unable to prove the existence of any such mistake, the Shipyard cannot meet its "substantial burden of establishing unconscionability."[31] Instead, the Shipyard conclusorily argues that the decision confers no benefit on the Shipyard if employees are allowed to sue for benefits beyond those provided in the decision. In fact, the Shipyard achieved a considerable benefit, both by significantly narrowing the number of shipwrights who continue to pursue high pay and by whittling down the claims of a number of Plaintiffs through the statute of limitations (as Motion No. 3 discusses).

The Shipyard also ignores that any agreement it reached was with the union, which had its own independent right to pursue arbitration.[32] The union relinquished this right following the grievance decision. This also constituted consideration to the Shipyard, as it avoided the costs and expense of continuing to fight the union through arbitration.

---

[29] Tr. at 75:24-76:4 and 165:2-16 (Aiken) [Supp. App. at 1-3.]; 531:21-532:5 (Tallman). [Supp. App. at 8-9.]
[30] Tr. at 284:9-23. [Supp. App. at 4.]
[31] RESTATEMENT (2d) OF CONTRACTS § 153 comment c.
[32] JX-01 (CBA) at § 3102.

The Shipyard also brushes over the reliance of its employees on the grievance decision over the last seven years, contending that the "true question of unconscionability is whether it is fair to the Shipyard." This statement misleads, for as Plaintiffs demonstrate, "Reliance by the other party [to a contract] may make enforcement of a contract proper although enforcement would otherwise be unconscionable."[33] Here, the "other party" includes all of the employees on whose behalf the union negotiated. The Shipyard nowhere assures this Court that it will not attempt to recoup compensation it paid to these employees. Thus, even if the grievance decision were unconscionable, the Shipyard's intent to undo that decision and dun its employees for benefits it has paid over the past seven years precludes avoidance of the decision on that basis.

### 2. The Union and the Shipyard Had the Power to Settle the Grievance Without Settling Individual Lawsuits

Citing *Mays v. United States Postal Service,*[34] the Shipyard next insists that the parties to the settlement agreement lacked the power to settle the grievance without simultaneously settling future lawsuits. Settlement, the Shipyard claims, is an all-or-nothing affair: either it effects a complete accord and satisfaction or it is a nullity. In fact, parties have the power to modify their rights contractually however they wish; *Mays* and the cases it cites involve questions of contract interpretation, not power.

The Shipyard's argument assumes that Plaintiffs assert only a single substantive right springing from a single source, just as Mays did. Here, however, Plaintiffs have two substantive rights: one based on regulation and statute, the other founded on

---

[33] RESTATEMENT (2d) OF CONTRACTS § 153 comment d.
[34] 995 F.2d 1056 (Fed. Cir. 1993).

contract (i.e., Article Ten of the CBA).[35] As the cases *Mays* cites make clear, a party may selectively release one substantive right arising under one source (whether federal law, state law, or private contract) while retaining other rights. For example, in *Judie v. Hamilton*,[36] the Ninth Circuit reversed the district court's decision that an administrative settlement barred a subsequent suit for civil rights claims on the same factual grounds.[37]

Yet even where a party has only one substantive right, *Mays* recognizes that a party may settle one procedural mechanism while reserving another. *Mays* arose from the attempted termination of an employee who by statute had the "opportunity to simultaneously pursue two avenues of appeal based on the same adverse action."[38] The first was the grievance procedure created by collective bargaining agreement; the second an appeal to the Merit Systems Protection Board.[39] The employee filed and then resolved a grievance by written settlement agreement. The Federal Circuit found the agreement's language "unambiguous" and that it "provide[d] for a broad waiver of Mays' right to continue to contest the Postal Service's adverse action. The phrase 'full and final settlement *to this matter*' is undeniably directed to the underlying removal action."[40] But in its concluding sentence, the court recognized that an employee with two procedural avenues for redress could "reserve the additional procedure if he chooses

---

[35] *Jaynes v. United States*, 75 Fed. Cl. 218, 226 (2007) ("...the Court's subject matter jurisdiction may be founded upon either plaintiffs' CBA or the PRSA, which mandate the payment of high pay when an employee does high work.")
[36] 872 F.2d 919 (9th Cir. 1989).
[37] *Id.* at 923-24. In *Judie*, like the present suit, the parties' "settlement agreement" was not reduced to writing. Therefore, the Ninth Circuit analyzed the only written record, an administrative order, to determine that the underlying agreement did not waive the plaintiff's claims.
[38] *Mays*, 995 F.2d at 1058.
[39] *Id.*
[40] *Id.* at 1059 (emphasis in original).

to settle a grievance."[41] In *Mays,* the employee simply failed to do so.

