No. 04-856C
Judge George W. Miller

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALTER JAYNES, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S SUPPLEMENTAL MEMORANDUM AND SURREPLY TO PLAINTIFFS' FIRST, SECOND, AND THIRD REPLY BRIEFS

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 616-2377
Fax: (202) 305-7644

OF COUNSEL:
TELIN W. OZIER
Senior Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street, S.E.
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Navy Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

February 25, 2008

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WALTER JAYNES, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 04-856C<br>(Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM AND SURREPLY TO PLAINTIFFS' FIRST, SECOND, AND THIRD REPLY BRIEFS**

Pursuant to this Court's order, dated February 8, 2008, defendant, the United States respectfully provides this supplemental memorandum and surreply to plaintiffs' first, second, and third replies.[1]

In their reply briefs, plaintiffs ignore the basic concepts of Federal sector labor law and incorrectly assert the use of the attempted grievance settlement as the basis for their statutory pay claims. The Federal sector grievance/arbitration process, however, is intended as an alternative to the judicial process, creates no precedent, and is intended by Congress to do no more than efficiently and informally resolve specific workplace disputes. As confirmed by Doe v. United States, 2008 WL 170188 (Fed. Cir. Jan. 22, 2008), disputes pursuant to the collective bargaining process are distinct from statutory claims. No matter how the Court characterizes the shipyard's attempt to resolve the grievance, should the Court accept plaintiffs' assertions, carve out a portion of an attempted settlement and use it as part of the basis for plaintiffs' purely statutory claims, the Court will be the first court to treat such a decision or settlement as a statutory determination, inconsistent with the Congressional purpose in creating the collective bargaining dispute resolution process.

[1] Because plaintiffs raise no new significant issues in their fourth reply, the Government is not aware of any new relevant case law, and plaintiffs appear to have conceded the fourth motion at the February 7, 2008 conference, we have not provided any supplemental briefing or surreply on this matter.

In their reply, plaintiffs characterize the Federal sector labor law system as "Byzantine" and declare that it has "nothing to commend it." Pl. Reply 1 at 1. To the extent that plaintiffs acknowledge that the Federal sector labor law system is comprehensive, created by statute and regulation, they would be correct.[2] To the extent that the mandatory procedures may seem complex, they might also be correct. However, it does not follow that because a system is comprehensive and complex, the Court is free to ignore it when determining how to use the grievance in the present case,[3] nor does it follow that this system is an "affront to justice." Id.

Indeed, a decision by this court that employs a decision or award that was made solely as part of the grievance/arbitration process mandated by the Federal Service Labor-Management Relations Statute ("FSLMR Statute") as the basis for establishing legal liability under the Tucker Act would directly conflict with the non-precedential and non-judicial nature of the grievance/arbitration process. Decisions made under the grievance/arbitration process mandated by this statute enjoy a special status. One of the main purposes of the Civil Service Reform Act of 1978 ("CSRA") is the "preservation of the ability of federal managers to maintain an effective and efficient Government, and the strengthening of the position of federal unions, and making the collective-bargaining process a more effective instrument of the public interest." Cornelius v. Nutt, 472 U.S. 648, 650-51 (1985) (citations, brackets, and internal quotes omitted.) The provisions "require[] any collective bargaining agreement between a [F]ederal agency and a union to provide for a grievance procedure and binding arbitration for the resolution of disputes arising under the agreement." Id. at 652. See 5 U.S.C. §§ 7121(a), (b). "[T]he comprehensive

---

[2] As noted in our initial briefs, the Federal labor sector is "a comprehensive legislative scheme regulating the organizational rights of [F]ederal employees. It embodies a statutory scheme . . . for the establishment of a law of labor-management relations for the federal public service analogous to that of the National Labor Relations Act in the private sector." Dep't of Navy v. FLRA, 815 F.2d 797, 798 (1st Cir. 1987) (internal citations and quotation marks omitted).

[3] As detailed below, the nature of the grievance process requires that this Court not use the grievance settlement or decision, or any portion thereof, to set a local determination.

nature of the Civil Service Reform Act . . . indicates a congressional intent to preclude … judicial review except as provided for in the statute itself." Veit v. Heckler, 746 F.2d 508, 509 (9th Cir. 1984).

If this Court determines that a grievance settlement or decision, made in the course of the negotiated grievance procedure, involving a low-level agency manager, obligates the Government to financial liability under the Tucker Act beyond the intended scope of the actual decision, then the Court will upset the dispute resolution process embodied in the FSLMR Statute. Directly contrary to congressional intent, the Court would be forever changing, and potentially destroying, this form of alternative dispute resolution.

**ARGUMENT**

**I. Plaintiffs' Reply Continues To Ignore Federal Sector Labor Law**

**A. The Federal Labor Law Scheme Is A Comprehensive, Statutory Scheme**

In the CSRA, Congress enacted a comprehensive revision of civil service law. Pub. L. No. 95-454, 92 Stat. 1111 (1978). The CSRA "comprehensively overhauled the civil service system." Lindahl v. OPM, 470 U.S. 768, 773 (1985). It created an "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy consideration." Bush v. Lucas, 462 U.S. 367, 388 (1983). "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." United States v. Fausto, 484 U.S. 444 (1988).