Thus, whether a party has released or retained particular claims depends on the language of the settlement agreement. Contrary to the Shipyard's position, the parties have the power to selectively release certain rights, or to select certain procedural avenues for the vindication of a single right. In each of the cases cited in *Mays*, the court analyzed the contract language to determine whether the plaintiffs released certain claims in the agreement.[42] In *Perez*, like *Mays*, the court found that an agreement containing language that payment was to be a "full and final settlement of this matter" prevented the plaintiff from bringing suit on a federal discrimination claim arising from the matter being settled.[43] In *Judie*, however, written settlement language was absent, and the court found that the plaintiff's claim was not barred.[44] Here, whether Plaintiffs have two substantive rights or one, the grievance decision nowhere precludes Plaintiffs from pursuing their high-pay claims in court and nowhere does it indicate that it is a "full and final settlement" of anything (as the Court has already ruled).

## VI. The Shipyard May Not Challenge Its Own Grievance Decision

The Shipyard undeniably decided that certain working conditions fall within OPM's definition of "high work." The last question concerns the effect of that decision.

The Shipyard's decision is not binding on this Court in any legal sense, as Plaintiffs are not seeking to appeal that decision, nor are they limited to seeking

---

41 *Id.* at 1060.
42 *See Judie*, 872 F.2d at 923-24; *Perez v. Maine*, 760 F.2d 11 (1st Cir. 1985); *Kawatra v. Medgar Evans College*, 700 F.Supp. 648 (E.D.N.Y. 1988); *Scherer v. Davis*, 543 F.Supp. 4 (N.D. Fla. 1982); *Okonko v. Union Oil Co. of California*, 519 F.Supp. 372 (D.C. Cal. 1981).
43 *Perez*, 760 F.2d at 12.
44 *Judie*, 872 F.2d at 924.

judicial review of the decision. The Shipyard contends that its "local determination," once made, is subject to review under "a standard akin to the APA."[45] But if the grievance is reviewable under such a standard, then the Shipyard may not seek judicial review of its own administrative determination at all, under *Newport News*.[46] The Shipyard argues that *Newport News* is distinguishable because this case is not an APA review case. But neither was *Newport News*. Moreover, the notion that an agency may not decide an issue and then appeal that decision would seem to comport with common sense.

Whether or not this case involves APA-style review, the doctrine of judicial estoppel precludes the Shipyard from challenging its own decision.[47] The Shipyard argues otherwise, but its arguments are premised on the notion that statements and commitments made during a settlement process do not preclude a change of position in subsequent litigation. That, however, was precisely the situation in *New Hampshire v. Maine*,[48] in which a state that took one position for purposes of settling a dispute by consent decree was barred from asserting a contrary position in subsequent litigation. Similarly here, the Shipyard cannot benefit from one position during negotiations and then deny that position during litigation, particularly when that change will undermine the reliance interest of the employees of Shop 64, including those who are not Plaintiffs here.

---

[45] Reply & Opp. at 3 n.1.
[46] *Department of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995). *See* Mot. No. 1, at 23-24.
[47] Plaintiffs' position regarding the validity of the decision is set forth in Motion No. 2.
[48] *New Hampshire v. Maine*, 532 U.S. 742, 747-52 (2001).

## VII. Conclusion

The Shipyard's grievance decision undeniably represents a determination by the head of the shipwrights' shop that when shipwrights are working above the first level without fall protection, they are in a high pay situation. The Shipyard attempts to undo this decision in a number of ways, but it cannot escape the facts. Whether the decision was a unilateral decision or an agreement is immaterial; the Shipyard cannot avoid the consequences of its action because it has now decided that it does not want to live with them. The Shipyard received the benefit of its bargain – the grievance and the union went away – and the Court may rely on its determination when determining the Plaintiffs' damages.

DATED this 2d day of January, 2008.