The Ninth Circuit noted the comprehensive and remedial nature of the CSRA when it stated:

> Congress enacted the CSRA to replace an outdated patchwork of statues and rules built up over almost a century. The goal was a single unified personnel policy which takes into account the requirements of all the various laws and goals governing Federal personnel management. The Act replaced the patchwork system with an integrated scheme of administrative and judicial review,

> designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration.

Saul v. United States, 928 F.2d 829, 833 (9th Cir. 1991) (Footnote, citations, brackets and internal quotes omitted) (emphasis added).

The labor-management provisions of the CSRA were included in Title VII of the CSRA and were entitled "Federal Service Labor-Management Relations." Civil Service Reform Act of 1978, Pub. L. No. 95-454, Title VII, 92 Stat. 1111, 1191-1219 (1978) (codified as amended at 5 U.S.C. §§ 7101-35). "Title VII of the Civil Service Reform Act, part of a comprehensive revision of the laws governing the rights and obligations of civil servants, contains the first statutory scheme governing labor relations between federal agencies and their employees." Bureau of Alcohol, Tobacco, and Firearms v. FLRA, 464 U.S. 89, 91 (1983). Thus, the FSLMR Statute provides a comprehensive scheme to govern labor relations in the federal civil service.

**B. Labor Law Envisions Resolution Of Disputes Through A Collective Bargaining Agreement**

The FSLMR Statute includes a comprehensive set of administrative provisions for the resolution of management-employee disputes. The FSLMR Statute "requires any collective bargaining agreement between a federal agency and a union to provide for a grievance procedure and binding arbitration for the resolution of disputes arising under the agreement." Cornelius, 472 U.S. at 652. See 5 U.S.C. §§ 7121(a), (b). Congress indicated an "unambiguous and unmistakable preference for exclusivity of arbitration [as] a central part of the comprehensive overhaul of the civil service system provided by the CSRA." Muniz v. United States, 972 F.2d 1304, 1309 (Fed. Cir. 1992). Congress intended to "elevate the role of the arbitrator in resolving federal employee labor-management disputes." Albright v. United States, 10 F.3d 790 (Fed. Cir. 1993).

A "grievance" is defined in the FSLMR Statute as "any complaint … by any employee concerning any matter relating to the employment of the employee." 5 U.S.C. § 7103(a)(9).

Section 7121 provides that "[e]xcept as provided in subsections (d),(e), and (g) of this section the [collective bargaining agreement] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage." 5 U.S.C. § 7121(a)(1). If a grievance is unresolved, the next step in the FSLMR Statute is binding arbitration. "[A]ny grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency." 5 U.S.C. § 7121(b)(1)(C)(iii) (2001). In the case of the high-pay grievance, the union reached a verbal agreement to settle the grievance and signed the grievance decision to implement that agreement, evidencing this resolution. Having attempted to settle this dispute, the union did not request arbitration.

Nonetheless, even if the union had not settled, had the grievance been denied, and arbitration invoked, the only appeal from arbitration is to the Federal Labor Relations Authority ("FLRA"). 5 U.S.C. § 7122(a). If either party to the arbitration fails to appeal to the FLRA within a thirty-day period following the arbitrator's award, the award would have been final and binding. 5 U.S.C. § 7122(b).

This non-judicial review process, from grievance to arbitration to the FLRA, is part of a comprehensive regulation of Federal employment labor relations. Pursuant to that process, the comprehensive nature of the CSRA is intended to preempt all other actions under the collective bargaining agreement ("CBA") as part of a scheme to eliminate duplicative actions. See generally Golt v. United States, 186 F.3d 1158, 1164-65 (9th Cir. 1999). Using one portion of a CBA grievance settlement or decision to create a "local determination" for a statutory claim subverts the intent of the CSRA. More importantly, any grievance decision or settlement is part of the non-precedential dispute resolution scheme and is not properly considered as part of a local determination, as detailed below.

## II. Plaintiffs Cannot Treat A Grievance Resolution As A Local Determination In This Case

### A. The Attempted Settlement Agreement/Grievance Decision Cannot Be Treated Independently, Without Due Consideration Of Federal Labor Law

Given the comprehensive statutory scheme that surrounds the grievance process, it should be clear that, contrary to plaintiffs' claims, the collective bargaining agreement and grievance decision cannot serve as the basis for plaintiffs' claims in this Court. Nevertheless, plaintiffs' replies clearly identified that document as the gravamen of their case.[4] See, e.g., Pl. Reply 1 at 11-18; Pl. Reply 2 at 4-9.

In Doe v. United States, 2008 WL 170188 (Jan. 22, 2008), the United States Court of Appeals for the Federal Circuit recently clarified the limits of this Court's jurisdiction over claims arising pursuant to the provisions of a collective bargaining agreement. The Federal Circuit had previously held that a Federal employee's statutory "claims were not barred by the CSRA because the 1994 amendments . . . established a [F]ederal employee's right to seek a judicial remedy for statutory claims even if those claims could also be raised as grievances subject to the negotiated procedures in the applicable collective bargaining agreement." Id. at *5 (emphasis added) (citing Mudge v. United, 308 F.3d 1220, 1227 (Fed. Cir. 2002); O'Connor v. United States, 308 F.3d 1233, 1239-40 (Fed. Cir. 2002)). However, removing a bar to otherwise appealable statutory claims is not the same as adding jurisdiction over claims that were otherwise not appealable, such as any claims based upon a CBA. Thus, if the claims of the Federal employees find their genesis in the CBA, they are "not rights that an employee can