Respectfully Submitted,

s/Donald B. Scaramastra

Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify on January 2, 2008 a copy of the foregoing "PLAINTIFFS' REPLY IN SUPPORT OF CROSS-MOTION NO. 1: FOR SUMMARY JUDGMENT OR FOR JUDGMENT ON ADMINSTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald B. Scaramastra
Donald B. Scaramastra
Jennifer A. Krebs
**Garvey Schubert Barer**
18th Floor
1191 Second Avenue
Seattle, WA 98101
Telephone (206) 464-3939
Facsimile (206) 464-0125
Attorneys for Plaintiffs

NO. 04-856C

Judge George W. Miller

UNITED STATES COURT OF FEDERAL CLAIMS

---

WALTER JAYNES, et al.,

Plaintiffs,

vs.

THE UNITED STATES,

Defendant.

---

# SUPPLEMENTAL APPENDIX TO PLAINTIFFS' REPLY IN SUPPORT OF CROSS-MOTION NO. 1: FOR SUMMARY JUDGMENT OR FOR JUDGMENT ON ADMINISTRATIVE RECORD

---

Donald B. Scaramastra
Jennifer A. Krebs
GARVEY SCHUBERT BARER
Attorneys for Plaintiffs

Eighteenth Floor
1191 Second Avenue
Seattle, Washington 98101-2939
(206) 464-3939

# Table of Contents to Supplemental Appendix


1. Excerpts from Trial Transcript of Barry Joe Aiken, pp. 75-76 and 165 ..............1 -3
2. Excerpt from Trial Transcript of Joseph Hamel, p. 284 ..............................................4
3. Excerpts from Trial Transcript of Mary Jane Tallman, pp. 491-493 .......................... 5-7
4. Excerpts from Trial Transcript of Mary Jane Tallman, pp. 531-532 .......................... 8-9


SEA_DOCS:874241.1

00075

could they have done with regards to the union?

MR. SCARAMASTRA: May I interject? I don't think the witness had finished his answer.

THE COURT: Yes, I think that that's correct. So back up a question.

MR. MAGER: All right. Where were we?

THE COURT: Well, let me try it.

MR. MAGER: All right.

THE COURT: In addition to the possibility of filing another grievance I think what Mr. Mager was asking is as you understood it was there anything else that the people who might be disappointed with the decision could do? And if so, what was that?

THE WITNESS: They could have filed an unfair labor practice charge against the union for failure to represent.

BY MR. MAGER:

Q And what is that?

A If upon the resolution date of the grievance the employees if they believe that they have been harmed under an unfair labor practice charge they have six months in which to file an unfair labor practice charge against the union.

Q What, if anything, did you and Ms. Tallman discuss regarding filing in federal court?

00076

A Did we discuss anything on filing in federal court?

Q Or what, if anything?

A Nothing. None, zero.

Q What authority did you have to sign this grievance?

A Article 6 of our contract under the paragraph that says "steward," stewards are to process and resolve grievances/complaints. I also had the authority from my chief steward in which to resolve that grievance.

Q At the time you signed the settlement other than saying that this was done and over what conversation, if any, can you recall that you may have had with Ms. Tallman?

A The length of time between this was actually resolved and to today I can't put any dates on that or any answer to that.

Q Well, what if anything did Ms. Tallman say or do with you?

A I believe we shook hands at the end of that.

Q I'm going to send you to another binder. Back to the Defense trial exhibits binder.

A That's Volume 1 of 1?

Q Defendant's Exhibit 21.

00165

did it?

A Not that I can recall.

Q Okay. And likewise, during that January 14 meeting you never discussed with Ms. Tallman whether the grievance decision would affect the right of the other shipwrights to sue for additional High Pay in court?

A I don't believe that was mentioned, no, sir.

Q All right. And certainly Ms. Tallman never said that one condition to her signing the grievance decision was that the union waive the rights of its members to sue for additional High Pay?

A I don't recall those words.

Q You don't recall Ms. Tallman using those words?

A I do not, no, sir.

Q Okay. Now, as I understand it from your direct testimony you had no meetings with Ms. Tallman from the moment you left her office on January 14, 2000, until you returned after the 3-day weekend the following Tuesday?

A Meetings over the grievance, that's correct.

Q Fair enough.

A As a apprentice instructor to give feedback on how the apprentices were progressing in the

00284

THE WITNESS: Yes.

THE COURT: Speak into the microphone.

THE WITNESS: If management gives us a favorable decision then we're going to accept that and the matter will be settled.

THE COURT: I see.

THE WITNESS: And there would be no point in going any further.