[4] While the plaintiffs ask this Court to use the grievance decision as the "local determination" for the purpose of their back pay claim, they are careful not to suggest the court do so on the basis of res judicata or collateral estoppel. Indeed, plaintiffs should be careful on this score because (1) plaintiffs are, with a few exceptions, the same parties as to the earlier "employee" grievance, (2) the grievance claim for back pay was for the same time period as in this present case, (3) the grievance claim was based on the same statute and regulations, and (4) as to the issue of back pay, the outcome of the grievance decision on that claim was a denial of back pay. If the court were to treat the grievance decision as having legal consequence, as plaintiffs now assert, the first legal consequence would be the preclusion of the back pay claim.

enforce by suit in the Court of Federal Claims." Id. See also Todd v. United States, 386 F.3d 1091, 1094-95 (Fed. Cir. 2004) (holding that the Court of Federal Claims lacked jurisdiction to hear a Federal Aviation Administration employee's breach of contract claim based on a CBA); Zaccardelli v. United States, 68 Fed. Cl. 426, 430-33 (2005) (holding that the Court of Federal Claims lacked jurisdiction to hear contract claim of former civilian employee of the Department of the Navy, where such claim is founded upon the CBA). The Federal Circuit noted that the holdings of Mudge and O'Connor do "not imply that the amendment to section 7121 provides a jurisdictional basis for the Court of Federal Claims to hear the appellants' breach of contract claim." Id. at *6. If matters arising under section 7121 of the FSLMR Statute do not provide an independent jurisdictional basis for claims before the Court of Federal Claims, then this Court also cannot properly use those matters, or the resolution of those matters as a basis to find liability under a statutory claim.

As reflected in our response to plaintiffs' second motion, we do not contest that Mudge allows plaintiffs to bring an independent statutory claim pursuant to the Tucker Act in this Court. "What they cannot do . . . is introduce the attempted settlement of the grievance as a basis for their claims." Def. Resp. 2 at 15. Plaintiffs argue that they "have two substantive rights: one based in regulation and statute, the other founded on contract (i.e. Article 10 of the CBA)." Pl. Reply 1 at 15-16. As we stated in our reply to plaintiffs' first motion, while plaintiffs may have two substantive bases to bring a claim, these different bases involve two separate procedures. If the plaintiffs wish to enlarge the attempted settlement agreement/grievance decision to create a retroactive five-foot standard for high work, then they are basing their claim on a document founded upon the CBA and the CBA's grievance procedure. Accordingly, the Court must remand the matter back to the agency to work within the procedures envisioned by the CBA and the FSLMR Statute. See Def. Resp. 2 at 11. If, however, plaintiffs do not rely on the attempted grievance settlement, but rather – as Mudge envisions and as recently confirmed by Doe v.

United States, 2008 WL 170188 – base any claim upon the Back Pay Act, then they must prove their case for back pay pursuant to the standards and operating practices of the shipyard that existed at that time of their claim. Id. at n.4.

In their reply, plaintiffs cite to Judie v. Hamilton, 872 F.2d 919 (9th Cir. 1989), a case that was decided before the amendments to the CSRA, to argue that the Court may "selectively release one substantive right arising under one source . . . while retaining other rights." Pl. Reply 1 at 16. Even setting aside that Judie is not controlling, and that it involves the litigation of rights in a different Federal court prior to the amendment of the CSRA, plaintiffs mischaracterize the case. Plaintiffs assert that in Judie, the United States Court of Appeals for the Ninth Circuit reversed a district court that held an "administrative settlement barred a subsequent suit for civil rights claims on the same factual grounds." Id. In fact, the civil suit was not based upon the same factual grounds: the administrative settlement was regarding discipline for poor supervisory skills and the civil rights suit was for restrictions imposed on duties.[5] Further, the Ninth Circuit held that because there was no written settlement agreement

[5] Because of allegedly poor supervision skills, Mr. Judie was given a seven-day suspension. Judie, 872 F.2d at 923. The suspension was ultimately reduced to two days through an administrative settlement. Id. After the suspension was resolved, Mr. Judie's supervisor began restricting Mr. Judie's supervisory duties. Id. Mr. Judie brought suit, claiming that the restrictions were a violation of 42 U.S.C. §§ 1981, 1983, 1985 and Title VII, 42 U.S.C. § 200e-2. The district court granted summary judgment on the Title VII claim because Mr. Judie had failed to present a prima facie case pursuant to McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Judie, 872 F.2d at 920. On appeal, the Ninth Circuit held that there was a prima facie case and reversed. Id. (This, of course, does not hold there was discrimination; merely that there was a prima facie case.) The district court had also granted summary judgment on Mr. Judie's 1981 contract claim, and the Ninth Circuit sustained that ruling on appeal. Id. at 922-23. Finally, as to the 1983 and 1985 claims, the Ninth Circuit inferred these claims on behalf of Mr. Judie, stating that "[a]lthough it is not clear from his brief, [Mr.] Judie seems to argue that his two-day disciplinary suspension from work was improper and thus establishes a cause of action under sections 1983 and 1985(3)." Id. at 923. "The district court held that [Mr.] Judie's claim that his two-day suspension violated his [1983 and 1985] civil rights was barred by his agreement to settle the dispute and withdraw the administrative appeal." Id. at 923-24. " 'A release of civil rights claims must be voluntary, deliberate, and informed.' Salmeron v. United States, 724 F.2d 1357, 1361 (9th Cir. 1983), citing Jones v. Taber, 648 F.2d 1201, 1203 (9th Cir.
(continued...)