THE COURT: Let me ask you this, let's assume that the matter is accepted by the union representative who regards it as favorable and a position that should be agreed to. Let us assume for the sake of argument that another shipwright looks at the same decision and reaches the conclusion that it is not sufficiently favorable. In other words, he believes that if he, for example, hired a lawyer and brought suit he could improve upon the agreement that the union had found satisfactory, in your view would the union's having found the grievance satisfactory preclude that particular shipwright from seeking more by means of a lawsuit?

THE WITNESS: No. If he wants to go and seek other relief that's his decision.

THE COURT: Okay, thank you.

Does that suggest any questions? If not,

up with. And so pulling that background into this decision was basically telling the shipwrights and the shipwrights agreeing to work safely.

We have now gotten the fall protection, including we got special fall protection for shipwrights that allows them to carry their belts and other things they need to build the staging.

Q Ultimately who was responsible for deciding or resolving this grievance on the management side?

A I was.

Q And where do you get that authority from?

A I called HR to make sure I had it, and by working with my boss.

Q Working with you boss. Who was your boss?

A My boss was Jerry Main who was the production resources manager.

Q Did you talk with Jerry Main at all about the settlement of this grievance?

A Yes.

Q What was the substance of those discussions?

A When we first got the grievance meeting with him and showing it to him that we got the grievance. And the authority to make a settlement, a payment of any kind basically I had never done anything this big so I went to my boss and we discussed here's what I

think I should do, here's what I think we should do as a shipyard. And had to get his agreement on that.

Q Did you discuss the safety standards in this document with him?

A Uh-huh, very much so. He was involved and he had put out a memorandum telling production workers we expect you to follow the fall protection.

Q What about the back pay issue, did you discuss that with him?

A Yes.

Q What would you have discussed with him?

A We had been working with the union and I can't say I discussed a monetary amount with him but I can say that I discussed a man hour amount with him, telling him how we had figured -- some people, some shipwright always take the lead and always do the climbing. Some shipwrights are always the ground men. And so it wasn't that all shipwrights would get maybe five out of eight hours High Pay or three out of eight hours High Pay but that depending on the type of work that they normally were assigned, the type of work that they normally did that there would be different formulas for the High Pay.

Q Would these discussions have taken place prior to the signing of the settlement agreement?

A Yes.

Q Can you remember a specific date?

A No.

Q In your recollection when did you first present this agreement to Joe Aiken?

A Presented it to him on a Friday.

Q Do you recall what date?

A I would say since it was signed on the 18th, having looked at a calendar it would have been the Friday before that which was the 14th.

Q How did you present it to him?

A I don't know if it was a formal meeting but in my office.

Q That's fair.

Do you recall anything that you may have said to Joe Aiken when you were presenting him with this? This would be the 14th.

A I know.

Q Sorry about that.

A I had at some point just recently talked to Jerry Main and got his agreement on the wording, got his agreement on the basically the offer for the back pay. And told him Jerry's listening now.

Q Okay.

A Something along that line that right now.

one, you had arranged -- that was my question, Your Honor -- you were the one that arranged for that to be drafted?

THE COURT: We've already established that --

THE WITNESS: Yes.

THE COURT: -- at least three times over.

MR. SCARAMASTRA: All right. And but I'm not sure, Your Honor, because of the answer she just gave.

BY MR. SCARAMASTRA:

Q Mr. Aiken didn't play any role in the inclusion of any language in the draft grievance decision that you presented to him on January 14?

THE COURT: She's answered that one as well. She said he didn't provide any language but that they had a continuing dialogue and it reflected at least some of his input.

MR. SCARAMASTRA: All right.

BY MR. SCARAMASTRA:

Q Now, at the time of your January 14 discussion with Mr. Aiken I gather that you had no discussions about the possibility of lawsuits by individual shipwrights; correct?

A We had no discussions about lawsuits.

Q And no discussions about whether an individual shipwright would lose their right to sue if you and Mr. Aiken signed the grievance decision; right?

A We had no discussion about lawsuits.

Q Okay. And I gather that you believe that you may have said something to the effect of "This is the end of it. This is resolved." Right?

A I said, "It's settled. It's over. We done good."

Q And you're positive as you sit here now that you used the words "it's settled," --

A Yes.

Q -- in addition to the words "it's over" and "we done good"?

A Yes.

Q Okay. Why don't you turn if you would to page 163 of your deposition. And you're with me on 163?

A Yes, I'm there.

Q Okay. I want to begin with we jumped off from an answer you gave on line 13. "We shook hands and we said 'this is the end of it.'" Do you see that?

A Yes.