there was no valid release of further claims. Thus, plaintiffs are incorrect to assert that this non-controlling case stands for the proposition that an "administrative settlement [that did not bar] a subsequent suit for civil rights claims on the same factual grounds."[6]

**B. The Union Must Necessarily Be Involved In Any Change In A Term Or Condition Of Employment**

**1. High Pay Is A Term And Condition Of Employment**

In an attempt to refute the proposition that high work is a "term and condition of employment" and avoid the requirement that the union (which is the exclusive representative of the employees at the shipyard) must be involved in any determination of the definition of high work, the plaintiffs cite to Adair v. United States, 497 F.3d 1244 (Fed. Cir. 2007). Pl. Reply 1 at 7. See also Pl. Reply 2 at 12. However, plaintiffs misinterpret this case. As we have previously noted, a "term and condition of employment" is a personnel policy, practice or matter established by rule, regulation or otherwise which affects working conditions. Adair concerned

---

[5](...continued)
1981)." Id. at 924.

[6] Plaintiffs also cite to Kawatra v. Medgar Evers Coll. of City Univ. of New York, 700 F. Supp. 648 (E.D.N.Y. 1988) for the proposition that parties have the power to selective release certain rights. That case, however, is a Title VII case, as are two other cases cited by plaintiffs: Okonko v. Union Oil of California, 519 F. Supp. 372 (D.C. Cal. 1981) and Perez v. Maine, 760 F.2d 11 (1st Cir. 1985). Waivers of Title VII rights require a heightened scrutiny when waiver is involved. "In considering whether a waiver of Title VII rights is knowing and voluntary, courts have looked to general principles of contract construction such as clarity and lack of ambiguity of the settlement agreement and the absence of undue influence. Kawatra, 700 F. Supp. at 651 (quoting Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir.1988)) (citing Pilon v. University of Minnesota, 710 F.2d 466 (8th Cir. 1983), Rogers v. General Elec. Co., 781 F.2d 452 (5th Cir. 1986)). Another factor is whether the employee was represented by or consulted with an attorney. See EEOC v. American Express Pub. Corp., 681 F. Supp. 216, 219 (S.D.N.Y. 1988). See also id. (listing various other factors to consider in determining voluntariness of releases). Courts have also noted that waivers of rights under Title VII are "not to be 'lightly inferred,' " Rogers, 781 F.2d at 455 (citing Watkins v. Scott Paper Co., 530 F.2d 1159, 1172 (5th Cir.), cert. denied, 429 U.S. 861 (1976)), and that "federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." Locafrance U.S. Corp. v. Intermodal Sys. Leas., 558 F.2d 1113, 1115 (2d Cir. 1977). See Rogers, 781 F.2d at 454-55.

second-hand smoke present in the workplace by virtue of prisoners having access to cigarettes. This was not a personnel policy or practice that had been established by the agency. Therefore, it would not be a matter subject to bargaining under the FSLMR Statute. This is not the same situation regarding establishing a local determination for the payment of high pay; such is a personnel matter being established and implemented and, as such, is a term and condition of employment and a matter subject to bargaining.

**2. Failure To Involve The Union In Reaching A Local Determination Is An Unfair Labor Practice**

In the high-pay grievance, the union accepted the settlement agreement/grievance decision and did not proceed to arbitration. Even if the union had involved arbitration, the only appeal from arbitration is to the FLRA.[7] 5 U.S.C. § 7122(a). This review process, from grievance to arbitration to the FLRA is part of the comprehensive regulation of Federal employment labor relations that is intended to limit the participation of the Federal courts.

Plaintiffs propose that the portion of the agreement setting the high pay level prospectively can be used as the local determination retroactively, and assert that the union would not object to such a favorable result. Pl. Reply 1 at 6. However, even assuming that the result is agreeable, the union would have lost an important bargaining right. As noted in the February 7, 2007 status conference, the shipyard could establish a local determination in two ways: 1) the shipyard could unilaterally issue an instruction and submit it to the union for bargaining, or 2) the shipyard could propose the subject for bargaining with the union and enter into negotiations. Either way, the union must necessarily be involved because high pay is a term

[7] There is a very limited judicial review of an FLRA decision, but it is not in the Court of Federal Claims, but in the United States Circuit Court of Appeals for the region in which the appellant resides or in the D.C. Circuit. 5 U.S.C. § 7123(a).

and condition of employment and as such, must be negotiated with the union. To fail to do so is an unfair labor practice.[8]

> The Federal Service Labor-Management Relations Act . . . requires federal agencies and unions representing [F]ederal employees to bargain over terms and conditions of employment. The parties are obliged to bargain in good faith; a failure to do so constitutes an "unfair labor practice" which may be the subject of a complaint brought to the FLRA. If negotiations between the parties reach an impasse, either party may refer the dispute to the Federal Service Impasses Panel (the "Panel"). The Panel is authorized to "take whatever action is necessary . . . to resolve the impasse." Panel decisions are "binding on [the] parties during the term of the agreement, unless the parties agree otherwise." A party's refusal to acquiesce in a Panel decision is subject to sanction as an unfair labor practice.

AFGE Locals 224, 2504 & 3723 v. FLRA, 712 F.2d 640, 641 (D.C. Cir. 1983).

A finding by the FLRA of an unfair labor practice is subject to a corrective order by the FLRA that almost universally requires the Federal agency to return to the status quo ante, and not institute any new practice until it has fully satisfied the bargaining rights of the union. See Department of Air Force, Scott AFB, Illinois and National Ass'n of Gov't Employees, Local R7-23, 42 FLRA 266 (Sept. 23, 1991) (For failing to meet and bargain in good faith with the union prior to making a change in environmental differential pay ("EDP"), agency was ordered to return to status quo ante, make affected employees whole for lost pay, and complete bargaining before further change in policy.)

As noted below, there was no evidence of any intent on behalf of the signatories to the settlement to pay at a local determination of five feet retroactive past fifteen days prior to the

---

[8] It should be noted, at least hypothetically, that bargaining between the union and the shipyard could result in an entire spectrum of high pay determinations, a different height, a clear iteration of weather conditions, wind speed, crane use, and any other matter the parties might bring to the bargaining table. Plaintiffs fear that the shipyard has never "assured this Court that it will not attempt to recoup compensation it [has already] paid to [shipwrights under the current prospective practice." See Pl. Reply 2 at 15. Plaintiffs equate silence on that matter as intent. Id. However, the actuality is that, once the matter is subject to bargaining, a myriad of options may present themselves. Such is the nature of bargaining in federal sector labor-management relations.

filing of the grievance. If this Court actually makes a local determination or otherwise applies the five-foot standard retroactively, it will be setting a term and condition of employment for a period of time that was not bargained. If the shipyard implements the Court's order (as it would be expected to do), it would commit an Unfair Labor Practice.

**3. The Settlement Agreement/Grievance Decision Is A Bargained-For Agreement That Is Subject To Interpretation By The Federal Labor Relations Authority**

Plaintiffs argue that, in the past at least, the "Court of Federal Claims has rejected the notion that Congress mandated the use of administrative procedures to resolve disputes over Environmental Differential Pay." Pl. Reply 1 at 6. While Bendure v. United States, 554 F.2d 427 (Ct. Cl. 1977)[9] was overruled by Harris v. United States, 841 F.2d 1097, 1100 (Fed. Cir. 1988), plaintiffs argue that, as a result of the 1994 amendments to the CSRA, it has now been "resurrected." Plaintiffs seek to exhume Bendure to buttress their argument that even if the provisions of the CSRA and the FSLMR Statute provide an administrative process, there is no need to administratively exhaust. But plaintiffs misstate the scope of the holding in Bendure. Even if revived, "[i]n Bendure, with respect to both the appeal and the collective bargaining procedure, the court concluded that the asserted remedies were not meaningful. Thus in Bendure the exhaustion doctrine was inapplicable because of futility, the administrative remedies being inadequate." Bendure, 554 F.2d at 431, 434 (emphasis added); Wilder v. Prokop, 846 F.2d 613 (10th Cir. 1988). This doctrine of futility does not apply in the case before this Court. The current remedies found in the CBA and under the FSLMR Statute are meaningful and adequate.

In Bendure, the reason the grievance procedure was inadequate was because it depended on the right of an appeal from a hearing examiner's report to the Civil Service Commission. This is not the case at the shipyard under the CBA, and the appellate process is set forth in detail

[9] Plaintiffs cite to Bendure v. United States but provide a typographically flawed citation. We provide the proper citation above.

in our response and this surreply. When an appeals process exists, however, the grievance procedure is not inadequate:

> Foremost among these is that as a result of the Commission's interpretation of its jurisdiction, the grievance procedure could not have been completed in the manner required to provide an adequate administrative remedy. The grievance procedure, by its own terms, depends upon the right of appeal from a hearing examiner's report to the full Civil Service Commission. In the absence of such appeal rights, the grievance procedure is inadequate, amounting to little more than an internal shifting of decision making within the employing agency. With respect to the claims before us, the Civil Service Commission notified plaintiffs in no uncertain terms that there was "no right of appeal to the Commission with regard to agency decisions concerning the applicability of environmental or hazard pay plans * * *." In other words, if the agency persisted in its contention that no EDP was allowable, there was no other forum where plaintiffs could seek redress.

Bendure v. United States, 554 F.2d at 431

### C. The Settlement Agreement/Grievance Decision Is Not a Local Determination

The Court has correctly noted that determining environmental differential pay first requires a "local determination." Jaynes v. United States, 75 Fed. Cl. 218, 228 (citing 5 C.F.R. § 532.511(a)). There has been no local determination in this case. Plaintiffs, however, have asked this court to hold that one portion of the settlement agreement/grievance decision be treated as such a local determination. See Pl. Reply 1.

As demonstrated at the trial on accord and satisfaction, the union and the shipyard attempted to settle the high pay grievance in 2000. The attempted settlement was a compromise between the parties whereby the union would drop the back pay claims of the employees in exchange for a very generous future pay policy for Shop 64. The exclusive union representative, Barry Joe Aiken, agreed to this compromise settlement, as did the management representative, Mary Jane Tallman.

The means to implement the settlement was by a document entitled "Grievance Decision." At least one reason it was entitled "Grievance Decision" rather than, for example,

"Shipyard High Pay Policy" is because neither of the two individuals signing the document had the authority to establish any pay policy for the shipyard except by the authority contained within the negotiated grievance procedure set forth in the CBA. As discussed below, neither Mr. Aiken, a shipwright mechanic at the time of the attempted agreement, nor Ms. Tallman, shop superintendent, could have set a shipyard pay policy by virtue of their respective positions at the shipyard.

Yet, regardless of the circumstances of its creation, plaintiffs ask this court to use the grievance decision as if it was the required local determination. As set forth in detail below, the Court may not do so for three reasons:

(1) Attaching legal liability to a grievance decision violates a basic tenant of Federal labor relations, as intended by Congress, that to improve the efficiency of the Federal workplace, employment disputes are to be resolved through the grievance/arbitration procedures separate from the judicial process – quickly, informally, and without legal complication;

(2) a local pay determination for the shipyard, as called for by Federal regulation, would be made by an entirely different management process, and would require the approval of the shipyard commander; and

(3) the fundamental intent of the "grievance decision" was to disallow the back pay plaintiffs now seek; to use it as the basis to pay the backpay would be a serious misapplication of the grievance decision and would require the Court to ignore the express language of the document itself.

### 1. Attaching Legal Liability To A Grievance Decision Violates A Basic Tenant Of Federal Labor Relations

The grievance/arbitration process that is required by statute to be in every CBA negotiated within the Federal government is an alternative dispute resolution process that benefits the Federal workplace by having limited judicial involvement. Congress intended to "narrow[] the role of judiciary and elevat[e] the role of the arbitrator in resolving federal

employee labor-management disputes." Albright, 10 F.3d at 794. Prior to Mudge, the vast majority of cases that are presented in the grievance/arbitration process could not proceed to Federal court. Consequently, there have been few situations were Federal courts have considered grievance decisions or arbitration awards except where an arbitrator was hired to decided a case that would have had judicial appeal had the employee elected to proceed before a federal administrative body, such as the Merit Systems Protection Board, instead of arbitration. Grievance decisions and arbitration awards have no legal authority beyond their own express application, have never been seen as precedential, and are reviewed administratively by the FLRA with such a high and intentional degree of deference that the FLRA has noted that it will sustain two arbitration awards interpreting the very same contract provision but which come to inconsistent results. AFGE Local 171 and Dep't of Justice, 58 FLRA 469 (2003) ("arbitration awards are not precendential and a contention that an arbitration award conflicts with other arbitration awards provides no basis for finding an award deficient under the statute"); SSA, OHA and AFGE Local 3615, 55 FLRA 349, 352 (1999) ("Because awards are not precedential, they may come to inconsistent results while interpreting the same contract provision without being set aside by the Authority [FLRA] . . ."). The FLRA has explained its rejection of such precedential effect:

> Thus, it is the duty of the selected arbitrator to resolve the matter consistent with how he or she views the equities in the case which is to be decided. In addition, the informality of arbitration, which is one of its greatest advantages, would be lost if an arbitrator is bound by precedent.

AFGE Local 1273 and VAMC, Boise, 44 FLRA 707, 713 (1992).[10]

---

[10] The references provided here relate to the non-precedential effect of an arbitration award. The arbitration award is the final and "binding" step in the negotiated grievance/arbitration process. 5 U.S.C. § 7121. It is axiomatic that earlier stages in the process, such as first-step and second-step grievance decisions, which are non-binding, have even less precedential status than the arbitration award.

The FLRA is the administrative body charged with administering the FSLMR Statute. 5 U.S.C. § 7105. Federal courts have consistently relied on FLRA interpretations of the FSLMR Statute. A basic tenant of Federal labor relations is the improvement in workplace efficiency made possible by an uncomplicated dispute resolution process that has minimal risk to either management or the union. The negotiated grievance/arbitration process will lose this central "informality" if decisions made as part of that process must bear legal weight, or, as here, unforeseen legal risk.

Should this court use the settlement agreement/grievance decision signed by Mr. Aiken and Ms. Tallman as a substitute for the legally required "local determination," this Court's decision will have the unintended consequence of sabotaging the informal, non-precedential, and non-judicial context of dispute resolution in federal labor relations.

**2. The Shop Superintendent Did Not Possess The Authority To Make A Local Determination, Only To Settle The Grievance**

Plaintiffs incorrectly argue in their reply that there is no evidence that Ms. Tallman lacked the authority to make a local determination. Pl. Reply 1 at 12. They present no evidence, however, that she is or was an official invested with the authority to make a pay policy decision, except in the well-defined and limited capacity to resolve a grievance filed under the CBA. Ms. Tallman had no training or experience in Federal pay setting. She was not making anything approaching a decision that the law required the payment of high pay.[11] Indeed, Ms. Tallman has expressly stated that she "was not making a pay decision based [upon] my interpretation that the [F]ederal pay regulations required that I pay Shipwrights for High Work." Def. Resp. 2 App. 11. See also id. at 16 ("I had not read the CFR"). Ms. Tallman sought no legal advice as to the grievance. Plaintiffs' attorney asked Ms. Tallman about the legal duty to pay for high work:

---

[11] Ms. Tallman testified that she had no expertise in Federal pay setting. Def. Resp. 2 App. 11. Ms. Niemi, who, as a human resource specialist, was giving technical advice to Ms. Tallman, testified that in researching her recommendation, which became the basis of the agreement, she found no definitive authority for when high pay was required. Def. Resp. 4 App. at 11-12.

> Q. Okay. And at the time you signed the January 18, 2000 grievance decision you had no idea whether and under what circumstances the shipyard was legally required to pay High Pay to Shop 64 shipwrights; right?
> A. I didn't involve the lawyers. I had not checked on the legal aspect.

Def. Resp. 2 App. 14. See also id. at 15-17.

Ms. Tallman was resolving a union-initiated grievance pursuant to the negotiated grievance process. The grievance process, as defined in the CBA, was the sole source for Ms. Tallman's authority in this matter. In any circumstance outside of the negotiated grievance procedure, Ms. Tallman would not have the authority to set pay policy for the Government, the Navy, or even the shipyard.[12] See generally Def. Supp. App. 4 at 1-5 (position description for Shop 64 supervisor). At most, her "grievance decision" set a temporary pay policy for Shop 64 for the limited time that she was superintendent for that shop. Because plaintiffs' present claims are independent of the negotiated grievance procedure that gave Ms. Tallman her limited pay setting authority, they have rejected her policy.

Indeed, the authority to set a local determination of pay policy at the shipyard, like most Federal activities, resides with the head of the activity, in this case the shipyard commander. Directions on setting EDP is set forth in activity "Instructions" that define the role of the various

[12] As noted in our response to plaintiffs' fourth motion (and restated herein for the Court's convenience), defendant respectfully suggests the Court's opinion contains an error in dicta in its decision on the accord and satisfaction issue. Jaynes, 75 Fed. Cl. at 230. Specifically, while there is no question that Ms. Tallman, as the Shop 64 superintendent, had the authority pursuant to the CBA to decide, and therefore settle, a grievance that arose from her shop. Pursuant to the CBA, the second-step of the grievance process is presented to the "Shop/Branch Head." Def. App. 28. However, contrary to the Court's discussion on that point, a grievance decision or a settlement made by that "Shop/Branch Head" is not itself a CBA that requires or obtains separate added authority by approval by the head of the agency pursuant to 5 U.S.C. § 7114. The process to reach a CBA and the process for employee complaints pursuant to the negotiated grievance procedure are very distinct and defined separately under 5 U.S.C. § 7103. There is no statutory provision for the submission of a grievance decision or grievance settlement to the head of the agency. Ms. Tallman's authority to decide the grievance and the authority of the decision comes solely from the negotiated grievance procedure contained in the CBA, a procedure that has been rejected by plaintiffs.

levels of management. See Def. Sur. App. 1-14. The instructions provide a role for the shop superintendent, but that role does not include the authority to set EDP. The relevant Instruction, issued by the shipyard commander, provide that the role of the shop superintendent was limited to"recommend[ing]" changes to the schedule of approved EDP at the shipyard. The Instruction provides, in pertinent part,

> Categories in enclosure (2) [locally approved EDP Schedule] have been determined applicable to work situations at Puget Sound Naval Shipyard. Per reference (a), there may be other instances or work that qualify for Environmental Differential which are not included in this instruction. In that case, the Shop or Division Head may recommend changes to the Schedule. When agreement is reached upon applicability of any new categories of additional work for a specified work situation, the Industrial Relations Office will issue a change to this instruction.

Id. at 7.

Accordingly, any pay determination made by Ms. Tallman can only be read in the context of the grievance procedure and cannot serve as a statutory local determination.

**3. The Settlement Agreement/Grievance Decision Was Clear In Its Intent**

Finally, Ms. Tallman's intent cannot have been more clear as to her involvement with the "grievance decision" as it was negotiated with the union. In her earliest declaration, Ms. Tallman has stated that:

> If I had believed that my decision would be seen as legal precedent upon which to base the payment of back pay for six or more years of Shipwright work already completed, I would have denied the grievance. That was never my intention. I worked with a union official who represented the grievants, and I believe he fully understood my intention was to make a prospective pay increase for the benefit of not just the grievants, but all the Shipwrights.

Def. Resp. 2 App. 12 (emphasis added). Ms. Tallman's statement is consistent with Mr. Aiken's characterization of the agreement as creating "an outstanding High Pay Policy going forward from this that's going to benefit the employees." Def. Sur. App. 15 (emphasis added), 16. Ms. Tallman's statement is also consistent with the testimony of another union official that

shipwrights were to receive high pay "moving forward from when the document was signed." Id. at 17 (emphasis added), 18. There was never any intent to apply such a generous pay policy retroactively. To apply the "grievance decision," the purpose of which was to cancel the claim for back pay, as the local determination in support of the payment of back pay is to create a policy that is the reverse of what was intended.

Further, in order to create such a policy, the Court must ignore doctrines of textual interpretation and selectively read the attempted settlement agreement/decision. Nowhere does the grievance decision provide that high pay shall be paid retroactively at the five-foot level. To the contrary, the document merely provides that shop 64 "will start immediately" to pay a high pay at this level. Def. App. 65. The grievance decision also separately addresses back pay, by expressly limiting the back pay claim to fifteen days prior to the date of the filing of the grievance, and leaving the proper amount of back pay subject to determination between the union and management. Id. To interpret the agreement/decision to provide a retroactive policy would require going beyond the text of this document, where all evidence indicates that such an interpretation would not properly reflect the intent of the parties.

At the February 7, 2008 status conference, plaintiffs asserted that they were unaware of any case law supporting the theory that Ms. Tallman's intent in settling the grievance would have any relevance to this dispute. They are incorrect. The case law makes clear that a statement by an agency cannot serve as a binding, voluntarily-adopted policy (or "binding norm") unless "so intended by the agency." Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987) (citing Doe v. Hampton, 566 F.2d 265, 281-82 (D.C. Cir. 1977)). See Ngure v. Ashcroft, 367 F.3d 975 (8th Cir. 2004). See generally Gardebring v. Jenkins, 485 U.S. 415, 430 (1988) (intent in the interpretation of a regulation). In determining whether or not the agency has adopted such a binding norm, the courts examine "the statement's language, the context, and any available extrinsic evidence." Padula, 822 F.2d at 100. Nothing in the grievance process and

negotiations as to settlement give any indication that the grievance decision was intended to serve as a binding norm. Accordingly, Ms. Tallman's intent not to treat the five-foot rule as a retroactive local determination/policy remains relevant to this Court's analysis.

**III. Plaintiffs' Statute Of Limitations Arguments Are Incorrect**

In their third reply, plaintiffs argue that this Court's statute of limitations may be equitably tolled. While there has been some debate as to whether 28 U.S.C. § 2501 may be equitably tolled, the Supreme Court conclusively settled this question in John R. Sand & Gravel v. United States, No. 06-1164, __ U.S. __, 2008 WL 65445 (Jan. 8, 2008). Contrary to plaintiffs' argument, the Supreme Court held that 28 U.S.C. § 2501 sets forth an "absolute" jurisdictional limitations period, which may not be equitably tolled. Id. at **3. While plaintiffs rely upon Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990) to make their argument for equitable tolling, the Supreme Court distinguished this case on the ground that Irwin involved a "different limitations statute" for which the Court had not provided "a definitive interpretation." Id. at **5. Accordingly, plaintiffs' argument that this Court's statute of limitations may be equitably tolled must be rejected.

Plaintiffs also argue that the CSRA amendments have no effect upon the plaintiffs' statute of limitations period. Assuming that this Court follows Doe v. United States, 2008 WL 170188, and properly treats plaintiffs' claim as statutory, rather than arising pursuant to the CBA and borne of the grievance settlement/decision, we would agree. However, plaintiffs have (incorrectly) argued that their claim arise pursuant to the terms of the CBA and grievance decision. Should the Court adopt this position, and reject the Government's contention that these are two separate claims, then the Government's arguments regards the effect of the CSRA amendments would remain.

Plaintiffs' reply on the CSRA amendment issue further illustrates their basic misunderstanding of Federal labor law. Plaintiffs argue that there was no substantive change to

plaintiffs' rights when Congress enacted the CSRA amendments because "under the FLRA's decision in Bremerton Metal Trades Council v. Puget Sound Naval Shipyard, . . . the 15-day provision in the CBA has no effect on a continuing failure to pay wages; before the CSRA Amendments took effect, an employee could have pursued administrative remedies for six years worth of back pay." Pl. Reply 3 at 18. This argument, however, assumes that Bremerton Metal Trades Council v. Puget Sound Naval Shipyard, 46 FLRA 1328 (1993), serves as precedent for other disputes. This is incorrect.

First, as a general matter, the FLRA's review of an arbitrator's decision is extremely limited. As stated in Bremerton Metal Trades Council itself:

> For an award to be found deficient . . . the party making the allegation must demonstrate that the award: (1) cannot in any rational way be derived from the agreement; (2) is so unfounded in reason and fact, and so unconnected with the wording and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator; (3) evidences a manifest disregard for the agreement; or (4) does not represent a plausible interpretation of the agreement.

Id. at 1333. Contrary to plaintiffs argument, the FLRA does not make a determination that the arbitrator's interpretation of the agreement is the sole, correct interpretation of the agreement.

Indeed, as noted above, the grievance process is non-precedential in nature. Moreover, "[b]ecause awards are not precedential, they may come to inconsistent results while interpreting the same contract provision without being set aside by the Authority [FLRA] . . ." SSA, OHA and AFGE Local 3615, 55 FLRA at 352. In other words, pursuant to the nature of the grievance process, if the very day after the FLRA's decision was issued the shipyard insisted that the 15-day provision in the CBA bars a claim for a continuing failure to pay wages, and an arbitrator agreed, the FLRA could properly affirm that decision, with no conflict. While this may seem inconsistent, such inconsistency is not only permissible, but is a necessary part of the grievance resolution process. As detailed above, this misunderstanding also illustrates the harm that this Court would be doing in expanding the application of the prospective five-foot standard found in

a portion of an attempted grievance settlement/grievance decision to the level of a statutory a local determination.

**CONCLUSION**

As set forth in our prior response and reply, we respectfully request that the Court deny plaintiffs' first, second , and third motions, and grant the Government's motion to dismiss or remand and for partial summary judgment.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.Mager@usdoj.gov
Attorneys for Defendant

OF COUNSEL:
TELIN W. OZIER
Senior Trial Counsel
Department of the Navy
OGC, Navy Litigation Office
720 Kennon Street., SE
WNY Bldg. 36, Room 256
Washington, D.C. 20374-5013

STEVEN L. SEATON
Labor Counsel
Department of the Navy
Puget Sound Naval Shipyard
1440 Farragut Avenue
Bremerton, WA 98314-5001

February 25, 2008

**CERTIFICATE OF FILING**

This is to certify that on this 25th day of February, 2008, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL MEMORANDUM AND SURREPLY TO PLAINTIFFS' FIRST, SECOND AND THIRD REPLY BRIEFS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice